UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MARCUS WILSON, et al.,

                              Plaintiffs,

                                                                9:18-CV-0391
          v.                                                    (LEK/TWD)

ANTHONY J. ANNUCCI, et al.,

                              Defendants.

---

APPEARANCES:

MARCUS WILSON
17-A-3001
Plaintiff, *pro se*
Auburn Correctional Facility
P.O. Box 618
Auburn, NY 13021

DAVID CARTER
94-A-7328
Plaintiff, *pro se*
Five Points Correctional Facility
Caller Box 119
Romulus, NY 14541


HON. LETITIA JAMES                          JOSHUA E. McMAHON, ESQ.
New York State Attorney General             Ass't Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224


THÉRÈSE WILEY DANCKS
United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

**I.    INTRODUCTION**

This civil rights action was brought by *pro se* Plaintiffs Marcus Wilson, Larry McNair, Clete Birkett, Matthew Jackson, Brian Piscopo, David Carter, and Felix Morales, asserting claims against named and "Doe" Defendants arising out of their incarceration at Auburn Correctional Facility ("Auburn C.F.").  Dkt. No. 1 ("Compl.").  Only the Eighth Amendment conditions-of-confinement claims brought by Plaintiffs Wilson and Carter remain in this action. *See* Dkt. No. 12 ("June 2018 Order") at 2, 6, 9-10; Dkt. No. 34.

The named Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Dkt. No. 54.  Plaintiff Wilson filed papers opposing the motion pursuant to Fed. R. Civ. P. 56(d), and requesting that the Court strike the motion, re-open discovery, compel responses, and impose sanctions.  Dkt. Nos. 57, 57-1, 57-2, 57-3, 57-4, 60 (collectively, the "Wilson Opposition and Omnibus Motion").[1]  Plaintiff Carter did not oppose Defendants' motion, but instead filed a proposed amended complaint.  Dkt. No. 63-2. Thereafter, Plaintiff Wilson also filed a proposed amended complaint.  Dkt. No. 66 ("Wilson Proposed Amended Complaint").

For the reasons that follow, the Court denies Plaintiff Wilson's motions, declines to accept either of the proposed amended complaints as the operative pleading, and recommends that Defendants' motion for summary judgment be granted in its entirety.

---

[1] Plaintiff Wilson separately filed papers seeking partial reconsideration of the June 2018 Order.  Dkt. No. 58 ("Motion for Reconsideration").  By Decision and Order filed on April 16, 2020, the Motion for Reconsideration was denied.  *See* Dkt. No. 69.

II.   **FACTUAL BACKGROUND**

A.   **The Complaint**

Plaintiffs filed this Section 1983 action in February, 2018.  *See* Compl. at 9.  The complaint alleges that between January, 2017 and February, 2018, Plaintiffs, who each have "preexisting medical conditions," were forced to eat in an environment contaminated by bird feces and "blood spatter," and use utensils that were not thoroughly cleaned and sanitized. *Id*. at 5-7.  The complaint names the following individuals as defendants: (1) "John Doe" Corrections Sergeants who worked the 7:00 A.M. to 3:00 P.M. shift in the mess hall; (2) "John Doe" Corrections Sergeants who worked the 3:00 P.M. to 11:00 P.M. shift in the mess hall; (3) "John/Jane Doe" Food Services Administrator; (4) Graham, the Superintendent of Auburn Correctional Facility; (5) Corey, the Deputy Superintendent of Auburn Correctional Facility; and (6) Anthony J. Annucci, the Commissioner of the New York State Department of Corrections and Community Supervision.  *Id*. at 1.

The complaint alleges that the "Doe" Defendants denied Plaintiffs' requests to "power wash" and sanitize the mess hall, in disregard of their own "policy," and that Defendants Annucci, Graham, and Corey each learned of the unsanitary conditions in the mess hall "via grievance complaints [filed] by [P]laintiffs[,]" yet failed to remedy the situation.  Compl. at 5-6. The complaint further alleges that Defendants failed to ensure that the mess hall was properly cleaned despite knowing that Plaintiffs' exposure to the unsanitary conditions presented an "excessive risk" to their "health and safety."  *Id*. at 6.

B.   **Undisputed Material Facts**

Birds were present in the mess hall where Plaintiffs ate meals beginning in January,

2017.  Dkt. No. 54-5 at 7-8; Dkt. No. 54-8 at 21-22, 62-63.  Plaintiffs frequently saw bird feces in eating areas of the mess hall.  Dkt. No. 54-5 at at 7-9; Dkt. No. 54-8 at 21-22, 62-63.  At times, human blood spatter resulting from inmate altercations was also visible in eating areas.  Dkt. No. 54-5 at 10-11.

The chairs and tables in the mess hall were wiped down and sterilized with disinfectant every morning and "after every meal" by inmates tasked with cleaning the mess hall area.  Dkt. No. 54-5 at 8-9.

Several inmates from Auburn Correctional Facility, including Wilson and Carter, developed respiratory infections in or around March, 2018.  Dkt. No. 54-5 at 7, 20; Dkt. No. 54-8 at 65.

Plaintiff Wilson filed a grievance on or about March 29, 2018, complaining about adverse health effects caused by an "air-borne disease" resulting from "the bird fecal problem" throughout the facility.  Dkt. No. 54-7 at 9.  Plaintiff Wilson filed a second grievance on April 1, 2018, complaining about the conditions of the mess hall.  *Id*. at 10.  Wilson's grievances were later consolidated with grievances filed by four (4) other inmates under Grievance Number AUB 74030-18.  *Id*. at 5.

The grievances concerning the conditions in the mess hall were investigated by Deputy Superintendent of Administration William Fennessy, and "Bird Feces Cleanup Crews" were established to power wash areas of the facility, including the mess hall where Plaintiffs ate.  Dkt. No. 54-7 at 6-8; Dkt. No. 54-8 at 63-66.  An "outside" company was also brought in to remove birds from the mess hall.  Dkt. No. 54-8 at 65-66.

## III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants argue that summary judgment is appropriate because (1) Plaintiffs failed

4

to name and serve the "Doe" Defendants, (2) Plaintiffs failed to establish that Defendants

Annucci, Graham, and Corey were personally involved in the alleged wrongdoing, (3) no

reasonable jury could conclude that the circumstances described in the complaint rise to the

level of a constitutional violation, and (4) Defendants are entitled to qualified immunity. *See*

*generally*, Dkt. No. 54-1.[2]

In response, Plaintiff Wilson argues, among other things, that (1) Plaintiffs were unable

to name and serve the "Doe" Defendants based on counsel's failure to properly comply with

the Court's *Valentin* Order issued as part of the June 2018 Order, (2) Defendants Annucci,

Graham, and Corey were aware of the mess hall conditions before any grievances were filed

and thus were personally involved in the constitutional violation,[3] (3) a reasonable jury could

conclude that the circumstances described in the complaint rise to the level of a constitutional

violation, and (4) Defendants are not entitled to qualified immunity.  *See* Dkt. No. 57-2; 57-3;

57-4.

───────────────────

[2] Defendants also argue that in the event summary judgment is not granted on one or more of the grounds raised in their motion papers, dismissal is appropriate based upon Plaintiffs' failure to exhaust their administrative remedies before commencing this action, and request an evidentiary hearing pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011). *See* Dkt. No. 54-1 at 7 n.3.  Because "failure to exhaust" is an affirmative defense, and Defendants have not expressly moved for summary judgment on this basis, the Court declines to consider the issue of exhaustion herein.

[3] In an effort to establish such awareness, Plaintiff Wilson has introduced evidence showing that (1) an inmate filed a Section 1983 lawsuit before this action was commenced complaining about the presence of birds and exposure to bird feces at Auburn Correctional Facility, (2) the facility might have been cited by The Public Employee Safety and Health Bureau ("PESH") in early 2018 for a health code violation, and (3) unidentified corrections officials might have filed a lawsuit about unsanitary conditions in a separate mess hall used exclusively by corrections officials at the facility.  *See* Dkt. No. 57-2 at 1-3; Dkt. No. 57-3 at 2-6; Dkt. No. 57-5 at 1.  Wilson further argues that counsel wrongly failed to provide discovery related to the PESH investigation and lawsuit filed by corrections officials.  Dkt. No. 57-2 at 2-3.

For the reasons set forth below, the Court recommends that Plaintiffs' Eighth Amendment claim be dismissed on the merits. As a result, the Court declines to consider the alternative grounds for dismissal raised by Defendants.

### A.   Legal Standard Governing Summary Judgment Motions

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

6

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."  "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Id*. (citation and internal quotation marks omitted).  "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation."  *Id.* (citation and internal quotation marks omitted).  "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations."  *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997)  (citation omitted).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93-CV-5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[4] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

---

[4] Copies of all unpublished decisions cited herein will be provided to Plaintiffs in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

7

**B.    Plaintiff Carter's Failure to Comply with N.D.N.Y. L.R. 7.1(a)(3)**

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).  Plaintiff Carter failed to respond to the statement of material facts filed by Defendants in support of their motion for summary judgment, as required under N.D.N.Y. L.R. 7.1(a)(3).[5]

Where a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement to which the plaintiff has not properly responded will be accepted as true (1) to the extent that they are supported by evidence in the record,[6] and (2) provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[7]  *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

---

[5]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts.  Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

[6]  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[7]  The Clerk's Office provided Plaintiffs with the requisite notice of the consequences of their failure to respond to Defendants' summary judgment motion.  *See* Dkt. No. 55.

8

### C.    Legal Standard Governing Conditions-of-Confinement Claim

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.  The prohibition extends to prison conditions.  *Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998).  "The Constitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations and internal quotation marks omitted).  "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to support a claim for unconstitutional conditions of confinement.  *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999).

To state a claim under the Eighth Amendment based upon conditions of confinement, an inmate must satisfy both an objective and a subjective element.  *Farmer*, 511 U.S. at 834, 837.  To satisfy the objective element, a plaintiff must establish that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[ ] necessit[y]" or a "substantial risk of harm."  *Id*. at 834.  To satisfy the subjective element, a plaintiff must establish that the "defendant official acted with a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations and internal quotation marks omitted).

To establish the objective element, an inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."  *Id*.  Health includes the risk of serious damage to "physical and mental soundness."  *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)).  Prison officials violate the Eighth Amendment when they "deprive an inmate

9

of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." *Walker,* 717 F.3d at 125 (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)).  There is no "static test" for determining whether a deprivation is serious enough to violate an inmate's Eighth Amendment rights.  *Id.* (citing *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).  "The conditions themselves must be evaluated in light of contemporary standards of decency."  *Jabbar,* 683 F.3d at 57 (citation and internal quotation marks omitted).

When the challenged prison conditions include exposure to unsanitary conditions, the Second Circuit has been unwilling "to set a minimum duration and minimum severity of an exposure for it to reach the level of a constitutional violation."  *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015).  There is no "bright-line durational requirement for a viable unsanitary conditions claim.  Nor is there some minimal level of grotesquerie required . . . ."  *Id.*  "The severity of an exposure may be less quantifiable than its duration, but its qualitative offence to a prisoner's dignity should be given due consideration."  *Id.*

To constitute deliberate indifference under the subjective element, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety."  *Jabbar*, 683 F.3d at 57; *see also Trammel v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003) (the state of mind for the subjective element in cases involving prison conditions is "deliberate indifference to inmate health or safety.").  "The official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  Mere negligence is not enough.  *Id.* at 835.

### D.     Analysis

Turning first to the objective element, this Court previously found that an inmate's

10

exposure to bird feces covering a heating system only ten feet from the inmate's cell, and mold on fencing a significant height above the inmate's cell, was not sufficiently serious to satisfy the objective element of an Eighth Amendment conditions-of-confinement claim, and recommended dismissal of the claim on summary judgment. *See Johnson v. Fischer*, No. 9:12-CV-0210, 2015 WL 670429, at *11 (N.D.N.Y. Aug. 5, 2014). That recommendation was accepted and adopted by the Honorable David N. Hurd, and the plaintiff's appeal was thereafter dismissed as lacking an arguable basis in law or fact. *See Johnson v. Fischer*, 2015 WL 670429, at *1 (N.D.N.Y. Feb. 17, 2015), *appeal dismissed*, No. 15-767 (2d Cir. Aug 6, 2015).

There is no evidence in the record that the Plaintiffs in this case experienced a greater exposure to bird feces than the plaintiff in *Johnson v. Fischer*, either in terms of duration or proximity. To the contrary, the evidence in the record shows that throughout the entire time that Plaintiffs ate in the mess hall, there were areas where no bird feces was present, and at least Plaintiff Wilson only ate in such areas. Dkt. No. 54-5 at 8-9. Moreover, Plaintiff Wilson testified that throughout the entire time that he ate at the mess hall at Auburn C.F., a group of inmates were tasked with cleaning the area, which they did before every meal. *Id.* Thus, the mess hall environment is distinguishable from environments that courts have found objectively serious based on the presence of, or exposure to, feces. *See Willey v. Kirkpatrick*, No. 07-CV-6484, 2013 WL 434188, at *8 (W.D.N.Y. Feb. 4, 2013) (collecting cases where Eighth Amendment conditions-of-confinement claims proceeded to trial based on protracted and concentrated exposure to feces or sewage), *vacated and remanded by* 801 F.3d 51 (2d Cir. 2015).

Moreover, neither Plaintiff has introduced evidence showing that they complained

11

about, or developed an illness attributable to, exposure to "blood spatter" or bird feces in the

mess hall at any point during 2017.  To the contrary, Plaintiff Wilson testified that he first

noticed he was having respiratory problems in March, 2018.  Dkt. No. 54-5 at 20.  In addition,

Plaintiff Wilson testified that after inmates complained about the mess hall environment, a

"power washing" crew was established to address the presence of bird feces throughout the

facility, and Plaintiff Carter testified that an "outside" company was also brought in to remove

the birds, which resulted in a significant reduction in the bird population.  Dkt. No. 54-5 at 9;

Dkt. No. 54-8 at 65-66; Dkt. No. 54-7 at 6-8.[8]  In other words, the evidence in the record

shows that the conditions in the mess hall were not objectively serious in 2017, and improved

thereafter.[9]

Based on these facts, no rational factfinder could conclude that Plaintiffs were

─────────────────────

[8]  Of course, power washing equipment would also address the alleged "blood spatter" on walls in the mess hall.

[9]  As noted, Plaintiff Wilson has also introduced showing corrections officials might have filed a lawsuit around the same time regarding the conditions of a different mess hall at Auburn C.F. where they dined, and PESH may have cited Auburn C.F. for an unidentified health code violation in early 2018.  Dkt. No. 57-2 at 1-3; Dkt. No. 57-3 at 2-6; Dkt. No. 57-5 at 1.  Even assuming these averments are true, neither is sufficient to establish that the conditions in the mess hall where Plaintiffs dined presented an unreasonable risk of serious damage to their health.  *See, e.g.*, *Vann v. Donnelly*, No. 00-CV-0911, 2005 WL 246810, at *4 (W.D.N.Y. Feb. 1, 2005) ("Without some basis to conclude that an unreasonable exposure took place, the alleged failure to comply with an OSHA regulation is not a sufficient basis to maintain an Eighth Amendment claim."); *Pack v. Artuz*, 348 F. Supp. 2d 63, 83 (S.D.N.Y. 2004) ("[E]ven if the concentration of airborne asbestos particulates in the counseling unit violated the air-quality guidelines set by either the State or by OSHA -- and plaintiff has offered no proof that it did -- plaintiff's limited exposure, which consisted of a few hours every three months over the course of five years, was simply insufficient to allow a reasonable fact-finder to conclude that plaintiff endured an unreasonable risk of serious damage to his health.").  Moreover, if public health officials did investigate Auburn C.F. in early 2018, the fact that the investigation did not result in even a temporary closure of the mess hall where Plaintiffs dined is actually further evidence that the mess hall conditions did not present a risk of serious harm to anyone eating or working in that environment.

subjected to an unreasonable risk of serious damage to their health as a result of dining in the mess hall at Auburn C.F.  *See, e.g., Thomas v. DeCastro*, No. 14-CV-6409, 2018 WL 1322207, at *13 (S.D.N.Y. Mar. 13, 2018) (concluding that plaintiff could not satisfy "the objective prong" with respect to "the allegations surrounding the birds in the mess hall area"); *Phillips v. LaValley*, No. 12-CV-609, 2014 WL 1202693, at *12 (N.D.N.Y. Mar. 24, 2014) (finding that an inmate's food tray being "contaminated" with a cockroach poses a condition that is "insufficiently serious to sustain an Eighth Amendment conditions of confinement claim"); *Johnson*, 2015 WL 670429, at *1, *11; *Mitchell v. Goord*, No. 04-CV-366, 2007 WL 189087, at *5 (N.D.N.Y. Jan. 22, 2007) (holding that allegations of, *inter alia*, an "infestation by vermin, insects, rats, and mice" does not rise to the level of an Eighth Amendment violation); *Govan v. Campbell*, 289 F. Supp. 2d 289, 296-97 (N.D.N.Y. 2003) (permitting*, inter alia*, "wild birds . . . to fly within the cells . . . do[es] not rise to the level of a constitutional violation"); *see also Vann v. Griffin*, No. 16-CV-9903, 2018 WL 6199860, at *7 (S.D.N.Y. Nov. 28, 2018) ("Exposure to germs alone does not create a deprivation sufficiently serious to satisfy the objective prong." (citing *Townsend v. Clemons*, 2013 WL 818662, at *7 (S.D.N.Y. Jan. 30, 2013)), *report and recommendation adopted by* 2013 WL 868605 (S.D.N.Y. Mar. 4, 2013).  Thus, Plaintiffs have failed to create a genuine issue of material fact with respect to the objective element of their claim.

Furthermore, even if the Court were to assume that the conditions in the mess hall presented an unreasonable risk of serious harm to Plaintiffs, there is no evidence in the record that any of the named Defendants or officials working in the mess hall knew that the environment was unsafe, yet refused to act to improve conditions.  Indeed, neither Plaintiff has presented any evidence showing that any inmate ever made a specific complaint to any

13

official that was ignored, or that any official was aware that inmates were suffering health complications as a result of eating in the mess hall, yet refused to act.  To the contrary, as noted above, Plaintiff Carter testified that after inmates complained, additional efforts were made to clean the mess hall.  Dkt. No. 54-8 at 63-66.  Plaintiff Wilson similarly testified that after complaints were made, a power washing crew was established.  Dkt. No. 54-5 at 9.  Such testimony is also consistent with the documentary evidence in the record, which shows that within days of inmates complaining about unsanitary conditions in the mess hall, their grievances were investigated and additional cleaning efforts were instituted.  Dkt. No. 54-7 at 6-8; Dkt. No. 57-3 at 16.  In other words, the record is devoid of any facts from which a rational factfinder could conclude that any of the named or "Doe" Defendants acted with deliberate indifference to an excessive risk to Plaintiffs' health or safety.  *See Forrest v. Cnty. of Nassau*, No. 14-CV-6979, 2016 U.S. Dist. LEXIS 16531, at *55-56 (E.D.N.Y. Feb. 2, 2016) ("Here, Plaintiff's Amended Complaint states that, after he filed grievances regarding his spider bite and the presence of vermin in his cell, Defendants sent an exterminator to treat his cell. . . . Thus, by Plaintiff's own admission, prison officials have taken measures to address the vermin infestation problem of which Plaintiff complained. . . . Although Plaintiff states that he still sees roaches, spiders, and mice after the extermination, this allegation is not sufficient to show that Defendants were deliberately indifferent to his health or safety."), *report and recommendation adopted by* 2016 U.S. Dist. LEXIS 25609 (E.D.N.Y. Feb. 25, 2016); *Ortiz v. Department of Corrections*, No. 08-CV-2195, 2011 WL 2638137, at *7 (S.D.N.Y. April 29, 2011) ("There is a clear difference between cases where defendants allegedly knew about unsanitary conditions but did nothing and cases where officials actually acted to resolve or alleviate the problem, as they are alleged to have done here."), *report and*

*recommendation adopted in full and complaint dismissed by* 2011 WL 2638140 (S.D.N.Y.

July 5, 2011); *Nolley v. Lord*, No. 96-CV-1621, 1997 WL 698172, at *7 (S.D.N.Y. Nov. 10,

1997) ("[A]llegations of the mere presence of roaches, ticks and cats, with no evidence to

rebut defendants' affidavits that prison officials have taken measures to address these

problems, do not rise to deliberate indifference on the part of prison officials."); *see also*

*Summerville v. Faciuna*, No. 05-CV-6459, 2009 WL 2426021, at *9 (W.D.N.Y. Aug. 6, 2009)

(granting summary judgment dismissing the plaintiff's condition of confinement claim where

evidence showed that the prison superintendent had the plaintiff's cell sprayed by an

exterminator and replaced the window screen of the cell, and where the plaintiff "failed to

point to any evidence suggesting that [the defendant] acted with reckless indifference to

[p]laintiff's health and safety by allowing him to be exposed to bugs"); *Shire v. Greiner*, No.

02-CV-6061, 2007 WL 840472, at *13 (S.D.N.Y. Mar. 15, 2007) (evidence that the prison

official defendant arranged to have exterminators treat the plaintiff's cells "belie[d his]

unsupported claim that [the defendant] was deliberately indifferent to his needs"); *Townsend*

*v. Clemons*, No. 12-CV-03434, 2013 WL 818662, at *8 (S.D.N.Y. Jan. 30, 2013), *report and*

*recommendation adopted by* 2013 WL 868605 (S.D.N.Y. Mar. 4, 2013) (dismissing the

plaintiff's sanitation-related claims where the plaintiff "has not linked any of these alleged

deprivations to defendants' 'deliberate indifference'"); *Hobson v. Fischer*, No. 10-CV-5512,

2011 WL 891314, at *6 (S.D.N.Y. Mar. 14, 2011) ("In Heath's denial of Hobson's appeal from

the IGRC, he listed the measures that were taken to remedy the grievances.  For instance, in

responses to Hobson's complaint regarding bird feces, Heath pointed out that prison porters

were cleaning up the bird feces on a daily basis.  Heath also stated that the mess hall 'is

being operated in full compliance within department regulations', and that the 'fans in the

15

Barber Shop are used for exhaust only.' . . .  Because he did not ignore the complaints brought to his attention as Superintendent, Hobson cannot allege that Heath acted with deliberate indifference.  Given that Hobson's grievances were investigated and responded to, his claim of deliberate indifference fails.").  Thus, Plaintiffs have also failed to create a genuine issue of material fact with respect to the subjective element of their claim.

Accordingly, the Court recommends granting summary judgment for Defendants on the merits.

## IV.   PLAINTIFF WILSON'S OMNIBUS MOTION AND PLAINTIFFS' PROPOSED AMENDED COMPLAINTS

Liberally construed, it appears that Plaintiff Wilson seeks to re-open discovery pursuant to Fed. R. Civ. P. 56(d), strike the motion for summary judgment, compel responses, and impose sanctions based on counsel's purported failure to provide him with discovery related to the lawsuit filed by unidentified corrections officials, the PESH investigation, and the identities of the "Doe" Defendants.  *See* Dkt. Nos. 57, 57-1, 57-2, 57-3, 57-4, 57-5; 66 at 25-27.  It also appears that both Plaintiffs seek to amend the complaint to add new allegations regarding personal harm from the conditions of the mess hall at Auburn C.F., among other things.  *See* Dkt. No. 63-2; Dkt. No. 66.[10]

As an initial matter, the discovery sought by Plaintiff Wilson was all available during the discovery period, and Plaintiffs certainly knew about the lawsuit filed by unidentified corrections officials and the PESH investigation while discovery was ongoing.[11]  Yet it does

---

[10]  Plaintiff Wilson's proposed amended complaint also contains new claims against new parties.  *See* Dkt. No. 66.

[11]  Plaintiff Carter testified about the lawsuit filed by unidentified corrections officials, and Plaintiff Wilson repeatedly references the lawsuit filed by corrections officials and the

not appear from the record that either Plaintiff ever served demands regarding the discovery Plaintiff Wilson now seeks, and neither filed a motion to compel such discovery, sought to extend the discovery deadline to obtain it, or otherwise notified the Court of the need for such material during the discovery deadline.

In any event, as noted above, the Court assumed the following for purposes of this Report-Recommendation and Order: (1) corrections officials filed a lawsuit regarding the conditions of the mess hall at Auburn C.F. where they dine; and (2) PESH officials cited Auburn C.F. for a health code violation in early 2018. However, as also noted above, proof that corrections officials filed a lawsuit regarding the conditions of a different mess hall at Auburn C.F., and/or that PESH officials cited Auburn C.F. for a health code violation is insufficient to establish either element of Plaintiffs' conditions of confinement claim. Furthermore, with respect to the discovery Plaintiff Wilson seeks regarding the "Doe" Defendants, properly identifying these officials would not change the Court's recommendation to dismiss his Eighth Amendment claim on the merits. In other words, there is no legal justification for re-opening discovery and imposing sanctions.

For these reasons, the Court denies Plaintiff Wilson's request to re-open discovery pursuant to Fed. R. Civ. P. 56(d), compel responses, and impose sanctions. *See Shomo v. Dep't of Corr. & Cmty. Supervision*, No. 9:15-CV-1029 (GLS/ATB), 2019 WL 7971871, at *12 n.12 (N.D.N.Y. Oct. 7, 2019) ("To the extent plaintiff seeks relief under Rule 56(f), we further recommend denying the same. Plaintiff admits that these transcripts, at most, include the state's request to withdraw their 2012 state court petition to force-feed plaintiff, and its

PESH investigation in his opposition papers. *See* Dkt. No. 54-8 at 22-23; Dkt. No. 57-3 at 3-4; Dkt. No. 57-4 at 8.

concession that the court stop short of determining plaintiff's status as a quadriplegic. . . .

Even assuming the validity of plaintiff's contentions as to the contents of the transcripts, such

evidence is not relevant to the instant motion and would not affect this court's

recommendation." (citing *Hodge v. Perilli*, No. 06-CV-2480, 2010 WL 291058, at *11

(S.D.N.Y. July 12, 2010) (citing *Sage Realty Corp. v. Insurance Co. of North America*, 34

F.3d 124, 128 (2d Cir. 1994) (noting that to obtain Rule 56(f) relief, additional discovery

sought must be material to opposition of the summary-judgment motion))), *report and

recommendation adopted by* 2020 WL 486868 (N.D.N.Y. Jan. 30, 2020); *see also Trebor

Sportswear Co., Inc. v. The Limited Stores, Inc*., 865 F.2d 506, 511 (2d Cir. 1989) ("[T]he trial

court may properly deny further discovery if the nonmoving party has had a fully adequate

opportunity for discovery." (citations omitted)); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL

2398762, at *2 (S.D.N.Y. Aug. 15, 2007) (denying plaintiff's request to extend discovery

because "[p]laintiff has not shown that her failure to complete discovery was anyone's fault

but her own" and "plaintiff did not diligently utilize the time available to her to complete

discovery, [so] there is no reason to extend that time."); *Yrityspankki Skop Oyj v. Delta

Funding Corp*., No. 98-CV-7888, 1999 WL 1018048, at *3-4 (S.D.N.Y. Nov. 9, 1999) ("In

seeking to reopen discovery in the face of the plaintiff's summary judgment motion, the

defendant must demonstrate by affidavit what additional information it wishes to discover,

how that additional information can reasonably be expected to defeat the summary judgment

motion by creating issues of material fact, what efforts the defendant has made during

discovery to obtain this information and why it was unsuccessful in doing so. . . . Plaintiff

utterly fails to satisfy these requirements of Fed. R. Civ. P. 56(f).").[12]

In addition, because the Court recommends that Plaintiffs' claims be dismissed on the merits, and the new allegations in the proposed amended pleadings filed by each Plaintiff would not change the Court's recommendation, it would be futile to allow either Plaintiff to file an amended complaint to add new defendants or Section 1983 claims arising out of the mess hall conditions at Auburn C.F.  *See Abdul-Matiyn v. Allen*, No. 9:06-CV-1503 (GTS/DRH), 2010 WL 3880510, at *6 (N.D.N.Y. Sept. 28, 2010) ("[W]hen a motion to amend or supplement is made in response to a motion for summary judgment, the court assessing whether to deny the proposed amendment as futile should consider the evidence in the record and not assess the proposed amendment as if the evidence does not exist; in such a case, the proposed amended/supplemental pleading is futile if it could not survive the summary judgment motion." (citing *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (explaining that, when cross-motion to amend complaint is made in response to a motion for summary judgment, and parties have fully briefed the issue of whether proposed amended complaint could raise genuine issue of fact and have presented all relevant evidence in support of their positions, court may deny the amendment as futile, even if it states valid claim on its face, where evidence in support of proposed new claim creates no triable issue of fact and defendant would be entitled to summary judgment on it)); *see also DiPace v. Goord*, 308 F. Supp. 2d 274, 279 (S.D.N.Y. 2004) (where parties submitted evidence outside the pleadings in connection with a motion to amend, the court judged the proposed pleading based on whether it could survive a motion for summary judgment);

---

[12]  The Federal Rules of Civil Procedure were amended on December 1, 2010, which included re-designating former Rule 56(f) as 56(d).

*Stoner v. N.Y. City Ballet Co.*, No. 99-CV-0196, 2002 WL 523270, at *14 n.10 (S.D.N.Y. Apr. 8, 2002) (denying motion to amend where the claim might survive a motion to dismiss, but would "immediately be subject to dismissal on a motion for summary judgment").[13]

Accordingly, insofar as Plaintiff Wilson has moved to strike the motion for summary judgment, re-open discovery, compel responses, and/or impose sanctions, his motion is

---

[13] Insofar as Plaintiff Wilson proposes to assert a medical indifference claim based on alleged inadequate treatment he received after he allegedly became ill in or around March, 2018, and/or a conditions of confinement claim based on alleged water pollution or conditions in areas of the facility other than the mess hall, *see* Dkt. No. 66 at 9-13, such claims involve collateral matters, are based on different factual allegations than those set forth in the original complaint and distinct legal theories from those already at issue in this case, and would therefore require new and additional discovery.  Plaintiff Wilson has also failed to explain why he waited until after the close of discovery and the amended pleadings deadline to assert these new claims.  Thus, Plaintiff Wilson's proposed amended complaint must also be denied insofar as it contains new claims based on events and circumstances unrelated to the mess hall conditions at Auburn C.F.  *See Amusement Indus. v. Stern*, No. 07-CV-11586, 2014 WL 4460393, at *13 (S.D.N.Y. Sept. 10, 2014) ("Courts regularly deny motions to amend where the moving party seeks to add claims involving collateral matters, based on different factual allegations and distinct legal theories, from the claims already at issue in a case."); *Mitchell v. Cuomo*, No. 17-CV-0892 (TJM/DJS), 2019 WL 1397195, at *3 (N.D.N.Y. Mar. 28, 2019) (adopting Magistrate Judge's recommendation to deny motion to supplement where "[t]he proposed First Amendment claims are neither related to nor pertain to the allegations in the operative pleading, thus providing a basis to deny amendment under Rule 15(d)"); *Beckett v. Inc. Vill. of Freeport*, No. 11-CV-2163, 2014 WL 1330557, at *6 (E.D.N.Y. Mar. 31, 2014) ("Supplemental pleadings are limited to subsequent events related to the claim or defense presented in the original pleading." (internal quotation marks omitted)); *Grace v. Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000) (noting that leave to amend or supplement is properly denied "where the belated motion would unduly delay the course of proceedings by, for example, introducing new issues for discovery" (internal citation omitted)); *see also Mitchell*, 2019 WL 1397195, at *3 ("Furthermore, denial of the motion to amend to add the First Amendment claims was proper because the addition of the claims would not promote the economic and speedy disposition of the controversy between the parties as framed in the operative pleading."); *Girard v. Hickey*, No. 9:15-CV-0187 (TJM/DJS), 2016 WL 915253, at *6 (N.D.N.Y. Mar. 4, 2016) ("[B]ecause this case presently includes multiple causes of action asserted against multiple defendants, the Court finds that the addition of numerous other defendants and unrelated claims arising at entirely distinct locations will necessarily prolong this action and impose additional expense on defendants. Moreover, the Court finds that adding these new claims would not aid in the efficient resolution of this action.").

denied.  In addition, insofar as either Plaintiff has sought leave to amend the complaint, their

motions are denied.

**V.     CONCLUSION**

ACCORDINGLY, it is hereby

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 54) be

**GRANTED** in its entirety; and it is hereby

ORDERED that Plaintiff Wilson's motions to strike the motion for summary judgment,

re-open discovery, compel responses, and impose sanctions (Dkt. No. 57) are **DENIED**; and

it is hereby

ORDERED that, insofar as Plaintiffs seek to amend the complaint (Dkt. Nos. 63-2, 66),

their motions are **DENIED**; and it is hereby

ORDERED that the Clerk provide Plaintiffs with a copy of this Order and

Report-Recommendation, along with copies of the unpublished decisions cited herein in

accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009)

(per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[14]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

---

[14] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated: April 23, 2020
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

22

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction Officer Richard Pflueger, having moved for an order, pursuant to Fed.R.Civ.P. 56, granting him summary judgment and dismissing the amended complaint, and United States Magistrate Judge James C. Francis IV having issued a report and recommendation, dated August 20, 1999, recommending that the motion be granted, and upon review of that report and recommendation together with plaintiff's letter to this Court, dated August 28, 1999, stating that plaintiff does "not contest the dismissal of this action", it is

ORDERED that the attached report and recommendation of United States Magistrate Judge James C. Francis IV, dated August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary judgment is granted, and the amended complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983. Mr. Cole alleges that the defendant Richard Pflueger, a corrections officer, violated his First Amendment rights by refusing to allow him to attend religious services. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate in the custody the New York State Department of Correctional Services ("DOCS"), incarcerated at the Green Haven Correctional Facility. (First Amended Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the plaintiff was in keeplock because of an altercation with prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is confined to his cell for twenty-three hours a day with one hour for recreation. (Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must apply for written permission to attend regularly scheduled religious services. (Reply Affidavit of George Schneider in Further Support of Defendants' Motion for Summary Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked

Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*
Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5

F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson, 477 U.S. at 255; Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson, 477 U.S. at 249–50* (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro*

*se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*′ s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

*4 Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

## Footnotes

1       In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 670429
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kevin J. JOHNSON, Plaintiff,

v.

Brian FISCHER; and Harold
H. Graham, Defendants.

No. 9:12–CV–0210 (DNH/TWD).
|
Signed Feb. 17, 2015.

**Attorneys and Law Firms**

Kevin J. Johnson, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Cathy Y. Sheehan, Esq., Ass't Attorney General,
of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Pro se plaintiff Kevin J. Johnson brought this civil
rights action pursuant to 42 U.S.C. § 1983. On August 5,
2014, the Honorable Therese Wiley Dancks, United States
Magistrate Judge, advised by Report–Recommendation that
defendants' motion for summary judgment pursuant to
Federal Rule of Civil Procedure 56 be granted and plaintiff's
complaint be dismissed. Plaintiff timely filed objections to the
Report–Recommendation.

Based upon a de novo review of the portions of the Report–
Recommendation to which plaintiff objected, the Report–
Recommendation is accepted and adopted in all respects. *See*
28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED;

2. Plaintiffs complaint is DISMISSED in its entirety; and

3. The Clerk is directed to serve a copy of this Decision and
Order upon plaintiff in accordance with the Local Rules and
close the file.

IT IS SO ORDERED.

### *REPORT–RECOMMENDATION and ORDER*

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

This pro se prisoner civil rights action, commenced pursuant
to 42 U.S.C. § 1983, has been referred to me for Report and
Recommendation by the Honorable David N. Hurd, United
States District Judge, pursuant to 28 U.S.C. § 636(b)
and Local Rule 72.3(c). Plaintiff Kevin J. Johnson claims
that he was exposed to dangerously high levels of tobacco
smoke, bird feces, and mold at Auburn Correctional Facility.
Currently pending before the Court is Defendants' motion
for summary judgment pursuant to Federal Rule of Civil
Procedure 56. (Dkt. No. 82.) For the reasons discussed below,
I recommend that the Court grant Defendants' motion for
summary judgment.

### I. FACTUAL AND PROCEDURAL SUMMARY

#### A. Smoking Issue

In the operative complaint, Plaintiff alleges that he has been
exposed to dangerously high levels of cigarette and other
tobacco smoke for "several years" at Auburn Correctional
Facility. (Dkt. No. 38 at 2.) A policy applicable to all
facilities within the New York Department of Corrections
and Community Supervision ("DOCCS") prohibits all indoor
smoking. (Dkt. No. 82–4 ¶ 7.) Under the policy, smoking
is permitted only in recreation yards. *Id.* Despite the policy,
Plaintiff alleges that officers, inmates, and civilian staff all
smoke, creating a "network of smokers that stick together [so]
there is nothing being done to stop indoor smoking." (Dkt. No.
38 at 2.) Plaintiff alleges that he "constantly encounter[ed]
clouds of smoke in just about every building in [the] facility,"
including the industry building, the cell block area, and the
school building. *Id.* at 3.

Plaintiff alleges that Defendant Harold D. Graham, the
superintendent of Auburn, "can not claim that he is unaware
of the disregard for the no smoking indoors policy" because

there are cigarette butts and ashes on the floor. (Dkt. No. 38 at 3.) At his deposition, Plaintiff testified that "it would be impossible for [Defendant Graham] to walk through ... the ... building and walk in one of those bathrooms and not know that smoking is going on." (Dkt. No. 82–9 at 38:20–23.[1]) However, Plaintiff admitted that he had no first-hand knowledge of Defendant Graham seeing an inmate smoke in the facility. *Id.* at 38:24–39:4. Plaintiff also admitted at his deposition that he had never seen Defendant Graham in the presence of a smoking employee. *Id.* at 39:5–14. In a declaration filed in opposition to the motion for summary judgment, Plaintiff declares that, since the time of his deposition, he has personally witnessed Defendant Graham in the presence of a smoking officer. (Dkt. No. 89 at 31.[2])

**\*2** Plaintiff alleges that he filed a grievance regarding the smoking issue and appealed the grievance to Defendant Graham. (Dkt. No. 38 at 3.) A document signed by Plaintiff, dated June 18, 2010, and addressed to Defendant Graham states that:

> I am writing this letter to you as an appeal of the above numbered grievance that I filed. I am forced to appeal in this manner because I was not afforded the hearing that I am entitled to, by policy and law. However I understand this issue is a touchy subject, but yet it's a very serious problem.
>
> I have addressed this issue, because I do have reason to worry about the fact that everyday I am being exposed to high amounts of second hand smoke. Mainly by the inmates who smoke, but I can not impose any sanctions against the inmates that smoke, and since there are policies that prohibit inmates from smoking inside the staff, mainly Corrections Officers are supposed to enforce these policies, but the Officer[ ]s don't enforce them because they too smoke. Which puts people like myself that don't smoke health at risk, from the exposure to second hand smoke inhalation.
>
> I am asking that you consider my recommendation that was made in my grievance, and or come up with some kind of solution to this problem. Because as long as this problem is ignored and continues to happen myself, and others in the same situation ... are being put at risk.

(Dkt. No. 89 at 33.)

Plaintiff alleges that Defendant Graham issued "a detailed response." (Dkt. No. 38 at 3.) The Superintendent level response to the grievance states:

> The grievant should address concerns regarding staff smoking to a supervisor and inmates smoking to area staff, at that time, to allow for remedial action to be taken. Appeal granted to that extent.

(Dkt. No. 89 at 32.)

Plaintiff alleges that he appealed Defendant Graham's decision to the Central Office Review Committee ("CORC") in Albany. (Dkt. No. 38 at 3.) Plaintiff's appeal statement said that "I should not be required to police the staff and or inmates, not to mention the potential for harm to my person for retaliation." (Dkt. No. 89 at 32.) The record does not include CORC's response to Plaintiff's grievance regarding smoking.

Plaintiff alleges that Defendant Brian Fischer, who at all relevant times was the Commissioner of DOCCS, is a "member of the Review Committee of CORC, which has reviewed and denied [Plaintiff's] grievance." (Dkt. No. 38 at 3.) Plaintiff further alleges that the CORC office "is located in the same office as" Defendant Fischer. *Id.* Plaintiff further alleges that "through prior reports, suits, and grievances [Defendant Fischer] is aware of the action[s] of his subordinates and refused to do anything about it; which constitutes a gross neglect in managing his subordinates." *Id.*

Defendant Fischer declares that "there is no indication in the files that I ever personally read or responded" to any letter from Plaintiff and that he has "no recollection of ever having done so." (Dkt. No. 82–7 ¶ 6.) Defendant Fischer declares that DOCCS' no-smoking policy was implemented during a predecessor's tenure as Commissioner. *Id.* ¶ 8. He declares that:

> **\*3** the day-to-day oversight of each of the Department's correctional facilities is carried out by the Superintendent of his/her respective correctional facility. This day-to-day oversight included the implementation of the DOCCS smoking policy. To my knowledge and belief,

each Superintendent ... was properly implementing the DOCCS smoking policy within their respective correctional facility. This includes Auburn Correctional Facility.

*Id.* ¶ 9.

Brian D. Chuttey, a Captain at Auburn, has filed a declaration in support of Defendants' motion for summary judgment. (Dkt. No. 82–4.) He declares that 206 inmates were disciplined for smoking indoors at Auburn between January 1, 2009, and January 1, 2012. *Id.* ¶ 9. Captain Chuttey's declaration does not include any information about enforcement of the smoking policy on staff.

Plaintiff has filed declarations from two other inmates regarding smoking. (Dkt. No. 89 at 26; 29.) Inmate Juan Smith declares that he smoked for the entire time he was housed at Auburn, in both the cell blocks and the industry building. (Dkt. No. 89 at 26.) He declares that officers allowed him to smoke in the shop and in the restroom. *Id.* He states that neither he nor anyone he knows has ever been "locked up" for smoking indoors. *Id.* Inmate Keith Todd declares that during his eight years at Auburn he observed "many inmates" and correction officers smoking inside. (Dkt. No. 89 at 29.) He declares that he has never known anyone who was punished for smoking in a cell or in the industry building. *Id.* He declares that the no smoking policy is not being enforced. *Id.*

### B. Bird Feces and Mold Issue
Plaintiff alleges that beginning on July 31, 2011, he was housed in a cell on the ground floor of the facility. (Dkt. No. 38 at 4.) Plaintiff alleges that his cell was ten feet away and directly across from the heating system, which was covered in bird feces. *Id.* Plaintiff alleges that the wire gates of the upper tiers were covered in mold. *Id.* Plaintiff attempted to clean those areas himself. *Id.*

Plaintiff, who is a diabetic, alleges that he researched the issue and learned that bird feces and mold are particularly toxic to diabetics. (Dkt. No. 38 at 4.) Accordingly, Plaintiff filed a grievance. *Id.* The Inmate Grievance Resolution Committee's report stated that "[i]t is recommended that this matter be addressed further. The issue with the 'chicken wire' fencing and the built up dirt, bird feces, etc has been an issue for a while." (Dkt. No. 89 at 25.) Plaintiff alleges that Defendant

Graham issued a detailed ruling. (Dkt. No. 38 at 4.) Plaintiff alleges that he then "appealed his grievance to CORC [where] Fischer based on information and belief is a committee member." *Id.* In an unsigned decision dated November 30, 2011, CORC unanimously accepted Plaintiff's grievance in part. The decision stated:

> Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated. CORC upholds the discretion of the facility administration to determine the necessity of cleaning outside fencing or bars ... CORC advises grievant ... to address copies or the status of his grievances to the IGP Supervisor.

**\*4** (Dkt. No. 89 at 23.)

Thereafter, the facility attempted to clean the area. (Dkt. No. 38 at 4.) Plaintiff alleges that:

> the unskilled clean up attempts are proving to create a greater hazard: the [f]eces is being washed down into the heating element cover, and soaked into the heating element which is releasing it into the air with the heat, and the [m]old was dry brushed off of the wire fencing sending a shower of [m]old spores into the air, not to mention the mold that's covering the walls, and the [a]ir [c]irculating unit covers, that's actually blowing [m]old spores around every time it's turned on.

*Id.*

Plaintiff alleges that on August 2, 2011, Defendant Fischer's office rescinded the policies governing proper cleanup of bird feces and had the directives governing cleanup removed from the files at Auburn. (Dkt. No. 38 at 4–5.) Plaintiff alleges

that "[b]y doing this Fischer has made it possible for the improper cleaning practices to be used and continued." *Id.* at 5. At Plaintiff's deposition, he identified the document that he alleged contained the rescission. (Dkt. No. 82–9 at 46:24–47:4.) That document was read into the record. It stated "please remove and destroy the following policies from your files: A–0A–03–06–A, cleanup of bird/bat feces. Comment: Proper cleaning procedures covered in directive 309045064 and 2121." *Id.* at 47:5–10.

Plaintiff has filed declarations from two inmates regarding the bird feces and mold. (Dkt. No. 89 at 27–28, 30.) Inmate Darryl L. Freeman declares that he never, in the eight years he was housed at Auburn, observed anyone clean the bird feces on a daily, weekly, or monthly basis. (Dkt. No. 89 at 27.) He declares that in his "thirty-three years in the State Prison system, [I] have never witnessed anything like the bird feces problem in Auburn Correctional Facility." *Id.* Inmate Eddie Badia declares that when he moved into Plaintiff's cell block in July 2011, the heating element cover along the entire wall in the cell area was covered in bird feces, as well as the wire fencing on the outer bars of the upper cell levels. (Dkt. No. 89 at 30.) He declares that the walls, windows, and covers for the exhaust fan units are covered in mold spores. *Id.* He declares that this "is still an on going issue that needs to be addressed." *Id.*

Captain Chuttey declares that Plaintiff's cell block "is cleaned every day by inmates who are provided with the appropriate cleaning supplies that are delivered to the Block every day." (Dkt. No. 82–4 ¶ 15.) Regarding the wire fencing specifically, Captain Chuttey declares that "I do not remember bird feces or mold ever being on the chain link fencing. Nevertheless, efforts have always been made to keep this area clean. Because of the height of the fencing, scaffolding is required to clean this area." *Id.* ¶ 16.

## C. Facts Regarding Plaintiffs Medical Condition

Plaintiff alleges that exposure to smoke, mold, and feces has caused him constant chest congestion, trouble breathing at night, allergies, nasal problems, persistent cold like symptoms, and heavy yellowish mucus in his throat in the mornings. (Dkt. No. 38 at 5.) Plaintiff alleges that the "need for clean indoor air is well known ... however the [staff] here still continue to smoke indoors improper clean up attempts of the [b]ird [f]eces and [m]old has truly created a gr[e]ater health hazard." *Id.*

*5 Mary C. Coryer, RN, the Nurse Administrator at Auburn, has filed a declaration in support of Defendants' motion for summary judgment. (Dkt. No. 82–3.) This declaration is based upon her review of Plaintiff s "medical records shown to me by my counsel in this action." *Id.* ¶ 4. She declares that "Plaintiffs medical records reveal that Plaintiff was seen on several occasions between March 2009 and October 2012, however, there is no indication in his medical record that he made any complaints concerning the issues raised in this lawsuit: second-hand smoke ... or bird feces and mold." (Dkt. No. 82–3 ¶ 5.) She further declares that "[d]uring the period in question, Plaintiff did not complain of a constant cough, constant cold and flu like symptoms, constant chest congestion, constant runny nose, constant shortness of breath, constant pulmonary and respiratory problems, vomiting, and confusion." *Id.* ¶ 6. She declares that "there is nothing in the medical records attached that would suggest Plaintiff is experiencing signs or symptoms of being exposed to [smoke] or bird feces and mold." *Id.* ¶ 7.

Defendants have submitted Plaintiffs medical records. (Dkt. No. 83.) The admissibility of these documents is supported by the affidavit of the keeper of records at Auburn. *Id.* at 2; Fed.R.Evid. 803(6). However, as Plaintiff correctly notes (Dkt. No. 89 at 4), these medical records include at least some documents regarding a different Kevin Johnson. For example, progress notes dated October 27, 2010, and October 29, 2010, are for a Kevin Johnson with a prison identification number of 93–A–2751. (Dkt. No. 83 at 40.[3]) Plaintiff's identification number is 98–B–0132. *Id.* at 2.

In addition to this potential problem with the accuracy of the records, the records themselves do no entirely support Nurse Coryer's declaration. Although the word "constant" is not used, the records include several examples of Plaintiff complaining about respiratory symptoms. A progress note dated December 14, 2010, indicates that cough syrup was provided to Plaintiff. (Dkt. No. 83 at 38.) A progress note dated August 23, 2011, indicates that Plaintiff complained of coughing and sneezing. *Id.* at 30. A progress note dated November 18, 2011, indicates that Plaintiff complained of blockage in both ears and a sore throat. *Id.* at 27. A progress note dated February 7, 2012, indicates that Plaintiff complained of a cold and sinus congestion and about sniffling. *Id.* at 25. A progress note dated February 16, 2012, indicates that Plaintiff complained of head cold symptoms. *Id.* at 24. A progress note dated May 1, 2012, indicates that Plaintiff complained of head cold symptoms and nasal congestion. *Id.* at 22.

On August 8, 2012, Plaintiff wrote to the Nurse Administrator to complain about lack of proper medical treatment. (Dkt. No. 89 at 20.) Plaintiff complained that he was coughing up a thick yellowish mucus and was suffering from chest congestion. *Id.* He also complained about bumps on the back of his head that were itching, bleeding, and burning. *Id.* He was concerned about the bleeding because, as a diabetic, "any type of sores and or bleeding is very dangerous for me." *Id.* He stated that he believed that both the chest congestion and the bumps on his head had been caused by exposure to bird feces. *Id.* The Nurse Administrator replied on August 10, 2012, that Plaintiff had been scheduled to see a doctor on August 13, 2012. *Id.* at 21. Progress notes show that Plaintiff actually saw the doctor on August 10, 2012, regarding the bumps on his head. (Dkt. No. 83 at 19.) Plaintiff was "instructed on care" and a follow up appointment was scheduled for August 13, 2012. *Id.* Plaintiff was seen as scheduled on August 13, 2012. *Id.* at 18.

**\*6** A progress note dated October 30, 2012, indicates that Plaintiff was seen regarding a burn. (Dkt. No. 83 at 13.) At that time, he also complained of nasal congestion. *Id.*

### D. Procedural History

Plaintiff filed the original complaint in this action on January 31, 2012. (Dkt. No. 1.) Plaintiff filed an amended complaint on April 30, 2012. (Dkt. No. 11.) Defendants moved to dismiss the amended complaint, arguing that Plaintiff had not sufficiently alleged their personal involvement. (Dkt. Nos. 20 and 31.) The Court granted the motion as to Defendant Fischer, giving Plaintiff leave to amend to allege facts plausibly suggesting Defendant Fischer's personal involvement. (Dkt. Nos. 35 and 37.) The Court denied the motion as to Defendant Graham. *Id.* Plaintiff filed a second amended complaint on December 14, 2012. (Dkt. No. 38.) The Court accepted the second amended complaint for filing and directed Defendants to respond. (Dkt. No. 39.) Defendants answered the second amended complaint. (Dkt. No. 40.) The parties proceeded to discovery.

Defendants now move for summary judgment. (Dkt. Nos. 82 and 83.) Plaintiff has opposed the motion. (Dkt. No. 89.) Defendants have filed a reply. (Dkt. No. 90.)

## II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 & n.l 1 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [4] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008).

## III. ANALYSIS

Defendants argue that they are entitled to summary judgment because (1) Plaintiff cannot establish that they were personally involved in any alleged constitutional violations; and (2) Plaintiff cannot establish any Eighth Amendment violation. (Dkt. No. 82–10.) For the reasons discussed below, I recommend that the Court grant Defendants' motion for summary judgment.

### A. Personal Involvement

#### 1. *Defendant Fischer*

**\*7** Defendants argue that Plaintiff cannot establish that Defendant Fischer was personally involved in the alleged constitutional violations. (Dkt. No. 82–10 at 4–6.[5]) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant.

*Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (per curiam); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted). [6]

Regarding the smoking issues, Plaintiff has not raised a triable issue of fact that Defendant Fischer was personally involved. Although Defendant Fischer's declaration does not explicitly state that he was not on the CORC panel that reviewed Plaintiff's grievance, there is no evidence in the record that Defendant Fischer reviewed Plaintiff's grievances about the smoking issue or that he was made aware of the alleged violations of the smoking policy. As noted above, the CORC decision is unsigned. Plaintiff's mere belief that Defendant Fischer reviewed his grievances is insufficient to establish Defendant Fischer's personal involvement. *See Patterson v. Cnty. of Oneida,* 375 F.3d 206, 219 (2d Cir.2004); *Setters v. M.C Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993). Therefore, I recommend that the Court dismiss the claim regarding smoking against Defendant Fischer for lack of personal involvement.

**\*8** Likewise, regarding the bird feces and mold issue, Plaintiff has not raised a triable issue of fact that Defendant Fischer was personally involved. As with the smoking issue, there is no evidence in the record that Defendant Fischer reviewed Plaintiffs grievances about bird feces and mold. Further, there is no evidence in the record that he was personally involved in rescinding the policy regarding cleaning procedures. Therefore, I recommend that the Court grant Defendant's motion for summary judgment and dismiss the action against Defendant Fischer for lack of personal involvement. [7]

### 2. *Defendant Graham*

Defendants argue that Defendant Graham was not personally involved in the alleged constitutional violations. (Dkt. No. 82–10 at 4–6.) Defendants argue that Plaintiff "admits he never communicated" with either Defendant about either the smoking issues or the bird feces and mold. (Dkt. No. 82–10 at 5.) However, as discussed above, Plaintiff alleges, and the evidence shows, that Defendant Graham responded to Plaintiff's grievances about both issues. Defendants have not addressed that fact.

The Second Circuit has noted in dicta that it is "questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of." *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004). District courts in the Second Circuit have struggled to answer this question. *See Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009) (collecting cases). The *Burton* court noted that district courts have found personal involvement based on denying a grievance where (1) the superintendent undertakes some kind of investigation into the initial denial; (2) the superintendent provides a detailed and specific response to the grievance rather than a pro forma denial; or (3) the grievance involves an ongoing violation "such that the 'supervisory official who reviews the grievance can remedy it directly.' " *Id.* (quoting *Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009)) (punctuation omitted).

Here, Defendant Graham issued responses to Plaintiff's grievances that, although not lengthy, were more than simply pro forma denials. (Dkt. No. 89 at 32; Dkt. No. 38 at 4.) Moreover, Plaintiff's grievances involved ongoing issues that Defendant Graham could have remedied directly. Therefore, Plaintiff has raised a triable issue of fact that Defendant Graham was personally involved in the alleged constitutional violations.

**B. Eighth Amendment**

Plaintiff alleges that Defendants violated the Eighth Amendment by exposing him to smoke, bird feces, and mold. (Dkt. No. 38.) The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials "must 'take reasonable measures to guarantee the safety of the inmates.' " *Id.* (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). To establish an Eighth Amendment conditions of confinement claim, a plaintiff must prove both an objective and a subjective component. *Id. at 834.* Defendants argue that they are entitled to summary judgment. (Dkt. No. 82–10 at 6–7.) Defendants are correct.

1. *Smoking*

**\*9** Plaintiff claims that Defendants violated his Eighth Amendment rights by exposing him to environmental tobacco smoke ("ETS"). (Dkt. No. 38.) Eighth Amendment jurisprudence on the subject of prison ETS claims distinguishes between claims of present harm from ETS exposure (such as where exposure to ETS creates or exacerbates a medical condition) and claims that ETS exposure will cause the prisoner harm in the future. *See, e.g., Davidson v. Coughlin,* 920 F.Supp. 305 (N.D.N.Y.1996). The Court will analyze the present claims and future claims separately.

a. *Present Claims*

ETS claims of present harm are analyzed, like other Eighth Amendment medical claims, pursuant to the framework set out in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In order to establish the objective prong, a plaintiff must show that ETS caused him to suffer serious adverse health consequences or that ETS aggravated an existing medical condition. *Liggins v. Parker,* No. 9:04–CV–0966 (NAM/DEP), 2007 U.S. Dist. LEXIS 98713, at \*49, 2007 WL 2815630, at \* 16 (N.D.N.Y. Sept. 25, 2007[8]) (citing *Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir.2001)).[9]

Defendants argue that "Plaintiff does not suffer from any symptoms due to exposure to ETS ... and, therefore, he cannot establish the first element. Plaintiff claims that the following symptoms are indicative or exposure to ETS ...: confusion; vomiting; constant cold and flu like symptoms; shortness of breath; pulmonary and respiratory problems; constant chest congestion; constant cough; and constant runny nose." (Dkt. No. 82–10 at 6, citing Dkt. No. 82–9 at 10:11–15:9.) Defendants are correct.

Medical conditions such as breathing problems, chest pains, dizziness, sinus problems, headaches, and loss of energy are "relatively minor" and are not sufficiently severe to establish the objective prong of an Eighth Amendment claim for present exposure to ETS. *Hen derson v. Sheahan,* 196 F.3d 839, 846 (7th Cir.1999); *see also Liggins,* 2007 WL 2815630, at \*16 (one complaint of shortness of breath, with no underlying diagnosis of asthma or similar condition, insufficient to establish objective element of an ETS present-injury claim). Here, Plaintiff's medical records reflect only minor respiratory symptoms. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiffs Eighth Amendment claims regarding present harm from exposure to ETS.

b. *Future Claims*

In order to succeed on an ETS claim alleging future harm, a plaintiff must establish both an objective and a subjective element. *Gill v. Smith,* 283 F.Supp.2d 763, 766 (N.D.N.Y.2003). To establish the objective element, the plaintiff must show that he was exposed to unreasonably high levels of ETS. *Helling v. McKinney,* 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Gill,* 283 F.Supp.2d at 766. Determining whether a plaintiff was exposed to unreasonably high levels of ETS

**\*10** requires more than scientific and statistical inquiry into the seriousness of the potential harm and the

likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Helling,* 509 U.S. at 36. As this quote indicates, in contrast to a claim of present harm from ETS, the focus in a claim of future harm from ETS is *not* on whether the plaintiff has sought treatment or complained of ailments associated with exposure to ETS. *McPherson v. Coombe,* 29 F.Supp.2d 141, 145–46 (W.D.N.Y.1998). Rather, the objective element for a claim regarding future harm from ETS focuses on whether levels of ETS in the facility were so high that they violated contemporary standards of decency.

A review of cases in which prisoners' claims regarding future harm from ETS survived summary judgment demonstrates the type of egregious facts necessary to raise a genuine issue of material fact. For example, in *Warren v. Keane,* 937 F.Supp. 301, 303 (S.D.N.Y.1996), the court denied the defendants' motion for summary judgment where the evidence showed that smoke in the poorly-ventilated facility was so thick that the plaintiffs had to hold wet handkerchiefs over their noses and mouths while in common areas such as the chapel, auditorium, gym and recreational area. In *McPherson,* the court denied the defendants' motion for summary judgment because the evidence showed that the plaintiff could not access the prison's day room due to the thick smoke, had to pass through the day room to reach the bathroom, and was housed in poorly ventilated and heavily populated units (first with forty-one other prisoners and then with ninety other prisoners) where smoking was allowed. In *Gill v. Smith,* 283 F.Supp.2d 763 (N.D.N.Y.003), the court denied the defendants' motion for summary judgment where, viewing the facts in the light most favorable to the plaintiff, the evidence showed that the asthmatic plaintiff was forced to spend a substantial part of each day in a room with a prison employee who smoked constantly.

Cases without such egregious facts have not survived summary judgment. For example, in *Davidson v. Coughlin,* 920 F.Supp. 305, 309 (N.D.N.Y.1996), the court granted summary judgment for the defendants where the plaintiff, who was single-celled, failed to demonstrate "what the level of smoke in the facility was or whether that degree of exposure would have been serious enough to cause or aggravate a current or future serious illness." In *Liggins,* the court granted summary judgment for the defendants where the evidence showed only that the plaintiff "was subjected to second hand smoke at the hands of fellow inmates as well as jail workers" and that prisoners' smoking habits were encouraged by jail officials. *Liggins,* 2007 WL 2815630, at *4, 17. The court deemed this cursory evidence insufficient to "describe conditions which rise to a level which today's society chooses not to tolerate." *Id.*

*11 Here, the conditions Plaintiff describes are not egregious enough to "describe conditions which rise to a level which today's society chooses not to tolerate." *Liggins,* 2007 WL 2815630, at *17. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claim regarding future harm from ETS.

### 2. Bird Feces and Mold

Plaintiff claims that Defendants violated the Eighth Amendment by exposing him to bird feces and mold. (Dkt. No. 38 at 4.) Defendants move for summary judgment of this claim. (Dkt. No. 82–10 at 6–7.)

To establish an Eighth Amendment conditions of confinement claim, a plaintiff must prove both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Id.* Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

The parties have not cited, and the Court cannot find, any Eighth Amendment cases dealing specifically with exposure to bird feces. Analogizing to cases involving exposure to human feces, the Court finds that Plaintiff has not raised a triable issue of fact regarding the objective component of his Eighth Amendment claim.

In *Gaston v. Coughlin,* 249 F.3d 156 (2d Cir.2001), the Second Circuit reversed a summary judgment entered in the defendants' favor where a prisoner presented evidence that the area directly in front of his cell was "filled" with human feces, urine, and sewage water for several consecutive days. The Second Circuit stated that it was "unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end." *Id.* at 166. Other courts considering protracted exposures to feces or sewage have similarly allowed the claims to proceed to trial. *See Willey v. Kirkpatrick,* No. 07–CV–6484 (MAT), 2013 U.S. Dist. LEXIS 14935, at *20–23, 2013 WL 434188, at *8 (W.D.N.Y. Feb.4, 2013) (collecting cases). [10] Where the exposure is not protracted, courts are split as to whether the prisoner has presented a triable Eighth Amendment claim. *Id.,* 2013 WL 434188, at *9 (collecting cases). Where claims in shorter-duration cases have survived dispositive motions, they have involved appalling conditions such as a "feces-covered cell," a "waste-filled cell," or a cell with no working toilet. *Id.*

Here, even viewed in the light most favorable to Plaintiff, the alleged feces and mold conditions at Auburn do not rise to the level described in *Gaston.* The evidence shows merely that Plaintiff was housed ten feet away from a heating system covered in bird feces and that there was a buildup of feces and mold on chain link fencing so high over Plaintiffs cell that it could only be accessed with scaffolding. (Dkt. No. 38 at 4; Dkt. No. 82–4 ¶ 15; Dkt. No. 89 at 27, 30.) These conditions do not compare, objectively, to the feces-filled environments to which the plaintiffs in cases that survived summary judgment were exposed. Therefore, I recommend that the Court grant Defendants' motion for summary judgment.

**\*12  ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 82) be ***GRANTED :*** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Liggins v. Parker,* No. 9:04–CV–0966 (NAM/DEP), 2007 U.S. Dist. LEXIS 98713, 2007 WL 2815630 (N.D.N.Y. Sept.25, 2007) and *Willey v. Kirkpatrick,* No. 07–CV–

6484 (MAT), 2013 U.S. Dist. LEXIS 14935, 2013 WL 434188 (W.D.N.Y. Feb.4, 2013).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

Filed Aug. 5, 2014

2007 WL 2815630

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeffrey LIGGINS, Plaintiff,

v.

Douglas PARKER, et al., Defendants.

No. 9:04–CV–0966. | Sept. 25, 2007.

**Attorneys and Law Firms**

Jeffrey Liggins, pro se.

Ryan, Smallacombe Law Firm, Claudia A. Ryan, Esq., John F. Moore, Esq., of Counsel, Albany, NY, for the Defendant.

**Opinion**

***ORDER***

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge David E. Peebles, duly filed on the 5th day of September, 2007. Following ten days

from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and no objections submitted thereto, it is

ORDERED, that:

1. The Report–Recommendation is hereby approved.

2. The Defendants' motion for summary judgment (Dkt. No. 33) is granted, and the Plaintiff's complaint is dismissed in its entirety.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Jeffrey Liggins, who is proceeding *pro se* and *in forma pauperis,* has commenced this inmate civil rights action pursuant to 42 U.S.C. § 1983 against Hamilton County and the County's Sheriff, as well as certain other County employees, complaining of conditions which he endured while confined as a pretrial detainee in the Hamilton County Jail ("HCJ"). Plaintiff's complaint represents a comprehensive, wide-ranging critique of the operations of the defendants' prison facility, with his allegations ranging in severity from the failure of prison guards to wear name tags, tuck in their shirts, lace and polish their shoes, and refrain from the use of foul language and boorish behavior, to defendants' failure to provide him with adequate medical care and interference with his access to the attorneys representing him and the courts. In light of the treatment which he received over the nine month period during which he was incarcerated at the HCJ, described by him as "inhumane", plaintiff seeks recovery of compensatory and punitive damages totaling $6 million.

**\*13** Currently pending before the court is a motion made on behalf of the defendants in the action seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety, both on the merits and based upon qualified immunity. For the reasons set forth below, I recommend that defendants' motion be granted.

### I. *BACKGROUND*

#### A. *The HCJ Generally*

Between June 27, 2002 and April 1, 2003, plaintiff was confined within the HCJ as a result of criminal charges originating in the Town of Lake Pleasant, New York located within Hamilton County. Amended Complaint (Dkt. No. 12) ¶ 18; Parker Aff. (Dkt. No. 33–3) ¶ 4; *see also* Defendants' Exhibits (Dkt. No. 35) Exh. 21. The HCJ is a six-cell prison facility located in Lake Pleasant, and comprised of four cells on the facility's main floor and two upstairs, with an additional group room located outside of the cells, containing an eating area, a television, and a table. Parker Aff. (Dkt. No. 33–3) ¶¶ 8–9; Defendants' Exhibits (Dkt. No. 35) Exh. 16–A. The HCJ typically houses and co-mingles both sentenced and non-sentenced inmates.

**\*2** Inmates confined within the HCJ are subject to rules and regulations which are reduced to writing and included in a prison rule book. Amended Complaint (Dkt. No. 12) ¶ 23; Parker Aff. (Dkt. No. 33–3) ¶ 10; Defendants' Exhibits (Dkt. No. 34) Exh. 10–A. The facility's rules and regulations were read to the plaintiff on the day of his arrival at the facility by Corrections Officer Robert Krugal, who is named in plaintiff's complaint as defendant "Robe Doe", and plaintiff signed a document acknowledging that this in fact occurred. Parker Aff. (Dkt. No. 33–3) ¶¶ 10–12; Defendants' Exhibits (Dkt.Nos.34–35) Exhs. 10–A, 24; *see also* Amended Complaint (Dkt. No. 12) ¶ 23. Included among the policies and procedures in existence at the HCJ is a grievance book to which all inmates within the facility have access. [1], [2] Parker Aff. (Dkt. No. 33–3) ¶ 13. Although they appear to have been available to him for review, plaintiff was not provided with a copy of either the facility rule book or the grievance procedure. Amended Complaint (Dkt. No. 12) ¶ 23.

#### B. *Missing Belongings*

In accordance with the policy in existence at the HCJ at the relevant times, each inmate is given a milk crate, which is tagged with the prisoner's name, in which to place clothing. Parker Aff. (Dkt. No. 33–3) ¶ 16. Clothing that does not fit within the milk crate is hung in a closet at the facility. *Id.* This practice was apparently followed with respect to the plaintiff. *Id.*

Shortly after his arrest on June 27, 2002, a relative of the plaintiff delivered dress clothes to the HCJ for his use during court appearances; though later recovered on or about

October 9, 2003 from a cabinet outside of another prisoner's cell door, those dress clothes were apparently misplaced for a time. Amended Complaint (Dkt. No. 12) ¶¶ 18, 32. In addition to his missing court clothes, plaintiff also maintains that at one point in October of 2002, prison officials at the HCJ misplaced a tee shirt and a CD, following his return from a brief stay at the Central New York Psychiatric Center in Marcy, New York; those items, however, were discovered in January of 2003 in a trash bag located within a milk crate. Amended Complaint (Dkt. No. 12) ¶ 33.

## C. *Attorney Access*

 **\*14**  One of the central issues raised in plaintiffs complaint concerns communications with attorneys in connection with the pending criminal prosecution against him. There is no specific written policy in existence at the HCJ governing telephonic communication between inmates and their attorneys; as a matter of practice, however, inmates are permitted to call their attorneys of record upon request, subject only to the availability of telephone facilities. Parker Aff. (Dkt. No. 33–3) ¶ 17. In-person legal visitation is a matter governed by a specific policy under which inmates are allowed to receive visits from their attorneys during normal hours of operation, provided that no disruption of the facility's operations results. *Id.* ¶ 18.

**\*3**  While acknowledging these policies, plaintiff attributes the failure of his first court appointed lawyer, Sterling Goodspeed, Esq., to visit him over the summer of 2002 to defendants' actions. Amended Complaint (Dkt. No. 12) ¶ 36. Neither plaintiff's complaint nor his affidavit in opposition to defendants' motion, however, supplies further amplification, nor does the record contain anything tending to corroborate his claim that the lawyer's failure to visit him is properly attributable to defendants' policies or actions. [3]

As a result of his inability to communicate with Attorney Goodspeed, plaintiff retained attorney Richard Bach, Esq., of Utica, New York. Amended Complaint (Dkt. No. 12) ¶¶ 37–39. After announcing during a court appearance in mid-September of 2002 that he had retained that attorney to replace court-appointed lawyer Goodspeed, plaintiff received a letter from Attorney Bach advising that he was unable to represent him and stating, in relevant part, as follows: "In reviewing my upcoming trial schedule-I have determined that I would be unable to represent Jeffrey in the manner which would best serve his legal interest." Defendants' Exhibits (Dkt.Nos.34–35) Exh. 14 at pp. 63, 72–77 and Exh. 20. Though once again offering no specifics or corroborating evidence, plaintiff

attributes the withdrawal of Attorney Bach and the return of his retainer to counsel's inability to speak with Liggins by telephone. Amended Complaint (Dkt. No. 12) ¶¶ 37–39.

Following Attorney Bach's withdrawal, the court appointed a second attorney, William Martuscello, Esq., to represent the plaintiff. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 80–81.That attorney represented Liggins in the course of the criminal prosecution against him up until the time of his sentencing. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 10.

## D. *Monitoring of Telephone Calls*

Plaintiff asserts that while speaking by telephone with attorneys or family members from the jail he could hear indications that his conversations were being monitored, including clicking sounds and other voices. Amended Complaint (Dkt. No. 12) ¶ 41. In response, defendants assert that pursuant to the policy in effect at the HCJ, prison officials are typically present during, and monitor inmate non-legal telephone conversations, although they are able to hear only the inmate portion of any given conversation. [4] Parker Aff. (Dkt. No. 33–3) ¶¶ 26–27. Plaintiff attributes any clicking or other similar sounds to "technical difficulties" resulting from having only one line into the facility. *See* Defendants' Exhibits (Dkt. No. 34) at pp. 66–67.

## E. *Access to Law Library and Legal Materials*

 **\*15**  Another facet of plaintiff's complaint concerns the availability of legal resources at the prison. Plaintiff maintains that the refusal of prison officials to make photocopies of legal documents without charge, the lack of "trained personnel to assist in the preparation of legal documents[,]" and the unavailability of a law library within the facility, impermissibly interferes with the right of inmate court access, in violation of the First Amendment. Amended Complaint (Dkt. No. 12) ¶¶ 44–45; Liggins Aff. (Dkt. No. 39) ¶ 6(p).

**\*4**  Because of its small size, the HCJ does not contain a law library, nor does it have a specific written policy concerning library use. Parker Aff. (Dkt. No. 33–3) ¶¶ 49–51. In practice, however, inmates at the facility are afforded the opportunity to request legal materials, which are then retrieved from a law library maintained within the county supervisor's office, a short distance from the jail facility. *Id.* While on occasion plaintiff did apparently request legal materials, and did not always receive the correct books, he was ultimately provided with the requested legal materials. *Id.; see also* Liggins Aff. (Dkt. No. 39) ¶ 6(q), (r) (Dkt. No. 12). It should be noted,

moreover, that those requests were made at a time when Liggins was represented by counsel, and thus any failure to provide him with legal materials did not hinder his ability to defend against pending criminal charges. *See* Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 95.

### F. *Medical Care and Treatment*

Another major focus of plaintiff's multi-faceted complaint is the medical care and treatment which he received while confined by the defendants within the HCJ. Plaintiff's medical care claim falls into two categories, one addressing his exposure to second hand smoke, or environmental tobacco smoke ("ETS"), and the second related to a chronic back condition which, he maintains, was inadequately addressed by the defendants during his stay there.

### 1. *ETS*

Plaintiff maintains that subsequent to his arrival at the HCJ in June of 2002, he was subjected to second hand smoke at the hands of fellow inmates as well as jail workers. Amended Complaint (Dkt. No. 12) ¶¶ 27–28, 48. According to the plaintiff, not only was smoking not prohibited at the HCJ but in fact inmates' smoking habits were encouraged by jail officials who were known to transport them to local ATM machines to withdraw cash for the purchase of cartons of cigarettes, and to go to the store for inmates on Thursdays and Fridays forthe purpose of purchasing cigarettes. *Id.* ¶¶ 47–48.

In January of 2003, as a direct result of plaintiff's complaints regarding exposure to second hand smoke, defendant Parker implemented a smoking ban, applicable to both inmates and employees alike, within the entire inside HCJ facility. [5], [6] Parker Aff. (Dkt. No. 33–3) ¶ 77. In accordance with that ban, which was strictly enforced, neither employees nor inmates were permitted to smoke inside of the facility. *Id.* ¶ 78.

 **\*16** Prior to implementation of the smoking ban, while employees and inmates were permitted to smoke, the plaintiff and other non-smoking inmates were free to move about the facility between 7:00 am and 11:00 pm, in such a way as to avoid anyone smoking. Parker Aff. (Dkt. No. 33–3) ¶ 80. Plaintiff and other inmates were also permitted to open windows to obtain ventilation of smoke. *Id.* ¶ 81. Additionally, in response to his complaints regarding ETS, plaintiff was offered the option of a second floor cell; Liggins, however, refused that proposed transfer. Parker Aff. (Dkt. No. 33–3) ¶ 76.

### 2. *Plaintiff's Back Condition*

*\*5 At the time of his entry into the HCJ, plaintiff had a documented history of a chronic lumbar back condition. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 103–09, 123–24; Eagan Aff. (Dkt. No. 33–4) ¶¶ 2–3; *see also* Defendants' Exhibits (Dkt. No. 35) Exh. 17. Records associated with plaintiff's pre-custodial medical treatment reveal that well prior to his incarceration at the HCJ he was diagnosed as suffering from degenerative disc disease and a herniated disc at L5–S1. *Id.*

In light of the size of the facility the HCJ does not employ a physician working at the jail; instead, HCJ inmates in need of medical care are treated by physicians and other medical personnel employed at the Speculator Primary Care Center or the Nathan Littauer Hospital, both of which apparently are located relatively near the prison facility. Parker Aff. (Dkt. No. 33–3) ¶ 58; Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 130.

Plaintiff initially was seen at the Speculator Health Center for his low back pain on August 9, 2002, at which time he was treated with a muscle relaxant but found to be neurologically intact. Defendants' Exhibits (Dkt. No. 35) Exh. 15–A. From that point until August 18, 2002, when plaintiff was taken to the Nathan Littauer Hospital Emergency Room complaining of low back discomfort, though without radicular pain, plaintiff's condition was treated with anti-inflammatory medications, pain medication and/or muscle relaxants on almost a daily basis. *Id.* Notes from that emergency room visit record a history of a herniated disc and pain "on and off for ten years, with a diagnosis of acute exacerbation of chronic low back strain/spasm, but with no acute disc herniation or neurological problems requiring further specialty care. *Id.; see also* Eagan Aff. (Dkt. No. 33–4) ¶ 5. Following that emergency room visit prison officials at the HCJ continued to treat the plaintiff's condition with anti-inflammatory medications, pain relief medication and/or muscle relaxants on a daily basis. Defendants' Exhibits (Dkt. No. 34) Exh. 15–D.

Plaintiff was next seen by outside medical professionals on September 27, 2002 when he was taken to the Speculator Primary Care Center complaining of shortness of breath, chest pain and back pain experienced after opening a window. Defendants' Exhibits (Dkt. No. 35) Exh. 15–A. Plaintiff was taken on that same day to Nathan Littauer Hospital for a chest x-ray and EKG, and was diagnosed as suffering from musculoskeletal pain and was prescribed medication for the pain. *Id.*

**\*17** Plaintiff was taken to the Speculator Primary Care Center on October 8, 2002, again complaining of back pain. Defendants' Exhibits (Dkt. No. 35) Exh. 15–A. On that occasion, plaintiff was diagnosed with acute lumbosacral strain with spasms, and was prescribed various medications. [7] *Id.*

Plaintiff was returned to the Speculator Primary Care Center on March 17, 2003, complaining of worsening pain based upon daily exercise from December of the previous year. Defendants' Exhibits (Dkt. No. 35) Exh. 15–A. On that occasion plaintiff was diagnosed as suffering from chronic lumbosacral spine spasm/strain. *Id.* An x-ray of plaintiff's lumbar spine taken at Nathan Littauer Hospital two days later revealed disc space narrowing at L5–S1, but with no fractures. *Id.* Exh. 15–A. Plaintiff continued receiving muscle relaxers on almost a daily basis between that time and his transfer out of the jail into the Clinton Correctional Facility on April 1, 2003. *Id.* Exh. 15–A, 15–D.

**\*6** At the heart of plaintiff's claims regarding the defendants' treatment of his back condition is his contention that he requested but was denied magnetic resonance imaging ("MRI") testing to determine the cause and the extent of his back pain, and that while x-rays were ultimately taken, as requested, he was not promptly notified of their results. [8] , [9] *See* Amended Complaint (Dkt. No. 12) ¶¶ 50–57; Liggins Aff. (Dkt. No. 39) ¶ 6(h)-(o).

In sum, it appears that while incarcerated at the HCJ between June 27, 2002 and April 1, 2003 plaintiff was treated on at least eight separate occasions for that condition by outside sources, and was provided medications on a regular basis to assist him in coping with his pain. It is true, as defendants acknowledge, that on between three and five occasions plaintiff requested to be seen by a doctor for his back pain; those requests, however, were denied on the basis either that they were made on weekends, when there were no deputies available for transport, or at times when snow conditions made travel hazardous. Defendants' Exhibits (Dkt. No. 34) Exh. 6 (Defendants' Responses to Interrogatories) ¶ 3(e)(1) (iii); Exh. 14 at pp. 112, 119; *see also* Amended Complaint (Dkt. No. 12) ¶ 49. The records also disclose, however, that plaintiff declined offers of doctor visits on several occasions including on January 6, 2003. Defendants' Exhibits (Dkt. No. 34) Exh. 10–D and Exh. 14 at pp. 112–13.

**G.** *Unprofessional Conduct and Other Miscellaneous Complaints*

Interspersed among the more serious claims set forth in this complaint, as amended, are allegations by the plaintiff of unprofessional conduct and unpleasant conditions experienced by the plaintiff as a result of the defendants' actions. Typical of those are allegations that 1) inmates are not properly overseen when washing and returning dishes for reuse, Amended Complaint (Dkt. No. 12) ¶ 66; 2) on one occasion, at plaintiff's request, prison officials purchased for him bread which later turned out to contain mold, *id.* ¶ 68; 3) dust is allowed to accumulate in the facility, *id.* ¶ 74; 4) there is evidence of insects, mosquitos and mice located within the jail, *id.* ¶¶ 74–77; 5) Liggins was required to use a cup with dry black stains on the outside when served milk by prison officials, *id.* ¶ 83–85; 6) prison administrators failed to properly supervise and monitor inmates, *id.* ¶¶ 87–92; and 7) prison guards were permitted to use inappropriate language, failed to wear proper uniforms or to wear name tags, and were permitted to wear denim jeans, *id.* ¶ 21.

## II. *PROCEDURAL HISTORY*

**\*18** Plaintiff commenced this action on August 16, 2004 and, at the direction of the court, filed an amended complaint on September 30, 2004. Dkt. Nos. 1, 8, 12.Named as defendants in plaintiff's complaint, as amended, are Hamilton County; Hamilton County Sheriff Douglas Parker; the Hamilton County Sheriff's Department; and several Hamilton County employees, including Corrections Lieutenant Carl Abrams, and Corrections Officers Robe Doe, Mike Doe and Dan Doe, each of whose last names are unknown to the plaintiff. [10] Plaintiff's complaint asserts various claims under the Eighth and Fourteenth Amendments to the United States Constitution, as well as alleging defendants' violation of state law and regulation associated with the operation of the HCJ. Dkt. No. 12.

**\*7** On September 21, 2006, following the joinder of issue and completion of pretrial discovery, defendants moved seeking summary judgment dismissing plaintiff's complaint in its entirety. Dkt. Nos. 33–35.In their motion, defendants argue that, as a matter of law, plaintiff's claims are deficient on the merits, and additionally assert their entitlement to qualified immunity from suit. *Id.* Plaintiff has since submitted an affidavit and memorandum in opposition to defendants' motion. [11] Dkt. No. 39. With the filing of that opposition and a subsequent reply on behalf of the defendants, filed on January 3, 2007, *see* Dkt. No. 41, this matter is now ripe for determination and has been referred to me for the issuance

of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 123(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see* Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*19** When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there

is a material issue of fact for trial. [12] Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*8** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [nonmovant's] *favor."* *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also* Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Plaintiffs Failure to Provide a Local Rule 7.1(a)(3) Counterstatement of Disputed Facts*

In support of their motion defendants have submitted a comprehensive statement of material facts which, they contend, are not genuinely disputed, as required by Rule 7.1(a)(3) of this court's local rules. [13] *See* Dkt. No. 33–5. Plaintiff's opposing motion papers, however, fail to contain such a statement or to otherwise specifically address the assertions set forth in defendants Local Rule 7.1(a)(3) statement. In their reply, defendants argue that this shortcoming carries with it fatal consequences, establishing their entitlement to the relief sought in their motion. As a threshold procedural matter, I must address the significance, if any, of plaintiff's failure to properly respond to defendants' 7.1(a)(3) statement.

Undeniably, the consequences of plaintiff's failure to properly refute the assertions set forth in defendants' rule 7.1(a)(3) statement are potentially significant. By its express terms, Local Rule 7.1(a)(3) provides that "[a]ny facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3). This and similar rules from other districts are routinely enforced by courts, resulting in facts set forth in such statements being deemed as admitted based upon an opposing party's obligation to respond properly to the statement. *See, e.g.,* Elgamil v. Syracuse Univ., No. 99–CV–611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also* Monahan v. New York City Dep't

*of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

**\*20** In this instance, while it is true that the plaintiff is in technical violation of the provisions of Local Rule 7.1(a)(3), he has not totally defaulted in connection with defendants' summary judgment motion, and indeed has clearly articulated in his opposing memorandum and affidavit-albeit in an extremely terse and conclusory fashion-his position concerning each of the factual matters at issue in this case. Accordingly, and in view of his *pro se* status and the reluctance of courts to decide cases on the basis of such procedural shortcomings, *see Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996), while underscoring the importance of Local Rule 7.1(a)(3) and its utility in ensuring an orderly and reasoned presentation to the court of summary judgment motions, I nonetheless recommend against a wooden application of the rule to deem all matters set forth in the defendants' Local Rule 7.1(a)(3) statement as admitted.

## C. *Court Access and Access to Counsel*

**\*9** In his complaint, plaintiff asserts that by their actions defendants unlawfully interfered with his access to counsel and the courts. Plaintiff's court access claim is comprised of two distinct components. Plaintiff initially asserts that while confined in the HCJ he was denied access to adequate legal resources, including a law library and photocopying facilities. Additionally, Liggins maintains that prison officials at the HCJ interfered with and hampered communication with the lawyers representing him in the criminal matter which resulted in his confinement.

### 1. *Access to Legal Materials*

The first portion of plaintiff's complaint relates to the alleged insufficiency of the legal materials and resources made available to inmates at the HCJ. Defendants seek summary dismissal of this claim as a matter of law.

Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established.[14]

*Bounds v. Smith,* 430 F.3d 817, 823, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977). Although in *Bounds* the Supreme Court held that this right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law[,]" *id.* at 828, 97 S.Ct. at 1498, the Court later clarified that

prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.

*Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 2180, 135 L.Ed.2d 606 (1996) (internal quotations and citations omitted). Instead, an inmate "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* In other words, to establish a violation of the right of access to the courts, a plaintiff must demonstrate that defendants' interference caused him or her actual injury-that is, that a "nonfrivolous legal claim had been frustrated or was being impeded" as a result of defendants' conduct.

*Id.* at 352, 116 S.Ct. at 2181. This is a particularly challenging requirement to meet in a case such as this, where the prison inmate asserting the court access denial claim is represented by legal counsel in the civil or criminal matter at issue. *See Santiago v. New York City Dep't of Corr.,* 2003 WL 1563773, at \*6 n.2 (S.D.N.Y. Mar. 6, 2003) (noting that where an inmate is represented by counsel, "there can be no violation of his constitutional right to access to the courts as a matter of law") (quotations omitted) (collecting cases); *see also*

*Smith v. City of New York,* No. 03 Civ. 7576, 2005 WL 1026551, at \* 7 (S.D.N.Y. May 3, 2005).

**\*21** \*10 It should be noted, moreover, that the law does not mandate that every prison facility, however small in size, maintain a physical library for use by inmates. *See Bounds,* 430 U.S. at 830–31, 97 S.Ct. at 1499. Indeed, courts have approved alternative measures deemed sufficient to afford appropriate legal materials in settings comparable to those now presented. *See, e.g., Holmes v. Buffardi,* No. 9:01–CV–980, Dkt. No. 17 (N.D.N.Y. May 9, 2002) (DiBianco, M.J.), *aff'd,* Dkt. No. 19 (N.D.N.Y. June 10, 2002) (Kahn, J.); (approving of the provision of legal materials through use of a CD Rom system); *Torres v. Buffardi,* No. 9:01–CV–1599, Dkt. No. 12 (N.D.N.Y. May 9, 2002) (DiBianco, M.J.), *aff'd,* Dkt. No. 13 (N.D.N.Y. June 12, 2002) (Kahn, J.) (approving

of the provision of legal materials through use of a CD Rom system).

As a small, six-cell facility, the HCJ does not include a law library. Parker Aff. (Dkt. No. 33–3) ¶¶ 8, 49–53. Instead, inmates are informed that upon request prison officials will retrieve law books and legal materials from the local county supervisor's office, which is within walking distance from the jail, and provide them to inmates. *Id.* ¶¶ 50–51. According to Sheriff Parker, each time the plaintiff requested legal materials, they were provided through this mechanism.[15] *Id.* ¶ 52.Such an alternative measure to maintaining a complete library for a six-cell prison facility suffices to satisfy the constitutional court access mandate, and no reasonable factfinder could conclude otherwise. *See, e.g., Saucedo v. Enders,* No. Civ. EP03CA433, 2004 WL 911309, at *2 (W.D.Tex. Apr.16, 2004) ("[A]ccess to the courts may be satisfied either by availability of legal materials, by counsel, or by any other appropriate device of the State; ... [the] alternatives open to the State are legion.") (quoting *Cruz v. Hauck,* 515 F.2d 322, 331 (5th Cir.1975)).

In addition to failing to establish a deprivation of constitutional significance resulting from the lack of a prison library at the HCJ, plaintiff has also failed to establish that he suffered prejudice as a result of that shortcoming. It is well-established that a necessary component of a court access deprivation claim under the First Amendment is the showing of actual injury sustained as a direct consequence of the deprivation. *Lewis,* 518 U.S. at 351–53, 116 S.Ct. at 2180–81; *Monsky v. Moraghan,* 127 F.3d 243, 246–47 (2d Cir.1997) (citing *Lewis* ),*cert. denied,* 525 U.S. 823, 119 S.Ct. 66, 142 L.Ed.2d 52 (1998). As was previously discussed, to sustain a First Amendment court access claim a plaintiff must prove that he or she was hindered in the pursuit of a nonfrivolous legal claim as a result of the alleged constitutional violations. *Lewis,* 518 U.S. at 351–55, 116 S.Ct. at 2180–81; *see also Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998). In this instance, plaintiff has not established the existence of any such injury. Unlike plaintiffs in many First Amendment court access claims arising under 42 U.S.C. § 1983, the plaintiff in this instance was represented by counsel at all stages of the criminal prosecution against him. Plaintiff's bare, conclusory allegation that because of defendants' actions he was ill-prepared to enter a plea and for sentencing are wholly

unavailing to establish a cognizable injury resulting from the alleged First Amendment violation.

### 2. *Interference With Communications With Attorneys*

**\*22  \*11** The second aspect of plaintiff's court interference claim arises from limitations allegedly placed by the defendants on his ability to select and communicate with an attorney to represent him in connection with the pending criminal proceedings. *See* Amended Complaint (Dkt. No. 12) ¶¶ 35–41. "[T]he right to counsel and the right of access to the courts are interrelated, since the provision of counsel can be a means of accessing the courts." *Benjamin v. Fraser,* 264 F.3d 175, 186 (2d Cir.2001). The Second Circuit has determined that, in cases involving a pretrial detainee's right to utilize counsel in his defense, both the due process right of access to the courts and the Sixth Amendment right to counsel are implicated. *Id.* at 187 (considering whether prison restrictions on pretrial detainees' visits with their attorneys violated the detainees' rights to counsel and of access to the courts). Where a plaintiff contests his or her access to counsel as a pretrial detainee, the court must consider whether the challenged prison conduct " 'unjustifiably obstruct[s] the availability of professional representation or other aspects of the right of access to the courts' " in light of " 'the central objective of prison administration, safeguarding institutional security.' " *Id.* at 187 (quoting *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974), *overruled on other grounds, Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1974 (1989) and *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)); *see also Elmaghraby v. Ashcroft,* No. 04 CV 1409, 2005 WL 2375202, at *22 (E.D.N.Y. Sept. 27, 2005), *affirmed in part, reversed in part, remanded by,* *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007).

In the instant case, plaintiff alleges that once he determined to retain counsel in order to replace his court appointed lawyer, he was provided with an antiquated, out-of-date version of the telephone book yellow page business entries. *See* Amended Complaint (Dkt. No. 12) ¶ 37. During his deposition, however, plaintiff acknowledged that a short time later he was provided with a more current version, and that he did not have any court appearances during the intervening time period while he was awaiting an updated telephone book. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 59–61.Defendants' exhibits, moreover, including logs of telephone contacts, reveal that plaintiff was able to

communicate on several occasions with his newly retained attorney, Richard Bach, Esq., who while initially agreeing to represent him later declined the role and returned plaintiff's retainer to him. Defendants' Exhibits (Dkt.Nos.34–35) Exh. 14 at pp. 63, 72–77 and Exh. 20. By the time of his plea and subsequent sentencing, Liggins was represented by yet another assigned counsel, William Martuscello. The record thus discloses no unjustifiable obstruction by prison officials of Liggins' ability to communicate with his lawyers. Plaintiffs access claim arising from alleged interference with communications with his lawyers is therefore subject to dismissal as a matter of law.[16] *See, e.g., Beyah v. Putman,* 885 F.Supp.2d 371, 374075 (N.D.N.Y.1995) (Baer, J.) (rejecting pretrial detainee's claims that the limitation of his telephone privileges violated his right to access the courts and his right to legal counsel where detainee conceded he was permitted to call his counsel and stated only that his personal calls were restricted).

### D. *Prison Conditions*

**\*23  \*12** At the heart of plaintiff's diverse and amalgamated claims is his complaint regarding the conditions to which he was exposed during the period of incarceration at the HCJ.[17] Plaintiff asserts that those conditions, when considered in their totality, resulted in a deprivation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences. *Benjamin v. Fraser,* 343 F.3d 35, 49–50 (2d Cir.2003). Under the Due Process Clause, government officials may subject a pretrial detainee to restrictions inherent to confinement in a detention facility so long as the resulting conditions do not "amount to punishment of the detainee." *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979). "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense[.]" *Id.* at 537, 99 S.Ct. at 1873. As the court noted in *Benjamin v. Fraser,* however, "because this punitiveness inquiry focuses principally on the *purpose* of an imposed disability, it is of limited utility when evaluating the environmental challenges to prison conditions at issue in this case, which ... were

not affirmatively imposed." 343 F.3d at 50 (emphasis in original).

In *Benjamin,* the Second Circuit acknowledged the government's duty to assume responsibility for the safety, general well-being, and basic human needs of those whose liberty it involuntarily restrains, and specifically distinguished between the circumstances presented by a pretrial detainee, who is still presumed innocent, and an inmate who has been convicted of a crime. *Id.* at 50–51.In light of those considerations, the court held that "although a pretrial inmate mounting a constitutional challenge to environmental conditions must show deliberate indifference, it may generally be presumed from an absence of reasonable care"; according to the Second Circuit, an inmate who challenges prison conditions like the ones at issue in *Benjamin* and in the instant case need not "show anything more than actual or imminent substantial harm." *Id.*

### 1. *Deliberate Medical Indifference*

A portion of plaintiff's complaint addresses the medical care provided to him and other inmates at the HCJ. Plaintiff complains, for example, of the fact there is no physician actually present and on staff at the jail facility. *See, e.g.,* Amended Complaint (Dkt. No. 12) ¶ 49. Plaintiff also challenges the medical care provided for his back condition, and specifically the failure of prison officials to arrange for MRI testing despite requests for such testing by him on several occasions. *Id.* ¶¶ 50–57.

In contrast to the well-established body of jurisprudence addressing deliberate medical indifference claims of sentenced prisoners under the Eighth Amendment, there is both a dearth of case law and significant uncertainty surrounding the precise standard to be applied to such claims brought by pretrial detainees. That such claims are subject to analysis under the Due Process Clause of the Fourteenth Amendment is clear. *Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991). The precise contours of the medical care obligation imposed under the Due Process Clause with respect to pretrial detainees, however, have not been firmly defined by either the Second Circuit or the Supreme Court.

*See Pressley v. Green,* No. 02 CIV. 5261, 2004 WL 2978279, at \*3 (S.D.N.Y. Dec.21, 2004). Since the Second Circuit has seemingly endorsed, at least implicitly, application of the Eighth Amendment's analysis to such claims, *id.; see also Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (applying the Due Process Clause of the Fifth

Amendment to a deliberate indifference claim brought by a federal pretrial detainee, and noting that "[w]e have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment") (citations omitted), I will look to the now-familiar medical indifference Eighth Amendment standards for guidance.

**\*24 \*13** The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the *inference."* *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at \*2 (same).

**a)** *Serious Medical Need*

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at \*2–\*3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.).

**\*25 \*14** In their motion defendants invite the court to conclude, as a matter of law, that plaintiff's back condition does not constitute a sufficiently serious condition to rise to a level of constitutional significance. In support of this assertion defendants offer the expert opinion of Dr. Thomas Stanford Eagan, a practicing orthopedic surgeon. *See generally,* Eagan Aff. (Dkt. No. 33–4). Based upon his review of plaintiff's medical records Dr. Eagan has opined, *inter alia,* that the progression of the protrusion of plaintiffs L5–S1 disc, identified as a condition which preexisted his incarceration at the HCJ, did not occur during the time of his incarceration there. *Id.* ¶ 11.Dr. Eagan therefore concludes that "the worsening of plaintiff's back condition had no relationship to his confinement at the Hamilton County facility or to the treatment that the plaintiff received while confined at the Hamilton County *Jail." Id.* ¶ 12.

In his response to defendants' motion, plaintiff has asserted that his back condition was "exacerbated" during his incarceration and that his conditions worsened during that time period. *See* Liggins Aff. (Dkt. No. 39) ¶¶ 6(h), (j). In

light of this assertion and the pain which he claims to have experienced while at the HCJ due to his back condition, however skeptical I may be that a reasonable factfinder will ultimately agree with the plaintiff on this score, I am unable to say as a matter of law that plaintiff's back condition was not capable of causing a sufficient level of pain or degenerating to such a degree as to constitute a serious medical condition to trigger the protections of the Eighth Amendment.

**b) *Defendants' Indifference***

Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 201–02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

**\*26 \*15** The record in this case reflects that defendants' efforts to address plaintiff's medical needs far exceeded anything tantamount to indifference. While having no medical personnel on staff at the facility, defendants treated the medical needs of the plaintiff and other inmates by utilizing resources available at nearby medical facilities, including the Speculator Primary Care Center and Nathan Littauer Hospital. Parker Aff. (Dkt. No. 33–3) ¶ 58.

A review of the relevant medical records reveals that plaintiff was provided care at those facilities on several occasions, and that he was provided or offered medication, including pain

relievers and muscle relaxants, on a frequent basis. In the opinion of Dr. Eagan, based upon his review of the plaintiff's medical records, not only was defendants' care and treatment of the plaintiff not indifferent, but indeed during the time of his incarceration at the HCJ it comported fully with generally accepted standards in the medical community. *See* Eagan Aff. (Dkt. No. 33–4) ¶ 16.

It is true that despite plaintiff's requests during the period of his incarceration that he be provided with MRI testing, no such testing occurred during that period. Based upon his review of plaintiff's medical records, Dr. Eagan found no basis to conclude that the failure to provide an MRI represented a departure from the level of care ordinarily anticipated within the medical community. Eagan Aff. (Dkt. No. 33–4) ¶ 16. In his affidavit, Dr. Eagan also noted that the MRI testing conducted on May 19, 2001—some six weeks after plaintiff's transfer out of the HCJ-showed a paracentral disc extrusion on the right L5–S1 with no evidence of any neural-compression, and did not reveal the existence of neurological problems which would require further evaluation by an orthopedic or a neurosurgical specialist. *Id.* ¶ 14. At best then, plaintiff's complaints regarding the failure to conduct MRI testing represent a classic disagreement by him with forms of treatment offered for his chronic back condition, and do not rise to a level of constitutional significance. *Rodriguez v. Yin,* 328 F.Supp.2d 414, 416–17 (W.D.N.Y.2004).

In sum, based upon the record now before the court, no reasonable factfinder could conclude that defendants were deliberately indifferent to plaintiff's serious medical needs. *See Rodriguez,* 328 F.Supp. at 416–17. Accordingly, I recommend the dismissal of plaintiff's medical indifference claims.

**2. *Exposure to Second–Hand Smoke***

In another portion of his complaint implicating the Fourteenth Amendment, plaintiff also complains of exposure to second hand smoke, or environmental tobacco smoke ("ETS"), while incarcerated at the HCJ. Amended Complaint (Dkt. No. 12) ¶¶ 47–48. Plaintiff's complaints in this regard are premised upon his allegation that corrections officers and other inmates were freely permitted to smoke near prisoners, including within the jail, during the period of his confinement. *See id.*

**\*27 \*16** In addressing plaintiff's ETS claims, which because of his status as a pretrial detainee arise under the Fourteenth Amendment, I have again drawn upon a well-established body of Eighth Amendment jurisprudence which differentiates between claims alleging present harm due to

ETS exposure, and those complaining of future harm caused by exposure to second hand smoke. *See Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir.2001); *Henderson v. Sheahan,* 196 F.3d 839, 845–47 (7th Cir.1999), *cert. denied,* 530 U.S. 1244, 120 S.Ct. 2691, 147 L.Ed.2d 962 (2000); *Oliver v. Deen,* 77 F.3d 156, 159–60 (7th Cir.1996); *Goffman v. Gross,* 59 F.3d 668, 672 (7th Cir.1995); *McPherson v. Coombe,* 29 F.Supp.2d 141, 145 (W.D.N.Y.1998); *see also, e.g., Warren v. Keane,* 196 F.3d 330, 333 (2d Cir.1999).

### a) *Present Injury*

Like other Eighth Amendment claims of deliberate indifference to medical needs, plaintiff's claim of ETS exposure endangering his existing health is governed by *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Alvarado,* 267 F.3d at 651; *see also Davidson v. Coughlin,* 920 F.Supp. 305, 309 (N.D.N.Y.1996) (McAvoy, C.J.). To state a claim under the objective prong of the *Farmer* test for present injury caused by ETS exposure, a plaintiff must show that ETS caused him or her to suffer serious adverse health consequences. [18] *Henderson,* 196 F.3d at 845. A serious medical need or injury is one that a physician has diagnosed as requiring treatment, which is so obvious that even a lay person would recognize the need for treatment. *Id.* at 846.

In this instance plaintiff does not seriously assert any present injury suffered by virtue of his exposure to ETS, nor do any records now before the court reflect the existence of such a reaction. While it is true that according to plaintiff's medical records he complained of shortness of breath attributed by him to exposure to ETS on at least one occasion, on September 27, 2002, when taken for treatment to the Speculator Center, a chest x-ray taken on that date at Nathan Littauer Hospital proved negative, and there is no indication in plaintiff's medical records of any asthma or similar condition which would be directly caused or triggered by his exposure to ETS. Defendants' Exhibits (Dkt. No. 35) Exh. 15–A. Accordingly, defendants are entitled to summary judgment dismissing the portion of plaintiff's ETS exposure claim based upon consideration of present injury suffered from that exposure. *Contrast, e.g., Gill v. Smith,* 283 F.Supp.2d 763, 769 (N.D.N.Y.2003) (Scullin,

C.J.) (summary judgment denied where defendant allegedly smoked in plaintiff's presence despite non-smoking policy and knowledge of plaintiff's asthmatic condition).

### (b) *Future Harm*

Plaintiff's claim based upon future harm caused by exposure to ETS is governed by *Helling v. McKinney,* in which the Supreme Court squarely held that deliberately indifferent exposure of an inmate to levels of ETS which poses an unreasonable risk of serious damage to future health can run afoul of the Eighth Amendment's proscription on cruel and unusual punishment. *Id.* at 35, 113 S.Ct. at 2481–82. While distinctly similar to the analysis employed to evaluate claims alleging present harm, objective analysis of allegations of future harm based upon ETS exposure is slightly more complicated, in that it involves two components. As a threshold matter, to prevail on such a claim plaintiff "must show that he [or she] ... is being exposed to unreasonably high levels of ETS." 509 U.S. at 35, 113 S.Ct. at 2482. Additionally, as the *Helling* Court further explained,

> **\*28 \*17** determining whether [plaintiff's] conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Id.* at 36, 113 S.Ct. at 2482 (emphasis in original).

In light of *Helling* plaintiff has failed to advance allegations of future harm sufficient to satisfy the objective prong of the ETS exposure test. While Liggins has alleged that he was exposed to ETS while at the HCJ, he has submitted nothing concrete to establish that such circumstances could result in harm to him; simply stated, plaintiff has failed to describe conditions which rise to a level which today's society chooses not to tolerate. *See LaCroix v. Williams,* No. 97–CV–0790, 2000 WL 1375737, at \*2–3 (W.D.N.Y. Sept.21, 2000) (no serious injury when plaintiff merely alleged residence in a smoking dormitory and there was no objective medical evidence showing that plaintiff's symptoms were caused by exposure to ETS. As the District of Columbia Circuit observed in *Scott*

*v. District of Columbia, Helling* does not mandate smoke-free prisons. 139 F.3d 940, 942 (D.C.Cir.), *cert. denied sub nom., Dawson v. District of Columbia,* 525 U.S. 851, 119 S.Ct. 125, 142 L.Ed.2d 101 (1998). Accordingly, plaintiff's Eighth Amendment claims of exposure to ETS based upon a future harm theory lacks merit.

### 4. *Miscellaneous Prison Conditions*

In addition to the claims already discussed, plaintiffs complaint contains a litany of grievances regarding the conditions to which he was exposed while confined in the HCJ. Plaintiff complains, for example, of suffering verbal harassment at the hands of certain of the defendants, and of Sheriff Parker permitting such conduct. *See, e.g.,* Amended Complaint (Dkt. No. 12) ¶ 21; Liggins Aff. (Dkt. No. 39) ¶ 6(bb). Such allegations, however, are insufficient to establish a constitutional violation since, regardless of how boorish and reprehensible such conduct may appear, verbal harassment of inmates by prison officials generally does not arise to a level of constitutional significance. *Chabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *see also Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003).

In his complaint plaintiff also challenges the defendants' failure to establish a meaningful grievance procedure through which he and other inmates could seek redress of constitutional violations. While the lack of such a procedure, or defendants' failure to properly administer it, might well provide a basis for excusing the plaintiff's failure to exhaust available administrative remedies as required under 42 U.S.C. § 1997e(a), *see Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389403, at *8 (E.D.N.Y. Jan.31, 2007), it does not independently establish a constitutional violation. [19] "Grievance procedures are the internal procedures and requirements of [prison officials], and, as such prison inmates [do not] have a constitutionally protected right to a grievance procedure...." *Faison v. Hash,* No. 03–CV–6475P, 2004 WL 944523, at *3 (W.D.N.Y. Apr.23, 2004) (citations omitted); *see also Adams v. Rice,* 40 F.3d 72, 75 (4th Cir.1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."). The plaintiff's allegations regarding the lack of a meaningful grievance procedure thus do not rise to a level of constitutional significance.

**\*29  \*18** Plaintiff next complains regarding unsanitary conditions and practices at the HCJ, and in particular in

connection with the preparation and service of food within the HCJ. In his complaint and supporting affidavit, for example, plaintiff asserts claims associated with the food served to him while at the HCJ alleging, *inter alia,* that he "was served food with hair in it", was "served from an ink stained cup on several occasions" and that "eating utensils were unclean." *See* Liggins Aff. (Dkt. No. 39) ¶¶ 6(kk), (mm), (nn); *see also* Amended Complaint (Dkt. No. 12) ¶¶ 66–72. Defendants contest the sufficiency of plaintiff's allegations, both as lacking in factual support and, even if true, failing to rise to a level of constitutional significance.

Undeniably, the Eighth Amendment's prohibition of cruel and unusual punishment extends to the food provided to prison inmates. While the Eighth Amendment does not elevate to constitutional significance an inmate's dislike for the food served or the portions received, *see, e.g., Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001), it does require that prisoners be given "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Ramos v. Lamm,* 639 F.2d 559, 570–71 (10th Cir.1980) (citations omitted), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759 (1981); *see also Robles v.. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citing *Lamm* ); *Cunningham v. Jones,* 567 F.2d 653, 659–60 (6th Cir.1977).

In their motion defendants assert that the food served to inmates within the HCJ is prepared by qualified and experienced individuals, with significant oversight by the New York State Department of Health. Parker Aff. (Dkt. No. 33–3) ¶¶ 30–31. Sheriff Parker's affidavit lists the identity and qualifications of the four individuals principally involved in food handling at the facility. Sheriff Parker also specifically addresses plaintiffs claims regarding a stained cup, explaining in his affidavit that an investigation into plaintiff's claims of discoloration of the beverage cup, attributed by Liggins to ink stains, revealed that the discoloration was due to exposure to hot temperatures in the facility dishwasher. *See* Parker Aff. (Dkt.33–3) ¶ 38; *see also* Defendants' Exhibits (Dkt. No. 34) Exh. 10–C. Plaintiff's complaint and affidavit in opposition to defendants' motion are comprised largely of conclusory allegations regarding the food and unsanitary conditions under which it is served, without evidentiary support or a great deal of specifics. By contrast, in their motion defendants have provided substantial, detailed information regarding the food service practices at the facility and the standards under which it operates. Since nothing in plaintiff's submissions reveals the existence of any condition associated with the preparation or

service of food which would present immediate danger to the health and well-being of inmates at the HCJ, I conclude that no reasonable factfinder could find in plaintiff's favor on his Eighth Amendment claims associated with food service.

**\*30  \*19** The balance of plaintiffs prison condition claims relate to minor matters, none of which, either singly or in combination, rise to a level sufficient to support a constitutional claim. Plaintiff alleges, for example, that his civilian clothes and property were misplaced on two occasions. The record reveals, however, that in both instances the missing items were ultimately located, and no evidence has been adduced to reflect that their temporary misplacement was the result of intentional acts on the part of any of the defendants. [20] In any event plaintiffs claim for loss of property does not lie in this instance in light of the fact that the State of New York provides inmates with a remedy under section 9 of the New York Court of Claims Act associated with such property losses. *See Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203–04, 82 L.Ed.2d 393 (1983); *Gadson v. Goord,* No. 96 Civ. 7544, 1997 WL 714878, at \*7 (S.D.N.Y. Nov.17, 1997).

Plaintiff also apparently complains of the fact that while at the HCJ he was not provided with an outside exercise area. *See* Liggins Aff. (Dkt. No. 39) ¶ 6(c). Without question, prison officials must afford at least some opportunity for exercise to prison inmates under the Eighth Amendment; consequently, the Due Process Clause of the Fourteenth Amendment, at a minimum, requires that some opportunity be provided. *See Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985). Cases addressing this requirement do not, however, set forth specific parameters associated with this requirement, instead leaving such matters to the sound discretion of prison officials. *See id.; see also Davidson v. Coughlin,* 968 F.Supp. 121, 130 (S.D.N.Y.1997). In determining whether a plaintiff's right to exercise has been abridged, courts generally look to a number of factors, including (1) the duration of the deprivation, (2) the extent of the deprivation, (3) the availability of other out-of-cell activities, (4) the opportunity for in-cell exercise, and (5) the justification for the deprivation. *Davidson,* 968 F.Supp. at 130 (citations omitted). The provision of an hour of exercise daily to prison inmates has been found to satisfy the minimum threshold requirement under the Eighth Amendment. *Anderson,* 757 F.2d at 35.

In this instance plaintiff was permitted to remain outside of his cell and was freely allowed access to the entire jail facility each day between the hours of 7:00 am and 11:00 pm. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 132–34; Parker Aff. (Dkt. No. 33–3) ¶¶ 14–15. While it is true that inmates at the HCJ are not provided with an outdoor exercise area, in light of practical constraints, they are free to exercise both in their cells and anywhere else in the jail facility during the sixteen hours that they were permitted to remain outside of their cells. Accordingly, I find that no reasonable factfinder could conclude that plaintiff's Eighth Amendment rights were violated in this regard.

**\*31  \*20** Plaintiff also complains of the failure of the defendants in several respects to comply with regulations governing the operation of county jails and penitentiaries, codified at 9 N.Y.C.R.R. §§ 7000–7103. The violation of a state law regulation, standing alone, however, does not arise to a level of constitutional significance actionable under section 1983. *See Ali v. Timmons,* No. 04–CV–0164, 2004 WL 1698445, at \*3 (W.D.N.Y. July 26, 2004) (citing *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987)).

In sum, while plainly not portraying conditions which could be described as exceedingly pleasant, none of plaintiff's allegations describe circumstances from which a reasonable factfinder could discern the existence of actual or imminent substantial harm sufficient to establish the violation of the Due Process Clause of the Fourteenth Amendment. I therefore recommend the entry of summary judgment dismissing plaintiff's prison condition claims as a matter of law.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiffs complaint, which recounts varied grievances regarding his nine month detention within the HCJ, includes an amalgamation of claims principally implicating his right to substantive Due Process under the Fourteenth Amendment United States Constitution. The HCJ, as portrayed by the plaintiff, is anything but a model prison. It may well be that with judicial oversight, many of the practices of which Liggins has complained could be rectified. The Supreme Court long ago sagely counseled against such judicial intervention, however, in its decision in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), observing that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions", falling within the ambit and expertise of corrections officials and requiring that "[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and

execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878 (citations omitted). For these reasons the Supreme Court has urged courts to resist the impulse to become "enmeshed in the minutiae of prison operations", noting that

> under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution or, in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

**\*32  \*21** *Id.* at 562, 99 S.Ct. at 1886.

Based upon a careful review of the record before the court, considered in a light most favorable to him, I find that none of the matters complained of rise to a level of constitutional significance and could lead to a finding by a reasonable factfinder that plaintiff's constitutional rights have been violated. [21] Accordingly, it is hereby

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 33) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE

REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

2013 WL 434188

Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Aaron WILLEY, Plaintiff,

v.

Robert KIRKPATRICK, et al., Defendants.

No. 07–CV–6484 (MAT). | Feb. 4, 2013.

**Attorneys and Law Firms**

Aaron Willey, Elmira, NY, pro se.

J. Richard Benitez, Nys Attorney General's Office, Rochester, NY, for Defendants.

**Opinion**

**DECISION AND ORDER**

MICHAEL A. TELESCA, District Judge.

**I. Introduction**

**\*1** On October 4, 2007, *pro se* plaintiff Aaron Willey ("Willey" or "Plaintiff") instituted this action pursuant to 42 U.S.C. § 1983 against Defendants, alleging that they violated his constitutional rights while he was an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). The Complaint alleges that Defendants acted "both individually and in concert," but does not allege any claims against them in their official capacities. The Complaint demands a "declaratory judgment stating that Defendants violated [Plaintiff's] constitutional rights," as well as compensatory and punitive damages.

Plaintiff was granted permission to file an amended complaint (Dkt # 60), which is the operative pleading in this action.

Defendants Robert A. Kirkpatrick, M. Monahan, Martin Kearney, Scott Lambert, Taylor Roberts, M. Sztuk, A. Allessandro, M. Overhuff, and Tom Schoellkopf have moved for summary judgment dismissing the complaint pursuant to [Federal Rules of Civil Procedure 56](). Plaintiff has opposed the motion and renewed his request for the appointment of counsel.

For the reasons discussed herein, Defendants' motion for summary judgment is granted, and the amended complaint is dismissed.

## II. Background

### A. The Parties

At all relevant times, Plaintiff was housed at Wende Correctional Facility ("Wende"), and Defendants were all employed at Wende. Specifically, Robert A. Kirkpatrick ("Supt.Kirkpatrick") was Superintendent at Wende; M. Monahan ("DSS Monahan") was Deputy Superintendent for Security; Martin Kearney ("Capt.Kearney") was a Corrections Captain; Scott Lambert ("Sgt.Lambert") and Jeff Jeziorski ("Sgt.Jeziorski") were Corrections Sergeants; Taylor Roberts ("C.O.Roberts"), M. Sztuk ("Sztuk"), A. Allesandro ("C.O. Allesandro"), and M. Overhuff ("C.O.Overhuff") were Corrections Officers; and Tom Schoellkopf ("H.O.Schoellkopf") was a Hearing Officer.

### B. Factual Summary

**\*33** The recitation of facts below is drawn from the pleadings and discovery documents on file in this matter. The Court has viewed the facts in the light most favorable to Plaintiff, as the party opposing summary judgment. *See, e.g.,* [United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)]() (In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party.).

### 1. The October 2005 False Misbehavior Report for Possessing a Weapon

On October 15, 2005, Sgt. Lambert and C.O. Roberts detained Willey and frisked him for no apparent reason. They brought him to a small room without a surveillance camera and

questioned him about an inmate they suspected of smuggling contraband into Wende. Sgt. Lambert opened a desk drawer and pulled out what appeared to be a metal weapon and said that if he did not work with them as an informant, they would falsely charge him with possessing a weapon. Plaintiff refused to cooperate, stating that he did not have any knowledge of the alleged smuggling. Sgt. Lambert responded, "Have it your way," and brought Willey back to his cell.

**\*2** On October 17, 2005, while Willey was undergoing a pat-frisk before attending yard recreation, CO. Roberts allegedly uncovered a flat piece of metal about four inches long and three-quarters of an inch wide secreted near his crotch area. CO. Roberts issued a disciplinary report charging Plaintiff with Possession of a Weapon and Possession of Contraband (PR 110.13 and 110.23). Willey was subsequently found guilty at a disciplinary hearing, even though he was not given notice or an opportunity to appear at the hearing.

On appeal, the conviction was set aside and a new hearing was ordered. At the hearing before Capt. Kearney on December 28, 2005, Plaintiff alleges that he was denied the right to call inmate witnesses and was unjustly removed from the hearing. He states that Capt. Kearney threatened to beat the shit out of him and called him a "young punk." According to Capt. Kearney, Willey's removal from the hearing was warranted because he refused to stop interrupting Capt. Kearney and attempting to place irrelevant matters on the record. Capt. Kearney found Willey guilty of both charges, and imposed 180 days in the Special Housing Unit ("SHU"), 180 days of lost privileges, and 12 months recommended loss of good time credits. On appeal, the conviction was set aside by Special Housing Unit Director Donald Selsky ("SHU Director Selsky") on February 28, 2006. [1]

### 2. The November 2005 False Misbehavior Report

On November 26, 2005, CO. Sztuk and CO. Allessandro escorted Willey to the shower. When Willey returned, he found that his cell had been "trashed"-the toilet had been flooded, and Willey's papers and belongings were strewn about his cell. When Willey asked CO. Sztuk for a "search contraband slip," Sztuk replied, "You really like fucking with me." Willey responded, "What?" CO. Sztuk said, "You heard me, keep fucking with me asshole and see what happens."

**\*34** Inmates housed nearby confirmed that they had seen CO. Sztuk carrying Willey's legal paperwork out of his cell after the cell search. Willey yelled out and asked to speak to an area supervisor. He was told to "give it a rest," to which he

replied that he would not give it a rest because they had stolen his legal paperwork. At that point, CO. Sztuk said, "What's that, Willey, you said you are going to shit us down (i.e., throw feces and/or urine on corrections officers)?" Willey denied saying anything like that.

Nevertheless, he was moved to the restricted side of the SHU where a Plexiglas shield was placed on his cell. CO. Allesandro then turned off the water to Plaintiff's cell, so that he could not flush the toilet. As a result, feces and urine accumulated in the bowl and made the air in the cell noxious. Willey alleges that the area supervisor, Sgt. Jeziorski, failed to properly supervise CO. Allessandro and CO. Sztuk.

On or about November 28, 2005, CO. Sztuk filed a false misbehavior report against Plaintiff, accusing him of threatening to "shit down" staff members. At the subsequent disciplinary hearing on December 7, 2005, before Susan Post (not a defendant in this action), Willey attempted to use videotape evidence to prove that he did not make such threat. However, according to Willey, someone had tampered with the surveillance tape to remove the sound and destroy the picture quality. Willey was found guilty and sentenced to 90 days in the SHU. On appeal, the charge was affirmed by SHU Director Selsky.

### 3. The December 2005 False Misbehavior Report

**\*3** On December 18, 2005, Willey placed the garbage from his evening meal on his feed-up tray to be picked up. However, CO. Overhuff refused to remove the refuse, and issued another false misbehavior report against Plaintiff for refusing a direct order (namely, to turn in his food tray) in violation of Prison Rule 106.10. According to CO. Overhuff, he told Willey to hand him tray, and Willey instead began to break his garbage in pieces; CO. Overhuff reiterated the order, and Willey again allegedly refused.

D.S.S. Monahan placed Willey on a pre-hearing restricted diet, and, on December 20, 2005, denied Willey's appeal of that decision.

At the disciplinary hearing conducted on January 10, 2006, with regard to the December 18, 2005 incident, H.O. Schoellkopf refused to allow Willey to question witnesses and ejected him from the hearing. According to Willey, H.O. Schoellkopf told him, "You are going to die in the SHU, youyoungpunk." H.O. Schoellkopf found Willey guilty and sentenced him to 30 days in the SHU, 30 days of lost privileges and two months of recommended loss of good time credits. OnFebruary 28, 2006, the conviction was reversed on

appeal by SHU Director Selsky, who found that Willey "was inappropriately removed from the hearing."

### 4. Harassment by Corrections Officers and Plaintiff's Suicide Attempt

Willey states that while he was housed in the SHU, he was subjected to continuous verbal harassment by numerous corrections officers, especially C.O. Allesandro. According to Willey, C.O. Allesandro made sexually harassing comments and, while Willey was showering, would stare at him licking his lips and blowing kisses. As a result, Willey became severely depressed and attempted to overdose on ibuprofen on February 9, 2006. He was taken to Erie County Medical Center and, upon his return to Wende, was placed in an observation cell he describes as filthy and reeking of urine and feces. Willey was left there, naked, for fourteen days. At that point, he was involuntary committed to the Central New York Psychiatric Center, where he stayed for six months.

**\*35** While there, Willey states that he was attacked by deranged, violent patients; strapped down to a gurney; and injected with potent psychotropic drugs against his will.

After his stint at the Psychiatric Center, he was returned to the Wende SHU.

### 5. The August 2006 False Misbehavior Report

On August 25, 2006, Willey received another misbehavior report for allegedly kicking a corrections officer while he was in restraints on February 10, 2006, the day after his suicide attempt. The issuing officer is not identified in the Complaint.

At the disciplinary hearing, H.O. Schoellkopf found Willey guilty and sentenced him to 180 days in the SHU. On September 17, 2006, Plaintiff wrote to Supt. Kirkpatrick regarding his continuing "false imprisonment" in SHU, claiming that he had done "nothing wrong." Willey also described the history of false misbehavior reports issued against him, beginning on October 15, 2005. Supt. Kirkpatrick responded that based on his review of the "hearing record packet and other related materials," he found "no reason to modify [the] disposition as rendered." Nevertheless, on appeal, SHU Director Selsky reduced the sentence in connection with the August 2006 misbehavior report.

### III. General Legal Principles

### A. Summary Judgment Standard

**\*4** The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TED. R. CIV. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)."[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). Where the non-moving party will bear the burden of proof at trial, the movant may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett, All* U.S. 317, 322–23, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the initial burden has been met by the movant, the non-moving party is required demonstrate that, as to a material fact, a genuine issue exists. FED. R. CIV. P. 56(e); *see also* *Anderson v. Liberty Lobby, Lnc, All* U.S. 242, 250, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A fact is 'material' only if the fact has some effect on the outcome of the suit." *Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998) (citing *Anderson,* 477 U.S. at 248). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*36** The court must draw all reasonable inferences, and resolve all ambiguities, in favor of the party opposing summary judgment. *Matsushita Elec. Lndus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City; Dept. of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) (citations omitted).

Although a court must read *apro se* litigant's papers liberally, interpreting them "to raise the strongest arguments that they suggest," *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), when alleging a violation of a civil rights statute, even a *pro se* litigant must make "specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987).

## B. 42 U.S.C. § 1983

To prevail in a Section 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. 42 U.S.C. § 1983; *see also, e.g., West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.l996).Section 1983 itself, however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

**\*5** "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The personal involvement of a supervisory defendant may be shown by evidence that, *inter alia,* the "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong ... or ... the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)[2] (citing *Wright,* 21 F.3d at 501 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986))).

## IV. Analysis

### A. Issuance of False Misbehavior Reports in Retaliation For Plaintiff's Refusal to Act as an Informant

The filing of baseless or false charges against an inmate does not, in and of itself, give rise to a constitutional violation. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) (An inmate "has no constitutionally guaranteed immunity

from being falsely accused of conduct which may result in the deprivation of a protected liberty interest."). Rather, to maintain an actionable claim against correction officers for filing a false misbehavior report, the inmate must be able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right. *See* *Freeman,* 808 F.2d at 951–53 (reasoning that the filing of false charges is not a constitutional violation, as long as the prisoner is granted a hearing and given an opportunity to rebut the charges); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988) (reversing grant of summary judgment where prisoner claimed that false disciplinary charges were filed against him as retaliation for his cooperation with a state investigation into alleged inmate abuse).

**\*37** Here, Willey has not alleged that the misbehavior reports were issued in retaliation for his exercise of a constitutionally protected right. However, the Complaint can be construed as alleging that certain defendants issued false misbehavior reports against Plaintiff and that the defendants acting as hearing officers denied him of due process at the related disciplinary hearings. *See* Complaint ¶ ¶ 19–22, 25–29, 45–48, 55–57, 69–70. In particular, Willey complains that both H.O. Kearney and H.O. Schoellkopf unlawfully ordered him removed from various disciplinary hearings stemming from the false misbehavior reports issued by CO. Sztuk and CO. Roberts.

Under New York State regulations, an inmate has the right to "be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals." N.Y. COMP.CODES R. & REGS., tit. 7, § 254.6. Although an inmate may bring a successful New York Civil Practice Law and Rules ("C.P.L.R.") Article 78 proceeding pursuant to this regulation, a claim under state law does not necessarily provide a viable due process claim under 42 U.S.C. § 1983.

**\*6** Here, New York has provided inmates with a procedural safeguard at their disciplinary hearings-the right to be personally present-above and beyond that which is required by the federal Constitution. *See* *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (ruling that inmates accused of disciplinary violations are afforded certain procedures, including 24—hours notice, the right to call—but not necessarily to be present during the testimony of—witnesses, and an impartial tribunal);

*Francis v. Coughlin,* 891 F.2d 43 (2d Cir.l989). "A procedural safeguard does not constitute a liberty interest[.]" *Dawes v. Leonardo,* 885 F.Supp. 375, 378 (N.D.N.Y.1995) (citing *Patterson v. Coughlin,* 761 F.2d 886, 892 (2d Cir.1985) (noting how the court below had "apparently confuse[d] the deprivation of a liberty interest with the denial of the constitutional right to procedural safeguards which is implicated by that interest"), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986))."[W]here that safeguard is not required by the United States Constitution's Due Process Clause, its denial cannot constitute a violation of that clause[.]" *Id.* (citing *Patterson,* 761 F.2d at 892 (finding a section 1983 action permissible where the disciplinary hearing in question violated state procedural requirements simultaneously violated federal due process mandates)). Thus, although it was violative of Willey's state regulatory rights to be excluded from the hearing, his federal constitutional rights were not violated thereby. Accordingly, his retaliation claim premised on a substantive federal due process violation must fail. *See, e.g., Livingston v. Kelly,* 561 F.Supp.2d 329, 331 (W.D.N.Y.2008) ("[A]n inmate's allegation that he has been found guilty of false disciplinary charges may support a constitutional claim if he also alleges that he was denied the minimum procedural due process protections guaranteed by the Fourteenth Amendment.") (citations omitted).

**B. Destruction of Personal Property**

**\*38** Willey alleges that CO. Sztuk and CO. Alessandro stole legal documents from his cell, and destroyed his personal property (e.g., family photographs and letters).

Under *Hudson v. Palmer,* 468 U.S. 517, 536, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), even the intentional destruction of an inmate's property by a prison officer does not violate the Due Process Clause if the state provides that inmate with an adequate post-deprivation remedy. While the loss of property is regrettable, and even though Willey has alleged that these defendants were personally responsible for the loss, he has not stated an actionable constitutional claim because New York state law provides him with an adequate post-deprivation remedy, i.e., § 9 of the Court of Claims *ActReyes v. Koehler,* 815 F.Supp. 109, 114 (S.D.N.Y.1993) (citing *Blum v. Koch,* 716 F.Supp. 754, 762 (S.D.N.Y.1989); *Friedman v. Young,* 702 F.Supp. 433, 437 (S.D.N.Y.1988); *DeYoung v. City of New York,* 607 F.Supp. 1040, 1042–13 (S.D.N.Y.1985)); *accord, e.g., Murchison v. Keane,* No.

94 Civ. 466 CSH, 2000 WL 489698, at *6 (S.D.N.Y.Apr.25, 2000) (citations omitted).

## C. Harassment

**\*7** Willey alleges that CO. Allessandro violated his constitutional rights by subjecting him to continuous harassment, which Willey describes as "psychological, emotional, verbal, and sexual." Willey states that CO. Allesandro would bang on his cell and turn his light switch on and off rapidly. Also, Willey indicates that CO. Allesandro would stare at him while he was showering and toweling off, and would make sexually suggestive comments. Willey does not claim that CO. Allessandro physically touched him in a sexual manner, however.

"Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983." *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) (citing *Patton v. Przybylski,* 822 F.2d 697, 700 (7th Cir.1987) (derogatory remarks do not constitute a constitutional violation); *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989); *Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9th Cir.1987); *Martin v. Sargent,* 780 F.2d 1334, 1338–39 (8th Cir.1985)). Willey has made no showing of uninvited physical or sexual contact, nor has he pled such a cause of action in his Complaint. CO. Allesandro's annoying conduct and comments, unaccompanied by physical threats or attacks, do not amount to a constitutional violation under § 1983.

## D. Eighth Amendment Violation Based Upon Unsanitary Conditions

Willey asserts that CO. Sztuk and CO. Allessandro violated his Eighth Amendment right to be free from cruel and unusual punishment by turning off the running water to his cell while the Plexiglas cell shield was in place between December 1, 2005, and January 10, 2006. At one point in the Complaint, Willey states that his drinking water and toilet water was shut off for "extensive lengths of time". Compl., ¶ 87 (Dkt # 1). In the next sentence, he states that his toilet water was shut off for "seven (7) days, forcing plaintiff to stay in a plexy glass shield (no air circulation) and breathe in air smelling of urine/ feces ..." *Id.*

**\*39** In his response to interrogatories propounded by Willey, CO. Allessandro denied "purposely shut[ting] [his] toliet [sic]

and water pressure off in between" December 1, 2005, and January 10, 2006. Dkt # 95 at 3, ¶ 9. However, Defendants failed to address this conditions-of-confinement claim in their motion for summary judgment.

"While the Eighth Amendment's prohibition against cruel and unusual punishment 'does not mandate comfortable prisons,' " *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)), the conditions of confinement must be at least 'humane,' " *id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). An Eighth Amendment violation based upon living conditions requires the inmate to show (1) a deprivation that is "objectively, sufficiently serious" of "the minimal civilized measure of life's necessities," and (2) a "sufficiently culpable state of mind" on the part of the defendant official, such as deliberate indifference to inmate health or safety. *Gaston,* 249 F.3d at 164 (quoting *Farmer,* 511 U.S. at 834) (internal quotation marks omitted in *Gaston* ).

**\*8** A Section 1983 claim will not lie for prison conditions that are merely unpleasant,, but chronic exposure to human waste will give rise to a colorable claim. *See Gaston v. Coughlin,* 249 F.3d 165–66. In *Gaston,* the Second Circuit reinstated an inmate's Eighth Amendment claim against two defendants where the area in front of the inmate's cell "was filled with human feces, urine, and sewage water" for several consecutive days. The Second Circuit stated that it was "unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end." *Id.* at 166.Similarly, in *LaReau v. MacDougall,* 473 F.2d 974, 977–79 (2d Cir.1972), the Second Circuit held that an inmate who spent five days in a cell that contained only a grate-covered hole in the floor for a toilet, which could only be flushed from the outside, was deprived of his Eighth Amendment rights. The circuit court observed that "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted. The indecent conditions that existed in this ... cell seriously threatened the physical and mental soundness of its unfortunate occupant." *Id.* at 978; *see also Wright v. McMann,* 387 F.2d 519, 522, 526 (2d Cir.1967) (finding 33–day placement of prisoner in strip cell which was "fetid and reeking from the stench

of the bodily wastes of previous occupants which ... covered the floor, the sink, and the toilet," combined with other conditions, violated Eighth Amendment).

Courts outside of the Second Circuit have reached the same result where exposure to sewage lasts for a substantial period of time. *See* McCord v. Maggio, 927 F.2d 844, 846–47 (5th Cir.1991) (finding Eighth Amendment violation where inmate lived in cell for two years and slept on floor for months "into which rain water and backed-up sewage leaked");

Williams v. Adams, 935 F.2d 960, 961–62 (8th Cir.1991) (reversing grant of summary judgment for prison defendants where plaintiff alleged "that the toilet in the cell did not work" and overflowed continuously "and the floor stay[ed] filthy with its wast[e]" over 13–day period); Howard v. Adkison, 887 F.2d 134, 136–38 (8th Cir.1989) (holding Eighth Amendment violation sufficiently proven where inmate lived for two years in cell where walls, door and food slot "were covered with human waste," mattress was "stained with urine and human waste" and pleas for remedial measures went unanswered); McCray v. Sullivan, 509 F.2d 1332, 1336 (5th Cir.1975) (holding conditions in isolation cells where inmates lived for as long as 21 days violated Eighth Amendment where waste "frequently" overflowed onto the floors of the cells); Looper v. Sanders, Civil No. 6:10–cv–06037, 2011 WL 861714, at *4–*5, *8 (W.D.Ark.Mar.10, 2011) (denying defendants' motion for summary judgment where plaintiff was exposed to raw sewage for over 10 months); Jones v. Sanders, No. 08–6035, 2009 WL 2432632, at *7 (W.D.Ark.Aug.7, 2009) (Report and Recommendation) (recommending denial of defendants' motion for summary judgment where plaintiff was exposed to raw sewage for a month and a half).

**\*40  \*9** "Where an inmate's exposure to waste lasts for three or four days, the Circuits are split." Ortiz v. Department of Correction of City of New York, 2011 WL 2638137 (S.D.N.Y.Apr.29, 2011) (comparing Smith v. Copeland, 87 F.3d 265, 269 (8th Cir.1996) (affirming summary judgment for defendants where plaintiff was subjected to an overflowing toilet in his cell for four days), *with* McBride v. Deer, 240 F.3d 1287, 1291–92 (10th Cir.2001) (vacating Rule 12(b)(6) dismissal where plaintiff alleged he was forced to live in "feces-covered cell" for three days); Sperow v. Melvin, No. 96–4219, 182 F.3d 922, 1999 WL 450786, at *l-*3 (7th Cir. June 24, 1999) (unpublished opn.) (reversing Rule 12(b)(6) dismissal where inmate "was subjected to

appalling conditions" of waste-filled cell "for three full days"); Young v. Quinlan, 960 F.2d 351, 355–56, 363–65, (3d Cir.1992), *superceded by statute on other grounds as stated in* Ghana v. Holland, 226 F.3d 175, 184 (3d Cir.2000) (reversing summary judgment for defendants where inmate was moved to "dry cell" without working toilet for 96 hours and forced to urinate and defecate in his cell)).

Especially because Willey has adequately pled maliciously wilful conduct by CO. Allessandro, rather than mere negligence, the alleged shut-off of the running water to Willey's toilet for several days place this case on the borderline between the levels of discomfort to be expected in prison and unacceptable, inhumane conditions. After reviewing the cases cited above, however, the Court concludes that on the particular facts presented here, Willey's conditions-of-confinement claim cannot withstand summary judgment. First, Willey is vague as to the dates that the alleged shut-off occurred, and has made conflicting allegations about the duration ("extensive lengths of time" versus "seven days" versus the time between December 1, 2005, and January 10, 2006). Second, Willey has not claimed that human waste from his toilet overflowed into his cell. *See* Smith v. United States, No. 9:09–CV–729 (TJM/DRH), 2011 WL 777969 at *2, *11 (N.D.N.Y.Feb.3, 2011) (Report and Recommendation) (recommending denial of summary judgment where inmate alleged that officers "refused to flush the toilet or provide the inmates with toilet paper for two weeks," causing overflow of human waste to spill onto cell floor and inmate to become "nauseous and lightheaded from the odor"), *adopted by,* 2011 WL 776150 (N.D.N.Y.Mar.l, 2011). Third, Willey has not claimed that he suffered sickness or other ill effects as a result of the malodorous atmosphere caused by the water shut-off. *Contrast with Sperow, supra* (reversing dismissal of complaint where, after three days of exposure to human feces and urine on the walls and floor, pieces of a mattress on the floor caked with feces and urine, and a dozen plastic food trays with decayed food, plaintiff was had a headache, gastrointestinal and respiratory problems, and was feverish and sweating); *Smith, supra* (denying summary judgment where inmate alleged that his exposure to raw sewage from overflowing toilet caused sickness and nauseousness).

**E. Imposition of Restricted Diet in Violation of Eighth Amendment and Due Process**

**\*41  \*10** Willey asserts that D.S.S. Monahan placed him on a pre-hearing restricted diet for seven days, consisting of a loaf of bread cabbage, in violation of his Eighth Amendment

rights. According to Willey, the bread was usually stale and the cabbage usually rotten. Willey also asserts a due process claim in connection with his request to D.S.S. Monahan to rescind the restricted-diet order during the seven days.

### 1. Eighth Amendment

As stated above, "a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer,* 511 U.S. at 834.

With respect to the first prong, "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15–16 (2d Cir.1983) (citations omitted). For instance, "the Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food ... [that does not] present an immediate danger to health and well being of the inmates who consume it." *Id.* at 15 (internal quotation marks and citation omitted). With respect to the second prong, a deliberate indifference to inmate health or safety may be shown where a prison official knew a diet was inadequate and likely to inflict pain. *See* *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002).

Courts in this Circuit routinely have dismissed claims similar to Willey's, finding that the inmate failed to establish that he experienced a sufficiently serious deprivation for purposes of the Eighth Amendment. *See* *Smith v. Burge,* 2006 WL 2805242, at *11 (N.D.N.Y.Sept.28, 2006) ("Plaintiff does not establish, or even specifically allege, that (1) the food he was served [i.e., a hard loaf of bread and an apple per day] was nutritionally inadequate (e.g., with respect to the total calories it contained, its grams of carbohydrates, protein, fiber, and fat, or its units of vitamins and minerals, etc.), (2) that he was physically unable to eat the food, or (3) that he lost weight during the week in question.") (footnotes omitted) & *id.,* n. 78 (citing, *inter alia,* *McEachin v. McGuinnis,* 357 F.3d 197, 199–201 (2d Cir.2004) (affirming district court's F.R.C.P. 12(b)(6) dismissal of Eighth Amendment claim alleging, *inter alia,* that inmate was placed on a restricted diet consisting of "loaf" for seven days)).

### 2. Procedural Due Process

To pursue a claim under *42 U.S.C. § 1983* that a defendant deprived him of his constitutional right to due process, a plaintiff must show that he "enjoyed a protected interest, and defendant's deprivation of that interest occurred without due process of law." *Taylor v. Rodriguez,* 238 F.3d 188, 191 (2d Cir.2001) (citation omitted). Thus, courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient...." *Kentucky Dept. of Corr.,* 490 U.S. at 460.

**\*42  \*11** Apparently relying on *7 N.Y.C.R.R. § 304.2,*[3] Willey asserts that he was entitled to a hearing before D.S.S. Monahan regarding his request to be removed from the restricted diet prior to the end of the seven-day period.

In order to demonstrate the existence of a liberty interest, the plaintiff must allege facts suggesting that he was subjected to a deprivation that imposed "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also* *Tellier,* 280 F.3d at 80. Willey is hard-pressed to allege or establish such facts given that the Second Circuit has held that the imposition of a restricted diet does not impose an "atypical and significant hardship" on inmates. *McEachin v. McGuinnis,* 357 F.3d at 200–01 (finding that a seven-day post-hearing restricted diet did not impose an atypical and significant hardship). Indeed, several federal courts "have specifically held that the imposition of a seven-day pre-hearing restricted diet of 'loaf' (imposed without the issuance of a deprivation order or the holding of a hearing during the seven-day period) did not create an atypical and significant hardship for purposes of the Fourteenth Amendment." *Smith v. Burge, supra* at n. 88 (citing *Beckford,* 151 F. Supp.2d at 208–209, 218–219 & n. 4 (not mentioning *7 N.Y.C.R.R. § 304.2,* but granting defendants motion for summary judgment as to plaintiff's due process claims because a seven-day pre-hearing restricted diet did not impose an atypical and significant hardship); *Turnboe v. Gundy,* 25 Fed. Appx. 292, 293 (6th Cir.2001) (being placed on a pre-hearing restricted diet consisting of "food loaf" for seven days does not constitute an "atypical and significant hardship" on the inmate in relation to the ordinary incidents of prison life); *Thomas v. Virginia,* 04–CV–0273, 2005 WL

15517, at *10–11 (W.D.Va. July 28, 2005)). The Court finds the analysis in these cases, especially *Smith v. Burge, supra,* persuasive. Accordingly, the Court concludes that Willey has failed to establish a procedural due process claim with respect to the seven-day imposition of a restricted diet prior to his disciplinary hearing.

## V. Conclusion and Orders

For the foregoing reasons, Defendants' motion for summary judgment is granted, and the Amended Complaint is dismissed. Plaintiff's motion for appointment of counsel, asserted in his opposition to Defendants' summary judgment motion, is denied as moot.

Plaintiff is advised that he must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**\*43  IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 670429

## Footnotes

1    Page numbers in citations to Plaintiffs deposition transcript refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

2    Page numbers in citations to Plaintiffs opposition to the motion for summary judgment refer to the page numbers assigned by the Court's electronic filing system.

3    Page numbers in citations to the medical records refer to the page numbers assigned by the Court's electronic filing system.

4    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

5    Page numbers in citations to Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

6    In *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal* 's effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories.

    *See* *Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). The Second Circuit itself has noted that "*Iqbal* has ... engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon.*" *Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2012). The Second Circuit declined to address the issue in *Reynolds,* however, and has not addressed it since that time. I will assume for the purposes of this motion that *Colon* remains good law.

7    Even if Defendant Fischer were personally involved, he would be entitled to summary judgment because, as discussed below, Plaintiff has not raised a triable issue of fact that his Eighth Amendment rights were violated.

8    Lexis and Westlaw list different dates for this decision. The Court has used the date listed by Westlaw, which reflects the date on which the Court adopted the magistrate judge's report and recommendation.

9    The Court will provide Plaintiff with a copy of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

10    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

1   Plaintiff disputes the availability of a functional grievance procedure at the facility. *See* Amended Complaint (Dkt. No. 12) ¶ 15 ("[t]here is no prison grievance procedure at the [HCJ]"); Liggins Aff. (Dkt. No. 39) ¶ 6(gg) ("[i]ntake made mention of a grievance book however I was never permitted to use this procedure").

2   While Sheriff Parker indicates that the grievance book is attached to as Exhibit 16 to the affidavit of defendants' counsel, that procedure manual does not accompany Exhibit 16 as filed with the court and I have been unable to locate it among the voluminous materials submitted by defendants in conjunction with their motion.

3   In their motion, defendants note that plaintiff was able to confer by telephone with Attorney Goodspeed following his initial booking into the HCJ, and that he was always permitted by prison officials to speak with Attorney Goodspeed by telephone or to receive his visits. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 44–45, 136 and Exh. 16–B. A log maintained at the HCJ reflects several telephone conversations between the plaintiff and Attorney Goodspeed, as well as calls made by the plaintiff to other attorneys during the time that Goodspeed acted as his counsel of record. *See* Defendants' Exhibits (Dkt. No. 34) Exh. 16–B.

4   Significantly, that policy did not apply to inmate conversation with attorneys, which remained private and confidential. Parker Aff. (Dkt. No. 33–3) ¶ 28.

5   According to the plaintiff, there was a no-smoking policy in effect at the HCJ at the time of his arrival in June of 2002, although it was not enforced until January, 2003. Liggins Aff. (Dkt. No. 39) ¶ 6(d).

6   Shortly after the smoking ban went into effect plaintiff was separated from two inmates who were smokers. Parker Aff. (Dkt. No. 33–3) ¶ 82. That separation was implemented for plaintiff's protection, with defendants fearing the possibility of retaliation against the plaintiff for implementation of the smoking ban. Parker Aff. (Dkt. No. 33–3) ¶ 82. That separation was short-lived, however, in light of assurances by the plaintiff that he did not fear being harmed as a result of the smoking ban. *Id.* ¶ 83.

7   According to the HCJ medication log, at or about this time plaintiff refused medication offered to him on three separate occasions. Defendants' Exhibits (Dkt. No. 34) Exh. 15–D.

8   Plaintiff's medical records do not substantiate his claim of having requested MRI testing of his back during his stay at the HCJ. *See* Defendants' Exhibits (Dkt. No. 35) Exh. 15–A.

9   According to the plaintiff, shortly after his transfer out of the HCJ he was administered an MRI, revealing a herniated disc, chronic degenerative disc disease of the lumbar region, narrowing of the disc space at L4–L5, and paracentral disc extrusion in contact with a nerve, and was scheduled for an epidural steroid injection. Liggins Aff. (Dkt. No. 39) ¶ 6(o). Defendants' medical expert, Dr. Eagan, confirms that such an MRI was conducted on May 19, 2003, but notes that while there was contact with the S1 nerve there was no displacement of the nerve root, and x-rays taken on June 10, 2003 revealed only mild degenerative disc disease. *See* Eagan Aff. (Dkt. No. 33–4) ¶ 6.

10  While the Hamilton County Court was also named as a defendant in plaintiff's initial complaint, the court sua sponte ordered dismissal of his claims against that entity based upon a routine review of plaintiff's complaint and *in forma pauperis* application. *See* Dkt. No. 8.

11  As will be seen, plaintiff's opposition papers do not include a response to defendants' statement of material facts not in dispute, submitted pursuant to Northern District of New York Local Rule 7.1(a)(3). *See* pp. 20–23, *post.*

12  In their reply papers, defendants argue that in order to avoid summary judgment the plaintiff was not entitled to rest upon the allegations of his complaint, but instead was duty bound to come forward with materials of evidentiary value in order to demonstrate the existence of genuine, triable issues of material fact, citing, *inter alia,* *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). *See* Defendants' Reply Memorandum (Dkt. No. 41–2) at 2. This argument, however, overlooks the fact that plaintiff's *pro se* complaint in this action is signed by the plaintiff under penalty of perjury, and consequently represents the functional equivalent of an affidavit, *see* *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1998) (citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), thus readily distinguishing this case from the circumstances extant in *Rexnord Holdings.*

13  That rule provides, in relevant part, that

> [a]ny motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established....
>
> * * *
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs....
>
> N.Y.N.D.L.R. 7.1(a)(3). Plaintiff was reminded of the requirements of this meaningful rule through defendants' attachment to their notice of motion of this court's "Notification Of The Consequences Of Failing To Respond To A Summary Judgment Motion." *See* Dkt. No. 33–6.

14   The right of court access derives from the First Amendment. *See* Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 741, 103 S.Ct. 2161, 2169, 76 L.Ed.2d 277 (1983). Although plaintiff's complaint does not purport to state a claim under that constitutional provision, in light of his *pro se* status I recommend that the court construe his complaint, as amended, liberally to assert such a cause of action. *See* Abbas v. Dixon, 480 F.3d 636, 638 (2d Cir.2007).

15   In his answering affidavit, submitted in opposition to defendants' motion, Liggins asserts that he requested legal materials on several occasions to assist in the preparation of his defense and to prepare for sentencing but that "[t]he guards failed to provide the correct material." *S ee* Liggins Aff. (Dkt. No. 39) ¶ 6(r). This statement, however, is at odds with plaintiff's deposition testimony, during which he acknowledged that while on occasion guards would return with the wrong legal materials, he would then be provided with the requested materials a few days later. *See* Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 95; *see also* Parker Aff. (Dkt. No. 33–3) ¶ 53. An affidavit given in opposition to a summary judgment motion which conflicts with other sworn statements of the opposing party cannot alone suffice to raise a genuine issue of material fact.

*See* Reisner v. Gen. Motors, 671 F.2d 91, 93 (2d Cir.) (disregarding factual claims made in opposition to summary judgment motion which contradicted earlier affidavits, deposition testimony, and interrogatory responses), *cert. denied*, 359 U.S. 858, 103 S.Ct. 130 (1982).

16   One portion of plaintiff's court access claim surrounds his suspicion that defendants were responsible for his sentencing being advanced from the originally scheduled date. *See* Amended Complaint (Dkt. No. 12) ¶¶ 61–62. During his deposition, however, plaintiff acknowledged that his allegations in that regard were the result of sheer surmise as to the defendants' involvement in the establishment of his sentencing date, and the record contains nothing of evidentiary value to substantiate his suspicions in this regard. Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 102–03.

17   Many of the claims made by Liggins fail to identify a particular defendant as the party responsible for the constitutional deprivation alleged. Although defendants have not raised this issue in their motion, the lack of a showing of personal involvement on the part of various defendants could provide a proper basis for dismissal of those claims for which no responsible party has been identified. *See* Bass v. Jackson, 790 F.2d 260, 263. And, while plaintiff appears to assert liability on the part of Sheriff Parker, that liability is plainly based upon his role in overseeing the jail facility and, there being no *respondeat superior* liability under 42 U.S.C. § 1983, *see* Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003), his role is in and of itself insufficient to establish his personal involvement in many of the complained of acts. *Id.; see also* Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994).

18   In certain circumstances, exposure to ETS can also give rise to a cognizable constitutional claim when it has the known effect of aggravating an existing medical condition. *See, e.g.,* Alvarado, 267 F.3d at 651 (plaintiff stated Eighth Amendment claim under *Estelle* when he submitted documentation showing that his severe chronic asthma was made worse by ETS).

19    There is considerable question as to whether the plaintiff fulfilled his obligation to exhaust available, internal remedies in order to seek redress of his complaints as required under 🚩 42 U.S.C. § 1997e(a) before commencing this action. In their motion defendants have not relied upon this procedural basis to seek dismissal of plaintiff's claims, perhaps owing to plaintiff's allegation that despite the existence of a grievance procedure he "was never permitted to use the procedure." *See* Liggins Aff. (Dkt. No. 39) ¶ 6(gg).

20    As previously noted, personal involvement in a constitutional violation is a prerequisite to a finding of liability under 📙 42 U.S.C. § 1983. *See* *Wright,* 21 F.3d at 501. Nothing in plaintiff's submissions identifies any of the particular defendants in this case as having been involved in the misplacement of plaintiff's clothes or, for that matter, in most of the incidents complained of, thus providing a independent basis for dismissal of plaintiff's claims. *See* 🔺 *Barnes v. Henderson,* 490 F.Supp.2d 313, 318–19 (W.D.N.Y.2007).

21    In light of my recommendation on the merits I have not addressed defendants' additional arguments, including to the effect that plaintiff's failure to establish a physical injury deprives him of the right to recover damages for mental anguish and emotional distress in this action under 🚩 42 U.S.C. § 1997e(e), as well as their claim of entitlement to qualified immunity from suit.

1    On November 28, 2006, Plaintiff was charged criminally with Promoting Prison Contraband in the First Degree, based upon the false misbehavior report issued by CO. Roberts in October 2005, regarding Plaintiffs possession of a shank-type weapon. This charge was subsequently dismissed, however, by Alden Town Court Justice LaDuca.

2    In *Colon,* the Second Circuit affirmed summary judgment for Commissioner of DOCCS and the facility superintendent on the grounds that, *inter alia,* the contents of the inmate's letters to them was not in the record and therefore the court did not know "whether the letter was one that reasonably should have prompted [defendants] to investigate." 📙 58 F.3d at 873, 874 n. 8. FN32036062358;00473;;LQ;7NYADC304.2;1013028;

      "The superintendent or his designee may issue a written order placing an inmate reported to have engaged in conduct described in subdivision (b) of this section [which conduct includes refusing to obey a direct order to return a food container at the conclusion of a meal] on a restricted diet for no more than seven days pending the outcome of the inmate's superintendent's hearing. The order shall briefly state the reason(s) for the imposition of the restricted diet and contain the following notice to the inmate: 'You may write to the deputy superintendent of security or his/her designee to make a statement as to the need for the continued pre-hearing imposition of the restricted diet.'..."

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment
Vacated and Remanded by Willey v. Kirkpatrick, 2nd Cir.(N.Y.), August 28, 2015

2013 WL 434188
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Aaron WILLEY, Plaintiff,
v.
Robert KIRKPATRICK, et al., Defendants.

No. 07–CV–6484 (MAT).
|
Feb. 4, 2013.

**Attorneys and Law Firms**

Aaron Willey, Elmira, NY, pro se.

J. Richard Benitez, Nys Attorney General's Office, Rochester, NY, for Defendants.

**DECISION AND ORDER**

MICHAEL A. TELESCA, District Judge.

**I. Introduction**

*1 On October 4, 2007, *pro se* plaintiff Aaron Willey ("Willey" or "Plaintiff") instituted this action pursuant to 42 U.S.C. § 1983 against Defendants, alleging that they violated his constitutional rights while he was an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). The Complaint alleges that Defendants acted "both individually and in concert," but does not allege any claims against them in their official capacities. The Complaint demands a "declaratory judgment stating that Defendants violated [Plaintiff's] constitutional rights," as well as compensatory and punitive damages. Plaintiff was granted permission to file an amended complaint (Dkt # 60), which is the operative pleading in this action.

Defendants Robert A. Kirkpatrick, M. Monahan, Martin Kearney, Scott Lambert, Taylor Roberts, M. Sztuk, A. Allessandro, M. Overhuff, and Tom Schoellkopf have moved for summary judgment dismissing the complaint pursuant to Federal Rules of Civil Procedure 56. Plaintiff has opposed the motion and renewed his request for the appointment of counsel.

For the reasons discussed herein, Defendants' motion for summary judgment is granted, and the amended complaint is dismissed.

**II. Background**

**A. The Parties**

At all relevant times, Plaintiff was housed at Wende Correctional Facility ("Wende"), and Defendants were all employed at Wende. Specifically, Robert Kirkpatrick ("Supt.Kirkpatrick") was Superintendent at Wende; M. Monahan ("DSS Monahan") was Deputy Superintendent for Security; Martin Kearney ("Capt.Kearney") was a Corrections Captain; Scott Lambert ("Sgt.Lambert") and Jeff Jeziorski ("Sgt.Jeziorski") were Corrections Sergeants; Taylor Roberts ("C.O.Roberts"), M. Sztuk ("Sztuk"), A. Allesandro ("C .O. Allesandro"), and M. Overhuff ("C.O.Overhuff") were Corrections Officers; and Tom Schoellkopf ("H.O.Schoellkopf") was a Hearing Officer.

**B. Factual Summary**

The recitation of facts below is drawn from the pleadings and discovery documents on file in this matter. The Court has viewed the facts in the light most favorable to Plaintiff, as the party opposing summary judgment. *See, e.g.,* United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party.).

**1. The October 2005 False Misbehavior Report for Possessing a Weapon**

On October 15, 2005, Sgt. Lambert and C.O. Roberts detained Willey and frisked him for no apparent reason. They brought him to a small room without a surveillance camera and questioned him about an inmate they suspected of smuggling contraband into Wende. Sgt. Lambert opened a desk drawer and pulled out what appeared to be a metal weapon and said that if he did not work with them as an informant, they would falsely charge him with possessing a weapon. Plaintiff refused to cooperate, stating that he did not have any knowledge of

the alleged smuggling. Sgt. Lambert responded, "Have it your way," and brought Willey back to his cell.

**\*2** On October 17, 2005, while Willey was undergoing a pat-frisk before attending yard recreation, C.O. Roberts allegedly uncovered a flat piece of metal about four inches long and three-quarters of an inch wide secreted near his crotch area. C.O. Roberts issued a disciplinary report charging Plaintiff with Possession of a Weapon and Possession of Contraband (PR 110.13 and 110.23). Willey was subsequently found guilty at a disciplinary hearing, even though he was not given notice or an opportunity to appear at the hearing.

On appeal, the conviction was set aside and a new hearing was ordered. At the hearing before Capt. Kearney on December 28, 2005, Plaintiff alleges that he was denied the right to call inmate witnesses and was unjustly removed from the hearing. He states that Capt. Kearney threatened to "beat the shit out of" him and called him a "young punk." According to Capt. Kearney, Willey's removal from the hearing was warranted because he refused to stop interrupting Capt. Kearney and attempting to place irrelevant matters on the record. Capt. Kearney found Willey guilty of both charges, and imposed 180 days in the Special Housing Unit ("SHU"), 180 days of lost privileges, and 12 months recommended loss of good time credits. On appeal, the conviction was set aside by Special Housing Unit Director Donald Selsky ("SHU Director Selsky") on February 28, 2006. [1]

### 2. The November 2005 False Misbehavior Report

On November 26, 2005, C.O. Sztuk and C.O. Allessandro escorted Willey to the shower. When Willey returned, he found that his cell had been "trashed"—the toilet had been flooded, and Willey's papers and belongings were strewn about his cell. When Willey asked C.O. Sztuk for a "search contraband slip," Sztuk replied, "You really like fucking with me." Willey responded, "What?" C.O. Sztuk said, "You heard me, keep fucking with me asshole and see what happens."

Inmates housed nearby confirmed that they had seen C.O. Sztuk carrying Willey's legal paperwork out of his cell after the cell search. Willey yelled out and asked to speak to an area supervisor. He was told to "give it a rest," to which he replied that he would not give it a rest because they had stolen his legal paperwork. At that point, C.O. Sztuk said, "What's that, Willey, you said you are going to shit us down (i.e., throw feces and/or urine on corrections officers)?" Willey denied saying anything like that.

Nevertheless, he was moved to the restricted side of the SHU where a Plexiglas shield was placed on his cell. C.O. Allesandro then turned off the water to Plaintiff's cell, so that he could not flush the toilet. As a result, feces and urine accumulated in the bowl and made the air in the cell noxious. Willey alleges that the area supervisor, Sgt. Jeziorski, failed to properly supervise C.O. Allessandro and C.O. Sztuk.

On or about November 28, 2005, C.O. Sztuk filed a false misbehavior report against Plaintiff, accusing him of threatening to "shit down" staff members. At the subsequent disciplinary hearing on December 7, 2005, before Susan Post (not a defendant in this action), Willey attempted to use videotape evidence to prove that he did not make such threat. However, according to Willey, someone had tampered with the surveillance tape to remove the sound and destroy the picture quality. Willey was found guilty and sentenced to 90 days in the SHU. On appeal, the charge was affirmed by SHU Director Selsky.

### 3. The December 2005 False Misbehavior Report

**\*3** On December 18, 2005, Willey placed the garbage from his evening meal on his feed-up tray to be picked up. However, C.O. Overhuff refused to remove the refuse, and issued another false misbehavior report against Plaintiff for refusing a direct order (namely, to turn in his food tray) in violation of Prison Rule 106.10. According to C.O. Overhuff, he told Willey to hand him tray, and Willey instead began to break his garbage in pieces; C.O. Overhuff reiterated the order, and Willey again allegedly refused.

D.S.S. Monahan placed Willey on a pre-hearing restricted diet, and, on December 20, 2005, denied Willey's appeal of that decision.

At the disciplinary hearing conducted on January 10, 2006, with regard to the December 18, 2005 incident, H.O. Schoellkopf refused to allow Willey to question witnesses and ejected him from the hearing. According to Willey, H.O. Schoellkopf told him, "You are going to die in the SHU, you young punk." H.O. Schoellkopf found Willey guilty and sentenced him to 30 days in the SHU, 30 days of lost privileges and two months of recommended loss of good time credits. On February 28, 2006, the conviction was reversed on appeal by SHU Director Selsky, who found that Willey "was inappropriately removed from the hearing."

#### 4. Harassment by Corrections Officers and Plaintiff's Suicide Attempt

Willey states that while he was housed in the SHU, he was subjected to continuous verbal harassment by numerous corrections officers, especially C.O. Allesandro. According to Willey, C.O. Allessandro made sexually harassing comments and, while Willey was showering, would stare at him licking his lips and blowing kisses. As a result, Willey became severely depressed and attempted to overdose on ibuprofen on February 9, 2006. He was taken to Erie County Medical Center and, upon his return to Wende, was placed in an observation cell he describes as filthy and reeking of urine and feces. Willey was left there, naked, for fourteen days. At that point, he was involuntary committed to the Central New York Psychiatric Center, where he stayed for six months.

While there, Willey states that he was attacked by deranged, violent patients; strapped down to a gurney; and injected with potent psychotropic drugs against his will.

After his stint at the Psychiatric Center, he was returned to the Wende SHU.

#### 5. The August 2006 False Misbehavior Report

On August 25, 2006, Willey received another misbehavior report for allegedly kicking a corrections officer while he was in restraints on February 10, 2006, the day after his suicide attempt. The issuing officer is not identified in the Complaint.

At the disciplinary hearing, H.O. Schoellkopf found Willey guilty and sentenced him to 180 days in the SHU. On September 17, 2006, Plaintiff wrote to Supt. Kirkpatrick regarding his continuing "false imprisonment" in SHU, claiming that he had done "nothing wrong." Willey also described the history of false misbehavior reports issued against him, beginning on October 15, 2005. Supt. Kirkpatrick responded that based on his review of the "hearing record packet and other related materials," he found "no reason to modify [the] disposition as rendered." Nevertheless, on appeal, SHU Director Selsky reduced the sentence in connection with the August 2006 misbehavior report.

### III. General Legal Principles

#### A. Summary Judgment Standard

**\*4**  The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). Where the non-moving party will bear the burden of proof at trial, the movant may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the initial burden has been met by the movant, the non-moving party is required demonstrate that, as to a material fact, a genuine issue exists. FED. R. CIV. P. 56(e); *see also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A fact is 'material' only if the fact has some effect on the outcome of the suit." Catanzaro v. Weiden, 140 F.3d 91, 93 (2d Cir.1998) (citing Anderson, 477 U.S. at 248). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The court must draw all reasonable inferences, and resolve all ambiguities, in favor of the party opposing summary judgment. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. New York City, Dept. of Corr., 84 F.3d 614, 619 (2d Cir.1996) (citations omitted).

Although a court must read a *pro se* litigant's papers liberally, interpreting them "to raise the strongest arguments that

they suggest," *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), when alleging a violation of a civil rights statute, even a *pro se* litigant must make "specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987).

### B. 42 U.S.C. § 1983

To prevail in a Section 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. 42 U.S.C. § 1983; *see also, e.g., West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Section 1983 itself, however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

**\*5** "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The personal involvement of a supervisory defendant may be shown by evidence that, *inter alia,* the "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong ... or ... the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)[2] (citing *Wright,* 21 F.3d at 501 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986))).

### IV. Analysis

#### A. Issuance of False Misbehavior Reports in Retaliation For Plaintiff's Refusal to Act as an Informant

The filing of baseless or false charges against an inmate does not, in and of itself, give rise to a constitutional violation.

*Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) (An inmate "has no constitutionally guaranteed immunity from being falsely accused of conduct which may result in the deprivation of a protected liberty interest."). Rather, to maintain an actionable claim against correction officers for filing a false misbehavior report, the inmate must be able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right. *See Freeman,* 808 F.2d at 951–53 (reasoning that the filing of false charges is not a constitutional violation, as long as the prisoner is granted a hearing and given an opportunity to rebut the charges); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988) (reversing grant of summary judgment where prisoner claimed that false disciplinary charges were filed against him as retaliation for his cooperation with a state investigation into alleged inmate abuse).

Here, Willey has not alleged that the misbehavior reports were issued in retaliation for his exercise of a constitutionally protected right. However, the Complaint can be construed as alleging that certain defendants issued false misbehavior reports against Plaintiff and that the defendants acting as hearing officers denied him due process at the related disciplinary hearings. *See* Complaint ¶¶ 19–22, 25–29, 45–48, 55–57, 69–70. In particular, Willey complains that both H.O. Kearney and H.O. Schoellkopf unlawfully ordered him removed from various disciplinary hearings stemming from the false misbehavior reports issued by C.O. Sztuk and C.O. Roberts.

Under New York State regulations, an inmate has the right to "be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals." N.Y. COMP.CODES R. & REGS., tit. 7, § 254.6. Although an inmate may bring a successful New York Civil Practice Law and Rules ("C.P.L.R.") Article 78 proceeding pursuant to this regulation, a claim under state law does not necessarily provide a viable due process claim under 42 U.S.C. § 1983.

**\*6** Here, New York has provided inmates with a procedural safeguard at their disciplinary hearings-the right to be personally present-above and beyond that which is required by the federal Constitution. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (ruling that inmates accused of disciplinary violations be

afforded certain procedures, including 24—hours notice, the right to call—but not necessarily to be present during the testimony of—witnesses, and an impartial tribunal); *Francis v. Coughlin,* 891 F.2d 43 (2d Cir.1989). "A procedural safeguard does not constitute a liberty interest[.]" *Dawes v. Leonardo,* 885 F.Supp. 375, 378 (N.D.N.Y.1995) (citing *Patterson v. Coughlin,* 761 F.2d 886, 892 (2d Cir.1985) (noting how the court below had "apparently confuse[d] the deprivation of a liberty interest with the denial of the constitutional right to procedural safeguards which is implicated by that interest"), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986)). "[W]here that safeguard is not required by the United States Constitution's Due Process Clause, its denial cannot constitute a violation of that clause[.]" *Id.* (citing *Patterson,* 761 F.2d at 892 (finding a section 1983 action permissible where the disciplinary hearing in question violated state procedural requirements simultaneously violated federal due process mandates)). Thus, although it was violative of Willey's state regulatory rights to be excluded from the hearing, his federal constitutional rights were not violated thereby. Accordingly, his retaliation claim premised on a subsequent federal due process violation must fail. *See, e.g., Livingston v. Kelly,* 561 F.Supp.2d 329, 331 (W.D.N.Y.2008) ("[A]n inmate's allegation that he has been found guilty of false disciplinary charges may support a constitutional claim if he also alleges that he was denied the minimum procedural due process protections guaranteed by the Fourteenth Amendment.") (citations omitted).

### B. Destruction of Personal Property

Willey alleges that C.O. Sztuk and C.O. Allessandro stole legal documents from his cell, and destroyed his personal property (e.g., family photographs and letters). Under *Hudson v. Palmer,* 468 U.S. 517, 536, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), even the intentional destruction of an inmate's property by a prison officer does not violate the Due Process Clause if the state provides that inmate with an adequate post-deprivation remedy. While the loss of property is regrettable, and even though Willey has alleged that these defendants were personally responsible for the loss, he has not stated an actionable constitutional claim because New York state law provides him with an adequate post-deprivation remedy, i.e., *§ 9 of the Court of Claims Act. Reyes v. Koehler,* 815 F.Supp. 109, 114 (S.D.N.Y.1993) (citing *Blum v. Koch,* 716 F.Supp. 754, 762 (S.D.N.Y.1989);

*Friedman v. Young,* 702 F.Supp. 433, 437 (S.D.N.Y.1988); *DeYoung v. City of New York,* 607 F.Supp. 1040, 1042–43 (S.D.N.Y.1985)); *accord, e.g., Murchison v. Keane,* No. 94 Civ. 466 CSH, 2000 WL 489698, at *6 (S.D.N.Y. Apr.25, 2000) (citations omitted).

### C. Harassment

**\*7** Willey alleges that C.O. Allessandro violated his constitutional rights by subjecting him to continuous harassment, which Willey describes as "psychological, emotional, verbal, and sexual." Willey states that C.O. Allesandro would bang on his cell and turn his light switch on and off rapidly. Also, Willey indicates that C.O. Allesandro would stare at him while he was showering and toweling off, and would make sexually suggestive comments. Willey does not claim that C.O. Allesandro physically touched him in a sexual manner, however.

"Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983." *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) (citing *Patton v. Przybylski,* 822 F.2d 697, 700 (7th Cir.1987) (derogatory remarks do not constitute a constitutional violation); *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989); *Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9th Cir.1987); *Martin v. Sargent,* 780 F.2d 1334, 1338–39 (8th Cir.1985)). Willey has made no showing of uninvited physical or sexual contact, nor has he pled such a cause of action in his Complaint. C.O. Allesandro's annoying conduct and comments, unaccompanied by physical threats or attacks, do not amount to a constitutional violation under § 1983.

### D. Eighth Amendment Violation Based Upon Unsanitary Conditions

Willey asserts that C.O. Sztuk and C.O. Allessandro violated his Eighth Amendment right to be free from cruel and unusual punishment by turning off the running water to his cell while the Plexiglas cell shield was in place between December 1, 2005, and January 10, 2006. At one point in the Complaint, Willey states that his drinking water and toilet water was shut off for "extensive lengths of time". Compl., ¶ 87 (Dkt # 1). In the next sentence, he states that his toilet water was shut off for "seven (7) days, forcing plaintiff to stay in a plexy glass

shield (no air circulation) and breathe in air smelling of urine/feces...." *Id.*

In his response to interrogatories propounded by Willey, C.O. Alessandro denied "purposely shut[ting] [his] toilet [sic] and water pressure off in between" December 1, 2005, and January 10, 2006. Dkt # 95 at 3, ¶ 9. However, Defendants failed to address this conditions-of-confinement claim in their motion for summary judgment.

"While the Eighth Amendment's prohibition against cruel and unusual punishment 'does not mandate comfortable prisons,' " *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)), the conditions of confinement must be at least 'humane,' " *id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). An Eighth Amendment violation based upon living conditions requires the inmate to show (1) a deprivation that is "objectively, sufficiently serious" of "the minimal civilized measure of life's necessities," and (2) a "sufficiently culpable state of mind" on the part of the defendant official, such as deliberate indifference to inmate health or safety. *Gaston,* 249 F.3d at 164 (quoting *Farmer,* 511 U.S. at 834) (internal quotation marks omitted in *Gaston* ).

**\*8** A *Section 1983* claim will not lie for prison conditions that are merely unpleasant,, but chronic exposure to human waste will give rise to a colorable claim. *See Gaston v. Coughlin,* 249 F.3d 165–66. In *Gaston,* the Second Circuit reinstated an inmate's Eighth Amendment claim against two defendants where the area in front of the inmate's cell "was filled with human feces, urine, and sewage water" for several consecutive days. The Second Circuit stated that it was "unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end." *Id.* at 166. Similarly, in *LaReau v. MacDougall,* 473 F.2d 974, 977–79 (2d Cir.1972), the Second Circuit held that an inmate who spent five days in a cell that contained only a grate-covered hole in the floor for a toilet, which could only be flushed from the outside, was deprived of his Eighth Amendment rights. The circuit court observed that "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted. The indecent

conditions that existed in this ... cell seriously threatened the physical and mental soundness of its unfortunate occupant." *Id.* at 978; *see also Wright v. McMann,* 387 F.2d 519, 522, 526 (2d Cir.1967) (finding 33–day placement of prisoner in strip cell which was "fetid and reeking from the stench of the bodily wastes of previous occupants which ... covered the floor, the sink, and the toilet," combined with other conditions, violated Eighth Amendment).

Courts outside of the Second Circuit have reached the same result where exposure to sewage lasts for a substantial period of time. *See McCord v. Maggio,* 927 F.2d 844, 846–47 (5th Cir.1991) (finding Eighth Amendment violation where inmate lived in cell for two years and slept on floor for months "into which rain water and backed-up sewage leaked"); *Williams v. Adams,* 935 F.2d 960, 961–62 (8th Cir.1991) (reversing grant of summary judgment for prison defendants where plaintiff alleged "that the toilet in the cell did not work" and overflowed continuously "and the floor stay[ed] filthy with its wast[e]" over 13–day period); *Howard v. Adkison,* 887 F.2d 134, 136–38 (8th Cir.1989) (holding Eighth Amendment violation sufficiently proven where inmate lived for two years in cell where walls, door and food slot "were covered with human waste," mattress was "stained with urine and human waste" and pleas for remedial measures went unanswered); *McCray v. Sullivan,* 509 F.2d 1332, 1336 (5th Cir.1975) (finding conditions in isolation cells where inmates lived for as long as 21 days violated Eighth Amendment where waste "frequently" overflowed onto the floors of the cells); *Looper v. Sanders,* Civil No. 6:10–cv–06037, 2011 WL 861714, at \*4–\*5, \*8 (W.D.Ark. Mar.10, 2011) (denying defendants' motion for summary judgment where plaintiff was exposed to raw sewage for over 10 months); *Jones v. Sanders,* No. 08–6035, 2009 WL 2432632, at \*7 (W.D.Ark. Aug.7, 2009) (Report and Recommendation) (recommending denial of defendants' motion for summary judgment where plaintiff was exposed to raw sewage for a month and a half).

**\*9** "Where an inmate's exposure to waste lasts for three or four days, the Circuits are split." *Ortiz v. Department of Correction of City of New York,* 2011 WL 2638137 (S.D.N.Y. Apr.29, 2011) (comparing *Smith v. Copeland,* 87 F.3d 265, 269 (8th Cir.1996) (affirming summary judgment for defendants where plaintiff was subjected to an overflowing toilet in his cell for four days), *with McBride v. Deer,* 240 F.3d 1287, 1291–92 (10th Cir.2001) (vacating Rule

12(b)(6) dismissal where plaintiff alleged he was forced to live in "feces-covered cell" for three days); *Sperow v. Melvin,* No. 96–4219, 182 F.3d 922, 1999 WL 450786, at *1-*3 (7th Cir. June 24, 1999) (unpublished opn.) (reversing Rule 12(b)(6) dismissal where inmate "was subjected to appalling conditions" of waste-filled cell "for three full days"); *Young v. Quinlan,* 960 F.2d 351, 355–56, 363–65, (3d Cir.1992), *superceded by statute on other grounds as stated in Ghana v. Holland,* 226 F.3d 175, 184 (3d Cir.2000) (reversing summary judgment for defendants where inmate was moved to "dry cell" without working toilet for 96 hours and forced to urinate and defecate in his cell)).

Especially because Willey has adequately pled maliciously wilful conduct by C.O. Alessandro, rather than mere negligence, the alleged shut-off of the running water to Willey's toilet for several days place this case on the borderline between the levels of discomfort to be expected in prison and unacceptable, inhumane conditions. After reviewing the cases cited above, however, the Court concludes that on the particular facts presented here, Willey's conditions-of-confinement claim cannot withstand summary judgment. First, Willey is vague as to the dates that the alleged shut-off occurred, and has made conflicting allegations about the duration ("extensive lengths of time" versus "seven days" versus the time between December 1, 2005, and January 10, 2006). Second, Willey has not claimed that human waste from his toilet overflowed into his cell. *See Smith v. United States,* No. 9:09–CV–729 (TJM/DRH), 2011 WL 777969 at *2, *11 (N.D.N.Y. Feb.3, 2011) (Report and Recommendation) (recommending denial of summary judgment where inmate alleged that officers "refused to flush the toilet or provide the inmates with toilet paper for two weeks," causing overflow of human waste to spill onto cell floor and inmate to become "nauseous and lightheaded from the odor"), *adopted by,* 2011 WL 776150 (N.D.N.Y. Mar.1, 2011). Third, Willey has not claimed that he suffered sickness or other ill effects as a result of the malodorous atmosphere caused by the water shut-off. *Contrast with Sperow, supra* (reversing dismissal of complaint where, after three days of exposure to human feces and urine on the walls and floor, pieces of a mattress on the floor caked with feces and urine, and a dozen plastic food trays with decayed food, plaintiff was had a headache, gastrointestinal and respiratory problems, and was feverish and sweating); *Smith, supra* (denying summary judgment where inmate alleged that his exposure to raw sewage from overflowing toilet caused sickness and nauseousness).

## E. Imposition of Restricted Diet in Violation of Eighth Amendment and Due Process

**\*10** Willey asserts that D.S.S. Monahan placed him on a pre-hearing restricted diet for seven days, consisting of a loaf of bread cabbage, in violation of his Eighth Amendment rights. According to Willey, the bread was usually stale and the cabbage usually rotten. Willey also asserts a due process claim in connection with his request to D.S.S. Monahan to rescind the restricted-diet order during the seven days.

### 1. Eighth Amendment

As stated above, "a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.'" *Farmer,* 511 U.S. at 834.

With respect to the first prong, "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15–16 (2d Cir.1983) (citations omitted). For instance, "the Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food ... [that does not] present an immediate danger to health and well being of the inmates who consume it." *Id.* at 15 (internal quotation marks and citation omitted). With respect to the second prong, a deliberate indifference to inmate health or safety may be shown where a prison official knew a diet was inadequate and likely to inflict pain. *See Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002).

Courts in this Circuit routinely have dismissed claims similar to Willey's, finding that the inmate failed to establish that he experienced a sufficiently serious deprivation for purposes of the Eighth Amendment. *See Smith v. Burge,* 2006 WL 2805242, at *11 (N.D.N.Y. Sept.28, 2006) ("Plaintiff does not establish, or even specifically allege, that (1) the food he was served [i.e., a hard loaf of bread and an apple per day] was nutritionally inadequate (e.g., with respect to the total calories it contained, its grams of carbohydrates, protein, fiber, and fat, or its units of vitamins and minerals, etc.), (2) that he was physically unable to eat the food, or (3) that he lost weight during the week in question.") (footnotes omitted) & *id.,* n.

78 (citing, *inter alia,* 📖 *McEachin v. McGuinnis,* 357 F.3d 197, 199–201 (2d Cir.2004) (affirming district court's F.R.C.P. 12(b)(6) dismissal of Eighth Amendment claim alleging, *inter alia,* that inmate was placed on a restricted diet consisting of "loaf" for seven days)).

#### 2. Procedural Due Process

To pursue a claim under 📖 42 U.S.C. § 1983 that a defendant deprived him of his constitutional right to due process, a plaintiff must show that he "enjoyed a protected interest, and defendant's deprivation of that interest occurred without due process of law." 📖 *Taylor v. Rodriguez,* 238 F.3d 188, 191 (2d Cir.2001) (citation omitted). Thus, courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient...." *Kentucky Dept. of Corr.,* 490 U.S. at 460.

**\*11** Apparently relying on 📖 7 N.Y.C.R.R. § 304.2,[3] Willey asserts that he was entitled to a hearing before D.S.S. Monahan regarding his request to be removed from the restricted diet prior to the end of the seven-day period.

In order to demonstrate the existence of a liberty interest, the plaintiff must allege facts suggesting that he was subjected to a deprivation that imposed "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 📖 *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Tellier,* 280 F.3d at 80. Willey is hard-pressed to allege or establish such facts given that the Second Circuit has held that the imposition of a restricted diet does not impose an "atypical and significant hardship" on inmates. 📖 *McEachin v. McGuinnis,* 357 F.3d at 200–01 (finding that a seven-day post-hearing restricted diet did not impose an atypical and significant hardship). Indeed, several federal courts "have specifically held that the imposition of a seven-day pre-hearing restricted diet of

'loaf' (imposed without the issuance of a deprivation order or the holding of a hearing during the seven-day period) did not create an atypical and significant hardship for purposes of the Fourteenth Amendment." *Smith v. Burge, supra* at n. 88 (citing *Beckford,* 151 F. Supp .2d at 208–209, 218–219 & n. 4 (not mentioning 📖 7 N.Y.C.R.R. § 304.2, but granting defendants motion for summary judgment as to plaintiff's due process claims because a seven-day pre-hearing restricted diet did not impose an atypical and significant hardship); *Turnboe v. Gundy,* 25 Fed. Appx. 292, 293 (6th Cir.2001) (being placed on a pre-hearing restricted diet consisting of "food loaf" for seven days does not constitute an "atypical and significant hardship" on the inmate in relation to the ordinary incidents of prison life; *Thomas v. Virginia,* 04–CV–0273, 2005 WL 15517, at \*10–11 (W.D.Va. July 28, 2005)). The Court finds the analysis in these cases, especially *Smith v. Burge, supra,* persuasive. Accordingly, the Court concludes that Willey has failed to establish a procedural due process claim with respect to the seven-day imposition of a restricted diet prior to his disciplinary hearing.

#### V. Conclusion and Orders

For the foregoing reasons, Defendants' motion for summary judgment is granted, and the Amended Complaint is dismissed. Plaintiff's motion for appointment of counsel, asserted in his opposition to Defendants' summary judgment motion, is denied as moot.

Plaintiff is advised that he must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

#### All Citations

Not Reported in F.Supp.2d, 2013 WL 434188

#### Footnotes

1   On November 28, 2006, Plaintiff was charged criminally with Promoting Prison Contraband in the First Degree, based upon the false misbehavior report issued by C.O. Roberts in October 2005, regarding Plaintiff's possession of a shank-type weapon. This charge was subsequently dismissed, however, by Alden Town Court Justice LaDuca.

2   In *Colon,* the Second Circuit affirmed summary judgment for Commissioner of DOCCS and the facility superintendent on the grounds that, *inter alia,* the contents of the inmate's letters to them was not in the record and therefore the court did not know "whether the letter was one that reasonably should have prompted [defendants] to investigate." 58 F.3d at 873, 874 n. 8.

3   Title 7, Section 304.2 of the New York Code of Rules and Regulations provides, in pertinent part, as follows: "The superintendent or his designee may issue a written order placing an inmate reported to have engaged in conduct described in subdivision (b) of this section [which conduct includes refusing to obey a direct order to return a food container at the conclusion of a meal] on a restricted diet for no more than seven days pending the outcome of the inmate's superintendent's hearing. The order shall briefly state the reason(s) for the imposition of the restricted diet and contain the following notice to the inmate: 'You may write to the deputy superintendent of security or his/her designee to make a statement as to the need for the continued pre-hearing imposition of the restricted diet.'..."

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 246810
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Ernest W. VANN, 91-B-2531; Joseph T. Owen, 97-
A-1660 and Patrick Wilson, 80-A-0663, Plaintiffs,
v.
E. DONNELLY, Captain Kerney, Ekpe D.
Ekpe, and Michael Cleesattel, Defendants.

No. 00CV0911.
|
Feb. 1, 2005.

**Attorneys and Law Firms**

Ernest W. Vann, Alden, NY, pro se.

Benjamin M. Zuffranieri, Jr., Hodgson, Russ, Andrews,
Woods & Goodyear, Buffalo, NY, for Plaintiff.

Joseph T. Owen, Napanoch, NY, pro se.

Patrick Wilson, Alden, NY, pro se.

Michael A. Siragusa, New York State Attorney General's
Office, Buffalo, NY, for Defendants.

Decision & Order

SCOTT, Magistrate J.

**\*1** Before the Court is the defendants' motion for summary
judgement (Docket No. 67).

Background

Plaintiffs, Ernest W. Vann ("Vann"), Joseph T. Owen
("Owen"), and Patrick Wilson ("Wilson"), are or were
inmates at the Wende Correctional Facility ("WCF"), Alden,
New York at the time this action was commenced. They
initiated this action under 42 U.S.C. § 1983 alleging
various claims relating to their exposure to hazardous work
conditions in connection with their inmate work program at
WCF. More specifically, plaintiffs contend that they were
exposed to asbestos dust in connection with the removal of

two ovens from the old WCF bakery in the fall of 2000. They
also contend that they were exposed to cement dust containing
crystalline silica in connection with the construction of two
cement picnic tables.

Summary Judgment

Summary judgment is appropriate only if the pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits show that there is no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law. *Ford v. Reynolds,*
316 F.3d 351 (2nd Cir.2003); Fed.R.Civ.P. 56(c). The party
seeking summary judgment has the burden to demonstrate
that no genuine issue of material fact exists. In determining
whether a genuine issue of material fact exists, a court must
examine the evidence in the light most favorable to, and draw
all inferences in favor of, the non-movant. *Ford,* 316 F.3d.
at 354. "A dispute regarding a material fact is genuine 'if
the evidence is such that a reasonable jury could return a
verdict for the non-moving party.' " ' *Lazard Freres & Co.
v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.1997)
(quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248,
106 S.Ct. 2505, 91 L.Ed.2d 202, (1986)). While the moving
party must demonstrate the absence of any genuine factual
dispute, ( *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106
S.Ct. 2548, 91 L.Ed.2d 265 (1986)), the party against whom
summary judgment is sought, however, "must do more than
simply show that there is some metaphysical doubt as to the
material facts.... [T]he non-moving party must come forward
with specific facts showing that there is a genuine issue for
trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538(1986);
*McCarthy v. American Intern. Group, Inc.,* 283 F.3d 121
(2d Cir.2002); *Marvel Characters v. Simon,* 310 F.3d
280, 285-86 (2d Cir.2002). Summary judgment is appropriate
"[w]here the record taken as a whole could not lead a rational
trier of fact to find for the non-moving party." *Nippon Fire
& Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc.,* 235
F.3d 53 (2nd Cir.2000) quoting *Matsushita Elec. Indus.
Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348,
89 L.Ed.2d 538 (1986).

Eighth Amendment Claim

To establish an Eighth Amendment violation, an inmate must
meet both an objective and a subjective requirement. To

meet the objective requirement, the alleged violation must be sufficiently serious by objective standards. The objective component is context specific, turning upon contemporary standards of decency. To meet the subjective requirement, the inmate must show that the prison officials involved had a wanton state of mind when they were engaging in the alleged misconduct. *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). Although significant injury is not required "[w]hen prison officials maliciously and sadistically use force to cause harm [because] contemporary standards of decency always are violated," the Eighth Amendment "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided the use of force is not repugnant to the conscience of mankind." *Hudson,* 503 U.S. 1, 9-10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). See also *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) ("a *de minimis* use of force will rarely suffice to state a constitutional claim"); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (holding that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*2** In a case alleging improper exposure to some harmful substance, the plaintiff must show that he is personally "being exposed to unreasonably high levels" of the substance. *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). A court must consider whether the risk that the prisoner complains of is one "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Id.* at 36. It has been held that exposure to toxic contaminants may serve as the basis of an Eighth Amendment claim even if no present physical injury is alleged. However, in such cases, the plaintiffs must demonstrate that the exposure "posed an unreasonable risk of serious damage to his future health." *Nunes v. Artuz,* 2003 WL 2252743 at \*5 (S.D.N.Y.2003)*Nunes v. Artuz,* 2003 WL 2252743 at \*5 (S.D.N.Y.2003).

Subjectively, the plaintiff must demonstrate that prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety." *Id.* at 837. "[T]he official must be aware of

facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must draw the inference." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). An Eighth Amendment claim cannot be based upon mere negligence or inadvertence on the part of a prison official. *Duncan v. Keane,* 1997 WL 328070 (S.D.N.Y.1997).

The Asbestos Claim
Plaintiffs Vann and Wilson claim that they were exposed to asbestos dust when ovens were removed in the old bakery area of WCF.

The defendants assert that Larry Ryan, as part of his duties as a vocational instructor, was in charge of a team of inmates who removed two ovens in the old WCF bakery in the fall of 2000. Declaration of Larry Ryan dated October 8, 2004 ("Ryan Dec.") ¶ 4. Ryan states that he supervised the removal of the ovens and was personally in physically removing the ovens along with the inmates assigned to his team. Ryan Dec., ¶ 4. It is undisputed that the plaintiffs in this action were not part of the oven removal team and were not involved in the removal of the ovens. Ryan Dec., ¶ 5.

Ryan asserts that while inmates from WCF were involved in the oven removal project, no inmate or employee from WCF was involved in removal of asbestos. Ryan Dec., ¶ 5. It is undisputed that the testing and removal of asbestos was conducted by Corcraft, a subsidiary of DOCS, with employees and inmates who are specially trained in asbestos removal. Ryan Dec., ¶ 5. Prior to the ovens actually being removed, they were tested to determine if asbestos was present. Ryan Dec., ¶ 6. The first tests were completed in 1987 as part of a comprehensive review of asbestos at WCF. At that time, the oven was sampled and it was determined that no asbestos was present. Ryan Dec., ¶ 6; see also Exhibit A to Ryan Dec., a PTL-Inspectorate Inc. Lab Report dated 2/26/87. The ovens were again tested in May of 1998. At that time, eight samples of the ovens were taken and analyzed for asbestos. One sample came back positive for asbestos. Ryan Dec., ¶ 7. The asbestos was contained in a grey fibrous gasket on the front oven. Ryan Dec., ¶ 7. Based on the positive finding for asbestos, Don Pietrantone, who is certified in the removal and testing of asbestos, traveled to WCF on February 10, 1999 and removed the asbestos gasket. Declaration of Don Pietrantone dated October 14, 2004 ("Pietrantone Dec.") ¶¶ 5, 8. Pietrantone states that because the gasket had not been disturbed prior to its removal on February 10, 1999, there was no contamination to the surrounding area nor any airborne

release of asbestos when it was removed. Pietrantone Dec.,
¶ 8. No staff or inmates from WCF were involved in the
asbestos removal. Pietrantone Dec., ¶ 8.

**\*3** The demolition of the front oven was completed without
any incident or any finding or suspected finding of asbestos.
Ryan Dec., ¶ 9. After the removal of the front oven, Ryan
and his team began to remove the second oven which was
located behind a plywood wall. Ryan Dec., ¶ 9. Early on in the
process of removing the second oven, two additional gaskets
were discovered that were suspected to contain asbestos. Ryan
Dec., ¶ 10. These two gaskets were not previously tested
for asbestos because they were not exposed until removal
of the second oven commenced. Ryan Dec., ¶ 10. Once the
suspected asbestos material was discovered in the second
oven, demolition of the oven was immediately halted. Ryan
Dec.,¶ 11. The area was then secured behind a locked wire
fence so that no one could enter the demolition area or disturb
the materials there, including the suspected asbestos. Ryan
Dec., ¶ 11.

According to the defendants, Corcraft was advised and Don
Pietrantone proceeded to take samples of the material for
asbestos testing. Ryan Dec., ¶ 10; Pietrantone Dec., ¶ 11.
On May 19, 2000, test results determined that some of the
material did contain asbestos. Ryan Dec., ¶ 10; Pietrantone
Dec.,¶ 11. Due to the positive findings of asbestos in two
fittings and two gaskets, Pietrantone was sent to WCF on
October 13, 2000. At that time, he removed the asbestos
gaskets and mud fittings in the oven. Pietrantone Dec., ¶ 13.
Between the time the asbestos was discovered in May of 2000
and its removal in October of that year, signs were posted
warning people that asbestos removal was taking place and
the area was isolated by closing the bakery so that it was not
accessible to inmates. Pietrantone Dec., ¶ 13. The removal
was done in an isolated environment being the old bakery
itself. Pietrantone Dec., ¶ 13. The defendants assert that at no
time did asbestos from either oven contaminate the bakery
area. Pietrantone Dec., ¶ 16. Pietrantone states that there was
no release of asbestos in the area. Pietrantone Dec., ¶ 16.

None of the plaintiffs claim that they worked on the removal
of the bakery ovens. None of the plaintiffs assert that they
have as of yet suffered any medical symptom, illness or injury
which can be connected to the exposure of asbestos during
the removal of the ovens at WCF. In response to the instant
motion, the plaintiffs present the deposition testimony of
plaintiff Patrick Wilson. It appears that plaintiff Owens does
not allege that he was exposed to the asbestos inasmuch as the

claim in the complaint and the response to the instant motion
are based solely upon the averments of Wilson. (Complaint,
Docket No. 1 at page 20). It is unclear whether plaintiff Vann
alleges exposure to asbestos in connection with this project.
In any event, the plaintiffs do not point to any factual evidence
presented by Vann that bears on the release of or exposure
to asbestos at the WCF. Wilson asserted that he worked in
close proximity to the bakery ovens while the ovens were
being removed. He contends that when the individuals who
were working on the removal project used torches and saws to
dismantle the ovens, the air became "puffy" with a "big vapor
cloud" of particles. (Docket No. 80, Exhibit M, page 19).
However, the plaintiffs have articulated no basis to conclude
that the particles that Wilson refers to were asbestos. Indeed,
when asked at his deposition whether he still believed that he
was exposed to asbestos, Wilson stated: "No, I amended the
complaint to fiberglass." [1] (Docket No. 80, Exhibit M, page
18). Other than the testimony of Wilson, the plaintiffs assert
only that the defendants failed to comply with certain state
and federal regulations regarding the removal of asbestos.
(Docket No. 80, Attachment 3, page 18).

**\*4** The plaintiffs' asbestos exposure claim cannot survive on
such a vague, speculative and contradictory basis. To present
a sustainable Eighth Amendment claim, the plaintiffs must
do more than assert a technical violation of some regulation
relating to the removal of asbestos. As noted above, the
plaintiffs must demonstrate some factual basis sufficient to
raise an issue of fact as to whether the plaintiffs were exposed
to "an unreasonably high level" of asbestos. The plaintiffs
have failed to meet this objective standard, as a matter of
law, in this case. The plaintiffs have had ample opportunity
for discovery in this matter. Without more, the fact that the
plaintiff saw unidentified "particles" in the air is insufficient
to sustain a claim of asbestos exposure. The plaintiffs have not
provided any basis from which a trier of fact could conclude
that the "particles" were asbestos, as opposed to wood, fiber
or various other substances. There is no evidence in the
record which would suggest that Wilson has any personal
knowledge of any friable asbestos in the ovens or the removal
process that was used. Similarly, the plaintiff's expert, Heidi
Reisman, has acknowledged that she cannot determine the
extent of any actual exposure of asbestos to Wilson. (Docket
No. 80, Exhibit S at page 2.) Although the plaintiffs contend
that the defendants did not fully comply with certain OSHA
regulations, the plaintiffs have not disputed any of the relevant
factual allegations presented by the defendants regarding the
removal of the asbestos gaskets from the ovens. Without some
basis to conclude that an unreasonable exposure took place,

the alleged failure to comply with an OSHA regulation is not a sufficient basis to maintain an Eighth Amendment claim.

Because the Court finds that the plaintiffs have not met their burden to establish a material issue of fact for trial as to the asbestos exposure claim, the Court declines to address whether the plaintiffs have demonstrated personal involvement on the part of the individual defendants or as to whether the individual defendants are entitled to qualified immunity.

Based on the above, the instant motion for summary judgment is granted as to the claims based upon the alleged exposure to asbestos relating to the removal of the bakery ovens at WCF.

The Crystalline Silica Claims

Plaintiffs Vann and Owen assert that they were improperly exposed to crystalline silica in the cement dust that resulted from the construction of two cement picnic tables on the WCF grounds. Again, neither Vann nor Owen has alleged that he yet suffers symptoms of any illness or injury as a result of the alleged exposure. As was the case with Wilson's asbestos claim, neither Vann, nor Owen, worked on the project to construct the picnic tables.

It is undisputed that construction of concrete tables commenced on or about May 15, 2000 and was completed on or about October 13, 2000. Declaration of Terry Pusch dated October 12, 2004 ("Pusch Dec.") ¶ 4. Terry Pusch and Thomas Prior supervised the construction work and supervision of the inmates who worked on construction of the concrete tables. Prior is now deceased. Pusch Dec., ¶ 5. It was their responsibility to instruct the inmate workers on how to construct the concrete tables and to instruct them on what safety equipment was needed and available. Pusch Dec., ¶ 5. According Pusch, he was aware of the hazardous nature of certain forms of cement and familiar with the safety equipment that is needed during the mixing and pouring of cement. Pusch Dec., ¶ ¶ 6, 7. While the work began on the construction of the forms to be used and other preparations in May of 2000, cement was not actually poured until June of 2000. Pusch Dec., ¶ 8. Pusch was in charge of mixing and pouring the cement. Pusch Dec., ¶ 9. While inmates did assist Pusch, none of the plaintiffs in this action assisted or were involved in either mixing or pouring the cement at any time. Pusch Dec., ¶ 9. Moreover, all concrete work was done outdoors. Pusch Dec., ¶ 10. All inmates who worked on the project were advised by Pusch and Tom Prior about what safety equipment was needed and they were provided with gloves, safety goggles or glasses, Tyvek coveralls, and dust masks to conduct the work. Pusch Dec., ¶ 11.

**\*5** The defendants argue that considering that the cement was mixed outdoors and that the plaintiffs were not involved in the mixing of the cement, there is simply no quantitative basis to conclude that the plaintiffs or anyone else was exposed to "an unreasonably high" level of cement dust. Furthermore, the defendants assert, there is no medical evidence produced by plaintiffs to support their claim that exposure to cement dust has resulted in any ill health effects or will in the future.

In response to the instant motion, although Vann and Owen do not dispute the fact that they did not work on the project, both claim that they were exposed to the cement dust because they worked in areas of the facility that were accessible to the outdoor courtyard where the cement was poured. Vann asserts that he worked in the maintenance department located in the Building # 3 which has a door that opens into the courtyard where the cement was poured. Owen asserts that he worked in the laundry located in Building # 7 which also adjoined the courtyard where the work on the picnic tables took place. Owen contends that the dust entered the laundry area through a garage door and fans that lead out to the courtyard.

The plaintiffs have presented no evidence of the amount of crystalline silica they may have been exposed to under the circumstances. Vann testified at his deposition that the dust would create "one big blanket of fog." (Docket No. 80, Exhibit H at page 63). It is unclear as to how long this condition existed in terms of length of time. The plaintiffs' responding papers do not point to any testimony from Owen which would further illuminate the amount of silica dust to which he was exposed. Once again, the plaintiffs' expert has concluded that she cannot determine the extent of actual exposure of Vann and Owens to silica dust. She concludes only that, in her opinion, an unnecessary risk of harm to the plaintiffs took place due to the failure of the prison officials to follow OSHA regulations. *Id.*

At her deposition, Reisman testified as to the existence of exposure limits relating to crystalline silica established by OSHA and other regulatory and/or industry agencies. (Docket No. 80, Exhibit R at page 33-35). Reisman has not been able to conclude the extent of exposure on the part of Vann and Owen (or anyone else at the WCF) or whether such exposure exceeded the exposure limits set by OSHA. (Docket No. 80, Exhibit S at page 2). Once again, the plaintiffs have

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

presented no evidence from which the trier of fact in this case could do anything but speculate as to the extent Vann and Owens were exposed to silica dust. This is insufficient to meet their burden to establish that the plaintiffs were subject to an unreasonable exposure to crystalline silica. Once again, the plaintiffs' focus on whether the prison officials complied with OSHA regulations, and not whether an unreasonable exposure occurred. An Eighth Amendment claim may not be sustained on these grounds.

**\*6** To the extent that the plaintiffs contend that the defendants may be held liable for an Eighth Amendment claim based solely on an alleged violation of an OSHA regulation without demonstrating an actual exposure to an unreasonable level of some toxin, the defendants are entitled to qualified immunity. The plaintiffs have presented no authority which would suggest that the violation of an OSHA regulation may serve as the basis of an Eighth Amendment claim without having to demonstrate the existence of an unreasonable exposure to the substance.

In light of the above, the Court does not address whether or not the individual defendants were personally involved sufficiently so that a claim under § 1983 may be asserted against them. The Court also does not address whether or not plaintiffs Vann and Owen exhausted their administrative remedies. It appears that the defendants do not dispute that plaintiff Wilson exhausted his administrative remedies.

Conclusion

In light of the above, the defendants motion for summary judgment (Docket No. 67) is granted. The trial scheduled to commence on February 14, 2005 is canceled. The complaint in this case is dismissed in its entirety.

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 246810

## Footnotes

1    No such amendment of the complaint has been made. The record does not reflect any basis for a claim that Wilson or any of the plaintiffs were exposed to fiberglass in connection with the removal of the ovens.

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Thomas v. DeCastro, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 75 of 301

**2018 WL 1322207**
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Bernard THOMAS, Plaintiff,

v.

Lieutenant DECASTRO, T. Humphrey,
Deputy Supt. of Security, Deputy Supt. of Sec.
J. King, Lt. Katz, C.O. D. Velez, Ms. Brenda
Clark, Sr. Mail Clerk, S. Encarnacion, Muslim
Chaplain, Albert Prack, Director of S.H.U.,
C.O. Lechance, Lindstrand, Deputy of Admin,
and Director Donald Venettozzi, Defendants.

Case No. 14-CV-6409 (KMK)
|
Signed 03/13/2018

**Attorneys and Law Firms**

Bernard Thomas New York, NY Pro Se Plaintiff.

Kristin R. Vogel, Esq. New York State Office of the Attorney
General New York, NY Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT
JUDGE

**\*1** Plaintiff Bernard Thomas ("Plaintiff"), currently an
inmate at Metropolitan Correctional Center ("MCC") and
formerly in the custody of the New York State Department
of Corrections and Community Supervision ("DOCCS"),
filed the instant Action pursuant to 42 U.S.C. §
1983 against Lieutenant John DeCastro ("DeCastro"),
Deputy Superintendent of Security Timothy Humphrey
("Humphrey"), Deputy Superintendent of Programming Jean
King ("King"), Lieutenant Steven Katz ("Katz"), Correction
Officer Damian Velez ("Velez"), Brenda Clark ("Clark"),
Imam Samuel Encarnacion ("Encarnacion"), Director of
Special Housing Albert Prack ("Prack"), Correction Officer
J. LaChance ("LaChance"), Deputy Superintendent of
Administration Jeffrey Lindstrand ("Lindstrand"), and
Director Donald Venettozzi ("Venettozzi") (collectively
"Defendants"). Plaintiff alleges that Defendants violated his
rights under the First and Fourteenth Amendments of the

United States Constitution arising out of disciplinary hearings
held at Woodbourne Correctional Facility ("Woodbourne"),
as well as violations of the Eighth Amendment based upon
allegedly unsafe and unsanitary conditions of confinement
at Great Meadow Correctional Facility ("Great Meadow").
*See generally* Compl. (Dkt. No. 2).) Before the Court is
Defendants' Motion To Dismiss the Complaint pursuant to
Federal Rule of Civil Procedure 12(b)(6) (the "Motion").
(Dkt. No. 46.) For the reasons described herein, Defendants'
Motion is granted.

I. Background

A. Factual History
The following facts are drawn from Plaintiff's Complaint and
attached exhibits and are taken as true for the purpose of
resolving the instant Motion.

1. April 22, 2012 Misbehavior Report

On April 22, 2012, Plaintiff received a misbehavior report
(the "April 22 Report") from Velez alleging Plaintiff had
violated disciplinary rules 104.13 (Creating a Disturbance),
107.10 (Interference with Employee), 106.10 (Refusing
Direct Order), and 109.12 (Movement Regulation Violation).
(*See* First Cause of Action ("First COA") 13 (Dkt. No. 2);
First COA Ex. B ("May 1, 2012 Disposition") 23 (Dkt.
No. 2).) [1] Plaintiff alleges that Velez fabricated the April
22 Report, (*see* First COA 13), and claims the report was
"very inadequate" because it was "not clear" what the charges
were, (*id.*). The next day, "De[C]astro[,] who has a personal
v[e]ndetta against [P]laintiff[,] changed the status of the
[April 22 Report], and altered/rewrote over the original
misbehavior report." (*Id.*) DeCastro reviewed the initial
report, and the final misbehavior report was delivered to
Plaintiff on April 23, 2012. (*See* May 1, 2012 Disposition
23.) Plaintiff alleges that DeCastro's alteration denied him
adequate notice of the charges against him prior to the
commencement of the disciplinary hearing, as is required
under 7 N.Y. Comp. Codes R. & Regs. § 251-3.1. (*See* First
COA 13–14.)

**\*2** Plaintiff's disciplinary hearing was then held on May
1, 2012, where Humphrey served as the presiding hearing
officer. (*See id.* at 14.) Humphrey "notice[d] the wrong" done
by DeCastro and was "suppo[sed] to adjourn the hearing
so [that] [P]laintiff c[ould] prepare for his defense." (*Id.*)

Thomas v. DeCastro, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 76 of 301

Yet, while Humphrey "t[ook] notice that [Plaintiff] did not receive a clear adequate copy of the misbehavior report," he failed to rectify the issue. (*Id.*) Ultimately, Humphrey found Plaintiff guilty of all charges except for the charged violation of disciplinary rule 104.13 (Creating a Disturbance). (*See* May 1, 2012 Disposition 23.) Plaintiff was sentenced to 45 days in keeplock and 45 days of lost privileges, including the loss of packages, commissary, and access to the telephone. (*See* First COA 16; May 1 Disposition 23.) Plaintiff timely appealed Humphrey's decision to Prack, but he allegedly "rubber stamped" the initial determination and denied Plaintiff's appeal. (First COA 16.)

### 2. April 2, 2013 Misbehavior
### Report and April 8, 2013 Hearing

On an unspecified date between March 25 and March 29, 2013, Plaintiff sent legal mail to an unnamed attorney. (*See* Second Cause of Action ("Second COA") 35 (Dkt. No. 2).) However, this letter was ultimately returned to Plaintiff, who claims that it was opened without his authorization by DeCastro and Clark, the mail clerk. (*Id.*) DeCastro then filed a misbehavior report on April 2, 2013 related to this letter, charging Plaintiff with violating disciplinary rules 118.11 (Facility Correspondence Violation), 114.10 (Smuggling), and 116.10 (Property Damage or Loss). (*See id.*; Second COA Ex. A ("April 2, 2013 Report") 41 (Dkt. No. 2).) According to DeCastro's report, which Plaintiff claims is entirely false, Plaintiff sent non-legal mail to an ex-inmate under the guise of legal mail to subvert proper correspondence procedures. (*See* Second COA 35; April 2, 2013 Report 41.) Plaintiff claims that DeCastro and Clark concocted this story and conspired together to "cover their actions," which included the allegedly unconstitutional opening of Plaintiff's legal mail. (Second COA 35.) Plaintiff further alleges that Clark, as the senior mail clerk, continued to open Plaintiff's legal correspondence outside of his presence after this incident. (*See id.* at 36.) Specifically, on April 15, 2013, Plaintiff received a letter marked as "Legal Mail" from Fordham University School of Law. (*Id.*) However, this mail was already opened when delivered to Plaintiff. (*Id.*)

At the April 8, 2013 hearing before King, Plaintiff was found guilty of all three charges and sentenced to three months of keeplock and lost privileges, including the loss of packages, commissary, and access to the telephone. (*See* Second COA Ex. B ("April 8, 2013 Disposition") 3 (Dkt. No. 2-1).) Moreover, in conjunction with finding Plaintiff guilty

of all three charges, King removed Plaintiff from his elected position on the Inmate Grievance Resolution Committee (the "IGRC"). (*See* Fourth Cause of Action ("Fourth COA") 36 (Dkt. No. 2-2).) Plaintiff alleges that King used this unrelated disciplinary hearing as an opportunity to remove Plaintiff from his position on the IGRC without complying with the proper notice and hearing requirements as mandated by 7 N.Y. Comp. Codes R. & Regs. § 701.4. (*See id.* at 36–37.)

Ultimately, King's April 8, 2013 disposition was reviewed and reversed by Prack on July 2, 2013. (*See* Second COA Ex. F ("July 2, 2013 Reversal") 25 (Dkt. No. 2-1).)

### 3. April 26, 2013 Misbehavior
### Report and Disciplinary Hearing

On April 24, 2013, while held in keeplock, Plaintiff sought to speak to Encarnacion, the Imam at Woodbourne. (*See* Third Cause of Action ("Third COA") 3 (Dkt. No. 2-2).) Eventually, Encarnacion came to visit Plaintiff that same day, where he proceeded to yell at Plaintiff for an unspecified reason. (*See id.*) Encarnacion then left, requesting that Plaintiff no longer call for him. (*See id.*) Two days later, Plaintiff received an allegedly false misbehavior report for violation of disciplinary rule 102.10 (Threats) arising out of his previous interaction with Encarnacion. (*See id.*; Third COA Ex. B ("May 7, 2013 Disposition") 17.) Plaintiff claims that this misbehavior report was in retaliation for a "serious incident" Encarnacion had at Woodbourne, where the "majority of the [M]uslims at Woodbourne ... flipped/sold him out and got him locked out [of the facility]." (Third COA 3–4.) Plaintiff was allegedly involved in an "investigation" of Encarnacion at Woodbourne commenced by the facility, where Plaintiff spoke to the investigator regarding Encarnacion. (*Id.* at 4.) Because of this, Encarnacion lied about Plaintiff's conduct, allegedly at the behest of DeCastro, which resulted in the filing of false charges against Plaintiff and arranging for Plaintiff's transfer from Woodbourne. (*Id.*)

**\*3** As a result of these charges, Plaintiff was subject to a disciplinary hearing before King that commenced on April 29, 2013, and was completed on May 7, 2013. (*Id.* at 5.) Plaintiff was ultimately found guilty of violating disciplinary rule 102.10 and sentenced to 60 days in the special housing unit ("SHU") to begin on July 1, 2013 given Plaintiff's current keeplock status given the April 8, 2013 disposition. (*Id.*; May 7, 2013 Disposition 17.) Plaintiff alleges that King was "bias[ed], un[] fair, and very prejudiced," and "imposed a very

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

Case 9:18-cv-00391-LEK-TWD  Document 70  Filed 04/23/20  Page 77 of 301

harsh penalty and exceeded the guidelines for th[e] charge," which itself was not supported by the evidence. (Third COA 5.) This disposition was affirmed by Venettozzi on July 10, 2013 after Plaintiff filed a timely appeal of King's decision. (*See* Third COA Ex. E. ("July 10, 2013 Review") 26.)

However, Plaintiff alleges that, on May 8, 2013, Katz "took it upon himself to (Forge) re-write ... and change[ ] the hearing disposition that was already complete[d]" on May 7, 2013. (Third COA 6.) Katz allegedly corrected King's original disposition by having Plaintiff's confinement in SHU commence immediately, rather than having Plaintiff continue to serve his "Invoked-Keeplock" time that arose out of the April 8, 2013 disposition. (*See id.*; Third COA Ex. C ("Revised May 7, 2013 Disposition") 19.) Effectively, Katz swapped the order of Plaintiff's penalties. Plaintiff claims that this created confusion regarding his sentences and resulted in him spending extra days in SHU, (*see* Third COA 6–7), and a delayed release from keeplock upon Prack's reversal of the April 8, 2013 disposition, (*see id.* at 7–8).

#### 4. Incidents at Great Meadow

On either May 28, 2013 or May 29, 2013, Plaintiff was transferred from Woodbourne to Great Meadow. (*See* Fifth Cause of Action ("Fifth COA") 19 (Dkt. No. 2-3).) Roughly one month after this transfer, on June 24, 2013, Plaintiff alleges that the "B1–SHU officials," including LaChance, failed to properly sanitize the showers after an allegedly HIV-positive inmate showered and bled "all over the shower floor." (*Id.*) Instead of cleaning the spill, the unnamed officials escorted the other inmate to the medical clinic, but failed to inform Plaintiff of the spill. (*See id.*) Plaintiff did not notice the blood upon entering the shower or during the entirety of his 8 minute shower because the floor was painted black. (*See id.*) However, upon getting out of the shower he noticed that he was "standing in blood" and confirmed with the HIV-positive inmate what had occurred. (*Id.* at 19–20.) Plaintiff took an HIV test and was "liv[ing] in fear and was mentally distress[ed] and very traumatize[d]" while awaiting the results. (*Id.* at 20.)

On October 28, 2013, another blood spill allegedly occurred, this time in the mess hall at Great Meadow. (*See id.*) Specifically, Plaintiff clams that several unnamed officials failed to clear the area before cleaning the spill with numerous chemicals. (*See id.*) As a result of his exposure to these chemicals, Plaintiff, who allegedly suffers from asthma,

experienced chest pain, difficulty breathing, coughing, and emotional distress. (*See id.* at 21.)

In addition to the blood spill, the mess hall at Great Meadow was allegedly filled with birds. (*See* Sixth Cause of Action ("Sixth COA") 6 (Dkt. No. 2-4).) On an unspecified date, Plaintiff was eating in the mess hall, where he and his food were defecated on by one of the birds flying overhead. (*See id.*) Plaintiff informed an unnamed officer about this incident, but that complaint was "disregarded." (*Id.*) The birds and their feces are "all over the mess[ ]hall," and while unnamed officials claim they are "try[ing] to eradicate the birds," nothing has been done. (*Id.*)

#### B. Procedural History

Plaintiff filed his Complaint and attached exhibits on August 5, 2014. (*See* Compl. (Dkt. No. 2).) That same day, Plaintiff requested to proceed in forma pauperis ("IFP"). (*See* Request to Proceed IFP (Dkt. No. 1).) The Court granted Plaintiff's request for IFP status on November 18, 2014. (Order Granting IFP Application (Dkt. No. 4).)

**\*4** On December 1, 2014, the Court issued an order of service, and ordered the Clerk of Court to send Plaintiff a U.S. Marshals Service Process Receipt and Return form ("USM-285 form") for each Defendant and for Plaintiff to complete a form for each Defendant and return those forms to the Court. (*See* Order of Service (Dec. 1, 2014) (Dkt. No. 6).) The service package and Order of Service were then mailed to Plaintiff at Great Meadow, his address listed on the docket, but ultimately returned to sender on December 11, 2014 and December 15, 2014, respectively. (*See* Dkt. (entries for Dec. 15, 2014 and Jan. 16, 2015).) The service package was sent to Plaintiff's updated address on January 16, 2015, but was again returned to the sender as undeliverable. (*See* Dkt. (entries for Jan. 16, 2015 and Mar. 5, 2015).)

On June 2, 2015, the Court ordered the Clerk of Court to resend the Order of Service and service package to Plaintiff's updated address. (*See* Order of Service (June 2, 2015) (Dkt. No. 10).) On August 3, 2015, the service package was returned as undeliverable. (*See* Dkt. (entry for Aug. 3, 2015).) On November 4, 2016, the Court again requested that the Clerk of Court resend the Orders of Service and the service package to Plaintiff's updated address. (*See* Order of Service (Nov. 4, 2016) (Dkt. No. 19).) The USM-285 form was received on November 17, 2016 and all Defendants were deemed to have been served on January 18, 2017. (*See* Order (Dkt. No. 30).)

Thomas v. DeCastro, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 78 of 301

On March 7, 2017, counsel for Defendants submitted a letter to the Court requesting permission to file a Motion To Dismiss on behalf of all Defendants pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Letter from Kristen R. Vogel, Esq., to Court (Dkt. No. 39).) On March 21, 2017, the Court entered an Order that Defendants could file their Motion To Dismiss by April 18, 2017, and Plaintiff should respond to any Motion by May 16, 2017. (*See* Mot. Scheduling Order (Dkt. No. 40).)

On April 18, 2017, Defendants filed their Motion To Dismiss and accompanying papers. (*See* Dkt. Nos. 46–47.) In the interim, Plaintiff sought appointment of counsel, (*see* Letter from Plaintiff to Court (April 27, 2017) (Dkt. No. 50)), as well as a 30-day extension to file his opposition to Defendants' Motion, (*see* Letter from Plaintiff to Court (May 4, 2017) (Dkt. No. 51)). The Court granted Plaintiff's request for an extension on May 15, 2017, (*see* Order (Dkt. No. 52)), but denied Plaintiff's request for counsel on May 24, 2017, (*see* Order (Dkt. No. 53).)

Plaintiff filed his opposition to Defendants' Motion and accompanying papers on June 12, 2017. (*See* Dkt. Nos. 54–55.) In response, Defendants filed their Reply on July 5, 2017. (*See* Dkt. No. 56.)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*5** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga Cty.*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro

Thomas v. DeCastro, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 79 of 301

se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and internal quotation marks omitted)).

### B. Analysis

#### 1. Procedural Due Process Claims

Plaintiff contends that, on three separate occasions, Defendants violated his procedural due process rights. First, Plaintiff alleges that Velez's April 22 Report, DeCastro's alteration of that report, and Humphrey's failure to correct this error at the hearing and sentence of 45 days in keeplock constituted a due process violation. (*See* First COA 13–16.) Second, Plaintiff alleges that DeCastro issued the April 2, 2013 Report, and that King violated Plaintiff's procedural due process rights by failing to properly give notice as the possible punishment of removal from the IGRC as a result of the April 8, 2013 hearing. (*See* Second COA 35–36; Fourth COA 36–37.) Third, Plaintiff contends that Encarnacion engaged in retaliatory conduct by issuing a false misbehavior report, and as a result King violated Plaintiff's due process rights at his April 26, 2013 hearing by way of her bias and prejudice, as well as the sentence of 60 days in SHU. (*See* Third COA 3–5.) Moreover, in connection with this third incident, Plaintiff alleges that Katz rewrote King's disposition, substantially altering his sentence without notice. (*See id.* at 6–8.) [2]

"[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (first alteration in original) (internal quotation marks omitted). The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment). However, the Supreme Court has clarified that "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). The Second Circuit has explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s atypical and significant

hardship test." *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (internal quotation marks omitted). The duration of disciplinary confinement, however, is "not the only relevant factor," and the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). Indeed, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of atypical and severe hardship," and, therefore, courts should consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions." *Id.* (internal quotation marks omitted); *see also Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." (citation omitted)).

**\*6** As a guidepost to determine whether due process protections are required in the prison context, the Second Circuit has instructed that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days —development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer*, 364 F.3d at 64–65 (internal quotation marks omitted); *see also Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at \*5 (S.D.N.Y. Feb. 17, 2015) (same). Moreover, "although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, [the Second Circuit has] explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65 (citation omitted). Indeed, "[a]bsent a detailed factual record, courts typically affirm dismissals of due process claims where the period of time spent in SHU was short—*e.g.*, thirty days—and there was no indication of unusual conditions." *Houston v. Cotter*, 7 F. Supp. 3d 283, 298 (E.D.N.Y. 2014) (citing *Palmer*, 364 F.3d at 66).

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives

Thomas v. DeCastro, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 80 of 301

"advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). "In the context of prison disciplinary hearings, the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, *inter alia,* does not prejudge the evidence and who cannot say, with ... utter certainty ..., how he would assess evidence he has not yet seen.' " *Rahman v. Acevedo,* No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (quoting *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir. 1990)).

### a. Keeplock and SHU Confinement

To make out a due process claim related to his keeplock and SHU confinement, Plaintiff must plausibly allege: (1) that there was a deprivation of a protected liberty interest; and (2) that such deprivation was the result of the procedural defects. *See Ortiz,* 380 F.3d at 654. Here, the first element of Plaintiff's due process claim has not been met as to any of the disciplinary actions.

Following the April 22, 2012 Report and subsequent hearing, Plaintiff was sentenced to 45 days in keeplock, although the attached disposition indicates that he was in fact only subjected to 10 days of such confinement with the remaining 35 days being suspended. (*See* May 1, 2012 Disposition 23.) It is well settled that 10 days, absent allegations of any "atypical and severe hardship," "is an insufficiently short period of time to establish the violation of a liberty interest. *Palmer,* 364 F.3d at 64. To that end, even had Plaintiff served 45 days in keeplock, Plaintiff's Complaint is devoid of *any* allegations regarding the conditions of his keeplock confinement. The only details provided by Plaintiff regarding this period are that he was not allowed access to "phones, packages [and] commissary." (First COA 16.) While the Second Circuit has declined to "delineate the precise contours of 'normal' SHU confinement ... it is sufficient to note that, ordinarily, SHU prisoners are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Ortiz,* 380 F.3d at 655. Plaintiff makes no allegations that he was kept in SHU for longer than the typical period, or that he was denied exercise, adequate showers, or was generally subjected to any

conditions that were "more onerous than usual," *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir. 2009), and in fact makes no allegations about the conditions of his keeplock beyond the withholding of privileges as detailed in the disposition. *See Branch v. Goord,* 05-CV-6495, 2006 WL 2807168, at *4 (S.D.N.Y. Sept. 28, 2006) ("Plaintiff's privileges were withheld during confinement, but lost privileges do not constitute an atypical and significant hardship because they are within the expected parameters of the sentence imposed by a court of law." (internal quotation marks omitted)).

**\*7** Similarly, Plaintiff has failed to establish that he was deprived of any actionable liberty interest as it relates to the April 8, 2013 Report and subsequent hearing. Here, Plaintiff was sentenced to 90 days in keeplock, but again, the time served appears to have been limited to 30 days, with the remaining two months being suspended. (*See* April 8, 2013 Disposition 3.) As this Court has previously noted, the "[30]-day confinement is right at the cut-off suggested by [the Second Circuit] for a presumptively typical confinement." *Aikens v. Royce,* No. 14-CV-663, 2015 WL 7758892, at *6 (S.D.N.Y. Dec. 1, 2015) (internal quotation marks omitted). And yet again, even if Plaintiff were to have spent 90 days in keeplock, he has failed to make any allegations regarding the conditions of his confinement. The only details provided regarding these conditions are delineated in the April 8, 2013 disposition, indicating that Plaintiff was subjected to the loss of privileges such as access to the phones, packages, and commissary. (*See* April 8, 2013 Disposition 3.) Thus, even if Plaintiff were subjected to 90 days of keeplock, the absence of any allegations regarding the conditions of that confinement means that Plaintiff has "failed to demonstrate a liberty interest entitling [him] to due process." *Vogelfang v. Capra,* 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012).

For these same reasons, Plaintiff has not established deprivation of a liberty interest as related to the April 24, 2013 Report and subsequent hearing. Plaintiff's sentence of 60 days in SHU is generally viewed as a shorter period of confinement, and the length of confinement is a factor that the Court considers in determining whether disciplinary punishment "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Hanrahan,* 331 F.3d at 97 (quoting *Sandin,* 515 U.S. at 484). However, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of atypical and severe hardship." *Palmer,* 364 F.3d at 64 (internal

Case 9:18-cv-00391-LEK-TWD    Document 70    Filed 04/23/20    Page 81 of 301

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

quotation marks omitted). Here, Plaintiff's claim fails once more. Plaintiff has failed to allege any facts that plausibly establish that his confinement in keeplock was atypical, as it appears Plaintiff was again subjected solely to the loss of privileges such as access to the phones, packages, and commissary. (May 7, 2013 Disposition 17.) As discussed above, "lost privileges do not constitute an atypical and significant hardship because they are within the expected parameters of the sentence imposed by a court of law." *Branch*, 2006 WL 2807168, at \*4 (internal quotation marks omitted). Thus, Plaintiff's 60-day confinement in SHU, absent any allegations regarding unduly harsh conditions, is by itself insufficient to establish a liberty interest protected by due process.

Accordingly, because Plaintiff's allegations regarding his keeplock and SHU confinement do not plausibly suggest that "the conditions of the disciplinary segregation differ[ed] from other routine prison conditions," *Palmer*, 364 F.3d at 64 (internal quotation marks omitted), Plaintiff has failed to establish a liberty interest as related to the imposition of various keeplock and SHU penalties. Therefore, the Court grants Defendants' Motion To Dismiss Plaintiff's due process claim against hearing officers Humphrey and King, as well as reviewing officers Prack, Katz, and Venettozzi.

*See* *Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470, at \*15 (S.D.N.Y. Sept. 29, 2014) (noting that "a number of courts in [the Second] Circuit ... have dismissed claims in which [the] plaintiffs alleged spending between [40] and [50] days in punitive segregation or faced other comparable discipline[,] ... conclud[ing] that, in the absence of some allegation that the conditions of keeplock or SHU confinement were in some way unusual, plaintiffs had failed to allege the violation of a protected liberty interest" (internal quotation marks omitted)) (collecting cases); *O'Diah v. Artus*, No. 10-CV-6705, 2013 WL 1681834, at \*2–3 (W.D.N.Y. Apr. 17, 2013) (dismissing case where the plaintiff, who was confined for 111 days, "failed to allege facts showing that the conditions of his confinement, combined with the duration of his confinement, created an atypical and significant hardship" (internal quotation marks omitted));

*Edwards v. Horn*, No. 10-CV-6194, 2012 WL 760172, at \*10 (S.D.N.Y. Mar. 8, 2012) (explaining that "[s]everal courts have concluded that, absent unusual conditions, 30 days of segregation is not an atypical or significant hardship under *Sandin*") (collecting cases); *Torres v. Logan*, No. 10-CV-6951, 2011 WL 1811003, at \*4 (S.D.N.Y. May 11, 2011) (dismissing the plaintiff's due process claim where he alleged

that he was confined for "a little over two-thirds of the 90 days sentence," because the plaintiff "fail[ed] to allege any facts regarding the conditions of his confinement, including whether they were abnormal or unusual" (alteration and internal quotation marks omitted)), *adopted by* 2011 WL 3894386 (S.D.N.Y. June 13, 2011).

### b. Removal from the IGRC

**\*8** To the extent Plaintiff claims his removal from the IGRC, following the April 8, 2013 disposition issued by King, constituted a due process violation, that claim also fails. DOCCS regulations require "a limited due process hearing," including "notice of the charges ... indicat[ing] that the affirmation of the[ ] charges may result in removal from the IGRC," prior to removal from the IGRC, 7 N.Y. Comp. Codes R. & Regs. § 701.4(c)(1), and thus Plaintiff contends that failure to comply with § 701.4 constitutes a violation of due process. However, as the Supreme Court held in *Sandin*, while New York "may under certain circumstances create liberty interests which are protected by the Due Process Clause ... these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483–84. The Court is unaware of any cases finding that there is a protected liberty interest in serving as an IGRC representative; indeed other courts within the Second Circuit have found to the contrary. *See Marrero v. Kirkpatrick*, 659 F. Supp. 2d 422, 425–26 (W.D.N.Y. 2009) (holding that there is no established liberty interest in serving as an IGRC representative); *Alnutt v. Cleary*, 913 F. Supp. 160, 168 (W.D.N.Y. 1996) ("[U]nder the new standards adopted by the Supreme Court in *Sandin*, the State's regulation limiting the transfer of IGRC representatives did not create a liberty interest and does not provide a basis for a civil rights action if that policy is violated.") Plaintiff has identified no legal basis for the Court to find that his removal from the IGRC without notice of that possible punishment at his disciplinary hearing constituted an "atypical and significant hardship" such that it would constitute a liberty interest.

However, even were the Court to assume, *arguendo*, that such a liberty interest did exist, all Defendants would be protected by qualified immunity. "The doctrine of qualified immunity

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 82 of 301

protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "[Qualified] immunity protect[s] government's ability to perform its traditional functions ... by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (second alteration in original) (citation and internal quotation marks omitted). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable officer in the defendant's position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (second alteration in original) (citations and internal quotation marks omitted). Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* at 665 (citations and internal quotation marks omitted). Otherwise stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the

Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

**\*9** Ultimately, the failure to inform Plaintiff of the possible *punishments* he was subject to has not been clearly established by either the Supreme Court or the Second Circuit. As previously discussed, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna*, 356 F.3d at 487; *see also Wolff*, 418 U.S. at 563–64 (same). No Supreme Court or Second Circuit case involving a prisoner's removal from the IGRC has held that due process rights adhere to such removal. Nor has either court set forth any requirement that an inmate be given notice of the potential *penalties* to be imposed based on the charges in a misbehavior report. [3] Accordingly, because there is no clearly established constitutional right to receive notice of the specific *penalties* that may be imposed in response to a misbehavior report, nor has it been clearly established that removal from the IGRC *requires* notice and a hearing to comport with the Constitution, Defendants' alleged conduct is protected by qualified immunity.

## 2. First Amendment Retaliation Claims

Plaintiff's claims that DeCastro, who allegedly has "a personal v[e]ndetta against [P]laintiff[,]" retaliated against Plaintiff by filing and altering the April 22 Report. (First COA 13.) DeCastro, along with Encarnacion, allegedly retaliated against Plaintiff roughly one year later, filing a false misbehavior report on or about April 26, 2013, claiming that Plaintiff violated disciplinary rule 102.10 in his interaction with Encarnacion two days earlier. (*See* Third COA 3–4.) The Court will address the claims against DeCastro and Encarnacion in turn.

A plaintiff asserting a First Amendment retaliation claim must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 83 of 301

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

marks omitted). Courts are instructed to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official ... can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted). Accordingly, First Amendment retaliation claims brought by prisoners must "be 'supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.' " *Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)).

### a. DeCastro

DeCastro contends that Plaintiff has failed to plausibly state a constitutional claim of retaliation as to either report because Plaintiff has failed establish a causal connection, or provide any factual support, related to DeCastro's alleged "personal vendetta." (Defs.' Mem. in Supp. of Mot. To Dismiss ("Defs.' Mem.") 11 n.4. (Dkt. No. 47); *see also* Defs.' Reply in Supp. Of Mot. To Dismiss ("Defs.' Reply") 2–5 (Dkt. No. 56).) The Court agrees.

Plaintiff's allegations regarding DeCastro's retaliation in his Complaint are that he has a "personal vendetta" against Plaintiff and therefore altered Velez's misbehavior report on April 22, 2012 and encouraged Encarnacion to file a report against Plaintiff in April 2013. (First COA 13; Third COA 3–4.) However, to the extent Plaintiff alleges in his opposition papers that DeCastro's personal vendetta arises out of Plaintiff's position on the IGRC and Plaintiff's past adverse findings against DeCastro, (*see* Pl.'s Opp'n to Defs.' Mot To Dismiss ("Pl.'s Opp'n") 4 (Dkt. No. 55)), such conduct could, liberally construed, be protected. *See Dolan,* 794 F.3d at 295 (holding that "retaliation against a prisoner for filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the [Inmate Liaison Committee], violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments." (internal quotation marks omitted)).

**\*10** However, Plaintiff has failed to allege any facts to support a finding that DeCastro took any adverse action against him, or that there was a causal connection between the

protected speech and the adverse action. Critically, Plaintiff did not receive either the April 22, 2012 or the April 2013 misbehavior reports from DeCastro. Rather, the April 2012 report was issued by Velez, (*see* First COA 13), and the April 2013 report was issued by Encarnacion, (*see* Third COA 3–4). Plaintiff's allegations regarding DeCastro are merely that he "altered/rewrote" the April 2012 report, (First COA 13), but the May 1, 2012 Disposition itself makes clear that to the extent DeCastro was involved it was to provide Plaintiff with a copy of the report on April 23, 2013. (*See* May 1, 2012 Disposition 23.) Similarly, Plaintiff alleges that he "do[es] believe [Encarnacion] spoke to ... DeCastro ... [who] told ... Encarnacion ... to write the false misbehavior report." (Third COA 4.) Each of these accusations is entirely conclusory, as Plaintiff's belief that DeCastro and Encarnacion colluded to punish him is not the same as a factual allegation, *see Aho v. Anthony,* 782 F. Supp. 2d 4, 7 (D. Conn. 2011) (dismissing a § 1983 action where "[t]he only allegation with respect to the defendants' personal involvement is that" defendants were "acting in concert" with each other and others to deprive the plaintiff of due process); *Malcolm v. Honeoye Falls–Lima Educ. Ass'n,* 678 F. Supp. 2d 100, 107 (W.D.N.Y. 2010) ("The Second Circuit has repeatedly emphasized that '[a] complaint containing only conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss' ") (quoting *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir. 1983)), and insufficient to establish that DeCastro had any role in the filing of a misbehavior report.

Moreover, even assuming DeCastro had taken adverse action, Plaintiff has failed to allege any causal connection between his presence on the IGRC and being issued any misbehavior reports. Plaintiff's claim that this created a "personal vendetta," (First COA 13), on the part of DeCastro is entirely conclusory. There are no facts that DeCastro was at all motivated by this alleged vendetta, or had any motive at all beyond Plaintiff's violation of DOCCS regulations. *See Vogelfang,* 889 F. Supp. 2d at 517 (S.D.N.Y. 2012) (holding that "repeatedly assert[ing] that [the plaintiff's] perceived mistreatment is a result of retaliatory animus on the part of the defendants," without "any specific and detailed factual allegations to support that assertion," is insufficient to establish a causal connection); *Bouknight v. Shaw,* No. 08-CV-5187, 2009 WL 969932, at \*6 (S.D.N.Y. Apr. 6, 2009) (finding plaintiff's allegation that the defendant "wrote me up for revenge" is "mere speculation" and therefore insufficient to plausibly establish "the requisite causal connection").

Accordingly, the Motion To Dismiss Plaintiff's retaliation claim against DeCastro is granted.

### b. Encarnacion

As to Encarnacion, Plaintiff alleges he was involved in, and cooperated with, an "investigation" at Woodbourne, and resulted in Encarnacion being "locked out" of the facility for two months. (Third COA 4.) The Court will assume for the purpose of this Motion that participation in an investigation of prison officials, akin to filing a grievance against such officials, is constitutionally protected conduct. *See* *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996) ("This court has held that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983."); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir. 1988) ("[I]ntentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that [§] 1983 is intended to remedy." (internal quotation marks and alterations omitted)). Moreover, the alleged filing of a false misbehavior report would constitute an adverse action in the retaliation context. *See* *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir. 2004) (holding that "the filing of false misbehavior reports against [the plaintiff] and his sentence of three weeks in keeplock," was sufficient to allege an adverse action, which "would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights through the grievance process and the courts").

Yet, as with DeCastro, Plaintiff has failed to establish any non-conclusory causal connection between that investigation, Plaintiff's participation in that investigation, and Encarnacion's alleged actions. Specifically, Plaintiff has failed to identify when the investigation took place, or that Encarnacion even knew that Plaintiff was involved in any such investigation.[4] In the absence of any allegation that Encarnacion was aware of Plaintiff's participation in an investigation, *Tirado v. Shutt,* No. 13-CV-2848, 2015 WL 774982, at *10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his ... grievance, [the plaintiff] has failed to provide any basis to believe that they retaliated against him."), *adopted in relevant part by* 2015 WL 4476027 (S.D.N.Y. July 22, 2015), or that there was any temporal relationship between the grievance and the disciplinary action, *see* *Rivera v. Goord,* 119 F. Supp. 2d 327, 341 (S.D.N.Y. 2000) (dismissing retaliation claim where the plaintiff failed to plausibly allege "temporal proximity between [the] plaintiff's protected activity and [the defendant's] alleged acts of retaliation"), Plaintiff cannot state a retaliation claim, *see* *Mateo v. Dawn,* No. 14-CV-2620, 2016 WL 5478431, at *8 (S.D.N.Y. Sept. 28, 2016) (holding a plaintiff's failure to allege any knowledge of the protected conduct results in a "fail[ure] to establish a plausible causal connection" for the purposes of a retaliation claim). Accordingly, the Motion To Dismiss Plaintiff's retaliation claim against Encarnacion is granted.

### 3. Access to Courts Claim

**\*11** Plaintiff alleges that DeCastro and Clark opened his legal mail without authorization. (*See* Second COA 35). According to Plaintiff, DeCastro and Clark justified their actions by charging Plaintiff with subverting the proper correspondence procedures by sending non-legal mail to an ex-inmate under the guise of legal mail. (*See id.* at 35; April 2, 2013 Report 41.) Plaintiff claims that DeCastro and Clark then conspired to "cover their actions," while Clark continued to open Plaintiff's legal correspondence outside of his presence. (*See* Second COA 35–36.)

It is well-established that "[a] prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir. 1986); *see also* *Bounds v. Smith,* 430 U.S. 817, 821 (1977) ("It is now established beyond doubt that prisoners have a constitutional right of access to the courts."). Relatedly, the Second Circuit has held that "[i]nterference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis,* 320 F.3d at 351. "To state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (quoting *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir. 1997)); *see also* *Rossi v. Stevens,* No. 04-CV-1836, 2008 WL 4452383, at *12 (S.D.N.Y. Sept. 30, 2008) ("[T]o state a valid [§] 1983 claim for denial of access to the courts

Thomas v. DeCastro, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD    Document 70    Filed 04/23/20    Page 85 of 301

based on interference with an inmate's legal mail, the inmate must satisfy two elements: that the deliberate and malicious interference impeded his/her access to the courts, and that, as a result of that interference, an existing meritorious action was prejudiced—that is, the inmate suffered actual injury."). Moreover, "[w]hile a prisoner has a right to be present when his legal mail is opened, an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Id.* (citation omitted).

Here, it is alleged that Clark and DeCastro interfered with what Plaintiff alleges was legal mail on two occasions. (*See* Second COA 35–36.) While "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts," *Davis*, 320 F.3d at 351, no such circumstances are present here, nor are there "specific allegations of invidious intent or of actual harm," *id.* Plaintiff has put forth purely conclusory allegations of DeCastro's "personal vendetta" as a motivating factor for any and all actions taken against Plaintiff, (*see* First COA 13), and similarly asserted, without detailed allegations, that both Clark and DeCastro "acted in a willful manner ... to hurt [Plaintiff] with malice," (Second COA 35). Moreover, Plaintiff's pleadings are critically deficient, as he makes no allegations that this interference was part of an "ongoing practice," or that he was "unjustifiably chilled" in seeking access to the courts to prosecute, or defend against, any pending legal action. *Davis*, 320 F.3d at 351; *see also Black v. Petitinato*, No. 16-CV-3941, 2016 WL 3983590, at *7 (E.D.N.Y. July 25, 2016) (dismissing a plaintiff's access to the courts claim based on a "fail[ure] to allege any facts showing that [the] defendant ... caused actual injury, i.e., that the defendant's actions hindered the plaintiff's efforts to pursue a legal claim." (citation and internal quotation marks omitted); *Smith v. City of New York*, No. 14-CV-443, 2015 WL 1433321, at *3 (S.D.N.Y. Mar. 30, 2015)) ("[The p]laintiff must allege facts demonstrating that he was prejudiced in his ongoing legal proceedings. A mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." (internal quotation marks omitted); *Solana v. NYC Dep't of Corr.*, No. 12-CV-3519, 2012 WL 5466425, at *6 (E.D.N.Y. Nov. 8, 2012) ("[The plaintiff's] assertions that the [prison] has a policy to open legal stamped mail and it has happened many, many times are mere conclusory statements,

not facts from which this court could infer a pattern of censorship on the part of the [prison]." (internal quotation marks omitted)). Accordingly, Plaintiff's access to the courts claim is dismissed.

**\*12** To the extent that Plaintiff alleges a conspiracy claim against Clark and DeCastro arising out of his mail tampering allegations, (*see* Pl.'s Opp'n 10–11), such a claim also fails. Claims for conspiracy to violate civil rights, even if brought under 42 U.S.C. § 1983, "should actually be stated as a claim under [§] 1985, which applies to conspiracies." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). Section 1985(2) "renders actionable (1) a conspiracy[,] (2) for the purpose of impeding, hindering, obstructing, or defeating, in any manner, (3) the due course of justice in any State or Territory, (4) with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." *Rodriguez v. City of N.Y.*, No. 05-CV-10682, 2008 WL 4410089, at *15 (S.D.N.Y. Sept. 25, 2008). "Title 42 U.S.C. § 1985(3) prohibits, in pertinent part, conspiracies undertaken 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws.' " *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 290 (2d Cir. 1992) (quoting 42 U.S.C. § 1985(3)). "The elements of a claim under § 1985(3) are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, ...; (3) an act in furtherance of the conspiracy; (4) whereby a person is ... deprived of any right of a citizen of the United States." *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 2000) (alterations in original) (internal quotation marks omitted); *see also Turkmen v. Hasty*, 789 F.3d 218, 262 (2d Cir. 2015) (same), *judgment rev'd in part, vacated in part on other grounds sub nom. Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017).

Both claims "require a showing of class-based invidiously discriminatory animus" on the part of the conspiring parties, *Hickey v. City of N.Y.*, No. 01-CV-6506, 2004 WL 2724079, at *22 (S.D.N.Y. Nov. 29, 2004), *aff'd*, 173 Fed.Appx. 893 (2d Cir. 2006), as well as "some factual basis supporting a meeting of the minds, such that [the] defendants

entered into an agreement, express or tacit, to achieve the unlawful end." *Webb*, 340 F.3d at 110 (internal quotation marks omitted). Plaintiff does not allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind [Defendant's] action[s]," *Turkmen*, 789 F.3d at 262, nor does he provide any specific facts to plausibly suggest that DeCastro and Clark "entered into an agreement, express or tacit, to achieve [an] unlawful end," *Webb*, 340 F.3d at 110. Instead, Plaintiff merely states that DeCastro and Clark "conspired against [him]" and had a "meeting of the minds." (Second COA at 35.) Such vague and conclusory allegations of conspiracy are insufficient, and therefore must be dismissed. *See Lastra v. Barnes and Noble Bookstore*, No. 11-CV-2173, 2012 WL 12876, at *7 (S.D.N.Y. January 3, 2012) (noting that "[u]nsubstantiated, conclusory, vague[,] or general allegations of a conspiracy" are insufficient to state a claim under § 1985); *Van Dunk v. St. Lawrence*, 604 F. Supp. 2d 654, 663 (S.D.N.Y. 2009) ("[C]laims of conspiracy that are vague and provide no basis in fact must be dismissed." (internal quotation marks omitted)).

### 4. Eighth Amendment Claims

Upon his transfer to Great Meadow, Plaintiff alleges that he was subjected to cruel and unusual conditions of confinement by way of LaChance's, and several unnamed "B1–SHU Officials[']," failure to clean up a blood spill in the showers, (Fifth COA 19–20), and Lindstrand and several unnamed officials at Great Meadow inability to eradicate birds from the mess hall, (*see* Sixth COA 6). [5]

"The conditions of a prisoner's confinement can give rise to an Eighth Amendment violation." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002). "In such cases, a prisoner may prevail only where he proves both an objective element —that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or safety.' " *Id.* (italics omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Under the "objective" requirement, a plaintiff must show that "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to [an inmate's] health," which can be satisfied if an inmate is deprived of "basic human needs such as

food, clothing, medical care, and safe and sanitary living conditions." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks omitted). "[T]o establish the objective element of an Eight[h] Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps*, 308 F.3d at 185.

**\*13**  Under the "subjective" requirement, a defendant " 'cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* at 185–86 (quoting *Farmer*, 511 U.S. at 837). "A prison official may be found to have had a sufficiently culpable state of mind if he participated directly in the alleged event, or learned of the inmate's complaint and failed to remedy it, or created or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001); *see also Abdur-Raheem*, 2015 WL 667528, at *4 (same); *Reid v. Nassau Cty. Sheriff's Dep't*, No. 13-CV-1192, 2014 WL 4185195, at *17 (E.D.N.Y. Aug. 20, 2014) (same).

Assuming, without deciding, that Plaintiff has satisfied the objective prong regarding the pool of blood left in the shower, no such claim would lie regarding the allegations surrounding the birds in the mess hall area. *See, e.g., Phillips v. LaValley*, No. 12-CV-609, 2014 WL 1202693, at *12 (N.D.N.Y. Mar. 24, 2014) (finding that an inmates' food tray being "contaminated" with a cockroach poses a condition that is "insufficiently serious to sustain an Eighth Amendment conditions of confinement claim"); *Mitchell v. Goord*, No. 04-CV-366, 2007 WL 189087, at *5 (N.D.N.Y. Jan. 22, 2007) (holding that allegations of, inter alia, an "infestation by vermin, insects, rats, and mice" does not rise to the level of an Eighth Amendment violation); *Govan v. Campbell*, 289 F. Supp. 2d 289, 296–97 (N.D.N.Y. 2003) (permitting, inter alia, "wild birds ... to fly within the cells ... do[es] not rise to the level of a constitutional violation").

However, irrespective of whether Plaintiff has met the substantive pleading standards for an Eighth Amendment claim, nothing in Plaintiff's Complaint suggests that either

Thomas v. DeCastro, Not Reported in Fed. Supp. (2019)

Case 9:18-cv-00391-LEK-TWD    Document 70    Filed 04/23/20    Page 87 of 301

LaChance or Lindstrand, the only named Great Meadow Defendants, was directly or indirectly involved in creating a dangerous or inhumane environment for Plaintiff. The Second Circuit has made clear that, "[p]roof of an individual defendant's personal involvement in the alleged wrong is, of course, a prerequisite to his liability on a claim for damages under § 1983." *Gaston*, 249 F.3d at 164. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted). In other words, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Here, Plaintiff makes no allegations in his Complaint that any Defendant actually knew of the alleged conditions, let alone participated in their creation. *See Wright*, 21 F.3d at 501 (finding no personal involvement when the defendant "was never put on actual or constructive notice of the [rule] violation," did not "create[ ] a policy or custom under which the violation occurred," and did not "act[ ] negligently in

managing subordinates who caused the violation"). Instead, he alleges that it was LaChance's "responsibility to close the shower area, call for a blood[ ]spill clean up crew [ ] [a]nd have the shower area sanitize[d]," (Fifth COA 19), and that Lindstrand "is legally responsible for the food operation/overall welfare of all the offenders at Great Meadow," (Sixth COA at 5). However, LaChance and Lindstrand cannot be held personally liable for constitutional violations merely "because [t]he[y] [are] in a ... position of authority" at Great Meadow. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Plaintiff does not plausibly allege that either of these individuals failed to "act on information regarding the [allegedly] unlawful conduct" or otherwise acted with "gross negligence." *Reid*, 2014 WL 4185195, at *12 (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003)). [6]

**\*14** Therefore, because the Complaint fails to allege that any Defendant was "aware of facts from which the inference could be drawn that" the conditions at Great Meadow specifically posed a substantial risk of serious harm to Plaintiff, or that Defendants in fact drew such an inference, *Farmer*, 511 U.S. at 837, the Court dismisses Plaintiff's Eighth Amendment claims. [7]

### III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted. However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. If Plaintiff wishes to file an amended complaint, Plaintiff should include within that amended complaint any changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. The amended complaint will replace, not supplement, the original complaint. The amended complaint must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations contained in supplemental letters, declarations, or memoranda. If Plaintiff fails to abide by the 30-day deadline, this Action may be dismissed with prejudice.

SO ORDERED.

Thomas v. DeCastro, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD    Document 70    Filed 04/23/20    Page 88 of 301

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1322207

## Footnotes

1    Plaintiff has submitted his Complaint as six separate causes of action across multiple ECF entries rather than as a singular Complaint. For ease of reference, the Court cites to the claims by each cause of action, and then to the ECF-generated page numbers stamped at the top of the given docket entry for that cause of action.

2    To the extent Plaintiff claims that Velez's, DeCastro's, or Encarnacion's allegedly false misbehavior reports each by itself constituted a due process violation, such a claim fails. *See* Benitez v. Ham, No. 04-CV-1159, 2009 WL 3486379, at *21 (N.D.N.Y. Oct. 21, 2009) ("[A] correctional officer's filing of unfounded charges does not give rise to procedural due process liability.") (citing Freeman v. Rideout, 808 F.2d 949, 953–54 (2d Cir. 1986)); *see also* Thomas v. Demeo, No. 15-CV-9559, 2017 WL 3726759, at *10 (S.D.N.Y. Aug. 28, 2017) (same). However, the Court will address the allegations against DeCastro and Encarnacion in more detail within the context of Plaintiff's First Amendment retaliation claims.

3    In any event, the DOCCS regulations governing disciplinary hearings provide that among the penalties that may be imposed is removal of an inmate from the IGRC. *See* 7 N.Y. Comp. Codes R. & Regs. § 254.7(a)(1)(d)(xi).

4    In fact, Plaintiff claims to have spoken "very highly of [Encarnacion]" when speaking to the investigators, (Third COA at 4), which would belie any claim that Plaintiff's participation would result in a retaliatory motive on the part of Encarnacion were he to have known of it.

5    In his Sixth COA, Plaintiff names "J. Shusda" as a Defendant given his role as the Food Service Administrator at Great Meadow. However, this individual has never been listed as a Defendant on Plaintiff's prison form complaint, has not been listed in the case caption on ECF, has not been issued a summons, and has not been served. Accordingly, the Court will not address any claims made against J. Shusda at this time.

6    Specifically, Plaintiff makes no allegation that LaChance knew of any blood spill in the showers, let alone that the amount of blood was significant or came from someone with HIV. As Defendants rightly note, Plaintiff himself did not even notice the blood during the duration of his shower, (*see* Fifth COA 19), and thus it is implausible that LaChance would have known without prompting from Plaintiff or any other individual in the area. Moreover, Plaintiff merely names Lindstrand as responsible for supervision at Great Meadow, but makes no further allegations that Lindstrand was ever made aware of any unsanitary conditions. (*See* Sixth COA 5–11.)

7    To the extent Plaintiff seeks injunctive relief regarding the mess hall conditions at Great Meadow, such relief would be moot given Plaintiff's release from the facility. *See* Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006) ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); Pugh v. Goord, 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008) (explaining that "[w]here a prisoner has been released from prison, his [or her] claims for injunctive relief based on the conditions of his [or her] incarceration must be dismissed as moot" (italics omitted)).

---

**End of Document**                                         © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1202693
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ralph Buck PHILLIPS, Plaintiff,

v.

T. LAVALLEY, et al., Defendants.

No. 9:12–CV–609 (NAM/CFH).
|
Signed March 24, 2014.

**Attorneys and Law Firms**

Ralph Buck Phillips, Malone, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of New York, Richard Lombardo, Esq., Assistant Attorney General, The Capitol, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

**\*1**  In this *pro se* inmate civil rights action, defendants move (Dkt. No. 33) for dismissal pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff did not submit opposition to the motion. Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge Christian F. Hummel issued a Report–Recommendation and Order (Dkt. No. 35) recommending that the motion be granted in part and denied in part.

Neither party has submitted an objection. The docket reflects that plaintiff has twice refused service of the Report–Recommendation and Order (Dkt. No. 36). "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003). A *pro se* litigant must be given notice of this rule, *see Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); here, however, the Report–Recommendation and Order provides the proper notice, and any failure to receive notice is due to plaintiff's conduct.[1]

The Court has reviewed Magistrate Judge Hummel's Report–Recommendation and Order—which thoroughly addresses this 60–page handwritten complaint—and accepts it in its entirety.

It is therefore

ORDERED that the Report–Recommendation and Order (Dkt. No. 35) is accepted; and it is further

ORDERED that defendants' Rule 12(b)(6) motion (Dkt. No. 33) is granted in part and denied in part as follows:

Dismissal is denied as to:

- Plaintiff's Eighth Amendment excessive force claims against defendants James and Lee;

- Plaintiff's Eighth Amendment deliberate indifference claims regarding his mental health treatment against defendants Waldron, Berggren, and Savage; and

- Plaintiff's Eighth Amendment deliberate indifference claims regarding his medically approved insoles against defendants Boudrieau, and Martin; and

Dismissal is otherwise granted as to all other claims and defendants; and it is further

ORDERED that the following defendants are dismissed from the case: T. LaValley; W. Allan; Menard; E. Bouissey; B. Tucker; D. Amo; Bezio; C. Delutis; J. Delisle; P. Hutti; C. Trudeau; and Susan M. Rocque; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

**REPORT–RECOMMENDATION AND ORDER**

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff pro se Ralph Buck Phillips, ("Phillips"), an inmate in the custody of the New York State Department of Corrections and Community Services ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that the defendants, all employees of Clinton Correctional Facility, violated his

constitutional rights under the First and Eighth Amendments. Compl. (Dkt. No. 1). Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) as to all claims against all defendants. Dkt. No. 33. Phillips has not responded to the motion. For the following reasons, it is recommended that defendants' motion be granted in part denied in part.

## I. Background

**\*2** According to the lengthy and at times confusing complaint, Plaintiff Phillips claims to have experienced a multitude of constitutional violations while he was housed at Clinton Correctional Facility (hereinafter "Clinton"). The facts are related herein in the light most favorable to Phillips as the non-moving party. *See* subsection II(A) *infra*.

### 1. LaValley

In the 4th Cause of Action, Defendant Lavalley is accused of denying Plaintiff use of ear plugs for a "serious medical need." As a result, Plaintiff is constantly deprived of any restful sleep and fails to experience peace at any time. Defendant LaValley allegedly did this in a "malicious context" because he is aware of the excessive noise. Compl. ¶¶ 20–21.

In the 9th Cause of Action, Plaintiff claims he filed a grievance against LaValley which caused him to retaliate against Plaintiff and take photos off the Plaintiff's cell wall, which Plaintiff was previously allowed to have. Compl. ¶¶ 44–45.

### 2. Allan

The 3rd and 21st Causes of Action accuse Defendant Allan of tampering with Plaintiff's legal mail. Compl. ¶¶ 17–19, 76–77. Plaintiff filed grievances against Defendant Allan, which Plaintiff claims caused Defendant Allan to tamper with his legal mail. Defendant Allan's tampering led to Plaintiff not being able to answer the motion to dismiss in this case. *Id.*

In the 10th Cause of Action, Plaintiff filed a grievance against Defendant Allan for harassment and retaliation for what Plaintiff claims were malicious and excessive cell frisks. Compl. ¶ 49. It appeared to Plaintiff that someone entered his

cage and "just scattered his paper work and property around to create a mess" in retaliation for filing grievances. *Id.*

The 20th Cause of Action is both a retaliation claim and conditions of confinement claim. Compl. ¶ 124. Plaintiff broke his cell door, so five days later Defendant Menard, along with Defendant Allan, put him in # 13 cage [described in paragraph 70 as not being swept or mopped and having loose and broken screws in the light fixture] which was unsanitary in retaliation for "making his cell gate malfunction." *Id.*

### 3. Menard

The 1st Cause of Action in which Plaintiff describes how Defendant Menard threatened him has been dismissed. Compl. ¶ 9.

The 20th Cause of Action is both a retaliation claim and conditions of confinement claim. Compl. ¶ 124. Plaintiff broke his cell door, so five days later Defendant Menard, along with Defendant Allan, put him in # 13 cage (as described above and in paragraph 70) which was unsanitary in retaliation for "making his cell gate malfunction." *Id.*

### 4. Boudrieau & Martin

In the 8th Cause of Action, Plaintiff claims both defendants confiscated the medically approved insoles for Plaintiff's medical boots by falsely making the metal detection device beep over his boots. Compl. ¶¶ 38, 40. Plaintiff claims this was done to harass and retaliate against Plaintiff for a sarcastic comment he made to Defendant Martin. *Id.* ¶¶ 40, 42. Without the insoles in his boots, Plaintiff got blisters and had "significant pain" in his heels and arches because his boots, no longer fit properly. *Id.* ¶ 42.

### 5. Delutis

**\*3** In the 19th Cause of Action, Plaintiff claims that Defendant Delutis should have given direction to someone to clean the cells since they are "not being adequately cleaned" and he is the SHU supervisor. Compl. ¶ 70.

In the 22nd Cause of Action, Plaintiff claims his Eighth Amendment rights were violated when Delutis fabricated a scenario to harm plaintiff by placing him in an unsanitary cell

while overseeing a cell frisk. Compl. ¶ 126. Plaintiff describes the cell as "smelling like a zoo" and "generally filthy," with the sink appearing to "not have been cleaned in months." *Id.* ¶ 82. Plaintiff states that "approximately an hour elapsed" between when he was taken out of this cell, placed in the unsanitary cell and ultimately brought to another cell. Compl. ¶ 83. Phillips contends that within the new cell the "pillow and mattress were both fouled" and it "smelled bad." *Id.* ¶ 84. Plaintiff tore the pillow and blanket to pieces and advised the facility Captain [1] of his mattress conditions. *Id.* ¶¶ 84–85. The Captain, once made aware of the cell conditions, provided Plaintiff with a new mattress. *Id.* ¶ 45. Defendant Delutis, the area supervisor of The Special Housing Unit ("SHU") [2] was asked by Plaintiff to inspect Defendant Delisle while he conducted the cell frisk. Plaintiff heard both Defendants "whispering in his cage and then brief laughter." *Id.* ¶ 79. Defendant Delutis told Plaintiff the frisk was going according to rules and regulations and that he "will not tell staff how to conduct a cell frisk, they do as they want, you don't like it, you know what you gotta do." *Id.* ¶ 79.

### 6. Delisle [3]

In the 22nd Cause of Action, as described in the paragraph above, Defendant Delisle is accused of fabricating a scenario to harm Plaintiff with Defendant Delutis by placing him in an unsanitary cell during the cell search. Compl. ¶¶ 78, 81–82, 84.

### 7. Tucker [4]

In the 11th Cause of Action, Plaintiff claims Defendant Tucker retaliated against him for a previous comment Plaintiff made the night before, which spurred a retaliatory cell frisk. Compl. ¶ 51. Plaintiff claims his property was strewn about and someone spit tobacco juice into Plaintiff's bread. Plaintiff also claims this was cruel and unusual punishment. *Id.* ¶¶ 52–53.

In the 12th Cause of Action, Plaintiff filed a grievance against Tucker for stealing his pillow and not receiving a replacement for multiple weeks. Compl. ¶ 55.

### 8. James

In the 2nd Cause of Action, Plaintiff claims his Eighth Amendment rights were violated when Defendant James yanked the chain holding Plaintiff's handcuffs which caused "blistering fire" in his wrists and his hands "felt numb and fuzzy." Compl. ¶ 12. Plaintiff contends James "appeared to be really attempting to snap plaintiff's wrists" by putting all of his weight onto the chain. *Id.* ¶ 12. James later roughly shoved Plaintiff into the wall "in an attempt to ram his face into the wall." *Id.* ¶ 13. James then put Plaintiff back in his cell, removed the cuffs, and slapped Plaintiff's hands "hard." *Id.* ¶ 14.

### 9. Bouissey [5]

**\*4** The 5th Cause of Action claims Defendant Bouissey violated Plaintiff's Eighth Amendment rights by denying him use of the restroom. Compl. ¶ 23. Plaintiff says he was deliberately ignored when he requested use of the bathroom on the monitoring camera while out in the exercise yard and therefore relieved himself in a drain ditch, which caused him to receive a "false" behavior report [6] . *Id.* ¶ 22.

### 10. Lee [7]

In the 13th Cause of Action, Plaintiff claims Defendant Lee gave him his kosher meal with dirty gloves and when Plaintiff objected to it, Lee slammed the hatch down on Plaintiff's hand, "applying his weight down in an effort to harm plaintiff and keep him pinned." Compl. ¶¶ 57–58. After this exchange, Lee did not give Plaintiff the rest of his meal. *Id.* ¶ 58.

The 16th Cause of Action alleges an Eighth Amendment violation when Lee denied Plaintiff outside exercise on one occasion. Compl. ¶ 64.

### 11. Bezio [8]

In the 17th Cause of Action, Defendant Bezio denied Plaintiff his outside recreation time for "running his mouth." Compl. ¶ 66.

### 12. Amo & Rocque

In the 14th Cause of Action, Plaintiff contends his Eighth Amendment rights were violated when the Defendants (the Food Service Administrator and Head Cook) gave Plaintiff a contaminated kosher tray that had a cockroach on it and was missing 2 jellies. Compl. ¶ 60. Plaintiff was denied another tray. *Id.*

### 13. Trudeau

In the 25th Cause of Action, Plaintiff contends Defendant Trudeau delivered a regular meal to Plaintiff instead of a kosher meal while Plaintiff was housed in OBS. Compl. ¶ 99. Plaintiff claims it was "obvious he was being denied his meal purposely since all concerned were aware he was in OBS." *Id.* Plaintiff asked Trudeau to get his kosher breakfast and was denied his meal. *Id.*

### 14. Hutti [9]

In the 24th Cause of Action, Defendant Hutti allegedly placed Plaintiff in a secure area (2–company shower) and kept him there for two hours while Hutti and plumbers were in Plaintiff's cell due to flooding from "action by Defendant and/ or civilian plumbers which caused the flooding." Compl. ¶ 93. After being taken from the shower, Plaintiff was taken to a new cell and noticed "there was no mat nor pillow [and] the cage was disgusting." *Id.* ¶ 94. Plaintiff also notes the sink and toilet had not been cleaned for some time and the sink gave off a strong smell "like sewage." *Id.* Hutti brought Plaintiff his kosher meal in that cage and Plaintiff told Hutti to put the kosher meal in his usual cell because "he had no intentions of attempting to consume food in such an obviously foul cage." *Id.* ¶ 95. Plaintiff then "heard his tray being tossed in the trash can." *Id.* Plaintiff claims he was in this cell for one hour before being returned to his regular cell. *Id.* ¶ 96.

### 15. Waldron & Berggren

In the 6th Cause of Action, Plaintiff stopped Defendant Waldron during her weekly round to tell her that he needed to privately speak with her about his mental health because he was experiencing "severe mental and emotional issues for which he had not previously been subjected to." [10] Compl. ¶ 24. Defendant Waldron replied there was nothing she could do for Plaintiff because he was in administrative segregation

status and she could not help him. *Id.* ¶ 25. Plaintiff filed requests with Defendants Waldron and Berggren to receive mental health services and was ignored. *Id* . ¶ 26. Plaintiff also sent identical mental health requests to outside agencies and his requests were met with negative responses. *Id.* ¶ 27. According to Plaintiff, "many responses were evidently constructed in a fashion as to 'cover' themselves as well as the facility at Clinton." *Id.*

### 16. Savage

**\*5** The 7th Cause of Action claims that Defendant Savage was walking around and Plaintiff stopped him to ask some questions about his mental health file. Compl. ¶ 31. Plaintiff claims he talked with Savage who told him, "you know how things 'work' when it concerns you." *Id.* Plaintiff claims Savage approached him a few months later and asked him if he wanted to come out of his cell to "talk." *Id.* ¶ 33. Plaintiff claims this was the last time he had a "bonafide interview" regarding his mental health and during this time. Plaintiff explained all of the symptoms he was experiencing. *Id.* Savage told Plaintiff he may have a "legitimate anxiety issue" and said he would get Plaintiff an opportunity to speak to Dr. Berggren personally. *Id.* Such opportunity never occurred. *Id.* ¶ 34.

This action followed.

## II. Discussion

### A. Legal Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure calls upon a court to gauge the facial sufficiency of that pleading using a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. 677–78 (quoting Fed.R.Civ.P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain

more than mere legal conclusions. *See* id. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party.

*Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Twombly,* 550 U.S. at 555–56); *see also* *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal,* 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570); *see also* *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570) (alterations omitted).

 **\*6** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 551 U.S. at 94 (" '[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) ("[W]hen a plaintiff proceeds *pro se,* a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.,* 804 F.Supp.2d 100, 104 (N.D.N.Y.2011) (Hurd, J.) ("A *pro se* complaint must be read liberally.").

## B. First Amendment

Phillips alleges that his First Amendment rights were violated when he was denied kosher meals intermittently while incarcerated at Clinton Correctional Facility.

The First Amendment protects the right to free exercise of religion. *See generally* *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citations omitted); *see also* *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation ... is reasonably related to legitimate penological interests.") (citations omitted).

The Turner Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Benjamin,* 905 F.2d at 574 (citing *Turner v. Safely,* 483 U.S. 78, 89–91 (1987)).

### 1. Failure to Provide Kosher Meals

The Second Circuit has held "that prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975). This includes providing kosher food to those of the Jewish faith. *Bass v. Coughlin,* 800 F.Supp. 1066, 1071 (N.D.N.Y.1991) (citing *Kahane,*

527 F.2d 492). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004). "Courts, however, are reluctant to grant dietary requests where the cost is prohibitive, or the accommodation is administratively unfeasible." *Benjamin,* 905 F.2d at 579.

**\*7** The denial of three kosher meals, on three separate occasions, did not constitute more than a *de minimus* burden. *See McEachin,* 357 F.3d at 203 n. 6 (holding that, "[t]here may be inconveniences so trivial that they are most properly ignored ... [thus] the time-honored maxim *'de minimis non curat lex'* [11] applies."); *see also Rapier v. Harris,* 172 F.3d 999, 1006 n. 4 (7th Cir.1999) (*"De minimis* burdens on the free exercise of religion are not of constitutional dimension.") (citations omitted); *Thomas v. Picio,* No. 04–CV–3174, 2008 WL 820740, at \*6 n. 8 (S.D.N.Y. Mar.26, 2008) (finding that the denial of all kosher meals for one or two days was "not a substantial burden" which was actionable) (Ex. A). [12] Similar to the plaintiff in *Thomas,* Philips was denied three individual meals on three separate days, with no other complaints of meal problems thereafter. Such denials resulted in a *de minimis* burden on Philips' religious practice.

Furthermore, the cessation of the diet was based mostly upon a miscommunication between defendants and Philips, or by Philips denying his meal. This behavior was, at worst, negligence on behalf of the staff which is insufficient to establish liability under § 1983. *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 88 L.Ed.2d 677, (1986) (holding "that § 1983 provides no remedy for the ... negligence found in this case") (internal quotation marks and citations omitted); *Poe v. Leonard,* 282 F.3d 123, 145 (2d Cir.2002) ("[M]ere negligence is insufficient as a matter of law to state a claim under section 1983.") (citations omitted). As such, he has failed to state a First Amendment claim.

Accordingly, defendants' motion as to Defendant's Lee, Trudeau and Hutti under this claim should be granted.

## 2. Access to Courts and Legal Mail

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order" [to state a claim for denial of access to the courts, including those premised on] interference with legal mail ... a plaintiff must allege [that a defendant caused 'actual injury,' i.e.] took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim." *Id.* (citations and internal quotation marks omitted). Such injury must affect "a non-frivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials." *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (citations and internal quotation marks omitted); *Shine v. Hofman,* 548 F.Supp.2d 112, 117–18 (D.Vt.2008) (explaining that actual injury "is not satisfied by just any type of frustrated legal claim because the Constitution guarantees only the tools that inmates need in order to attack their sentences ... and ... challenge the conditions of their confinement.") (internal quotation marks and citations omitted). Accordingly, without identification of the underlying action which was prejudiced, actual injury, and by extension a First Amendment violation, cannot be established. *See Christopher v. Harbury,* 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) ("[T]he underlying cause of action ... is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.").

**\*8** Phillips alleges in his first claim that defendant Allan began impeding his access to the courts in 2006 when Allan took over mail watch duties. However, Phillips has failed to plead with any specificity what the underlying action was that had supposedly been prejudiced or what hindrance resulted to Phillips' underlying legal claim. Accordingly, defendant's motion as to this claim should be granted.

In Phillips second claim, he alleges that in 2011 an Article 78 claim was not received by the courts until approximately one month after it was sent. Phillips broadly contends that "there was no reason why plaintiff's document should have been delayed." In the same claim, plaintiff states he believes Allan also prevented the filing of his "motion in opposition" to defendant's motion to dismiss which resulted in the Article 78 being dismissed for failure to reply. However, Phillips has failed to identify with any sort of specificity the underlying legal claim or demonstrate that it was meritorious. Therefore, because conclusory assertions are insufficient to state a claim

under 42 U.S.C. § 1983, defendants' motion as to this claim should be granted.

### 3. Retaliation

Courts have been cautioned to approach First Amendment retaliation claims by prisoners with skepticism and particular care. *See e.g.,* Davis v. Goord, 320 F.3d 346, 352 (2d Cir.2003) (citing Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema,* NA, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). However, that does not mean that such claims are automatically to be dismissed. Such a claim can survive a defendant's motion to dismiss, but only if plaintiff alleges facts tending to establish that (1) the speech or conduct that led to the allegedly retaliatory conduct is the sort of speech or conduct that is protected by the Constitution; (2) defendant(s) took adverse action against the plaintiff; and (3) there is a causal connection between the protected speech or activity and the adverse action. *See* Jones v. Harris, 665 F.Supp.2d 384, 398 (S.D.N.Y.2009). These allegations may not be conclusory; they must have some basis in specific facts that are not inherently implausible on their face. *See* Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); South Cherry Street LLC v. Hennessee Group LLC, 573 F.3d 98, 110 (2d Cir.2009).

Furthermore, '[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his ... constitutional rights constitutes an adverse action[;] ... [if a] retaliatory act is ... *de minimis,* ... [it falls] outside the ambit of constitutional protection." Davis, 320 F.3d at 353 (citing Dawes, 239 F.3d 489). In this regard, prisoners may be required to tolerate more than public employees or average citizens before a purportedly retaliatory action taken against them is considered adverse, Thaddeus–X v. Blatter, 175 F.3d 378, 392–93 (6th Cir. 1999).

### a. LaValley

**\*9** Phillip's alleges that defendant LaValley retaliated against him after Phillip's filed a grievance regarding a prior incident with LaValley. Defendant LaValley supposedly forced Plaintiff to remove photos off of his cell wall that he was previously allowed to have. While filing of grievances is protected conduct, the adverse action of removing photos off of a cell wall is so *de minimis,* that it "falls outside the ambit of constitutional protection." Davis, 320 F.3d at 353 (citing Dawes, 239 F.3d 489). Therefore, defendants' motion as to this claim should be granted.

### b. Allan

The facts as to the alleged retaliation by defendant Allan are somewhat unclear, however it appears that after Plaintiff filed a grievance against Allan and then Plaintiff returned to his cell and found his paperwork and property scattered around "to create a mess ." It appears that Plaintiff is alleging defendant Allan is responsible for the state of his cell.

Plaintiff alleges that Allan's retaliatory searches [13] resulted in the seizure of some of his property and the "trashing" of his cell. While the filing of grievances is protected conduct, the cell search does not appear to establish adverse action. Plaintiff may be

> suggesting that these searches were unusually punitive and so were out of the ordinary[. However,] plaintiff alleges no facts tending to show that, in an ordinary random cell search, property is not seized and cells are not turned upside down and inside out. It is to be expected that cell searches will disrupt, not only the prisoner's life, but also the living conditions inside the cell; and since one purpose of a cell search is to locate and recover contraband, the court cannot turn a blind eye to the fact that prisoner property is sometimes seized when cells are searched."

Jones v. Harris, 665 F.Supp.2d 384, 398 (S.D.N.Y.2009). Phillips has failed to allege any facts demonstrating that the searches (regardless of who conducted or ordered them or how disruptive they were) were so much a departure from the norm as to be greater than a *de minimis* disruption, or to qualify as conduct that would deter an individual of ordinary firmness from exercising his constitutional rights. *Id.* Accordingly, defendants' motion as to this claim should be granted.

### c. Menard

Defendant Menard is accused of putting Plaintiff in an "unsanitary cell" in retaliation for Phillip's making his cell gate malfunction five days prior. Plaintiff fails to meet his burden of demonstrating the first prong of a plausible claim, because destruction of prison property is not a constitutionally protected action. [14] Accordingly, defendants' motion as to this claim should be granted.

### d. Boudrieau & Martin

Defendants Boudrieau and Martin are jointly accused of removing Plaintiff's medically approved insoles from his boots, which caused him blistering and "significant pain" in retaliation for a sarcastic comment made by Plaintiff to defendant Martin. However, making sarcastic comments to Correctional Officers is not conduct protected by the Constitution [15], therefore defendants' motion as to this claim should be granted.

### e. Tucker

**\*10** Plaintiff claims that he made a comment to defendant Tucker which caused him to retaliate against Plaintiff by doing a cell frisk the following evening which caused Plaintiff's property to become "strewn about," and "someone" supposedly spit tobacco juice into his bread. Plaintiff does not meet the burden of proof here because he has not established an engagement in protected conduct. "Inmates have no reasonable expectation of privacy in their prison cells[; therefore Phillips] ha[s] no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." *See* *Rodriguez v. McClenning,* 399 F.Supp.2d 228 at 239 (2005). Accordingly, defendants' motion as to this claim should be granted.

### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Eighth Amendment obligations include the duty to protect prisoners from other known harms. *Farmer v. Brennan,* 511 U.S. 825, 829, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1970); *Matthews v. Armitage,* 36 F.Supp.2d 121, 124 (N.D.N.Y.1999) (citations omitted). It also includes the

provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### 1. Conditions of Confinement

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer,* 511 U.S. at 832. This includes the right to "receive adequate food, clothing, shelter, and medical care...." *Id.* (citations omitted). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element —that the prison officials' transgression was sufficiently serious—and a subjective element—that the officials acted, or omitted to act, with a sufficiently culpable state of mind ...." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (internal quotation marks and citations omitted).

> The objective prong can be satisfied by conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise —for example, a low cell temperature at night combined with a failure to issue blankets.

**\*11** *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (citing *Wilson v. Seiter,*

501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety." *Farmer,* 511 U.S. at 834 (citations omitted).

### a. Allan and Menard

Defendant's Allan and Menard are accused of placing Plaintiff in an unsanitary cell in retaliation for breaking his cell door. However, the allegations do not supply any more detail explaining what made the cell unsanitary, let alone a substantial risk of serious harm. *See Hamilton v. Fischer,* No. 10–CV–1066 (MAD/RFT), 2012 WL 987374, at *8 (N.D.N.Y. Feb.29, 2012) ("allegations of unsanitary conditions that are general in nature and do not specify any particularized facts regarding the level of hygiene do not state a claim upon which relief can be granted.") (internal quotation marks and citations omitted) (Ex. B). Additionally, no facts were alleged that suggest either Defendant Allan or Menard acted with deliberate indifference to Phillips' safety.

Accordingly, defendants' motion as to this claim should be granted.

### b. Delutis and Delisle

Defendant's Delutis and Delisle are accused of placing Plaintiff in an unsanitary cell which Plaintiff describes as "smelling like a zoo" and "generally filthy," with the sink appearing to "not have been cleaned in months." Plaintiff states that "approximately an hour elapsed" when he was taken out of this cell and brought to another cell. Phillips contends that in the new cell he was brought to the "pillow and mattress were both fouled" and it "smelled bad." Plaintiff tore the pillow and blanket to pieces and advised the facility Captain of his mattress conditions. The Captain, once made aware of these conditions, provided Plaintiff with a new mattress.

In this case, Plaintiff was held in these conditions for approximately one hour. "The Eighth Amendment is generally not violated ... where unsanitary conditions are temporary." *Ortiz v. Department of Correction of the City of New York,* No. 08–CV–2195 (RJS)(HBP), 2011 WL 2638137, at *7 (S.D.N.Y.Arp.29, 2011) (Ex. C) (quoting

*Kee v. Hasty,* No. 01–CV2123 (KMW)(DF), 2004 WL 807071 at *26 n. 24 (S.D.N.Y. Apr. 14, 2004) (Freeman, M.J.) (Report and Recommendation) (Ex. D)), *see also McNatt v. Unit Manager Parker,* No. 99–CV1397 (AHN), 2000 WL 307000 at *4 (D.Conn.2000) (Ex. E); *Whitnack v. Douglas County,* 16 F.3d 954, 955–58 (8th Cir.1994) (reversing jury verdict for plaintiff and finding no violation based on 24 hour exposure to vomit in sink, dried feces on toilet seat and dried urine puddles on floor before cleaning supplies were made available); *Prellwitz v. Anderson,* No. 07–CV–2120 (PAM/JSM), 2007 WL 2033804 at *2–*3 (D.Minn. July 12, 2007) (granting motion to dismiss under 28 U.S.C. § 1915A(b) where waste water on cell floor lasted only three hours and odor of inoperable toilet lasted six hours) (Ex. F); *Odom v. Keane,* No. 95–CV–9941 (SS), 1997 WL 576088 at *5 (S.D.N.Y. Sept.17, 1997)[19] (Sotomayor, D.J.) (condition where toilet failed to flush between 9 p.m. and 7 a.m. for several months "does not amount to cruel and unusual punishment") (Ex. G); *Evans v. Fogg,* 466 F.Supp. 949, 950 (S.D.N.Y.1979) (Lasker, D.J.) ("To be kept in a refuse-strewn cell for 24 hours and in a flooded cell (a condition resulting from [plaintiff's own acts) for two days is a rough experience, but, since neither condition persisted for more than a limited period of time, it cannot be said that the condition amounted to cruel and unusual punishment.")). Thus, even crediting Plaintiff's allegations as true, because he only spent an hour in that cell has failed to satisfied the objective prong of the analysis.

**\*12** Additionally, a plaintiff cannot succeed on an Eighth Amendment claim where there is no genuine issue of fact that defendants were deliberately indifferent. *See Ortiz* 2011 WL 2638137, at *8. In this case, Plaintiff was provided with a new mattress when he informed staff about his need for a new one. This behavior does not indicate deliberate indifference to Phillips' condition and therefore based on the above, defendants' motion as to this claim should be granted.

### c. Amo & Roque

Defendants Amo and Roque are accused of providing Plaintiff with a "contaminated" Kosher tray that was missing two jellies but included a cockroach. Plaintiff then claims that he requested and was denied receiving a different tray. Plaintiff has failed to allege any harm or deprivation of a singular human need. According, these allegations are insufficiently

serious to sustain an Eighth Amendment conditions of confinement claim. *See* Govan v. Campbell, 289 F.Supp.2d 289, 296–97 (N.D.N.Y.2003) (allegations that shower stalls had rust bubbles, birds were permitted to fly within the cells, and that the prison had "cockroach problems" were insufficient to state an Eighth Amendment claim, especially since plaintiff failed to identify how he was harmed by such conditions). Defendants' motion as to this claim should be granted.

### d. Hutti [16]

Defendant Hutti is accused of moving Plaintiff to a secure area after he allegedly flooded the company. Plaintiff was taken to this location for two hours and claims the area he was being held in began to flood due to actions by "defendant and/or civilian plumbers." Plaintiff was taken from this location and moved to # 7 cage where he noticed "there was no mat or pillows" and "the cage was disgusting." Plaintiff also states that the sink and toilet "had not been cleaned in some time" and dirty water in the sink gave off "a strong stench not unlike sewage." Other descriptions of the cell include it being "generally filthy" and Plaintiff did not believe the floor had been swept in weeks because there were "dust bunnies."

Conditions that create "temporary inconveniences and discomforts" or that make "confinement in such quarters unpleasant" are insufficient to state an Eighth Amendment claim. Adams v. Pate, 445 F.2d 105, 108–09 (7th Cir.1971). In *Adams,* the court of appeals did not find a constitutional violation when an inmate alleged that his cell was filthy and stunk, the water faucet from which he drank was only inches above the toilet, and the ventilation was inadequate. *Id.* The *Adams* holding, while only persuasive, is still instructive to this case given the factual similarities such that in both cases the inmates alleged having "filthy" cells among other issues. The *Adams* court did not find those conditions to be adverse enough as to rise to the level of an Eighth Amendment violation, despite them being arguably more unpleasant than the circumstances as described here. For this reason, defendants' motion as to this claim should be granted.

### 2. Denial of a Basic Human Need

**\*13** Defendants LaValley, Tucker and Bouissey are accused of denying Plaintiff of what he claims are "basic human needs" under the Eighth Amendment. In three separate and unrelated instances, Phillips alleges he was denied (1) ear plugs by defendant LaValley; (2) a pillow by defendant Tucker; and (3) use of the restroom while in the exercise yard by defendant Bouissey.

However, even assuming the truth of these factual allegations, they are the type of *de minimis* deprivations that fail to state a constitutional claim. *Phelan v. Zenzen,* No. 10–CV6704 CJS, 2012 WL 5420423, at *5 (W.D.N.Y. Nov.6, 2012) (stating that the denial of a pillow for several nights did not violate Eighth Amendment) (Ex. H); *see also, Gillard v. Rovelli,* No. 09–CV–0431 (TJM/DEP), 2010 WL 5149277 at *5 (N.D.N.Y.Aug.30, 2010) (collecting cases concerning razors) (Ex. I); *Williams v. DeTella,* No. 95–CV–6498, 1997 WL 603884 at *2 (N.D.Ill. Sep.23, 1997) ("Clothing is one of the necessities of civilized life ... and while prisoners are not entitled to a daily change of clothes, at some point the denial of clean clothes could be a deprivation of constitutional magnitude ... The same goes for bedding ... although the court emphasizes that the limit is set by decency and hygiene, not comfort. Pillows need not be provided.") (Ex. J) (citations omitted); *Loadholt v. Lape,* No. 09–CV–0658 (LEK/RFT), 2011 WL 1135934 at *4 (N.D.N.Y.Mar.3, 2011) ("[C]ourts in this Circuit have found the deprivations of better pain medicine, a cane, a mattress, a pillow, or better shoes, as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment.") (Ex. K); *Smith v. Arnold,* No. CV 07–1353–PHX–DGC (MEA), 2008 WL 5331754 at *4 (D.Ariz. Dec.22, 2008) ("[A] restriction on possessing a television, a radio/cassette player, headphones, a fan, an electric shaver, and tapes does not rise to the level of a significant and atypical hardship that creates a liberty interest.") (Ex. L).

As to the denial of Plaintiff's use of the bathroom, "case law has established that temporary denial of a bathroom does not establish the existence of an objective injury for purposes of an Eighth Amendment claim." Jones v. Marshall, No. 08–CV–0562, 2010 WL 234990, at *3 (S.D.N.Y. Jan.19, 2010) (Ex. M); *see also* Whitted v. Lazerson, No. 96–CV2746(AGS), 1998 WL 259929, at *1–2 (S.D.N.Y. May 21, 1998) (no objective injury where plaintiff had to wait ninety minutes to use the bathroom, during which time he "was forced to hold his bowel movement at painful levels, and at times partially urinated and defecated in his

clothing") (Ex. N); *Odom v. Keane,* No. 95–CV9941 (SS), 1997 WL 576088, at *5 (S.D.N.Y. Sept.15, 1997) (no objective injury where plaintiff's toilet did not function for a ten-hour period between 9 p.m. and 7 a.m.) (Ex. G); *Rogers v. Laird,* No. 07–CV–668 (LEK/RFT), 2008 WL 619167, at *3 (N.D.N.Y. Feb.8, 2008) ("The temporary deprivation of restroom privileges for a three hour period does not constitute an extreme deprivation of life's necessities.") (citation omitted) (Ex. O); *Bourdon v. Roney,* No. 99–CV–0769 (LEK)(GLS), 2003 WL 21058177, at *10–11 (N.D.N.Y. Mar. 6, 2003) (three hour deprivation of bathroom privileges did not constitute Eighth Amendment violation) (Ex. P). Consistent with this case law, Plaintiff's temporary deprivation of access to bathroom facilities while he was outside during recreation are similarly insufficient to establish a constitutional violation. Defendants' motion as to these claims should be granted for failure to state a claim.

### 3. Denial of Outdoor Recreation

**\*14** Defendants Lee and Bezio are each accused of denying Plaintiff outdoor recreation time on two separate and unrelated occasions. As previously stated by the Western District, "[a]lthough the Second Circuit has approved one hour of outdoor recreation per day, it has not held that to be the constitutional minimum". *Phelan,* No. 10–CV–6704 CJS, 2012 WL 5420423, at *5 (W.D.N.Y. Nov.6, 2012) (citations and quotations omitted) (Ex. H). Instead, deprivations of exercise for relatively brief periods of time are usually upheld. *Ford v. Phillips,* No. 05–CV–6646 (NRB), 2007 WL 946703, at *9 (S.D.N.Y. Mar.28, 2007) (finding that, "as a matter of law, minor and temporary deprivations of property, showers and recreation ..." in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment.") (citations omitted) (Ex. Q); *see, e.g., Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days was insufficient to satisfy the subjective prong and therefore does not violate the Eighth Amendment); *Houston v. Goord,* No. 03–CV–1412 (GTS/DEP), 2009 WL 890658, at *15 (N.D.N.Y.Mar.31, 2009) (declaring Eighth Amendment claim without merit because denial of opportunity to exercise outdoors for less than two weeks was *de minimis* ) (Ex. R); *Dumpson v. Goord,* No. 00–CV–6039–CJS, 2011 WL 4345760 at *9

(W.D.N.Y.Sep.15, 2011) (citing cases) (Ex. S). Here, Phillips does not allege that he was deprived of all exercise. Instead, Plaintiff alleges that on only two separate occasions was he deprived of exercise in the prison yard. Such allegations fail to state an Eighth Amendment claim, and defendants' motion as to these claims should be granted.

### 4. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute [s][an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (quotation omitted).

**\*15** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 at 21 (citation omitted). The wantonness inquiry "turns on 'whether

force is applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant [;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

### a. James

Phillips alleges that Defendant James yanked the chain holding Plaintiff's handcuffs and according to Plaintiff "he appeared to be really attempting to snap Plaintiff's wrists." Phillips also asserts that James later roughly shoved him into the wall in what Phillips believed was "an attempt to ram his face into the wall." After this incident James supposedly placed Plaintiff back in his cell, removed his handcuffs and "slapped his hands hard."

As the complaint is read in a light most favorable to the Plaintiff, this conduct while potentially not objectively serious, seems to have been done solely to cause harm. Thus, pursuant to *Blyden,* such a malicious use of force, intended solely cause harm, is sufficient to establish a plausible Eighth Amendment violation. Therefore defendants' motion as to this claims should be denied.

### b. Lee

Plaintiff claims that Defendant Lee gave him his Kosher meal with dirty gloves, which Plaintiff objected to, causing Lee to slam the hatch down on Plaintiff's hand, "applying his weight down in an effort to harm Plaintiff and keep him pinned."

In this situation also, the complaint is being read in a way most favorable to the Plaintiff and since this conduct does not appear to be in a good-faith effort to maintain or restore discipline but instead to solely cause harm, it is sufficient to establish a plausible Eighth Amendment violation. Accordingly, Defendants' motion as to this claims should be denied.

### 5. Meals

The Eighth Amendment "require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and wellbeing of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). "While no court has held that denial of food is a *per se* violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation ... may well be recognized as being of constitutional dimension." *Id.* (citations omitted). However, the deprivation must be sufficient to create a serious danger to the health of the inmate.

*See, e.g., Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (finding deprivation of two of three meals per day for eight days created an issue of material fact sufficient for Eighth Amendment claim to survive summary judgment); *Moss v. Ward,* 450 F.Supp. 591, 596–597 (W.D.N.Y.1978) (finding denial of food for four consecutive days and reduced food for three days thereafter sufficient to violate prisoner's Eighth Amendment rights).

**\*16**  As addressed earlier, Phillips claims defendant's Lee, Trudeau, and Hutti caused him to miss three meals on separate and unrelated occasions. The scope of the deprivation of food required to constitute cruel and unusual punishment is significantly greater than the deprivation present here. Missing a single meal on three separate occasions represents a *de minimus* injury which did not deny Plaintiff the minimal civilized measure of life's necessities. *Beckford,* 151 F.Supp.2d at 213; *Moss,* 450 F.Supp. at 596–97. While no doubt this was more than likely unpleasant, it is insufficient to establish an Eighth Amendment claim. Accordingly, defendants' motion on this ground should be granted.

### 6. Medical Care

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A prisoner advancing an Eighth Amendment claim for denial of medical care must

allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson,* 503 U.S. at 9). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was

adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

### a. Waldron & Berggren

**\*17** Plaintiff claims that Defendants Waldron and Berggren were deliberately indifferent to his serious medical needs when he disclosed to Defendant Waldron that he was experiencing "severe mental and emotional issues for which he had not previously been subjected to" and Defendant Waldron replied that there was nothing she could do for him. Plaintiff also claims he filed requests to see Defendant's Waldron and Berggren and was ignored. Plaintiff claims he sent requests to outside agencies as well but was met with negative responses which Plaintiff claims were fashioned to " 'cover' themselves as well as the facility at Clinton."

As to Phillips' claims regarding his mental health, "treatment of mental disorders of mentally disturbed inmates is ... a serious medical need" as contemplated by *Estelle.* *Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn.1984). Thus, considering all of Phillips' various complaints concerning his mental health, it is clear that he has alleged facts sufficient to allege an objective medical need as a result of his mental illnesses.

Moreover, Phillips also contends that defendants have deliberately precluded him from speaking to mental health personnel by ignoring his requests and dismissing his complaints, despite his various attempts to do so. Reading the facts in the light most favorable to Plaintiff, this constitutes deliberate indifference to Phillips' mental health needs. Therefore, it is recommended that the defendants' motion on this ground be denied.

### b. Savage

Defendant Savage was walking around and Plaintiff stopped him to ask some questions regarding his mental health file. Plaintiff claims Defendant Savage told him "you know how things 'work' when it concerns you." Plaintiff also claims Defendant Savage approached him a few months later and

asked if he was to come out of his cell to talk. Plaintiff claims this was the last "bonafide interview" he received and after hearing all of Phillips' symptoms told him he may have "a legitimate anxiety issue." Plaintiff claims Defendant Savage was deliberately indifferent to his medical need since Phillips' never had an opportunity to speak with Dr. Berggren, though Savage told Plaintiff he would.

For the same reasons as stated above, Phillips has succeeded in alleging a serious medical need. Moreover, Savage's actions of speaking to Plaintiff, identifying that he probably needed help for a legitimate mental health need, and continuing to fail to arrange for such treatment constitutes a plausible claim of deliberate indifference. Thus, it is recommended that defendants' motion on this ground be denied.

### c. Boudrieau & Martin

Defendants Boudrieau and Martin are jointly accused of removing Plaintiff's medically approved insoles from his boots during a security screening, which caused him blistering and "significant pain" in retaliation for a sarcastic comment made by Plaintiff to defendant Martin.

Construing Phillips' allegations as true, it appears that Phillips' has established a plausible claim that defendants acted with deliberate indifference to Phillips' unnamed medical condition. Phillips contends that defendants intentionally interfered with his treatment by denying him use of his medically approved boot insoles. Viewing the facts in the light most favorable to Phillips, the fact that he had medically provided insoles indicates that he received treatment from a medical professional regarding a medical need. Accordingly, such actions indicates a plausibly objectively serious medical condition. Moreover, construing the facts in the light most favorable to Phillips, defendants actions in intentionally causing the security device to malfunction and knowingly taking away medically indicated and approved insoles indicates deliberate indifference. Therefore, defendant's motion to dismiss on this ground should be denied.

### D. Qualified Immunity

**\*18** Defendants claim that even if Phillips' constitutional claims against them are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

Here, the second prong of the inquiry must only be discussed with regard to Phillips' Eighth Amendment right to medical care and the infliction of excessive force. It is wellsettled that during Phillips' stay at Clinton, the Eighth Amendment protected an inmate from the infliction of cruel and unusual punishment, which extends to the provision of medical care (*Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)) and prohibition against excessive force (*Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Therefore, it would not be objectively reasonable to conclude that indifference to various medical conditions and excessive force would fail to violate this right. Thus, accepting all of Phillips' allegations as true, qualified immunity cannot be granted to defendants for their alleged misconduct. Accordingly, defendants' motion on this ground should be denied.

### E. Injunctive Relief

To the extent that Phillips requests declaratory and injunctive relief, such requests are moot as he has been transferred from Clinton and is now housed at Upstate Correctional Facility. *See* *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility.") (citations omitted). Accordingly, to the extent that Phillips seeks declaratory and injunctive relief, those claims for relief should be dismissed as moot.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 33) should be:

**\*19**  1. **DENIED** as to:

  A. Phillips' Eighth Amendment excessive force claims against defendants James and Lee;

  B. Phillips' Eighth Amendment deliberate indifference claims regarding his mental health treatment against defendants Waldron, Berggren, and Savage; and

  C. Phillips' Eighth Amendment deliberate indifference claims regarding his medically approved insoles against defendants Boudrieau and Martin; and

2. **GRANTED** as to all other claims and defendants.

Pursuant to  28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984F.2d 85, 89 (2d Cir.1993);  *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989);  28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: Dec. 2, 2013

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1202693

---

### Footnotes

1    Although the Report–Recommendation and Order sets forth plaintiff's address as Clinton Correctional Facility (plaintiff's place of incarceration when the complaint was filed), this is merely a clerical error. It is clear from the docket (see Dkt. No. 36) that the Report–Recommendation and Order was properly mailed to plaintiff at Upstate Correctional Facility, where he has been housed since no later than August 1, 2012 (see docket entry for August 1, 2012; also see *Phillips v. La Valley,* 9:12–CV–610, Dkt. No. 20.)

1    Captain Lacy is named in the description of events, however he is not a named party to this action.

2    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2007). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

3    Defendant Delisle is also accused of stealing all of Plaintiff's property (Compl.¶¶ 78), however that claim has been dismissed.

4    Defendant Tucker is also accused of destruction of Plaintiff's legal documents, stealing property, and an illegal cell frisk (Compl.¶¶ 51), however these claims have been dismissed.

5    In the 15th Cause of Action, Defendant Bousissey is accused of threating Plaintiff, however that claim has been dismissed.

6    Claims of false misbehavior reports have also been dismissed.

7    Defendant Lee was also accused of harassment, however that claim has been dismissed.

---

8     Defendant Bezio was also accused of harassment, however that claim has been dismissed.

9     Defendant Hutti is accused of violating Plaintiff's Fourth and Fourteenth Amendment rights, however those claims have been dismissed and only the remaining Eighth Amendment claims will be analyzed.

10     Plaintiff notes in Complaint ¶¶ 30 that he has been required to "self-diagnose" his mental issues, and has diagnosed himself as having severe anxiety, blackouts, chronic fatigue and nervousness.

11     This phrase translates as "the law does not concern itself with trifles." *Gottlieb Dev. LLC v. Paramount Pictures Corp.,* 590 F.Supp.2d 625, 632 (S.D.N.Y.2008).

12     All unpublished decisions are attached to this Report and Recommendation.

13     In Plaintiff's complaint, he uses the wording "cell frisks" implying more than one, however the complaint only addresses and describes one instance. While Plaintiff filed a grievance against Defendant Allan for this cell search, Plaintiff's complaint does not specify who searched his cell, only that "someone entered his cage" while he was gone. Compl. ¶¶ 49.

14     While the court could not find this enumerated in any cases, it is apparent to the court that destruction of property is not conduct protected by the Constitution.

15     While the court could not find this enumerated in any cases, it is apparent to the court that sarcastic comments to Corrections Officers is not conduct protected by the Constitution.

16     Fourth and Fourteenth amendment claims against Defendant Hutti have previously been dismissed and only the Eighth amendment claim will be addressed in this report.

---

**End of Document**       © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 189087
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Paul MITCHELL, Plaintiff,
v.
Glenn S. GOORD, Jr., Commissioner, New York
State Correctional Service; et al., Defendants.

No. 9:04-CV-366 (LEK/DRH).
|
Jan. 22, 2007.

**Attorneys and Law Firms**

Paul Mitchell, of counsel, Queens, NY, Plaintiff Pro Se.

Hon. Eliot Spitzer, Attorney General for the State of New
York, Charles J. Quackenbush, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** This matter comes before the Court following a Report-
Recommendation filed on September 20, 2006, by the
Honorable David R. Homer, United States Magistrate Judge,
pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the
Northern District of New York. Report-Rec. (Dkt. No. 49).

Within ten days, excluding weekends and holidays, after a
party has been served with a copy of a Magistrate Judge's
Report-Recommendation, the party "may serve and file
specific, written objections to the proposed findings and
recommendations," FED. R. CIV. P. 72(b), in compliance with
L.R. 72.1. In the interval of at least fifteen days since the
Magistrate Judge filed the subject Report-Recommendation,
no objections to it have been raised. Furthermore, after
examining the record, the Court has determined that the
Report-Recommendation is not subject to attack for plain
error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 49)
is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it
is further

**ORDERED,** that Defendants' motion for summary judgment
(Dkt. No. 45) is **GRANTED** as to all moving Defendants for
the first and second causes of action, and judgment is entered
for those Defendants on the first two causes of action; and it
is further

**ORDERED,** that Defendants' motion (Dkt. No. 45) is
**GRANTED** as to all moving Defendants as to the third cause
of action, whereby that third cause of action is **DISMISSED
WITHOUT PREJUDICE** as to the moving Defendants; and
it is further

**ORDERED,** that the Complaint (Dkt. No. 1) is **DISMISSED
WITHOUT PREJUDICE** as to Defendants John Doe # 1
and Corrigan; and it is further

**ORDERED,** that this action is TERMINATED in its entirety
as to all Defendants and all claims; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all
parties.

**IT IS SO ORDERED.**

### **REPORT-RECOMMENDATION AND ORDER** [1]

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se Paul Mitchell ("Mitchell"), formerly an
inmate in the custody of the New York State Department of
Correctional Services ("DOCS"), brings this action pursuant
to 42 U.S.C. § 1983 alleging that defendants, twelve
DOCS employees, violated his constitutional rights under the
First, Sixth, Eighth, and Fourteenth Amendments. Compl.
(Docket No. 1). Presently pending is defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56. Docket No.
45. [2] For the reasons which follow, it is recommended that
defendants' motion be granted. It is also recommended that
the complaint be dismissed without prejudice as to the two
unserved defendants.

## I. Failure to Respond

Mitchell has not oppose defendants' motion. In an order dated May 8, 2006, Mitchell was warned that his failure to respond to defendants' motion by setting forth specific facts demonstrating a genuine issue of fact would result in this Court treating the facts asserted by defendants as true and that the motion might be granted absent a response from Mitchell. Docket No. 47. Despite this notice, Mitchell has failed to respond to the motion.

**\*2** "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.; Fed.R.Civ.P. 56(c).* Because Mitchell has not responded to the existence of material fact, however, the facts as set forth in defendants' Rule 7.1 Statement of Facts (Docket No. 45) are accepted as true. *Adirondack Cycle & Marine, Inc. v. American Honda Motor Co.,* No. 00-CV-1619, 2002 WL 449757, at \*1 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) (citing *Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997)).

## II. Background

At all relevant times, Mitchell was an inmate in the custody of Clinton Correctional Facility ("Clinton"). After arriving at Clinton, Mitchell was admitted to Unit 14, the Special Housing Unit ("SHU")[3] at Clinton. Compl. at ¶ 18.[4] While in Unit 14, Mitchell complained of the living conditions and filed grievances alleging, *inter alia,* that the mentally ill inmates in the unit screamed and sang at all hours and that the unit was infested with vermin, insects, rats, and mice. *See* Compl. at ¶¶ 22-23; *see also* Eagen Decl. (Docket No. 45) at Exs. C-1, C-2. The grievances were denied. *See* Eagen Decl. at Exs. C-1, C-2.

On February 19, 2004, Mitchell sought medical treatment for tendon problems in both his legs. Compl. at ¶¶ 24, 41-42. Mitchell requested that he be given a medical pass so that he did not have to climb steps, special boots to alleviate the pain caused by his condition, and a different painkiller. *Id.* at ¶¶ 41-42. These requests were denied. *Id.* In

response, Mitchell filed a grievance alleging denial of proper medical care. *See* Eagen Decl. at Ex. C-4. This grievance was also denied. *Id.* Mitchell also complained that on several occasions, Clinton staff denied him a proper kosher diet. Compl. at ¶¶ 25-26, 43-71. On March 15, 2004, Mitchell filed a grievance alleging, inter alia, that the plastic wrap had been taken off his kosher meals outside his presence and he was denied boiling water to prepare his oatmeal in accordance with his kosher diet requirements. Eagen Decl. at Ex. C-3. This grievance was also denied. *Id.* This action followed.

## III. Discussion

Mitchell asserts three causes of action in his complaint, each against all defendants. The first alleges that defendants retaliated against him for filing grievances, the second that defendants were deliberately indifferent to his serious medical needs, and the third that defendants deprived him of his kosher diet. Compl. at ¶¶ 78-83. Defendants seek judgment on all claims.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*3** The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo*

*v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.*[5] However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

## B. Personal Involvement

Defendants contend that Mitchell cannot demonstrate the personal involvement of any of the defendants.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *§ 1983.*' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). The doctrine of respondeat superior is not a substitute for personal involvement. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved," however, if they participated in the conspiracy, learned of the violation but failed to remedy the wrong, created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue, or were grossly negligent in managing subordinates who caused the violation. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted).

### 1. Dion, Duquette, Hunt, LeClair, LaRock, Ano, Saunders, and Tedford

Defendants contend that Mitchell fails to demonstrate the personal involvement of Dion, Duquette, Hunt, LeClair, LaRock, Ano, Saunders, and Tedford. However, viewing the contested facts in the light most favorable to Mitchell, and in light of Mitchell's pro se status, he has sufficiently alleged the personal involvement of these defendants. *See* Compl. at ¶¶ 49-51 (Dion), 66-71 (Duquette), 59-64 (Hunt), 54-56

(LeClair); 49-51 (LaRock), 74-75(Ano), 44-48 (Saunders), 29-30 (Tedford).

Therefore, it is recommended that defendants' motion for summary judgment on this ground be denied as to Dion, Duquette, Hunt, LeClair, LaRock, Ano, Saunders, and Tedford.

### 2. Goord and Knapp-David

Mitchell fails to establish the personal involvement of Goord, the Commissioner of DOCS, and Knapp-David, the Director of Classification and Movement for DOCS.

**\*4** In his complaint, Mitchell's only allegations as to the personal involvement of Goord and Knapp-David are that Mitchell wrote each of them a letter documenting the violations of Mitchell's rights. Compl. at ¶¶ 72-73. However, "receiving a letter from an inmate does not constitute sufficient personal involvement to generate supervisory liability." *Petty v. Goord,* No. 00 Civ.803(MBM), 2002 WL 31458240 at *8 (S.D.N.Y. Nov. 4, 2002). Further, there is no evidence that Goord or Knapp-David participated here in the alleged violations or created a policy which allowed constitutional violations to continue.

Therefore, it is recommended that defendants' motion for summary judgment as to Goord and Knapp-David be granted on this ground.

### 3. Dr. Lee

Defendants contend that Mitchell fails to demonstrate the personal involvement of Dr. Lee. In his complaint, Mitchell alleged that Dr. Lee "refused to issue a medical order preventing [Mitchell] from climbing steps and also refused to give [Mitchell] a painkiller that he was taking at ... three prior facilities." Compl. at ¶ 42. Thus, viewed in the light most favorable to Mitchell as the non-moving party, Mitchell has sufficiently alleged Dr. Lee's personal involvement.

Therefore, it is recommended that defendants' motion for summary judgment on this ground be denied as to Dr. Lee.

## C. Eighth Amendment

### 1. Medical Treatment

In his second cause of action, Mitchell contends that defendants forced him "to climb steps [and] ... den[ied] him medical treatment and footwear for his documented tendon problems." Compl. at ¶ 81. Defendants contend that this claim is without merit.

A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

A serious medical need is " 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995) (quoting *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir.1991)). An impairment that a reasonable doctor or patient would find important and worthy to treat, a medical condition that affects the daily activities of an individual, or the existence of chronic and substantial pain are all factors that are relevant in the consideration of whether a medical condition was serious. *Chance,* 143 F.3d at 702-03.

**\*5** Deliberate indifference requires the prisoner to prove that the prison official knew of and disregarded the prisoner's serious medical needs. *Id.* at 702. Mere disagreement

over proper treatment does not create a constitutional claim as long as the treatment was adequate. *Id.* at 703. Allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Mitchell contends that he suffered from foot drop, a condition involving his Achilles tendons. *See* Compl. at ¶¶ 24, 41; Mitchell Dep. (Docket No. 45, Quackenbush Decl., App. A) at 16. As a result of this condition, Mitchell contends that he suffered from "[c]ontinuous pain, difficulty walking up and down steps," and difficulty with his back. Mitchell Dep. at 19; *see also* Compl. at ¶ 41. However, Mitchell does not argue that his condition rendered him immobile. In fact, Mitchell concedes that he was able to ambulate despite his injury. *See* Mitchell Dep. at 20 (stating that he climbed stairs anytime he went to recreation or to the infirmary); *see also Moody v. Pickles,* No. Civ. 03-850(DEP), 2006 WL 2645124, at *6 (N.D.N.Y. Sept. 13, 2006) (Peebles, M.J.) (holding that although plaintiff's knee injury caused him pain, he was not rendered immobile and thus failed to demonstrate a serious physical injury). Although Mitchell contends that "[i]t is documented in his medical file that he is *not* supposed to walk up and down steps and that he is supposed to have special boots," Mitchell provides no medical evidence to support these claims. Compl. at ¶ 24 (emphasis in original). Thus, Mitchell has failed to raise a material issue of fact as to whether his condition constituted a serious medical need.

Therefore, it is recommended that defendants' motion for summary judgment on this ground be granted as to the second cause of action. [6]

### 2. Conditions of Confinement

Liberally construed, Mitchell's complaint alleges that his conditions of confinement constituted cruel and unusual punishment. Defendants contend that these claims are without merit.

In order to prove that a prison condition amounted to cruel and unusual punishment, a plaintiff must satisfy both an objective and a subjective standard. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996). To satisfy the objective test, a plaintiff must show that the conditions of his confinement resulted " 'in unquestioned and serious deprivations of basic human

needs.' " *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). To satisfy the subjective test, a plaintiff must show that the defendants were deliberately indifferent to plaintiff's health or safety. *See Jolly,* 76 F.3d at 480.

Here, Mitchell contends that he was housed in filthy and inhumane conditions with infestation by vermin, insects, rats, and mice. *See* Compl. at ¶ 23. Mitchell also contends that he was housed with mentally ill inmates who screamed and sang at all hours and threw urine and feces on the staff, other inmates, and on the tiers. *See id.* at ¶ 22. On February 3, 2004, Mitchell filed a grievance regarding these conditions. However, it was concluded that Mitchell had failed to substantiate his claim that inmates were being housed in dangerous and unhealthy conditions, "appropriate schedules are maintained in the unit," and "the facility does utilize extermination measures in order to control pests." Eagen Decl. at Ex. C-1. Further, Mitchell has failed to show how he was actually harmed by these conditions, much less that defendants were deliberately indifferent to his health or safety. *See Govan v. Campbell,* 289 F.Supp.2d 289, 296-97 (N.D.N.Y.2003) (Sharpe, M.J.) (holding that cockroach problems and wild birds flying in the cells did not constitute constitutional violations). Thus, Mitchell has failed to show either the objective or subjective standard needed to prove a claim for cruel and unusual prison conditions.

**\*6** Therefore, it is recommended that defendants' motion for summary judgment on this ground be granted.

### D. First Amendment

#### 1. Retaliation

In his first cause of action, Mitchell contends that defendants confined him in "flithy and inhumane conditions," denied him Kosher meals, and refused to allow him to participate in various prison programs in retaliation for filing lawsuits and grievances against defendants. Compl. at ¶¶ 71, 77, 79. Defendants contend that this claim is without merit.

To prevail on a retaliation claim, a plaintiff must first assert that the plaintiff's conduct was constitutionally protected and that this conduct was a "substantial factor" that caused the adverse action against plaintiff. *Mt. Healthy City Sch. Dist.*

*Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). The burden then shifts to the defendant to show that by a preponderance of the evidence, the adverse action would have resulted even in the absence of the protected conduct. *Id.; see also Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema,* 534 U.S. 506 (2002). Retaliation claims are actionable because the conduct may tend to chill an individual's exercise of constitutional rights. *Dawes,* 239 F.3d at 491. However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.*

Here, Mitchell's filing of lawsuits and grievances were clearly assertions of a constitutional right and his alleged confinement in filthy and inhumane conditions and his denial of a proper kosher diet could constitute adverse action. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); see also *Pell v. Procunier,* 417 U.S. 817, 822 (1974). However, Mitchell alleges in only bare, conclusory terms that these alleged acts were taken in retaliation for his protected conduct. Thus, Mitchell has not alleged specific facts that "give rise to a colorable suspicion of retaliation." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983); *see also Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003).

Therefore, it is recommended that defendants' motion for summary judgment on this ground be granted.

#### 2. Free Exercise of Religion

In his third cause of action, Mitchell contends that defendants denial of certain kosher foods and beverages deprived him of his free exercise of religion. Defendants contend that this claim is without merit.

"[I]nmate[s] retain those First Amendment rights that are not inconsistent with [their] status as a prisoner." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Thus, subject to reasonable prison regulations, inmates retain the protection of the Free Exercise Clause in the First Amendment. *See id.* In order to demonstrate a free exercise claim, a plaintiff must show that the defendants "significantly interfered" with his or her religious beliefs. *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004); *see also Jones v. Goord,* 435

F.Supp.2d 221, 256 (S.D.N.Y.2006). It is well established that "an inmate is ... entitled to a reasonable accommodation of his religious beliefs," including " 'a diet consistent with his religious scruples.' " *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) (citing *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975) and *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992)). Thus, all that is required for a prison diet not to burden an inmate's free exercise of religion is "the provision of a diet sufficient to sustain the prisoner in good health without violating [his religion's] dietary laws." *Kahane,* 527 F.2d at 496.

**\*7** Here, it is undisputed that Mitchell is Jewish. *See* Compl. at ¶ 25; Defs. Mem. of Law (Docket No. 45) at 20. Mitchell contends under oath that "several times a week," as well as on specific occasions, he did not receive boiling water with his kosher meals, the means by which he prepared some kosher food and beverages. Compl. at ¶ 26. Mitchell also contends that on one occasion his food was improperly unsealed prior to his consumption in violation of the laws of his faith. Compl. at ¶¶ 25, 43-48. Defendants contend that Mitchell's entire free exercise claim is based on four isolated events. Defs. Mem. of Law at 20. However, although in dicta, the Second Circuit stated that "courts [including those in the Second Circuit] have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin,* 357 F.3d at 203. Thus, on this record, material issues of fact remain as to whether the defendants significantly interfered with Mitchell's religious beliefs when on at least four occasions, and possibly several times a week, they failed to provide him with meals that met the requirements of a kosher diet.

Therefore, it is recommended that defendants' motion for summary judgment on this ground be denied.

### E. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,*

236 F.Supp.2d 211, 229-30 (N.D.N.Y .2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached as to the first and second causes of action because, as discussed *supra,* accepting all of Mitchell's allegations as true, he has not shown that defendants violated his constitutional rights. However, as to Mitchell's third cause of action, it was well established that on the dates that Mitchell was denied his kosher meals, prison officials had to provide inmates with "a diet that is consistent with his [or her] religious scruples." *Bass,* 976 F.2d at 99.

Therefore, it is recommended that defendants' motion for summary judgment on this alternative ground be granted as to the first and second cause of action and denied as to the third cause of action.

### F. Exhaustion

Defendants contend that before Mitchell commenced this action on April 1, 2004, four of his grievances relating to his second and third causes of action were not properly exhausted. *See* Compl. at 1. [7]

**\*8** The Prison Litigation Reform Act of 1995 ("PLRA"), Pub.L. No. 104-134, 803(d), 110 Stat. 1321-66, 71 (1996), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any suit concerning prison life, be it in general or of a particular episode. *See* 42 U.S.C. § 1997e(a); *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Administrative remedies include all appellate remedies provided within the system. *Fletcher v. Haase,* No. Civ. 99-9549(GEL), 2002 WL 313799, at \*1 (S.D.N.Y. Feb. 27, 2002). There may be special circumstances, however, that render administrative remedies unavailable and the exhaustion requirement may be fulfilled by an inmate's reasonable belief that certain actions have sufficed fully to

exhaust administrative remedies. *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004).

"The PLRA's exhaustion requirement is designed to 'afford[ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524-25). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Johnson,* 380 F.3d. at 697 (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Johnson,* 380 F.3d at 697.

DOCS has established a grievance process which includes a three-stage review and appeal. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes R. & Regs. tit.7, § 701.1-.16 (2003). When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee (IGRC). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee (CORC). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(a) (2003).

### 1. CL-49853-04

Here, Mitchell reiterated the same complaints he made in grievance CL-49757-04, only adding a new claim about vermin infestation. *See* Eagen Decl. at Ex. C-2; *see also* Eagen Decl. at Ex. C-1. Defendants contend that Mitchell did not properly exhaust this grievance until twenty days after filing this action. The grievance was filed on March 2, 2004 and was not denied by CORC until April 21, 2004. This action was filed on April 1, 2004. docket No. 1.

Thus, the issues contained in this grievance were not properly exhausted before this action was commenced even though they became fully exhausted three weeks after the complaint was filed. *Pettus v. McCoy,* No. 04-CV-471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.) (dismissing an inmate's § 1983 claim without prejudice for failure to exhaust where inmate filed a grievance before

commencing action but did not complete the grievance prcess until after the action had been commenced); *see also* *Woodford v. Ngo,* 126 S.Ct. 2378, 2386 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."). It is recommended that defendants' motion on this ground be granted and that this claim be dismissed without prejudice.

### 2. CL-49925-04

**\*9** This grievance was filed on March 15, 2004 alleging, inter alia, that the plastic wrap had been taken off his kosher meals outside his presence and he was denied boiling water to prepare his oatmeal in accordance with his kosher diet. Eagen Decl. at Ex. C-3. However, CORC did not deny Mitchell's appeal until May 19, 2004, over six weeks after the complaint was filed. *Id.* Thus, the issues contained in this grievance were not properly exhausted. See subsection (1) *supra.* Therefore, it is recommended that defendants' motion on this ground be granted and that this claim be dismissed without prejudice.

### 3. CL-49935-04

This grievance was filed on March 16, 2004 alleging, *inter alia,* that Mitchell suffered from an Achilles tendon problem and was denied special boots, a "flats order" that would house him in an area without steps, and pain medication to treat his condition. Eagen Decl. at Ex. C-4. However, CORC did not deny Mitchell's appeal until May 26, 2004, over seven weeks after the complaint was filed. *Id.* Thus, as with the grievances discussed above, the issues contained in this grievance were not properly exhausted. Therefore, it is recommended that defendants' motion on this ground be granted and that this claim be dismissed without prejudice.

### 4. CL-49999-04

This grievance was filed on April 2, 2004 alleging, *inter alia,* that Clinton staff had mishandled some of his legal mail in retaliation for filing a lawsuit again the staff. Eagen Decl. at Ex. C-5. Mitchell also requested a transfer to a different facility. *Id.* However, CORC did not deny Mitchell's appeal until May 26, 2004, over seven weeks after the complaint was

filed. *Id.* Thus, the issues contained in this grievance were not properly exhausted. Therefore, it is recommended that defendants' motion on this ground be granted and that this claim be dismissed without prejudice.

#### IV. Failure to Serve Defendants Doe and Corrigan

Mitchell's complaint asserts claims against John Doe # 1, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because this defendant has not been identified by Mitchell or served with process, it is recommended that the complaint be dismissed without prejudice as to this defendant.

As to defendant Corrigan, summonses for service of process upon him were issued on August 9, 2004 and October 19, 2005. Docket Entries dated 8/9/04 & 10/19/05. More than 120 days have passed since the summonses for Corrigan were reissued. Accordingly, it is also recommended that the complaint be dismissed as to Corrigan without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

#### V. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 45) be **GRANTED** as to all moving defendants for the first and second causes of action and that judgment be entered for those defendants on the first two causes of action;

**\*10** 2. Defendants' motion be **GRANTED** as to all moving defendants as to the third cause of action to the extent that the third cause of action be **DISMISSED** without prejudice as to the moving defendants;

3. The complaint be **DISMISSED** without prejudice as to defendants John Doe # 1 and Corrigan; and

4. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 189087

### Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).
2   The motion is brought on behalf of all defendants except Corrigan and John Doe # 1, who have neither been served with process nor otherwise appeared in this action. *See* Section v. *infra.*
3   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (1995). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.
4   Under Fed.R.Civ.P. 56(e), the non-moving party must offer evidence in sworn affidavits to oppose a properly supported motion for summary judgment. A verified complaint meets this requirement. *See Ford v. Wilson,*

90 F.3d 245, 246 (7th Cir.1996); *King v. Dogan,* 31 F.3d 344, 346 (5th Cir.1994). The complaint here was verified, *see* Compl. at 15, and will, therefore, be considered on this motion.

5   Nevertheless, Mitchell does have substantial experience as a pro se litigant having filed at least ten other federal action since 1998. See *U.S. Party/Case Index* (visited Sept. 17, 2006) <http://pacer.uspci.uscourts.gov/cgi-bin/dquery.pl>.

6   It is, of course, unnecessary to address the second prong of Mitchell's claim here where he has failed to meet the first. However, it is worth noting that on this record, plaintiff would be able to raise a material issue of fact as to defendants' deliberate indifference. Mitchell alleges that Dr. Lee refused to issue a medical order excusing him from climbing steps and refused to give him a painkiller he received at three previous correctional facilities. *See* Compl. at ¶ 42. Mitchell contends that in response to these requests, Dr. Lee stated "that if [Mitchell] was 'out in the street' it could be done for him but since he incarcerated it cannot." *Id.*

7   Defendants concede that grievance CL-49757-04, which dealt with Mitchell's complaints about being housed with mentally ill inmates and his allegations of filthy and inhumane conditions, was properly exhausted. *See* Defs. Mem. of Law at 7; *see also* Eagen Decl. (Docket No. 45) at Ex. C-1.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Vann v. Griffin, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 114 of 301

2018 WL 6199860
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kouriockein VANN, Plaintiff,
v.
Superintendent T. GRIFFIN; Sgt. Roser; Deputy
Comm'r of Special Operations, P. Griffin; I.G.R.C.
Supervisor, L. Stanaway; C.O. J. Morrissey; C.O.
Warren Freeman; C.O. Margente; C.O. D. Smith,
Claims Officer; C.O. Cacuzza Jr.; Sgt. Cacuzza Sr.;
Sgt. P. Moreau; Sgt. Osborne; Capt. Carey; C.O.
Polito; Sgt. Surber; Lt. Plimely; Lt. S. Hann; C.O.
Q. Stevens; C.O. Eliezer; and Employees for the
NYSDOCCS at Green Haven Corr. Fac., Defendants.

16 CV 9903 (VB)
|
Signed 11/28/2018

**Attorneys and Law Firms**

Kouriockein Vann, Fallsburg, NY, pro se.

Jennifer Rose Gashi, State of New York Office of the Attorney
General, White Plains, NY, for Defendants.

Claims Officers, pro se.

**OPINION AND ORDER**

Vincent L. Briccetti, United States District Judge

 **\*1** Plaintiff Kouriockein Vann, proceeding pro se and in
forma pauperis, brings this action against Superintendent
("Supt.") T. Griffin, Sergeant ("Sgt.") Roser, Deputy
Commissioner of Special Operations P. Griffin, Inmate
Grievance Resolution Committee ("IGRC") Supervisor L.
Stanaway, Correction Officer ("C.O.") J. Morrissey, C.O.
Warren Freeman, C.O. Margente, C.O. D. Smith, C.O.
Cacuzza Jr., Sgt. Cacuzza Sr., Sgt. P. Moreau, Sgt. Osborne,
Captain ("Capt.") Carey, C.O. Polito, Sgt. Surber, Lieutenant
("Lt.") Plimely, Lt. S. Hann, C.O. Q. Stevens, and C.O.
Eliezer, under the Universal Declaration of Human Rights and
42 U.S.C. § 1983.[1]

Plaintiff alleges violations of his First, Eighth, and Fourteenth
Amendment rights. In addition, liberally construed, plaintiff's
amended complaint also asserts violations of his Fourth
Amendment rights and of the Religious Land Use and
Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §
2000cc-1.

Now pending is defendants' motion to dismiss the amended
complaint pursuant to Rule 12(b)(6). (Doc. #77).[2]

For the following reasons, defendants' motion is
GRANTED.[3]

The Court has subject matter jurisdiction under 28 U.S.C. §
1331.

**BACKGROUND**

For the purpose of ruling on the motion to dismiss, the Court
accepts as true all well-pleaded factual allegations in the
amended complaint, and draws all reasonable inferences in
plaintiff's favor, as summarized below. In addition, plaintiff
attached several documents to his amended complaint as
exhibits, which the Court may consider in deciding the instant
motion. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104,
111 (2d Cir. 2010).

Plaintiff's amended complaint is difficult to follow.
Nevertheless, it is clear that plaintiff's allegations stem from
five incidents at Green Haven Correctional Facility ("Green
Haven"), described below.

A. January 30, 2014
Plaintiff alleges on January 30, 2014, Sgt. Surber, while
searching plaintiff, "deliberately 'flicked and rubbed' her
fingers across" plaintiff's Santeria beads, which plaintiff was
wearing around his neck. (Am. Compl. at 7).[4] Plaintiff told
Sgt. Surber that touching the Santeria beads violated his
religious beliefs, yet Sgt. Surber "intentionally reache[d] out
and grab[bed] all of plaintiff's Santeria beads with her bare
hands," threatened plaintiff, and "walk[ed] off smiling." (Id.
at 8).

B. June 14, 2015

**\*2** Plaintiff alleges on or about June 14, 2015, C.O. Morrissey, C.O. Freeman, and an unnamed C.O. searched plaintiff's cell under Sgt. Roser's supervision. During the search, C.O. Morrissey and C.O. Freeman took plaintiff's three-gallon bucket and Sangean radio. Further, C.O. Freeman "deliberately touched items sacred to the plaintiff's religious beliefs (cigar, religious pouch containing sea shells, a rock, chicken bones, etc.)," and C.O. Freeman and the other C.O. "deliberately crushe[d] the cigar." (Am. Compl. at 5). C.O. Freeman also "made derogatory and negative comments." (Id.). Sgt. Roser "supported and watched defendants Morrissey and Freeman." (Id. at 6).

C.O. Margente subsequently escorted plaintiff to the body orifice scanner ("B.O.S.S.") chair in his underwear and slippers and with his genitals exposed, in front of male and female personnel. C.O. Margente commented, "we got one winging in the wind guys!" (Am. Compl. at 6) (emphasis removed). Plaintiff alleges C.O. Margente exposed plaintiff to "unsanitary and unsafe conditions" by not protecting plaintiff from "germs and infections to the plaintiff's groin, and other surfaces of the plaintiff's epidermis." (Id.).

Plaintiff further alleges Supt. T. Griffin denied his grievance and thus failed to protect his rights; Supt. T. Griffin and Deputy Commissioner P. Griffin told him if it were up to them, they would never have allowed plaintiff to have the items that were taken from his cell; IGRC Supervisor Stanaway violated his rights by allowing Sgt. Roser to investigate plaintiff's grievance, even though Sgt. Roser allowed the underlying acts to occur in the first place; and C.O. Smith denied plaintiff's property claim without giving him a claim number.

### C. August 7, 2015

Plaintiff alleges on August 7, 2015, Sgt. Cacuzza Sr. and Sgt. Moreau ordered C.O. Cacuzza Jr. to search plaintiff because they thought they had heard a cell phone. Plaintiff asked C.O. Cacuzza Jr. not to touch his Santeria beads. Sgt. Moreau told C.O. Cacuzza Jr. to continue his search, and C.O. Cacuzza Jr. "proceeded to pull all of my beads out of my T-shirt, and then touched them all, leaving them on the outside of my T-shirt." (Am. Compl. at 54).

Plaintiff further claims C.O. Cacuzza Jr. sexually assaulted him by looking in his underwear and his buttocks, which plaintiff claims is not part of a standard search.

Plaintiff asserts he tried to speak about the incident with Sgt. Cacuzza Sr., Sgt. Osborne, and Capt. Carey, all of whom were present, but they refused to speak with him.

### D. December 17, 2015

Plaintiff alleges on December 17, 2015, C.O. Polito searched plaintiff's cell and ordered plaintiff to take off his Santeria beads, because plaintiff was not permitted to wear them during the search. Plaintiff placed his Santeria beads on his religious altar, which contained other items related to his practice of the Santeria religion. C.O. Polito took plaintiff's items from the altar, threw them on plaintiff's bed, and looked through plaintiff's "religious pouches." (Am. Compl. at 59).

Plaintiff complained to Lt. Hann, but Lt. Hann took no action except to tell plaintiff he should consider himself lucky that Lt. Hann had not performed the search herself.

### E. February 4, 2017

Finally, plaintiff alleges on February 4, 2017, C.O. Stevens searched plaintiff's cell and "desecrated" plaintiff's altar. (Am. Compl. at 8). C.O. Stevens then "maliciously and deliberately discarded and intentionally misplaced all of plaintiff's property in his cell." (Id.). C.O. Eliezer "supported" C.O. Stevens and told plaintiff, "we are corrections officers, we can do anything we want to you. You are an inmate. You cannot do nothing. (Id. at 9) (emphasis removed). Moreover, C.O. Eliezer "threatened to use the disciplinary system" to prevent plaintiff from complaining to the area supervisor. (Id.).

### DISCUSSION

#### I. Legal Standard

**\*3** In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in 📙 Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiffs' legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. 📙 Id. at 678; 📙 Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then

Vann v. Griffin, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 116 of 301

determine whether they plausibly give rise to an entitlement to relief." 📑 Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." 📑 Ashcroft v. Iqbal, 556 U.S. at 678; 📑 Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 📑 Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting 📑 Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

The Court must liberally construe submissions of pro se litigants, and interpret them "to raise the strongest arguments that they suggest." 📑 Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. See 📑 Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." 📑 Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted). Nor may the Court "invent factual allegations" plaintiff has not pleaded. Id.

II. First Amendment

Liberally construed, the amended complaint asserts First Amendment free exercise claims against (i) Sgt. Surber and Sgt. Roser for the January 30, 2014, search; (ii) C.O. Freeman for the June 14, 2015, search; (iii) Sgt. Moreau, C.O. Cacuzza Jr., Sgt. Cacuzza Sr., Sgt. Osborne, and Capt. Carey for the August 7, 2015, search; (iv) C.O. Polito and Lt. Hann for the December 17, 2015, search; and (v) C.O. Stevens and C.O. Eliezer for the February 4, 2017, search.

Defendants argue plaintiff's free exercise claims fail because plaintiff fails to allege defendants caused a substantial burden on his sincerely held religious beliefs.

The Court agrees.

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." 📑 O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (internal citation omitted). The First Amendment's free exercise guarantee applies to state actors through the Fourteenth Amendment. 📑 Cantwell v. Connecticut, 310 U.S. 296, 303 (1940). An inmate's "right to practice his religion is, however, not absolute." 📑 Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993) (internal citation omitted).

To state a free exercise claim, plaintiff "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." 📑 Salahuddin v. Goord, 467 F.3d 263, 274–75 (2d Cir. 2006) (internal citation omitted). "A substantial burden is more than a mere inconvenience," 📑 Gill v. DeFrank, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000), aff'd, 8 F. App'x 35 (2d Cir. 2001) (summary order), and exists where the state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." 📑 Newdow v. Peterson, 753 F.3d 105, 109 (2d Cir. 2014) (per curiam) (alteration in original) (quoting 📑 Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996) ). [5]

**\*4** In addition, corrections facilities may restrict religious exercise so long as such restrictions are "reasonably related to legitimate penological interests." 📑 O'Lone v. Estate of Shabazz, 482 U.S. at 349 (citation omitted). Thus, even if plaintiff can establish defendants substantially burdened his right to religious exercise, he cannot state a free exercise claim if defendants can show "the disputed official conduct was motivated by a legitimate penological interest." 📑 Salahuddin v. Goord, 467 F.3d at 276

Plaintiff fails sufficiently to allege a substantial burden. Plaintiff alleges on five occasions, defendants interfered with the practice of his religion by touching or moving his Santeria beads, crushing his cigar, looking through his religious pouches, or otherwise desecrating plaintiff's religious objects. None of these actions caused plaintiff "to choose between violating a tenet of his beliefs or facing consequences at the hands of the state." 📑 Colliton v. Bunt, 2016 WL 7443171, at *11 (S.D.N.Y. Dec. 27, 2016) (citing 📑 Newdow v. Peterson, 753 F.3d at 108, aff'd, 709 F. App'x 82 (2d Cir. 2018)

Vann v. Griffin, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 117 of 301

(summary order) ). Indeed, plaintiff complains of mere inconveniences.

Accordingly, plaintiff's free exercise claims are dismissed.

III. RLUIPA

To the extent plaintiff brings a claim or claims under RLUIPA, those claims are moot because, for the reasons discussed above, there is no continuing burden on plaintiff's religious practice. See Hill v. Chapdelaine, 2017 WL 62511, at *2 (D. Conn. Jan. 5, 2017) (citing Green v. Mansour, 474 U.S. 64, 71–73 (1985) ).

Accordingly, plaintiff's RLUIPA claims, if any, are dismissed.

IV. Fourth Amendment

In an abundance of caution, the Court addresses whether, liberally construed, plaintiff's amended complaint sufficiently alleges a Fourth Amendment claim against C.O. Margente for violating plaintiff's right to be free from unreasonable search and seizures during the June 14, 2015, search.

It does not.

The Supreme Court has recognized a constitutional "right of personal privacy, or a guarantee of certain areas or zones of privacy." Roe v. Wade, 410 U.S. 113, 152 (1973). Inmates retain this constitutional guarantee, but only within limited circumstances. See Harris v. Miller, 818 F.3d 49, 57 (2d Cir. 2016). "There is a long-established principle that the routine, random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment." Vaughn v. Strickland, 2013 WL 3481413, at *4 (S.D.N.Y. July 11, 2013) (internal quotation omitted). "Nevertheless, 'the Fourth Amendment still requires all searches conducted within a prison, including strip searches, to be reasonable.' " Id. (quoting Jean-Laurent v. Wilkerson, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006), aff'd, 461 F. App'x 18 (2d Cir. 2012) (summary order) ).

"To state a cognizable privacy claim, an inmate must allege that (1) he exhibited an actual, subjective expectation of bodily privacy, and (2) prison officials lacked sufficient justification to intrude on the inmate's [F]ourth [A]mendment rights." Telesford v. Annucci, 693 F. App'x. 1, 3 (2d Cir. 2017)

(summary order) (alterations in original) (internal quotations omitted).

When analyzing the sufficient justification prong for a claim premised on an isolated search, courts apply the four-part balancing test articulated in Bell v. Wolfish, 441 U.S. 520, 559 (1979). Harris v. Miller, 818 F.3d at 58. The so-called "Bell factors" are: "[1] the scope of the particular intrusion; [2] the manner in which it is conducted; [3] the justification for initiating it; and [4] the place in which it is conducted." Harris v. Miller, 818 F.3d at 58 (alterations in original) (quoting Bell v. Wolfish, 441 U.S. at 559).

**\*5** Plaintiff has sufficiently alleged facts supporting only the first Bell factor.

As alleged, the search was an invasive intrusion. An intrusion's scope varies depending on two factors: the type of search and who performs it. See Harris v. Miller, 818 F.3d at 58. "[I]t is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." Id. at 59 (internal quotation omitted). However, "courts in this Circuit have distinguished between 'regular' and 'close' viewing and 'incidental' and 'brief viewing of a naked prisoner,' with the latter being found constitutional." Holland v. City of New York, 197 F. Supp. 3d 529, 543 (S.D.N.Y. 2016) (internal quotation omitted) (collecting cases).

Plaintiff's allegations suggest he was subjected to at least a visual body cavity search, an inherently invasive intrusion. See Harris v. Miller, 818 F.3d at 58. In addition, plaintiff alleges members of the opposite sex were present during the search, although plaintiff merely alleges he had to "walk in front of" female personnel. (Am. Compl. at 6).

However, as to the second Bell factor, plaintiff has not alleged facts that show the manner of the search was unreasonable. The manner of a search is more likely to be reasonable if the search is conducted in a respectful or "professional manner," rather than an abusive, frightening, or humiliating manner. Harris v. Miller, 818 F.3d at 59–60. "It is well established that in the course of these searches, 'officers may direct the arrestees to disrobe, shower, and submit to a visual inspection'; moreover, '[a]s part of

Vann v. Griffin, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 118 of 301

the inspection, the arrestees may be required to manipulate their bodies.' " Vaughn v. Strickland, 2013 WL 3481413, at *5 (alterations in original) (quoting Florence v. Bd. of Chosen Freeholders, 566 U.S. 318, 341 (2012) (Alito, J., concurring) ). Further, an officer's inappropriate comments, without additional allegations such as physical or sexual abuse, do not make an otherwise reasonable search. See Malik v. City of New York, 2012 WL 3345317, at *13 (S.D.N.Y. Aug. 15, 2012), report and recommendation adopted, 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012).

Plaintiff's allegations that his boxers left his genitals exposed and he was not allowed to cover himself with his hands do not sufficiently allege C.O. Margente unreasonably conducted the search of plaintiff. Moreover, C.O. Margente's comments during the search—although inappropriate if true—do not make the search unreasonable.

As to the third Bell factor, plaintiff does not allege what C.O. Margente's justification was for conducting the search. And fourth, although plaintiff alleges female personnel were present at some point during the search, plaintiff does not allege any facts suggesting the female personnel were "unnecessary spectators." See Harris v. Miller, 818 F.3d at 62.

Accordingly, plaintiff fails to allege a Fourth Amendment claim for unreasonable search and seizure against C.O. Margente for the June 14, 2015, search.

V. Eighth Amendment
Defendants argue plaintiff fails to state Eighth Amendment claims for sexual assault against C.O. Cacuzza Jr. or for unsanitary conditions against C.O. Margente.

**\*6** The Court agrees. [6]

To state a claim for an Eighth Amendment violation, "an inmate must allege that: (1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety.' " Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (alterations original) (quoting Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001) ).

A. Sexual Abuse
Plaintiff fails to state an Eighth Amendment claim based on sexual abuse against C.O. Cacuzza Jr. for the August 7, 2015, search.

Under the Eighth Amendment, conditions of confinement "must not involve the wanton and unnecessary infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). "[S]exual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment." Boddie v. Schnieder, 105 F.3d 857, 860–61 (2d Cir. 1997). Although sexual harassment not sufficiently "severe or repetitive" does not satisfy the objective prong, id. at 861, "a single incident of sexual abuse, if sufficiently severe or serious, may violate an inmate's Eighth Amendment rights." Crawford v. Cuomo, 796 F.3d 252, 257 (2d Cir. 2015). A plaintiff asserting an Eighth Amendment sexual abuse claim generally must allege physical contact to adequately plead the objective prong. See Holland v. City of New York, 197 F. Supp. 3d 529, 547 (S.D.N.Y. 2016) (collecting cases).

When analyzing the subjective prong, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." Crawford v. Cuomo, 796 F.3d at 257–58.

Plaintiff alleges only that C.O. Cacuzza Jr. sexually assaulted him by looking in his underwear and exposing his buttocks. Plaintiff does not allege any defendant ever physically contacted him, or allege any facts suggesting the search was conducted for the purpose of humiliating him or independent of legitimate penological purposes. Plaintiff therefore fails to satisfy either prong of an Eighth Amendment claim for sexual assault.

Accordingly, plaintiff's Eighth Amendment sexual assault claim against C.O. Cacuzza Jr. is dismissed.

B. Unsanitary Conditions
Plaintiff also fails to state an Eighth Amendment claim based on unsanitary conditions against C.O. Margente for requiring

Vann v. Griffin, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD    Document 70    Filed 04/23/20    Page 119 of 301

plaintiff to sit in a B.O.S.S. chair in his underwear and slippers on June 14, 2015.

**\*7** The Eighth Amendment requires prison conditions to be at least "humane." 📑 Gaston v. Coughlin, 249 F.3d at 164 (quoting 📑 Farmer v. Brennan, 511 U.S. 825, 832 (1994) ). To satisfy the objective requirement of a claim based on unsanitary conditions of confinement, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." 📑 Walker v. Schult, 717 F.3d at 125 (citing 📑 Rhodes v. Chapman, 452 U.S. 337, 347 (1981); 📑 Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) ). He must allege prison officials deprived him "of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." Id. (internal citations omitted). Exposure to germs alone does not create a deprivation sufficiently serious to satisfy the objective prong. See Townsend v. Clemons, 2013 WL 818662, at \*7 (S.D.N.Y. Jan. 30, 2013), report and recommendation adopted, 2013 WL 868605 (S.D.N.Y. Mar. 4, 2013).

With respect to the subjective requirement:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This "deliberate indifference" element is equivalent to the familiar standard of "recklessness" as used in criminal law.

📑 Phelps v. Kapnolas, 308 F.3d at 185–86 (citation omitted).

Plaintiff alleges C.O. Margente exposed plaintiff to unsanitary and unsafe conditions by forcing plaintiff to sit in the B.O.S.S. chair in his underwear and slippers, with his genitals exposed to germs and infections. Plaintiff's

allegations are insufficient to state a sufficiently serious deprivation. Moreover, plaintiff fails to allege any facts suggesting C.O. Margente was aware of a substantial risk of serious harm from forcing plaintiff to sit in the B.O.S.S. chair in his underwear and slippers.

Accordingly, plaintiff's Eighth Amendment unsanitary and unsafe conditions claim against C.O. Margente is dismissed.

## VI. Fourteenth Amendment

Plaintiff fails to state claims for violation of his Fourteenth Amendment due process rights against C.O. Morrissey, C.O. Freeman, or Sgt. Roser for lost or destroyed property; or against Supt. T. Griffin, Deputy Commissioner P. Griffin, IGRC Supervisor Stanaway, or C.O. Smith for denial of grievances or violations of New York State Department of Corrections and Community Supervisions ("DOCCS") directives.

Procedural due process requires "that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin., 620 F.3d 146, 150 (2d Cir. 2010) (quoting 📑 Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) ). Thus, to sustain a 📑 Section 1983 claim based on an alleged violation of due process, a plaintiff must allege (i) he possesses a liberty or property interest protected by the Constitution or federal statutes, and (ii) he was deprived of that liberty or property interest without due process. 📑 Ciambriello v. County of Nassau, 292 F.3d 307, 313 (2d Cir. 2002).

### A. Lost or Destroyed Property

Plaintiff fails to state a claim for lost or destroyed property against C.O. Morrissey, C.O. Freeman, or Sgt. Roser for the alleged taking of his radio and three-gallon bucket on June 14, 2015.

"An unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." 📑 Hudson v. Palmer, 468 U.S. at 533. Here, such a remedy was available to plaintiff in the form of an action in the New York State Court of Claims, but apparently was not pursued. See Davis v. New York, 311

Vann v. Griffin, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD    Document 70    Filed 04/23/20    Page 120 of 301

F. App'x 397, 400 (2d Cir. 2009) (summary order) (Court of Claims action is adequate postdeprivation remedy, precludes prisoner's due process claim for lost personal property).

 **\*8**  Accordingly, plaintiff's due process claim for lost or stolen property against C.O. Morrissey, C.O. Freeman, and Sgt. Roser is dismissed.

   B. Grievances and DOCCS Directives

Plaintiff likewise fails to state a claim for violation of his Fourteenth Amendment due process rights against Supt. T. Griffin, Deputy Commissioner P. Griffin, IGRC Supervisor Stanaway, or C.O. Smith for denying his grievances or for failing to comply with DOCCS directives.

To state a claim for denial of access to the courts, "a plaintiff must allege that the defendant took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (alterations in original) (internal quotation omitted). Notwithstanding the First Amendment's guarantee of the right to petition the government for redress, "inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under [ Section] 1983." Cancel v. Goord, 2001 WL 303713, at \*3 (S.D.N.Y. Mar. 29, 2001).

Indeed, any claim that plaintiff was deprived of his right to petition the government for redress is belied by the fact of his bringing this lawsuit. See Harris v. Westchester Cty. Dep't of Corr., 2008 WL 953616, at \*5 (S.D.N.Y. Apr. 3, 2008) ("[I]n the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is the course taken by plaintiff here: directly petitioning the government for redress of his claims.").

Moreover, it is well established that violation of state procedural rules or safeguards does not in itself constitute deprivation of due process, when the process actually provided suffices under the Constitution. See, e.g., Holcomb v. Lykens, 337 F.3d 217, 224 (2d Cir. 2003) ("[S]tate statutes do not create federally protected due process entitlements to specific state-mandated procedures.").

Accordingly, plaintiff's due process claims for denial of grievances and violations of DOCCS directives against Supt.

T. Griffin, Deputy Commissioner P. Griffin, IGRC Supervisor Stanaway, and C.O. Smith are dismissed.

VII. State Law Claims

To the extent plaintiff's amended complaint can be read as asserting state law claims, the Court declines to exercise supplemental jurisdiction over them. See 28 U.S.C. § 1367(c)(3).

Plaintiff's state law claims, to the extent he asserts them, are therefore dismissed without prejudice.

VIII. Universal Declaration of Human Rights

Plaintiff's claims under the Universal Declaration of Human Rights are dismissed because the Universal Declaration of Human Rights does not create a federal cause of action. Joyner-El v. Giammarella, 2010 WL 1685957, at \*3 n.4 (S.D.N.Y. Apr. 15, 2010).

IX. Leave to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure instructs that courts "should freely give leave" to amend a complaint "when justice so requires." Liberal application of Rule 15(a) is warranted with respect to pro se litigants, who "should be afforded every reasonable opportunity to demonstrate that [they have] a valid claim." Matima v. Celli, 228 F.3d 68, 81 (2d Cir. 2000) (internal quotation omitted). District courts "should not dismiss [pro se complaints] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation omitted).

 **\*9**  Here, the Court already granted plaintiff leave to amend and warned plaintiff that because his motion to amend "was prompted by his review of defendants' first motion to dismiss ... absent exceptional circumstances, he will not be given another opportunity to amend his complaint." (Doc. #50 at 2). "Plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend." Jeanty v. Newburgh Beacon Bus Corp., 2018 WL 6047832, at \*12 (S.D.N.Y. Nov. 19, 2018) (internal citations omitted). Moreover, plaintiff "has not suggested he is in possession of facts that would cure the deficiencies identified in this opinion." Id.

Vann v. Griml, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-00391-LEK-TWD    Document 70    Filed 04/23/20    Page 121 of 301

Accordingly, the Court declines to grant plaintiff leave to amend.

## CONCLUSION

The motion to dismiss is GRANTED.

The Clerk is instructed to terminate the pending motion (Doc. #77) and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore <u>in forma pauperis</u> status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6199860

## Footnotes

1    Plaintiff incorrectly sued Sgt. Roser as "Sgt. Rosier" and Sgt. Surber as "Sgt. Surbert (sic)." (Doc. #51 ("Am. Compl.") ).

2    Defendants previously filed a motion to dismiss the complaint on October 19, 2017. (Doc. #44). On October 29, 2017, plaintiff filed a motion for leave to file an amended complaint. (Doc. #47). On November 3, 2017, the Court granted plaintiff leave to file an amended complaint and denied defendants' motion to dismiss without prejudice. (Doc. #50). Plaintiff filed the amended complaint on December 19, 2017. (Doc. #51).

3    To the extent plaintiff brings claims against unidentified defendants, those claims are likewise dismissed for the reasons contained in this Opinion.

4    "Am. Compl. at ___" refers to the automatically generated page numbers at the top of electronically filed documents.

5    Plaintiff will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

6    Neither party has explained whether plaintiff was a pretrial detainee or a post-conviction inmate at the time of these events. Defendants apply the Eighth Amendment standard to plaintiff's claim, and plaintiff does not object. However, even under the more lenient standard applicable to pretrial detainees under the Fourteenth Amendment's Due Process Clause, plaintiff fails to state a claim. See Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 818662
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Floyd TOWNSEND, Plaintiff,
v.
William CLEMONS, et al., Defendants.

No. 12–CV–03434 (RJS)(SN).
|
Jan. 30, 2013.

*REPORT AND RECOMMENDATION*

SARAH NETBURN, United States Magistrate Judge.

**\*1  TO THE HONORABLE RICHARD J. SULLIVAN:**
*Pro se* plaintiff Floyd Townsend ("Townsend") brings this action pursuant to 42 U.S.C. § 1983, alleging violation of his constitutional rights based on the conditions of his confinement while in the custody of the New York City Department of Correction ("DOC").

Townsend is suing three defendants: (1) William Clemons ("Clemons"), Warden of the Robert N. Davoren Center ("RNDC"); (2) "Mr. Gumsdere" ("Gumsdere"), Deputy Warden of Security at RNDC; and (3) the City of New York (the "City"). These defendants have moved to dismiss Townsend's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court's task is to weigh the plausibility of Townsend's allegations and determine to what extent the defendants may be tied to the violations that he alleges. Because I conclude that Townsend cannot state a plausible claim for violation of his constitutional rights under § 1983, I recommended that defendants' motion to dismiss be GRANTED in its entirety.

**FACTUAL BACKGROUND**

The following facts are assumed to be true for the purposes of this motion to dismiss. According to Townsend's complaint, the events giving rise to his claim occurred at the RNDC, in the "[M]ess Hall, Clinic, Intake Pens and 6 Lower," on October 14, 2011. (Complaint ("Compl.") at 2.) [1] This is the only date in Townsend's complaint.

Townsend's general allegations can be grouped into three categories. First, Townsend complains about food. He alleges that there is "often not enough [ ] food in the Mess Hall to accommodate the vast amount of detainees housed at [RNDC]." (Id at 4.) Diabetic detainees, moreover, "are not issued the [necessary] low sugar diet foods to supplement their needs." (*Id.*)

Second, Townsend complains about sanitation. He alleges that, although linen sheets are exchanged every week, the blankets issued to detainees "are never washed or exchanged during the winter months," and are a "magnet for dust [,] bugs and other infectious germs." (*Id.*) When detainees are transferred from one housing area to another, their "belongings and property" are placed in those blankets, and dragged to the new area, accumulating dirt along the way. (*Id.*) Personal clothing, "which detainees ... wear [throughout their] stay at the [RNDC]," also is "not allowed to be cleaned at [the] facility [laundry]." (*Id.* at 5.) Furthermore, "[m]any housing area showers are not [industrial-cleaned] due to [the] lack of cleaning agents that will combat bacteria." (*Id.*) Townsend also states that the "New York City Department of Corrections has failed to enforce The Environmental Health that was stated by Judge Harold Baer Jr." (*Id.* at 4.)

Third, Townsend complains about living conditions, alleging that the "pre-trial detainees['] living conditions are deplorable." (*Id.*) Detainees are "compel[led] to sleep close" to each other. (Id at 5.) There is overcrowding. (*Id.*) When detainees are awoken for court appearances, "we are [constantly] being housed in jail cells that are extremely [overcrowded]," which is a "security issue." (*Id.*) Although "several dorms ... have air conditioners," some detainees are "housed in fifty[-]man dorm[s] with one [oscillating] fan." (*Id.*). This creates a "hostile environment that is [waiting] to happen." (*Id.*)

**\*2**  Townsend states that his allegations violate the DOC's "Minimum Standards" for hygiene, overcrowding and access to the courts. (*Id.*) He alleges that he did not sustain any injuries related to these events, (*id.* at 3), and requests as relief that the DOC implement corrective policies and procedures, as well as provide $9,000,000 in compensatory damages and punitive damages for emotional distress and pain and suffering (*id.* at 7).

## PROCEDURAL BACKGROUND

Townsend filed his complaint on April 30, 2012. (Docket Number ("Doc.No.") 2.) On June 11, 2012, the Honorable Richard J. Sullivan referred this case to a magistrate judge for general pretrial supervision and dispositive motions requiring a report and recommendation. (Doc. No. 11.) On July 12, 2012, defendants filed a motion to dismiss Townsend's claims. (Doc. No. 12.) Townsend did not timely oppose this motion, and so on August 14, 2012, the Honorable James L. Cott directed defendants to serve Townsend with their moving papers and ordered Townsend to file his opposition by September 11, 2012. (Doc. No. 15.) Judge Cott warned Townsend that if he did not file an opposition the Court would consider defendants' motion to be unopposed. (*Id.*) Townsend did not file opposition papers, and therefore the motion was fully briefed on September 11, 2012. [2] On November 8, 2012, the referral was reassigned to my docket. (Doc. Nos.17–18.)

## DISCUSSION

Defendants argue that Townsend's complaint should be dismissed because Townsend: (1) does not allege Clemons or Gumsdere were personally involved in a constitutional violation; (2) lacks standing because he does not plead he was personally aggrieved; (3) does not allege constitutional violations; (4) does not adequately plead municipal liability; and (5) cannot claim compensatory relief because he has not suffered physical injury. (Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss ("Def.Br.") at 1.)

### I. Statement of Law

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must take "factual allegations [in the complaint] to be true and draw[ ] all reasonable inferences in the plaintiff's favor." *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009) (citation omitted). To state a legally sufficient claim, a complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). But a pleading that only "offers 'labels and conclusions' or 'a

formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly,* 550 U.S. at 555.) If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570.

**\*3** *Pro se* litigants "are entitled to a liberal construction of their pleadings," and therefore their complaints "should be read to raise the strongest arguments that they suggest." *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (citation and internal quotation marks omitted). But "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987).

In determining the sufficiency of a complaint, the Court may consider "the factual allegations in [the] ... complaint, ... documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, [and] documents either in plaintiffs' possession or of which the plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

Furthermore, when a court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is sufficient bases for granting the motion. *See Kinlaw v. Walsh,* 10 Civ. 7539(RMB)(JLC), 2012 WL 2548437, at \*1 (S.D.N.Y. June 29, 2012) (reviewing record when considering defendants' unopposed motion to dismiss *pro se* plaintiff's complaint); *see also Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 246 (2d Cir.2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.") (citation and internal quotation marks omitted).

### II. Standing Through Personal Injury

As a threshold issue, defendants argue that Townsend fails to allege personal injury. The Constitution limits the judicial power of federal courts to decide cases or controversies. *See* U.S. Const. art. III, § 2, cl. 1. To bring a claim for relief, a

plaintiff must allege a concrete and particularized "injury in fact" fairly traceable to the challenged actions of defendants. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see ARKO Ivesticni Spolecnost, A.S. v. A.B. Watley, Inc.,* 01 Civ. 7693(LAP), 2003 WL 1108135, at *2 (S.D.N.Y. Mar. 12, 2003) ("A party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' ") (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Indeed, personal injury is necessary to bring suit under § 1983. *Oliver v. Powell,* 250 F.Supp.2d 593, 601 (E.D.Va.2002) (prisoner could not maintain § 1983 action when he failed "to specify any defendants[ ] whose actions were fairly traceable to an actual injury"); *see Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (prisoner could not bring § 1983 claim when placed in "keeplock" for disciplinary charges because he had no liberty interest, and thus suffered no injury).

**\*4** Townsend's claims do not establish personal injury. He pleads that there is not enough food to accommodate all the detainees, (Compl. at 4), but not that he went hungry. He pleads diabetic detainees are not provided with "[necessary] low sugar diet foods," (*id.*), but not that he is diabetic. He complains that the blankets are dirty and are dragged from place to place, (*id.*), that personal clothing is not allowed to be cleaned at the facility laundry, (*id.* at 5), and that many showers are not industrial cleaned, (*id.*), but does not plead that he was injured by the dirt. He pleads that living conditions are deplorable, (*id.* at 4), detainees must sleep close together, (*id.* at 5), there is overcrowding, (*id.*), and some dorms do not have air conditioners, (*id.*), but likewise does not plead that he was affected by these conditions. Indeed, the only potential personal injury that Townsend alleges is that when detainees are awoken for court appearances, "we are [constantly] being housed in jail cells that are extremely [overcrowded]." (*Id* .) (emphasis added). But although this allegation suggests Townsend's personal involvement, it does not suggest any injury suffered because of that overcrowding beyond an unspecified "security issue." (*Id.*) Indeed, when given the chance to describe the injuries that he suffered, Townsend writes that he suffered "none." (*Id.* at 3.) Townsend's claims fail because he has not alleged a legally cognizable personal injury.

## III. Personal Involvement of Individual Defendants

Defendants also argue that Townsend has not alleged the personal involvement of defendants in any alleged constitutional deprivations. "An individual cannot be held liable for damages under § 1983 merely because he held a high position of authority, but can be held liable if he was personally involved in the alleged deprivation." *Back v. Hastings on Hudson Union Free School Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (citation and internal quotation marks omitted). Personal involvement can be shown by:

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

Dismissal of a defendant is warranted when a plaintiff fails to allege how that particular defendant was personally involved in any of the actions or inactions that purportedly led to a violation of the plaintiff's constitutional or federal rights. *Hemmings v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998); *Schwartz v. Dennison,* 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y.2007) (no personal involvement found when complaint was devoid of allegations "from which it can be reasonably inferred that [defendants] created, or allowed to continue, [an impermissible] policy").

**\*5** Outside of naming them as defendants, Townsend does not mention Clemons or Gumsdere anywhere in his complaint or allege their personal involvement in any of

the actions that led to the alleged deprivations of his constitutional rights. Clemons and Gumsdere, therefore, should be dismissed from the complaint. *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 435 (S.D.N.Y.2004) (dismissing *pro se* complaint against individual named defendants not mentioned in body of complaint); *Mabery v. Keane,* 95 Civ. 1093(JFK), 1998 WL 148386, at *3 (S.D.N.Y. Mar. 30, 1998) (mentioning defendants "only ... in the caption of the Complaint ... is not enough to establish personal involvement for § 1983 purposes"); *see Back,* 365 F.3d at 127–28 (granting summary judgment when there was no allegation that individual defendant engaged directly in any discriminatory conduct under § 1983).

Clemons and Gumsdere also cannot be held liable solely because of their supervisory capacities as Warden and Deputy Warden of Security at RNDC. The "bare fact that [a defendant] occupies a high position in the New York prison hierarchy" does not suffice to sustain a claim. *Colon, 58 F.3d at 874.* Townsend must allege their personal involvement, which he has not done. *Collins v. Goord,* 438 F.Supp.2d 399, 420 (S.D.N.Y.2006) (dismissing plaintiff's claims against DOC Commissioner when plaintiff did not allege sufficient personal involvement). Townsend also is foreclosed from arguing supervisory liability under a theory of *respondeat superior. Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior";* proof of linkage in prison chain of command similarly is insufficient) (citations omitted).

## IV. Sufficiency of Constitutional Violation

Turning to the substance of the complaint, Defendants argue that Townsend's allegations do not rise to the level of constitutional deprivations. To allege a constitutional violation, a plaintiff must bring a claim pursuant to 42 U.S.C. § 1983. Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Newton v. City of New York,* 566 F.Supp.2d 256, 269–70 (S.D.N.Y.2008) (citing *Morris–Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005)). To state a claim under § 1983, "a plaintiff must show that the conduct

complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution." *Newton,* 566 F.Supp.2d at 270 (citing *Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004)).

It is unclear if Townsend was a pre-trial detainee or a post-conviction prisoner during the period giving rise to his claim. For constitutional purposes, however, the analysis is the same. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."). To allege a constitutional violation, a plaintiff must plead an objectively "serious deprivation," and that the officials who caused the harm acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302, 305, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002).

**\*6** To allege the first prong, a "serious deprivation," a plaintiff must plead the denial of "the minimal civilized measure of life's necessities," *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), including the "basic human needs" of "food, clothing, shelter, medical care and reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (citation and internal quotation marks omitted); *see Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006).

To allege the second prong, "deliberate indifference," a plaintiff must plead that a prison official knew of and disregarded an "excessive risk to inmate health or safety," which requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see Caiozzo,* 581 F.3d at 71 (plaintiff must show "that the government-employed defendant disregarded a risk of harm to the plaintiff of which the defendant was aware").

Townsend's allegations can be grouped into three potential violations: complaints about food, sanitation and living conditions. None of his complaints, however, alleges "sufficiently serious" deprivations or the "deliberate indifference" of a defendant.

### A. Temporary Deprivations

As an initial matter, Townsend provides little in the way of temporal context as to when the violations occurred. He pleads various general allegations, but indicates that the "events giving rise to [his] claim(s)" occurred on October 14, 2011, without clarifying whether or not all of his allegations actually occurred on that day. (Compl. at 2.) Defendants argue that this suggests that Townsend is pleading temporary deprivations only, and temporary deprivations do not amount to the denial of "the minimal civilized measure of life's necessities." (Def. Br. at 10–12.)

Defendants cite to cases when temporary deprivations did not create constitutional deprivations. (*Id.*) But defendants' citations are not articulating a general rule; indeed, the length of the deprivation is not in itself dispositive. *See Channer v. Mitchell,* 43 F.3d 786, 787–88 (2d Cir.1994) (remanding suit when district court did not address allegations that the deprivation of bed linen, pillow, or comfortable place to rest for two evenings violated the Eighth Amendment because "there is no *per se* bar to such a suit") (collecting cases); *see also Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003) ("In a case like this, however, where the prisoner is receiving appropriate on-going treatment for his condition, but, instead brings a narrower denial of medical care claim based on a temporary delay or interruption in treatment, the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner."); *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) (five days in "strip cell [fell] below the irreducible minimum of decency required by the Eighth Amendment"); *Moss v. Ward,* 450 F.Supp. 591, 596–97 (W.D.N.Y.1978) (withholding food for four consecutive days violated Eighth Amendment). To the extent defendants argue that the temporary nature of the deprivation by itself warrants dismissal of Townsend's complaint, (Def. Br. at 12), without looking into what was deprived, they are incorrect.

### B. Food and Diabetes

*7 Turning to his allegations, Townsend takes general issue with the food at RNDC, complaining that there is not enough food for "the vast amount of detainees," and that diabetics are not issued "the [necessary] low sugar diet foods." (Compl. at 4.) The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well[-]being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). But a conclusory allegation that there is not enough food simply is not a "substantial deprivation" absent an allegation of actual harm. *McNatt v. United Manager Parker,* 99 Civ. 1397(AHN), 2000 WL 307000, at *5–6 (D.Conn. Jan. 18, 2000) (allegation of small food portions, absent evidence that prisoners suffered ill effects from these reduced portions, fails to state Eighth Amendment claim) (collecting cases). Townsend does not allege that he went without food. Moreover, he does not allege that a general lack of food was caused by any defendant's "deliberate indifference." *Singh v. Fuller,* 93 Civ. 5937(CSH), 1999 WL 777872, at *3 (Sept. 30, 1999) (dismissing complaint when plaintiff failed to show alleged deprivation of food was caused by "deliberate indifference" of defendant).

Refusing a prisoner a necessary "special diabetic diet" could create a sufficiently serious condition. *See Edmonds v. Cent. NY. Psychiatric Ctr.,* 10 Civ. 05810(DAB)(KNF), 2011 WL 2207527, at *3–6 (S.D.N.Y. May 31, 2011), *adopted by* 2011 WL 3809913 (S.D.N.Y. Aug 25, 2011); *Johnson v. Harris,* 479 F.Supp. 333, 337 (S.D.N.Y.1979). But Townsend simply alleges that "low sugar diet foods" were not issued. (Compl. at 4.) He does not allege that he actually was denied such foods, or indeed, that any defendant was "deliberately indifferent" to his actual dietary needs. *Cf. Edmonds,* 2011 WL 2207527, at *5–6.

### C. Sanitation

Townsend also complains about sanitation. First, Townsend alleges that the RNDC's linen sheets are a "magnet for dust[,] bugs and other infectious germs." (Compl. at 4.) But dust, bugs and germs do not create a "serious deprivation" without additional pleadings Townsend has not provided. *See Bess v. R.N.D.C. C–74,* 11 Civ. 6272(WFK), 2012 WL 34100, at *1–2 (E.D.N.Y. Jan. 6, 2012) ("vague allegations of unsanitary conditions," including that unit where prisoner was moved was "filthy to the core, ... [with] dust & corrosion all over, [and] mildew & mice all over" did not create

constitutional deprivation) (citation and internal quotation marks omitted); *McCoy v. Goord,* 255 F.Supp.2d 233, 243, 260 (S.D.N.Y.2003) (dismissing complaint although plaintiff alleged cell was infested with roaches).

Second, Townsend alleges that the blankets are dirty. (Compl. at 4.) But this also is insufficient to establish a constitutional violation absent any allegation of harm. *McGee v. Pallito,* 10 Civ. 11, 2011 WL 6291954, at *14 (D.Vt. Aug.3, 2011) ("allegations of ants on [prisoner's] bedding are insufficient to state a constitutional violation, particularity when there is no accompanying allegation of harm or injury") (collecting cases); *Myers v. City of New York,* 11 Civ. 8525(PAE), 2012 WL 3776707, at *8 (S.D.N.Y. Aug. 29, 2012) (alleging prisoner "had to sleep on 'rust laden sheets for over a month' " did not amount to constitutional violation when prisoner did not allege lack of opportunity or means to clean his sheets) (collecting cases).

*8 Third, Townsend alleges that personal clothing is "not allowed to be cleaned at [the] facility laundry." (Compl. at 5.) To the extent he is alleging inadequate laundry services, he has not alleged a sufficiently "serious deprivation" because he has not plead he could not clean his clothes at all. *See Myers,* 2012 WL 3776707, at *8 (no due process violation when prisoner claimed laundry service had ceased, and clean clothes were in short supply, but did not allege he was denied opportunity or means to clean linens or clothes himself);

*Lunney v. Brureton,* 04 Civ. 2438(LAK)(GWG), 2007 WL 1544629, at *14 (S.D.N.Y. May 29, 2007) (alleging inadequate laundry services without alleging inability to wash clothing did not violate Eighth Amendment), *adopted by* 2007 WL 2050301 (S.D.N.Y. July 17, 2007). Townsend similarly has failed to allege a sufficiently "serious deprivation" to the extent he is complaining about the dirtiness of clothing. *McGee,* WL 6291954, at *8 ("allegation that [plaintiff] had to wear the same clothes for a significant period of time while at [prison] does not rise to the level of a constitutional violation") (collecting cases).

Indeed, courts have found more particular and severe allegations have not established a constitutional violation of sanitary conditions. *See, e.g., Mabery,* 1998 WL 148386, at *8 (conclusory allegations of unsanitary conditions "due to a lack of cleaning supplies, infrequent extermination of housing units (only one or two times yearly), poor ventilation in the shower and bathroom areas resulting in the seepage of 'stink' and moisture into the housing areas, and the nearby burning

of raw sewage ... that results in inmates having to breathe these fumes" do not state Eighth Amendment violations). Townsend, moreover, has not linked any of these alleged deprivations to defendants' "deliberate indifference."

### D. Living Conditions

Townsend next complains about the living conditions at RNDC, but similarly fails to plead constitutional deprivations. First, Townsend complains about overcrowding, alleging that detainees are "compel[led] to sleep close[ ] to other detainees," and some are housed in fifty-men dorms. (Compl. at 5.) But this level of overcrowding does not create a "serious deprivation" absent additional allegations Townsend does not provide. *Myers,* 2012 WL 3776707, at *6–8 (complaints about overcrowding where 60 detainees were housed in areas designed to hold only 50, and insufficient sinks and toilets were available, did not reach level of constitutional violation of due process rights);

*D'Attore v. New York City,* 10 Civ. 3102(JSR)(MHD), 2011 WL 3629166, at *6 (S.D.N.Y. June 2, 2011) ("overcrowding" of "less than sixty square feet of bed space" did not constitute "serious deprivation" absent specific allegations of deprivation), *modified by* 2011 WL 3629018 (S.D.N.Y. Aug.17, 2011) (clarifying that dismissal of overcrowding claim was without prejudice). Temporary overcrowding in jail cells for court appearances, (Compl. at 5), similarly, is not a "serious deprivation." *See Myers,* 2012 WL 3776707, at *6.

*9 Second, Townsend alleges that, although several dorms have air conditioners, other dorms must "bear the hot [humidity] with one fan." (Compl. at 5.) But uncomfortable dorms do not create a "serious deprivation" absent additional pleadings of actual injury. *See, e.g., Hall v. Perilli,* 03 Civ. 4635(RCC)(AJP), 2004 WL 1068045, at *8 (S.D.N.Y. May 13, 2004) (report and recommendation collecting cases where temperature discomfort did not amount to constitutional violation). Finally, Townsend does not allege that any defendant was "deliberately indifferent" to his living conditions.

### V. Additional Allegations

Townsend also makes three other potential claims for relief: (1) a denial of access to court; (2) violations of the DOC's "Minimum Standards;" and (3) that the DOC has failed to enforce a consent decree.

### A. Denial of Access to Court

First, Townsend alleges a denial of access to court when he pleads that detainees are placed in crowded jail cells when they are taken for court appearances. (Compl. at 5.) But to state a claim for denial of access to the courts under 🔖 § 1983, a prisoner "must demonstrate that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Green v. Phillips,* 04 Civ. 10202(TPG), 2006 WL 846272, at *5 (S.D.N.Y. Mar 31, 2006) (citation and internal quotation marks omitted). Townsend does not allege that he was prevented from attending his court appearances, and therefore, he cannot state a claim for denial of access to court.

### B. Department of Correction Minimum Standards

Second, Townsend alleges that the conditions of his confinement violate the DOC's "Minimum Standards" regarding hygiene, overcrowding, and access to the Courts. (Compl. at 5.) But the violation of City Minimum Standards does not, on its own, violate a prisoner's constitutional rights. *Gamble v. City of New York ex rel. N.Y.C. Dep't of Corr.,* 04 Civ. 10203(TPG), 2009 WL 3097239, at *5 (S.D.N.Y. Sept. 25, 2009); *see Myers,* 2012 WL 3776707, at *6 (finding violation of minimum City occupancy standards did not, on its own, violate prisoner's due process rights) (collecting cases). [3]

### C. "Baer" Standards

Third, Townsend also states that the "New York City Department of Corrections has failed to enforce The Environmental Health that was stated by Judge Harold Baer Jr." (Compl. at 4.) Reading this as a request for injunctive relief, the Court notes that Townsend is no longer in DOC custody at the RNDC, but rather is incarcerated in the Great Meadow Correctional Facility. Under the Prison Litigation Reform Act, "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than

necessary to correct the violation." 🔖 18 U.S.C. § 3626(a)(1). The Court of Appeals for the Second Circuit has held that "a transfer from a prison facility moots an action for injunctive relief against the transferring facility." 🔖 *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996). Townsend's allegation of a violation of Judge Baer's consent decree fails because he is no longer at RNDC. *See* 🔶 *Hallett v. Davis,* 11 Civ. 4646(WHP), 2012 WL 4378020, at *1, *6 (S.D.N.Y. Sept. 25, 2012) (finding that prisoner's allegation that the DOC "failed to enforce environmental health standards stated by Judge Harold Baer Jr" did not state claim for injunctive relief when defendant was transferred out of DOC facility) (citation and internal quotation marks omitted). Townsend's concerns about the treatment of other detainees also do not entitle him to relief. *See* 🔖 *Hinck v. United States,* 550 U.S. 501, 510 n. 3, 127 S.Ct. 2011, 167 L.Ed.2d 888 (2007) ("[It is a] general rule that a party must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (citation and internal quotation marks omitted).

### CONCLUSION

**\*10** For these reasons, I recommend that defendants' motion to dismiss be GRANTED in its entirety. Because I recommend dismissal based on several alternative grounds, I have not addressed defendants' remaining arguments. Because Townsend is a *pro se* plaintiff, I recommend that the dismissal of his complaint be with prejudice, but with leave to reopen within 30 days by filing an amended complaint that addresses the defects in his original complaint.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 818662

### Footnotes

1    Because Townsend's complaint has inconsistent pagination, citations to the complaint will refer to the actual order of pages instead of the number that might be written on the bottom of a page.

2    The docket website confirms that Townsend is still incarcerated at the address on record, and defendants' moving papers and Judge Cott's order were mailed to him there. (*See* Doc. No. 16.)

3       Moreover, the DOC's Minimum Standards expressly allow for occupancy of 50 detainees or 60 sentenced
        inmates in a housing area. (Minimum Standards, Rules of the City of New York Bd. of Corr. (40 RCNY) § 1–
        04(c)(5)). Absent additional pleadings, Townsend's allegation that detainees are housed in a 50–man dorm,
        (Compl. at 5), does not allege a violation of DOC standards.

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 868605
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Floyd TOWNSEND, Plaintiff,

v.

William CLEMONS, et al., Defendants.

No. 12 Civ. 03434 RJS SN.
|
March 4, 2013.

*ORDER ADOPTING REPORT AND RECOMMENDATION*

SULLIVAN, J.

**\*1**  Plaintiff filed a Complaint on April 30, 2012 seeking injunctive relief and monetary damages relating to the allegedly unconstitutional conditions he experienced while in the custody of the New York City Department of Correction ("DOC"). The three named Defendants are William Clemons, Warden of the Robert N. Davoren Center ("RNDC"), Mr. Gumsdere, Deputy Warden of Security at RNDC, and the City of New York.

On June 11, 2013, this matter was referred to Magistrate Judge James L. Cott for general pretrial supervision and dispositive motions requiring a report and recommendation. On July 21, 2012, Defendants filed a motion to dismiss the Complaint. Despite Judge Cott's reminder and extension of time, Plaintiff never filed any opposition to Defendants' motion. On November 8, 2012, the case was reassigned to Magistrate Judge Sarah Netburn's docket. On January 30, 2013, Judge Netburn issued a Report and Recommendation (the "Report") concerning Defendants' motion to dismiss the Complaint.

In her Report, Judge Netburn advised the parties that failure to file timely objections to the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). No party has filed objections to the Report, and the time to do so has expired. *See Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1993). When no objections to a report and recommendation are made, the court may adopt the report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000).

After reviewing the record, the Court finds that Judge Netburn's well-reasoned Report is not facially erroneous. Accordingly, the Court adopts the Report in its entirety and, for the reasons set forth therein, GRANTS Defendants' motion to dismiss the Complaint with prejudice, but grants Plaintiff leave to reopen the case within 30 days by filing an amended complaint that addresses the defects in his original complaint.

The Clerk of the Court is respectfully requested to terminate the motion at Doc. No. 12.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 868605

---

**End of Document**                                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk - Negative Treatment

Overruling Risk Darnell v. Pineiro, 2nd Cir., February 21, 2017

2011 WL 2638137
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Angelo ORTIZ, Plaintiff,

v.

DEPARTMENT OF CORRECTION OF the
CITY OF NEW YORK, et al., Defendants.

No. 08 Civ. 2195(RJS)(HBP).
|
April 29, 2011.

REPORT AND RECOMMENDATION

PITMAN, United States Magistrate Judge.

**\*1** TO THE HONORABLE RICHARD J. SULLIVAN,
United States District Judge,

I. *Introduction*

Plaintiff Angelo Ortiz, a former inmate on Rikers Island,
commenced this action *pro se* against the Department of
Correction of the City of New York ("NYCDOC") and
five individual defendants pursuant to 42 U.S.C. § 1983
("Section 1983"). Ortiz alleges he was subjected to
unsanitary conditions in violation of his Eighth Amendment
right against cruel and unusual punishment. On consent, the
NYCDOC was dismissed from this action on August 10, 2010
(Docket Item 51).

By notice of motion dated September 22, 2010 (Docket
Item 57), individual defendants Correction Officer Tamika
Hernandez, Correction Officer Kaia Sweeting, Correction
Officer Petchula Harris, Deputy Warden Yolanda Canty and
Captain Kelly Lester move to dismiss plaintiff's complaint
pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure. For the reasons set forth below, I respectfully
recommend that the motion be granted.

II. *Facts* [1]

Plaintiff's claim arises from allegedly unsanitary conditions
he was subjected to while in the custody of the NYCDOC
and incarcerated at Rikers Island. On three occasions between
December 3 and December 14, 2007, the toilet in plaintiff's
cell overflowed and contaminated the cell with the products
of elimination. The flooding was apparently the result of
a drainage problem that the NYCDOC was attempting to
rectify; plaintiff was told a plumber had been called.

On December 3, 2007, plaintiff noticed that his toilet was
overflowing as soon as he was transferred into his cell in
the 11th Lower Housing Unit. He alerted Hernandez, who
told plaintiff that he "better get use [sic] to it" and that this
had been going on for "the long's," which I take to mean a
long time. [2] When plaintiff asked to be moved to a different
cell, Hernandez told him that he must wait until the plumber
fixed the drain. Plaintiff also noticed human waste coming
out of the drain outside his cell. At approximately 4 p.m. that
day, plaintiff was moved. After the flooding, plaintiff was
not given appropriate equipment (an unspecified "mask" and
gloves) to clean his cell. He told the deputy in charge that
he was sick from the smell and that he had "a tumor in [his]
head." He was told to go sit in the dayroom.

On December 8, 2007, plaintiff awoke to find that another
sewage overflow had flooded his cell; the sewage touched his
feet. His entire unit was sent to the gym for four hours. When
he returned to his cell, he again cleaned his cell without a mask
or gloves.

On the evening of December 13, 2007, plaintiff's cell flooded
again due to a sewage overflow, and he slept in the dayroom
on chairs and tables. The next day, when plaintiff asked a
captain if he could be moved, another captain was called. The
second captain handcuffed plaintiff, told him to keep quiet
and moved him to intake, where plaintiff slept on the floor.
Plaintiff was then relocated to another part of the prison and
later moved to another facility. He never again slept in his cell
in the 11th Lower Housing Unit.

**\*2** Plaintiff claims he suffered severe headaches and
dizziness as a result of the flooding. He seeks $100,000 in
damages for pain and suffering, emotional stress and neglect.

III. *Analysis*

A. *Standards Applicable to a Motion to Dismiss*
The standards applicable to a motion to dismiss pursuant to
Rule 12(b)(6) are well-settled and require only brief review.

When deciding a motion to dismiss under Rule 12(b)(6), [the court] must accept as true all well-pleaded factual allegations of the complaint and draw all inferences in favor of the pleader. *See* *City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986); *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (referring to "well-pleaded allegations"); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). " '[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.' " *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)). The Court also may consider "matters of which judicial notice may be taken." *Leonard T. v. Israel Discount Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999) (citing *Allen v. WestPoint–Pepperill, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)). In order to avoid dismissal, a plaintiff must do more than plead mere "[c]onclusory allegations or legal conclusions masquerading as factual conclusions." *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000) (quoting 2 James Wm. Moore, Moore's Federal Practice ¶ 12.34[a] [b] (3d ed.1997)).

*Hoffenberg v. Bodell,* 01 Civ. 9729(LAP), 2002 WL 31163871 at *3 (S.D.N.Y. Sept. 30, 2002) (Preska, D.J.); *see also* *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007); *Johnson & Johnson v. Guidant Corp.,* 525 F.Supp.2d 336, 345–46 (S.D.N.Y.2007) (Lynch, D.J.).

The Supreme Court has clarified the proper mode of inquiry to evaluate a motion to dismiss pursuant to Rule 12(b)(6), which uses as a starting point the principle that "[a] pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a).

[I]n *Bell Atl [antic] Corp. v. Twombly,* 550 U.S. 544 (2007), the Court disavowed the well-known statement in *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)[,] that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. at 562. Instead, to survive a motion to dismiss under *Twombly,* a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

**\*3** *Talley v. Brentwood Union Free Sch. Dist.,* 08 Civ. 790, 2009 WL 1797627 at *4 (E.D.N.Y. June 24, 2009).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations ... a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do .... Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact) ....

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007) (citations, internal quotations and alterations omitted).

In evaluating a motion under Rule (12)(b)(6), the court must determine whether the plaintiff has alleged any facially plausible claims. *See* *Smith v. NYCHA,* No. 09–4473–CV, 2011 WL 564294 at *1 (2d Cir. Feb. 18, 2011) (unpublished). A claim is plausible when its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citations omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal, supra,* 129 S.Ct. at 1949 (internal quotations omitted). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'

" *Ashcroft v. Iqbal, supra,* 129 S.Ct. at 1950, *quoting* Fed.R .Civ.P. 8(a)(2).

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," however. *Ashcroft v. Iqbal, supra,* 129 S.Ct. at 1949; *Reed Const. Data Inc. v. McGraw–Hill Cos., Inc.,* 09 Civ. 8578, 2010 WL 3835196 at *3 (S.D.N.Y. Sept. 14, 2010)* (Sweet, D.J.). As a result, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal, supra,* 129 S.Ct. at 1950.

Nevertheless, where, as here, a plaintiff proceeds *pro se,* the complaint must be liberally construed to raise the strongest claims the allegations suggest. *Sims v. Blot,* 534 F.3d 117, 133 (2d Cir.2008); *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Haines v. Kerner,* 404 U.S. 519, 520–21 (1972); *Tracy v. Freshwater,* 623 F.3d 90, 100–04 (2d Cir.2010)* (observing that the requirement of "special solicitude" includes liberal construction of papers, "relaxation of the limitations on the amendment of pleadings," leniency in enforcing procedural rules, and "deliberate, continuing efforts to ensure that a *pro se* litigant understands what is required of him.") (citations omitted); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006).

B. *Exhaustion Requirement*
**\*4** The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Handberry v. Thompson,* 446 F.3d 335, 341 (2d Cir.2006); *Oates v. City of New York,* 02 Civ. 5960(GEL), 2004 WL 1752832 at *1 (S.D.N.Y. Aug. 4, 2004)* (Lynch, D.J.). However, while "the PLRA establishes a mandatory exhaustion requirement, it does not create a jurisdictional

predicate to our ability to hear the appeal." *Handberry v. Thompson, supra,* 446 F.3d at 342, *citing Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Thus, "[t]he failure to exhaust available administrative remedies is an affirmative defense ... [that] is waiveable." *Handberry v. Thompson, supra,* 446 F.3d at 342, *quoting Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004); *accord Johnson v. Rowley, supra,* 569 F.3d at 45; *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *Hobson v. Fischer,* 10 Civ. 5512(SAS), 2011 WL 891314 at *2 n. 22 (S.D.N.Y. Mar. 14, 2011) (Scheindlin, D.J.); *Banks v. Stewart,* 08 Civ. 7463(RJS) (THK), 2010 WL 2697075 at *2 (S.D.N.Y. July 6, 2010) (Sullivan, D.J.) (adopting Report and Recommendation), *quoting Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

Defendants do not argue that plaintiff failed to exhaust his administrative remedies. Therefore, I conclude that defendants have waived this defense.

C. *Standards Applicable to Section 1983 Claims*

Section 1983 imposes liability on individuals who, while acting under the color of state law, violate an individual's federally-protected rights. *Perkins v. Brown,* 285 F.Supp.2d 279, 283 (E.D.N.Y.2003); *Johnson v. Bendheim,* 00 Civ. 720(JSR), 2001 WL 799569 at *5 (S.D.N.Y. July 13, 2001) (Rakoff, D.J.). Plaintiff alleges that defendants violated his Eighth Amendment right against cruel and unusual punishment by subjecting him to the unsanitary conditions of repeated toilet overflows.

A jailed individual is protected by the United States Constitution against deliberate indifference to conditions that pose a substantial risk of serious harm to his physical well-being. If the individual is a sentenced prisoner, the source of protection is the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 828 (1994) (citations omitted). If the individual is a pretrial detainee, the source of protection is the Due Process Clause of the Fourteenth Amendment. *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). It is unclear whether plaintiff was a pretrial detainee or was serving a sentence at the time of the events alleged in the complaint, but this ambiguity is of no moment because the Fourteenth Amendment provides substantially the same

protection to pretrial detainees that the Eighth Amendment provides to sentenced prisoners. *See* *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979); *Weyant v. Okst, supra,* 101 F.3d at 856; *Bryant v. Maffucci,* 923 F.2d 979, 983 (1991); *see also* *Caiozzo v. Koreman,* 581 F.3d 63, 70 (2d Cir.2009) ("We have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment." (quoting *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000)). Moreover, "[b]ecause the due process rights of pretrial detainees are 'at least as great as the Eighth Amendment protections available to a convicted prisoner,' and the same standard applies, cases cited that refer to the Eighth Amendment are thus applicable to the conditions of confinement claims alleged here." *Pine v. Seally,* No. 9:09–CV–1198 (DNH/ATB), 2011 WL 856426 at *3 n. 12 (N.D .N.Y. Feb. 4, 2011), quoting *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983).

**\*5** The Eighth Amendment prohibits "cruel and unusual punishments." In *Wilson v. Seiter,* 501 U.S. 294, 296–302 (1991), the United States Supreme Court addressed an inmate's claim that prison conditions violated the Eighth Amendment's prohibition against cruel and unusual punishment and noted that "[t]he Constitution ... 'does not mandate comfortable prisons," ... and only those deprivations denying 'the minimal civilized measure of life's necessities,' ... are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter, supra,* 501 U.S. at 298, quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 349 (1981); *Salahuddin v. Goord,* 467 F.3d 263, 267 (2d Cir.2006).

In *Farmer v. Brennan, supra,* 511 U.S. at 834, the Supreme Court articulated a two-part test with both objective and subjective components for determining whether prison conditions violated the Eighth Amendment. "First, the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer v. Brennan, supra,* 511 U.S. at 834, quoting *Wilson v. Seiter, supra,* 501 U .S. at 298; *see also* *Hudson v. McMillian, supra,* 503 U.S. 1, 5 (1992). For claims premised on "a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan, supra,* 511 U.S. at 834 (1994), *citing* *Helling v. McKinney,* 509 U.S. 25, 35 (1993).

Additionally, the Supreme Court required that "a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan, supra,* 511 U.S. at 834, *quoting* *Wilson v. Seiter, supra,* 501 U.S. at 297; *see also* *Wilson v. Seiter, supra,* 501 U.S. at 302–303; *Hudson v. McMillian, supra,* 503 U.S. at 8; *Trammell v. Keane, supra,* 338 F.3d at 161. In cases involving prison conditions, "that state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer v. Brennan, supra,* 511 U.S. at 834, quoting *Wilson v. Seiter, supra,* 501 U .S. at 302–03; *see also* *Helling v. McKinney, supra,* 509 U.S. at 34–35; *Hudson v. McMillian, supra,* 503 U.S. at 5; *Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Hines v. Lacy,* 189 F.3d 460, 1999 WL 642915 at *3 (2d Cir.1999) (unpublished) (internal citations omitted); *Lyncee v. Jenks,* 98 Civ. 3638(RCC), 2000 WL 343893 at *2–*3 (S.D.N.Y. Mar. 31, 2000) (Casey, D.J.). An official acts with deliberate indifference when she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan, supra,* 511 U.S. at 837; *see also* *Wilson v. Seiter, supra,* 501 U.S. at 298–302 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). "The subjective element requires a state of mind that is the equivalent of criminal recklessness ...." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

**\*6** A Section 1983 claim will not lie for prison conditions that are merely unpleasant. However, chronic exposure to human waste will give rise to a colorable claim. In *Gaston v. Coughlin,* 249 F.3d 156, 165–66 (2d Cir.2001), the Second Circuit reinstated an inmate's Eighth Amendment claim against two defendants where the area in front of the inmate's cell "was filled with human feces, urine, and sewage water" for several consecutive days. There, the Court of Appeals stated that it was "unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for

prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end." *Gaston v. Coughlin, supra,* 249 F.3d at 166. Similarly, in *LaReau v. MacDougall,* 473 F.2d 974, 977–79 (2d Cir.1972), the Second Circuit held that an inmate who spent five days in a cell that contained only a grate-covered hole in the floor for a toilet, which could only be flushed from the outside, was deprived of his Eighth Amendment rights. "Causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted. The indecent conditions that existed in this ... cell seriously threatened the physical and mental soundness of its unfortunate occupant."

*LaReau v. MacDougall, supra,* 473 F.2d at 978; *see also Wright v. McMann,* 387 F.2d 519, 522, 526 (2d Cir.1967) (finding 33–day placement of prisoner in strip cell which was "fetid and reeking from the stench of the bodily wastes of previous occupants which ... covered the floor, the sink, and the toilet," combined with other conditions, violated Eighth Amendment); *Smith v. United States,* No. 9:09–CV–729 (TJM/DRH), 2011 WL 777969 at *2, *11 (N.D.N.Y. Feb. 3, 2011) (Report and Recommendation), *adopted by,* 2011 WL 776150 (N.D.N.Y. Mar. 1, 2011) (denying motion for summary judgment where inmate alleged that officers "refused to flush the toilet or provide the inmates with toilet paper for two weeks," causing overflow of human waste to spill onto cell floor and inmate to become "nauseous and lightheaded from the odor").

Courts outside of this Circuit have reached the same result where exposure to sewage lasts for a substantial period of time. *See McCord v. Maggio,* 927 F.2d 844, 846–47 (5th Cir.1991) (finding Eighth Amendment violation where inmate lived in cell for two years and slept on floor for months "into which rain water and backed-up sewage leaked"); *Williams v. Adams,* 935 F.2d 960, 961–62 (8th Cir.1991) (reversing grant of summary judgment for defendants where plaintiff alleged "that the toilet in the cell did not work" and overflowed continuously "and the floor stay[ed] filthy with its wast[e]" over 13–day period); *Howard v. Adkison,* 887 F.2d 134, 136–38 (8th Cir.1989) (Eighth Amendment violation sufficiently proven where inmate lived for two years in cell where walls, door and food slot "were covered with human waste," mattress was "stained with urine and human waste" and pleas for remedial measures went unanswered); *McCray v. Sullivan,* 509 F.2d 1332, 1336 (5th Cir.1975) (finding conditions in isolation cells where inmates lived for

as long as 21 days violated Eighth Amendment where waste "frequently" overflowed onto the floors of the cells); *Looper v. Sanders,* Civil No. 6:10–cv–06037, 2011 WL 861714 at *4–*5, *8 (W.D.Ark. Mar. 10, 2011) (denying defendants' motion for summary judgment where plaintiff was exposed to raw sewage for over 10 months); *Jones v. Sanders,* No. 08–6035, 2009 WL 2432632 at *7 (W.D.Ark. Aug. 7, 2009) (Report and Recommendation) (recommending denial of defendants' motion for summary judgment where plaintiff was exposed to raw sewage for a month and a half).

**\*7** On the other hand, where exposure to such waste is intermittent or limited to a matter of hours, courts normally will not entertain such actions. "The Eighth Amendment is generally not violated ... where unsanitary conditions are temporary." *Kee v. Hasty,* 01 Civ. 2123(KMW)(DF), 2004 WL 807071 at *26 n. 24 (S.D.N.Y. Apr. 14, 2004) (Freeman, M.J.) (Report and Recommendation), *citing McNatt v. Unit Manager Parker,* No. 3:99 Cv. 1397(AHN), 2000 WL 307000 at *4 (D.Conn.2000); *Whitnack v. Douglas County,* 16 F.3d 954, 955–58 (8th Cir.1994) (reversing jury verdict for plaintiff and finding no violation based on 24–hour exposure to vomit in sink, dried feces on toilet seat and dried urine puddles on floor before cleaning supplies were made available); *Prellwitz v. Anderson,* Civil No. 07–2120 (PAM/JSM), 2007 WL 2033804 at *2–*3 (D.Minn. July 12, 2007) (granting motion to dismiss under 28 U.S.C. § 1915A(b) where waste water on cell floor lasted only three hours and odor of inoperable toilet lasted six hours); *Odom v. Keane,* 95 Civ. 9941(SS), 1997 WL 576088 at *5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, D.J.) (condition where toilet failed to flush between 9 p.m. and 7 a.m. for several months "does not amount to cruel and unusual punishment"); *Evans v. Fogg,* 466 F.Supp. 949, 950 (S.D.N.Y.1979) (Lasker, D.J.) ("To be kept in a refuse-strewn cell for 24 hours and in a flooded cell (a condition resulting from [plaintiff's] own acts) for two days is a rough experience, but, since neither condition persisted for more than a limited period of time, it cannot be said that the condition amounted to cruel and unusual punishment.").

In *Burkholder v. Newton,* 116 F. App'x 358, 363 (3d Cir.2004), the Third Circuit affirmed the dismissal of the complaint where a prisoner alleged his toilet often overflowed during a 30–day period. "It is questionable if having ... a toilet that backs up sometimes is really an 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.' " *Burkholder v. Newton, supra,* 116 F.

App'x at 363, *quoting Sandin v. Conner,* 515 U.S. 472, 484 (1995). *But see DeSpain v. Uphoff,* 264 F.3d 965, 971–72 (10th Cir.2001) (reversing grant of summary judgment for defendants where plaintiff alleged that a unit-wide backup of the plumbing system lasted 36 hours); *Sherman v. Gonzalez,* No. 1:09–cv–00420–LJO–SKO PC, 2010 WL 2791565 at *4–*6, *8 (E.D.Cal. July 14, 2010) (Report and Recommendation), *adopted by,* 2010 WL 3432240 (E.D.Cal. Aug. 31, 2010) (denying defendants' motion to dismiss where prisoner was left in his cell for five hours following toilet overflow that prompted prison officials to leave building).

Where an inmate's exposure to waste lasts for three or four days, the Circuits are split. *Compare Smith v. Copeland,* 87 F.3d 265, 269 (8th Cir.1996) (affirming summary judgment for defendants where plaintiff was subjected to an overflowing toilet in his cell for four days), *with McBride v. Deer,* 240 F.3d 1287, 1291–92 (10th Cir.2001) (vacating Rule 12(b)(6) dismissal where plaintiff alleged he was forced to live in "feces-covered cell" for three days), *and Sperow v. Melvin,* 182 F.3d 922, 1999 WL 450786 at *1–*3 (7th Cir.1999) (unpublished) (reversing Rule 12(b)(6) dismissal where inmate "was subjected to appalling conditions" of waste-filled cell "for three full days"); *and Young v. Quinlan,* 960 F.2d 351, 355–56, 363–65, (3d Cir.1992), *superceded by statute on other grounds as stated in Ghana v. Holland,* 226 F.3d 175, 184 (3d Cir.2000) (reversing summary judgment for defendants where inmate was moved to "dry cell" without working toilet for 96 hours and forced to urinate and defecate in his cell).

**\*8** Under the subjective component of the two-prong test, a Section 1983 claim will not lie for conduct by prison officials that is merely negligent. *Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003) (affirming grant of summary judgment for defendants and finding no deliberate indifference, but at worst negligence, where inmate was left with one roll of toilet paper to last approximately nine days); *accord Dye v. Lomen,* 40 F. App'x 993, 994, 996–97 (7th Cir.2002) (no proof that defendants deprived plaintiff of toilet paper for several days to unnecessarily and wantonly inflict pain); *Harris v. Fleming,* 839 F.2d 1232, 1234–35 (7th Cir.1988) (finding defendants' neglect of plaintiff's need for toilet paper over five days "was not intentional, nor did it reach unconstitutional proportions"). "Not every

governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny .... To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety."

*Whitley v. Albers,* 475 U.S. 312, 319 (1986); *accord County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998), *citing Daniels v. Williams,* 474 U.S. 327, 328 (1986) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *Kruzel v. County of Suffolk,* 23 F. App'x 95, 96 (2d Cir.2002); *John E. Andrus Mem'l, Inc. v. Daines,* 600 F.Supp.2d 563, 585 (S.D.N.Y.2009) (Seibel, D.J.); *Miner v. N.Y. State Dep't of Health,* 02 Civ. 3180(MBM), 2004 WL 1152491 at *5 (S.D.N.Y. May 24, 2004) (Mukasey, D.J.).

Finally, courts have dismissed plaintiffs' claims where there is no genuine issue of fact that defendants were deliberately indifferent to only a brief toilet overflow. *Lollis v. Page,* Civil No. 4:07–cv–4067, 2008 WL 853561 at *4 (W.D.Ark. Mar. 27, 2008) (defendant "supplied cleaning materials to Plaintiff" ten to fifteen minutes after toilet overflow); *Brown v. Hickman,* Civil No. 06–3035, 2007 WL 2806711 at *9–*10 (W.D.Ark. Sept. 25, 2007) (adopting Report and Recommendation) (although toilet overflowed for 4 1/2 hours and did not work for 22 hours, a plumber was called and defendant "checked the cell and saw only a small amount of water on the floor").

D. *Application of the Foregoing Principles to Plaintiff's Claim*

Judged by the standards set forth above, I conclude that plaintiff's claim does not survive the motion to dismiss. As an initial matter, the circumstances alleged by plaintiff are not sufficiently serious under the objective prong. Even if plaintiff's allegations are true, the conditions he describes did not pose a substantial risk of serious harm.

As the cases discussed above demonstrate, courts have generally distinguished claims based on an inmate's continuous and chronic exposure to waste from claims of only intermittent or brief exposure. Here, plaintiff alleges: (1) that he was exposed to a sewage overflow for an unspecified number of hours on December 3, 2007; (2) that he awoke to a second overflow on December 8, 2007, and was moved later that day, and (3) that a third overflow occurred on the night of December 13, 2007 which resulted in plaintiff being

moved elsewhere. In each of these incidents, plaintiff was only exposed to waste for a relatively small number of hours; it appears that his total exposure was probably less than 24 hours. Although unpleasant, these incidents are simply too limited to withstand a motion to dismiss. In 📌 *Sherman v. Gonzalez, supra,* 2010 WL 2791565 at \*4, the complaint was found to withstand a motion to dismiss because it alleged that plaintiff had actually "suffered significant physical harm from the conditions in his cell" and "was rushed to an outside hospital for emergency treatment after the unsanitary conditions triggered a severe asthma attack, and [that] his heart stopped temporarily." In contrast, plaintiff never suffered from any similar conditions and only complained about headaches, dizziness and sickness. Plaintiff's allegation that he had "a tumor in [his] head" does not change the foregoing analysis. The allegation that plaintiff developed a tumor from transitory exposure to sewage is fanciful and need not be credited here. "The law requires 'something more than a fanciful allegation' to survive a motion to dismiss." *Brown v. Lindemann,* 83 Civ. 6174(RLC), 1992 WL 147667 at \*4 (S.D.N.Y. June 15, 1992) (Carter, D.J.), *quoting* 📌 *Contemporary Mission, Inc. v. United States Postal Serv.,* 648 F.2d 97, 100 (2d Cir.1981). I conclude, therefore, that the facts here are distinguishable from those in *Sherman v. Gonzalez, supra.*

**\*9** While the Second Circuit has stated that it was "unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement *for days on end,"* 📌 *Gaston v. Coughlin, supra,* 249 F.3d at 166 (emphasis added), the conditions to which plaintiff was subjected here did not last "for days on end." Five days passed between each incident, and the exposure did not last for an entire day in any of the incidents. This, I conclude, distinguishes this case from the cases cited above in which a plaintiff's claim was sustained. Judges in this district have repeatedly declined to find that sporadic or brief exposures to waste represented cruel and unusual punishment. 📌 *Odom v. Keane, supra,* 1997 WL 576088 at \*5; *Evans v. Fogg, supra,* 466 F.Supp. at 950. Similarly, in the cases cited above where Courts of Appeals have reversed Rule 12(b)(6) dismissals or grants of summary judgment in favor of defendants, the exposure to sewage and waste was of far longer duration than that alleged here.

Additionally, I note that in *Wesolowski v. Kamas,* 590 F.Supp.2d 431, 434–35 (W.D.N.Y.2008), *aff'd,* No. 09–

2506–pr, 2011 WL 477583 (2d Cir. Feb. 11, 2011), the Honorable David G. Larimer, United States District Judge, stated that a "prison's failure to provide [plaintiff] with specific cleaning supplies or the magnitude of its response to an overflowed toilet elsewhere on the cell block, represent minor inconveniences of prison life which 'are part of the penalty that criminal offenders pay for their offenses against society' " (*quoting Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)). I agree with Judge Larimer's analysis, and I conclude that plaintiff's allegations concerning the lack of cleaning supplies to represent a transitory problem, not a constitutional deprivation.

Furthermore, even if plaintiff could satisfy the objective prong of a 📌 Section 1983 claim, his claim would still fail because he does not sufficiently allege that defendants were deliberately indifferent. Plaintiff does not sufficiently allege that defendants actually knew of and disregarded a substantial risk to plaintiff's health or safety, or that defendants were aware of facts from which they could have inferred that there was a substantial risk of serious harm, that they drew such an inference and that they disregarded it.

Although plaintiff claims that the defendants "all knew [the backed-up toilet in plaintiff's cell] was an on going problem, and did nothing about it," his own narrative in the second amended complaint contradicts this statement. He details the various attempts by prison officials to repair the sewage system and to relocate plaintiff and other inmates until the problem was resolved. There is a clear difference between cases where defendants allegedly knew about unsanitary conditions but did nothing and cases where officials actually acted to resolve or alleviate the problem, as they are alleged to have done here. *Compare* 📌 *Smith v. United States, supra,* 2011 WL 777969 at \*2 (prison officials refused to flush inmates' toilet or provide inmates with toilet paper for two weeks). The complaint's specific factual allegations demonstrate that defendants repeatedly took steps to alleviate plaintiff's exposure to the overflowing toilet. During the first incident, plaintiff was told that a plumber had been called—which is the antithesis of deliberate indifference. The complaint also states that within hours of the first incident, plaintiff was moved. When plaintiff became sick from cleaning waste, prison officials let him leave his cell and sit in the dayroom. In the second incident plaintiff describes, the entire unit was moved to the gym. And during the third incident, plaintiff slept overnight in the dayroom one night, in intake the next night and never returned to his cell to sleep.

**\*10**  Because plaintiff's claims do not "raise a right to relief above the speculative level," he has failed to state a claim. *Bell Atl. Corp. v. Twombly, supra,* 550 U.S. at 555 (citation omitted). Therefore, I respectfully recommend that the individual defendants' motion to dismiss be granted. [3]

### IV. *Conclusion*

Accordingly, for all the foregoing reasons, I recommend that the individual defendants' motion to dismiss (Docket Item 57) be granted.

### V. *Objections*

Pursuant to 28 U.S.C. § 636(b)(1)(C)) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Richard J. Sullivan, United States District Judge, 500 Pearl Street, Room 640, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983) (*per curiam* ).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2638137

### Footnotes

1      The facts set forth herein are drawn from plaintiff's second amended complaint (Second Amended Complaint, dated May 2, 2009 (Docket Item 30)) unless otherwise noted.

2      Plaintiff handwrote his second amended complaint on a form complaint. He also handwrote his response to the motion to dismiss. Although plaintiff frequently used improper grammar, his submissions are understandable.

3      While plaintiff's claims fail on the merits as to all individual defendants, Hernandez also appears to have a valid defense pursuant to Fed.R.Civ.P. 12(b)(2). As discussed above, service was not made on Hernandez (Docket Item 41). Defendants note this fact but argue that the complaint should be dismissed as to all defendants on Rule 12(b)(6) grounds (Defs.' Mem. at 2 n. 1). Because plaintiff has failed to state a claim, I need not reach the Rule 12(b)(2) issue.

  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2638140
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Angelo ORTIZ, Plaintiff,

v.

Officer Tamika HERNANDEZ
# 15756 [1], et al., Defendants.

No. 08 Civ. 2195(RJS)(HBP).
|
July 5, 2011.

*ORDER ADOPTING REPORT AND RECOMMENDATION*

RICHARD J. SULLIVAN, District Judge.

**\*1** Before the Court is the Report and Recommendation (the "Second Report") of the Honorable Henry B. Pitman, Magistrate Judge, recommending that the Individual Defendants' [2] motion to dismiss Plaintiff's Second Amended Complaint (the "SAC") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure be granted. For the following reasons, the Court adopts the Second Report in its entirety and dismisses the SAC.

On March 5, 2007, *pro se* Plaintiff Angleo Ortiz filed a Complaint arising from allegedly unsanitary conditions to which he was subjected while incarcerated on Rikers Island. The original Complaint named New York City's Department of Correction ("NYCDOC"), two Jane Does, and three individual correction officers as Defendants. Plaintiff filed his First Amended Complaint on February 5, 2009. In an Order dated March 27, 2009, the Court referred this action to Judge Pitman for general pretrial purposes and for a report and recommendation on any dispositive motions. On May 6, 2009, Plaintiff filed the SAC, which named two Defendants who were previously known only as Jane Doe.

By notice of motion dated September 9, 2009, Defendant NYCDOC moved to dismiss the SAC, pursuant to Rules 4(m), 41(b), and 12(b)(6) of the Federal Rules of Civil Procedure. Due to mistakes by the Court's Pro Se Office, the Individual Defendants had not yet been served with the SAC. On July 23, 2010, Judge Pitman issued a Report and Recommendation (the "First Report") recommending that

NYCDOC's motion be granted pursuant to Rule 12(b)(6) on consent and denied in all other respects. In an Order dated August 10, 2010, the Court adopted Judge Pitman's First Report and dismissed Plaintiff's case against NYCDOC.

The Individual Defendants filed their motion to dismiss on October 29, 2010. Judge Pitman issued his Second Report on April 29, 2011. In the Second Report, Judge Pitman first found that, because the Individual Defendants did not argue that Plaintiff had failed to exhaust his administrative remedies, they had waived that defense. (Second Report at 9.) Turning to the merits of Plaintiff's claims, Judge Pitman noted that the Supreme Court has laid out a two-part test for determining whether prison conditions violate the Eighth Amendment in *Farmer v. Brennan*, 511 U.S. 825 (1994). Under the first prong, the conditions "must be, objectively, sufficiently serious," and under the second prong, prison officials must be "deliberately indifferen[t] to inmate health or safety." *See id.* at 834 (internal quotation marks omitted). (*See* Second Report at 12.) Judge Pitman found that Plaintiff had failed to meet either prong. (*Id.* at 20, 23.) Judge Pitman also briefly noted that Defendant Hernandez "appear[ed] to have a valid defense pursuant to Fed.R.Civ.P. 12(b)(2)" because she was not served, but did not reach this issue because plaintiff failed to state a claim. (*Id.* at 25 n. 3.) Copies of the Second Report were mailed to Plaintiff and Defendants on April 29, 2011. The Second Report advised the parties that failure to file objections within the statutory period would constitute waiver of those objections on appeal. *See* 28 U.S.C. § 636(b)(1)(C) (2006); Fed.R.Civ.P. 72(b)(2). Plaintiff submitted timely objections.

**\*2** When no party objects to a report and recommendation, the Court may adopt the report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato*, 388 F.Supp.2d 250, 253 (S.D.N.Y.2005). A magistrate judge's decision is "clearly erroneous" only if the district court is "left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quoting *United States v. U .S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). When a party objects, the objections "must be specific and clearly aimed at particular findings in the magistrate judge's proposal," *Harden v. LaClaire*, No. 07 Civ. 4592(LTS)(JCF), 2008 WL 4735231, at \*1 (S.D .N.Y. Oct. 27, 2008). "[I]f the party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and

Recommendation only for clear error." *Dawson v. Phillips, No. 03 Civ. 8632(RJS)(THK), 2008 WL 818539, at *1 (S.D.N.Y. Mar. 25, 2008)* (internal quotation marks omitted). However, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed.R.Civ.P. 72(b)(3); 28 U.S.C. § 636(b)(1); *see also Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir.1989) (explaining that § 636(b)(1) "affords the district court broad latitude" in reviewing the magistrate judge's recommendation).

In a submission dated May 4, 2011, Plaintiff makes six objections to Judge Pitman's Second Report. (*See* Pl.'s Objections at 1–3.) Of these objections, one—listed by Plaintiff as Objection (5)(D)—is nonsensical, providing only the heading "Principles to Plaintiff's Claim," and does not require the Court to review the Second Report for anything more than clear error. Two others—listed by Plaintiff as Objections (1) and (6)(E)—can be broadly construed to challenge Judge Pitman's finding that Defendant Hernandez was not properly served. As this portion of the Second Report is dicta, the Court's review of this issue would not change the outcome. The Court therefore declines to review this portion of Judge Pitman's Second Report.

In the three remaining objections—listed by Plaintiff as Objections (2)(A), (3)(B), and (4)(C)—Plaintiff asserts additional facts and arguments concerning his medical condition and Defendants' conduct. Specifically, Plaintiff contends that he suffered not only headaches and dizziness, but also emotional stress. (*See* Pl.'s Objections at 1.) He also alleges that he required treatment for his liver, as well as shots and pills to boost his white cell count and because he was weak. (*Id.* at 1–2.) In addition, Plaintiff contends that "Defendants did not follow policy and procedure or follow rules and regulations," and were not properly trained. (*Id.* at 2.)[3] However, Plaintiff did not raise these allegations before Judge Pitman. "[A] district court generally should not entertain new grounds for relief or additional legal arguments not presented to the magistrate ...." *Ortiz v. Barkley,* 558 F.Supp.2d 444, 451 (S.D.N.Y.2008); *see also Abu–Nassar v. Elders Futures, Inc.,* No. 88 Civ. 7906(PKL), 1994 WL 445638, at *4 n. 2 (S.D.N.Y. Aug. 17, 1994) ("If the Court were to consider formally these untimely contentions, it would unduly undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments,") The Court declines to consider these untimely arguments.[4] Therefore, the Court reviews the Second Report for clear error only.

**\*3** After careful review of Judge Pitman's thorough and well-reasoned Second Report, the Court finds no clear error and adopts the Second Report in its entirety. For the reasons set forth therein, IT IS HEREBY ORDERED that the Individual Defendants' motion is granted. The Clerk of the Court is respectfully directed to terminate the motion located at docket number 57 and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2638140

# Footnotes

1.   In Plaintiff's Second Complaint, this Defendant's surname is spelled "Hernandes," but the parties appear to agree that it is actually spelled "Hernandez" (*see* Pl.'s Objections at 1; Defs.' Resp. at 1). The Clerk of the Court is respectfully directed to correct the caption.

2.   The Individual Defendants are Defendants Officer Tamika Hernandez # 15756, Officer Kaia Sweeting # 12679, Officer Petchula Harris # 14851, Deputy Yolanda Canty # 136, and Captain Kelly Lester # 615.

3.   Objections 3(B) and 4(C) are given the headings "Exhaustion Requirement" and "Standards Applicable," respectively, but then raise issues unrelated to those headings. To the extent that these objections could be read to challenge Judge Pitman's findings on the exhaustion requirement and the applicable legal standards, they are far too general to require *de novo* review. In addition, with regard to the exhaustion requirement, Judge Pitman ruled in Plaintiff's favor.

4      Even if the Court were to entertain these new arguments out of deference to Plaintiff's *pro se* status, they would not alter the outcome. Assuming *arguendo* that Plaintiff's arguments about emotional stress, liver treatment, shots, and pills would satisfy the first *Farmer* prong, an unlikely leap, Plaintiff's vague claims of Defendants' failure to follow procedure and regulations would be insufficient to meet the second part of the test—deliberate indifference—upon *de novo* review. "General, conclusory allegations need not be credited, ... when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995). As Judge Pitman details in his Second Report, the allegations in the SAC demonstrate that the Individual Defendants took timely action to alleviate Plaintiff's exposure to the conditions of his cell. (*See* Second Report at 24–25; SAC at 3, continuation of page 3.) This is the exact opposite of deliberate indifference. Moreover, while an allegation of improper training might be relevant to claims against NYCDOC, it should be noted that all claims against that Defendant were dismissed by the Court's Order dated August 10, 2010.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Nolley v. Lord, Not Reported in F.Supp. (1997)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 142 of 301

1997 WL 698170
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Louise K. NOLLEY, #95-G-1061, Debra
Johnson, #94-G-0476, Josephine Rosa, #95-
G-1179, Ramona Gittens, 394-G-0814, Estella
Medina, #94-G-0620, Mary R. Scarpello, #95-
G-1277, and All Similarly Situated, Plaintiffs,
v.
Elaine LORD, Superintendent of Bedford Hills
Correctional Facility, Dr. Griffin, employee
at Bedford Hills Correctional Facility, Nurse
Crum, employee at Bedford Hills Correctional
Facility, Jane and John Doe, of Bedford Hills
Correctional Facility, A. Andrews, Superintendent
of Albion Correctional Facility, Grace Nelson,
Employee at Albion Correctional Facility, John
and Jane Doe, of Albion Correctional Facility,
Bridget Gladwin, Superintendent of Taconic
Correctional Facility, Dr. Rush, employee of
Taconic Correctional Facility and John and Jane
Doe, of Taconic Correctional Facility each in
their official and individual capacity, Defendants.

No. 96 CIV. 1621 (JSM).
|
Nov. 10, 1997.

**Opinion**

MARTIN, JR., D.J.

**\*1** Plaintiffs, Louise K. Nolley, Debra Johnson, Josephine Rosa, Ramona Gittens, Estella Medina and Mary R. Scarpello, bring this § 1983 action against the Superintendents and various employees of the Bedford Hills, Albion and Taconic Correctional Facilities for violations of plaintiffs' constitutional rights during their incarceration at these facilities. The plaintiffs, who are all HIV–positive or have AIDs, allege inadequate medical treatment, failure to provide sanitary housing at the facilities, inadequate access to the law library and a failure to establish a grievance system at the Taconic Correctional Facility. Plaintiffs brought this action *pro se,* but plaintiffs Nolley and Scarpello were represented by counsel in the motion for summary judgment.

## BACKGROUND AND FACTS

In a motion for summary judgment, the nonmoving party must demonstrate that there is a genuine issue as to a material fact. In the instant action, plaintiffs have only submitted their statement of claims and portions of deposition testimony from several of the plaintiffs. The facts, for the purposes of this motion, are taken from plaintiffs' statements and from defendants' unrebutted affidavits.

All the plaintiffs allege similar claims about inadequate and unsanitary conditions at the Bedford Hills, Albion and Taconic Correctional Facilities and claim that their status as HIV–positive inmates makes these unsanitary conditions even more harmful than to the ordinary inmate. Plaintiffs describe broken pipes, windows, toilets and sinks, leaking and steaming radiators, lack of hot water and electrical blackouts as well as vermin infestation from roaches, ticks, cats and cat feces. At Taconic, three showers must be shared by 45 women. Inmates are responsible for cleaning the facilities, but plaintiffs state that they are supplied insufficient cleaning supplies. Plaintiffs also claim that there are inadequate facilities for washing and drying clothes. Clothes must be hand washed and if it is raining, clothes are to be dried in the inmates' cell and sometimes in their lockers where they mildew. Plaintiff Gittens alleges possible asbestos exposure. Plaintiffs Nolley and Scarpello claim they have been denied adequate library access.

All plaintiffs also claim deliberate indifference to serious medical needs. Although all six plaintiffs are HIV–positive or have AIDS, the facts surrounding their medical treatment must be addressed individually. The facts with respect to each individual's medical treatment are set out below. [1]

a. *Plaintiff Louise K. Nolley*

Nolley arrived at Bedford Hills Correctional Facility on July 25, 1995. On July 26, 1995, Nolley was seen by the medical department and got a T.B. test as well as a gynecological screening, blood and urine tests. Nolley alleges that the examining doctor discontinued various medications. At her deposition, Nolley testified that she did receive four of her medications including AZT, but did not receive Motrin and one other medication.

**\*2** Nolley also claims that in August 1995 she developed a cough, visited the nurses' screening three times and received

Nolley v. Lord, Not Reported in F.Supp. (1997)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 143 of 301

cough medicine. She was told that she should see a doctor as soon as possible.

On August 8, 1995, plaintiff complains that Dr. Griffith [2] discontinued medication. Plaintiff did not receive medication for eight days and states that every day she did not receive her AZT, it "took days away from my life." Nolley Comp., at 5; Nolley Dep., at 34.

Plaintiff also claims that she did not receive her medication between August 30, 1995 and September 1, 1995 while she was being transferred from Bedford Hills to Lakeview Shock and then to Albion Correctional Facility. While at Albion, plaintiff again developed a cough and was denied a visit to a doctor. When she returned to nurse's call, complaining of the cough, she was given a T.B. test. Plaintiff Nolley has never had T.B.

On November 17, 1995, Nolley was transferred to the Taconic Correctional Facility and was not given her medications during the eight hour ride. When she arrived, plaintiff received her medicine as prescribed at Albion. On November 20, 1995 plaintiff reported to sick call to complain about blisters and a cough, and was treated by a nurse. On November 30, Nolley returned to the nurse complaining of the same symptoms. No treatment as given, but Nolley was scheduled for a doctor's appointment.

On December 6, 1995, Nolley was seen by HIV specialist Dr. Rush who discontinued Nolley's medications, including AZT and declined Nolley's request that he speak to the Doctor who originally prescribed the medication. Dr. Rush submitted an affidavit stating that he discontinued AZT because in his medical judgment the drug was no longer beneficial to plaintiff. Dapsone and Nizoral were discontinued because Nolley's T-helper count was high enough that such medications were not necessary.

Nolley was returned to Albion Correctional Facility on April 29, 1996. Dr. John Fernandez, the Health Services Director at Albion, has seen and treated plaintiff approximately 45 times since her return. In July and November of 1996, she was referred to the Erie County Medical Center and was seen by an ophthalmologist. No eye disease was detected. Nolley is currently receiving treatment for her HIV–positive condition. On several occasions since May 13, 1996 plaintiff has failed to follow up on prescribed medical care.

### b. *Plaintiff Debra Johnson*

Plaintiff Johnson was admitted to the Taconic Correctional Facility in July 1995. Johnson suffered a rash on her buttocks which she attributed to the unsanitary bathroom conditions. She was given medicine by a nurse and received follow-up treatment from Dr. Koo. The rash worsened. Plaintiff received a stronger medication, but was denied a trip to St. Claire's Hospital. Nurse Crispy helped plaintiff get her own cell which had an individual toilet and sink so plaintiff could insure proper hygiene. Johnson was also treated for a lesion which was diagnosed at Taconic and operated on at St. Agnes Hospital on February 8, 1996.

### *Plaintiff Josephine Rosa*

**\*3** Plaintiff Rosa arrived at Bedford Hills Correctional Facility in August 1995 and received a gynecological screening by Dr. Williams who diagnosed an infection and prescribed antibiotics. Two weeks later, Rosa was transferred to Beacon Correctional Facility and was seen by Dr. Frances, who prescribed medication for a sinus infection. After three months, plaintiff had another gynecological screening and was advised by Dr. Grappi that she was HIV–positive and had precancerous cells on her cervix which needed further testing.

In November 1995, Rosa was transferred to the Taconic Correctional Facility and seen by Drs. Paris, Marcearani, and Dr. Anderson. Dr. Paris referred Rosa to an outside facility for treatment for the cervical lesions. Sometime in April or May of 1996, plaintiff was treated at St. Agnes Hospital.

On January 6, 1995, Rosa was taken to Albany Medical Center to be seen by Dr. Fang, an arthritis specialist. Rosa claims that while at Taconic she was taking 375 milligrams of Naprosyn, but that she needed 500 milligrams. Dr. Fang prescribed 500 milligrams. During her deposition, Rosa admitted that she was not injured by the medical treatments she sets forth in her complaint.

### d. *Ramona Gittens*

Plaintiff Gittens entered Bedford Hills Correctional Facility on June 1, 1994 and did not receive her various medicines until five days later.

In July 1994, plaintiff complained of problems breathing, and of swollen adenoids and lymph glands. Dr. Wormser made her an appointment with a doctor at St. Agnes who recommended plaintiff have her adenoids removed. During her deposition,

Nolley v. Lord, Not Reported in F.Supp. (1997)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 144 of 301

Gittens stated that she did have the operation and that her condition subsequently improved. Gittens also alleges that Dr. Wormser removed her from her T.B. medicine three and a half months too soon. Plaintiff never became ill with T.B.

In August 1994, plaintiff was prescribed antibiotics for various infections. Gittens visited Dr. Williams several times and was repeatedly given the same medication. Plaintiff alleges that the failure to better treat the infections resulted in her hospitalization. During her hospitalization Gittens was successfully treated for the infections.

In January 1995, Gittens was transferred to Albion Correctional Facility and was only given a portion of her medications and was not seen by a doctor. Gittens was advised by her counselor at Albion that if she agreed to an administrative move she could be transferred to Taconic where all her medical needs could be met.

Gittens also complains that, while at Albion, she was programmed to jobs requiring her to carry heavy boxes and work eight hour shifts in cold weather conditions. Plaintiff did see a physician's assistant, who informed her he would get her long johns and proper clothing for the winter weather. Dr. Fernandez signed the forms necessary for her to receive the clothing.

Gittens also claims that while at Albion her medical confidentiality was breached when an unnamed nurse advised various correction officers and plaintiff's counselor and business teacher about her HIV–positive status.

**\*4** In March 1995, Gittens was transferred to Taconic Correctional Facility. Plaintiff went to nurse's call the day after her transfer and began receiving the same medications she was receiving at Albion. She was also placed on the doctor's list and saw Dr. Koo, the Health Services Director at Taconic, three weeks later. Dr. Koo prescribed medication and referred plaintiff to St. Agnes Hospital to visit a gynecological specialist, who she saw twice. Gittens was sent two more times to St. Agnes, once to be treated for an adenoid problem and once for a biopsy because of her enlarged lymph nodes.

On May 5, 1995, Gittens was admitted to St. Claire's Hospital for 14 days and received a battery of tests, including blood tests, x-rays, brain scans, cat scans and an EKG. One week later, Gittens was admitted to St. Agnes where she received laser surgery.

Plaintiff returned to St. Claire's to see a gynecologist in November 1995 and was prescribed an antibiotic. There was a nine day delay before plaintiff received this medicine because plaintiff refused to be examined by Dr. Paris at Taconic. When the medicine was prescribed, it was only for seven days instead of 14, although Dr. Gram, an HIV specialist subsequently ordered the remaining seven days of the prescription.

On October 16, 1995, plaintiff became ill and was taken the next morning to St. Claire's Hospital where she stayed for ten days being treated for various infections. Plaintiff was again examined by Dr. Koo at Taconic in November 1995. In December 1995, plaintiff was given AZT and Zerit.

### e. *Plaintiff Mary Scarpello*
On October 3, 1995, Scarpello was transferred from Bedford Hills Correctional Facility to Taconic Correctional Facility. During her incarceration she was ill with the flu, and suffered from back pains and a skin rash. Scarpello has been treated for all of these conditions.

### DISCUSSION
Currently before the Court is defendants' motion for summary judgment. Federal Rule of Civil Procedure 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993 (1962).

### I. Claims of Deliberate Indifference to Serious Medical Needs
In reviewing the plaintiffs' claims, role of the Court is to protect the constitutional rights of the prisoners, but not to substitute its judgment for that of the prison administrators. *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807 (1974).

In order to prevail on their claim that defendants violated plaintiffs' eighth amendment right to be free of cruel and

Nolley v. Lord, Not Reported in F.Supp. (1997)

Case 9:18-cv-00391-LEK-TWD    Document 70    Filed 04/23/20    Page 145 of 301

unusual punishment, plaintiffs must show that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104–06, 94 S.Ct. 285, 291–92 (1976). As detailed above, plaintiffs received more than adequate care.

**\*5** Plaintiffs Rosa, Gittens and Scarpello admitted in their depositions that they had suffered no physical injuries from the treatments they received. Plaintiff Nolley did allege injury. She claims that she suffered "stress and anxiety," and that days were taken from her life when she was taken off AZT. The law is clear, however, that a difference of opinion as to the appropriate medical care for an inmate will not for a basis for a finding of deliberate indifference. *Id.* at 106, 97 S.Ct. at 292. Even a showing that a doctor has been negligent in treating an inmate does not constitute a constitutional violation. *Id.; see also Bryant v. Maffucci,* 923 F.2d 979, 984–85 (2d Cir.1991).

Even if plaintiffs had shown a serious medical need, on the undisputed facts before this Court, plaintiffs have not made a sufficient showing of a culpable state of mind on the part of the prison officials. As the facts above demonstrate, on each occasion that plaintiffs visited nurse's call, they were treated. Some or many of the treatments given were not to plaintiffs' satisfaction, nonetheless, no urgent medical need went unattended. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1990) (citing *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990). To the contrary, plaintiffs saw immune deficiency specialists, were treated by outside doctors and underwent extensive testing in outside facilities when necessary.

Plaintiffs have failed to show deliberate indifference to serious medical needs, therefore, defendants were entitled to summary judgment against all plaintiffs on that claim.

II. Unsanitary Conditions at Various Correctional Facilities
The Eighth Amendment imposes "constitutional limitation upon punishments: they cannot be 'cruel and unusual.' " *Rhodes v. Chapman,* 452 U.S. 337, 345, 1001 S.Ct. 23392, 2398 (1981). Conditions that are "restrictive and even harsh" are not necessarily unconstitutional. *Id.* at 347, 1001 S.Ct. at 2399.

As with claims of inadequate medical treatment, in order for conditions of confinement to constitute a violation of the Eighth Amendment, they must satisfy a two-part test comprising of both an objective and subjective element.

*Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991). Conditions violate the objective component if they result "in unquestioned and serious deprivations of basic human needs ... [or] deprive inmates of the minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 347, 1001 S.Ct. at 2399; *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds,* 441 U.S. 520, 99 S.Ct. 1861 (1979). The subjective element requires that the conditions be imposed with deliberate indifference to the prisoner's well-being. *Wilson,* 501 U.S. at 303, 111 S.Ct. at 2326–27.

Plaintiffs' claims of violative conditions of confinement include allegations of malfunctioning plumbing and heating systems, unsanitary conditions created by unclean facilities, insufficient cleaning supplies, insufficient laundry facilities and vermin infestation.

**\*6** Plaintiffs state that the facilities have leaking and steaming radiators, and broken pipes, windows, toilets and sinks. Plaintiffs' allegations are general in nature and do not state with any specificity the number of broken windows, radiators or toilets, nor do plaintiffs allege with any specificity injuries they suffered as a result of these conditions. Defendants contest the accuracy of plaintiffs' claim and submit the affidavit and inspection reports of Robert F. O'Connor, the Supervisor of the Department of Laundry and Housekeeping Services.[3]

Even if the conditions alleged by plaintiffs constituted an eighth amendment violation, plaintiffs have failed to make a showing of deliberate indifference on the part of prison officials. *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 2480 (1993). A prison official demonstrates deliberate indifference to prison conditions if he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979. Plaintiffs have offered no evidence that officials disregarded conditions posing a substantial risk of serious harm.

As plaintiffs points out, they have filed many grievances with respect to the conditions at Taconic, but as the record also reflects, numerous work orders were filled out and

problems remedied as a result of these complaints. *See* Plaintiff's Memo., Ex. A. The fact that a building needs maintenance and repair, and that those repairs are undertaken, is not sufficient to satisfy the subjective element required for an eighth amendment claim that prison officials acted with deliberate indifference to an inmates' substantial needs.

*Farmer,* 511 U.S. at 845, 114 S.Ct. at 1983 ("Prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause").

Plaintiffs also claim that as a result of the broken windows, faulty heating and prison life in general they have suffered more colds and flus. The threat that poses to them as HIV–positive inmates must be of concern to prison officials. Plaintiffs, however, have failed to show that officials acted in disregard of that concern. Plaintiffs themselves document the extensive medical treatment they received.

The record is clear that the cleanliness of the bathrooms and living areas is the responsibility of the inmates and, absent some action or lack of action on the part of prison officials, plaintiffs have not shown deliberate indifference by the officials. Plaintiffs make conclusory allegations that the cleaning supplies provided are inadequate; yet defendants have provided evidence that adequate cleaning supplies have been provided, consistent with Department of Corrections regulations. O'Connor Aff., Ex. A. Plaintiffs have failed to allege specifically in what way the supplies are inadequate. Similarly, plaintiffs' claim of inadequate facilities to dry prisoner laundry does not rise to an eighth amendment violation.

**\*7** Finally, plaintiffs do raise the troubling problem of vermin infestation and claim that as HIV–positive inmates they are at risk for their lives from exposure to Lyme disease bearing ticks and toxoplasmosis from cat feces. With the exception of plaintiff Gittens, plaintiffs do not make specific allegations about the numbers of these creatures or even where they are seen. Gittens does specifically allege tick, flea and cat infestation in the basement of Building #71 at the Taconic Correctional Facility, but she also details the efforts made by prison officials to exterminate that area. None of the plaintiffs have been afflicted with either Lyme disease or toxoplasmosis. As plaintiffs rightly point out, it is not necessary for disaster to strike before there exists a violation of the prohibition of cruel and unusual punishment.

*Helling,* 509 U.S. at 33, 113 S.Ct. at 2480. Nonetheless, allegations of the mere presence of roaches, ticks and cats,

with no evidence to rebut defendants' affidavits that prison officials have taken measures to address these problems, do not rise to deliberate indifference on the part of prison officials.

Plaintiffs claim that the inadequate conditions at Taconic Correctional Facility were exacerbated by the lack of a grievance procedure at the facility. There is no constitutional right to a grievance procedure. In addition, defendants' have presented the affidavit of Jim Farrell, the Inmate Grievance Program Coordinator with New York State Department of Correctional Services for the Southern Region of New York. According to his affidavit, Taconic maintained a grievance procedure in substantial compliance with New York State Corrections Law § 139. For a period of 18 months Taconic was without a civilian grievance program supervisor because that person was on extended sick leave. During this period the grievance program office was opened during normal business hours and the record reflects that inmates were indeed filing grievance reports. Plaintiffs have not put this fact in dispute.

For all the reasons stated above, the conditions of confinement at the Bedford Hills, Albion and Taconic Correctional Facilities, taken separately or in their totality, do not subject inmates to constitutionally-prohibited cruel and unusual punishment. Therefore, defendants' motion for summary judgment against all plaintiffs' claims of unsanitary conditions is granted.

### III. Inadequate Access to the Law Library

Plaintiffs Nolley and Scarpello also claim inadequate access to the Taconic Correctional Facility Law Library. Inmates have a fundamental right of access to the courts which requires "prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491 (1977). Plaintiffs allege they have been denied sufficient access to the library because there are certain times when clerks are aiding a fixed number of prisoners, and those researching on their own are not allowed to use the library. Defendants have submitted the affidavit of Jose Morales, Deputy Superintendent and Law Library Administrator, as well as the log book for March 9, 1995—March 27, 1996. The log book documents the frequent access Nolley and Scarpello had to the law library and shows that they have been provided adequate library access. *See also* *Flittie v. Solem,* 827 F.2d 276, 280 (8th

**Nolley v. Lord, Not Reported in F.Supp. (1997)**

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 147 of 301

Cir.1987) (regulations may prevent domination of law library by individual inmates).

 **\*8** Plaintiff Nolley's claim that the Taconic Correctional Facility law library is insufficient because there is no typewriter, pencil sharpener, correcting materials and books needed for research is also denied. Nolley admits that there is a typewriter and fails to dispute the facts presented by the Morales affidavit that the library is adequately stocked.

IV. Plaintiff Scarpello's Claim to a Job as Law Library Clerk Scarpello also claim that she was denied a job in the law library, although she was very qualified. New York State law does not give a prisoner any statutory, regulatory or precedential right to a prison job. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987). Therefore, a prisoner has no liberty or property interest in such employment. Accordingly, Scarpello's claim that she was unconstitutionally denied employment as a law library clerk must be dismissed.

For the reasons stated above, defendant's motion for summary judgment is granted in its entirety and plaintiffs' complaint is dismissed.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1997 WL 698172

## Footnotes

1    Plaintiff Estella Medina singed the complaint, but submitted no statement of claim nor asserts any individual injuries.
2    Plaintiffs refer to her as Dr. Griffin.
3    Defendants submitted Health & Sanitation Audits of the Bedford Hills Correctional Facilities for July 1995 and July 1996 and of the Taconic Correctional Facilities for July 1996, July 1996 and March 1997. During both inspecting at Bedford Hills, Mr. O'Connor evaluated the inmates' cleaning effectiveness, quantity of supplies, the facilities' pest management program, their procedures for laundering inmate clothing and bedding and the general state of upkeep of the facilities. Some infractions were flagged for improvement, but the report notes that "no unsanitary conditions were found to exist in any location." Sanitation & Hygiene Audit of July 24, 1995 and July 12, 1996.
     In all Audits at Taconic, no unsanitary conditions were found and the 1997 report states specifically that "no pest control problems were reported or observed during the two day audit process." Sanitation & Hygiene Audit of March 3 & 4, 1997.
     Defendants also submit test results showing no asbestos at the Taconic Correctional Facility.

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2426021
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Anthony W. SUMMERVILLE, Plaintiff,
v.
Eileen FACIUNA, Joseph Tan,
and J. Berbary, Defendants.

No. 05–CV–6459 (CJS).
|
Aug. 6, 2009.

**Attorneys and Law Firms**

Anthony W. Summerville, Gouverneur, NY, pro se.

Gary M. Levine, A.A.G., New York State Office of the
Attorney General, Rochester, NY, for Defendants.


DECISION and ORDER

CHARLES J. SIRAGUSA, District Judge.


**INTRODUCTION**

**\*1** **Siragusa, J.** This is an action by pro se Plaintiff, a
prison inmate, brought under 42 U.S.C. § 1983, asserting
Eighth Amendment claims of inadequate medical care and
inadequate conditions of confinement. Now before the Court
is Defendants' Motion for Summary Judgment. (Docket # 24.)
For the reasons set forth below, Defendants' motion is granted.


**BACKGROUND**

Unless otherwise noted, the following are the undisputed
facts of this case viewed in the light most favorable
to Plaintiff. At all relevant times, Anthony Summerville
("Plaintiff") was a prison inmate in the custody of the New
York State Department of Correctional Services ("DOCS").
(Am.Compl.¶ 2.) On September 7, 2005, Plaintiff filed a
Complaint against four individuals who, at all relevant times,
were employed by DOCS at Collins Correctional Facility
("Collins"): Superintendent J. Berbary ("Berbary"), Jospeh

Tan, M.D. ("Tan"), Nurse Elieen Faciuna ("Fucina") [1], and
Sergeant Polike ("Polike"). (Compl. ¶ 3; Am. Compl. ¶¶ 4–6.)

Around 1:40 a.m. on July 14, 2005, Plaintiff awoke in
distress because of what felt like an insect inside his ear.
(Am.Compl.¶ 1.) Plaintiff screamed in pain, and his cell-mate
called for assistance. (Id.) Plaintiff spoke with a Sergeant,
who directed two correction officers to escort Plaintiff to the
bull pen until Nurse Fucina could see him. (Id.) When Nurse
Fucina examined Plaintiff, she told him there was no bug
in his ear and suggested that he had stuck something in his
ear. (Am.Compl.¶ 4.) Plaintiff continued to experience pain
and begged Nurse Fucina to flush the bug out of his ear.
(Am.Compl.¶ 5.) Nurse Fucina refused and told the correction
officers to escort Plaintiff back to his cell. (Id.)

Plaintiff refused to be put back in his cell. (Am.Compl.¶
7.) According to Plaintiff, one of the correction officers told
Nurse Fucina that he might really have a problem because
he refused to go back in his cell. (Id.) The correction officer
put Plaintiff in the bull pen until he could see a doctor at
Erie County Medical Center ("ECMC") via teleconference
("Telemed"). (Id.) Before Plaintiff could consult with the
doctor, he again begged Nurse Fucina to re-examine his ear
because he felt dizzy, had trouble hearing, and felt severe
pain. (Am.Compl.¶ 8.) Plaintiff alleges that Nurse Fucina
accused him of faking his distress and refused to provide any
assistance to Plaintiff. (Am.Compl.¶ 9.)

Nurse Fucina, however, states in her declaration that she
examined Plaintiff's ear several times and made multiple
attempts to get a consultation for Plaintiff. (Fucina Decl. ¶¶ 3–
7, Ex. A.) Plaintiff's medical records show that Nurse Fucina
observed and noted that his left ear drum was bulging and
red. (Fucina Decl., Ex. A.) Furthermore, Plaintiff admits that
Nurse Fucina examined his ear. (Pl.'s Dep. 15:18–19.) At 6:40
a.m., she gave Plaintiff Tylenol to alleviate the pain. (Fucina
Decl. ¶ 6; Tan Decl., Ex. A.) Contrary to Plaintiff's assertions
that Nurse Fucina did not consult other medical staff (Pl.'s
Resp. ¶ 5), she notified the on-call physician, Dr. Bangsil, who
ordered an ECMC consult via Telemed (Fucina Decl. ¶ 4; Tan
Decl., Ex. A). Nurse Fucina made four attempts to connect
with ECMC via Telemed. (Fucina Decl. ¶ 5 .) [2]

**\*2** Nurse Fucina, though, was unable to connect with ECMC
via Telemed. (Id.) Consequently, she notified the Nurse
Administrator of the connection problem. (Fucina Decl. ¶ 7.)
At 7:10 a.m., the Nurse Administrator obtained authorization
for Plaintiff's transport to ECMC. (Fucina Decl., Ex. A.) The

Patient Referral Form notes that the reason for referral was "c/o a bug flew in his L ear while sleeping & felt something inside ... bulging 'RED' tympanic membrane [ ] scant amount of bleeding & c/o muffled hearing from L ear. Denies any dizziness." (Tan Decl., Ex. A.)

The following represents Plaintiff's account of his visit to the ECMC emergency room ("ER"). (*See* Am. Compl.) Two doctors at ECMC looked in Plaintiff's ear and said they saw a bug. (Am.Compl.¶ 19.) One of the doctors attempted to flush it out but could not. (*Id.*) The doctor said if the ear had been irrigated promptly, it would not have swollen and trapped the bug inside. (*Id.*) Correction Officer Gill ("Gill") was present for Plaintiff's examination. (*Id.*) The doctor told Gill to report back to medical staff that he was unable to remove the bug due to the swelling and that Plaintiff should be sent to an ear, nose, and throat specialist ("ENT") if he continue to experience pain, dizziness, or loss of hearing. (Am.Compl.¶ 20.) The doctor gave Plaintiff an antibiotic to prevent infection of his ear. (Am.Compl.¶ 19.) The doctor also stated that any complaint of hearing loss warrants referral to an ear specialist within seventy-two hours. (Am.Compl.¶ 20.)

However, the ER physician's report, which was sent back to the prison, does not show any of the instructions Plaintiff claims were given. Rather the ER report states:

*Diagnosis:* Left Ear Pain

*Medications/Changes:* [illegible] Take As Directed

*Patient Instructions:* Please—Follow Up With Facility Doctor In 5 Days. Take Medication As Instructed—Return To ER For Any Concerns—Fever, Dizziness

(Pl.'s Resp., Attach. 2.)

Five days later, on July 19, 2005, Dr. Tan followed these instructions and reexamined Plaintiff's ear. (Pl.'s Resp., Attach. 2.) Plaintiff still complained that the bug in his ear impeded his hearing. (Am.Compl.¶ 23.) Plaintiff alleges that during this examination, Dr. Tan killed a fly and said, "look Summerville, the bug jumped out of your ear." (Am.Compl.¶ 21.) Although Plaintiff also maintains that Dr. Tan refused Plaintiff's request to see an outside physician (Am.Compl.¶ 21), on that same day, July 19, 2005, Dr. Tan submitted a request for consultation form (Pl.'s Resp., Attach. 2). In the referral form, Dr. Tan noted that the reason for consultation was, "pain[f]ul mass growing left ext auditory canal causing

conductive hearing loss ... initially, inmate thought it was a bug that went inside left ear [ ] no bug was recovered." (*Id.*)

On July 21, 2005, Dr. Tan's request for consultation was approved. (*Id.*) Before that consultation took place, Dr. Tan prescribed Plaintiff three different kinds of medication, and nurses checked his ear every day. (Am.Compl. ¶ 25.) The nurses always stated that they did not see anything in Plaintiff's ear. (*Id.*) On August 2, 2005, Plaintiff saw an ENT specialist, Dr. Beverly Prince ("Prince"), who removed a Japanese beetle from his ear, ordered a hearing test, and recommended a follow-up in two weeks. (Pl.'s Resp., Attach. 2.) Further, Dr. Prince noted that she was not able to get a few of the beetle's appendages out of Plaintiff's ear. (*Id.*) In accordance with Dr. Prince's instructions, Dr. Tan immediately referred Plaintiff for a hearing test. (*Id.*) Plaintiff received a hearing test later that same day. (*Id.*) The doctor performing the hearing test noted, "unreliable audiogram L ear [ ] follow up w/ Dr. Prince as ordered." (*Id.*) [3]

**\*3** On August 3, 2005, the day after Plaintiff's outside consultation, Dr. Tan requested a follow-up consultation for Plaintiff, in accordance with Dr. Prince's orders. (*Id.*) On August 23, 2005, Plaintiff had his follow-up appointment with Dr. Prince. (Tan Decl., Ex. A.) In the report, Dr. Prince wrote:

*Physical Exam:* ... drum is somewhat swollen. There is a small remnant attached to the drum that I am not removing.

*Assessment and Plan:* The hearing test shows normal thresholds and they felt it was unreliable because there was blood. The plan is to let the remnant [of the Japanese beetle] sluff off. Keep the ear dry.

*Follow-up:* To see the patient back in one month.

(*Id.*) Again, Dr. Tan put in a referral request for Plaintiff to have another follow-up appointment with Dr. Prince. (*Id.*) However, this request was denied on the ground that facility staff could adequately monitor Plaintiff's condition. (*Id.*) If Plaintiff's condition did not improve, then the review committee would reconsider a request for outside consultation. (*Id.*)

On October 28, 2005, Dr. Tan again requested a referral because Plaintiff continued to complain about his ear. (*Id.*) Dr. Tan wrote, "inmate still has foul smelling discharge from left ear in spite of [medications prescribed] 4 drops 4 times a day." (*Id.*) He also noted that Plaintiff "still c/o pain and inability to hear [ ] same soft tissue mass obstructing

incompletely left ext auditory canal [ ] chronic otitis externa, soft tissue mass left ear .... " (*Id.*)

On or around November 9, 2005, Plaintiff was transferred to Wende Correctional Facility ("Wende"). (*Id.*) Per Dr. Tan's request, Plaintiff saw Dr. Prince on November 22, 2005, who reported:

> *History of Present Illness:* ... He is still complaining that he can't hear and has a foul smell and it hurts.
>
> *Physical Exam:* The ear exam is basically normal. The drum is intact. You can see that there was use of eardrops in the past.
>
> *Assessment and Plan:* The patient is to keep the ear absolutely dry and we are to get a hearing test. If the hearing test is normal, there is no more concern. As far as his otalgia I can't be sure what he is talking about.

(*Id.*) Following Dr. Prince's advice, a doctor at Wende requested a referral for Plaintiff to receive another hearing test. (*Id.*) On December 20, 2005, Plaintiff received another hearing test. (*Id.*) Although the results for his left ear were "inconsistent" and "unreliable" (Tan Decl., Ex. A), they fell within normal limits (Tan Decl. ¶ 15).

In addition to his inadequate medical treatment claim, Plaintiff alleges that his constant exposure to insects in his cell gives rise to conditions of confinement that violate the Eighth Amendment. (Am.Compl.¶¶ 27–37.) Specifically, he alleges that from March 2005 to November 2005, he was forced to inhabit an infested cell. (Am.Compl.¶ 28.) Plaintiff maintains that Superintendent Berbary had a responsibility to maintain sanitary conditions in Collins. (Am.Compl.¶ 27.) However, Plaintiff insists he never saw any indications that his cell or the correction officers' area was treated by an exterminator. (*Id.*) Further, Plaintiff states that if an exterminator treated his cell, he never received a mask to protect him from the fumes. (Am.Compl.¶ 28.) Plaintiff also alleges that the window screens had large holes that allowed bugs to come into his cell. (Am.Compl.¶ 29.) He notes that bugs also came in through the cracks around the door and holes or cracks in the wall. (*Id.*)

**\*4** Defendant Berbary states that he responded to Plaintiff's complaints of insect infestation by having the cell exterminated and ordering a new window screen. (Berbary Decl. ¶¶ 5, 8.) According to the grievance that Plaintiff filed on July 14, 2005, the day the bug flew in Plaintiff's ear, he was housed in cell OS–B–1. (Pl.'s Resp., Attach. 2.) By July

19, 2005, Plaintiff had moved to cell OS–A2–36 because he listed that cell in a grievance filed on that date. [4] (*Id.*) On July 20, 2005, cell OS–A2–36 was sprayed by a professional exterminator. (Berbary Decl. ¶ 5.) Furthermore, on July 25, 2005, the Superintendent's Deputy sent Plaintiff a memo informing him that his cell had been exterminated. (Berbary Decl., Ex. B.)

On August 4, 2005, Plaintiff again wrote to the Superintendent complaining about the bugs in his cell. (Berbary Decl., Ex. C.) On August 8, 2005, Superintendent Berbary issued a memo ordering that a new screen be installed "ASAP" in cell 0S–A2–36. (Berbary Decl., Ex. D.) Plaintiff was sent a copy of this memo as well. (*Id.*) In his deposition, Plaintiff acknowledged that workmen came to cell OS–A2–36, inspected the screen, and determined it worked perfectly. (Pl.Dep.32:11–19.) Furthermore, Plaintiff agreed that the screen did not need to be fixed. (*Id.*)

By Order of December 5, 2005, the Court dismissed the claims against Sergeant Polike with prejudice. (Docket # 3.) In lieu of an answer, Defendants filed a motion to dismiss all claims against Berbary and the claims against Tan and Fucina in their official capacities. (Docket # 5.) On July 10, 2006, the Court dismissed the claims against the remaining Defendants in their official capacities, but not the claims against them in their individual capacities. (Docket # 7.) By leave of the Court, Plaintiff filed an Amended Complaint. (Am.Compl.) In the Amended Complaint, Plaintiff alleges that Superintendent Berbary negligently managed the prison (Am.Compl.¶ 4); Nurse Fucina delayed medical care and misdiagnosed Plaintiff's ailment (Am.Compl.¶ 5); and Dr. Tan delayed treatment, misdiagnosed Plaintiff's problem, and treated him with deliberate indifference (Am.Compl.¶ 6).

On March 12, 2007, Defendants filed the subject motion for summary judgment. (Docket # 24.) Defendants maintain that Plaintiff's medical condition was not sufficiently serious because there is no medical evidence that it would result in death, degeneration, or extreme pain. (Defs.' Mem. 8.) Defendants also state that they were not deliberately indifferent because Plaintiff received sufficient medical treatment for all his complaints. (*Id.*) As to the conditions of confinement claim, Defendant Berbary maintains that all of Plaintiff's complaints were addressed "in an appropriate and timely fashion." (*Id.* at 11.) Furthermore, Defendants state that they were not aware of an excessive risk to Plaintiff's health or safety. (*Id.*) In any event, Defendants argue that they are entitled to qualified immunity. (*Id.* at 12.) Finally,

Defendants note that Plaintiff cannot seek compensatory damages because he has not presented any evidence of physical injury as a result of Defendants' conduct. (*Id.*) Accordingly, they state that only nominal damages should be considered for any claims that survive summary judgment. (*Id.* at 15.)

**\*5** Plaintiff responded by stating that Defendants failed to properly diagnose his condition, caused a delay in his treatment, and failed to treat him in a professional manner. (Pl.'s Resp.) Further Plaintiff claims that Defendants' conduct was designed to cover up Nurse Fucina's initial mistake of not seeing the Japanese beetle in Plaintiff's ear. (Pl.'s Resp. 7.) Plaintiff again states that Defendants did not exterminate his cell and did not fix his screen. (Pl.'s Resp. 5.) However, even if Defendants did exterminate his cell, Plaintiff maintains that he was exposed to toxic chemicals because he never received a mask to protect him from the fumes. (*Id.*) Either way, he claims these conditions of confinement constitute cruel and unusual punishment. (*Id.*)

## ANALYSIS

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir.2001). Where the non-moving party will bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

Once that burden has been met, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed.R.Civ.P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Anderson,* 477 U.S. at 248–49; *Doe v. Conn. Dep't of Pub. Safety ex rel. Lee,* 271 F.3d 38, 47 (2d Cir.2001), *rev'd on other grounds,* *Conn. Dep't of Pub. Safety v. Doe,* 538 U.S. 1 (2003).

"Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Conroy v. New York State Dep't of Corr. Servs.,* 333 F.3d 88, 94 (2d Cir.2003). Rather, evidentiary proof in admissible form is required. Fed.R.Civ.P. 56(e). "[W]here there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial and cannot defeat a motion for summary judgment." *Salahuddin v. Goord,* 467 F.3d 263, 281 (2d Cir.2006) (citing *Celotex,* 477 U.S. at 322–32).

**\*6** Since Plaintiff is proceeding pro se, the Court must construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Furthermore, because opposing a summary judgment motion can be complicated, either the district court or the moving party must supply a pro se litigant with notice of the requirements of Rule 56. *Irby v. New York City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001). On October 16, 2007, the Court sent Plaintiff notice pursuant to *Irby.* (Docket # 39.)

### Plaintiff's Inadequate Medical Treatment Claims

The Supreme Court has noted that "the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat 'a prisoner's serious illness or injury' resulting in the infliction of unnecessary pain and suffering." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Estelle v. Gamble,* 429 U.S. 97, 105 (1976)). However, "mere negligence in diagnosis or treatment is insufficient to state a valid Eighth Amendment claim and [ ] 'medical malpractice does not become a constitutional

violation merely because the victim is a prisoner.' " *Id.* (quoting *Estelle,* 429 U.S. at 105–06). There are two prongs to the test for determining whether inadequate medical care rises to the level of "deliberate indifference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). First, using an objective standard, the court must find that the alleged deprivation of care is "sufficiently serious." *Id.* Second, using a subjective standard, the court must find that the defendant acted with a "sufficiently culpable state of mind." *Id.*

The proper inquiry for the objective "sufficiently serious" test is (1) whether there was an actual deprivation of adequate medical care and (2) whether the inadequacy of the care is sufficiently serious. *Salahuddin,* 467 F.3d at 279–80. To prove that the inadequacy of care was sufficiently serious, the prisoner must show "that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (quoting *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998)). Furthermore, "only 'deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.' " *Salahuddin,* 467 F.3d at 279 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Prison officials "cannot be found liable under the Cruel and Unusual Punishments Clause," if they acted reasonably in response to the inmate's health concern. *Id.* (finding it unreasonable to postpone prisoner's *Hepatitis C* treatment for five months).

Under the second prong of the test for inadequate medical care, the court must determine whether the official acted with "deliberate indifference" to the prisoner's medical needs. *Chance,* 143 F.3d at 702. As the Supreme Court has explained, a prisoner cannot state a valid Eighth Amendment claim merely by alleging negligence in diagnosis or treatment. *Estelle,* 429 U.S. at 105–06. As the Court further noted, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan,* 511 U.S. 825, 838–40 (1994) (adopting criminal law standard of subjective recklessness to determine deliberate indifference under the Eighth Amendment).

**\*7** Generally, in cases involving delayed care, the Second Circuit has reserved a finding of deliberate indifference for extreme cases, such as: ignoring a life-threatening and fast-degenerating condition for three days, *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990); delaying care as a form of punishment, *Archer v. Dutcher,* 733 F.2d 14, 16–17 (2d Cir.1984); or delaying major surgery for over two years, *Hathaway v. Coughlin,* 841 F.2d 48, 50–51 (2d Cir.1988).

Defendants maintain that Plaintiff's condition was not sufficiently serious to meet the objective test under the Eighth Amendment. (Defs.' Mem. 8.) Even assuming, for the sake of this motion, that Plaintiff's condition was sufficiently serious, Plaintiff still has to show that he was denied adequate medical care and that the deprivation was sufficiently serious. *See Salahuddin,* 467 F.3d at 279–80 (noting that a "serious medical condition" is only one factor in determining whether the deprivation of care was sufficiently serious). Plaintiff cannot complain that he was completely denied treatment for his ear problem. Even though Tan and Fucina did not agree with Plaintiff's self-diagnosis, they agreed that there was something wrong with his ear. (*See* Fucina Decl. ¶ 3; Tan Decl., Ex. A.) The record clearly shows that Defendants did not ignore Plaintiff's complaints. (*See* Pl.'s Resp., Attach. 2; Tan Decl., Ex. A.) Indeed, they sent him to the emergency room and to see a specialist on several occasions. (Pl.'s Resp., Attach. 2; Tan Decl., Ex. A.) Plaintiff complains that Nurse Fucina and Dr. Tan should have seen the Japanese beetle in his ear. (Pl.'s Resp. ¶ 4.) However, the fact that they referred Plaintiff to outside physicians suggests that at most, they misdiagnosed his condition. Negligent misdiagnosis does not rise to the level of an Eighth Amendment violation. *See Estelle,* 429 U.S. at 105–06; *Smith,* 316 F.3d at 184.

Consequently, the only possible inadequacy of the care Plaintiff received was a delay in treatment or the denial of a second follow-up appointment. On July 14, 2005, Plaintiff awoke in distress around 1:40 a.m. (Am.Compl.¶ 1) but did not get to ECMC until close to 10 a.m. (Tan Decl., Ex. A). However, the record shows that during that time, Nurse Fucina actively tried to provide Plaintiff with adequate care. (*See* Fucina Decl.; Pl.'s Resp., Attach. 2.) Nurse Fucina made multiple attempts to follow the instructions of the on-call physician to get an ECMC physician to consult with Plaintiff via Telemed. (Fucina Decl. ¶¶ 4–6.) When the Telemed attempts failed, Nurse Fucina contacted the Nurse Administrator, who arranged for Plaintiff to go directly to

ECMC. (Fucina Decl. ¶ 7.) During this period between Plaintiff's initial complaint and the time he went to ECMC, Nurse Fucina examined his ear and provided him with medication to alleviate his pain. (Fucina Decl. ¶¶ 3, 6.) Furthermore, the delay of eight hours for Plaintiff to see a physician, hardly rises to the same level of seriousness as the delays in *Liscio* and *Hathaway*. 🚩 *Liscio,* 901 F.2d at 277 (ignoring a life-threatening and fast-degenerating condition for three days); 🔖 *Hathaway,* 841 F.2d at 50–51 (delaying major surgery for over two years).

**\*8** As to the effects of this delay in treatment, Plaintiff states that one of the ER doctors told him the delay resulted in swelling that trapped the bug inside Plaintiff's ear. (Am.Compl.¶ 19.) However, the ER doctor's report does not indicate that the bug still needed to be removed. (Tan Decl., Ex. A.) It merely states that Plaintiff was diagnosed with "left ear pain," and he should take his prescribed medications, follow up with the facility doctor in five days, and return to the ER with any concerns such as fever or dizziness. (*Id.*) Five days later, on July 19, 2005, Dr. Tan followed the ER doctor's instructions and re-examined Plaintiff. (*Id.*)

Despite Plaintiff's original allegation that he was denied access to an outside physician (Am.Compl.¶ 21), the record clearly shows that Plaintiff was referred for several outside consultations (Pl.'s Resp., Attach. 2; Tan Decl., Ex. A). After these consultations, the facility medical staff routinely followed the instructions of the outside physicians.[5] Plaintiff also complains of the delay in getting him to an outside specialist. (Am.Compl.¶ 25.) When Dr. Tan examined Plaintiff on July 19, 2005, he immediately put in a request for an outside consultation. (Tan Decl., Ex. A.) On July 21, 2005, the review committee approved Dr. Tan's request. (*Id.*) It's not clear from the record why Plaintiff did not get to see Dr. Prince until August 2, 2005. However, by Plaintiff's own admission, nurses checked his ear every day, and Dr. Tan prescribed him three kinds of medication for his ear problem. (Am.Compl.¶ 25.) A fourteen-day wait for outside consultation regarding a condition that was neither life-threatening nor fast-degenerating does not meet the sufficiently serious standard, especially when Plaintiff received treatment and monitoring throughout that period.

Similarly, the denial of a second follow-up appointment with Dr. Prince does not meet the standard for a sufficiently serious deprivation of adequate medical care. In response to Defendants' motion, Plaintiff suggests that he should have

been allowed this follow-up because there were still bug legs in his ear. (Pl.'s Resp. ¶¶ 12–13.) The record shows, though, that Dr. Tan followed Dr. Prince's recommendation to let the remnants of the beetle sluff off on their own. (Tan Decl., Ex. A.)

While a delay in care may sometimes meet the "sufficiently serious" standard, in this case it does not. *See* 🔖 *Salahuddin,* 467 F.3d at 281. Even assuming that Plaintiff's medical condition was sufficiently serious, Plaintiff has failed to show that objectively, the delay in seeing outside physicians or the denial of a second follow-up appointment constitute a sufficiently serious deprivation of adequate medical care. Plaintiff may not have received the care he wished for and Defendants may have failed to correctly diagnose his problem, but they did not deny him medical treatment or access to outside medical care. When outside physicians gave their opinions and recommendations, Dr. Tan followed them.

**\*9** Moreover, Plaintiff fails to meet the subjective standard because he has not pointed to admissible evidence showing that Defendants deliberately disregarded a risk to Plaintiff's health. Indeed, far from disregarding Plaintiff's condition, Defendants sought second opinions when Plaintiff complained about his ear.

Therefore, given that Plaintiff has not met either the objective standard or the subjective standard under the Eighth Amendment, his claim for inadequate medical treatment fails.

### *Plaintiff's Conditions of Confinement Claim*

To determine whether prison conditions violate the Eighth Amendment's prohibition on cruel and unusual punishment, the court must determine (1) whether the plaintiff "was 'denied the minimal civilized measure of life's necessities' " and (2) whether the defendant "acted with 'deliberate indifference' to his needs." 🔖 *Channer v. Mitchell,* 43 F.3d 786, 788 (2d Cir.1994) (quoting 🔖 *Wilson,* 501 U.S. at 298– 303). Deliberate indifference does not exist unless the official "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that the substantial risk of serious harm exists, and he must also draw the inference." 🔖 *Farmer,* 511 U.S. at 837. The charged official must act with reckless indifference, not merely negligence." 🔖 *Salahuddin,* 467 F.3d at 280.

As the Supreme Court has noted, "[i]f the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." *Wilson,* 501 U.S. at 301. Even if the conditions of confinement were found to be unreasonable as a matter of law, a plaintiff cannot survive summary judgment unless he can point to "record evidence creating a genuine dispute" as to the facts regarding Defendants' culpable mental state. *Salahuddin,* 467 F.3d at 282.

Plaintiff filed two complaints with the Superintendent regarding bugs in his cell. (Pl.'s Resp., Attach. 2.) The record shows that the Superintendent responded to both of these complaints and informed Plaintiff of the action taken in both instances. (Berbary Decl. ¶¶ 5, 8.) After Plaintiff's first complaint, Superintendent Berbary directed his deputy to respond and Plaintiff's cell was sprayed by an exterminator. (Berbary Decl. ¶¶ 3–5, Ex. B.) When Plaintiff filed a second complaint of bugs in his cell, Superintendent Berbary ordered that his window screen be replaced. (Berbary Decl. ¶ 8, Ex. D.) As Plaintiff admits, the workmen determined that the screen was in perfect working order and did not need to be replaced. (Pl.Dep.32:11–19.) Throughout his papers, Plaintiff merely accuses Superintendent Berbary of acting negligently. (Am. Compl. ¶ 30; Pl.'s Resp. 5.) However, even assuming that Plaintiff did allege "deliberate indifference," Plaintiff has failed to point to any evidence suggesting that Defendant Berbary acted with reckless indifference to Plaintiff's health and safety by allowing him to be exposed to bugs.

**\*10** As to Plaintiff's claim that he may have been exposed to toxic chemicals, he fails to show that he was exposed to a serious risk of harm to his health or safety. *See Warren v. Keane,* 196 F.3d 330, 333 (2d Cir.1999) ( "Objectively, a plaintiff must show that he himself is being exposed to unreasonably high levels of [chemicals]."). Plaintiff does not point to any evidence showing what he was exposed to or what the potential risk of harm was. For the subjective element, he fails to allege that Berbary acted with deliberate indifference. (Am.Compl.¶ 4.) A defendant may be liable when the dangers of a toxic substance are well known, on the theory that a reasonable person would have known that exposure to toxic substances, such as second-hand smoke or asbestos, could violate the Eighth Amendment. *Warren v. Keane,* 196 F.3d at 333. Here Plaintiff has not presented any evidence that he was exposed to a substance that a reasonable person would know could cause harm. While Berbary acknowledges that Plaintiff's cell received treatment for insects, he maintains that he was not aware "of an excessive risk to [P]laintiff's health or safety." (Defs.' Mem. 11.) Defendants also note that there is no evidence to support an inference that a substantial risk of serious harm existed. (*Id.* at 11–12.) Plaintiff has failed to point to any evidence to support either that he was objectively exposed to a grave risk or that Berbary acted with a sufficiently culpable state of mind. Therefore, his Eighth Amendment claim regarding conditions of confinement also fails.

### Qualified Immunity

"If the facts as alleged would not amount to the violation of a constitutional right, the qualified-immunity inquiry is at an end, and summary judgment must be granted." *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006). Because the Court found no constitutional violation regarding Plaintiff's medical care and conditions of confinement, the Court need not address Defendants' qualified immunity claims.

### CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment is granted as to Plaintiff's Eighth Amendment inadequate medical treatment claim and as to Plaintiff's Eighth Amendment conditions of confinement claim.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2426021

---

**Footnotes**

1    Counsel for Defendants informs the Court that the correct spelling is Eileen Fucina. (Defs.' Mem. 1.)

2    Plaintiff's medical records show that Nurse Fucina made requests for a video consultation through Telemed at 4:20 a.m., 4:45 a.m., 5:30 a.m., and 6:15 a.m. (Pl.'s Resp., Attach. 2.)

3    The Court notes that Plaintiff had a prior ear exam on March 22, 2005 that showed his hearing to be within normal range. (Tan Decl. ¶ 4.)

4    In Plaintiff's Response to Defendants' Motion for Summary Judgment, he states that he was moved to cell OS–A2–36 in August 2005. (Pl.'s Resp. 4.) However, Plaintiff's grievance and prison records show he was housed in cell OS–A2–36 on July 20, 2005, the date of the extermination. (Pl.'s Resp., Attach. 2; Berbary Decl. ¶ 5.)

5    The only time Dr. Tan did not follow Dr. Prince's recommendation was when he preliminarily denied Plaintiff's second follow-up appointment. (Tan Decl., Ex. A.) As a result, Plaintiff did not have a second follow-up appointment with Dr. Prince. (*Id.*) Dr. Tan based this decision on the grounds that Plaintiff's condition had clinically improved and the follow-up was not medically necessary at that time. (Tan Decl. ¶ 12.) If Plaintiff's condition did not continue to improve, Dr. Tan would reconsider sending him for another outside consultation. (Tan Decl., Ex. A.)

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 840472
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ivory SHIRE, Plaintiff,
v.
Supt. Charles GREINER, et al., Defendants.

No. 02 Civ. 6061(GBD).
|
March 15, 2007.

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** *Pro se* plaintiff Ivory Shire brought this civil rights action, pursuant to 42 U.S.C. § 1983. He alleges that defendants were deliberately indifferent to his medical needs. He also alleges that they conspired and retaliated against him for complaining about an insect infestation in his cell. After discovery, defendants moved for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure. The motion was referred to this Court to Magistrate Judge Frank Maas for a Report and Recommendation ("Report"). Magistrate Judge Maas recommended that the motion for summary judgment be granted. Plaintiff filed timely objections to the Report.

The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. 28 U.S.C. § 636(b)(1). When there are objections to the Report, the Court must make a *de novo* determination of those portions of the Report to which objections are made. *Id.; Rivera v. Barnhart,* 432 F.Supp.2d 271, 273 (S.D.N.Y.2006). When no objections to a Report are made, the Court may adopt the Report if "there is no clear error on the face of the record." *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005) (citation omitted).

The Court is obligated to exercise "sound judicial discretion with respect to whether reliance should be placed on [the magistrate judge's] findings." *Am. Express Int'l Banking Corp. v. Sabet,* 512 F.Supp. 472, 473 (S.D.N.Y.1981), *aff'd,* 697 F.2d 287 (2d Cir.1982). The Court, however, "may adopt the uncontested portions of the report unless they show clear

error." *La Barbera v. A.F.C. Enterprises, Inc.,* 402 F.Supp.2d 474, 476-77 (S.D.N.Y.2005) (citations omitted). With respect to the portions of the Report to which no objections were made, those findings are not clearly erroneous. As to the portions of the Report to which plaintiff objects, this Court has considered the objections and finds them to be without merit. The Report is adopted and defendants' motion for summary judgment is granted.

Plaintiff, currently an inmate at the Mid-State Correctional Facility, filed this action while he was incarcerated at the Green Haven Correctional Facility, alleging that his cell in Green Haven was infested with biting insects. Though staff members who inspected his cell found only a few fruit flies, plaintiff's cell was treated for infestation, he was allowed to change cells on eight occasions, and he was given various ointments and daily shower permits. Plaintiff contends that because the insect problem continued unabated, defendants were deliberately indifferent to his serious medical needs. Plaintiff also contends that staff members retaliated against him for his continued complaints by instituting several disciplinary actions against him that resulted in his repeated loss of privileges and confinement to keeplock.

In support of their motion for summary judgment, defendants argue that they are immune from suit, pursuant to the Eleventh Amendment to the United States Constitution, because the plaintiff has sued defendants in their official capacities. Defendants also argue that plaintiff is precluded from bringing this lawsuit because he has not exhausted his administrative remedies. Magistrate Judge Maas found that the defendants were not being sued in their official capacities so that the Eleventh Amendment did not bar plaintiff's claims for monetary relief, and that defendants failed to meet their burden of proving that plaintiff had not in fact exhausted his administrative remedies. Magistrate Judge Maas, however, recommended that defendants' motion for summary judgment be granted because plaintiff did not show that defendants were deliberately indifferent to his serious medical needs, that defendants retaliated against plaintiff, or that defendants conspired to retaliate against plaintiff.

**\*2** Plaintiff objects to the Report's ultimate recommendation to grant summary judgment. He argues that since he hasn't had any issues with bugs or disciplinary infractions at his new facility, it demonstrates that his continued complaints were justified and that defendants did retaliate against him. He also states that his requests for treatment for a prior back and hip injury went unacknowledged by the Green Haven staff for

two-and-one-half years, apparently in an attempt to show a pattern of indifference towards his medical needs.

Summary judgment is appropriate when the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue of fact exists if, based on the record as a whole, a reasonable trier of fact could return a verdict for the non-moving party. *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.,* 472 F.3d 33, 41 (2d Cir.2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw inferences against the moving party. *Id.* (citing *U.S. v. Diebold,* 369 U.S. 654 (1962)). It is not sufficient for a non-moving party to rely on "conclusory statements" to defeat summary judgment. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993).

To prove deliberate indifference to serious medical needs, a plaintiff must first allege a "sufficiently serious deprivation of medical treatment." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). This deprivation must be reasonably likely to result in death, degeneration, or extreme pain. *Id.; see also Harrison v. Barkley,* 219 F.3d 132 (2d Cir.2000). Next, the plaintiff must allege facts "tending to show that the defendant acted with a sufficiently culpable state of mind." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Disputes about the proper course of treatment do not create a constitutional claim, and "[s]o long as the treatment given is adequate, the fact that the prisoner might prefer a different treatment does not give rise to an Eight Amendment violation." *Chance v. Armstrong* 143 F.3d 698, 703 (2d Cir.1998).

In order to establish a claim of retaliation, the plaintiff must show that he engaged in speech or conduct that is protected, that the defendant took adverse action against the plaintiff, and that there is a causal connection between the protected speech or conduct and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). An adverse action is "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis,* 320 F.3d at 353 (quoting *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001)). Prisoners' claims of retaliation are reviewed with care and

skepticism because of "both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated...." *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995).

**\*3** In this case, the plaintiff has not established any genuine issue of material fact to support the allegations raised in his complaint. Plaintiff has not shown either that his itching from insect bites were serious enough to cause death, degeneration, or extreme pain if not addressed, or that defendants deliberately deprived plaintiff of requested medical treatment. In fact, the record shows that defendants made numerous attempts to address plaintiff's complaints. The record also shows that the disciplinary actions taken against plaintiff resulted from his behavior at the facility which included, among other things, charges of possessing flammable material and assaulting another inmate. Moreover, several of the charges against plaintiff were eventually dismissed by some of the defendants plaintiff alleges retaliated against him. While disciplinary actions such as keeplock are considered adverse actions, *see Gill v. Pidlypchak,* 389 F.3d 379 (2d Cir.2004), the record does not show that the disciplinary actions were causally connected to plaintiff's complaints of bug infestation.

The Court adopts Magistrate Judge Maas's Report and Recommendation. Defendants' motion for summary judgment is granted.

SO ORDERED:

*REPORT AND RECOMMENDATION TO THE HONORABLE GEORGE B. DANIELS*

MAAS, Magistrate J.

I. *Introduction*

*Pro se* plaintiff Ivory Shire ("Shire") is an inmate at the Mid-State Correctional Facility. Shire brings this civil rights action, pursuant to 42 U.S.C. § 1983, claiming that, during an earlier period of incarceration at the Green Haven Correctional Facility ("Green Haven"), the defendants (a) were deliberately indifferent to his medical needs arising out of insect bites that he sustained in infested cells, (b) retaliated against him in response to his repeated complaints, and (c) conspired to retaliate against him. Following the close

of discovery, the defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, that motion should be granted.

II. *Background*

Unless otherwise noted, the following facts are either undisputed or set forth in the light most favorable to Shire.

A. *Relevant Facts*

1. *Shire's Complaints of Cell Infestation and Insect Bites*

Shire has been in jail since January 11, 1995, and was lodged at Green Haven from January 5, 1998, until September 17, 2004. (Ex. MM) . [1] His documented complaints of insect bites and cell infestation at Green Haven began on or about February 6, 2000, and continued throughout the remainder of his stay there. (*See* Ex. C). On some (but far from all) occasions when Shire complained of bites, the medical staff at Green Haven found actual or possible insects bites on Shire's body. (*See, e.g.,* Ex. C at Bates Nos. 82, 85, 100, 139-41, 149, 154, 172, 184, 187).

The medical staff at Green Haven took various steps to alleviate the conditions about which Shire complained. For example, on February 6, 2000, defendant Catherine Metzler ("Nurse Metzler"), a nurse at Green Haven, contacted the Institutional Steward, who advised her that Shire's cell had been exterminated the prior Wednesday. (Ex. C at Bates No. 229). On September 20, 2000, defendant Carl Koenigsmann ("Dr.Koenigsmann"), then the Director of Facility Health Services at Green Haven, instructed a subordinate to have Shire's cell exterminated. (Ex. 7 (Decl. of Dr. Koenigsmann, M.D., dated Nov. 19, 2004) ("Koenigsmann Decl.") ¶ 3; Ex. 8 (Decl. of Harold Mamis, M.D., dated Nov. 24, 2004) ("Mamis Decl.") ¶ 15). On September 26, 2000, defendant Harold Mamis ("Dr.Mamis"), Shire's primary care physician at Green Haven, prescribed skin lotion for Shire. (Mamis Decl. ¶ 19; Ex. C at Bates No. 199). On September 29, 2000, Dr. Mamis gave Shire hydrocortisone cream. (Mamis Decl. ¶ 21; Ex. C at Bates No. 198). On November 27, 2000, Dr. Mamis arranged a two-week daily shower permit for Shire. (Mamis Decl. ¶ 30; Ex. C at Bates No. 187). On December 1, 2000, Shire was prescribed Benadryl. (Mamis Decl. ¶ 32; Ex. C at Bates No. 184). On May 14, 2001, Dr. Mamis prescribed calamine lotion for Shire's lesions. (Mamis Decl. ¶ 52; Ex. C at Bates No. 153). On July 6, 2001, Dr. Mamis prescribed triamcinolone oil for Shire's lesions. (Mamis Decl. ¶ 73; Ex.

C at Bates No. 140). On September 19, 2001, Shire was given Bacitracin ointment. (Mamis Decl. ¶ 91; Ex. C at Bates No. 128). On September 24, 2001, Nurse Metzler arranged for an exterminator to treat Shire's cell. (Ex. LL at Bates No. 1070).

**\*4** In addition to the medical staff, Shire also complained to the Green Haven administrative staff about his insect bites and cell infestation. Defendant Charles Greiner ("Superintendent Greiner"), then the Superintendent of Green Haven, received several complaints from Shire, which he forwarded to the appropriate departments to be resolved. (Ex. 1 (Decl. of Charles Greiner, dated Nov. 15, 2004) ¶ 4). In response to Shire's complaints of infestation, Shire's cell was changed eight times from October 11, 2000, to February 11, 2002. (Ex. 6 (Decl. of Deputy Supt. Gayle Haponik, dated Nov. 23, 2004) ("Haponik Decl.") ¶ 6; Ex. FF at Bates No. 431). Defendant Gayle Haponik ("Deputy Haponik"), a Deputy Superintendent for Administration at Green Haven, also frequently arranged to have Shire's cells treated by an exterminator. (*See, e.g.,* Haponik Decl. ¶¶ 3-5; Exs. HH, JJ, KK). Between January 2000 and May 2002, Shire's cells were treated seventeen times. (Ex. 12 (Decl. of Emily Williams, dated Nov. 23, 2004) ¶ 6).

Several months after Shire began complaining about insects, Dr. Mamis became convinced that the "bugs" were actually delusions suffered by Shire. (*See* Mamis Decl. ¶ 9). Dr. Mamis began regularly referring Shire to the Psychiatric Unit ("PSU") whenever Shire would complain about insects. (*See, e.g.,* Ex. C at Bates Nos. 84, 86, 100, 103, 105, 160). During Shire's first such visit to the PSU on October 18, 2000, a PSU psychiatrist examined Shire and concluded, "No diagnosis. No treatment needed." (Ex. D at 112). To prove that he was not delusional, Shire then started to capture insects in his cell to show to the medical staff. (*See, e.g.,* Ex. C at Bates Nos. 157, 172).

On June 4, 2001, Shire again was admitted to the PSU because of his complaints regarding insect bites. (Ex. D at 28). After three days of evaluation, the PSU staff concluded that Shire was obsessive compulsive and suffered from dementia caused by his HIV-positive status. (*Id.* at 37). However, the next week, on June 13, 2001, the PSU staff acknowledged that "there are rashes or bites on his skin." (*Id.* at 38).

On August 17, 2001, Shire again was sent to the PSU because of his complaints regarding insect bites. (*Id.* at 108). This time the PSU reported:

[Shire] is *not* psychotic, delusional or suicidal/homicidal. He is not persistently mentally ill. He does have issue [sic] with being sensitive to insect bites, etc. Our mental health facility cannot help him in the area of insect bites.... No need for further evaluation on the same issues. This is the 5th referral on the same problem.

(*Id.*) (emphasis in original).

On August 28, 2001, Shire asked to see a dermatologist to treat his bites, but Dr. Mamis denied this request, stating that there was no evidence of bites or lesions. (Mamis Decl. ¶ 86). Having been unable to convince Dr. Mamis that he was not actually suffering from insect bites, Shire obtained a second opinion from Dr. John C. Bendheim on December 14, 2001. (Ex. C at Bates No. 109). Dr. Bendheim reported that Shire had "chronically experienced a biting sensation on his skin, associated with insects" that he had "seen where he lives." Dr. Bendheim observed numerous papules which were slightly raised, but not any lesions consistent with insect bites. Dr. Bendheim recommended that Shire consult a dermatologist. (*Id.*).

 **\*5**  On January 3, 2002, Dr. Mamis emailed Deputy Haponik, asking whether she had any substantiated reports from the exterminator that there were insects in Shire's cell. The email indicates that Dr. Mamis was seeking to provide the PSU with documentation that there were no insects in Shire's cell so that the PSU "could take some action on this matter." (Ex. II). The following day, the PSU diagnosed Shire with delusional disorder, somatic type. [2] (Ex. D at Bates Nos. 4, 12).

On January 7, 2002, a dermatologist examined Shire and concluded that he had scabies (a ringworm of the skin) for which he prescribed Eurax. (Mamis Decl. ¶ 125; Ex. C at Bates No. 105). The next day, however, Dr. Mamis overruled the dermatologist, explaining that Shire "does *not* have scabies," and that he had "spoken [with Thomas] Ryan, head of PSU, [because Shire] needs to be commanded to take psychiatric medications which he now refuses." (Ex. C at Bates No. 105) (emphasis in original). On January 9, 2002, Dr. Mamis reported that the Eurax the dermatologist had prescribed was more for psychological than therapeutic

benefit. (*Id.* at Bates No. 103). Accordingly, when Shire complained that the bugs were causing him to lose sleep, Dr. Mamis agreed to prescribe Eurax for Shire if he would to go to the PSU for sleep medication. (*Id.*).

On January 18, 2002, to prove that his cell was in fact infested, Shire brought Dr. Mamis two fruit flies adhered to adhesive tape. Dr. Mamis' entry on Shire's health record for that date states that he had spoken with the PSU staff on several occasions and that they were monitoring Shire. (*Id.* at Bates No. 101). That same day, the PSU diagnosed Shire as having delusional disorder, unspecified, [3] and Shire agreed to take psychiatric medication. (Ex. D at Bates Nos. 5, 13-14, 18). Thereafter, on January 27 and 28, 2002, Shire changed his mind, refusing to take the medication because of the side effects. (*Id.* at Bates Nos. 14, 16).

On February 6, 2002, Shire tried to show Dr. Mamis insects in his coat, but Dr. Mamis did not see any. (Ex. C at Bates No. 98). Dr. Mamis acknowledged seeing two pinhead sized lesions "which may have been mosquito or fruit fly bites," yet still described Shire as "delusional." (*Id.*).

On February 11, 2002, Shire terminated his treatment at the PSU because he did not believe that he had any mental health problems. (Ex. D at Bates Nos. 6, 15, 17). On February 27, 2002, Dr. Mamis reported that he had "flatly told [Shire] that he is 'crazy.' ' (Ex. C at Bates No. 96). This statement evidently was made after Shire undressed to show Dr. Mamis insects that he did not see. Dr. Mamis and Shire agreed that if Dr. Mamis visited Shire's cell and found no insects, Shire would return to the PSU. (*Id.*). The next day, Dr. Mamis went to Shire's cell, where he found no insects other than a dead fruit fly on a piece of flypaper. (*Id.* at Bates No. 94).

 **\*6**  Thomas Ryan, the psychologist who heads the PSU at Green Haven (and is not a party to this suit), has reviewed Shire's psychiatric records from January 11, 1995, when Shire was transferred to DOCS custody, through September 17, 2004, when he was transferred to the Attica Correctional Facility. (*See* Ex. 11 (Decl. of Thomas Ryan, Ph.D, dated Nov. 16, 2004) ¶ 3). On the basis of that review, Dr. Ryan evidently believes that Shire suffers from a delusional disorder. As he explains:

During January/February, 2002, Mr. Shire attended four counseling appointments, at which counselors tried to persuade him to accept mental health treatment/ medication. Ultimately, he refused to cooperate, denying

that he had any mental health problems and insisting his only problem was the prison infestation issue. Because of his lack of cooperation, and because he was not considered at risk for violence to himself or others, he was terminated from mental health services. There have been no referrals to mental health since 2002.

Individuals suffering with a delusional disorder experience a fixed, relatively long term, not bizarre false belief that could occur in real life. (This distinguishes delusional disorder from other psychoses marked by bizarre beliefs such as contact with alien beings.) Apart from this one aspect of deluded thought, every day functioning is not impaired. The individual's behavior is not apparently odd. One could have a normal conversation with such an individual and if the delusion were not raised in conversation you would not suspect the person had any problem.

(*Id.* ¶¶ 6-7).

On March 4, 2002, Shire visited the dermatology clinic, which recommended that he use Sarna lotion. On March 8, 2002, Dr. Mamis rejected that recommendation and instead prescribed hydrocortisone cream. (Mamis Decl. ¶¶ 143-44; Ex. C at Bates No. 93).

From May through July 2002, Shire frequently requested daily shower permits to alleviate his insect bites. On May 10 and 20, 2002, Dr. Mamis denied these requests. (Ex. C at Bates Nos. 84-85). However, on June 5, 2002, after seeing three or four mosquito bites on Shire's skin, Dr. Mamis granted him a shower permit. (*Id.* at Bates No. 82). Several days later, when Shire requested another daily shower permit, Dr. Mamis noted in Shire's medical records, "I will not issue another one!" (*Id.* at Bates No. 80). Consistent with that entry, on July 10, 2002, Dr. Mamis denied Shire's request for a shower permit. (*Id.* at Bates No. 75). Dr. Mamis explained that he had previously granted Shire a daily shower permit in the hope that he would have fewer complaints of insect bites, "but these complaints continue." (*Id.*).

On several occasions during Shire's stay at Green Haven, Shire asked Dr. Koenigsmann to have Dr. Mamis replaced as his primary care physician. Dr. Koenigsmann reviewed Dr. Mamis' overall medical treatment of Shire and decided not to replace Dr. Mamis because, in his view, Dr. Mamis provided Shire with appropriate medical care. (Koenigsmann Decl. ¶ 4).

### 2. *Disciplinary Actions Against Shire*

**\*7** Shire alleges that several disciplinary actions taken against him at Green Haven constituted retaliation for his frequent complaints regarding insects. In the first such instance, on April 23, 2001, Correctional Officers Dear and Fitzpatrick charged Shire with stealing a shirt from the package room. (Ex. Y). As a result, Shire was kept in keeplock (*i.e.,* continuously confined to his cell) until his hearing. (*Id.;* Ex. 4 (Decl. of William Keyser, dated Nov. 23, 2004) ("Keyser Decl.") ¶ 5). On April 28, 2001, defendant William Keyser ("Captain Keyser"), the assigned Disciplinary Hearing Officer, heard evidence regarding this charge. (Keyser Decl. ¶ 6). Captain Keyser found Shire guilty of three of the five charges on the basis of an Inmate Misbehavior Report prepared by Officer Dear and the testimony of Officers Dear and Fitzpatrick. (*Id.* ¶ 9; Ex. Z at Bates No. 392). Captain Keyser imposed a penalty of thirty days' keeplock, followed by thirty days' loss of commissary, telephone, package room, and recreation privileges. (Ex. Z at Bates No. 390).

On November 27, 2001, Shire was the subject of an Inmate Misbehavior Report charging him with refusing a direct order, using obscene language, and engaging in conduct that disturbed the order of the facility. (Ex. AA). Once again, Shire was kept in keeplock until his hearing. (*See id.;* Ex. BB ("Dec. 2, 2001 Hr'g Tr.") at 2). Defendant William Russett ("Lieutenant Russett"), the Disciplinary Hearing Officer, conducted that hearing on December 2, 2001.[4] (Russett Decl. ¶ 4). At the hearing, Shire testified that the day before the charges were brought, Officer Leonard responded with an "attitude" when Shire asked whether the exterminator was coming. (Dec. 2, 2001 Hr'g Tr. at 6). The next day, Shire slept through the "go around" during which inmates can make various requests. When Shire awoke, he called out to Officer Leonard asking for his medication. Officer Leonard agreed to write down Shire's request for medication, but nothing else. As Officer Leonard began to walk away, however, Shire called out to Officer Leonard again. According to Shire, Officer Leonard then ordered keeplock for Shire. (*Id.*).

Shire testified that he did not curse at Officer Leonard and never would have because the consequence would be keeplock in his insect-infested cell. (*Id.* at 7). Shire explained that Officer Leonard "had it in" for him because he often would ask when the exterminator was coming. (*Id.* at 8). He testified further that the officers had made jokes about the bugs in his cell, calling him the "bugman." (*Id.* at 7-8).

Five inmates testified on behalf of Shire, stating that Shire had repeatedly called out for his medication, but had not cursed at Officer Leonard. (*Id.* at 11-21). At the conclusion of the hearing, Lieutenant Russett nevertheless found Shire guilty of creating a disturbance and refusing an order but not guilty of using obscene language. (*Id.* at 21-22). The guilty findings evidently were based solely on the misbehavior report written by Officer Leonard. (*See id.* at 22). Lieutenant Russett imposed a penalty of five days' keeplock, which Shire had already served while awaiting the hearing, and thirty days' loss of recreation, telephone, and commissary privileges. (*Id.*).

**\*8** On May 21, 2002, Shire was the subject of yet another misbehavior report. This report charged him with possessing flammable matter. At a hearing held on May 24, 2002, Shire was found guilty and sentenced to thirty days of keeplock (of which twenty-seven days were suspended) and thirty days' loss of commissary, package, and telephone privileges (which also was suspended). Shire appealed to defendant David Thacker ("Deputy Thacker"), then the Deputy Superintendent of Security at Green Haven, who affirmed the disposition on May 31, 2002. Deputy Thacker also conducted a discretionary review of the disposition the following day, apparently leaving the sanctions unchanged. (*See* Ex. 5 (Decl. of Deputy Thacker, dated Nov. 23, 2004) ("Thacker Decl.") ¶ 4).

On June 5, 2002, defendant Sue Hann ("Sergeant Hann") charged Shire with assaulting an inmate and fighting, based on a tip from a confidential source that Shire had punched an inmate named Vasquez in the face. (Ex. 10 (Decl. of Sergeant Hann, dated Nov. 23, 2004) ("Hann Decl.") ¶ 4; Ex. L). Sergeant Hann also authorized a special search of Shire's cell. (Hann Decl. ¶ 5). Based on the search of the cell, Shire was charged with possessing an altered razor, smoking, possessing unauthorized quantities of outdated medicine, and destruction of state property. (Ex. F at 4). Shire was kept in keeplock until his hearing. (*See* Ex. L).

On June 13, 2002, defendant William Totten ("Captain Totten"), who was then a Correctional Captain at Green Haven, presided over a hearing regarding the alleged contraband in Shire's cell. (Ex. 2 (Decl. of Captain Totten, dated Nov. 29, 2004) ("Totten Decl.") ¶ 13). On June 28, 2002, after reviewing the evidence against Shire and examining the confiscated items, Captain Totten dismissed the charges against him. (*Id.* ¶ 16; Ex. J).

That same day, Captain Totten also presided over a second hearing regarding Shire's alleged fight with inmate Vasquez. (Totten Decl. ¶ 4). This hearing was adjourned three times so that Shire's witnesses could testify. (Ex. G at 13, 14, 28). Ultimately, however, prison officials were unable to complete the hearing within the required fourteen-day period after issuance of the misbehavior report. (Totten Decl. ¶ 9). For that reason, Captain Totten dismissed the fighting and assault charges against Shire. (*Id.*).

### B. *Procedural History*

Shire's complaint is dated May 10, 2002, and was received by the Pro Se Office of the Court on July 10, 2002. (Docket No. 1). The complaint thereafter was filed on July 30, 2002. Liberally construed, Shire's complaint alleges that: (1) the defendants were deliberately indifferent to his insect bites and cell infestation; (2) their assertion that Shire is mentally ill and the disciplinary actions that were taken against him both constituted retaliation for his complaints regarding insects; and (3) the defendants conspired to retaliate against him. Although Your Honor had granted Shire's motion for the appointment of counsel in March 2003, (Docket No. 20), no attorney volunteered to take his case, and Shire therefore proceeded *pro se*.

**\*9** On November 26, 2004, after the close of discovery, the defendants filed their motion for summary judgment. (*See* Docket Nos 42-46). On or about January 28, 2005, Shire responded to the defendants' motion by submitting an unsworn "Statement Pursuant to Local Rule 56.1." (Although the Statement was never filed, I recently have submitted it for docketing.) On February 8, 2005, the defendants filed their reply memorandum of law. (Docket No. 50).

### III. *Discussion*

#### A. *Standard of Review*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only when:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and ... draw all permissible inferences in favor of that party." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir.1997).

When the moving party meets its burden of showing that there is no genuine issue of fact, the burden shifts to the non-moving party to produce evidence that would support a jury verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). To defeat a motion for summary judgment, the non-moving party cannot merely rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256. "This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." Id. at 257.

Although the same summary judgment rules apply to a party proceeding pro se, special latitude is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are inartfully worded. See Morris v. Citibank, N.A., No. 97 Civ. 2127(JGK), 1998 WL 386175, at *2 (S.D.N.Y. July 8, 1998). By the same token, however, "a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Odom v. Keane, No. 95 Civ. 9941(SS), 1997 WL 576088, at *3 (S.D.N.Y. Sept. 17, 1997) (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1995)); accord Jorgensen v. Careers BMG Music Publ'g, No. 01 Civ. 0357(LAP), 2002 WL 1492123, at *3 (S.D.N.Y. July 11, 2002).

In accordance with Local Civil Rule 56.2, the defendants served Shire with a written notice that to oppose the defendants' motion, he would be required to submit evidence, such as "witness statements or documents, countering the facts asserted by the defendant[s] and raising issues of fact

for trial." (Docket No. 43). Shire further was cautioned that "[a]ny witness statements, which may include your own statements, must be in the form of affidavits." (Id.). Despite these admonitions, Shire has submitted only an unsworn "Statement Pursuant to Local Rule 56.1." He therefore has submitted no evidence in opposition to the defendants' motion for summary judgment. Shire consequently can defeat this motion only if the defendants have failed to meet their burden of showing no genuine issue of material fact.

**B. Eleventh Amendment**

**\*10** The defendants contend that this Court lacks jurisdiction over Shire's claims pursuant to the Eleventh Amendment. The Eleventh Amendment generally bars suits against states in federal court, unless the claim is for prospective relief, the state has consented to suit, or Congress has expressly abrogated the states' immunity. See Papasan v. Allain, 478 U.S. 265, 276 (1986); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). This immunity extends to state officials sued in their official capacities. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989); Huminski v. Corsones, 386 F.3d 116, 133 (2d Cir.2004). On the other hand, claims against state officials acting in their personal capacities are not barred by the Eleventh Amendment. Hafer v. Melo, 502 U.S. 21, 31 (1991); Huminski, 386 F.3d at 133. Where doubt exists as to whether officials have been sued in their official capacities, personal capacities, or both, "the course of the proceedings ordinarily resolves the nature of the liability sought to be imposed." Rodriguez v. Phillips, 66 F.3d 470, 482 (2d Cir.1995); see also Hafer, 502 U.S. at 24 n* (noting, without resolving, a circuit split regarding the manner in which the determination should be made).

Shire's complaint is silent as to whether he is suing the defendants in their official or personal capacities. The defendants nevertheless contend that they are being sued in their official capacities "[b]ecause plaintiff seeks damages for actions and omissions allegedly made by these DOCS employees during the course of their employment at Green Haven." (Defs.' Mem. 23). This, however, begs the question because most, if not all, Section 1983 claims against DOCS employees are predicated on acts taken by them during the course of their employment by the state.

An examination of the "course of the proceedings" in this case confirms that Shire's claims against the defendants are brought against them in their individual capacities. First, in his complaint, Shire does not challenge any general DOCS policy, but, rather, seeks redress for specific acts and omissions by the defendants which he alleges violate his constitutional rights. Second, Shire seeks monetary damages, which are unavailable against the state. Third, in their motion for summary judgment, the defendants seek a finding that they are entitled to qualified immunity, (Defs.' Mem. at 23-25), which is a defense unavailable to them in their official capacities. *Brandon v. Holt,* 469 U.S. 464, 468-69 (1985). Finally, although at least two of the defendants have retired since this suit was commenced, neither Shire nor the defendants have sought to substitute their replacements pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure. *See Rodriguez,* 66 F.3d at 482.

Accordingly, because Shire has sued the defendants in their individual capacities, the Eleventh Amendment does not bar his claims for monetary relief.[5]

### C. *Exhaustion of Administrative Remedies*

**\*11** Under the Prison Litigation Reform Act ("PLRA"), an inmate seeking to maintain an action challenging prison conditions must first exhaust all available administrative remedies. 42 U.S.C. § 1997e(a). The duty to exhaust administrative remedies before filing suit "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2003). Moreover, the Supreme Court recently has held that the PLRA requires "proper" exhaustion; accordingly, before initiating a lawsuit the prisoner must comply "with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo,* 126 S.Ct. 2378, 2386 (2006). Although the PLRA exhaustion requirement is mandatory, *see Booth v. Churner,* 532 U.S. 731, 739 (2001), it is not jurisdictional, *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Rather, lack of exhaustion is simply an affirmative defense which may or may not be asserted by a defendant. *See Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (citing *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999)).

In this case, the defendants' answer properly asserts Shire's failure to exhaust his administrative remedies as an affirmative defense. (*See* Ex. B (Answer) ¶ 9). However, the defendants have not offered any proof that Shire failed to exhaust his administrative remedies with respect to any of his claims. For this reason, they have failed to meet their evidentiary burden and cannot rely on the PLRA exhaustion requirement as a basis for the dismissal of any of Shire's claims. *Burns v. Zwillinger,* No. 02 Civ. 5802(LMM), 2005 WL 323744, *1 (S.D.N.Y. Feb. 9, 2005) ("Exhaustion of administrative remedies under the PLRA is an affirmative defense, and 'therefore defendants bear the burden of proof' ") (quoting *McCoy v. Goord,* 255 F.Supp.2d 233, 247-48 (S.D.N.Y.2003)); *see also Drexel Burnham Lambert Group Inc. v. Galadari,* 777 F.2d 877, 880 (2d Cir.1985) ("The party asserting an affirmative defense usually has the burden of proving it. This rule has particular cogency where the facts in support of the defense are peculiarly within the knowledge of the party asserting it.") (citations omitted).

### D. *Eighth Amendment*

#### 1. *Medical Treatment*

To establish a violation of the Eighth Amendment arising out of inadequate medical treatment, a prisoner is required to prove "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). This deliberate indifference standard consists of both an objective and a subjective prong. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Under the objective prong, the alleged medical need or prison condition must be "sufficiently serious." *Id.* A "sufficiently serious" medical need is one that produces "a condition of urgency ... that may produce death, degeneration or extreme pain." *Id.* (internal quotation marks and citation omitted).

**\*12** Under the subjective prong, a prisoner must demonstrate that the defendants acted with a "sufficiently culpable state of mind." *Id.* This standard "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835 (1994); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (likening deliberate indifference to "the equivalent of criminal recklessness") (internal quotation marks and citation omitted). In other

words, to meet the subjective element of the test, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway,* 37 F.3d at 66 (quoting *Farmer,* 511 U.S. at 837).

A difference of opinion between an inmate and medical personnel regarding the appropriate course of medical treatment does not rise to the level of a constitutional violation. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998); *Veloz v. New York,* 35 F.Supp.2d 305, 313 (S.D.N.Y.1999) (citing *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972)). Nor will deliberate indifference be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Instead, to establish deliberate indifference, a plaintiff must show that "prison officials 'intentionally den[ied] or delay[ed] access to medical care or intentionally interfer[ed] with the treatment once prescribed." ' *Muhammed v. Francis,* No. 94 Civ. 2244(SS), 1996 WL 657922, at *5 (S.D.N.Y. Nov. 13, 1996) (alteration in original) (quoting *Estelle,* 429 U.S. at 104-05).

Shire has failed to establish a genuine issue of fact as to either prong of the deliberate indifference standard with regard to his medical treatment. At the outset, Shire's alleged emotional distress is not a medical condition "sufficiently serious" that it potentially can produce "death, degeneration or extreme pain." *Hathaway,* 37 F.3d at 66. Nor are Shire's alleged itching and sleep deprivation sufficiently serious to give rise to an Eighth Amendment violation. *See, e.g., Smith v. Sussex State Prison,* No. 2:03CV00338, 2004 WL 3258275, at *5 (E.D.Va. Sept. 24, 2004) ("[E]ven if Plaintiff's spider bite claim survived the assertion of qualified immunity by the Custodial Defendants, it would likely fail the objective prong of the conditions of confinement test because the deprivation alleged was not sufficiently serious."); *Ford v. LeMire,* No. 03-CV-10176-BC, 2004 WL 1234137, at *5 (E.D. Mich. June 1, 2004) ("the delay in treating the plaintiff's spider bite did not amount to the deprivation of treatment for a 'serious' medical condition"); *see also Brown v. Bowles,* No. 3:99-CV-2158-BC, 2000 WL 980011, at *2 (N.D.Tex. July 17, 2000) (insect bites leaving "scars" typical of such bites "can

hardly be said to surmount the *de minimus* [sic] hurdle of the PLRA").

**\*13** Furthermore, the record establishes that Drs. Mamis and Koenigsmann and Nurse Metzler (the only Green Haven medical staff members named as defendants) were far from indifferent to Shire's skin problems or emotional distress. Dr. Mamis' medical treatment of Shire included hydrocortisone cream, Benadryl, calamine lotion, triamcinolone oil, Bacitracin ointment, Sarna lotion, and shower permits. Additionally, Dr. Koenigsmann and Nurse Metzler arranged for an exterminator to treat Shire's cell on several occasions. (*See* Ex. C at Bates No. 229; Ex. LL at Bates No. 1070; Koenigsmann Decl. ¶ 3). Although Dr. Koenigsmann denied Shire's requests to have Dr. Mamis replaced as his primary care physician, the Eighth Amendment does not entitle Shire to the doctor of his choice or treatment by every available medical alternative. Moreover, Dr. Koenigsmann's denial clearly was not based on a desire to punish Shire, but, rather, his belief that Dr. Mamis was providing Shire with appropriate medical care. (Koenigsmann Decl. ¶ 4).

For these reasons, the defendants are entitled to summary judgment as to Shire's medical deliberate indifference claims against Dr. Mamis, Nurse Metzler, and Dr. Koenigsmann. [6]

*2. Cell Infestation*

The deliberate indifference standard applies not only to medical treatment, but also to challenges to prison conditions generally. *See Wilson v. Seiter,* 501 U.S. 294, 303 (1991). Here, however, there is no admissible evidence that Shire's cells were infested to the extent he alleges. Indeed, the record establishes that when Dr. Mamis visited Shire's cell, he did not see any insects except for a single fruit fly adhered to flypaper. (Ex. C at Bates No. 94). Moreover, Shire's cells were frequently changed and treated by exterminators. (*See* Ex. C at Bates No. 127; Haponik Decl. ¶ 3-6; Ex. FF at Bates No. 431; Ex. LL at Bates Nos. 1071, 1075; Exs. HH, JJ, KK).

Even if these actions were insufficient to cure the alleged cell infestation, Shire has failed to show that the defendants had the requisite culpable state of mind. Although Shire alleges that Superintendent Greiner ignored his complaints of cell infestation, (*see, e.g.,* Compl. at 15, 20, 21), the Superintendent's declaration states that he forwarded the complaints that he received from Shire to the appropriate departments to be resolved (Ex. 1 ¶ 4). There simply is no

evidence that he knew that the problem thereafter persisted or was not being addressed.

Shire similarly alleges that Deputy Haponik ignored Shire's complaints of cell infestation. (*See, e.g.,* Compl. at 20, 21). However, Deputy Haponik had Shire's cell changed eight times in response his complaints of cell infestation. (*See* Haponik Decl. ¶ 6; Ex. FF at Bates No. 431). She also frequently arranged to have exterminators treat his cells. (*See* Haponik Decl. ¶¶ 3-5; Exs. HH, JJ, KK). This conduct belies Shire's unsupported claim that Deputy Haponik was deliberately indifferent to his needs.

**\*14** In his papers, Shire does not dispute that the defendants took these steps to address his frequent complaints of cell infestation. Rather, he contends that "each of the [defendants'] actions have been insufficient to rectify the problem," and that they failed to provide Shire with the "outside specialist" he requested. (Compl. at 4). In the absence of any evidence that they were aware that Shire faced a substantial risk of serious harm, these assertions are insufficient to meet the second prong of an Eighth Amendment claim.

Accordingly, the defendants' motion for summary judgment as to Shire's Eighth Amendment claims against Deputy Haponik and Superintendent Greiner should be granted.

### E. *Retaliation*

To establish a First Amendment retaliation claim, a prisoner must demonstrate that (1) the speech or conduct in question was protected; (2) the defendants took adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

It is settled law that a prisoner has a First Amendment right to file grievances and complaints against prison officials. *See, e.g., Gill,* 389 F.3d at 380; *Dawes,* 239 F.3d at 492; *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Indeed, the defendants do not dispute that Shire had a First Amendment right to file grievances and complaints regarding the cell infestation and insect bites to which he allegedly was subjected. Thus, to prevail in his retaliation claim, Shire need only show that he suffered an adverse action that was causally related to his First Amendment activity.

In the prison context, the Second Circuit has employed an objective definition of "adverse action," stating that it is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)); *Dawes,* 239 F.3d at 493. Shire alleges that he was subjected to two such adverse actions: unwarranted referrals to the PSU and proceedings related to the filing of false misbehavior reports.

#### 1. *PSU Referrals*

The only named defendant who referred Shire to the PSU is Dr. Mamis. The defendants argue that Dr. Mamis' referrals do not rise to the level of an adverse action. (*See* Defs.' Mem. at 11-12). This does not appear to be correct. *See Morales v. Mackalm,* 278 F .3d 126, 132 (2d Cir.2002) (allegation that prison officials placed inmate in the PSU and subsequently transferred him to a psychiatric facility is sufficient to establish an adverse action). The Court need not resolve this issue, however, because even if the PSU referrals constituted adverse action, Shire has not demonstrated a causal connection between those referrals and Shire's exercise of First Amendment rights.

**\*15** To be sure, the PSU referrals were the direct result of Shire's frequent statements about alleged insect bites and cell infestation. Shire has not shown, however, that Dr. Mamis made these PSU referrals in an effort to chill the exercise of Shire's First Amendment rights, instead of a legitimate concern that Shire's frequent complaints were manifestations of a psychotic disorder. Nor has he adduced any evidence which would permit a jury to make that leap of faith. At best, Shire's Rule 56.1 statement speculates that the PSU referrals were retaliatory. (*See* Pl.'s R. 56.1 Stmt. ¶ 17). Dr. Mamis' declaration, on the other hand, expressly denies any retaliatory intent. (*See* Mamis Decl. ¶¶ 9-11). In the absence of any contrary evidence from which a jury might reasonably infer that Dr. Mamis acted out of retaliatory animus, Shire's speculation does not create a factual issue entitling him to a trial of his retaliation claim insofar as it is based on the PSU referrals.

#### 2. *False Misbehavior Reports*

Shire also alleges that certain defendants issued false misbehavior reports and imposed unwarranted punishments

upon him in retaliation for his frequent complaints about insect bites and infestation. The defendants counter that "an inmate has no constitutional right to be free from being falsely accused in a misbehavior report." (Defs.' Mem. at 12) (citing *Snyder v. McGinnis,* No. 03-CV-0902, 2004 WL 1949472, at *2 (W.D.N.Y. Sept. 2, 2004)). While that is certainly true, *see, e.g., Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), "an allegation that a prison official filed a false disciplinary charge 'in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance' *does* state a claim under § 1983." *Snyder,* 2004 WL 1949472, at *2 (quoting *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002)) (emphasis added); *see also Boddie,* 105 F.3d at 862 ("There must be more [than a false misbehavior report], such as retaliation against the prisoner for exercising a constitutional right."). Indeed, in *Gill* the Second Circuit held that the filing of false misbehavior reports and a punishment of three weeks' keeplock constituted "adverse action." *Gill,* 389 F.3d at 384.

Nevertheless, Captain Totten plainly cannot be held liable for the issuance of a false misbehavior report since it is undisputed that his sole involvement in this case was to serve as a hearing officer at two hearings. Furthermore, at those hearings, Captain Totten *dismissed* all of the charges against Shire presented to him. Therefore, regardless of any alleged procedural errors that he may have committed during the hearings, it is clear that Captain Totten did not take any adverse action against Shire. Accordingly, the defendants' motion for summary judgment as to Captain Totten should be granted.

The remaining question is whether there is a causal connection between Shire's complaints of insects and the adverse actions allegedly taken by Captain Keyser, Lieutenant Russett, Deputy Thacker, and Sergeant Hann, each of whom is accused of either issuing a false misbehavior report or playing a role in the imposition of punishment upon Shire.

### a. *Captain Keyser*

**\*16** Captain Keyser served as the hearing officer at the April 23, 2001, hearing arising out of the charge that Shire stole a shirt from the package room. In support of the defendants' motion for summary judgment, Captain Keyser has submitted a declaration in which he states that he played no role

in Shire's prehearing confinement and has never retaliated against him. (Keyser Decl. ¶¶ 5, 12). Shire's unsworn Rule 56.1 Statement alleges, to the contrary, that Captain Keyser imposed the penalties that he did in retaliation for Shire's repeated grievances and complaints. (*See* Pl.'s R. 56.1 Stmt. at 49). Even if this assertion were sworn, however, it is devoid of any *facts* to support Shire's suggestion that Captain Keyser acted with a retaliatory intent. Accordingly, the defendants' motion for summary judgment with respect to Captain Keyser should be granted. [7]

### b. *Lieutenant Russett*

Lieutenant Russett was the hearing officer at the December 2, 2001, hearing held to address charges that Shire had refused a direct order, used obscene language, and engaged in conduct which disturbed the order of the facility following his request for his medications after missing the "go around." (Dec. 2, 2001 Hr'g Tr. at 5; Russett Decl. ¶ 4). Shire contends that the disposition of these charges was retaliatory, but the only evidence that he cites is Lieutenant Russett's failure to call as hearing witnesses the two correctional officers who signed the Inmate Misbehavior Report. (*See* Ex. AA; Pl.'s R. 56.1 Stmt. at 50-51). There is no evidence, however, that Shire ever requested that the officers be called as hearing witnesses. In fact, after Shire made a statement denying the charges, Lieutenant Russett asked him whether he wanted to call any witnesses. (Dec. 2, 2001 Hr'g Tr. at 9). Although Shire indicated that he simply "wanted to get this over with," the Lieutenant apparently encouraged him to call his fellow inmates, stating, "No you don't, you want to get off keeplock." (*Id.*). The Lieutenant then heard from the five inmates who supported Shire's version of the incident. (*See id.* at 11-21). After that, Lieutenant Russett asked Shire, "Are you ready to finish this up?" Shire responded, "Yea I am," without requesting any further testimony. (*Id.* at 21). Although the Lieutenant ultimately chose to credit the officers' misbehavior report, rather than the testimony of Shire and his fellow inmates, there is no evidence which would warrant the inference that this was retaliatory. Accordingly, the defendants are entitled to summary judgment with respect to Shire's retaliation claim against Lieutenant Russett.

### c. *Deputy Thacker*

On May 24, 2002, following a Tier II hearing, Shire was found guilty of possessing flammable matter and was sentenced to thirty days of keeplock, twenty-seven days of which were suspended to encourage him to toe the line so that they would not be reinstated. (*See* Thacker Decl. ¶ 4). Thereafter,

Deputy Thacker affirmed this disposition and conducted a discretionary review of the disposition which did not result in any change. (*See id.*). In his Rule 56.1 Statement, Shire alleges that Deputy Thacker also affirmed Captain Keyser's April 23, 2001, disposition of the stolen shirt charge. Even if this is true, there is not a scintilla of evidence that any of Deputy Thacker's actions was motivated by retaliatory animus. Accordingly, because Shire's conclusory assertions are no substitute for evidence, the defendants are entitled to summary judgment with respect to Shire's retaliation claim against Deputy Thacker.

#### d. *Sergeant Hann*
**\*17** Sergeant Hann issued a June 5, 2005, misbehavior report which charged Shire with fighting based upon information that she states was received from a confidential source. (Hann Decl. ¶ 4). In addition, the Sergeant authorized a special search of Shire's cell because cells are routinely searched when inmates are caught fighting. (*Id.* ¶ 5).

Shire's complaint alleges that prior to this incident, he and Sergeant Hann had a conversation about the insects in Shire's cell. (Compl. at 32). Even assuming this unsworn allegation is true, it hardly suggests that this was the reason that Sergeant Hann issued the misbehavior report against Shire, and her declaration expressly denies that it was. (Hann Decl. ¶¶ 9, 11).

The only other basis upon which Shire argues that Sergeant Hann's report was retaliatory is his assertion that he never was identified by a confidential source as having assaulted inmate Vasquez in the "E & F Yard." (Pl.'s R. 56.1 Stmt. at 53). Shire does not explain, however, how he could possibly be in a position to know whether Sergeant Hann received confidential source information concerning the assault. Accordingly, in the absence of any evidence establishing that Shire has personal knowledge as to whether Sergeant Hann received such information, and in light of her own sworn statement that she did, the defendants are entitled to summary judgment dismissing Shire's retaliation claim against her.

#### F. *Conspiracy*
Shire also alleges that the defendants engaged in a [📄] Section 1983 conspiracy against him. The elements of such a conspiracy claim are: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an

overt act done in furtherance of that goal causing damages." [📄] *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Here, Shire alleges that Lieutenant Keyser "acted with" Correctional Officer Fitzpatrick (who is not a defendant in this action) at the hearing held by Lieutenant Keyser. (Compl. at 13). Shire also alleges that Lieutenant Russett conspired with Correctional Officers Leonard and Staven (who, again, are not defendants in this action) at the hearing conducted by Lieutenant Russett. (*Id.*). Finally, Shire alleges that Deputy Thacker, Superintendent Greiner, and Deputy Haponik "reached an agreement" to deprive him of appeals and a resolution of his "bug problem." (*Id.*). However, Shire has failed to show that any of these individuals intended to infringe his constitutional rights. Accordingly, the mere fact that they may have worked together, or with others not named in the complaint, does not entitle him to further relief. The defendants are therefore entitled to summary judgment as to Shire's conspiracy claims.

#### G. *Failure to Serve Superintendent P. Richard*
The only other defendant named in Shire's complaint is Superintendent P. Richard. (*See* Comp. at 1). This defendant has never been served and is not represented by the Attorney General of the State of New York. (*See* Defs.' Mem. at 1 n. 1). Moreover, the body of Shire's complaint is utterly silent as to anything Superintendent Richard may have done.

**\*18** Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, a summons and complaint must ordinarily be served within 120 days after the complaint is filed. Inasmuch as Shire has missed this deadline by several years, the Court should dismiss the complaint as against Superintendent Richards on its own. *See* Fed.R.Civ.P. 4(m).

#### H. *Qualified Immunity*
Because there are no genuine issues of fact as to any of Shire's claims, there is no need to discuss whether the defendants are protected by qualified immunity.

#### IV. *Conclusion*
For the foregoing reasons, the defendants' motion for summary judgment should be granted.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 840472

## Footnotes

1    "Ex." refers to the exhibits annexed to the Declaration of Ass't Att'y Gen. Neil Shevlin, dated Nov. 26, 2004.

2    The diagnosis of the somatic type of delusional disorder "applies when the central theme of the delusion involves bodily functions or sensations." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Health Disorders* 325 (4th ed. Text Revision 2000) ("DSM-IV-TR"). The most common manifestations include "the person's conviction ... that there is an infestation of insects on or in the skin." *Id.*

3    This diagnosis applies when the dominant delusional belief cannot be clearly determined. *DSM-IV-TR* 325.

4    The transcript of the hearing mistakenly indicates that "Lieutenant Ross" presided over the hearing. (*See* Ex. 3 (Decl. of Lieutenant Russett, dated Nov. 23, 2004) ("Russett Decl.") ¶ 4).

5    Shire's claim for injunctive relief is moot because Shire is no longer incarcerated at Green Haven and has not suggested that his problems persisted after he was assigned to a new facility. *See Muhammad v. City of N.Y. Dep't of Corr.,* 126 F.3d 119, 124 (2d Cir.1997) (prisoner's claim for prospective relief mooted upon his release).

6    In his Rule 56.1 Statement, Shire, for the first time, alleges that Drs. Mamis and Koenigsmann violated the consent decree in *Milburn v. Coughlin,* No. 79 Civ. 5077(RCC), by failing to address adequately his medical needs arising out of a chronic back and hip problem. (Pl.'s R. 56.1 Stmt. Intro.). *Milburn* was a class action brought on behalf of "all persons who are or will be inmates at Green Haven" to challenge the adequacy of Green Haven's health care services. The parties entered into a series of agreements culminating in 1991 in a "modified consent decree," which established guidelines for the provision of medical care at Green Haven. *See Scott v. Goord,* No. 01 Civ. 0847(LTS)(AJP), 2004 WL 2403853, at *14 (S.D.N.Y. Oct. 27, 2004); *Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 WL 731691, at *7 n. 13 (S.D.N.Y. Apr. 23, 2002).

     Shire's eleventh-hour *Milburn* claim is neither set forth in his complaint nor supported by evidence. In any event, any application to enforce the *Milburn* consent decree must be brought as a contempt proceeding before the district judge assigned to that case, not as a separate  Section 1983 action. *See Scott,* 2004 WL 2403853, at *14; *Woods,* 2002 WL 731691, at *7 n. 13; *McKenna v. Wright,* No. 01 Civ. 6571(WK), 2002 WL 338375, at *7 n. 9 (S.D.N.Y. Mar. 4, 2002); *Kaminsky v. Rosenblum,* 737 F.Supp. 1309, 1317 n. 6 (S.D.N.Y.1990) ("Violations of the *Milburn* decree can be remedied only by bringing the alleged violations to the attention of the able District Judge who retains supervision over that decree."). On January 13, 2004, the *Milburn* case was reassigned to Judge Casey. *See Milburn v. Coughlin,* No. 79 Civ. 5077(RCC) (Docket.No. 252). Accordingly, any claim that the defendants have violated the *Milburn* consent decree cannot be considered as part of this case.

7    Shire's complaint also alleges that he filed a grievance seeking reimbursement for a shirt, which Deputy Haponik denied in order to retaliate against Shire for having filed a complaint. (Compl. at 27). It is not clear whether the shirt Shire was accused of stealing from the package room and the shirt for which he sought reimbursement are one and the same. In any event, Shire has produced no evidence to support his contention that the denial of this grievance was retaliatory. Accordingly, Deputy Haponik is entitled to summary judgment on this claim.

     Shire's complaint also seeks to "combine [his] claims of retaliation and harassment" with his "complaints filed against the package room officer, Ms. Fitzpatrick [sic]" for "stolen and missing" packages. (Compl.

at 7). However, Ms. Fitzpatrick is not a defendant in this action and has never been served. Accordingly, Shire is not entitled to any relief as against her.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 891314
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Henry HOBSON, Plaintiff,

v.

Brian FISCHER, Commissioner of N.Y.S.
D.O.C.S, in his official and individual
capacity, and Phillip Heath, Superintendent,
Sing Sing Correctional Facility, in his
individual and official capacity, Defendants.

No. 10 Civ. 5512(SAS).
|
March 14, 2011.

**Attorneys and Law Firms**

Henry Hobson, Ossining, NY, pro se.

Steven Neil Schulman, Assistant Attorney General, New
York, NY, for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

**\*1** Henry Hobson ("Hobson" or "Plaintiff"), proceeding *pro
se,* filed the instant action pursuant to section 1983, Title
42 of the United States Code ("section 1983"). Named as
defendants are Commissioner Brian Fischer ("Fischer") and
Superintendent Phillip Heath ("Heath" or "Superintendent"),
officials in the New York State Department of Correctional
Services ("DOCS"), both in their official and individual
capacities (collectively "Defendants"). Hobson's Complaint
alleges Constitutional violations resulting from his exposure
to hazardous environmental conditions at Sing Sing
Correctional Facility ("Sing Sing"), where plaintiff is an
inmate. He seeks damages of $100,000, in addition to
twenty-five dollars per day for each uncorrected violation
commencing July 1, 2009, as well as an order requiring
defendants to remedy the hazardous conditions.

Defendants now move to dismiss the Complaint on the
following grounds; (1) plaintiff fails to state a facially

plausible claim against defendants; (2) plaintiff fails to allege
an identifiable injury; (3) plaintiff fails to allege personal
involvement on the part of Fischer; and (4) defendants are
protected from suit by qualified immunity. For the reasons
stated below, defendants' motion is granted in its entirety and
plaintiff's Complaint is dismissed with prejudice, and without
leave to file an amended complaint.

## II. BACKGROUND [1]

### A. First Complaint to the Inmate Grievance Committee

Hobson alleges that he has been exposed to unhealthy
environmental conditions at Sing Sing since his incarceration
on August 15, 2007. [2] On July 1, 2009, plaintiff filed
grievance # 46509 with the Inmate Grievance Resolution
Committee ("IGRC"). [3] In his grievance to the IGRC,
Hobson complained that the mess hall fans were unsanitary
because they blew "food, dust, [and] spittle into each others
food trays." [4] In addition, Hobson stated the following; the
ventilation in the cells was unsatisfactory and there were
no working exhaust fans in the cell blocks, which caused
inmates to breathe in bird feces and dust; because there were
no screens in the windows, contaminated air entered the
cells; and the barber shop should have an exhaust system in
place, rather than fans which can cause respiratory ailments. [5]
According to Hobson, because of these violations, the facility
"could not lawfully pass any inspection or be certified." [6]
Hobson requested that each violation be remedied, and that he
be given twenty-five dollars a day for each day the violations
were not removed. [7]

On August 4, 2009, the IGRC denied Hobson's grievance,
advising him that monetary compensation for facility
violations was "beyond the purview of the committee" and
that he should seek assistance from the Inmate Liaison
Committee for corrective actions concerning the alleged
violations. [8]

Hobson appealed the IGRC decision to Superintendent Heath,
who denied the grievance on September 9, 2009. [9] The
Superintendent's decision stated that the mess hall was
operating in full compliance with department regulations. [10]
It further stated that the bird droppings were cleaned by
porters on a daily basis and that the fans in the barber shop
were used for exhaust purposes only. [11]

**\*2** On the same day that Hobson's grievance was denied by the Superintendent, he appealed the decision to the Central Office Review Committee ("CORC"). [12] On December 9, 2009, CORC issued its ruling, finding that Hobson's request was "accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated." [13] CORC noted that the facility took action to replace the screens and to clean the bird droppings, as needed. [14] CORC stated that it had not been previously notified of problems with the fans or ventilation systems and that Hobson should address immediate concerns with the area staff. [15]

### B. Second Complaint to the Inmate Grievance Committee

On December 21, 2009, Hobson filed a second grievance, Grievance 47122–09, with the IGRC. [16] This grievance complained of the lack of locking mechanisms on the bath house windows. [17] Hobson argued that the open windows posed "a health risk for colds, flu" and that he had "brought this to the attention of area supervisors who indicated that they'd tried to have maintenance fix them in the past." [18] Hobson requested that new locks be installed so as to prevent drafts from entering the bath house which posed health risks to the inmates. [19]

On December 29, 2009, the IGRC responded to Hobson's grievance, stating that "per investigation, attempt to repair windows in question were made, however ... it appears that the repair in question did not meets its intend [sic] goal, therefore further repair is needed," [20] On January 11, 2010, Hobson checked the box on the IGRC response, indicating that he wished to appeal to the Superintendent. [21] There is no further documentation attached to the Complaint concerning Hobson's appeal of this grievance to the Superintendent. [22]

### C. The Instant Complaint

Hobson filed his Complaint on July 13, 2010 against Fischer and Heath, both in their individual and official capacities under 🔖 section 1983. He seeks remedies for the conditions previously complained of in his grievances. *First,* Hobson seeks the appointment of a special master to investigate and monitor the conditions in issue Additionally, he requests placement of screens on all windows, ventilation in the cells, and installation of exhaust fans in the cell blocks, barber shop and mess hall. Hobson also asks that the bath house windows be fixed and that any accreditation benefits given to the facility be rescinded. [23] As noted, Hobson also seeks per diem damages for each uncorrected violation, commencing July 1,2009.

## III. LEGAL STANDARDS

### A. Rule 12(b)(6)—Failure to State a Claim

In deciding a Rule 12(b)(6) motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint" [24] and "draw all reasonable inferences in [the] plaintiff's favor." [25] However, a court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness." [26] To survive a motion to dismiss, the pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" [27] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [28] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." [29]

**\*3** In deciding a 12(b)(6) motion, a court may not consider evidence offered by a party which is outside of the pleadings. Rather, a court is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which a court may take judicial notice. [30] Judicial notice may encompass the status of lawsuits in other courts and the substance of papers filed in those actions. [31]

In sum, "[f]actual allegations must be enough to raise a right to relief above the speculative level." [32] A pleading that offers nothing but "labels and conclusions," "naked assertions" without "further factual enhancement," or a "formulaic recitation of the elements of action" will not suffice. [33] This pleading requirement applies equally to *pro se* litigants. [34] However, the submissions of a *pro se* litigant should be held " 'to less stringent standards than formal pleadings drafted by lawyers ....' " [35] District courts should "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise

the strongest arguments that they suggest.' " [36] These same principles apply to briefs and opposition papers submitted *by pro se* litigants. [37]

## B. Section 1983

Section 1983 states, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... [38]

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [39] "The purpose of [ section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." [40]

Imposition of liability under section 1983 requires a defendant's direct involvement in the alleged constitutional violation. [41] "Thus, [a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." [42] A plaintiff "cannot bring a section 1983 claim against [an individual] based solely on [his] supervisory capacity or the fact that [he] held high positions of authority." [43] "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." [44]

In 1995, the Second Circuit held that the personal involvement of a supervisory defendant may be shown by evidence that; (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to respond to notices that unconstitutional acts were occurring. [45] However, in 2009, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must [prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." [46] "Accordingly only the first and third *Colon* factors have survived the Supreme Court's decision in *Iqbal.*" [47]

## C. Deliberate Indifference to Serious Medical Needs

**\*4** The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment on prisoners. In *Estelle v. Gamble,* [48] the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [49] The Eighth Amendment charges prison officials with a duty to "provide humane conditions of confinement" and to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to] take reasonable measures to guarantee the safety of the inmates." [50]

"[A] prison official violates the Eighth Amendment only when two requirements are met." [51] The two requirements include an objective prong and a subjective prong. *First,* the alleged deprivation must be sufficiently serious in that it denies a prisoner "the minimal civilized measure of life's necessities." [52] A sufficiently serious deprivation means an objective "condition ... that may produce death, degeneration or extreme pain." [53] *Second,* the official must act with a "sufficiently culpable state of mind." [54] That state of mind is a "deliberate indifference to [an] inmate's health or safety." [55] "[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm

or with knowledge that harm will result.' " [56] Deliberate indifference requires that a prison official "knows of and disregards an excessive risk to inmate health or safety." [57] Subjectively, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." [58] Accordingly, recklessness can satisfy the deliberate indifference standard where the official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." [59]

## IV. DISCUSSION

### A. Personal Involvement of Commissioner Fischer

Defendants argue that Fischer cannot be held liable for the alleged violations based solely on his supervisory role as the DOCS' Commissioner. The Eleventh Amendment immunizes state agencies and officials acting in their official capacity from suit under section 1983. [60] The Eleventh Amendment does not, however, bar suit against a State official in his individual capacity. [61] Therefore, the claims against Fischer and Heath in their official capacities are dismissed pursuant to the Eleventh Amendment.

Hobson does not allege that Fischer personally participated in the denial of his grievances, but argues that Fischer knew or shuld have known, of the alleged constitutional violations as the Commissioner of DOCS and the former Superintendent of Sing Sing. [62] Hobson further claims that Fischer knew of his "duties and obligations ... to uphold the U.S. Constitution and the laws of the State of New York as his oath of office requires him to do. There[fore] liability attaches since he acted outside the scope of his lawful authority." [63]

**\*5** Hobson does not elaborate as to how Fischer knew about the alleged violations. It appears that he expects this Court to infer that while Fischer was the Superintendent, he must have observed and inspected the areas of which Hobson complained. [64] Nevertheless, Hobson has failed to show Fischer's personal involvement in any alleged constitutional violation. Accordingly, Fischer is dismissed from this lawsuit. [65]

### B. Prison Conditions Imposing a Serious Health Risk

Hobson's Complaint alleges that the conditions of his confinement constituted cruel and unusual punishment under the Eighth Amendment. Defendants argue that the prison conditions alleged in the Complaint did not violate Hobson's constitutional rights, nor did Hobson identify any injuries he suffered as a result of these conditions.

"Conditions that are restrictive and harsh are an element of the penalty that criminal offenders pay to society for their offenses." [66] A medical condition is considered objectively serious if it is a condition of urgency that may result in death, degeneration or extreme pain. [67] Hobson fails to show how he was actually harmed by the conditions alleged in his Complaint. For instance, Hobson filed a grievance about the broken lock on the bathhouse window, asserting that "it poses a health risks for colds, flu, etc." [68] However, Hobson failed to allege that he was adversely affected by the broken locks. Similarly, in Hobson's original grievance to the IGRC, he stated that the fans in the barber shop created respiratory ailments and that the barber shop should have an exhaust system in it. [69] Still, Hobson did not claim that the barber shop ventilation personally affected him, nor did he allege that he suffered from any respiratory problems.

While Hobson's Complaint fails to allege a serious health risk caused or exacerbated by prison conditions, he provides a more detailed account of his injuries in his opposition papers. In those papers, he asserts medical conditions that he now claims were caused by the alleged violations. Hobson states that he "suffers from COPD a respiratory disease that he had no indication of prior to coming to Sing Sing." [70] Additionally, he has high blood pressure, and had a stent placed in his heart valve. [71] At the time he filed his opposition papers, Hobson also had "an infection in [his] left leg (purportedly, cellulitis) which was either caused by the surgery placing the stent or from a spider bite." [72]

Construed liberally in order to raise the strongest argument for the *pro se* litigant, plaintiff's history of COPD is sufficient to raise an objectively serious health risk. While Hobson has not provided health records or indication of the seriousness of his COPD, this Court will assume that plaintiff has sufficiently met the objective prong to raise an Eighth Amendment violation,

### C. Deliberate Indifference by Heath

Defendants argue that even if the Complaint alleges an objectively serious health risk, plaintiff has failed to show Heath's deliberate indifference. Heath was on notice of plaintiff's allegations upon his receipt of Hobson's grievance through the IGRC. [73] Hobson also states in his opposition papers that he personally spoke with Heath about the alleged violations. [74] However, Hobson has failed to allege that Heath acted with the state of mind required to state an Eighth Amendment violation. While Heath was aware of the prison conditions raised in the grievances, none of them gave rise to a substantial risk to Hobson's health. Hobson's grievances to the IGRC and his subsequent appeals fail to mention any injury. There is no evidence that Heath had any knowledge that Hobson suffered from COPD or any other illness. Therefore, Heath was not aware that the conditions alleged by Hobson posed a substantial risk of serious harm.

**\*6** In Heath's denial of Hobson's appeal from the IGRC, he listed the measures that were taken to remedy the grievances. For instance, in responses to Hobson's complaint regarding bird feces, Heath pointed out that prison porters were cleaning up the bird feces on a daily basis. [75] Heath also stated that the mess hall "is being operated in full compliance within department regulations", and that the "fans in the Barber Shop are used for exhaust only." [76] With regard to the broken locks on the bathhouse windows, the IGRC attempted to fix the problem, and noted that it needed further work. [77] Heath addressed the concerns raised in the grievances. Because he did not ignore the complaints brought to his attention as Superintendent, Hobson cannot allege that Heath acted with deliberate indifference. Given that Hobson's grievances were investigated and responded to, his claim of deliberate indifference fails. Heath is therefore dismissed from this lawsuit.

### D. Leave to Amend the Complaint

Under Federal Rules of Civil Procedure 15(a), leave to amend a complaint should be "freely given when justice so requires." [78] A pro se plaintiff should be permitted to amend his complaint prior to its dismissal for failure to state a claim "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim ." [79] Thus "it is well established that leave to amend a complaint need not be granted when amendment would be futile." [80]

Hobson cannot amend his Complaint to cure his claims against Fischer, due to Fischer's lack of personal involvement. The same holds true for Hobson's claims against Heath given the lack of deliberate indifference on Heath's part. As Hobson documented in his Complaint, his grievances were addressed through Sing Sing's grievance process. Because Heath was not on notice of Hobson's COPD, or any other ailment resulting from the alleged hazardous conditions, Hobson is unable to allege that Heath acted with the requisite state of mind. There is no additional information that was not already raised either in the Complaint of in Hobson's opposition papers that could cure this deficiency. Therefore, even if further documentation of Hobson's ailments were provided, he would still fail to meet the subjective prong required to show Heath's deliberate indifference.

Additionally, this Court has already taken into account plaintiff's opposition papers, which alleged injuries caused by the violations. Because this additional information proved insufficient to state a viable claim against the defendants, further amendment would be futile. Therefore, plaintiff's claims are dismissed with prejudice.

### V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. The Clerk of the Court is directed to close this motion (Docket No. 9) and this case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 891314

---

### Footnotes

1     The following facts are drawn from the Complaint ("Compl.") and are presumed to be true for the purpose of this motion.

2   *See* Compl. at 2.

3   *See id.* at 1–2, 8. Plaintiff included an illegible copy of the July 1, 2009 grievance in his Complaint at page 8. Defendants obtained a legible copy of this grievance from DOCS ("Grievance # 46409"), which they attached to their motion to dismiss, Ex. A at 15.

4   Grievance # 46409.

5   *See id.*

6   *Id.*

7   *See id.*

8   *See* IGRC Response to Grievance # 46409–09, attached to the Complaint at 14.

9   *See* Decision of the Superintendent on Grievance # 46409–09 ("Decision of Superintendent"), attached to the Compl. at 12.

10   *See id.*

11   *See id.*

12   *See id.*

13   CORC response to Grievance # 46409–09 ("CORC Response"), attached to the Complaint at 9.

14   *See id.*

15   *See id.*

16   *See* Grievance # 47122–09, attached to the Compaint at 11.

17   *See id.*

18   *Id.*

19   *See id.*

20   IGRC Response to Grievance # 47122–09, attached to the Complaint at 13.

21   *See id.*

22   Plaintiff's grievance appears not to have been fully exhausted as required by the The Prison Litigation Reform Act ("PLRA"). However, defendants failed to raise exhaustion as an affirmative defense. Therefore, the defense is waived. *See Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004) ("The failure to exhaust available administrative remedies is an affirmative defense. We have in the past instructed district courts, on remand, to consider whether defendants waived compliance with the exhaustion requirement by failing to raise it. At least two other circuits have explicitly held that the PLRA's exhaustion requirement may be waived. We today join them and hold that this defense is waiveable.") (quotation marks and citations omitted).

23   *See id.* at 5.

24   *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 572 (2007). *Accord Rescuecom Corp. v. Google Inc.,* 562 F.3d 123, 127 (2d Cir.2009).

25   *Ofori–Tenkorang v. American Int'l Group, Inc.,* 460 F.3d 296, 298 (2d Cir.2006).

26   *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007) (quotation marks and citation omitted).

27   *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly,* 550 U.S. at 570 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.")).

28   *Id.*

29   *Id.* (quoting *Twombly,* 550 U.S. at 556).

30   *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007); *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007); *Leonard F. v. Israel Disc. Bank,* 199 F.3d 99, 107 (2d Cir.1999).

31   *See Anderson v. Rochester–Genesee Reg'l Transp. Auth.,* 337 F.3d 201, 205 n. 4 (2d Cir.2003); *Conopco, Inc. v. Roll Int'l,* 231 F.3d 82, 86–87 & nn. 3 & 4 (2d Cir.2000); *Lejkowitz v. Bank of New York,* 676

F.Supp.2d 229, 238–39 & n. 1 (S.D.N.Y.2009) (taking judicial notice of Surrogate's Court and state Supreme Court findings and decisions).

32  *Twombly,* 550 U.S. at 555.

33  *Id.* at 557.

34  *See Arias–Mieses v. CSX Transp., Inc.,* 630 F.Supp.2d 328, 331 (S.D.N.Y.2009).

35  *Hughes v. Rowe,* 449 U.S. 5, 9 (1980) (quoting *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam)).

36  *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

37  *See Ortiz v. McBride,* 323 F.3d 191, 194 (2d Cir.2003); *Burgos,* 14 F.3d at 790.

38  42 U.S.C. § 1983.

39  *Morris–Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985)). *Accord Gonzaga Univ. v. Doe,* 536 U.S. 273, 285 (2002) (" '[O]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything.' ") (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617 (1979)).

40  *Wyatt v. Cole,* 504 U.S. 158, 161 (1992).

41  *See Iqbal,* 129 S.Q. at 1948–49.

42  *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009).

43  *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998). *Accord Wheat v. New York City Dep't of Corr.,* No. 10 Civ. 5459, 2010 WL 5129065, at *2 (S.D.N.Y. Dec. 15, 2010) ("Because vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must [prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

44  *Brooks v. Chappius,* 450 F.Supp.2d 220, 225 (W.D.N.Y. Sept. 21, 2006) (quoting *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quotation marks omitted)). *Accord Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995).

45  *See Colon,* 58 F.3d at 873.

46  *Iqbal,* 129 S.Ct. at 1948–49 (citations omitted) (explicitly rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution").

47  *Spear v. Hugles,* No. 08 Civ. 4026, 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009).

48  429 U.S. 97(1976).

49  *Id.* at 104 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind.... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotation marks and citations omitted).

50  *Farmer,* 511 U.S. at 834.

51  *Id.* at 833.

52  *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981).

53  *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (quotation marks omitted).

54   *Farmer,* 511 U.S. at 834 (quotation marks and citations omitted).

55   *Id.* at 835.

56   *Hathaway,* 99 F.3d at 553 (quoting *Farmer,* 511 U.S. at 835) (ellipsis and brackets in original).

57   *Farmer,* 511 U.S. at 837.

58   *Id.*

59   *Id.* at 847.

60   *See* *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office. As such, it is no different from a suit against the State itself.") (citations omitted).

61   *See* *Hafer v. Melo,* 502 U.S. 21, 22 (1991).

62   Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss ("Opp.Mem.") at 4. I will consider the factual allegations contained in plaintiff's opposition papers to the extent they are consistent with the allegations in the Complaint. "In general, a court may not look outside the pleadings when reviewing a 12(b)(6) motion to dismiss. However, the mandate to read the papers of pro se litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Burgess v. Goord,* No. 98 Civ.2077, 1999 WL 33458, at *1 n. 1 (S.D.N.Y. Jan. 28, 1999) (quotation marks and citation omitted). *See also* *Cusamano v. Sobek,* 604 F.Supp.2d 416, 461 (N.D.N.Y.2009) ("[T]he mandate to read the papers of pro se litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.") (citations omitted).

63   Opp. Mem. at 4.

64   *See id.*

65   Qualified immunity serves as an alternative ground to dismiss Hobson's claims against Fischer who did not violate any "clearly established statutory or constitutional rights of which a reasonable person would have known." *Alster v. Goord,* No. 05 Civ. 10883, 2010 WL 3835081, at *18 (S.D.N.Y. Sept. 10, 2010).

66   *Govan v. Campbell,* 289 F.Supp.2d 289, 296–97 (N.D.N.Y., Oct. 29, 2003) (finding that shower stalls with rust bubbles, wild birds flying in the cells, and cockroach problems were not conditions rising to the level of a constitutional violation).

67   *See* *Hathaway,* 99 F.3d at 553.

68   Grievance # 47122–09.

69   *See* Grievance # 46409–09.

70   Opp. Mem. at 3. COPD stands for Chronic Obstructive Pulmonary Disease.

71   *See id.*

72   *Id.*

73   *See* Compl. at 12.

74   Opp. Mem. at 5.

75   *See* Decision of Superintendent.

76   *Id.*

77   *See* IGRC Response to Grievance # 47122–09.

78   Fed.R.Civ.P. 15(a).

79   *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir.1999).

80   *Ellis v. Chao,* 336 F.3d 114, 127 (2d Cir.2003).

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 7971871
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jose SHOMO, a/k/a Jose J. Shomo, Plaintiff,
v.
State of New York DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al., Defendants.

9:15-CV-01029 (GLS/ATB)
|
Signed 10/07/2019

**Attorneys and Law Firms**

JOSE SHOMO, Plaintiff, pro se.

MICHAEL G. MCCARTIN, Asst. Attorney General, for
Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

 **\*1** This matter has been referred to me for Report and
Recommendation by the Honorable Gary L. Sharpe, United
States District Judge. Presently before the court is defendants'
motion for summary judgment pursuant to Fed. R. Civ. P.
56. (Dkt. No. 132). Plaintiff responded in opposition to the
motion, and defendants filed a reply. (Dkt. Nos. 142, 143,
144). Plaintiff then filed a sur-reply. (Dkt. No. 150). For the
reasons set forth below, this court will recommend granting
defendants' motion and dismissing the amended complaint.

### BACKGROUND

#### I. Procedural History
On August 25, 2015, plaintiff commenced this action against
the State of New York Department of Corrections and
Community Supervision ("DOCCS") and Corision Health
Services ("Corision") by filing a pro se complaint pursuant
to 42 U.S.C. § 1983 (" Section 1983"); Title II of the
Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131
et seq.; and Section 504 of the Rehabilitation Act of 1973
("Rehabilitation Act"), 29 U.S.C. § 794 et seq. (Dkt. No.

1). At the same time, plaintiff filed a motion to proceed in
forma pauperis ("IFP"). (Dkt. No. 2). On November 18, 2015,
Judge Sharpe issued an order in which he granted plaintiff's
motion for IFP; dismissed the access-to-courts claims, as well
as the ADA and Rehabilitation Act claims against Corision,
without prejudice; and ordered that a response to plaintiff's
ADA and Rehabilitation Act claims against DOCCS be filed
by the defendants. (Dkt. No. 9).

After some discovery and various preliminary proceedings,
plaintiff filed a motion to serve an amended complaint on
March 29, 2018, which defendants opposed. (Dkt. No. 78,
79). On June 18, 2018, this court issued an order granting
plaintiff's motion in part and denying it in part. (Dkt. No.
81). Specifically, the motion to amend was granted to the
extent that plaintiff was permitted to proceed on the following
claims:

(1) First Amendment access-to-courts claims against
Superintendents William J. Connolly and Daniel
Martuscello; and

(2) ADA and Rehabilitation Act claims for money damages
against DOCCS.

(Dkt. No. 81 at 25). Now, upon completion of discovery,
defendants bring the instant motion for summary judgment
seeking dismissal of the amended complaint. (Dkt. No. 132).

#### II. Relevant Facts and Contentions
Detailed summaries of plaintiff's allegations were included
in Judge Sharpe's November 18, 2015 order and my June 18,
2018 order. (Dkt. Nos. 9 at 4-6; 81 at 6-11). This court will
provide a brief summary of the facts and contentions relevant
to the issues raised in defendants' pending motion.

Plaintiff is currently serving a term of 25 years to life for his
2000 felony convictions of murder and criminal possession of
a weapon. (Dkt. No. 132-3 at 7). Plaintiff alleges that prior to,
and at the time of, his September 1999 arrest for these crimes,
he suffered from a neurological condition [1] causing him to
have no use of his right arm and very limited use of his left
hand and arm. (Dkt. No. 143 at 1). Plaintiff further alleges
that he subsequently lost any remaining use of his left arm. [2]
Thus, plaintiff contends that he has not been able to use either
of his upper extremities since 1999. (*Id.* at 2).

 **\*2** Plaintiff claims that since being received into DOCCS
custody in 2001, he has "only been housed in ... one of

DOCCS's Regional Medical Units (RMU), infirmar[ies] or other specialized units for persons with disabilities or medical [limitations] who were unable to be program[m]ed." (*Id.*).

Based on plaintiff's allegations, and as relevant to the instant motion, he was confined at Fishkill Correctional Facility ("Fishkill C.F.") from May 2012 through December 2013, and at Coxsackie Correctional Facility ("Coxsackie C.F.") from December 2013 through 2015. Specifically, plaintiff was transferred to Fishkill C.F. on May 29, 2012. (Dkt. No. 82 at 47). Plaintiff claims that, upon arrival to Fishkill C.F., he was initially provided assistance with all activities of daily living ("ADL"). (*Id.*). However, on or about July 31, 2012, the nursing staff suddenly refused to assist plaintiff with accessing his legal papers. (Dkt. No. 132-8 at 17). On August 3, 2012, defendant Connolly issued a memorandum to plaintiff indicating that, as a result of plaintiff's disciplinary issues since arriving to Fishkill C.F., [3] the "extra privileges" previously made available to plaintiff were effectively rescinded. (Dkt. No. 132-5). This included, among other things, the provision of a "scribe" to assist plaintiff with correspondence and legal work. (*Id.*). Defendant Connolly expressed that paper and pen would still be provided to plaintiff. (*Id.*). Plaintiff contends that for the remainder of his custody at Fishkill C.F., he was denied the assistance of a scribe.

Plaintiff was then transferred from Fishkill C.F. to Coxsackie C.F. on or about December 2, 2013. (Dkt. No. 82 at 36-37). Although not clearly set forth by the plaintiff, it appears that he continued to be denied the assistance of a scribe upon his initial transfer to Coxsackie C.F. (Dkt. 82 at 47). However, on May 15, 2014, Coxsackie C.F. superintendent Daniel Martuscello "approved plaintiff to receive 'minimum' assistance from an inmate 'scribe,' however the scribe was '[s]trictly [p]rohibited' from either filing or writing any institutional grievances or writing any form of legal papers[.]" (Dkt. Nos. 82 at 47; 132-3 at 55-57, 70, 73-74). Plaintiff was permitted assistance from a scribe to write correspondence to potential legal counsel. (Dkt. No. 132-3 at 74-76). In August 2015, Superintendent Martuscello gave plaintiff "permission" to file the original complaint in the instant case, with the qualification that plaintiff could not personally name any DOCCS staff, and could only seek injunctive relief. (Dkt. No. 82 at 47). Plaintiff alleges that the original complaint was further subject to review by a corrections officer, to confirm that DOCCS staff were not personally named. (*Id.*).

Plaintiff was transferred out of Coxsackie C.F. to Wende C.F. in 2015. (Dkt. No. 132-8 at 4).

## DISCUSSION

### III. Summary Judgment

**\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

### IV. Access to Courts

#### A. Legal Standards

The United States Constitution guarantees prisoners a "meaningful right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 830 (1977). As the Supreme Court explained in *Bounds*, this right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal

papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."

*Id.* at 828. However, "*Bounds* did not create an abstract, freestanding right to a law library or legal assistance," nor did it "guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims."

*Lewis v. Casey,* 518 U.S. 343, 351 (1996). Instead, "the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.' " *Collins v. Goord,* 438 Supp. 2d 399, 415–16 (S.D.N.Y. 2006) (quoting *Lewis,* 518 U.S. at 355). "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

The courts have recognized two variants of claims for denial of access to courts: first, "forward-looking claims," where "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," and second, "backward-looking access claims," which cover "specific cases that cannot now be tried (or tried with all material evidence)" due to the actions of state officials. *Jean-Laurent v. Lawrence,* No. 12-CV-1502, 2015 WL 1208318, at *3 (S.D.N.Y. Mar. 17, 2015) (citing *Christopher v. Harbury,* 536 U.S. 403, 413–14 & n. 11 (2002)). "The Second Circuit has emphasized, however, that the viability of [backward-looking] claims is far from clear, pointing out that the [Supreme Court's] *Harbury* decision was careful not to endorse their validity." *Id.* (quoting *McNaughton v. de Blasio,* No. 14 Civ. 221, 2015 WL 468890, at *12 (S.D.N.Y. Feb. 4, 2015)) (other citations omitted). Although the availability of a backward-looking access claim remains uncertain in this Circuit (*see Sousa v. Marquez,* 702 F.3d 124, 128 (2d Cir. 2012) ("The viability of backward-looking right-of-access claims is far from clear in this Circuit ...")), the existing case law suggests four elements:

> **\*4** First, the plaintiff must identify a nonfrivolous, arguable underlying claim. Second, the plaintiff must establish that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim. Third, the plaintiff

must show that the defendant's alleged conduct was deliberate and malicious [4]. Fourth, the plaintiff must demonstrate that the defendant's actions resulted in an actual injury to the plaintiff.

*Jean-Laurent v. Lawrence,* 2015 WL 1208318, at *4 (internal citations and quotations omitted). What does remain clear is that such denial-of-access claims are "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Harbury,* 536 U.S. at 415; *see also Sousa,* 702 F.3d at 128 (citation omitted).

### B. Application

Plaintiff's surviving First Amendment claims allege that defendants Connolly and Martuscello deprived him of access to the courts by denying him a scribe assistant. [5] Defendants present a number of legal arguments supporting their position that plaintiff's access-to-courts claims must fail, including qualified immunity, collateral estoppel, and a lack of actual injury to the plaintiff. (Defendants' Brief ("Def. Br.") at 3-18). This court will analyze the First Amendment claim as against each defendant.

### 1. Superintendent Connolly

Defendant Connolly was the Superintendent of Fishkill C.F. for the entirety of plaintiff's incarceration therein, from May 2012 until December 2013. (Dkt. No. 132-18 at 1). In a sworn declaration submitted in support of defendants' motion, defendant Connolly concedes that, upon initial entry into Fishkill C.F., plaintiff was permitted the use of an inmate scribe to "assist [plaintiff] with writing, including legal matters to the court." (*Id.*). Defendant Connolly also concedes that, on August 3, 2012, plaintiff's license to use the assistance of an inmate scribe was rescinded. (*Id.* at 2). Defendants do not dispute that plaintiff was denied assistance from a scribe for the remainder of his confinement at Fishkill C.F. Nevertheless, defendant Connolly maintains that he is immune from liability for any alleged denial of access to the courts claimed by plaintiff because, among other reasons, he relied on the medical opinions of plaintiff's treatment providers, who determined that plaintiff had no medical need for the assistance of a scribe for writing.

**\*5** It is well settled that "supervisors without medical training are entitled to rely on the medical expertise of their subordinates." *Dumont v. Corr. Corp. of Am.*, No. 2:14-CV-209, 2016 WL 8193639, at \*8 (D. Vt. Nov. 21, 2016) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000)); *see also Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("[A] prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners ..."). Although this premise is often cited in the context of prisoner deliberate indifference claims regarding medical care, the courts have recognized that such protections apply to supervisors who rely on the medical judgment of prison medical staff, for purposes of making day-to-day determinations regarding an inmate's confinement. *See Williams v. Bailey*, No. 9:09-CV-0643 (DNH/DEP), 2010 WL 3881024, at \*8 (N.D.N.Y. Sept. 3, 2010) ("The fact that [defendants] relied upon a medical clearance form signed by a prison doctor [in clearing plaintiff for work in the mess hall], without more, negates a finding [of liability]."), Report and Recommendation Adopted, 2010 WL 3843723 (N.D.N.Y. Sept. 28, 2010); *Cooke v. Stern*, No. 9:07-CV-1292 (GLS/ATB), 2010 WL 3418393, at \*7 (N.D.N.Y. Aug. 2, 2010) (finding no liability for "members of the Program Committee" who assigned plaintiff to work in the mess hall because "they relied upon the judgment of the prison medical staff, which specifically cleared plaintiff for that job placement.").

The issue of plaintiff's physical condition and alleged paraplegia have been raised and argued in several of plaintiff's prior court actions. At a minimum, plaintiff's prior lawsuits and the decisions flowing therefrom cast considerable doubt on the severity of plaintiff's alleged limitations. *See Shomo v. New York Dept. of Correctional Services*, No. 9:04-CV-0910(LEK/GHL), 2007 WL 2580509 (N.D.N.Y. Sept. 4, 2007); *Shomo v. City of New York*, No. 03 Civ. 10213, 2012 WL 13128742 (S.D.N.Y. Aug. 23, 2012). Nevertheless, for the purposes of analyzing plaintiff's claim against defendant Connolly, it is sufficient to note that, at the time of plaintiff's transfer to Fishkill C.F. in 2012, his medical history contained conflicting reports of whether plaintiff suffered from paralysis of the upper extremities, and if he required assistance with activities of daily living.

When plaintiff arrived to Fishkill C.F. in 2012, he was placed under the care of various DOCCS physicians, including John T. Hammer, M.D. and Joseph Avanzato, M.D. (Dkt. Nos. 132-20 at 1; 132-22 at 1). According to Dr. Hammer's sworn declaration, plaintiff was placed in the long term care unit shortly after his arrival, "in order to evaluate plaintiff for general population within the correctional facility because [plaintiff] alleged he was unable to use his arms and legs." (Dkt. No. 132-22 at 2). By plaintiff's own admission, he was provided assistance with all activities of daily living at this time. However, in July 2012, plaintiff's treatment team came to the conclusion that "there was nothing neurologically wrong with [plaintiff] that ... prevented him from using his arms and hands." (Dkt. Nos. 132-20 at 2; 132-22 at 2). This opinion was set forth in significant detail in a six page progress note prepared by Dr. Avanzato on July 12, 2012. (Dkt. No. 132-21 at 1-6). Dr. Avanzato included detailed support for his conclusion regarding plaintiff's medical condition, including an analysis of plaintiff's prior medical records, review of previous radiology and diagnostic testing, and anecdotal reports of plaintiff's voluntary limb movement. (Dkt. No. 132-21 at 1-6). Dr. Hammer concurred with Dr. Avanzato's medical opinion, based on his own review of plaintiff's history as well as personal examinations. (Dkt. No. 132-22 at 2). Dr. Avanzato's medical conclusion was further endorsed by the subsequent medical opinion of neurologist Kishore N. Ranade, M.D., a consulting physician for DOCCS. Dr. Ranade examined plaintiff in 2012, concluding that plaintiff was not a quadriplegic, and did not suffer from any disease that would prevent him from moving his extremities. (Dkt. No. 132-23 at 3). Based on Dr. Avanzato's conclusion, defendant Connolly discontinued the provision of a scribe to plaintiff, citing it as a "privilege" which plaintiff's disciplinary record no longer justified. (Dkt. No. 132-18 at 2-3).

**\*6** This court recommends dismissing the First Amendment access-to-courts claim against defendant Connolly. As a lay prison administrator, he was entitled to rely on the judgment of the prison medical staff, which specifically opined that plaintiff had no limitations for using his upper extremities. *Cooke,* 2010 WL 3418393, at \*7; *Williams v. Bailey,* 2010 WL 3881024, at \*8. As the superintendent of Fishkill C.F., defendant Connolly was otherwise entitled to impose disciplinary policies that potentially affected plaintiff's access to the courts. [6] Nevertheless, the evidence reflects that plaintiff was provided with an alternative means to prepare his legal memoranda, and there is no allegation that plaintiff's access to the courts was otherwise hindered by defendant Connolly throughout the remainder of plaintiff's incarceration at Fishkill C.F. [7] *See Desmarat*

*v. Artus,* 2011 WL 1564605, at *5 ("While states must provide, at state expense, certain materials, such as paper and pen to draft legal documents[,] with notarial services to authenticate them, and with stamps to mail them[,] economic factors may nevertheless be considered when choosing the methods used to provide meaningful access. A state need not provide the best manner of access, nor is it obligated to equalize the financial resources of each of its inmates ... So long as the State's procedure's [sic] meet constitutional minima, the courts should not second-guess them.") (internal quotations and citations omitted), Report and Recommendation Adopted, 2011 WL 1557914 (N.D.N.Y. Apr. 25, 2011).

### 2. Defendant Martuscello

Plaintiff argues that he was still denied the assistance of a scribe upon his initial transfer to Coxsackie C.F. in December 2013, and for the following several months. Defendants argue that, without further analysis, defendant Martuscello is nevertheless subject to qualified immunity with respect to this claim.

In August 2012, Judge Alvin K. Hellerstein of the Southern District of New York issued a decision dismissing a prior lawsuit commenced by plaintiff, for allegations regarding the conditions of his confinement at a separate correctional facility. *Shomo v. City of New York,* No. 03 Civ. 10213, 2012 WL 13128742 (S.D.N.Y. Aug. 23, 2012). There, Judge Hellerstein made a specific finding that plaintiff had not demonstrated a serious medical need to satisfy his Eighth Amendment claims, particularly that "[t]he evidence, which is overwhelming ... gives no medical support for [plaintiff's] purported paralysis." *Id.* at *4. Defendants argue that Judge Hellerstein's findings are controlling in the instant matter, and that defendant Martuscello is entitled to qualified immunity because federal law did not prohibit the defendants from denying the plaintiff a scribe during the time plaintiff was incarcerated at Coxsackie C.F. (Def.'s Br. at 9-11).

*\*7* The court is not persuaded that summary judgment for defendant Martuscello is appropriate based on qualified immunity, particularly due to the nature of plaintiff's allegations against defendant Martuscello. Unlike the claim against defendant Connolly, plaintiff's access-to-courts allegations against defendant Martuscello are not limited to the scribe issue. Plaintiff also contends that defendant Martuscello personally censored plaintiff's legal filings,

including what claims he allowed plaintiff to file and against whom he was allowed to file them. (Dkt. No. 82 at 47-48). Accordingly, Judge Hellerstein's previous determination that plaintiff was not paralyzed would not protect defendant Martuscello from the totality of the allegations against him.

The court therefore proceeds with its analysis of the access-to-courts claim asserted against defendant Martuscello. To be sure, plaintiff's First Amendment cause of action is wholly premised on backward-looking claims. Thus, plaintiff must allege facts to plausibly suggest a nonfrivolous, arguable underlying claim that has been frustrated by defendant Martuscello's actions, and a continued inability to obtain the relief sought by the underlying claim. *See Johnson v. McKay,* No. 9:14-CV-00803 (BKS/TWD), 2016 WL 4047852, at *4 (N.D.N.Y. June 9, 2016), Report and Recommendation Adopted, 2016 WL 4033199 (N.D.N.Y. July 27, 2016). Plaintiff has presented, in some detail, four previously pending causes of action allegedly dismissed because he was denied access to the courts, and four other causes of action that plaintiff "wanted to bring but was prohibited because of defendants['] denial of assistance." (Dkt. No. 82 at 24). Immediately, the court can dispose of three of the underlying claims, as plaintiff does not allege that defendant Martuscello was personally involved in the purported obstruction of these lawsuits. [8] The court addresses the remaining underlying causes of action in turn.

### a. Plaintiff's Federal Habeas Corpus Claim

*\*8* As previously discussed, plaintiff is currently incarcerated pursuant to his various felony convictions. In his complaint, plaintiff describes in great detail the facts surrounding his underlying arrest, trial and conviction. (Dkt. No. 82 at 3-18). Included is the fact that, in April 2009, plaintiff became aware of a legal defect in the expert testimony elicited by the FBI, on behalf of the prosecutor, at his criminal trial. (Dkt. No. 82-1). Plaintiff maintains that this defect, among others, was a basis on which he could have brought a successive petition for habeas corpus in federal court. (*Id.* at 11-12). Nevertheless, plaintiff asserts that "because the Fishkill defendants 'refused' to allow anyone to even assist plaintiff in filling out legal papers, he was unable to fill out the application [for a successive petition] and return it [within] the 45 day time period." (Dkt. No. 82 at 49).

Notwithstanding the foregoing, plaintiff does not assert a viable access-to-courts claim premised on his habeas petition.

Plaintiff fails to provide the dates on which he was provided the successive habeas corpus application or the date that the 45 day deadline expired, however he explicitly alleges that the "Fishkill defendants[']" actions prevented him from meeting the 45 day deadline. (*Id.*). As discussed, defendant Martuscello was the superintendent of Coxsackie C.F., and had no personal involvement in plaintiff's access to the courts while incarcerated at Fishkill C.F. Therefore, defendant Martuscello cannot be held liable for the obstruction of this claim.

Furthermore, plaintiff's access claim relative to his habeas petition cannot survive summary judgment because a searching review of the federal docket indicates plaintiff has, in fact, since moved for leave to file a successive habeas corpus petition. *See Shomo v. Zon,* No. 1:05-CV-10337 (S.D.N.Y.) (Dkt. No. 25); *Shomo v. Heath,* No. 1:12-CV-01974 (S.D.N.Y.) (Dkt. No. 7). Moreover, the Southern District denied plaintiff's motion, finding that plaintiff did not make a prima facie showing that the requirements of 28 U.S.C. § 2244(b) were satisfied. *Id.* Having already filed his successive petition and it being determined on the merits, plaintiff cannot now assert that he was foreclosed from seeking judicial relief in the underlying habeas proceeding. [9]

#### b. Plaintiff's "Lost" Litigation Opportunities

The four remaining claims upon which plaintiff premises his access-to-courts action against defendant Martuscello are construed as potential § 1983 claims for constitutional violations imposed during plaintiff's incarceration at the various DOCCS facilities. Specifically, plaintiff alleges that he "wanted" to, but was prevented from, bringing a claim against (1) Clinton Correctional Facility personnel for constitutional violations occurring between 2008 and January 2010 (the "Clinton C.F. claim"); (2) Attica Correctional Facility personnel for constitutional violations occurring between April 2010 and December 2011 (the "Attica C.F. claim"); (3) Sing-Sing C.F. personnel for constitutional violations occurring between December 2011 and May 2012 (the "Sing-Sing C.F. claim"); and (4) Fishkill C.F. personnel for constitutional violations occurring between May 2012 and December 2013 (the "Fishkill C.F. claim").

**\*9** In premising his access-to-court claim on the aforementioned "lost" causes of action, plaintiff necessarily represents that defendant Martuscello's conduct was so severe

as to "render [ ] hollow his right to seek redress ... thereby completely foreclos[ing] a judicial remedy." *Blake v. Dowe,* 36 F. Supp. 3d 271 (D. Conn. 2014) (internal quotations omitted) (quoting *Sousa,* 702 F.3d at 128). Importantly, when the access claim "looks backwards ... the complaint must identify a remedy that may be awarded as recompense *but not otherwise available in some suit that may yet be brought." Holmes v. Grant,* 2006 WL 851753, at \*12 (emphasis added) (citing *Christopher v. Harbury,* 536 U.S. at 414-15); *see also Olivia v. Town of Greece, NY,* 71 F. Supp. 3d 368, 375 (W.D.N.Y. 2014) ("In other words, the critical issue here is whether or not the plaintiffs were 'completely foreclosed' from seeking a judicial remedy.").

The courts have suggested that the doctrine of equitable tolling presents such an alternative available means for a plaintiff to pursue his "lost" claims, at least in the context of habeas corpus relief. *See Hizbullahankhamon v. Walker,* 255 F.3d 65, 75 (2d. Cir. 2001) ("were we to determine, in an appropriate case, that the discretionary deprivation of a prisoner's access to his own legal materials and law library materials prevented a prisoner from petitioning for a writ of habeas corpus in federal court, we would be obliged to consider granting a request for equitable tolling ..."); *Trombley v. Bosco,* No. 9:14-CV-01118 (JKS), 2016 WL 6238576, at \*4-5 (N.D.N.Y. Oct. 25, 2016) (finding petitioner established an extraordinary circumstance warranting tolling of the one-year limitation period where the facility in which he was civilly confined had "no law library and that [residents were] not allowed access to computerized legal research"); *Holmes v. Grant,* 2006 WL 851753, at \*13 ("[A]lthough plaintiff claims he is forever barred from pursuing his habeas petition, an alternative course of action with respect to this [access-to-courts] claim is to file his habeas petition and request equitable tolling in light of defendants' alleged destruction of his legal materials."). This court has not been presented with any reason why the same theory should not apply to plaintiff's "foregone" claims here, claiming unconstitutional conditions of confinement. *See e.g.*

*Borges v. Administrator For Strong Memorial Hosp.,* No. 99-CV-6351, 2002 WL 31194558, at \*7-8 (W.D.N.Y. Sept. 30, 2002) (applying doctrine of equitable tolling to inmate plaintiff's deliberate indifference to medical needs claim). This is especially compelling, considering that plaintiff has, since the inception of the instant access-to-courts suit, commenced a separate lawsuit in the Southern District of New York for the very same causes of action alleged in

the underlying Sing-Sing C.F. claim, raising the doctrine of equitable estoppel. *See Shomo v. State of New York, et al.,* No. 18-CV-8523 (S.D.N.Y.) (Dkt. No. 1). It is, therefore, difficult to accept plaintiff's argument that he is "completely foreclosed" from seeking a judicial remedy in these matters.

Plaintiff's underlying claims prove otherwise fatal to his access-to-courts action against defendant Martuscello. For example, according to the amended complaint, the statute of limitations for plaintiff's Clinton C.F. claim would have run no later than January 2013. (Dkt. No. 82 at 24-25). Plaintiff does not allege he was denied access to the courts by defendant Martuscello until his transfer to Coxsackie C.F. in December 2013, and as such there could have been no personal involvement by defendant Martuscello in obstructing his ability to file a complaint regarding the Clinton C.F. claim.

**\*10** Furthermore, "delays in communicating with the courts or delays in the ability to work on a legal action do not rise to the level of a constitutional violation." *Murphy v. Feliciano,* No. 3:17-CV-269, 2017 WL 3698490, at \*4 (D. Conn. Aug. 25, 2017) (quoting *Cathedral Church of The Intercessor v. Incoporated Village of Malverne,* 353 F. Supp. 2d 375, 388 (E.D.N.Y. 2005) (other citations omitted)); *see also Tanzi v. Town of Marlborough,* 13 Civ. 113 (GTS/RFT), 2014 WL 2815577, \*5 (N.D.N.Y. Jun. 23, 2014) ("Conduct that merely delays a plaintiff's ability to work on a pending cause of action or communicate with the courts does not amount to a violation of the right to access"); *Jermosen v. Coughlin,* 877 F. Supp. 864, 871 (S.D.N.Y. 1995) ("A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation"). The statute of limitations for the Fishkill C.F. claim would not have expired until December 2016, and plaintiff alleges that he began receiving assistance with writing legal papers as early as August 2015. (Dkt. No. 82 at 23). Moreover, he was transferred out of Coxsackie C.F. and into Wende C.F. by December 2015. To the extent that defendant Martuscello's alleged conduct amounted to a mere delay in plaintiff's ability to commence the Fishkill C.F. action, plaintiff has failed to allege actual injury for purposes of his denial of access to courts claim.

Based on the aforementioned, this court recommends granting summary judgment and dismissing the access-to-courts claim against defendant Martuscello.

## V. ADA/Rehabilitation Act

### A. Legal Standards

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To assure that those requirements are met, 'reasonable accommodation' may have to be provided to the qualified individual." *Harris v. Mills,* 572 F.3d 66, 73 (2d Cir. 2009) (citations omitted). Similarly, section 504 of the Rehabilitation Act declares, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Title II of the ADA and section 504 are applicable to inmates in state prisons. *Allah v. Goord,* 405 F. Supp. 2d 265, 274 (S.D.N.Y. 2005). In order to state a claim under the ADA, the inmate must establish that: "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity [that] provides the service, program, or activity is a public entity." *Id.* (citations omitted).

The standards for an inmate's claim under section 504 are generally the same as an ADA claim. *See Id.* at 113 n.2 (the most significant distinction between the two statutes is that Title II of the ADA applies to all state and municipal governments, while section 504 applies only to those government agencies or departments that accept federal funds, and only those periods during which the funds are accepted); *Harris v. Mills,* 572 F.3d at 73.

### B. Application

Plaintiff maintains an ADA and Rehabilitation Act (collectively "Acts") claim against DOCCS [10] for the "denial of ADA accommodations." (Dkt. No. 47-48). Defendant raises the following challenges to plaintiff's claim: First, defendants contend that the doctrine of collateral estoppel bars plaintiff from litigating the issue of whether he has a qualifying disability under the Acts. Second, defendants argue

that, notwithstanding the application of collateral estoppel, plaintiff cannot meet his burden to show he is a "disabled individual" within the meaning of the Acts.

**\*11** "Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *LB on behalf of PB v. Hines*, No. 15-CV-5238, 2018 WL 1773138, at \*3 (S.D.N.Y. Apr. 10, 2018) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)). "Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Id.* (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979)). Four elements must be met for collateral estoppel to apply: "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.' " *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997)).

Defendants correctly point out that the precise issue of whether plaintiff qualifies as a "disabled individual" under the Acts was previously litigated and decided on the merits by Judge Hellerstein, as set forth in his August 23, 2012 order, dismissing plaintiff's prior Southern District of New York ADA claim. *See Shomo v. The City of New York*, 2012 WL 13128742 at \*7 ("The medical evidence indicates, for the reasons stated in Section V(A) above, that Shomo is not a "disabled individual" within the meaning of the [ADA and RA]."). Because the Southern District concluded that plaintiff did not suffer from a disability for the purposes of the Acts, that determination precludes plaintiff from mounting the same challenge in this court. *See Cole v. N.Y. State Dep't of Corr. & Comm. Supervision*, No. 9:14-CV-0539(BKS/DEP), 2016 WL 5394752, at \*31 (N.D.N.Y. Aug. 25, 2016) (finding Southern District Court's conclusion that plaintiff did not suffer from a hearing disability for purposes of the ADA barred plaintiff from litigating the issue of his disability in the pending action); *see also Moran v. N.Y. Dep't of Health*, 111 F.3d 123 (2d Cir. 1997).

Moreover, "a person alleging a disability protected by the ADA has a burden of establishing with medical evidence the existence of the alleged disability...." *Fagan v. United International Insurance Co.*, 128 F. Supp. 2d 182, 186 n.2 (S.D.N.Y. 2001). Summary judgment is appropriate when a plaintiff fails to produce such evidence. *See Sussle v. Sirina Protection Systems Corp.*, 269 F. Supp. 2d 285, 301 (S.D.N.Y. 2003) ("District courts in the Second Circuit have repeatedly held that a plaintiff's personal testimony which describes the alleged limits that affect a major life activity, 'without supporting medical testimony, simply is not sufficient to establish [a] prima facie case under the ADA.' ").

Here, plaintiff cannot satisfy his burden to show that he is a "disabled individual" within the meaning of the Acts. As previously discussed, the medical evidence proffered by defendants in the form of Dr. Avanzato, Dr. Hammer, and Dr. Ranade's sworn affidavits overwhelmingly contradicts plaintiff's allegations of paralysis. These medical affidavits are consistent with Dr. Avanzato's lengthy analysis of plaintiff's medical condition, prepared contemporaneously with the time period in dispute. Plaintiff, in an attempt to argue that a question of fact remains with respect to his disability status, relies on the May 2012 Mount Vernon Hospital records "where he was diagnosed as a quadriplegic." (Dkt. No. 150 at 5). These records consist of a physician progress note and physical therapy evaluation prepared when plaintiff was transported to Mount Vernon Hospital to treat for his reported hunger strike while at Sing-Sing C.F. (Dkt. Nos. 82-1 at 207-209; 142-1 at 11-15). Although the term "quadriparesis" appears in the history section of plaintiff's records, the physician's progress note merely concludes with an assessment of "Quadriparesis by history." (Dkt. No. 142-1 at 15) (emphasis added). Plaintiff's subjective complaints and reports of paralysis do not rise to the level of a disability under the Acts, and plaintiff cannot satisfy his burden in this regard.

**\*12** Plaintiff argues that, notwithstanding a lack of medical evidence supporting the his alleged paralysis, he is nevertheless entitled to the protections of the Acts because he was "regarded as having such an impairment" by DOCCS personnel during the period in question. Admittedly, the ADA Amendment Act of 2008 [11] alternatively defines a "disability" as "being regarded as having such an impairment [that substantially limits one or more major life activities.]" 42 U.S.C. § 12102(1). However, the ADAAA now makes clear that no failure to accommodate claim can be made, as a matter of law, for an individual who was "regarded as" disabled, rather than who was actually disabled. "In other words, the

"regarded as" theory of disability is no longer actionable in the context of a failure to accommodate claim." *Graham v. Three Village Central School Dist.*, 2013 WL 5445736, at *11 (citing 42 U.S.C. § 12201(h) ("A covered entity under subchapter I, a public entity under subchapter II, and any person who owns, leases (or leases to), or operates a place of public accommodation under subchapter III, need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section.")); *see also Morris v. Town of Islip*, No. 12-CV-2984, 2014 WL 4700227, at *8 (E.D.N.Y. Sept. 22, 2014) (quoting *Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n. 7 (7th Cir. 2011) ("[T]he ADAAA clarified that an individual 'regarded as' disabled (as opposed to actually disabled) is not entitled to a 'reasonable accommodation.' ")). Thus, even assuming plaintiff was, for a time, "regarded as" disabled by DOCCS, he was not entitled to a reasonable accommodation under the Acts.

## VI. Sanctions

Plaintiff has requested that the court impose sanctions on the defendants for their asserted failure to respond to discovery demands, as well as spoliation of evidence. Although these requests [12] should be moot in light of our recommendation to grant defendants' summary-judgment motion and dismiss the amended complaint, we also separately recommend that plaintiff's motion for sanctions be denied even if the court were to deny some aspect of defendants' Rule 56 motion.

 **\*13** When determining the proper sanction for discovery infractions, we must consider "(a) [the] willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party has been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party." *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124,138 (S.D.N.Y. 2009) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998)). Plaintiff first complains that the defendants have been 'evasive' and 'misleading' in responding to various demands for admissions asserted by the plaintiff. (Dkt. No. 142-2 at 9-15). However, Plaintiff's request for sanctions regarding defendants' allegedly insufficient discovery responses has

already been considered by this court, and denied in my January 30, 2019 text order. (Dkt. No. 129). Plaintiff presents no new basis for his discovery sanctions request, therefore the court will rely on its prior denial of such relief.

Second, plaintiff alleges the defendants' "spoliation" of evidence. (Dkt. No. 142-2 at 15-17). Although unclear, the court interprets the allegation to be that defendants improperly destroyed certain videos of plaintiff depicting images "consistent with plaintiff being a quadriplegic." (*Id.* at 15). Pursuant to Rule 37 of the Federal Rules of Civil Procedure,"[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the Court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may;

>> (A) presume that the lost information was unfavorable to the party;

>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). As the language of the revised rule [13] makes clear, the Advisory Committee "adopted the principle that severe sanctions are permitted only where the court finds an 'intent to deprive another party of the information's use in the litigation[.]' " *CAT3, LLC*, 164 F. Supp. 3d at 495(quoting Fed. R. Civ. P. 37(e)(2)).

At the outset, plaintiff fails to give any detail as to the date, location, or content of the videos for which he seeks spoliation sanctions. To the extent plaintiff argues that DOCCS should have preserved the video that was allegedly produced for his December 2012 state hearing on the force-feeding petition, there is no evidence to support an inference that, once the Order to Show Cause was determined, any video evidence of plaintiff should have been preserved because it would be requested by plaintiff in a future, unrelated legal proceeding commenced several years later. Moreover, plaintiff has not presented any evidence beyond his unsworn, self serving

statements indicating that the defendants destroyed video of the plaintiff with the intent to deprive him of its use in this litigation. Accordingly, and in light of this court's recommendation to dismiss the complaint, plaintiff has not presented a justification for spoliation sanctions against the defendants.

**\*14  WHEREFORE**, based on the findings above, it is **RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 132) be **GRANTED,** and it is further

**RECOMMENDED,** that plaintiff's motion for sanctions be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec. of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2019 WL 7971871

## Footnotes

1   Plaintiff contends that these injuries stem from an October 24, 1994 incident at Riker's Correctional Facility, where he was previously incarcerated for a separate offense. (Dkt. No. 132-3 at 45-50). Allegedly, plaintiff was in his cell reaching down for some personal items when he came into contact with exposed wires, causing him to become electrocuted and thrown backwards, thereby sustaining the claimed injuries. (Id.).

2   According to plaintiff, the second injury to his left arm occurred as a result of being handcuffed to another prisoner on September 7, 1999, while in DOCCS custody. (Dkt. No. 143 at 2) (citing Shomo v. City of N.Y., 579 F. 3d. 176, 183 (2d Cir. 2009)).

3   Submitted with defendants' motion papers is a copy of plaintiff's Inmate Disciplinary History, indicating that plaintiff was found guilty of three Tier 2 offenses in the little over two months between his transfer to Fishkill C.F. and the date of Superintendent Connolly's memorandum. (Dkt. No. 132-8). The Inmate Disciplinary History further reveals that, between February 2003 and August 2018, plaintiff was charged with 70 different Tier 2 and Tier 3 offenses, for almost all of which he was found guilty. (Id.).

4   But see Desmarat v. Artus, Civ. No. 08 Civ. 977 (DNH/RFT), 2011 WL 1564605, at *7 (N.D.N.Y. Mar. 25, 2011) (questioning whether 'maliciousness' is a proper element of a backward-looking access to court claim, based on Second Circuit jurisprudence).

5   Plaintiff's complaint also alleges a general claim for denial of access to the law library. (Dkt. No. 82 at 46-47). However, the pleadings lack sufficient factual detail surrounding this claim, including the actual harm resulting from his lack of law library access or how the defendants were personally involved in such deprivation. See Fowler v. Dep't of Corr., No. 3:17-CV-00848, 2017 WL 3401252, at *7 (D. Conn. 2017) (dismissing access-to-courts claim for lack of sufficiently detailed description of underlying court case and how it was impeded by denial of access to prison law library books). Moreover, plaintiff's general complaint that the four hours a week he was allowed access to the law library violated his constitutional rights is unavailing. Bilal v. New York State Dep't of Corrections, No. 09 Civ. 8433, 2010 WL 2506988, at *13 (S.D.N.Y. June 21, 2010) (citing inter alia Penrod v. Zavras, 94 F.3d 1399, 1403–04 (10th Cir. 1996)) (no constitutional violation where, inter alia, prisoner had access to library "several hours every week"); Auguste v. Dep't of Corr., 424 F. Supp. 2d 363, 369 (D. Conn. 2006) (no constitutional violation where prison permitted plaintiff to visit law library for one hour every other day and permitted plaintiff additional library visits sixty-three times during an approximately

fifteen month period). Accordingly, plaintiff's access-to-courts claim based on a denial of access to the law library is factually and legally deficient, warranting dismissal.

6    The evidence of record reflects that between August 2012 and December 2013, plaintiff spent the majority of his confinement at Fishkill C.F. in keeplock, and was subject to other disciplinary consequences, as a result of his conduct. (Dkt. No. 132-8). "[A] practice that is reasonably related to legitimate penological interests may be upheld, even if it negatively impacts on prisoners' access to court." *Arce v. Walker,* 58 F. Supp. 2d 39, 44 (W.D.N.Y. 1999) (citing *Lewis,* 518 U.S. at 361). "Legitimate penological interests include preserving prison security and maintaining order and discipline." *Knight v. Keane,* 247 F. Supp. 2d 379, 393 (S.D.N.Y. 2002) (citing *Security and Law Enforcement Employees v. Carey,* 737 F.2d 187, 203 (2d Cir. 1984)). Courts owe "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Mitchell v. N.Y. State Dept. of Correctional Services,* No. 6:06-CV-6278, 2012 WL 6204205, at *9 (W.D.N.Y. Dec. 12, 2012) (citing *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003)). "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta,* 539 U.S. at 132.

7    At one point during his deposition, plaintiff stated that at Fishkill C.F. he "had no personal property available to [him], not a pen, no piece of paper, not legal work, not personal mail. I had nothing available to me." (Dkt. No. 132-3 at 38-39). The context of plaintiff's testimony, however, implies that plaintiff had "nothing available" because he was not being "assisted" with these items. (*Id.*).

8    Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Purdie v. Graham,* No. 9:09-CV-951(FJS/ATB), 2010 WL 6428487, at *3 (N.D.N.Y. July 14, 2010), Report Recommendation Adopted, 2011 WL 1258525 (N.D.N.Y. Mar. 31, 2011). In 2006, plaintiff commenced a lawsuit with respect to alleged constitutional violations that took place at Wende Correctional Facility. (Dkt. No. 82 at 23-24). *See Shomo v. State of New York, et.al.,* No. 1:06-CV-00353 (W.D.N.Y.). Plaintiff maintains that his ability to prepare certain paperwork in order to serve those defendants was obstructed by defendant Connolly's conduct while plaintiff was incarcerated at Fishkill C.F., resulting in a dismissal of that claim. (Dkt. No. 132-3 at 89-90). Because defendant Martuscello lacked any personal involvement in the alleged obstruction that occurred at Fishkill C.F., he cannot be held liable for an access action premised on this claim. Plaintiff further alleges that, as a result of defendant Connolly's "denial of assistance with fi[l]ling out [a] notice of appeal" of Judge Hellerstein's previously discussed decision and order, that case was "terminated" with "no further action" available to the plaintiff. (Dkt. No. 82 at 21-23). Once again, the lack of defendant Martuscello's personal involvement in the alleged obstruction of this underlying claim precludes a finding of liability against him.

Last, plaintiff alleges that, in 1994 while an inmate at Riker's Correctional Center, he sustained injuries when he came into contact with "loose" electrical wires. (Dkt. No. 82 at 19). Plaintiff filed a Notice of Claim in 1996 against the city, and litigation ensued. (*Id.* at 20-21). Apparently, in light of plaintiff's 2000 conviction, the state court "informed plaintiff that the case would be taken off the active calendar, and all that would be need[ed] was for plaintiff to file a motion to restore the case to the active calendar." (*Id.*). Plaintiff, claiming that he spent the interim 12 years seeking counsel to represent him in the personal injury matter, apparently did not attempt to file the motion to restore the case to the active calendar until he was at Fishkill C.F., sometime after May 29, 2012. (*Id.*). Once again, plaintiff asserts that he was unable to return the motion to the court as a result of the "Fishkill Defendants[']" failure to provide assistance to plaintiff. (*Id.* at 21-22). By plaintiff's own account, defendant Martuscello had no personal involvement in the alleged obstruction identified, and as such cannot be held liable.

9    It would also appear that plaintiff's claim is barred by the Supreme Court's holding in *Heck v. Humphrey*, as the award of damages in plaintiff's access claim would necessarily imply the invalidity of plaintiff's underlying

conviction. 512 U.S. 477, 487 (1994). "In *Heck v. Humphrey,* [the Supreme Court] held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence,' unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated." *Adams v. Annucci,* No. 17-CV-3794, 2018 WL 4608216, at *5 (S.D.N.Y. Sept. 25, 2018) (quoting *Edwards v. Balisok,* 520 U.S. 641, 643 (1997)). Therefore, plaintiff cannot seek monetary relief based on his alleged wrongful conviction, because he has not shown that his conviction has been invalidated. See, e.g., *Antrobus v. City of New York,* No. 11 Civ. 2524, 2014 WL 1285648, at *3 (S.D.N.Y. Mar. 27, 2014) (citing *Hoard v. Reddy,* 175 F.3d 531, 533 (7th Cir. 1999) (explaining why monetary damages are not available under *Heck* for an access-to-the-courts claim until after a prisoner's conviction has first been set aside)); *Holmes v. Grant,* No. 03 Civ. 3426, 2006 WL 851753, at *12–13 (S.D.N.Y. Mar. 31, 2006) (finding a section 1983 claim that the defendants caused dismissal of prisoner's habeas petition was barred by *Heck*).

10    To the extent plaintiff attempts to revive his ADA and Rehabilitation Act claims against any individual defendants (Dkt. No. 142-2 at 7; Dkt. No. 150 at 3-4), these claims were previously dismissed in my June 18, 2018 Decision and Order. (Dkt. No. 81 at 21-23).

11    The ADA Amendment Act of 2008 ("ADAAA"), effective January 1, 2009, altered the analysis for assessing ADA disability claims, "substantially broaden[ing] the definition of a disability under the law, in explicit response to *Sutton v. United Air Lines,* 527 U.S. 471 (1999) and *Toyota Motor Mfg. v. Williams,* 534 U.S. 184 (2002), in which the ADA's terms defining disability had been strictly defined." *Green v. DGG Properties Co.,* Inc., No. 11–CV–1989, 2013 WL 395484, at *9 (D. Conn. Jan. 31, 2013) (citation and internal quotation marks omitted); *see also Kravtsov v. Town of Greenburgh,* No. 10–CV–3142, 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012) ("In enacting the ADA, Congress intended to provide broad coverage for individuals with disabilities, and in enacting the ADAAA in 2008, rejected Supreme Court precedent in *Toyota Motor Mfg. v. Williams,* 534 U.S. 184 (2002), as interpreting the term 'substantially limits' to require a greater degree of limitation than was intended.") (alteration, citation, and internal quotation marks omitted). Thus, "[w]hile the terms of the statute were not changed, the interpretation of those terms was modified." *Brtalik v. S. Huntington Union Free Sch. Dist.,* No. CV–10–0010, 2010 WL 3958430, at *7 (E.D.N.Y. Oct. 6, 2010). Pursuant to this definition, an asserted "disability" will "be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of the chapter." 42 U.S.C. § 12102(4).

*Graham v. Three Village Central School Dist.,* No. 11-CV-5182, 2013 WL 5445736, at *11 (E.D.N.Y. Sep. 30, 2013).

12    Inasmuch as plaintiff is seeking relief that is separate and distinct from the issues raised in defendants' pending motion, plaintiff's various sanctions requests should have properly been asserted by way of cross-motion, instead of tacked on to the end of plaintiff's memorandum of law and sur-reply in opposition. However, plaintiff also requests in his opposition papers that the court reopen discovery in order for him to obtain additional documentation, in particular various transcripts relative to his December 2012 hearing regarding the state's request for an order to force-feed plaintiff. (Dkt. No. 150 at 1-2). To the extent plaintiff seeks relief under Rule 56(f), we further recommend denying the same. Plaintiff admits that these transcripts, at most, include the state's request to withdraw their 2012 state court petition to force-feed plaintiff, and its concession that the court stop short of determining plaintiff's status as a quadriplegic. (*Id.*). Even assuming the validity of plaintiff's contentions as to the contents of the transcripts, such evidence is not relevant to the instant motion and would not affect this court's recommendation. *Hodge v. Perilli,* No. 06 Civ. 2480, 2010 WL 291058, at *11 (S.D.N.Y. July 12, 2010) (citing *Sage Realty Corp. v. Insurance Co. of North America,* 34 F.3d 124,

128 (2d Cir. 1994))(noting that to obtain Rule 56(f) relief, additional discovery sought must be material to opposition of the summary-judgment motion).

13    This rule underwent substantial revision as part of a series of amendments to the Federal Rules that became effective on December 1, 2015. *See CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 495 (S.D.N.Y. 2016). Prior to these amendments, "the Second Circuit permitted [spoliation] sanctions upon a finding that

the party that had lost or destroyed evidence had acted negligently." *Id.* (citing *Residential Funding Corp. v. DeGeorge Capital Corp.*, 306 F.3d 99, 108 (2d Cir. 2002)).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 Arizona Senate Bill No. 1198, Arizona Forty-Ninth..., 2010 Arizona Senate...

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 192 of 301

2010 Arizona Senate Bill No. 1198, Arizona Forty-Ninth
Legislature - Second Regular Session (FULL TEXT - NETSCAN)

ARIZONA BILL TEXT

VERSION: Introduced
January 26, 2010
ALLEN S, AGUIRRE, MIRANDA, MCGUIRE, ALVAREZ, MELVIN, PEARCE R, PIERCE S, VERSCHOOR

 Image 1 within document in PDF format.

SUMMARY: AN ACT Amending section 40B-361, Arizona Revised Statutes; relating to utilities.

**TEXT:**

REFERENCE TITLE: ~~line extensions; utility infrastructure; charges.~~

State of ArizonaSenateForty-ninth LegislatureSecond Regular Session2010 SB 1198

Introduced bySenators Allen S, Aguirre, Miranda; Representative McGuire: Senators Alvarez, Melvin, Pearce R, Pierce S, Verschoor

**AN ACT**

**Amending section 40-361, Arizona Revised Statutes; relating to utilities.**

(TEXT OF BILL BEGINS ON NEXT PAGE)

Be it enacted by the Legislature of the State of Arizona:

Section 1. Section 40-361, Arizona Revised Statutes, is amended to read:

40-361. Public service corporations; line extensions; utility infrastructure; charges; applicability; rules; definitions

A. Charges demanded or received by a public service corporation for any commodity or service shall be just and reasonable. Every unjust or unreasonable charge demanded or received is prohibited and unlawful.

B. Every public service corporation shall furnish and maintain such service, equipment and facilities as will promote the safety, health, comfort and convenience of its patrons, employees and the public, and as will be in all respects adequate, efficient and reasonable.

C. All rules and regulations made by a public service corporation affecting or pertaining to its charges or service to the public shall be just and reasonable.

**D. A public service corporation may not charge a customer for the first one thousand feet of a line or service lateral required to extend electric service from a public service corporation's existing permanent facility to the point of delivery if the cost of the line or service lateral ten thousand dollars or less. If the cost of the line or service lateral is more than ten thousand dollars, the public service corporation may conduct a cost analysis, at its own expense, to determine the cost, including all applicable taxes and fees, and require the customer to pay any cost of the line or service lateral that is more than ten thousand dollars.**

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 Arizona Senate Bill No. 1198, Arizona Forty-Ninth..., 2010 Arizona Senate...

Case 9:18-cv-00391-LEK-TWD Document 70 Filed 04/23/20 Page 193 of 301

**E. A public service corporation shall offer credits toward the cost of any necessary utility infrastructure in an amount of at least:**

**1. Five thousand dollars per lot for residential subdivisions not located in a master plan community development.**

**2. Four thousand dollars per lot for residential subdivisions located in a master plan community development.**

**F. Lot credits provided under subsection E shall not exceed the actual cost of the necessary utility infrastructure provided to the residential subdivision. The public service corporation may require:**

**1. The applicants for the residential subdivision to sign an extension agreement with the public service corporation. The extension agreement shall be for a minimum of five years from the activation of the first permanent residential home connection. A Public service corporation may reduce the amount of the credit required in subsection E if the applicant for the residential subdivision requests an extension agreement that exceeds five years.**

**2. That any additional cost in excess of the per lot credit be paid as a nonrefundable contribution to the public service corporation.**

**3. A field audit of a residential subdivision twenty-four months after the execution of an extension agreement to determine the number of permanently connected customers within a development.**

**4. A refundable advance of any construction costs that exceed the amount credited toward any permanently connected customers as determined at the time of the field audit.**

**G. A public service corporation shall offer a credit toward the cost of any necessary utility infrastructure in the amount of at least one thousand dollars per lot for a master plan community development. The per Lot credit shall not exceed the actual cost of the necessary utility infrastructure provided to the master plan community development. The public service corporation may require:**

**1. The applicants for the master plan community development to sign an extension agreement with the public service corporation. The extension agreement shall be for a minimum of five years from the activation of the first permanent residential home connection. A Public service corporation may reduce the amount of the credit required in this subsection if the applicant for the master plan community development requests an extension agreement that exceeds five years.**

**2. That any additional cost in excess of the per lot credit be paid as a nonrefundable contribution to the public service corporation.**

**H. A public service corporation shall only charge a customer or applicant for the actual costs associated with the installation of a line or service lateral or for any necessary utility infrastructure provided to a customer or applicant.**

**I. The public service corporation shall furnish, install and maintain any risers, raceways and termination cabinets necessary for the installation of the corporation's underground service conductors.**

**J. Subsections D through H do not apply to any public service corporation that does not charge a fee for a service lateral extension to a service applicant.**

**K. For the purposes of this section:**

1. **"Master plan community development"** means developments that consist of a number of separately subdivided parcels for residential subdivisions.

2. **"Necessary utility infrastructure"** means any distribution facilities installed to service a development, including feeder lines, cables, conduits, duct banks, manholes, switching cabinets and capaciter banks.

3. **"Point of delivery"** means:

(a) **For above ground service point of delivery, where the utilities' service conductors terminate at the customer's weatherhead or bus riser.**

(b) **For underground service point of delivery, where the utilities' service conductors terminate in the customer's or developments' service equipment.**

4. **"Residential subdivision"** means any tract of land that has been divided into four or more contiguous lots with an average size of one acre or less.

Bz2007 Arizona State Legislature.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 Arizona Senate Bill No. 1198, Arizona Forty-Ninth..., 2010 Arizona Senate...

Case 9:18-cv-00391-LEK-TWD Document 70 Filed 04/23/20 Page 195 of 301

2010 Arizona Senate Bill No. 1198, Arizona Forty-Ninth
Legislature - Second Regular Session (FULL TEXT - NETSCAN)

ARIZONA BILL TEXT

VERSION: Filed
January 25, 2010
ALLEN S, AGUIRRE, MIRANDA, MCGUIRE, ALVAREZ, MELVIN, PEARCE R, PIERCE S, VERSCHOOR
Image 1 within document in PDF format.
SUMMARY: AN ACT Amending section 40B-361, Arizona Revised Statutes; relating to utilities.

**TEXT:**

REFERENCE TITLE: ~~line extensions; utility infrastructure; charges.~~

State of ArizonaSenateForty-ninth LegislatureSecond Regular Session2010 SB 1198

Introduced bySenators Allen S, Aguirre, Miranda; Representative McGuire: Senators Alvarez, Melvin, Pearce R, Pierce S, Verschoor

**AN ACT**

**Amending section 40-361, Arizona Revised Statutes; relating to utilities.**

(TEXT OF BILL BEGINS ON NEXT PAGE)

Be it enacted by the Legislature of the State of Arizona:

Section 1. Section 40-361, Arizona Revised Statutes, is amended to read:

40-361. Public service corporations; line extensions; utility infrastructure; charges; applicability; rules; definitions

A. Charges demanded or received by a public service corporation for any commodity or service shall be just and reasonable. Every unjust or unreasonable charge demanded or received is prohibited and unlawful.

B. Every public service corporation shall furnish and maintain such service, equipment and facilities as will promote the safety, health, comfort and convenience of its patrons, employees and the public, and as will be in all respects adequate, efficient and reasonable.

C. All rules and regulations made by a public service corporation affecting or pertaining to its charges or service to the public shall be just and reasonable.

**D. A public service corporation may not charge a customer for the first one thousand feet of a line or service lateral required to extend electric service from a public service corporation's existing permanent facility to the point of delivery if the cost of the line or service lateral ten thousand dollars or less. If the cost of the line or service lateral is more than ten thousand dollars, the public service corporation may conduct a cost analysis, at its own expense, to determine the cost, including all applicable taxes and fees, and require the customer to pay any cost of the line or service lateral that is more than ten thousand dollars.**

**E. A public service corporation shall offer credits toward the cost of any necessary utility infrastructure in an amount of at least:**

**1. Five thousand dollars per lot for residential subdivisions not located in a master plan community development.**

**2. Four thousand dollars per lot for residential subdivisions located in a master plan community development.**

**F. Lot credits provided under subsection E shall not exceed the actual cost of the necessary utility infrastructure provided to the residential subdivision. The public service corporation may require:**

**1. The applicants for the residential subdivision to sign an extension agreement with the public service corporation. The extension agreement shall be for a minimum of five years from the activation of the first permanent residential home connection. A Public service corporation may reduce the amount of the credit required in subsection E if the applicant for the residential subdivision requests an extension agreement that exceeds five years.**

**2. That any additional cost in excess of the per lot credit be paid as a nonrefundable contribution to the public service corporation.**

**3. A field audit of a residential subdivision twenty-four months after the execution of an extension agreement to determine the number of permanently connected customers within a development.**

**4. A refundable advance of any construction costs that exceed the amount credited toward any permanently connected customers as determined at the time of the field audit.**

**G. A public service corporation shall offer a credit toward the cost of any necessary utility infrastructure in the amount of at least one thousand dollars per lot for a master plan community development. The per Lot credit shall not exceed the actual cost of the necessary utility infrastructure provided to the master plan community development. The public service corporation may require:**

**1. The applicants for the master plan community development to sign an extension agreement with the public service corporation. The extension agreement shall be for a minimum of five years from the activation of the first permanent residential home connection. A Public service corporation may reduce the amount of the credit required in this subsection if the applicant for the master plan community development requests an extension agreement that exceeds five years.**

**2. That any additional cost in excess of the per lot credit be paid as a nonrefundable contribution to the public service corporation.**

**H. A public service corporation shall only charge a customer or applicant for the actual costs associated with the installation of a line or service lateral or for any necessary utility infrastructure provided to a customer or applicant.**

**I. The public service corporation shall furnish, install and maintain any risers, raceways and termination cabinets necessary for the installation of the corporation's underground service conductors.**

**J. Subsections D through H do not apply to any public service corporation that does not charge a fee for a service lateral extension to a service applicant.**

**K. For the purposes of this section:**

**1. "Master plan community development"** means developments that consist of a number of separately subdivided parcels for residential subdivisions.

**2. "Necessary utility infrastructure"** means any distribution facilities installed to service a development, including feeder lines, cables, conduits, duct banks, manholes, switching cabinets and capaciter banks.

**3. "Point of delivery"** means:

(a) **For above ground service point of delivery, where the utilities' service conductors terminate at the customer's weatherhead or bus riser.**

(b) **For underground service point of delivery, where the utilities' service conductors terminate in the customer's or developments' service equipment.**

**4. "Residential subdivision"** means any tract of land that has been divided into four or more contiguous lots with an average size of one acre or less.

Bz2007 Arizona State Legislature.

---

**End of Document**                                                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

2020 WL 486868
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jose SHOMO, Plaintiff,

v.

State of New York DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION et al., Defendants.

9:15-cv-1029 (GLS/ATB)
|
Signed 01/30/2020

**Attorneys and Law Firms**

Jose Shomo, Beacon, NY, pro se.

Michael G. McCartin, Office of Attorney General, Albany,
NY, for Defendants.

### SUMMARY ORDER

Gary L. Sharpe, U.S. District Judge

**\*1** Plaintiff *pro se* Jose Shomo commenced this action
against several defendants, pursuant to 42 U.S.C. §
1983; Title II of the Americans with Disabilities Act
(ADA), [1] and Section 504 of the Rehabilitation Act of 1973 [2]
("Rehabilitation Act"). (Compl., Dkt. No. 1). Most of the
defendants have since been terminated, (Dkt. No. 81 at 26),
leaving the State of New York Department of Corrections and
Community Supervision (DOCCS); William Connolly, then-
Superintendent of Fishkill Correctional Facility; and Daniel
Martuscello, then-Superintendent of Coxsackie Correctional
Facility as the only defendants, (*id.* at 25-26).

In granting in part Shomo's motion to file an amended
complaint, (Dkt. No. 78), the court permitted the following
claims to proceed: (1) First Amendment access-to-courts
claims against Connolly and Martuscello; and (2) ADA
and Rehabilitation Act claims for monetary damages against
DOCCS. (Dkt. No. 81 at 25.) The amended and operative
complaint was filed shortly thereafter. (Am. Compl., Dkt. No.
82.)

Upon completion of discovery, defendants moved for
summary judgment, seeking dismissal of the amended
complaint. (Dkt. No. 132.) Shomo filed a response, (Dkt.
No. 142), in which he requested sanctions be imposed
against defendants, (Dkt. No. 142, Attach. 2). On October 7,
2019, Magistrate Judge Andrew T. Baxter issued a Report-
Recommendation (R&R) recommending that this court deny
Shomo's request for sanctions, and grant defendants' motion
for summary judgment and dismiss the amended complaint.
(Dkt. No. 154.) Pending are Shomo's objections to the
R&R. [3] (Dkt. No. 158.) For the reasons that follow, the R&R
is adopted in its entirety.

Before entering final judgment, this court routinely reviews
all report and recommendation orders in cases it has
referred to a magistrate judge. If a party has objected
to specific elements of the magistrate judge's findings
and recommendations, this court reviews those findings
and recommendations *de novo. See Almonte v. N.Y. State
Div. of Parole*, No. Civ. 904CV484, 2006 WL 149049,
at \*3-4 (N.D.N.Y. Jan. 18, 2006). In those cases where
no party has filed an objection, or only vague or general
objections have been filed, this court reviews the findings and
recommendations of the magistrate judge for clear error. *See
id.*

**\*2** While Shomo filed objections to the R&R consisting of
forty-four pages [4] and ninety-seven paragraphs, most of them
are clearly without merit for several reasons: they relate to
matters outside the scope of the R&R, [5] they overlook or
misapprehend the reasons supporting the recommendations in
the R&R, they rehash arguments previously presented to and
rejected by Judge Baxter, and/or they raise new arguments
not presented to Judge Baxter in the initial briefing. (*See
generally* Dkt. No. 158.)

Accordingly, the vast majority of Shomo's objections invoke
review only for clear error. *See Williams v. Smith*, No. 9:11-
CV-0601, 2015 WL 1179339, at \*1 (N.D.N.Y. Mar. 13,
2015) (dismissing objections that consisted of "general or
irrelevant statements"); *Almonte*, 2006 WL 149049 at \*4
(explaining that resubmitting the same arguments previously
made "fails to comply with the specificity requirement");
*Smith v. Hulihan*, No. 11 CV 2948, 2012 WL 4928904,
at \*1 (S.D.N.Y. Oct. 17, 2012) ("[N]ew arguments and
factual assertions cannot properly be raised for the first
time in objections to the R & R, and indeed may not
be deemed objections at all."). With regard to these
objections, the court has carefully considered the R&R, and

finds no clear error in Judge Baxter's thorough analysis, which squarely addresses Shomo's arguments and provides multiple, appropriate reasons for granting defendants' motion for summary judgment. (*See generally* Dkt. No. 154.)

However, Shomo also made specific objections to essentially all of the R&R's findings, for which the court has conducted a *de novo* review. See *Almonte*, 2006 WL 149049, at *3-4. Having carefully considered the R&R in light of Shomo's objections, the court sees no reason to repeat what is said in the R&R in conducting a *de novo* review because this court reaches the same conclusions as those reached by Judge Baxter. (*See generally* Dkt. No. 154.) Accordingly, the R&R is adopted in its entirety.

Accordingly, it is hereby

**ORDERED** that defendants' letter motion requesting a finding that Shomo waived his right to object to the Report-Recommendation (Dkt. No. 157) is **DENIED**; and it is further

**\*3 ORDERED** that the Report-Recommendation (Dkt. No. 154) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 132) is **GRANTED**; and it is further

**ORDERED** that the Amended Complaint (Dkt. No. 82) is **DISMISSED**; and it is further

**ORDERED** that Shomo's request for sanctions (Dkt. No. 142, Attach. 2 at 9, 12-18) is **DENIED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 486868

## Footnotes

1    *See* 42 U.S.C. §§ 12101-12213.

2    *See* 29 U.S.C. §§ 701-796*l*.

3    Defendants submitted a letter motion on December 4, 2019 requesting the court to find that Shomo had waived his right to object to the R&R, and to enter judgment for defendants. (Dkt. No. 157.) This motion is denied. The deadline for Shomo to file objections was set as November 25, 2019. (Dkt. No. 156.) Although his objections were not filed on the docket until December 3, 2019, (Dkt. No. 158), they are dated and were submitted to prison officials on November 20, 2019, (*id.* at 43-44), and are therefore timely. *See Sides v. Paolano*, 782 F. App'x 49, 50 (2d Cir. 2019) ("Under the prison mailbox rule, a *pro se* prisoner's [document] is deemed filed upon its delivery to prison authorities for transmittal to the district court." (citations omitted));

     *Yancey v. Robertson*, No. 9:17-cv-0381, 2019 WL 315048, at *1 (N.D.N.Y. Jan. 24, 2019) ("Under the prison mailbox rule, the objection [to the R&R] was timely filed.") (citing *Mannix v. Phillips*, 619 F.3d 187, 196 (2d Cir. 2010)).

4    Objections are limited by the Local Rules to no more than twenty-five pages without prior leave of the court. *See* N.D.N.Y. L.R. 72.1(c). Although Shomo requested an extension of time to file his objections to the R&R, (Dkt. No. 155), which was granted, (Dkt. No. 156), he did not request, and was not granted, leave to file objections that exceeded the twenty-five page limit. Accordingly, the court would be justified in either rejecting the objections altogether or considering only the first twenty-five pages. But given Shomo's *pro se* status, the court has considered the entire document.

5    For example, Shomo discusses his criminal proceedings and the resulting murder conviction at length, (Dkt. No. 158 at 15-20), but those proceedings are not at issue in the R&R, (Dkt. No. 154). Specifically, Shomo's request to reopen the criminal proceedings in state court and require the state court to conduct a discovery

hearing, (Dkt. No. 158 at 15-20), is not related in any way to the R&R, is procedurally and substantively improper, and is denied. *See Luevano v. Clinton*, No. 5:10-CV-754, 2010 WL 3338704, at *5 (N.D.N.Y. July 1, 2010) (denying a plaintiff's request for the federal court to reopen and review his criminal conviction in state court because, *inter alia*, "[n]one of the defendants [in the instant action] owe any duty to plaintiff regarding his [state] criminal conviction"), *adopted by* 2010 WL 3338711 (N.D.N.Y. Aug. 20, 2010).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2398762
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Marie FLAHERTY, Plaintiff,

v.

Jason FILARDI, et al., Defendants.

No. 03 Civ. 2167(LTS)(HBP).
|
Aug. 15, 2007.

*OPINION AND ORDER*

PITMAN, United States Magistrate Judge.

## I. *Introduction*

**\*1** I write to resolve the discovery disputes raised by plaintiff's letter dated August 14, 2006 and in her motion for a default judgment and other sanctions dated October 5, 2006 (Docket Item 166). For the reasons set forth below, both of plaintiff's applications are denied in all respects.

## II. *Facts*

This is a copyright infringement action in which plaintiff, an attorney who is proceeding *pro se,* claims that the motion picture *Bringing Down the House,* its screenplay and draft scripts infringe a screenplay that she authored entitled *Amoral Dilemma.* Plaintiff's claims are discussed in detail in the opinion of the Honorable Laura Taylor Swain, United States District Judge, granting in part and denying in part defendants' motion for summary judgment. *Flaherty v. Filardi,* 388 F.Supp.2d 274 (S.D.N.Y.2005). Familiarity with this decision is assumed.

In October 2005, I issued a scheduling Order setting the final pretrial conference in this matter for August 1, 2006. Since I believed that discovery would have been substantially completed by July 24, 2006, I scheduled a settlement conference for that date (the "July 24 Conference"). However, I received correspondence from plaintiff prior to the July 24 Conference voicing general gripes concerning discovery; accordingly, I advised counsel that the July 24 Conference would be a status conference rather than a settlement conference.

At the July 24 Conference, I sought to determine what discovery, if any, remained to be done. Although plaintiff made sweeping claims that defendants had denied her discovery, she did not identify any specific, relevant documents or information that the defendants had withheld. It became clear at the July 24 Conference that plaintiff had conducted no discovery at all other than (1) serving document requests to which defendants responded in the fall of 2005 and (2) conducting the deposition of Jason Filardi. Indeed, plaintiff specifically admitted that she had served no discovery requests in the seven-month period preceding the July 24 conference (Transcript of Conference held on July 24, 2006 ("7-24-06 Tr.") at 8). In addition, I pointed out to plaintiff that she had never made any specific application to me to compel discovery (7-24-06 Tr. at 9-10). After further discussion, plaintiff even admitted that defendants were not responsible for the delay in resolving the case that she had previously attributed to them (7-24-06 Tr. at 15). Nevertheless, plaintiff sought an extension of discovery. Given plaintiff's lassitude in pursuing discovery, defendants opposed the application.

Although I did not extend the discovery period at the July 24 Conference, in an effort to ensure that plaintiff had an opportunity to assert any specific discovery issues that she had, I advised the parties that I was setting a firm date for the submission of any open discovery disputes. Plaintiff stated she could make the motion within a week (7-24-06 Tr. at 36). Because this date sounded overly optimistic, I gave plaintiff until August 14, 2006 to make her motion. Specifically, the Order that I issued after the July 24 Conference provided:

**\*2** 2. If any party has any dispute with respect to any discovery responses served to date, such disputes are to be raised by letter or motion no later than August 14, 2006. Any applications made pursuant to this paragraph shall either include or quote the discovery request(s) and response(s) in issue and shall identify specifically the alleged deficiencies in the response.

3. Responses to any applications for relief made pursuant to paragraph 2 shall be served and filed no later than September 15, 2006.

(Order dated July 25, 2006, Docket Item 150). I further advised the parties that if either side sought to extend the discovery, they could make their application in their August 14, 2006 submission.

On August 14, plaintiff submitted a three-page letter, attaching certain exhibits. In this letter plaintiff sought (1) an open-ended extension of discovery; (2) an extension of time to September 29, 2006 to serve and file a motion seeking dispositive relief based on defendants' alleged discovery abuses; (3) an Order compelling defendants to explain the basis for certain objections they made at the deposition of Jason Filardi; (4) an Order compelling Jason Filardi to answer certain deposition questions; (5) an Order directing that defendants make the originals of certain documents available for inspection by plaintiff; (6) an Order compelling defendants to produce unredacted financial information concerning the motion picture *Bringing Down the House,* and (7) an Order that the Writers Guild of America produce unredacted versions of certain contracts. With respect to items 2 through 7, plaintiff offered no explanation at all of why she was entitled to the relief she sought.

Notwithstanding the fact that I never extended the August 14 deadline for the submission of discovery motions and notwithstanding that she had sought an extension until only September 29, 2006, plaintiff also filed a motion on or about October 7, 2006 seeking a default judgment and other unspecified sanctions for defendants' alleged discovery abuses. As discussed in more detail below, plaintiff's October 7 motion contains a substantial amount of rhetoric but almost no specifications of discovery misconduct by defendants that prejudiced plaintiff or prevented her from discovering facts relevant to her remaining claims.

III. *Analysis*

A. *Plaintiff's August 14 Letter Application*
Plaintiff's request to extend discovery in her August 14 letter application is denied. Plaintiff has not shown that her failure to complete discovery was anyone's fault but her own. As noted above, plaintiff did absolutely nothing to pursue discovery between the completion of Jason Filardi's deposition on November 15, 2005 and the July 24, 2006 status conference. Since plaintiff did not diligently utilize the time available to her to complete discovery, there is no reason to extend that time. *Little v. City of New York,* 487 F.Supp.2d 426, 435-36 (S.D.N.Y.2007); *Gotlin v. Lederman,* 04-CV-3736 (ILG), 05-CV-1899 (ILG), 2007 WL 1429431 at *3 (E.D.N.Y. May 7, 2007) (collecting cases); *see Stone & Webster Constr., Inc. v. E-J Elec. Installation Co.,* 06-CV-5641 (BMC) (SMG), 07-CV-2102 (BMC)(SMG), 2007 WL 1989444 at *4 (E.D.N.Y. July 9, 2007); *PSG Poker, LLC*

*v. DeRosa-Grund,* 06 Civ. 1104(DLC), 2007 WL 1837135 at *7 (S.D.N.Y. June 27, 2007).

 **\*3** Plaintiff's application for an extension of time to raise her discovery disputes is also denied. On July 24, 2006, plaintiff represented that she would make her motion within a week. Given her *pro se* status, even though plaintiff is an attorney, I granted her an extra two weeks on my own motion. Plaintiff has not shown any valid basis to extend that deadline for a further six weeks.

Plaintiff's application for an Order compelling defendants to state the basis for certain objections asserted at the Filardi deposition is denied. The validity of objections asserted at a deposition becomes material only when the testimony to which objection is made is offered *and* the objecting party elects to stand on his or her objection. It is frequently the case that even where a valid objection is stated at a deposition, the objecting party will waive the objection when the testimony is offered. In the absence of a live controversy concerning an objection at a deposition, the basis for the objection is immaterial. Since there is no current dispute concerning the validity of any specific objection, having defendants state the basis for their objections would serve no purpose.

Plaintiff's applications to compel Jason Filardi to answer certain question posed at his deposition, to compel defendants to produce original documents and to compel defendants' and the Writers Guild of America's production of unredacted financial documents are also denied. My July 25, 2006 Order expressly directed the parties to set forth the bases for any applications they made to compel discovery. Since plaintiff's August 14 letter offers no argument at all explaining why the foregoing relief should be granted, plaintiff has failed to comply with my July 25, 2006 Order and has failed to establish any basis for the relief she seeks. Neither defendants nor I should be forced to guess at what plaintiff's theories for the production of this discovery might be.

B. *Plaintiff's October 5, 2007 Motion for a Default Judgment and Other Sanctions*
Although plaintiff's October 5, 2007 motion makes broad allegations of discovery and other misconduct by defendants, she has shown no basis for the imposition of any discovery sanction.

First, the motion is untimely. As noted above, the deadline for discovery motions was August 14, 2006. The fact that plaintiff requested an extension of that date is immaterial.

Court ordered deadlines would be meaningless if a party could unilaterally extend the deadline by the expedient of requesting an extension; it is self-evident that a request for relief, without more, does not operate to grant the relief sought. *Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.,* 707 F.Supp. 1429, 1441 (D.Del.1989).

Second, a number of the arguments made by plaintiff have no connection with defendants' alleged failure to comply with their discovery obligations. For example, plaintiff repeatedly points out in her affirmation and memorandum of law that one of Jason Filardi's early drafts of the screenplay contained scenes in which an adult character engages in sexual activity that was observed by children. There is no dispute that these scenes were deleted from the script before the motion picture was filmed, nor is there any dispute that these scenes were not copied from plaintiff's work. Since the presence of these scenes is immaterial to the discovery issues and the substantive issues in the case, plaintiff's injection of this material into her motion is nothing but a ham-fisted attempt to cast defendants in a negative light and only establishes the poverty of plaintiff's position. Other similarly immaterial matters cited by plaintiff include Roy Disney's criticism of the management of the Walt Disney Company, the fact that one of the defendants' attorneys has written an article on the need for civility among attorneys, Filardi alleged untruthfulness in an interview with a magazine, the alleged fact that Filardi was wearing a recording device and may have ingested something at the deposition, alleged threats by defendants' counsel that there could be personal consequences to plaintiff from continuing the action or making discovery motions,[1] alleged misstatements of the law in defendants' summary judgment motion and plaintiff's contention that Tobia had more to do with the drafting of the script than he admits. None of these matters has anything to do with the sufficiency of defendants' responses to her discovery requests.

**\*4** Third, although plaintiff cites a number of document requests that she contends were inadequately answered (Flaherty Aff. SI 110), for the most part she offers no evidence or argument that additional responsive documents exist and have not been produced. Although there are a handful of instances where plaintiff does offer some evidence or argument that additional documents exists (Flaherty Aff. at SI 110, pages 41-42), sanctions are inappropriate because plaintiff has not and cannot establish that sanctions are being withheld in violation of a court order. *Salahuddin v. Harris,* 782 F.2d 1127, 1131 (2d Cir.1986) (sanctions

under Fed.R.Civ.P. 37(b) can be awarded only where a court order is violated); *Israel Aircraft Indus., Ltd. v. Standard Precision,* 559 F.2d, 203, 208 (2d Cir.1977) (same). Even if I deem the motion to be a motion to compel with respect to these categories, an award of relief is inappropriate because plaintiff has not stated that she has met and conferred with defendants' counsel and attempted to resolve these disputes without the court's intervention. Fed.R.Civ.P 37(a)(2) (A and B); *see generally* *Apex Oil Co. v. Belcher Co.,* 855 F.2d 1009, 1019-20 (2d Cir.1988).

Finally, plaintiff has also submitted the transcript and DVD's of Filardi's deposition which she contends establish misconduct by defendants' counsel. Although plaintiff has established misconduct by defendants' counsel, it does not appear that the misconduct prevented plaintiff from completing Filardi's deposition.

During a conference with plaintiff and counsel on November 10, 2005, I gave the parties my standard admonitions concerning the conduct of depositions, namely (1) colloquy should be avoided; (2) counsel should not make "speaking" objections unless the party conducting the deposition seeks the basis for an objection,[2] and (3) instructions to the witness not to answer should not be given to the witness unless a question would invade an area of privilege or seeks information that is so irrelevant that the question is abusive. I also advised plaintiff and counsel at that time that if they had a dispute at the deposition that they could not resolve, they could call my chambers for a ruling.

Despite these admonitions, defendants' counsel engaged in obstructionist conduct in direct contravention of my instructions and made a large number of baseless objections. A few examples are sufficient to illustrate the nature of counsel's conduct.

At one point in Filardi's deposition, plaintiff had him read a quote attributed to him in a magazine article in which he purportedly stated that he thought it's " 'very important to read a lot of scripts' " (Transcript of the Deposition of Jason Filardi, annexed as Exhibit 5 to Flaherty Aff. ("Filardi Dep."), at 75). The following colloquy then occurred:

> Q Does that accurately reflect your belief?
>
> A It's a hard one to answer because-yeah. It's a good thing for a writer to do.

**\*5** Q So that accurately reflects your belief?

MR. NEWMAN: [3] He answered the question.

MS. FLAHERTY: I didn't-he did not answer that question.

MR. CONCIATORI: If you pose another question, he'll answer.

MS. FLAHERTY: Could you read that question back, please.

(The record was read)

BY MS. FLAHERTY:

Q That doesn't answer my question, "Does that accurately reflect your belief?"

MR. CONCIATORI: What specifically are you talking about now?

MR. MULDOON: I thought he said-

MS. FLAHERTY: Mr. Muldoon, please do not interrupt the court reporter and ask her to go back and point to her computer and reflect an answer that Mr. Filardi did not give.

MR. CONCIATORI: Well, there's no question pending now. So let me say Mr. Filardi's doing his very best in the examination that's being conducted here-

MS. FLAHERTY: Mr. Conciatori-

MR. CONCIATORI: If you ask him a clear question- if you let me finish-

MS. FLAHERTY: No. You are instructed to make your objections. You were instructed to make your objections. You were instructed to make a one-word objection. If I requested further information from you, as far as the grounds, that is what you are supposed to do-is wait for my instruction.

MR. NEWMAN: Well, as long as there's no question pending, let me suggest that you get something to the point.

(Filardi Dep. at 76-77).

As she was entitled to do, plaintiff had asked Filardi a question that called for a "yes" or "no" answer. The question asked whether Filardi believed that reading "a lot" of scripts was "very important" for a screen writer; Filardi did not respond with an unqualified "yes" or "no," but rather stated that "It's a hard one to answer-yeah. It's a good thing for a writer to do." Since Filardi neither answered the question directly nor did he state that he was unable to answer the question yes or no, plaintiff was entitled to ask the question again and press for a direct answer. Nevertheless, defendants asserted an objection that inaccurately characterized the record by stating that Filardi had answered the question. Mr. Conciatori went on to misstate the record a second time by stating that there was no question pending when the foregoing excerpt demonstrates that the question clearly remained pending.

Approximately 45 minutes later, the following colloquy occurred:

Q All right. I'd like to draw your attention to the exhibit marked 2, the screenplay, JAILBABE.COM. Is there a motion picture based on this screenplay, JAILBABE.COM?

MR. MULDOON: Object to the form.

MR. CONCIATORI: Objection. That's a term of art.

BY MS. FLAHERTY:

Q You can answer the question.

A Yeah, I guess-I'm sorry. I don't know what you mean by base-did this-

MR. MULDOON: No. Wait. Wait for a question please sir.

BY MS. FLAHERTY:

Q Why don't you-if you could tell me your understanding of what-based upon-a motion picture as being based upon a script is.

**\*6** MR. MULDOON: Object to the form.

BY MS. FLAHERTY:

Q Your understanding.

MR. CONCIATORI: I'll allow him to answer that, although I'll note my objection of foundation [*sic*]. Calls for a legal conclusion.

THE WITNESS: I don't know of any movies based upon a screenplay. Movies based upon novels, movies based upon real-life facts. I don't know any movies based upon screenplays. It's not a term-it's not a-

(Filardi Dep. at 102-03).

First, counsel's gratuitously providing suggestive reasons for their objections violated the instructions I had given them for the conduct of depositions. Second, there is no prohibition in the Federal Rules of Evidence against a question that utilizes a term of art. If a witness does not understand the meaning of a word used in a question, he is free to advise the interrogating party that he does not understand the question. If the defending attorney believes the witness misunderstood a term or the question, he is free to correct the mistake either through cross examination or by the use of an errata sheet. There was no valid reason for Mr. Muldoon to interrupt Mr. Filardi's request for clarification. Fourth, contrary to Mr. Conciatori's objection, a question to a witness seeking the witness's understanding of certain terms is not, by any stretch of the imagination, a question seeking a legal conclusion. Given the lack of any legal basis for defense counsel's comments, I am forced to conclude that the colloquy was nothing more than an attempt to kick up dust and to fluster plaintiff.

Other examples of improper conduct by defense counsel include the following exchanges:

Q Okay. I'm sorry. I just want to make sure you understand my question. The first time you ever heard that I had a claim or-concerning BRINGING DOWN THE HOUSE, the writing, BRINGING DOWN THE HOUSE, was when an article concerning the lawsuit was in the paper?

MR. CONCIATORI: I'm going to object to the form of the question. You mean so far as it suggests that you had a claim. You changed it to-you expressed a claim or served one-

(Filardi Dep. at 120-21).

Q Okay. You didn't-did you receive any letters concerning my name or me prior to when the lawsuit was announced in the papers?

MR. MULDOON: I'm going to object to that. The time is all balled up.

(Filardi Dep. at 121).

Q Did you correspond by e-mail with George Tobia in 1999?

A I'm sure-

MR. MULDOON: Well, no, no. The question is do you know.

MS. FLAHERTY: Excuse me. Please, do not testify.

MR. MULDOON: Please, let the witness answer the question that you put to him.

(Filardi Dep. at 205).

The objections stated in the first two examples are not supported by any Federal Rule of Evidence. Mr. Muldoon's "all balled up" objection is particularly troubling. As noted above, if counsel believes that the direct examination has left a misleading record, his remedy is cross-examination or a correction by way of an errata sheet. Apart from the crude diction, stating in front of the witness that the question has the facts "all balled up" is suggestive and, therefore, improper. Fed.R.Civ.P. 30(d)(1) (If an objection is made at a deposition, it "must be stated concisely and in a non-argumentative and non-suggestive manner."). The third example is also noteworthy because not only does Mr. Muldoon interrupt the witness's answer and improperly rephrase plaintiff's question, he then goes on to berate plaintiff for not letting the witness answer the question notwithstanding the fact that it was Mr. Muldoon-not plaintiff-who interrupted the witness.

**\*7** Additional examples of defense counsels' misbehavior exist in the record; the foregoing are sufficient, however, to illustrate the nature of their conduct. [4]

Although defendants' counsels' behavior at the Filardi deposition was improper, it does not necessarily follow that sanctions are appropriate. Under 28 U.S.C. § 1927, an award of sanctions is appropriate when the offending attorney "essentially destroys a deposition through excessive groundless objections or lengthy personal attacks on his or her adversary." *Am. Fun & Toy Creators, Inc. v. Gemmy Indus., Inc.,* 96 Civ. 799(AGS)(JCF), 1997 WL 482518 at *8 (S.D.N.Y. Aug. 21, 1997); *accord* *Sicurelli v. Jeneric/ Pentron, Inc.,* 03CV4934 (SLT)(KAM), 2005 WL 3591701 at *3 (E.D.N.Y. Dec. 30, 2005), *report & recommendation*

*adopted by,* 2006 WL 681212 (E.D.N.Y. Mar. 14, 2006); *Morales v. Zondo, Inc.,* 204 F.R.D. 50, 54 (S.D.N.Y.2001). Fed.R.Civ.P. 30(d)(3) provides that an award of sanctions is appropriate "[i]f the court finds that any impediment, delay, or other conduct has frustrated the fair examination of the deponent."

I have reviewed the transcript of the Filardi deposition in its entirety, and cannot conclude that defense counsel's misconduct destroyed the deposition or entirely frustrated the fair examination of Filardi. In almost all instances where the questioning was interrupted by unnecessary colloquy by defense counsel, Filardi nevertheless answered the question asked. Variations of the following colloquy occurred at numerous points throughout the deposition:

Q Okay. What is your understanding of the term "pitch"?

MR. CONCIATORI: As he uses it?

THE WITNESS: As I use it?

BY MS. FLAHERTY:

Q Yes. Your understanding of the term "pitch," yes.

A A pitch is going in and sitting down and pitching a movie to an executive, a producer.

Q When you say, "pitch," can you define that to me?

MR. MULDOON: I think he just did.

BY MS. FLAHERTY:

Q I said, please, define "pitch," and you said you pitch. What is a "pitch"?

A A pitch is-

MR. CONCIATORI: Again, as he uses the term and understands it.

MS. FLAHERTY: Certainly.

THE WITNESS: As I know and understand the term.

BY MS. FLAHERTY:

Q Yeah. Ad how you do it.

A All right. A pitch is giving a-not very detailed, but a basic run of the movie that I want to write.

Q Do you do it orally?

A Orally.

(Filardi Dep. at 52-53). Notwithstanding the static defense counsel generated,[5] plaintiff asked for the definition of "pitch," and Filardi initially responded with an answer that used the term for which the definition was sought. In light of this deficiency, plaintiff was entitled to press for an answer that did not use the term, she did so, and ultimately got a response. Plaintiff's papers do not identify any relevant subject matters that she was unable to question Filardi about nor does she identify a single relevant question that counsel prevented Filardi from answering.

**\*8** In addition, a substantial portion of defense counsels' objections were made during questioning that had no relationship to the issues in this case. Although this conduct was inappropriate, it did not materially impeded the inquiry of relevant subjects. Finally, plaintiff does not explain why she did not call my chambers during the deposition to seek an Order to defense counsel to cease their obstructive behavior. The Filardi deposition commenced at 10:31 a.m., Pacific Time. Notwithstanding the time difference, there was substantial overlap between the hours during the deposition was conducted and the working day on the east coast and Ms. Flaherty had ample opportunity to call my chambers for a ruling. Inexplicably, she did not so.

Thus, although defendants' counsel repeatedly and improperly interrupted plaintiff's questioning of Filardi, I have not found any relevant and material questions that Filardi was prevented from answering. Overall, plaintiff has not shown that there was any discovery misconduct by defendants that materially impaired her ability to conduct discovery. An award of sanctions is therefore inappropriate.[6]

IV. *Conclusion*
Accordingly, for all the foregoing reasons, the relief sought in plaintiff's letter dated August 14, 2006 and in her motion for a default judgment and other sanctions dated October 5, 2006 (Docket Item 166) is denied in all respects.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2398762

## Footnotes

1    If they were made, the "threats" plaintiff references appear to be nothing more than defense counsel's attempts to dissuade plaintiff from pursuing the action by indirect references to plaintiff's potential personal liability for costs or the expenses of discovery motions (*see* Affirmation of Marie Flaherty, dated October 6, 2006 ("Flaherty Aff."), ¶¶ 19, 22). Given the fact that summary judgment has already been granted dismissing plaintiff's claim for copyright infringement by the motion picture, the stakes in this action are fairly modest. It is, therefore, simply inconceivable that defendants' counsel would engage in acts of attempted extortion.

2    "Speaking" objections should be avoided because they tend to prompt witnesses. Moreover, unless the deficiency in the question is one that could be rectified at the deposition, it is unnecessary for the party defending the deposition to register any objection whatsoever. Fed.R.Civ.P. 32(b), (d)(3)(B).

      As noted in a leading treatise,

      Rule 32(b) must be read in connection with Rule 32(d)(3), dealing with objections as to the taking of a deposition. Taken together these provisions make it clear that if the matter sought is within the scope of discovery, objection to its admissibility as evidence should be made at the trial or hearing when the deposition is offered in evidence and not at the taking of the deposition, unless the ground of the objection is one that might have been obviated or removed if made when the deposition was being taken.

      8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* § 2152, at 194-95 (2d ed.1994) (footnote omitted); *accord Rosary-Take One Prod. Co. Ltd. P'ship v. New Line Distrib., Inc.,* 89 Civ.1905(CSH), 1996 WL 79328 at *1 (S.D.N.Y. Feb. 23, 1996).

3    Kenneth Newman is in-house counsel for the Walt Disney Company. He is not counsel of record for any of the parties in this action. Accordingly, he had no business making any objections at the deposition.

4    I also note that plaintiff's conduct at the deposition was not exemplary. Plaintiff attempted to examine Filardi about salacious scenes contained in an early draft of his script even though they did not appear in the motion picture and plaintiff was not claiming they had been copied from her work (Filardi Dep. at 228-31). There could not have been any good faith basis for this line of questioning. Plaintiff also spent an inordinate amount of time asking plaintiff about other screenplay he had written and other matters unrelated to the screenplay in issue.

5    Mr. Conciatori's objection/comment "[a]s he uses it?" does not appear to be supported by any Federal Rule of Evidence. As repeatedly noted above, Mr. Conciatori's remedy for any perceived ambiguities or inaccuracies was either cross-examination or clarification through an errata sheet.

6    In light of defense counsel's misconduct at the Filardi deposition, it is troubling that there is no sanction available to provide specific and general deterrence. *See generally Rickles, Inc. v. Frances Penney Corp.,* 508 F.Supp. 4, 8 (D.Mass.1980). I hope that the fact that this opinion will, no doubt, be reported by the computerized legal research services and constitute a permanent record of the misconduct of Messrs. Kenneth E. Newman, Jeffrey A. Conciatori and Robert J. Muldoon will be sufficient to provide that deterrence.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 1018048
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

YRITYSPANKKI SKOP OYJ, formerly known as
Saastopankkien Kesku–Osake–Pankki, Plaintiff,

v.

DELTA FUNDING CORPORATION, Defendant.

No. 98Civ.7888(BSJ)(MHD).
|
Nov. 9, 1999.

*MEMORANDUM & ORDER*

DOLINGER, Magistrate J.

**\*1** By order to show cause, defendant Delta Funding Corporation seeks to reopen discovery to conduct four new depositions and to resume a fifth, while postponing the briefing and determination of plaintiff's previously served motion for summary judgment. The premise for this requested relief is defendant's contention that plaintiff has waived its previously asserted attorney-client privilege. According to defendant, that waiver may be found on the basis of one statement contained in an affidavit that plaintiff submitted in support of its summary judgment motion. We conclude that there is no basis for defendant's claim of a waiver and in any event no justification for the belated discovery that defendant now seeks. Accordingly the motion is denied. [1]

Plaintiff ("Skopbank") commenced this lawsuit in the Spring of 1998, seeking recovery on a partial guarantee issued by Delta in connection with plaintiff's purchase of two earlier loans extended by Delta to Florida real estate developers. According to plaintiff, the borrowers defaulted in 1990, and at the suggestion of Delta plaintiff hired Florida counsel to commence foreclosure proceedings against the borrowers. (Pl.'s Local Rule 56.1 Statement at ¶ 39). In 1991 plaintiff filed a foreclosure action in Florida, in which it also sought recovery against Delta on its guarantees. (*Id.* at ¶ 40). As defendants, the borrowers also asserted cross-claims against Delta. (*Id.* at ¶ 55).

Eventually, the Florida court granted Delta's motion for summary judgment against the plaintiff, on the ground that the suit on the guarantees was premature (*id.* at ¶ 67), but the court

later granted judgment for plaintiff against the borrowers, directing that a foreclosure sale take place. (*Id.* at ¶ 71). According to plaintiff, it was the high bidder at that sale. (*Id.* at ¶ 73). The Florida court then entered a deficiency judgment against the borrowers, which has apparently not been satisfied, thus forming the premise for the current suit against Delta on its guarantees. (*Id.* at ¶ 79).

This suit was commenced in 1998. By agreement of the parties, the Court entered an order for all discovery to be completed by July 28, 1999. (*See* Order dated Jan. 29, 1999). That deadline was later extended to August 13, 1999. (*See* Order dated June 30, 1999). The parties later agreed, and the court concurred, that plaintiff could serve a summary judgment motion by October 1, 1999, which it proceeded to do.

One issue addressed by plaintiff's summary judgment motion concerns Delta's affirmative defense to the effect that, by filing the Florida foreclosure action in its own name, plaintiff waived the guarantees issued by Delta. (*See* Aff. of Victor M. Metsch, Esq., sworn to Oct. 14, 1999, at ¶ 28). Partly in opposition to this contention, plaintiff proffered the declaration of Carl–Fredrik Londen, the Chief Legal Counsel of the plaintiff. [2] In his declaration, among other matters, Mr. Londen relates that, as in-house counsel for plaintiff, he "received the bank's Florida attorneys' reports and [is] familiar with the foreclosure proceedings in the Circuit Court, Palm Beach County, in which ... claims were originally made against Delta on the Delta guarantees." (Londen Decl., executed Sept. 30, 1999, at p. 4). Mr. Londen goes on to state:

**\*2** I am not aware of any instance in which Delta represented to the Florida court or to anyone else that Skopbank was disabled in any[ ]way from maintaining the foreclosure proceedings or that by virtue of its having done so was disabled from enforcing the Delta guarantees.

The only position taken by Delta relating to enforcement of the guarantee claims in the Florida Circuit Court was its assertion that Skopbank's claim was premature in that Skopbank could not enforce the guarantees unless and until a foreclosure judgment had been obtained and a deficiency judgment entered. Both of those conditions have occurred.

(*Id.*).

Based on these statements by Mr. Londen, Delta has applied for a reopening of discovery before the due date for its papers

opposing the summary judgment motion. Delta argues that it should be permitted to engage in further deposition discovery because plaintiff has waived its attorney-client privilege shielding its communications with its Florida counsel in the foreclosure action. In support of that contention, defendant proffers two theories. One is apparently based on the assumption that Mr. Londen's statement in his declaration about the positions taken by Delta in the Florida case discloses confidential communications to him by the plaintiff's Florida attorneys, thus waiving the privilege for all attorney-client communications on the subject of the foreclosure action. The other is that his statements put "in issue" the otherwise privileged communications, thus again waiving the privilege.

Defendant's motion fails for a number of reasons. First, neither of its theories for implying a waiver of the attorney-client privilege has any merit. Second, even if the Londen declaration were deemed to have waived the privilege, the result would not change since defendant fails to show any basis for staying the summary judgment motion to permit further discovery. We first address the two waiver arguments.

The attorney-client privilege protects from disclosure those communications made in confidence between an attorney and a client for the purpose of facilitating the attorney's rendering of legal advice or other professional legal services to the client. *See, e.g.,* *United States v. Constr. Prods. Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996); *United States v. Adlman,* 68 F.3d 1495, 1499 (2d Cir.1995); *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989). The protection of the privilege may be lost if the client discloses the substance of a protected communication, *see, e.g.,* *In re von Bulow,* 828 F.2d 94, 100–01 (2d Cir.1988), or if the client asserts a claim or defense that puts the substance of the otherwise privileged communication in issue in the case. *See, e.g.,* *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991). [3]

Delta's assertion that plaintiff has disclosed privileged matter in the Londen declaration is plainly wrong. Hence it cannot form the predicate for a waiver of any sort.

**\*3** Mr. Londen's declaration does not disclose confidential communications between attorney and client that convey either legal advice by the attorney or information from the client to facilitate the attorney's rendering of such advice. All that the cited passage does is to note that, in the

course of the Florida proceeding, Delta never asserted, as a defense to plaintiff's claims on the guarantees, that plaintiff's commencement of the foreclosure action in its own name vitiated the guarantees. Mr. Londen is simply reporting what the public record of the Florida court discloses, and is not revealing an attorney's legal advice or the substance of confidential disclosures by the client to the attorney. Accordingly the cited statements by Mr. Londen are not covered by any privilege.

Indeed, it is not at all evident from the Londen declaration that the Florida attorneys ever discussed the absence of such a defense with the plaintiff. Such information might well have been derived by the client simply from a perusal of the legal papers filed in the Florida courts and any pertinent transcripts, copies of which, we assume, are routinely provided by corporate trial counsel to their in-house counterparts.

In any event, even if this information were conveyed by the attorneys in Florida to their client in the course of otherwise confidential discussions, that communication would not be privileged. Statements by an attorney to his client reporting information obtained from public sources or elsewhere are simply not covered by the privilege. *See, e.g.,* *Liberty Envir. Sys., Inc. v. County of Westchester,* 1997 WL 471053, at \*2 (S.D.N.Y. Aug. 18, 1997); *Smith v. Conway Org., Inc.,* 154 F.R.D. 73, 78 (S.D.N.Y.1994) (citing cases). The positions taken by Delta in the Florida lawsuit are, as noted, a matter of public record, and hence an attorney's report of them to his client is not protected.

As its alternative argument for waiver of the privilege, defendant presses the notion that the Londen declaration has put "in issue" the substance of the privileged communications between client and counsel, thus purportedly justifying the proposed new depositions. Again defendant's waiver argument is seriously misguided.

Defendant correctly notes that in the Second Circuit a party may waive the attorney-client privilege if he "asserts a claim that in fairness requires examination of the protected communication." (Deft's Memo at 12) (citing *Bilzerian,* 926 F.2d at 1292). As indicated in *Bilzerian,* the operative standards for an "at issue" waiver derive from the decision of the District Court in *Hearn v. Rhay,* which noted that a waiver is appropriate if the party invoking the privilege "put the protected information at issue by making it relevant to the case[ ] and application of the privilege would have denied

the opposing part access to information vital to his defense."
68 F.R.D. 574, 581 (E.D.Wash.1975).

The problem for defendant, however, is that plaintiff has not asserted a claim or argument that would require examination of privileged communications between it and its Florida attorneys. The relevant assertion by plaintiff is simply that Delta never argued in the Florida court that Skopbank was an improper party to bring the foreclosure action or that its filing of that suit negated the guarantees extended by Delta to it. The truth or falsity of that assertion may be demonstrated by examining the record of the Florida court proceeding or by defendant proffering the testimony of one or more witnesses as to what defenses and legal arguments it invoked in the Florida case. There is absolutely no need to examine communications between Skopbank and its Florida attorneys to determine that fact.

 *4  Finally, in any event there is no basis for defendant's motion. In seeking to reopen discovery in the face of the plaintiff's summary judgment motion, the defendant must demonstrate by affidavit what additional information it wishes to discover, how that additional information can reasonably be expected to defeat the summary judgment motion by creating issues of material fact, what efforts the defendant has made during discovery to obtain this information and why it was unsuccessful in doing so. *See, e.g.,* Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir.1999); Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d

Cir.1995). Plaintiff utterly fails to satisfy these requirements of Fed.R.Civ.P. 56(f).

Delta was fully aware of the relevance of the information in question during discovery, since it has been asserting in this case a defense that the Skopbank lawsuit in Florida defeated the earlier guarantees. Thus, there is no reason why Delta could not have developed information during discovery reflecting what positions it had taken in the Florida case. Indeed, as we have noted, there is no current obstacle to Delta offering evidence—if it exists—that, contrary to Mr. Londen's representation, Delta did indeed assert in the Florida case that Skopbank's commencement of the foreclosure action was inconsistent with the requirements for enforcing the guarantees. In short, Delta has failed to demonstrate any necessity for procuring the type of testimony that it currently seeks in order to respond to plaintiff's motion.

*CONCLUSION*

For the reasons noted, the motion of defendant Delta Funding Corporation to reopen discovery and to stay the briefing of plaintiff's summary judgment motion during the pendency of that discovery is denied.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 1018048

---

**Footnotes**

1    In a cross-motion plaintiff seeks the imposition of sanctions against defendant and its attorneys in the form of an award of costs under Fed.R.Civ.P. 56(g). We address that application separately in a Report and Recommendation.

2    The declaration of Mr. Londen is also directed to the calculation of the amounts currently owing to plaintiff on Delta's guarantees. (*Id.* at 5).

3    We note that defendant appears to assume that federal standards govern the privilege and its waiver. (*See* Defs.' Mem. at 11–12) (citing principally federal-law authority). Although this is presumably not correct in a case involving only state-law claims and defenses, *see, e.g.,* Bowne of New York City v. AmBase Corp., 150 F.R.D. 465, 470 (S.D.N.Y.1993) (citing cases), we note that plaintiff has not taken issue with this assumption. Because the parties appear to have assumed that federal law will control this motion and because it appears that the same result would follow irrespective of which body of law we look to, we follow defendant's lead and accordingly apply federal principles rather than Florida law, Walter E. Heller & Co. v.

*Video Innovations, Inc.,* 730 F.2d 50, 52 (1984) (court relying on law cited by both parties in their briefs rather than choice-of-law analysis), even though that state's law would ordinarily appear to be the proper source of substantive legal principles in this case. *See generally* *Golden Trade, S.r.L. v. Lee Apparel Co.,* 143 F.R.D. 514, 521 (S.D.N.Y.1992) (citing cases).

---

**End of Document**                                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3880510
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Faris ABDUL–MATIYN, Plaintiff,
v.
ALLEN, Correction Officer; Rowe, Correction
Officer; Valezquez, Correction Officer; Benbow,
Correction Officer; Johnson, Sullivan Correctional
Facility Senior Parole Officer; Walsh, Sullivan
Correctional Facility Superintendent; Elizabeth
Farnum, Doctor; Debroize, Doctor; Forshee,
Doctor; Pete Hanmer, CNYPC Primary
Therapist; Tom Murphy; Jeff Nowicki; Sharon
Barboza, Director CNYPC Sotp Program;
Steve Capolo; and Linda Becker, Defendants.

No. 9:06–CV–1503 (GTS/DRH).
|
Sept. 28, 2010.

**Attorneys and Law Firms**

Faris Abdul–Matiyn, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Christina L. Roberts–Ryba, Esq., of Counsel,
Albany, NY, for the State Defendants.

Hon. Michael A. Cardozo, Corporation Counsel of the City
of New York, Elizabeth A. Wells, Esq., Assistant Corporation
Counsel, of Counsel, New York, NY, for the City Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

*1 Currently before the Court in this *pro se* prisoner
civil rights action, filed by Faris Abdul–Matiyn ("Plaintiff")
against fifteen employees of the City of New York
Department of Correction or the New York State Department
of Correctional Services, are the following: (1) a motion
for summary judgment filed by Defendants Allen, Benbow,
Rowe and Valezquez (hereinafter, the "City Defendants")
(Dkt.Nos.102–106); (2) a motion for summary judgment filed
by Defendants Johnson, Walsh, Farnum, Debroize, Forshee,
Hanmer, Murphy, Nowicki, Barboza, Capolo, and Becker

(hereinafter, the "State Defendants") (Dkt. No. 107); and (3)
United States Magistrate Judge David R. Homer's Report–
Recommendation recommending that the City Defendants'
motion be granted in its entirety, and that the State Defendants'
motion be granted in part and denied in part (Dkt. No. 121).
Neither party has submitted an Objection to the Report–
Recommendation, and the time in which to do so has expired.
For the following reasons, the Report–Recommendation is
accepted and adopted in part, and all the claims asserted
in Plaintiff's Complaint are dismissed except for his First
Amendment claim that Defendants Hanmer, Murphy, and
Nowicki denied him the right to pray.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**
Plaintiff filed his Complaint on December 15, 2006, having
signed it on or before December 1, 2006. (Dkt. No. 1.)
Generally, construed with the utmost of liberality, Plaintiff's
Complaint asserts the following six claims against the above-
captioned Defendants:

**(1)** all four **City Defendants** violated his rights under the
**Eighth Amendment** by being **deliberately indifferent** to
his serious medical needs during his incarceration at Rikers
Island between approximately May 5, 2005, and September
16, 2005;

**(2)** certain of the **State Defendants** (presumably including
**Johnson, Walsh, Murphy** and **Farnum**) violated his rights
under the **Fourteenth Amendment** by regularly placing him
in restraints and **involuntarily committing** him to the Central
New York Psychiatric Center ("CNYPC") in April of 2006,
following his release on parole from Sullivan Correctional
Facility;

**(3)** certain of the **State Defendants** (presumably including
**Becker, Hanmer, Murphy, Nowicki** and **Capolo**) violated
his rights under the **First Amendment** by failing to provide
him with halal **religious meals and prayer time** while he
resided at CNYPC, between approximately April of 2006, and
December 1, 2006;

**(4)** certain of the **State Defendants** (presumably including
**Johnson** and **Murphy**) violated his rights under the **Fourth
Amendment** by performing, or authorizing, an **unlawful
strip search** on him between approximately April of 2006,
and December 1, 2006 (specifically, one search immediately
before he left Sullivan Correctional Facility, another such

search immediately after he arrived at CNYPC, and other such searches "on a few occasions" at CNYPC and whenever he was transported to outside medical facilities during the referenced time period);

**\*2** **(5)** certain unidentified **State Defendants** violated his rights under the **Fourteenth Amendment** by failing to provide him with **adequate living conditions** at CNYPC between approximately April of 2006, and December 1, 2006 (specifically, by not allowing him to clean his room for the first five months, and by allowing his bathroom to remain filthy and infested with bugs, despite Plaintiff's complaints); and

**(6)** certain of the **State Defendants** (presumably including **Johnson** and **Walsh**) violated his rights under the **Fourteenth Amendment** by **treating him differently** than other similarly situated individuals, specifically, by civilly confining male sex offenders such as himself after parole but not doing so to female sex offenders. (*See generally* Dkt. No. 1 [Plf.'s Compl.] .)

For a recitation of the factual allegations giving rise to these claims, the Court refers the reader to the Complaint in its entirety, and Magistrate Judge Homer's thorough Report–Recommendation. (Dkt.Nos.1, 121.)

### B. Briefing on Parties' Motions

For the sake of brevity, and because this Decision and Order is intended primarily for the review of the parties, the Court will not recite the legal arguments advanced by the parties during the rather extensive briefing that has occurred on the two motions currently pending before the Court. The Court will simply note that the City Defendants were afforded the opportunity to file three memoranda of law, the State Defendants were afforded the opportunity to file two memoranda of law, and Plaintiff was afforded the opportunity to file five memoranda of law. (*See* Dkt. Nos. 104, 107, 110, 112, 113, 115, 116, 117, 118, 120.)

### C. Magistrate Judge Homer's Report–Recommendation

On March 4, 2010, Magistrate Judge Homer issued a Report–Recommendation recommending as follows: (1) that the City Defendants' motion for summary judgment (Dkt. No. 102) be granted, and judgment be entered for Allen, Rowe, Valezquez, and Benbow on all claims; (2) that the State Defendants' motion for summary judgment (Dkt. No. 107) be denied

as to Plaintiff's First Amendment claim against Defendants Hanmer, Murphy and Nowicki based on the alleged denial of the right to pray; (3) that the State Defendants' motion for summary judgment (Dkt. No. 107) be denied as to Plaintiff's Fourth Amendment claim against Defendants Nowicki and Barbozza based on the alleged unlawful strip searches; and (4) that the State Defendants' motion for summary judgment (Dkt. No. 107) otherwise be granted, resulting in the dismissal of all other claims against Defendants Hanmer, Murphy, Nowicki, and Barbozza, and the dismissal of all claims against Defendants Johnson, Walsh, Farnum, Debroize, Forshee, Capolo, and Becker. (*See generally* Dkt. No. 121.)

Neither party has submitted an Objection to the Report–Recommendation.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review Governing a Report–Recommendation

**\*3** When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). [1] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at \*2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999). [2] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Standard Governing a Motion for Summary Judgment

Magistrate Judge Homer correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 121, at

13–14.) As a result, this standard is incorporated by reference in this Decision and Order.

## III. ANALYSIS

As an initial matter, neither party objected to Magistrate Judge Homer's thorough Report–Recommendation. As a result, the Court reviews the entire Report–Recommendation for clear error. After carefully reviewing all of the papers in this action, including Magistrate Judge Homer's thorough Report–Recommendation, the Court accepts and adopts Magistrate Judge Homer's Report–Recommendation except his recommendation that Plaintiff's strip-search claim should survive as supported by sufficient admissible record evidence. The Court need not reach the merits of Magistrate Judge Homer's recommendation regarding the evidentiary sufficiency of that claim because the Court concludes, as a threshold matter, that the claim suffers from multiple fatal pleading deficiencies.

The Court possesses the authority, and indeed the duty, to *sua sponte* dismiss for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), and such a dismissal may occur at any time. *See Benitez v. Ham,* 04–CV–1159, 2009 WL 3486379, at *7 (N.D.N.Y. Oct. 21, 2009) (Mordue, C.J. adopting Lowe, M.J.) ("[E]ven where a defendant has not advanced ... a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a pro se prisoner has failed to state a claim upon which relief may be granted.").

Here, Plaintiff's Complaint alleges, in conclusory fashion, as follows: (1) "[s]ubsequent to plaintiff's encounter with P.O. Johnson[, where he was told that he was being transferred to Marcy Psychiatric C.F.,] plaintiff was taken to a room where he was told he had to undergo a strip search ... [before he] was placed in a van and transported to ... CNYPC"; [3] (2) upon arriving at CNYPC, Plaintiff was "forced to undergo a strip search"; [4] (3) "Plaintiff has been forcefully striped searched[ ] on a few occasions and threatened with the threat of being injected with drugs if he refused to be striped searched or if he refused to participate in the programs ... at CNYPC"; [5] and (4) "[w]hen plaintiff is transported to outside medical facilities or any other place outside [CNYPC] he is striped searched and placed in cuffs, shackles and leg irons." [6] Simply stated, Plaintiff's Complaint does not contain factual allegations plausibly suggesting the personal involvement of any Defendant in this action in any unconstitutional strip

search conducted of Plaintiff between May 5, 2005 (when he was initially incarcerated at Rikers Island) and December 1, 2006 (the approximate date on which he signed his Complaint in this action).

**\*4** Of course, the Court is mindful of the fact that, in his response papers, Plaintiff has alleged that, on January 10, 2007, he was also subjected to an unlawful strip-search. The Court is also mindful of the special solicitude that is generally to be afforded to the pleadings of *pro se* civil rights litigants. Finally, the Court is mindful that such special solicitude may sometimes be relied on to construe the factual allegations contained in a *pro se* civil rights litigant's papers in opposition to a motion to dismiss for failure to state a claim as effectively amending the allegations of his complaint (to the extent those factual allegations are consistent with the allegations of the complaint). [7]

For the sake of brevity, the Court will set aside the issue of whether the full measure of this special solicitude should be extended to Plaintiff-who was an extremely experienced *pro se* civil rights litigant before he drafted his 31–page typed Complaint in this action. [8] The more important problem is that, here, Plaintiff has not responded to a *motion to dismiss for failure to state a claim* (which typically occurs relatively early in an action), but has responded to two *motions for summary judgment.* As a result, Plaintiff's earliest response to Defendants' motions was filed three years after the signing of his Complaint (which occurred on or before December 1, 2006), and four months after the conclusion of discovery (which occurred on April 14, 2009).

Simply stated, permitting Plaintiff to drastically change the landscape of his claims at such a late stage of the action (by asserting a claim based on a strip search conducted more than a month *after* Plaintiff signed his Complaint in this action) would unduly prejudice Defendants, who spent the time and expense of filing two comprehensive and lengthy motions for summary judgment on the claims asserted in Plaintiff's Complaint, and who would not have the benefit of conducting discovery on such new claims before trial. [9] The Court notes that, during his deposition in this action, Plaintiff never mentioned the strip search in question. (*See generally* Dkt. No. 105, Part 1; Dkt. No. 107, Part 7; Dkt. No. 105, Part 1.)

Moreover, even if Plaintiff's response papers in this action could be deemed to amend and/or supplement Plaintiff's Complaint, the arguments contained in those response papers

would not plausibly suggest a Fourth Amendment claim. For example, Plaintiff's argument that he was subject to "regular strip searches" is both vague and conclusory. [10] Simplicit argument that, contrary to Registered Nurse Kelly Appler's nursing note dated January 11, 2007, he did not *in fact* consent to being strip-searched on January 11, 2007, is legally insufficient to render the alleged strip-search actionable under the Fourth Amendment. [11] This is because, in his response papers, Plaintiff acknowledges that the search occurred in response to a fire breaking out in the ward in which Plaintiff resided.

**\*5** More specifically, according to his own response papers, Plaintiff's late-blossoming factual allegations regarding the search on January 11, 2007, are as follows: (1) a small fire broke out in a patient's bathroom on Ward 405 on the evening of January 10, 2007; (2) a management meeting was held between eight staff members, including Defendant Nowick; (3) at some point, Defendant Barboza was "apprised" of the meeting; (4) at this meeting, the decision was made to order strip searches on all patients due to the severity of the safety issue; (5) this explanation was then given to Plaintiff on January 11, 2007; and (6) Plaintiff was then strip searched in a private area by all male staff on January 11, 2007. (*See generally* Dkt. No. 110, at 76–77 [attaching two Nurse Progress Notes regarding Plf., incorporated by reference into response]; Dkt. No. 110 at 14, ¶ 25 [attaching Plf.'s Affirm. in Response to State Defs.' Motion for Summ. Judg., incorporated by reference into response].)

Based on even these allegations, the Court would find no actionable Fourth Amendment claim asserted by Plaintiff in this action. The Supreme Court has made clear that, "in the context of safety and administrative regulations, a search unsupported by probable cause may be reasonable when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Bd. of Educ. v. Earls,* 536 U.S. 822, 829 (2002). "[I]n certain limited circumstances, the Government's need to discover ... latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Earls,* 536 U.S. at 829. "However, the 'special needs' standard does not validate searches simply because a special need exists." *N.G. v. Conn.,* 382 F.3d 225, 231 (2d Cir.2004). "Instead, what is required is 'a fact-specific

balancing of the intrusion ... against the promotion of legitimate governmental interests.' " *N.G.,* 382 F.3d at 231 (quoting *Earls,* 536 U.S. at 830). "This is simply an application of the overarching principle that '[t]he test of reasonableness under the Fourth Amendment ... requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.' " *Id.* (quoting *Bell v. Wolfish,* 441 U.S. 520, 559 [1979] ). [12]

According to Plaintiff's own allegations, the State Defendants possessed a reasonable suspicion that a patient at the facility started the fire. Moreover, the extreme safety issues associated with an individual attempting to set a building on fire is sufficiently compelling to justify the intrusion on privacy entailed by conducting the searches of the patients without any measure of individualized suspicion. [13] As a result, any such search did not violate Plaintiff's Fourth Amendment rights. [14]

**\*6** Finally, even if the Court were to liberally construe Plaintiff's response papers as a formal motion to amend/supplement his Complaint, and even if the Court were to look past the fact that Plaintiff has failed to submit a proposed Amended/Supplemental Complaint specifying his proposed amendments, the Court would still reject Plaintiff's proposed claim. This is because, when a motion to amend or supplement is made in response to a motion for summary judgment, the court assessing whether to deny the proposed amendment as futile should consider the evidence in the record and not assess the proposed amendment as if the evidence does not exist; in such a case, the proposed amended/supplemental pleading is futile if it could not survive the summary judgment motion. [15] Here, the only admissible record evidence adduced in support of this claim establishes that Plaintiff manifested to correctional staff his consent to the strip search on January 11, 2007, entitling Defendants (at the very least) to qualified immunity. (Dkt. No. 110, at 76–77.) [16] Furthermore, the admissible record evidence establishes that the only personal involvement of any Defendant in this action in the search was (1) Defendant Nowicki's participation in a "management meeting" between himself and seven other staff members (including security supervisors) regarding whether to perform the searches of patients, and (2) Defendant Barboza's being "apprised" of that meeting. (*Id.* at 176.)

For each of these several alternative reasons, the Court rejects any Fourth Amendment claim proposed by Plaintiff arising

from the strip-search he allegedly experienced on January 11, 2007.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Homer's Report–Recommendation (Dkt. No. 121) is *ACCEPTED* and *ADOPTED* **in part;** and it is further

**ORDERED** that the Defendants' motions for summary judgment (Dkt.Nos.102, 107) are *GRANTED* **in part and** *DENIED* **in part;** and it is further

**ORDERED** that all the claims asserted in Plaintiff's Complaint (Dkt. No. 1) are *DISMISSED* from this action except for Plaintiff's First Amendment claim that Defendants

Hanmer, Murphy, and Nowicki denied him the right to pray; and it is further

**ORDERED** that the clerk shall terminate Defendants Allen, Rowe, Valezquez, Benbow, Johnson, Walsh, Farnum, Debroize, Forshee, Barboza, Capolo and Becker from this action; and it is further

**ORDERED** that the clerk of the Court shall appoint pro bono counsel for plaintiff for purposes of trial, and as soon as pro bono counsel has been appointed, the Court will schedule a pretrial conference to set a trial date in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3880510

## Footnotes

1    On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g .,* *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

2    *See also* *Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895 (1996).

3    (Dkt. No. 1, at 18.)

4    (Dkt. No. 1, at 19.)

5    (Dkt. No. 1, at 23.)

6    (Dkt. No. 1, at 23.)

7    *Cusamano v. Sobek,* 604 F.Supp.2d 416, 461–62 & n. 79 (N.D.N . Y.2009) (Lowe, M.J., adopted by Suddaby, J.) [citing cases].

8    The Court notes that, from the Federal Judiciary's Public Access to Electronic Court Records ("PACER") Service, it appears that Faris Abdul–Matiyn (a/k/a Faris Matin a/k/a Stephen Jackson), who was first incarcerated in the New York State Department of Correctional Services in 1978, filed some two dozen *pro se* prisoner civil rights actions in federal court before he filed his Complaint in this action in 2006.

9    *See* *Cusamano,* 604 F.Supp.2d at 492 ("[W]hile special solicitude permits a *pro se* plaintiff to effectively amend the allegations of his complaint while responding to a motion to dismiss for failure to state a claim

(which, typically, comes relatively early in an action), it does not permit him to do so while responding to a motion for summary judgment (which, typically, comes relatively late in an action, for example, where, as here, after the defendants have completed discovery based on the allegations contained in the plaintiff's complaint)."); *Shaheen v. McIntyre,* 05–CV–0173, 2007 WL 3274835, at *9 (N.D.N.Y. Nov. 5, 2007) (McAvoy, J., adopting Report–Recommendation by Lowe, M.J., finding that a *pro se* civil rights plaintiff could not effectively amend the allegations of his complaint through allegations raised for the first time in his response to the defendants' summary judgment motion, since discovery had already been completed); *accord, Jackson v. Onondaga County,* 549 F.Supp.2d 204, 220 & n. 45 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation by Lowe, M.J.) (explaining that "the net effect of permitting Plaintiff to so change the landscape of his claims at this late stage of the action would be to deprive Defendants of the fair notice envisioned by Fed.R.Civ.P. 8."); *cf.* Shah v. Helen Hayes Hosp., 252 F. App'x 364, 366 (2d Cir.2007) (holding that plaintiff's claims raised for first time in response to summary judgment motion could not be used as means to amend complaint); *Isaac v. City of New York,* 701 F.Supp.2d 477, 491 (S.D.N.Y.2010) ("Plaintiff may not use his submission in opposition to summary judgment as a back door means to amend the complaint."); Shabazz v. Pico, 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("Plaintiff's delay in asserting that he was injured until his response to defendant's argument [during his motion for summary judgment] that verbal threats without injuries are not actionable under § 1983 confirms the implausibility of plaintiff's new claim.") (Sotomayor, J.), *af'd,* 205 F.3d 1324 (2d Cir.2000).

10    (Dkt. No. 110, at 14, ¶ 25.)

11    Specifically, Plaintiff argues that he did not thank staff for providing him with an explanation for the search, and he "could never feel better or good after being so degradingly violated where he had to expose his entire naked body to staff ...." (Dkt. No. 110, at 14, ¶ 25.)

12    In *N.G.,* the Second Circuit addressed, among other things, whether a strip search of one girl at a juvenile detention facility based on a missing pencil (on two separate occasions) was appropriate given that she was one of among ten to twenty girls in the room in which the pencil went missing. *N.G.,* 382 F.3d at 234. In reaching its conclusion that the complaint stated a claim of an unlawful strip search, the Court of Appeals noted that, "[a]lthough we recognize the possibilities that a pencil could be used as a weapon and could be concealed in a body-cavity, the combination of these possibilities alone is too unlikely to justify the serious intrusion of a strip search, in the absence of reasonable suspicion concerning possession of the missing item." *Id.* The Court noted further that "[s]uch reasonable suspicion might arise if less intrusive searches such as pat-downs of the girls in the room where the pencil disappeared failed to locate it, raising suspicion that one of the girls in that room had the pencil concealed." *Id.* However, the Court of Appeals also noted that, "[s]ince the pencils were numbered, it would not have been difficult to keep track of which girls had which pencils, thereby pinpointing the girl who had not turned in the missing pencil."

13    Unlike in *N.G.,* which involved the *possibility* of contraband being used as a weapon, the facts in this case establish that contraband was used to start a fire prior to the search. Moreover, unlike in *N.G.,* there was no way to pinpoint who started the fire in the bathroom such that less invasive measures could have been taken.

14    The Courts notes that it finds *Aiken v. Nixon,* 236 F.Supp.2d 211 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003), distinguishable from this case because *Aiken* involved the repeated strip searching of a patient whenever he appeared for admission into the psychiatric center, based on the State psychiatric center program director placing a standing order in the patient's record for this to be done.

15    *See, e.g.,* Milanese v. RustOleum Corp., 244 F.3d 104, 110 (2d Cir.2001) (explaining that, when cross-motion to amend complaint is made in response to a motion for summary judgment, and parties have fully briefed issue whether proposed amended complaint could raise genuine issue of fact and have presented all relevant evidence in support of their positions, court may deny the amendment as futile, even if it states valid claim on its face, where evidence in support of proposed new claim creates no triable issue of fact and

defendant would be entitled to summary judgment on it); *accord, Newburgh v. Adlabs Films USA, Inc.,* 09–CV–11067, 2010 WL 2772446, at *6 (E.D.Mich. July 13, 2010).

16    More specifically, the record evidence establishes that, at 2:32 p.m. on January 11, 2007, Nurse Supervisor Tanya Marr completed a "Progress Note" regarding Plaintiff, which states as follows: (1) on the evening of January 10, 2007, a small fire broke out in the patient's bathroom on ward 405; (2) a management meeting was subsequently held, where the decision was made to strip search all patients "due to [the] severity of this safety issue"; (3) "N. Nihalani MD wrote order for [Plaintiff] to be strip searched, [and] the reason for the procedure was explained to [Plaintiff]"; (4) Plaintiff "was moved to a private area and search was conducted by male staff"; (5) "Dr. Nihalani spoke with [Plaintiff] and showed [him] the policy and procedure"; (6) "[Plaintiff] was cooperative with procedure"; (7) "[Plaintiff] was cooperative for ward room search"; and (8) "[Plaintiff] voiced no concerns, complaints or questions during the search." (Dkt. No. 110, at 76.) Moreover, at 3:45 p.m. on January 11, 2007, Nurse Supervisor Kelly Appler completed a "Progress Note" regarding Plaintiff, which states as follows: (1) this Progress Note is an "[a]ddendum to [the] nursing note [prepared at 2:32 p.m.]"; (2) "[Plaintiff] stated [to Dr. Nihalani that 'he] felt violated that [he] was searched' "; (3) "Dr. Nihalani and Jeff Nowicki and [Kelly Appler] reassured [Plaintiff] it was done for safety and security reasons"; and (4) "[Plaintiff] stated[,] 'Thank you I feel better that you reassured me of the reason.' " (*Id.* at 77.)

---

**End of Document**                                             © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Mahar v. U.S. Xpress Enterprises, Inc., N.D.N.Y., July 21, 2009

2002 WL 523270
United States District Court, S.D. New York.

Martin STONER, Plaintiff,
v.
NEW YORK CITY BALLET COMPANY, Defendant.

No. 99 Civ. 0196(BSJ).
|
April 8, 2002.

*Order & Opinion*

JONES, J.

## I. INTRODUCTION

**\*1** Pro se Plaintiff, Martin Stoner ("Stoner"), brings this action against the New York City Ballet Company ("Ballet") pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e *et seq.,* the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law 290 *et seq.,* and the Administrative Code of the City of New York ("NYCHRL"), §§ 8-101 *et seq.,* alleging employment discrimination in that he has been retaliated against by the Ballet since 1998 because of his alleged protected conduct.[1] A detailed summary of Plaintiff's contentions and the facts of this case is set forth in this court's May 8, 2001, Order and Opinion. *See Stoner v. New York City Ballet Co.,* No. 99 Civ. 0196(BSJ), 2001 WL 492430, at \*1- \* (S.D.N.Y. May 8, 2001) [hereinafter *Stoner I* ]. Some of the more pertinent background facts are also described below.

## A. FACTS

Plaintiff has been employed as a violinist with the Ballet's orchestra since 1976. (Complaint ("Compl.") ¶ 9.) From approximately 1980, Stoner was in a group of male and female substitute musicians known as "necessaries." The necessaries sought, among other things, health benefits and entry into the basic orchestra without audition. In particular,

Stoner has fought continuously, but unsuccessfully, for the right to automatic entry to the orchestra without audition for rotation players. (Stoner Dep. at 113, 134-35.) Currently, a collective bargaining agreement ("CBA") between the Ballet and the Associated Musicians of Greater New York, Local 802, American Federation of Musicians, AFL-CIO, ("Union") governs the employment of orchestra musicians.

In 1983, the Ballet and the Union adopted a procedure into their CBA to govern the process by which musicians would attain entry into a permanent opening in the basic orchestra. (Goldberg Aff. ¶ 5.) There are several options available to fill a permanent position in the orchestra under the CBA. (*See* Menaker Decl. of 6/11/01, Ex. C.) These options, which a joint management-musicians Audition Committee "shall attempt to satisfy in the following order of preference," include:

> 1. to appoint a player from the orchestra or from among the players who have substituted for orchestra members on a regular basis without audition, on the basis of personal knowledge; 2. to appoint a player recommended to it, but only after a personal audition before the Committee; 3. to appoint a player chosen through open auditions.

(Menaker Decl. of 6/11/01, Ex. C, at 35-36, 40-41.) Eight votes are required for appointments under options one and two. (*Id.* at 41.) If there are insufficient votes to appoint an applicant to the orchestra, the Committee must hold an open audition. (*Id.* at 40-42.)

Although he has never been a basic or permanent member of the orchestra, Plaintiff has been a rotator since 1985, when the Ballet first recognized musicians of that status. Rotators are replacement musicians who are the first musicians to be called in when a permanent orchestra member is absent. (Goldberg Aff. of 2/16/99, ¶ 3.) According to Stoner, during the 1998-1999 winter season, he played in approximately "95% of the required performances," which is more than some of the basic orchestra members of the violin section played. (Pl.'s Aff. in Opp'n to Def.'s Mot. for Summ. J. ¶ 67.)

## B. PLAINTIFF'S CLAIMS

**\*2** In his Complaint, Stoner claimed that the Ballet retaliated against him in violation of Title VII because he "testified in a Federal Court civil rights proceeding against [the Ballet]." (Compl.¶ 2.) Specifically, Stoner claims that on June 2 and September 24, 1997, he was deposed in connection with *Pray v. New York City Ballet,* 96 Civ. 5723 (*"Pray"* ), a sexual harassment lawsuit initiated against the Ballet by three female violinists. The plaintiffs in the *Pray* litigation alleged that they had been subjected to a hostile work environment by Laurance Fader ("Fader"), a fellow musician, who was the head of the Union Negotiating Committee. Stoner testified against Fader and Jack Katz, another musician who was the Chairman of the Audition Committee. According to Stoner, his testimony was damaging to the Ballet. (Compl.¶¶ 10-12.) Stoner claims that since that time the Ballet has consistently retaliated against him for his participation in the *Pray* litigation, principally by failing to promote him to the basic orchestra without audition.

## C. PENDING MOTIONS

Currently multiple motions are pending before this court. Both Defendant and Plaintiff move for reconsideration of different portions of this court's May 8, 2001, Order and Opinion. Plaintiff also moves to amend his Complaint. Moreover, Plaintiff has raised additional arguments and claims in correspondence to the court to which Defendant has responded by letter brief. Finally, Plaintiff has filed a motion for sanctions against Defendant.[2]

## II. PLAINTIFF'S MOTION FOR RECONSIDERATION

Plaintiff seeks reconsideration of this court's May 8, 2001, Order and Opinion, which addressed Defendant's Motion for Summary Judgment, Plaintiff's Cross-motion for Summary Judgment, and Plaintiff's first Motion to Amend the Complaint. Plaintiff contends that the court erred by overlooking evidence, failing to view the evidence in the light most favorable to Plaintiff, failing to draw inferences in Plaintiff's favor, denying Plaintiff adequate discovery,[3] misapplying the law, failing to view the record as a whole, and impermissibly resolving issues of fact. (*See* Pl.'s Mem. in Supp. of Pl.'s Mot. for Recons. ("Pl.'s Recons. Mem.") at 1.)

## A. LEGAL STANDARDS

Motions for reconsideration governed by Local Civil Rule 6.3 are within the sound discretion of the district court. *Schaffer v. Soros,* No. 92 Civ. 1233, 1994 WL 592891, at \*1 (S.D.N.Y. Oct. 31, 1994). The rule provides in pertinent part: "There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." Rule 6.3 must be applied so as to avoid re-litigating repetitive arguments on issues previously decided. *System Management Arts, Inc. v. Avesta Tech., Inc.,* 106 F.Supp.2d 519, 521 (S.D.N.Y.2000). Therefore, the movant must demonstrate that the court overlooked controlling decisions or factual matters that were put before it on the underlying motion that might reasonably be expected to alter the conclusion reached by the court on the underlying motion. *Dellefave v. Access Temporaries, Inc.,* No. 99 Civ. 6098, 2001 WL 286771, at \*1 (S.D.N.Y. Mar. 22, 2001). The movant may not "advance new facts, issues or arguments not previously presented to the Court." *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Md.,* 768 F.Supp. 115, 116 (S.D.N.Y.1991). Moreover, the parties may not "reargue those issues already considered." *In re Houbigant, Inc.,* 914 F.Supp. 997, 1001 (S.D.N.Y.1996).

## B. PLAINTIFF'S DISMISSED RETALIATION CLAIMS

**\*3** Plaintiff seeks reversal of this court's decision dismissing portions of his retaliatory failure to promote claim on summary judgment. Contrary to this court's rulings, Plaintiff argues that he did, in fact, demonstrate an adverse employment action sufficient to withstand summary judgment. Specifically, Plaintiff claims that the court overlooked evidence demonstrating (1) that persons hostile to Stoner improperly influenced the Ballet's decision to deny Stoner direct entry to the orchestra, (2) that it would have been futile for Stoner to audition because the process was unfair to him, and (3) that not all openings in the violin section have been filled by open auditions. (*See* Pl.'s Recons. Mem. at 2-6.) Plaintiff's assertions are entirely without merit.

Plaintiff, for the most part, rehashes the arguments he made before this court in motions decided in the May 8, 2001, Order and Opinion. With respect to the "evidence" Plaintiff claims the court overlooked about the Ballet's denial of Plaintiff's

direct entry into the orchestra and the alleged futility of the audition process, Plaintiff's arguments continuously fail to distinguish between unsupported, irrelevant hearsay and evidence that would support his claims. *See H. Sand & Co., Inc. v. Airtemp,* 934 F.2d 450, 454-55 (2d Cir.1991) ("[T]estimony ... that would not be admissible if testified to at the trial may not properly be set forth in [the Rule 56(e)] affidavit.") (internal quotations and citations omitted); *see also Allen v. Coughlin,* 64 F.3d 77, 80 (2d Cir.1995) (finding conclusory allegations in affidavits insufficient). Moreover, Plaintiff's allegations regarding the "open" or "closed" nature of the auditions overlook the crucial distinction between openings for principal positions and entry into the basic orchestra, which are governed by different processes under the CBA. (*See* Def.'s Mem. in Opp. to Pl.'s Mot. for Recons. at 6-7.)

Plaintiff's arguments citing law allegedly ignored by the court are similarly unavailing. The "controlling" precedents submitted by Plaintiff are, in fact, inapplicable to Plaintiff's retaliation claims. The doctrines cited by Plaintiff deal with aspects of discrimination and hostile work environment claims unrelated to Plaintiff's failure to demonstrate an adverse employment action in support of his retaliation claims. (*See* Pl.'s Recons. Mem. at 3.) Since Plaintiff has failed to demonstrate that the court overlooked any evidence or controlling law that, if considered, could reasonably be found to alter the court's decision to dismiss some of his retaliation claims in its May 8, 2001, Order and Opinion, the court denies Plaintiff's Motion for Reconsideration of those claims. *See Dellefave,* 2001 WL 286771, at *1.

## C. PLAINTIFF'S PROPOSED AMENDMENTS TO THE COMPLAINT

### 1. RETALIATORY FAILURE TO PROMOTE

In its Order and Opinion of May 8, 2001, the court granted in part and denied in part Plaintiff's first Motion to Amend the Complaint. At that time, Plaintiff's first Proposed Amended Complaint sought to add two new sets of allegations of retaliatory conduct on the part of the Ballet. The first set occurred between 1984 and December 1997 and was allegedly precipitated by protected activity in which Stoner claimed he began to engage on January 1, 1980. Plaintiff alleged that the Ballet retaliated against him by failing to promote him to the basic orchestra in 1984; November,

1985; November, 1990; February, 1992; November, 1992; and February, 1996; and by failing to investigate and to take remedial action regarding his complaints that Fader harassed him in January, 1985; January, 1988; January, 1993; May and June, 1997; and December, 1997. *Stoner I,* 2001 WL 492430, at *8. The second set occurred after the filing of the original Complaint in this litigation on January 11, 1999. *Stoner I,* 2001 WL 492430, at *5.

**\*4** Assuming, for the purposes of the motion, that Plaintiff had engaged in protected activity and had demonstrated a discriminatory policy or mechanism,[4] the court found Plaintiff's new claims concerning the Ballet's conduct before February 5, 1998, were time-barred and that Plaintiff failed to set forth a continuing violation sufficient to warrant an exception to the statutorily required limitations on filing time. *Stoner I,* 2001 WL 492430, at *7. Therefore, the court denied Plaintiff leave to amend by adding retaliation claims concerning any conduct of the Ballet prior to February 5, 1998.[5]

For the most part, Plaintiff's objections to the court's decision concern the findings that his allegations prior to 1998 were time-barred because Plaintiff failed to set forth a continuing violation. (*See* Pl.'s Recons. Mem. at 8-11.) Under Title VII, a claimant must file a discrimination claim "with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local employment agency, within 300 days of the alleged discriminatory action." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996). This statutory requirement is analogous to a statute of limitations, so a charge filed after the stated time frame will be barred. *Id.* The continuing violation doctrine provides an exception to that rule. "Under that doctrine, if a plaintiff has experienced a continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir.2001) (internal quotations and citations omitted). The Second Circuit has held that

> [a]lthough the continuing violation exception is usually associated with a discriminatory policy, rather than with individual instances of discrimination, and although acts so 'isolated in time ... from each other ... [or] from the timely allegations[ ] as to break the asserted continuum of

Case 9:18-cv-00391-LEK-TWD  Document 70  Filed 04/23/20  Page 222 of 301
Stoner v. New York City Ballet Co., Not Reported in F.Supp.2d (2002)
88 Fair Empl.Prac.Cas. (BNA) 1867

discrimination' will not suffice, *Quinn v. Green Tree Credit Corp.,* 159 F.3d at 766, a continuing violation may be found 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice."

*Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994).

*Fizgerald,* 251 F.3d at 359. A plaintiff may not rely on such a continuing violation theory, however, unless he has asserted a continuing violation in the administrative proceedings. *Miller v. International Tel. & Tel. Corp.,* 755 F.2d 20, 25 (2d Cir.), *cert. denied,* 474 U.S. 851 (1985).

The evidence Plaintiff suggests that the court "overlooked" when denying his Motion to Amend by adding retaliatory conduct occurring prior to February 5, 1998, consists almost entirely of hearsay allegations contained within Plaintiff's own self-serving affidavits. (*See, e.g.,* Pl.'s Recons. Mem. at 9-10.) Moreover, Plaintiff has continually "reconstrued" the often contradictory facts and conclusory allegations on which he relies to support his claims of a continuing violation in an attempt to make his case resemble favorable precedent. For example, Plaintiff initially claimed that he has been engaged in protected activity since at least January 1, 1980. (Proposed Am. Compl. ¶¶ 12, 16-17.) However, as the court noted in its May 8, 2001, Order and Opinion, Stoner's own allegations and the documents he relies upon do not support his claim that the NLRB charges [Stoner raised in the early 1980s] related to gender based discrimination." *Stoner I,* 2001 WL 492430, at *6. Moreover, even assuming that there was a continuing policy or mechanism of gender-based discrimination, Plaintiff, by his own admissions, should have been on notice no later than the mid-1980s of the Ballet's discriminatory policy. Consequently, Plaintiff's notice precluded application of the continuing violation doctrine. *See* *Stoner I,* 2001 WL 492430, at *7.

*5 In an apparent attempt to circumvent those notice limitations of the continuing violation doctrine, Plaintiff asserted in his Memorandum in Support of Plaintiff's Motion for Reconsideration that despite his complaints and charges filed with the NLRB, (1) his awareness was not triggered because he wasn't regularly harassed until he was noticed for his deposition in May 1997, and (2) it was reasonable for him not to assert his rights until 1998 because he thought the discrimination might be mitigated by a Union settlement in 1985. (Pl.'s Recons Mem. at 10.) The latter assertions is

an admission by Plaintiff that he was aware of the alleged discrimination prior to 1985; otherwise, Plaintiff would have no reason to believe there were any "adverse consequences" to be mitigated by the settlement. Moreover, any reliance by Plaintiff on the Union settlement to bring about changes in the audition process would necessarily have been negated by the next occasion on which auditions were held to fill an opening in the orchestra, which occurred in November of 1985. (*See* Def.'s Mem. in Opp'n to Pl.'s Mot. for Recons. at 10.)

Further "clarifying" his position in his Memorandum of Law in Support of Plaintiff's [second] Motion for a Preliminary Injunction, Plaintiff asserted:

> In his complaint and in two amended complaints, Stoner has alleged an ongoing pattern of retaliation by the Ballet. However, Stoner now asserts that there was a break in his protected activity from approximately 1985 to 1997. In other words, Stoner's early activity from 1980-1985 was gender-based, protected opposition and his protected activity from 1997-present was also gender-based.

(Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. at 1-2.) Stoner's most recent averments only serve to demonstrate that he cannot meet the continuity requirements necessary to qualify for a tolling of the statutory filing period under the continuing violation doctrine. The law is clear that discrete, sporadic incidents do not meet the frequency requirement. *See* *Weeks v. New York State Div. of Parole,* 273 F.3d 76, 84 (2d Cir.2001) ("Absent unusual circumstances, a two-year gap is a discontinuity that defeats use of the continuing violation exception.")

Now, however, Plaintiff "alleges that his well-documented fight against auditions for the Rotation Players from 1985-97 (which is undisputed) did not constitute a twelve year gap in Stoner's gender-based protected activity." (Pl.'s Mem. of Law in Supp. of Sanctions at 4.) While Plaintiff's position with respect to the time periods in which he was engaged in protected activity and his awareness of the alleged discrimination by the Ballet has shifted dramatically and repeatedly since the outset of this litigation, Plaintiff's

reclassification of the facts on which he relies does not demonstrate that the court overlooked any evidence that, if considered, could reasonably be found to alter the court's decision to deny his Motion to Amend to add retaliatory conduct occurring before February 5, 1998.

**\*6** Stoner argues that the court should reconsider his continuing violation claims not only in light of those new assertions by Stoner but also because the Supreme Court has granted *certiorari* in *Morgan v. Amtrak,* 232 F.3d 1008 (9th Cir.2000), *cert. granted,* 121 S.Ct. 2547 (2001), a Ninth Circuit case. In *Morgan,* as in prior cases, the Ninth Circuit rejected the application of the test articulated in *Berry v. Board of Supervisors,* 715 F.2d 971 (5th Cir.1983), to continuing violation claims predicated upon the assertion of a hostile environment. Specifically, the Ninth Circuit rejected the strict "notice limitation" of the continuing violation doctrine in the context of hostile work environment claims after finding that "most cases of hostile environment are not capable of facile identification." First, the granting of *certiorari* by the Supreme Court does not represent a change in law warranting reconsideration, and Plaintiff does not point to any change in the law of this Circuit warranting reconsideration. Second, the twelve-year break in Plaintiff's "protected activity" and the attendant harassment admitted by Stoner is dispositive of his claim for continuing violation under any standard adopted by the courts. *See Weeks,* 273 F.3d at 84 (holding that where the events pleaded are few and unlinked and no discriminatory incidents were alleged during a three-year period prior to the limitations period there could be no continuing violation); *Morgan,* 232 F.3d at 1015 (holding that the incidents of discrimination cannot be "isolated, sporadic or discrete" and that the incidents prior to the limitations period must be sufficiently related to those occurring within the limitations period).

Plaintiff, by his own admission, was harassed only once during the twelve-year period prior to his testimony in the *Pray* litigation, (*see* Mem. of Law in Supp. of Prelim. Inj. at 1-2), and was unaware of any gender-based harassment against women at the Ballet from at least 1990 to 1996, (*see* Reply Aff. in Supp. of Pl.'s Rule 15 Mot. of 8/14/00, ¶ 10). Moreover, much of the evidence Plaintiff cites to demonstrate harassment both shortly before and then following his *Pray* deposition reveals that even Plaintiff did not believe the harassment was gender-based. For example, in a letter dated May 18, 1997, Stoner complained to Local 802 and the Ballet about a hostile environment. (First Proposed Am. Compl.

¶ 25.) However, the text of the letter itself demonstrates that Plaintiff's complaints at that time had nothing to do with gender-based harassment. (*See* Letter from Stoner to Executive Board, Local 802 of 5/19/97.) Plaintiff also cites two letters written in 1985 and 1988, (First Proposed Am. Compl. ¶¶ 19-20); however, those letters make no reference to gender-based discrimination. Thus, as this court found in its Order and Opinion of May 8, 2001, the alleged discrimination and Stoner's protected activity occurring outside the statutory limitations period, which appears to be labor-related, is not related to the gender-based discrimination alleged during the limitations period and cannot support a continuing violation allegation. *See Stoner I,* 2001 WL 492430, at \*6. Furthermore, in this case, Plaintiff's claims must be rejected as untimely since Plaintiff, by his own admission, had *actual* notice that he should assert his rights as far back as the early 1980s. (*See* Am. Aff. in Supp. of Pl.'s Cross-mot. for Summ. J. ¶ 34 ("Lawyers that [Stoner] met with in the early 1980's, including former New York City Mayor John Lindsay, suggested to me that I and a group of women ... file Federal discrimination charges in District Court.").)

**\*7** Plaintiff admits to actual notice of discrimination and the non-continuity of the alleged harassment. Under either theory, the continuing violation exception to the statutorily imposed filing time limits is inapplicable.[6] Thus, the court denies Plaintiff's Motion for Reconsideration with respect to those amendments. *See Dellefave,* 2001 WL 286771, at \*1. Although Plaintiff may disagree with the manner in which the court applied the relevant legal standard to the facts before it, such disagreement does not justify reconsideration. *In re Houbigant, Inc.,* 915 F.Supp. 997, 1001 (S.D.N.Y.1996) (A Rule 6.3 motion is "not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved."); *see also Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y.1988) (The strict standards of Rule 6.3 aim "to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.").

## 2. SECTION 1985(2) CLAIM

Plaintiff also contends that the court erred in denying leave to amend to add a claim under 42 U.S.C. § 1985(2). Plaintiff sought to amend his Complaint to assert a cause of action against the Ballet under 42 U.S.C. §§ 1981, 1985(2),

and § 1985(3) because it engaged in a conspiracy with "its officers, and its attorneys to deprive him of equal protection of, and equal privileges and immunities under the Fourteenth Amendments [sic]." *Stoner I,* 2001 WL 492430, at *9. The court analyzed Plaintiff's new conspiracy claim and properly found that it was not cognizable under either § 1981 or § 1985(3), *see id.,* and those two claims are not addressed in Plaintiff's Motion for Reconsideration. However, the court did not analyze Plaintiff's claim under § 1985(2) sufficiently. Therefore, the court grants Plaintiff's Motion for Reconsideration with respect to Plaintiff's Motion to Amend the Complaint to add a claim under 42 U.S.C. § 1985(2).

On reconsideration, the court denies Plaintiff's Motion to Amend the Complaint to add a conspiracy claim under 42 U.S.C. § 1985(2). While it is clear that pro se plaintiffs generally should be afforded the opportunity to amend their complaints, *see Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991), "[a]fter the filing of a responsive pleading, the grant or denial of leave to amend is within the discretion of the district court," *Keady,* 116 F.Supp.2d at 440. A motion to amend should be denied when the amendment would be futile. *Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d 45, 47 (2d Cir.1998); *Keady,* 116 F.Supp.2d at 440. Amendments have been found futile where a plaintiff cannot state a claim or where the claims would be subject to dismissal on some other basis. *Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 340 (S.D.N.Y.1999), *aff'd,* 210 F.3d 354 (2d Cir.2000); *Azurite Corp. Ltd. v. Amster & Co.,* 844 F.Supp. 929, 939 (S.D.N.Y.1994) ("Azurite's proposed amendment would be futile because the factual foundations of Azurite's new allegations are insufficient, as a matter of law, to withstand defendants' motion for summary judgment."), *aff'd,* 52 F.3d 15 (2d Cir.1995). Additionally, leave to amend may be denied upon a finding of bad faith or when the plaintiff has acted with the intention of unduly delaying the litigation. *Keady,* 116 F.Supp.2d at 441.

**\*8** At the time Plaintiff moved to amend his Complaint, he failed to state a cognizable claim under § 1985(2).[7] It is well established that a plaintiff must allege the existence of a § 1985 conspiracy with particularity. *See Thomas*

*v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). When Plaintiff moved to add a § 1985 claim, he failed to identify specific individuals involved in the conspiracy or to cite to any agreement, concerted activity, or overt act taken in furtherance of the conspiracy. *See id.* However, Plaintiff has gradually refined his conspiracy allegations over time, and the court analyzes the claim as it has evolved throughout this pro se Plaintiff's numerous submissions.

In his Motion for Reconsideration, Plaintiff claims that he is alleging two conspiracies: a conspiracy to deter Plaintiff from testifying during his *Pray* deposition and a conspiracy to retaliate against him for attending that deposition. (*See* Pl.'s Recons. Mem. at 12.) Later, in a letter to the court, Plaintiff alleged that "Pat Turk, a former Company Manager, and Anne Parsons, the current Company Manager, conspired with Kathleen McKenna, the Ballet's outside counsel, to injure [Plaintiff]" within the meaning of § 1985(2). (*See* Letter from Stoner to the court of 10/15/01, at 1.) Plaintiff claims that the alleged conspirators caused him emotional and financial harm by retaliating against him for his participation in the *Pray* case. Specific acts then alleged by Plaintiff included conspiring to enforce the Ballet's promotion procedures selectively and to deny him promotions for both temporary and permanent positions. (*See id.*) The conspirators are also alleged to have conspired "to cover up allegations of gender-based harassment and a hostile workplace" with respect to both Plaintiff's testimony in the *Pray* case and in the instant suit. (*See id.* at 2.)

In a letter to the court dated November 5, 2001, Plaintiff clarifies that he is asserting no less than three different claims under § 1985(2). First, Plaintiff claims that Kathleen McKenna, counsel for Defendant, and Pat Turk violated § 1985(2) "by conspiring to cover up ongoing and repeated instances of gender-based retaliation and harassment during the period of [Plaintiff's] *Pray* depositions" from May 1997 to June 1998. (Letter from Stoner to the court of 11/4/01, at 2.) Second, Plaintiff claims that Kathleen McKenna and Brooks Parsons, Chief Financial Officer of the Ballet, (*see* Menaker Decl. of 6/11/01, Ex. B, Ex. 1, at 3), violated § 1985(2) "by conspiring to cover up ongoing and repeated instances of gender-based retaliation and harassment" from June 1990 to December 1998. (Letter from Stoner to the court of 11/4/01, at 2.) Third, Plaintiff claims that Kathleen McKenna and Anne Parsons violated § 1985(2) "by conspiring to cover up

ongoing and repeated instances of gender-based retaliation and harassment" from May 1998 to the present. (*Id.*)

**\*9** Concerted action among the directors, officers, and managers of a corporation cannot constitute a conspiracy. *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.), *cert. denied,* 439 U.S. 1003 (1978); *Burrell v. City Univ.,* 995 F.Supp. 398, 414 (S.D.N.Y.1998). That prohibition against intra-corporate conspiracies applies to claims lodged under § 1985. *See, e.g., Herrmann,* 576 F.2d at 459 (finding no claim for conspiracy stated under § 1985(2) where each alleged conspirator was either a trustee or a faculty member of an educational corporation). Since all of the conspiracy theories alleged by Plaintiff involve a conspiracy between officers of the Ballet-Pat Turk, Anne Parsons and Brooks Parsons, they fail under the intra-corporate conspiracy doctrine.

Plaintiff attempts to surmount the intra-corporate conspiracy doctrine by alleging that Defendant's outside counsel Kathleen McKenna was also a conspirator. This ploy can be seen most clearly in Plaintiff's most recent letter, which splits the conspiracy into three separate conspiracies, each of which includes the Ballet's outside counsel and one officer of the Ballet. (*See* Letter from Stoner to the court of 11/4/01.) Of course, there can be no conspiracy between a corporation and its counsel where the advice or concerted activity was within the scope of the representation. *See Heffernan v. Hunter,* 189 F.3d 405, 413-14 (3d Cir.1999) (dismissing claims under §§ 1985(1) and (2) because there could be no conspiracy between attorney and client where attorney acted within the scope of their representation, even if attorney may have had mixed motives such as enhancing his reputation); *Doherty v. American Motors,* 728 F.2d 334, 340 (6th Cir.1984) (citing the general rule that a corporation cannot conspire with its agents, finding no conspiracy where it was clear the attorneys were motivated "not by personal concerns" but by concern for their clients). Indeed, "treating the involvement of a lawyer as the key unlocking § 1985 would discourage corporations from obtaining legal advice before acting, hardly a sound step to take." *Travis v. Gray Comm. Mental Health Ctr.,* 921 F.2d 108, 111 (7th Cir.1990).

In response, Plaintiff alleges that Kathleen McKenna participated in the conspiracies to further "her own self-

interest to prevent [Plaintiff] from deposing Proskauer attorneys or otherwise involve [ ] various members of the Proskauer legal team in the instant matter ." (Letter from Stoner to the court of 11/4/01, at 2.) Therefore, Plaintiff claims that Kathleen McKenna had a "personal stake" in the conspiracy. (*See id.*) Plaintiff is correct that "[t]here is a 'personal interest' or 'personal stake' exception to the intracorporate conspiracy doctrine, ... which permits a § 1985 claim where there are individuals who are 'motivated by an independent personal stake in achieving the corporation's objective." ' *Salgado v. City of New York,* No. 00 Civ. 3667, 2001 WL 290051, at \*8 (S.D.N.Y. Mar. 26, 2001) (quoting *Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66, 72 (2d Cir.1976)). However, none of the motivations of counsel recited by Plaintiff support the Ballet's alleged goal of retaliation against Stoner. Any alleged attempt by counsel to prevent the deposition of attorneys represents neither a personal stake in the Ballet's alleged retaliation nor a direct attempt to retaliate against Plaintiff. Therefore, Plaintiff has failed to allege a personal stake on the part of the Ballet's counsel sufficient to preclude assertion of the intra-corporate conspiracy doctrine in this case. Since Plaintiff's attempt to allege a claim under § 1985(2) would necessarily fail, the court denies Plaintiff's Motion to Amend the Complaint to add a conspiracy claim. *See Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; *Keady,* 116 F.Supp.2d at 440.

### III. DEFENDANT'S MOTION FOR RECONSIDERATION AND/OR RENEWED MOTION FOR SUMMARY JUDGMENT [8]

### A. TEMPORARY POSITIONS IN JANUARY AND DECEMBER, 1998

**\*10** In its Order and Opinion dated May 8, 2001, the court held that Plaintiff had adequately established a prima facie case of retaliation in support of his allegations that Defendant discriminated against him by hiring temporary employees ahead of him in January and December, 1998. *Stoner I,* 2001 WL 492430, at \*5. The court, therefore, denied Defendant's Motion for Summary Judgment with respect to those claims. *Id.* Defendant now seeks reconsideration of that decision. (*See* Mem. of Law in Supp. of Def.'s Mot.

88 Fair Empl.Prac.Cas. (BNA) 1867

for Recons. and/or Renewed Mot. for Summ. J. ("Def.'s Recons. Mem.") at 6-9.) Defendant argues that the court overlooked evidence that conclusively establishes that the appointment of a substitute player to fill a temporary opening in the orchestra in both January and December of 1998 was neither discriminatory nor retaliatory. Defendant also argues that Plaintiff's claims regarding the January appointment are time-barred and that Plaintiff cannot establish a causal connection between his failure to be appointed to the temporary openings and his protected activity. (*Id.*) Defendant is correct that the court overlooked evidence that would reasonably be expected to affect the outcome of Defendant's Motion for Summary Judgment; therefore, the court grants reconsideration of Defendant's motion with respect to these claims. *See Dellefave,* 2001 WL 286771, at \* 1.

## B. PLAINTIFF'S PROPOSED AMENDMENTS TO THE COMPLAINT

### 1. APPOINTMENT OF A "NEW" ROTATOR

In its Order and Opinion dated May 8, 2001, the court permitted Plaintiff to amend his Complaint to add two new claims. *Stoner I,* 2001 WL 492430, at \* 8. The first amendment added a new claim of retaliation alleging that "the Ballet created a new violin Rotation Player shortly after plaintiff lost his TRO on February 19, 1999 which plaintiff alleges was intended to impact adversely on plaintiff's work." (First Proposed Am. Compl. ¶¶ 49, 50, 52.) At that time, the court noted that "[w]hile the Ballet claims that this allegation is moot because it recognized that it erred in creating a new rotator and shortly thereafter revoked the new rotator's status, this Court finds that Stoner should be allowed to allege it in his Complaint as the Ballet's actions may have caused Stoner to miss performances he might otherwise have been asked to perform." *Stoner I,* 2001 WL 492430, at \* 8 n. 14. Citing evidence overlooked by the court, Defendant seeks reconsideration of that finding. Specifically, Defendant contends that the court overlooked evidence showing that the 1999 rotator appointment took place and was rescinded between seasons, negating any potential adverse impact on Plaintiff's employment, and that appointment to rotator status is not discretionary, negating any inference of causal connection. (*See* Def.'s Recons. Mem. at 2.)

The Order and Opinion of May 8, 2001, makes it clear that the court did not take notice of evidence establishing that the 1999 rotator appointment was both made and rescinded during the off-season. *See Stoner I,* 2001 WL 492430, at \* 8, \* 8 n. 14. Defendant is correct that if the court had taken that evidence into consideration, it would reasonably have been expected to alter the outcome reached by the court. Thus, the court grants reconsideration of its decision with respect to Plaintiff's Motion to Amend the Complaint to add this claim. *See Dellefave,* 2001 WL 286771, at \* 1.

## 2. ORCHESTRA MEMBERS PLAYING MORE THAN SIX PERFORMANCES

**\*11** The second amendment the court permitted in its Order and Opinion dated May 8, 2001, permitted Plaintiff to add a claim that "the Ballet allowed a large number of members of the violin section to play more than six performances per week during the week ending February 28, 1999 which caused [Plaintiff] to lose work." (First Proposed Am. Compl. ¶ 49.) *See Stoner I,* 2001 WL 492430, at \* 8. Defendant now seeks reconsideration of that decision. Specifically, Defendant argues that the court overlooked evidence showing that basic members of the Ballet orchestra are permitted to work more than six performances per week under the CBA and routinely did so as early as 1994. Defendant is correct that the court did not consider that evidence. Since that evidence could reasonably have been expected to alter the outcome reached by the court, the court grants Defendant's Motion for Reconsideration with respect to this amendment to the Complaint. *See Dellefave,* 2001 WL 286771, at \* 1.

## IV. RECONSIDERATION

### A. LAW GOVERNING RETALIATION CLAIMS

Title VII provides that "it shall be an unlawful employment practice for an employer-(1) fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e-2(a)(1). Title VII claims are analyzed under the familiar three-part burden-shifting framework set forth in *McDonnell Douglas Corp.*

Stoner v. New York City Ballet Co., Not Reported in F.Supp.2d (2002)
Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 227 of 301
88 Fair Empl.Prac.Cas. (BNA) 1867

*v. Green,* 411 U.S. 792, 802-04 (1973). The plaintiff in a Title VII action has the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence.

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993). In order to establish a prima facie claim of retaliation, a plaintiff must show (1) that he was participating in a protected activity; (2) that his employer knew of his participation in the protected activity; (3) that the employer took adverse action against him; and (4) that a causal connection existed between the protected activity and the adverse action. *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993) (citations omitted).

If the plaintiff satisfies that initial burden, the burden of production shifts to the defendants to "articulate a legitimate, clear, specific and non-discriminatory reason" for their actions. *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995). Once a nondiscriminatory basis is advanced, the burden of persuasion shifts back to the plaintiff to show the finder of fact that the reasons proffered by the defendants are pretextual. *Hicks,* 509 U . S. at 515; *Quaratino,* 71 F.3d at 64. That is, the plaintiff must demonstrate by a preponderance of the evidence both (1) that the asserted basis for the employer's conduct is false, and (2) that the real reason for that conduct was unlawful discrimination. *Hicks,* 509 U.S. at 515-16.

## B. TEMPORARY POSITIONS IN JANUARY AND DECEMBER, 1998

**\*12** During the winter 1997-1998 season, Janet Berman ("Berman"), the Associate First Chair of the second violin section, left the orchestra. (Menaker Decl. of 6/11/01, Ex. B, Ex. 1.) In response, Gordon Boelzner ("Boelzner")-at that time the Music Director-selected Alexander Simonescu ("Simonescu"), a member of the basic orchestra, for that Associate First Chair position. (*Id.*) The selection of Simonescu was made pursuant to the CBA. (*See* Menaker Decl. of 6/11/01, Ex. C, at 12-13 ("Replacements for any of the foregoing who cease to be associate first chair players by reason of leaving the basic orchestra shall be selected by the Music Director.").) The departure of Berman and the assumption of her Associate First Chair position by Simonescu created a vacancy in the violin section. (Menaker Decl. of 6/11/01, Ex. B, Ex. 1.) Pending the holding of auditions to fill that vacancy, Nancy McAlhany, a substitute

player, was appointed as a temporary replacement. Her appointment was made by Boelzner in agreement with the principal of the second violin section of the orchestra pursuant to the procedures set forth in Article XII of the CBA. (Menaker Decl. of 6/11/01, Ex. C., at 36, 43.)

In December 1998, auditions were held to fill five openings in the violin section, including the opening temporarily filled by McAlhany. All violin rotators, including Stoner, were invited to audition. Even though he had previously requested, on October 10, 1998, that the Ballet "count [him] in," (Menaker Decl. of 6/11/01, Ex. D, Ex. 3), Stoner did not audition, (Menaker Decl. of 6/11/01, Ex. D ¶ 19). Of the twenty musicians who auditioned, only four were selected for entry into the orchestra. The Audition Committee was unable to decide on a fifth violinist. (Menaker Decl. of 6/11/01, Ex. D ¶ 19.) Pursuant to the procedures set forth in Article XII of the CBA, a temporary appointment was made until another audition could be held. (*See* Menaker Decl. of 6/11/01, Ex. C, at 43 ("A temporary opening of one (1) season or less shall be filled by a player mutually agreeable to the Music Director and the principal of the section having the temporary opening.").) Andy Schaw, who received the most votes among the unsuccessful candidates in the December 1998 audition, was temporarily appointed to the vacancy. Auditions to permanently fill that position were held in February 1999.

On reconsideration, the court first notes that Defendant is correct that Plaintiff's claims regarding the January temporary appointment are time-barred and are, therefore, dismissed. *See Stoner I,* 2001 WL 492430, at *7 ("[A]ny allegedly unlawful employment actions that occurred ... on or before February 5, 1998-are time barred."). Unfortunately, by the time Plaintiff submitted opposition papers to Defendant's Motion for Reconsideration, Plaintiff's claims had once again metamorphosed. In his opposition, Plaintiff asserted new allegations that the Ballet's "failure to appoint him to a permanent opening was due to the selective application of the audition procedure" and that, similarly, the Ballet's failure to promote him to these two temporary openings was also due to the selective application of the audition procedure. (Reply Mem. in Opp'n to Def.'s Mot. for Recons. and/or Renewed Mot. for Summ. J. ("Pl.'s Recons. Reply") at 1.) It is from of these new allegations that Plaintiff attempts to resurrect a continuing violation.

**\*13** Plaintiff's new continuing violation claim must fail. As the court has already discussed, Plaintiff cannot maintain a continuing violation claim. [9] *See* discussion *supra* Part II.C.1.

Moreover, the record demonstrates that Plaintiff's failure to be appointed to both temporary positions was not causally connected to his participation in the *Pray* litigation. Both appointments were made pursuant to clear, unambiguous procedures set forth in the CBA, which does not require that rotators receive any priority in the filling of temporary openings. Stoner has the least seniority of the three rotators in the violin section, and not one of the three rotators-Helen Strilec, Sue Ellen Colgan, or Plaintiff-was selected to fill the temporary openings. (Menaker Decl. of 6/11/01, Ex. D ¶ 7; Ex. E, at 2.) Stoner himself admits that the Ballet used this same appointment procedure to fill temporary openings prior to his deposition in *Pray,* with the same result. (*See* Menaker Decl. of 6/11/01, Ex. B, Ex. 3 (Stoner NLRB Charge asserting that, on January 1, 1997, the Ballet, allegedly motivated by Stoner's continued Union activity, hired and seated a subordinate ahead of him).) There are no circumstances surrounding these temporary appointments that could give rise to an inference of retaliation. Plaintiff has failed to establish a prima facie case of retaliation with respect to either of the temporary appointments. Therefore, the court grants Defendant's Motion for Summary Judgment with respect to the January and December, 1998, temporary positions and dismisses those claims.

### C. APPOINTMENT OF A "NEW" ROTATOR

The Ballet has two New York seasons-a winter season from November to February and a spring season from May to June. (Menaker Decl. of 6/11/01, Ex. A ¶ 14.) There is also a three-week tour in July in Saratoga that is not part of the regular season. (Def.'s Recons. Mem. at 3.) In January of 1999, Nancy McAlhany ("McAlhany"), a substitute violist who had played with the orchestra for several years, sought appointment to rotator status under the CBA. (Menaker Decl. of 6/11/01, Ex. F at 4; Ex. G ¶ 5.) Article XIV of the CBA provides that a rotation player "shall be defined as any musician who has worked, or who in the future works, at least fifty (50%) percent of the New York City weeks in at least four out of five consecutive years...." (Menaker Decl. of 6/11/01, Ex. C, at 47.) McAlhany herself approached Arnold Goldberg ("Goldberg"), Personnel Manager of the Ballet orchestra, claiming that she had sufficient performances under the CBA to request appointment under rotator status. (Menaker Decl. of 6/11/01, Ex. G ¶ 5.) Goldberg confirmed McAlhany's performance information and informed her of her appointment on March 31, 1999, when the Ballet was not in season. The Union then notified Goldberg, and it was

later determined, that incorrect performance criteria, using calendar years rather than the Ballet's seasonal years, had been applied. Since it turned out McAlhany did not yet qualify for rotator status, her appointment was revoked on April 31, 1999. (Menaker Decl. of 6/11/01, Ex. F, at 4.)

**\*14** On reconsideration, the court denies Plaintiff's Motion to Amend the Complaint to add a claim of retaliation through the appointment of McAlhany as a new rotation player on February 19, 1999. The entire process occurred while the Ballet was not in season; therefore, McAlhany never worked as a rotator and her brief, if mistaken, appointment did not affect Plaintiff's own employment in any way. When Plaintiff moved to amend adding this claim, Plaintiff failed to identify a single negative effect the temporary appointment had on his employment. Given the undisputed facts about McAlhany's appointment, the court finds that Plaintiff will never be able to establish an adverse employment action with respect to this claim. [10] Since this proposed amendment to the Complaint is futile, the court denies Plaintiff's Motion to Amend his Complaint with respect to this claim. *See* 🔖 *Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; 🚩 *Keady,* 116 F.Supp.2d at 440; 🔖 *Azurite,* 844 F.Supp. at 939.

Once again, in response to the court's earlier decisions and Defendant's arguments, Plaintiff attempts to conjure up a new claim including an adverse employment action. Stoner now argues that the adverse employment action stems from the chilling effect of Defendant's allegedly retaliatory activity. (*See* Pl.'s Recons. Reply at 3.) By the time Plaintiff filed his most recent Motion for a Preliminary Injunction, his claim had grown into the contention that the Ballet's actions against him caused a chilling effect that is deterring Ballet employees, the Orchestra Committee, and the Union from protecting their own rights or cooperating as witnesses in this case.

In support of his claim of chilling effect, Stoner cites to an inapposite line of cases in the Second Circuit, particularly 🔖 *Holt v. Continental Group, Inc.,* 708 F.2d 87, 91 (2d Cir.1983) ("A retaliatory *discharge* carries with it the distinct risk that other employees may be deterred from protecting their rights under the Act or from providing testimony for the plaintiff in her effort to protect her own rights.") (emphasis added). (*See* Pl.'s Recons. Reply at 3.) The cases on which Plaintiff relies relate to retaliatory discharge, which Plaintiff does not and cannot allege. Moreover, the notion of a chilling effect is analyzed in the context of preliminary injunction

motions and irreparable harm determinations, not as an adverse employment action.

As this court noted in its denial of Plaintiff's most recent request for a preliminary injunction,

> In this action, Plaintiff's contentions regarding a chilling effect upon fellow employees are wholly unsupported.... When Plaintiff merely demands appointment to the regular orchestra but refuses to participate in the audition process, *see Stoner,* 2001 WL 492430, at *2, the resulting selection of another musician can not have a chilling effect on the other employees.

*Stoner v. New York City Ballet Co.,* No. 99 Civ. 0196, 2001 WL 1505492, at *2 (S.D.N.Y. Nov. 26, 2001) [hereinafter *Stoner II* ]. Plaintiff also asserts that the Ballet is chilling participation by the Orchestra Committee and the Union in dealing with matters related to this case. Plaintiff cites the Union's refusal of his request to file a grievance about the selective application of the contract, a change in the attitude of the Orchestra Committee towards him after February of 2000, and the failure of rotators and other musicians to complain or assist in his lawsuit as evidence that the Ballet is chilling their efforts to exercise their rights. (*See* Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. at 3-6.) *See also Stoner II,* 2001 WL 1505492, at *3. However, the "evidence" cited by Plaintiff does not support a finding of any chilling effect caused by the Ballet's actions. *See Stoner II,* 2001 WL 1505492, at *2-*3. Thus, even Plaintiff's newest allegations of a chilling effect do not affect the futility of raising this claim. Therefore, the court denies Plaintiff leave to amend to add this claim. *See supra* note 10 and accompanying text. Even if the court were to permit Plaintiff leave to amend adding this claim, such claim would immediately be subject to dismissal on a motion for summary judgment. *See Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; *Keady,* 116 F.Supp.2d at 440; *Azurite,* 844 F.Supp. at 939.

## D. ORCHESTRA MEMBERS PLAYING MORE THAN SIX PERFORMANCES

**\*15** Under the CBA, members of the basic orchestra are compensated for a minimum of six performances per week. (Menaker Decl. of 6/11/01, Ex. C, at 3.) In addition, they are permitted to work more than six performances, and if they do so, they receive additional compensation.[11] (*Id.* at 16.) Regular, or basic, players in the orchestra have, in fact, routinely played more than six performances per week since at least 1994. (Menaker Decl. of 6/11/01, Ex. I; Def.'s Mem. of Law in Supp. of Summ. J. ("Def.'s Summ. J. Mem.") at 5.) That practice has consistently occurred during the Ballet's winter season. (Menaker Decl. of 6/11/01, Ex. F; Def.'s Amend. Br. at 5, n. 4.) Plaintiff himself complained of the practice in a letter to the Executive Board of Local 802 dated January 4, 1994. The letter indicated that members of the basic orchestra were "routinely" being allowed to play more than six performances per week. (Def.'s Summ. J. Mem. at 5; Menaker Decl. of 6/11/01, Ex. I.)

Based on the evidence presented, the court finds that it is undisputed that the Ballet's routine practice of permitting basic members of the orchestra to play more than six performances per week predated Plaintiff's participation in the *Pray* litigation by at least three years. Thus, Plaintiff can not put forward a credible claim that the practice is causally related to his participation in the *Pray* litigation or his filing of an unsuccessful motion for a temporary restraining order in this case in February of 1999. Moreover, Plaintiff's own evidence negates any possible inference of an adverse employment action as well. The chart of performances attached to his opposition by Plaintiff does not support the conclusion that he lost work in comparison with other players who are similarly situated but for Stoner's participation in protected activities. (*See* Pl.'s Recons. Reply at 3-4; Ex. 2.) Plaintiff erroneously focuses on the performers in other sections of the orchestra, but examination of the records for violin rotators indicates that all three violin rotators-Stoner, Colgan, and Strilec-played three performances during the week in question. (*See* Pl.'s Recons. Reply Ex. 2.) Stoner worked exactly the same amount as the other two violin rotators, both of whom are senior to him and neither of whom has participated in Stoner's alleged protected activities. (*See id.*) Since Plaintiff will not be able to demonstrate a prima facie claim of retaliation concerning the orchestra members playing more than six performances in any given week, Plaintiff's claim of retaliation in this instance would be futile.

88 Fair Empl.Prac.Cas. (BNA) 1867

*See supra* note 10 and accompanying text. Even if the court were to permit Plaintiff to amend his Complaint to add such a claim, it would be subject to immediate dismissal on a motion for summary judgment. *See Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; *Keady,* 116 F.Supp.2d at 440; *Azurite,* 844 F.Supp. at 939. Therefore, the court denies Plaintiff's Motion to Amend with respect to this claim.

## V. PLAINTIFF'S SECOND MOTION TO AMEND THE COMPLAINT

**\*16** Plaintiff moves to amend his original Complaint pursuant to Rule 15, Federal Rules of Civil Procedure, for the purpose of stating new allegations of retaliatory conduct on the part of the Ballet. (*See* Pl.'s Mem. of Law of 7/6/01, at 1.) Plaintiff alleges that these recent retaliatory events were precipitated by Stoner's filing of his Complaint in this action, filing his first Proposed Amended Complaint, and his correspondence to Ms. Anne Parsons, the Ballet's Company Manager, dated December 21, 2001, complaining about the Ballet's audition procedure. (*See id.*) Plaintiff alleges that all three of those activities were protected activities. (*See id.*)

Plaintiff's most recent proposed amended Complaint asserts three new allegations of retaliation: the Audition Committee's failure to appoint Stoner to a permanent position in the orchestra on January 18, 2001, and the Ballet's failure to appoint Stoner to two temporary openings in the orchestra in the fall of 2000 and the spring of 2001. (*See id.; see also* Proposed Am. Compl. of 7/6/01, at 2.) Stoner claims that all three incidents involved the selective application of the CBA, and that such selective application constitutes an ongoing policy or mechanism of discrimination engaged in by the Ballet. (*See* Proposed Am. Compl. of 7/6/01, at 2.)

## A. PERMANENT POSITION IN JANUARY, 2001

First, Stoner asserts that the Ballet failed to appoint him to a permanent position in the orchestra on January 18, 2001. With the exception of its more recent date, this claim is identical to the failure to promote claims raised and addressed by the court when dealing with the parties' initial motions for summary judgment. The court dismissed those claims, and Plaintiff sought reconsideration of that decision. Essentially, Plaintiff's second Motion to Amend the Complaint to add

the January 2001 position seeks a second reconsideration of this court's ruling in *Stoner I.* Plaintiff, urging the court to ignore its earlier ruling, asserts that under the law of the case doctrine "there is no imperative duty to follow the earlier ruling." (Mem. of Law in Support of Mot. for Leave to Amend Compl. at 3.) However, "the law of the case counsels against reconsideration absent 'compelling circumstances,' including an intervening change of law, the availability of new evidence, or to correct a clear error or prevent manifest injustice." *Scottish Air Int'l v. British Caledonian Group, PLC,* 152 F.R.D. 18, 25 (S.D .N.Y.1993) (citing *Diduck v. Kaszycki & Sons Contractors, Inc.,* 737 F.Supp. 792, 796 (S.D.N.Y.1990); *United States v. Uccio,* 940 F.2d 757, 757 (2d Cir.1991)). Plaintiff's claim that a perceived lack of discovery prior to the original summary judgment motions in this case somehow constitutes compelling circumstances for the court to revisit those rulings, (*see* Pl.'s Reply Mem. of 8/14/01, at 3), fails entirely in the face of this court's repeated scrutiny of discovery in this case and the court's prior rulings finding adequate discovery had been conducted. *See supra* note 4.

**\*17** Once again, Plaintiff molds his claims to fit potentially favorable precedent and to fill gaps identified in this court's previous rulings. Plaintiff now specifically asserts that the Ballet's failures to appoint him result in lost benefits, including sick pay, vacation pay, and personal days. (*See* Pl.'s Mem. of Law of 7/6/01, at 5-6.) Plaintiff's new allegations miss the point, however. As the court ruled previously, Plaintiff cannot establish an adverse employment action as a part of his retaliatory failure to promote claim because he has failed to apply for the specific position he alleges he was denied. *See Stoner I,* 2001 WL 492430, at *4 (citing *Brown v. Coach Stores,* 163 F.3d 706, 710 (2d Cir.1998)). In an effort to create "new" evidence that surmounts that insufficiency, Plaintiff "fulfilled" the application requirement with a letter dated December 21, 2000, which demanded direct appointment to the permanent orchestra without audition. (*See* Pl.'s Mem. of Law of 7/6/01, at 6.) Although the Committee determined that certain musicians, including Stoner, need not submit to the initial round of auditions but could proceed directly to the final audition, (Parsons Decl. of 7/27/01, ¶ 9), Plaintiff did not audition. Again, Plaintiff fails to appreciate that "it is undisputed that Stoner did not audition for the position of permanent orchestra member after the *Pray* litigation" and that his "contention that the Ballet was required to appoint him to the basic orchestra ... without audition is without merit." *Stoner I,* 2001 WL 492430, at *4.

Plaintiff also clarifies his argument concerning the application of the CBA. He alleges that the Audition Committee must proceed through the three audition options in order, (*see* Menaker Decl. of 6/11/01, Ex. C, at 41), and that the Ballet is bypassing the required step E(2). Plaintiff overlooks the fact that it is provision E(1), not E(2), that would permit the direct appointment of a player from the substitutes without audition. (*See* Menaker Decl. of 6/11/01, Ex. C, at 41.) Moreover, at a meeting on January 18, 2001, the Audition Committee explicitly considered that possibility but "concluded that no musicians would be appointed for direct entry into the violin section of the basic orchestra." (Parsons Decl. of 7/27/01, at 2; *see also* Parsons Aff. of 6/11/01, ¶ 3.)

Even if the court assumes, for the purposes of this motion, that the Audition Committee consistently failed to follow the steps listed in the CBA in order, Plaintiff cannot present any evidence to suggest that the alleged practice was instituted in response to his participation in a protected activity. As the court has already ruled about Plaintiff's earlier, identical claims arising from auditions in 1998, "the Ballet has set forth undisputed evidence that open auditions are not only provided for in the current collective bargaining agreement, but have been used to fill every permanent violin opening since the audition procedure was adopted in the collective bargaining agreement of 1983." *Stoner I,* 2001 WL 492430, at *4. Thus, "the undisputed facts that open auditions have been used to fill every permanent violin opening in the basic orchestra since 1983, and that Stoner did not audition, although invited to do so, adequately rebuts" Stoner's allegation that timing alone can establish causal connection.

**\*18** Since Plaintiff cannot establish either an adverse employment action or causal connection with respect to this claim of retaliatory failure to promote, the court denies Plaintiff's motion to amend his Complaint to add this allegation. *See supra* note 10 and accompanying text. Any such amendment would be futile because it would be subject to immediate dismissal on a motion for summary judgment.

*See* Jones v. N.Y. State Div. of Military & Naval Affairs, 166 F.3d at 47; Keady, 116 F.Supp.2d at 440; Azurite, 844 F.Supp. at 939. The court also finds that Plaintiff's continued reassertion of these identical retaliatory failure to promote claims, given the court's rulings concerning Plaintiff's failure to establish an adverse employment action, demonstrates bad faith and, therefore, warrants denial of leave

to amend. *See* Keady, 116 F.Supp.2d at 441. This claim is identical to several others previously dismissed by the court, and Plaintiff's own actions attempting to "cure" the defect in his claims with his December, 2001, letter reveal his knowledge that the claim is not viable.

## B. TEMPORARY POSITIONS, FALL OF 2000 AND SPRING OF 2001

As the court has already noted with respect to Plaintiff's other claims relating to temporary positions, pursuant to Article XII(H) of the CBA, temporary openings are filled by the Music Director in agreement with the principal of the affected section. (*See* Menaker Decl. of 6/11/01, Ex. C, at 43.) The CBA does not include any provision requiring that such an opening be filled by a rotation player or any particular individual. In this instance, both vacancies created by the absences of regular musicians Catherine Sim and Aaron Stolow were filled by making the performances available equally to the three violin rotators, instead of appointing a single person to fill the vacancies. (*See* Parsons Decl. of 7/27/01, ¶¶ 11-13.) Thus, Stoner received equal consideration and equal opportunity to perform with the other rotators. Moreover, Stoner has the least seniority of the three violin section rotation players-Strilec, Colgan, and Stoner. (*See* Parsons Decl. of 7/27/01, ¶ 11.) Thus, Stoner cannot establish either an adverse employment action or a causal connection or inference of discrimination with respect to these two claims.

Any amendment to add these two claims would be subject to immediate dismissal on a motion for summary judgment, and so amendment would be futile. *See* Jones v. N.Y. State Div. of Military & Naval Affairs, 166 F.3d at 47; Keady, 116 F.Supp.2d at 440; Azurite, 844 F.Supp. at 939. Since amendment to add these two claims would be futile, the court denies Plaintiff's Motion to Amend the Complaint with respect to these two claims. *See supra* note 10 and accompanying text. The court also finds that Plaintiff's attempt to amend to add these two claims was made in bad faith and therefore warrants denial of leave to amend. *See* Keady, 116 F.Supp.2d at 441. These allegations are nearly identical to those raised previously concerning temporary appointments. Moreover, Plaintiff deliberately attempted to obfuscate the issues surrounding these claims by failing to address either of these claims in his Memorandum of Law. Plaintiff never revealed to the court that he himself

was actually given the opportunity to share equally in these appointments with the two other rotators.

## C. PLAINTIFF'S REPLY

**\*19** Plaintiff's Reply Memorandum of August 14, 2001, in support of his second Motion to Amend the Complaint makes it clear that his Motion to Amend is really a second motion for reconsideration of this court's Order and Opinion of May 8, 2001. The Reply does not even address the new claims asserted in the second Motion to Amend; instead, it recites four numbered arguments seeking reversal of the court's prior rulings. Clearly, Plaintiff's arguments are extremely untimely, and most of the arguments do not merit discussion.[12] One of Plaintiff's newly articulated bases for his claims, however, warrants attention from the court. Plaintiff now claims that the court overlooked evidence demonstrating an adverse employment action through the repeated failure of the Ballet to remedy the harassment of Stoner by Fader and others. (*See* Pl.'s Reply Mem. of 8/14/01, at 3 (citing *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999) (holding that retaliatory harassment may constitute an actionable "adverse employment action")).)

### 1. THE SHIFTING CONTOURS OF PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM

For the first time in his Cross-motion for Summary Judgment, Plaintiff asserted as "background" that he was motivated to file his complaint to deter ... a hostile workplace." (Mem. of Law in Supp. of Pl.'s Cross-Mot. for Summ. J. at 3.) However, he alleged only (1) that a hostile environment constitutes an adverse employment action and (2) that "Plaintiff is alleging the existence of a hostile environment which made it impossible for plaintiff to get a fair hearing at an audition." (Mem. of Law in Supp. of Pl.'s Cross-Mot. for Summ. J. at 14-15.) Only later, when he first moved to amend the Complaint, did Plaintiff tie his hostile work environment claim to a continuing violation theory. At that time, he stated "I am also asserting that the conduct alleged in my amended complaint constitutes a "continuing violation." (Aff. in Supp. of Pl.'s Mot. to Amend Compl. of 6/23/00, ¶ 9.)

During the course of this litigation, Plaintiff has raised various allegations of direct harassment of Plaintiff by Fader and others. Recently, however, those allegations have expanded to include Fader's harassment of other, female players and to assert what amounts to a poorly-defined continuing violation/ hostile work environment claim predicated on gender-based discrimination against women. Plaintiff's hostile work environment claim, as most recently alleged, appears to have something to do with "the effect of Fader's harassment of Ms. Pray and others on Stoner." (Letter from Stoner to the court of 10/19/01, at 2.) As pointed out by Defendant, "Plaintiff apparently now recognizes that absent an aggregation of various and sundry complaints about isolated incidents of alleged 'harassment' occurring over a period of almost twenty years (with a break of twelve years in between 'incidents'), his complaints, as a matter of law, cannot satisfy the 'severe and pervasive' requirements of a hostile work environment claim." (Letter from Defendant to the court of 12/17/01, at 1 n. 1.)

**\*20** Contrary to Plaintiff's assertions, the court did, in fact, address Plaintiff's hostile work environment claims, as they were originally pleaded, in its Order and Opinion of May 8, 2001. To prevail on a claim for gender-based hostile work environment under Title VII, a plaintiff must prove that he is a member of a protected class, that the harassment was based upon his membership in the protected class, and that the harassment was sufficiently severe and pervasive to affect a term, condition or privilege of employment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995). In his Cross-motion for Summary Judgment, the only term or condition of employment that Plaintiff asserted was affected was that Plaintiff could not receive a fair hearing at an audition. However, the court found that (1) plaintiff failed to produce any evidence to support the futility of the auditions, (2) it was undisputed that the audition process guaranteed anonymity, (3) the Ballet had accommodated Stoner's request not to have Fader attend the one audition in which Stoner participated, and (4) "there is no proof that demonstrates the Ballet's audition process was unfair to Stoner ." *Stoner I,* 2001 WL 492430, at \*4. Plaintiff has not identified any change in the law or any evidence that the court overlooked when denying Plaintiff's Cross-motion for Summary Judgment with respect to his hostile work environment claims. Thus, there is no basis for reconsideration of that motion. *See Dellefave,* 2001 WL 286771, at \*1.

Considered broadly, however, Plaintiff's voluminous submissions and correspondence may be construed to raise

a claim for continuing violation hostile work environment with slightly different contours than the claim as alleged prior to the court's Order and Opinion of May 8, 2001. Therefore, the court will construe those submissions by Plaintiff as a motion to amend the Complaint to add his newest conception of his hostile work environment claim. Plaintiff now claims that he has established a continuing violation hostile work environment based on Fader's harassment of Stoner and the effect of Fader's gender-based harassment of Ms. Pray and others on Stoner. The court finds that Plaintiff has failed to allege a gender-based hostile work environment claim and denies Plaintiff leave to amend to add such a claim. The court continues to decline to find allegations of a continuing violation sufficient to warrant tolling the statutory time limitations governing Plaintiff's claims; however, the court finds that Plaintiff has sufficiently alleged a claim of retaliatory harassment and grants Plaintiff leave to amend the Complaint to maintain a single retaliation claim asserting only retaliatory harassment occurring after February 5, 1998.

## 2. NO GENDER-BASED HOSTILE WORK ENVIRONMENT CLAIM

Plaintiff has failed to state a claim for a gender-based hostile work environment. Plaintiff's allegations that Fader and others harassed *women* working for the Ballet's orchestra do not support his claim because they fail to allege specific acts to support a claim that the work environment was hostile towards men, like Stoner. *See Smith v. AVSC Int'l, Inc.,* 148 F.Supp.2d 302, 311 (S.D.N.Y.2001). Allegations of harassment against other employees may be relevant to a plaintiff's hostile work environment claim. *Leibovitz v. New York City Transit Authority,* 252 F.3d 179, 190 (2d Cir.2001) ("[W]e recognize that evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination."). However, the employees subject to the harassing acts must be in the same protected class as the plaintiff in order for the plaintiff's own hostile work environment claim to withstand a motion to dismiss. *See AVSC Int'l,* 148 F.Supp.2d at 310; *see also Leibovitz,* 252 F.3d at 186 (holding the plaintiff's hostile work environment claim was proper because she was "a member of the protected class that she claims was subjected to discrimination" unlike other cases where plaintiffs "asserted Title VII rights on behalf of a protected class of employees to which the plaintiff did not belong").

**\*21** Moreover, none of the alleged acts of harassment committed directly against Plaintiff support a claim that Plaintiff is being harassed because he is a *male* employee. In order for Title VII to be employed to combat a hostile work environment, a causal connection must exist between the gender of the plaintiff and the resultant disparity in treatment in the workplace. *DeCintio v. Westchester County Med. Ctr.,* 807 F.2d 304, 308 (2d Cir.1986). As the Second Circuit has stated, when read in the context of the legislative history of Title VII, the term "sex" "logically could only refer to membership in a class delineated by gender," rather than harassment for engaging in an activity regardless of gender.

*See DeCintio,* 807 F.2d 304, 306 (2d Cir.1986); *see also Trans World Airlines v. Hardison,* 432 U.S. 63, 71 (1977) ("The emphasis of both the language and the legislative history of [Title VII] is on eliminating discrimination in employment; similarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin."); *Gregory v. Daly,* 243 F.3d 687, 691-92 (2d Cir.2001) (referring to the "prohibited causal factor" requirement). Since Plaintiff cannot possibly allege facts in this situation that would state a claim for hostile work environment harassment against him based upon his gender, the court denies Plaintiff leave to amend to add such a claim-any such amendment would be futile. *Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; *Keady,* 116 F.Supp.2d at 440.

## VI. PLAINTIFF'S RETALIATORY HARASSMENT CLAIM

Having found that Stoner cannot state a hostile work environment claim, however, the court notes that Plaintiff is proceeding pro se. Therefore, the court must construe the claims raised in Plaintiff's submissions broadly in an attempt to determine whether Plaintiff may have alleged facts sufficient to state any other claim with respect to harassing acts directed at Plaintiff. So doing, the court finds that Plaintiff can state a *retaliation* claim for retaliatory harassment imposed upon him for his participation in the *Pray* litigation. The court applies "the same standards in determining whether *retaliatory* harassment constitutes an adverse employment action" for the purposes of a retaliation claim based upon harassment as it does "in assessing whether harassment *imposed because of sex* works an actionable alteration in the

terms or conditions of employment." *Gregory v. Daly,* 243 F.3d 687, 701 (2d Cir.2001) (citing *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999) (holding that retaliatory harassment may constitute an actionable "adverse employment action" if it works a "materially adverse change in the terms and conditions of employment" (internal quotation marks omitted))).

To sustain a hostile work environment claim, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment...." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). The conduct at issue must create an *objectively* hostile work environment, and the victim must *"subjectively"* perceive the environment to be abusive." *Id.* at 21-22 (emphasis added). The plaintiff must show either that a single incident was "extraordinarily severe," or that a series of harassing incidents were "sufficiently continuous and concerted" to have altered the conditions of the plaintiff's working environment. *Cruz v. Coach Stores,* 202 F.3d 560, 570 (2d Cir.2000) (citations omitted).

**\*22** Looking at only instances after 1997, Plaintiff alleges direct harassment by Fader on May 20, 1997; December 26, 1997; December 28, 1997; and June 11, 1998. [13] (*See* Letter from Defendant to the court of 12/17/01, Ex. K, Stoner Statement of 12/20/98, at 1.) Fader allegedly tried to distract Stoner and behaved inappropriately during the orchestra's performances. Plaintiff has submitted sufficiently specific facts with respect to these allegations to warrant amendment of the Complaint in this case. The court grants Plaintiff leave to amend the Complaint to contain a single claim alleging retaliatory harassment. However, the court has previously discussed multiple bases for a finding that Plaintiff cannot allege a continuing violation exception to the statutory filing limitation in this case. *See supra* Part II.C.1. Those rationales apply equally to Plaintiff's retaliatory harassment allegations. Therefore, Plaintiff's retaliatory harassment claims prior to February 5, 1998, are time-barred; Plaintiff may assert a claim only for retaliatory harassment occurring after February 5, 1998.

## VII. PLAINTIFF'S MOTION FOR SANCTIONS

With permission of the court, Plaintiff filed a Motion for Sanctions against Defendant on December 31, 2001. The court directed Defendant not respond to the motion. Plaintiff asserts that Defendant's submission to the court of December 17, 2001, was an abuse of process. (*See* Pl.'s Mem. of Law in Supp. of Sanctions at 1.) Plaintiff's allegations are meritless. The court expressly granted Defendant permission to make the filing in a telephone conference with the parties on December 10, 2001. Moreover, Defendant's filing constitutes a response to various and sundry new allegations raised by Plaintiff long after the appropriate time, including a letter from Plaintiff to the court dated October 19, 2001. Plaintiff himself abused the leave granted to him by the court to file the motion for sanctions. After a brief one-page discourse on the alleged abuse of Defendant's submission of December 17, 2001, Plaintiff devotes an additional *five* pages to rehashing and offering new argument on his hostile work environment and continuing violation claims. Moreover, Plaintiff attaches a new seven-page affidavit that purports to "support" his motion for sanctions but instead reframes and enlarges upon the other "evidence" in support of his claims. If there is any abuse of process here, it is on the part of Plaintiff. For the foregoing reasons, the court denies Plaintiff's Motion for Sanctions.

## VIII. CONCLUSION

For the reasons discussed above, the court GRANTS in part and DENIES in part Plaintiff's Motion for Reconsideration of its Order and Opinion of May 8, 2001. Specifically, the court GRANTS reconsideration of Plaintiff's Motion to Amend the Complaint to add a claim under 42 U.S.C. § 1985(2). On reconsideration, the court DENIES Plaintiff's Motion to Amend the Complaint to add a conspiracy claim under 42 U.S.C. § 1985(2). The court also GRANTS Defendant's Motion for Reconsideration of its Order and Opinion of May 8, 2001. On reconsideration, the court GRANTS Defendant's Motion for Summary Judgment with respect to Plaintiff's claims concerning the January and December, 1998, temporary positions. On reconsideration, the court also DENIES Plaintiff's Motion to Amend the Complaint to add a claim of retaliation through the appointment of a "new" rotation player on February 19, 1999, and DENIES Plaintiff's Motion to Amend the Complaint to add a claim of retaliation through permitting basic members of the orchestra to play more than six performances per week.

**\*23**  With respect to motions filed after and unrelated to the court's Order and Opinion of May 8, 2001, the court DENIES Plaintiff's second Motion to Amend the Complaint. Moreover, with one exception, the court DENIES Plaintiff leave to amend to add any of the other new claims raised in Plaintiff's extensive submissions to the court in the form of correspondence. The court also DENIES Plaintiff's Motion for Sanctions.

The court GRANTS Plaintiff leave to amend the Complaint to contain a single claim alleging retaliatory harassment occurring after February 5, 1998. Plaintiff is ORDERED to submit his final proposed amended Complaint on or before May 8, 2002. The court will not grant further leave to amend the Complaint in this case.

If either party believes further discovery must be conducted in order to obtain more complete information concerning this narrowly defined claim, that party must submit a request for further discovery to the court clearly indicating the specific discovery sought and the precise reasons why the discovery is deemed necessary. The parties are ORDERED to submit to this court any proposed requests and schedules for further discovery necessitated by this amendment to the Complaint no later than two weeks after the filing of Plaintiff's Amended Complaint.

The court further ORDERS that any party seeking to file a motion or a request for relief with the court, even in correspondence, must first request a pre-motion conference, to be held by the court as soon as practicable following the request.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

---

**Footnotes**

1  The analysis used in considering employment discrimination claims brought under the NYSHRL and the NYCHRL is the same as it is in Title VII claims. *See* Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n. 1 (2d Cir.2000) (citing Leopold v. Baccarat, Inc., 174 F.3d 261, 264 n. 1 (2d Cir.1999); *Landwehr v. Grey Adver. Inc.,* 622 N.Y.S.2d 17, 18 (1st Dep't 1995)).

2  Many of this court's problems in resolving Plaintiff's motions and claims stem from Plaintiff's own conduct. Throughout this litigation, Plaintiff's claims have represented an ever-moving target. For example, although Plaintiff informed the court, by letter dated April 21, 1999, that he intended to move for leave to amend his Complaint, Plaintiff did not make the motion until more than a year later, after both Defendant's and Plaintiff's motions for summary judgment were fully submitted. *See* Stoner I, 2001 WL 492430, at [*] 5, [*] 5 n. 7. Even after decision on dispositive motions, Plaintiff has repeatedly changed his claims and raised entirely new theories of liability, often only briefly mentioned and buried in correspondence to the court or in unrelated motion papers. As late as December of 2001, Plaintiff articulated new bases for liability in correspondence to the court. Defendant is entirely correct when it asserts that "Plaintiff has employed a succession of tactics-including [two] failed request[s] for a preliminary injunction, a campaign of abusive, and then abandoned, discovery requests, repeated attempts to embroil defendant's counsel in this litigation, and a barrage of untimely supplemental requests and briefs-to delay the inevitable dismissal of his [original] complaint." (Mem. of Law in Opp'n to Pl.'s Mot. for Leave to Amend the Compl. at 1.)

3  To the extent that Plaintiff seeks reconsideration of the denial of his requests for additional discovery, the court denies Plaintiff's Motion to Reconsider his discovery requests. This court and Magistrate Judge Michael H. Dolinger have repeatedly reconsidered and denied Plaintiff's overly-broad requests for discovery. *See, e.g.,* Order of May 18, 1999(MHD); Order of Nov. 6, 1999(MHD); Order of Aug. 18, 2000(MHD); Order of Nov.

20, 2000(BSJ). Plaintiff can make no colorable claim that any evidence or authority has been overlooked with respect to his repeated, vexatious requests for overly broad discovery.

4   Plaintiff's complaint that the court erred by concluding that he could not show an "ongoing policy or mechanism" of discrimination, (*see* Pl.'s Recons. Mem. at 11), entirely ignores the fact that in deciding the motion, the court assumed such a policy or mechanism to exist. *See* 📒 *Stoner I,* 2001 WL 492430, at [*]7.

5   The court did, however, permit Plaintiff to add two allegations of retaliation allegedly occurring after the filing of his original Complaint. *See* 📒 *Stoner I,* 2001 WL 492430, at [*]8.

6   In addition to the court's finding that the claims were time-barred and failed to set forth a viable continuing violation exception, the court notes that Plaintiff would be entirely unable to establish an adverse employment action with respect to the allegations that the Ballet retaliated against him by failing to promote him to the basic orchestra in 1984; November, 1985; November, 1990; February, 1992; November, 1992; and February, 1996. *See* 📒 *Stoner I,* 2001 WL 492430, at [*]4 (dismissing identical retaliation claims). Thus, there is an additional ground upon which the court finds futility and, therefore, denies Plaintiff leave to amend to add these particular retaliation claims. *See* 📒 *Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d 45, 47 (2d Cir.1998); 🚩 *Keady v. Nike, Inc.,* 116 F.Supp.2d 428, 440 (S.D.N.Y.2000), *vacated in part on other grounds,* 2001 WL 1168334 (2d Cir.2001) (Table, Text in Westlaw). The court also finds that Plaintiff's continued reassertion of these claims, given the court's rulings concerning Plaintiff's failure to establish an adverse employment action with respect to the Ballet's allegedly retaliatory failure to promote Stoner to the basic orchestra, demonstrates bad faith and warrants denial of leave to amend on that ground as well. *See* 🚩 *Keady,* 116 F.Supp.2d at 441.

7   📒 42 U.S.C. § 1985 provides in pertinent part: "If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified ... the party so injured or deprived may have an action for recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

8   The court agrees with Defendant that the claims remaining following the court's Order and Opinion of May 8, 2001, were addressed in the motion papers and other submissions at that time. However, both parties, particularly Plaintiff, have regularly made voluminous submissions to the court through correspondence and interrelated motions. To the extent that any of the facts or documents relied upon herein were not formally submitted specifically in support of Defendant's Motion for Summary Judgment, Plaintiff's Cross-motion for Summary Judgment, or Plaintiff's first Motion to Amend the Complaint being reconsidered at this time, the court construes Defendant's motion as a renewed motion for summary judgment on the outstanding claims. *See, e.g., Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 955 F.Supp. 203, 210 (S.D.N.Y.1997); *Bentley v. New York,* Nos. 82 Civ. 3492 & 82 Civ. 5774, 1986 U.S. Dist. LEXIS 28224, at [*]4-[*]5 (S.D.N.Y. Mar. 13, 1986).

9   The court also notes that both temporary appointments were made pursuant to a specific provision of the CBA that could not possibly involve selective application. The provisions are clear and unambiguous and were followed by the Ballet. (*See, e.g.,* Menaker Decl. Ex. C, at 43 ("A temporary opening of one (1) season or less shall be filled by a player mutually agreeable to the Music Director and the principal of the section having the temporary opening.").) The evidence on which Plaintiff relies to attempt to establish an issue of fact with respect to the application of the CBA for these two appointments consists entirely of inadmissible hearsay contained in Plaintiff's own self-serving affidavit. Since it is clear that neither of these temporary appointments involved selective application of the audition procedure, they cannot be part of Plaintiff's any alleged continuing violation based on selective application of provisions in the CBA.

10  The court is aware that a plaintiff need not plead facts sufficient to meet the requirements of a prima facie case, including an adverse employment action, in order to survive a motion to dismiss. *See* 📒 *Swierkiewicz*

*v. Sorema,* 122 S.Ct. 992, 997 (2002) ("The prima facie case under *McDonnell Douglas* ... is an evidentiary standard, not a pleading requirement.") Under the standard announced in *Swierkiewicz,* it is possible this claim might survive a motion to dismiss. Nevertheless, even if the court were to permit Plaintiff to amend his Complaint by adding this claim, the claim would immediately be subject to dismissal on a motion for summary judgment. *See* 🔖 *Azurite,* 844 F.Supp. at 939.

11    It is clear from the face of the CBA that no selective application of that contract is involved in the decision by an individual musician to play more than six performances per week; the CBA expressly permits regular members of the orchestra to do so.

12    For example, Plaintiff again complains that he was not afforded adequate discovery. (*See* Pl.'s Reply Mem. of 8/14/01, at 2-3.) The court will not revisit the issue again.

13    All other allegations of harassment of other men at the Ballet pointed to by Plaintiff consist of wholly unsupported allegations based entirely on inadmissible hearsay. (*See* Letter from Stoner to the court of 1/8/02, at 1-2.)

---

**End of Document**                                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4460393
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

AMUSEMENT INDUSTRY, INC., et al., Plaintiffs,

v.

Moses STERN, aka Mark Stern, et al., Defendants.

No. 07 Civ. 11586(LAK)(GWG).
|
Signed Sept. 11, 2014.

*OPINION AND ORDER*

GABRIEL W. GORENSTEIN, United States Magistrate
Judge.

**\*1** Amusement Industry, Inc., Practical Finance Co.,
Inc., Joshua Safrin, Avery Egert, and the Safrin Group,
LLC (collectively the "Moving Parties") have moved to
amend their pleadings pursuant to Fed.R.Civ.P. 15(a)(2)
and Fed.R.Civ.P. 21. The Moving Parties seek to assert
claims for "deceit" under New York Judiciary Law § 487
against Buchanan Ingersoll & Rooney, P.C. ("Buchanan")
and Stephen Friedman, who are currently parties, and to join
as new parties Hoffinger Stern & Ross LLP ("Hoffinger")
and Stephen Stern, who are or were attorneys appearing in
this case. The proposed claims for deceit are premised on
the alleged wrongful conduct of these attorneys during the
discovery phase of this litigation. Buchanan and Friedman
—whom we will refer to as "the Attorneys"—have filed
submissions opposing the motion. For the following reasons,
the motion to amend is denied.

I. *BACKGROUND*

A. *The Parties' Allegations in the Current Pleadings*
In April 2007, defendant Moses Stern, operating through an
entity called First Republic Group, Corp. ("FRG"), entered
into a contract with non-party Colonial Realty Limited
Partnership for the purchase of a real estate portfolio
consisting of eleven shopping centers. *See* Third Amended
Complaint, filed Apr. 27, 2010 (Docket # 405) ("3d Am.
Compl."), ¶¶ 2, 20. [1] As the closing date approached, Moses
Stern still had not obtained the required amount of financing
for the acquisition, so he authorized Steven Friedman, an

attorney at Buchanan, to help locate potential sources of
financing. *See id.* ¶¶ 2, 22. Defendants Joshua Safrin and
Avery Egert, "who were contributing money to facilitate the
acquisition of the Portfolio," also allegedly played a role in
securing the additional funds needed for the closing. *See id.*
¶ 2.

In June 2007, Friedman approached plaintiff Amusement
Industry, Inc. ("Amusement") and "offered Amusement the
opportunity to invest in the Portfolio." *Id.* ¶ 23. Friedman
"repeatedly represented to Amusement that he had been
retained by [Moses] Stern, Safrin, Egert, and the entity
designated to buy the Colonial Portfolio, which was FRG
Corp. and/or FRG LLC, to act as an attorney for them and
to serve as an agent for them to locate, negotiate and close
financing for the planned acquisition of the Portfolio." *Id* .
¶ 25. In reliance on Friedman's representations, on June
29, 2007, Amusement executed a Letter of Understanding
with Moses Stern in which Amusement agreed to provide
$13 million in financing in exchange for a 50 percent
equity and voting interest in the portfolio. *See id.* ¶¶ 29–
31. Amusement thereafter deposited the $13 million into an
escrow account pending finalization of the agreement. *See
id.* ¶¶ 2, 32–33. Over the course of the next two weeks,
Amusement attempted to negotiate the final agreement
with Moses Stern and the other defendants. *See id.* ¶
35. However, instead of finalizing the financing agreement
with Amusement, defendants unilaterally transferred the $13
million out of the escrow account and completed the purchase
of the portfolio "without [Amusement's] permission and
knowing that they did not have [its] permission." *Id.* ¶¶
3–4; see also *id.* ¶ 40. Specifically, Amusement alleges
that on July 3, 2007, defendant Ephraim Frenkel, who
was the principal of Land Title Associates Agency, LLC
("LTA"), "transferred Amusement's money from the account
into which Amusement had wired the funds into once
controlled by FRG ... [and] disbursed the $13 million in
accordance with instructions from Stern [and] FRG." *Id.* ¶
3. Defendants subsequently attempted to have Amusement
ratify the unauthorized use of its funds, but Amusement
refused. *See id.* ¶ 4.

**\*2** Joshua Safrin, who was alleged to have been involved
as one of the key investors in defendants' real estate scheme,
later contended that "he had no knowledge of any of
the representations or actions described in [Amusement's]
Complaint" and that he was "unaware of the existence
of the Colonial Transaction and the events that occurred
in connection with securing the necessary financing until

shortly before being served with process in late 2007." *See* Safrin Prop. Pl. ¶¶ 8–9. According to Safrin, "[Moses] Stern, Friedman, [and FRG] together with Frenkel, LTA, Buchanan, Steven Alevy/Bankers were an integral part of a conspiracy to defraud Safrin by, among other things, forging his signature on documents relating to the Colonial Transaction ... and by misappropriating Safrin's identity ... in order to secure financing for the Colonial Transaction. *Id.* ¶ 10. Safrin alleges that, when Friedman was negotiating with Amusement on Moses Stern's behalf, Friedman represented that "Safrin and/ or Egert were equity participants in the Colonial Transaction, when [he] knew that neither Safrin nor Egert had made any such commitment and that Egert was not authorized to make any such commitment on behalf of Safrin." *Id.* ¶ 39.

According to Safrin, Moses Stern was able to obtain "a commitment from Citigroup to provide senior and mezzanine financing in the amount of approximately $126 million for the purchase of the Portfolio" based on his "representation to Citigroup that Safrin was a sponsor/investor and would sign carve out and environmental guarantees." *Id.* ¶¶ 40–41. As part of the negotiations for this transaction, Citigroup required that certain financing and organizational documents be signed by Safrin. *Id.* ¶ 51. Thus, many documents pertaining to the financing agreement with Citigroup, as well as to the closing of the Colonial Transaction, purported to contain Safrin's signature. *See id.* ¶¶ 37, 84, 88, 105, 128, 133–34. However, Safrin contends that he did not sign any documents relating to the negotiations with Citigroup or Amusement and that he was not even aware of the Colonial Transaction until much later. *See id.* ¶¶ 47, 50, 52, 90, 100, 125. Safrin alleges that certain defendants, including Stern, Buchanan, and Friedman, conspired to forge his signature on these documents. *See id.* ¶¶ 165–73; *see also id.* ¶ 87. Safrin has pointed to certain contemporaneous emails between Moses Stern, attorneys at Buchanan and others— referred to as the "wizzy bizzy" emails—in which these individuals discussed the need for Safrin's signature and exchanged various documents containing forgeries of Safrin's signature. *See id.* ¶¶ 84–91, 103–05. As explained by the Moving Parties, wizzy bizzy is "the anonymous email sender who took part in the forgery of Safrin's signatures on the Citigroup loan document." *See* Moving Parties' Memorandum in Further Support of Their Joint Motion to Amend Their Pleadings, filed June 16, 2014 (Docket # 765) ("Mov.Reply"), at 5.

B. *The Alleged Discovery Misconduct*

**\*3** On December 27, 2007, Amusement and a related company filed the original complaint in this action, seeking to recover $13 million in damages from Moses Stern, Joshua Safrin Ephraim Frenkel and other defendants. *See* Complaint, filed Dec. 27, 2007 (Docket # 1). Amusement raised "claims asserting a security interest in the real estate ... claims of tort resulting from the theft of the funds ... [and] claims related to the agreements reached between the parties and the unjust enrichment of the defendants." 3d Am. Compl. ¶ 5. Since the filing of the original complaint, this case became increasingly complex as other parties have been joined as third party defendants, including Stephen Friedman, Steven Alevy, Buchanan, and Bankers Capital Realty Advisors LLC. *See* Third Party Complaint, filed May 1, 2008 (Docket # 65). Later, Avery Egert and the Safrin Group, LLC were sued as fourth party defendants. *See* Fourth Party Complaint, filed Mar. 17, 2009 (Docket # 238). The various parties have asserted numerous counterclaims, cross-claims, and third party claims.

On March 12, 2008, plaintiffs issued a subpoena to Buchanan, which at that time was a non-party, requesting documents concerning its representation of Moses Stern in the underlying real estate transaction and about Stephen Friedman's financing negotiations with Amusement. *See* Prop. Compl. ¶ 61. Specifically, plaintiffs requested: "Documents sent by [Buchanan] to, and received by [Buchanan] from, Amusement, [Moses] Stern, [FRG], [and] Safrin ... concerning the loans and First Republic LLC's purchase of shopping centers from Colonial in 2007"; "Documents concerning monies received by [Buchanan] or by Friedman from Amusement, [Moses] Stern, [FRG], [and] Safrin ... during the period of April 1, 2007 through December 31, 2007 as to the loans and First Republic LLC's purchase of shopping centers from Colonial in 2007"; "Documents that contain information to induce Citigroup to make the loans"; and "Signature pages that contain a signature of Joshua Safrin, from Documents concerning business or loan transactions." *Id.* (emphasis removed). On March 7, 2008, defendant Safrin similarly issued subpoenas to Buchanan and to Friedman, seeking, "documents concerning Safrin," "documents concerning the negotiation and execution of the Loan Agreement between First Republic LLC and Citibank," "documents concerning the negotiation and execution of the Mezzanine Loan Agreement between [FRG] and Citibank," and "documents and communications concerning the closing of the sale of the Property Portfolio." *Id.* ¶ 62.

Before Buchanan and Friedman complied with the subpoenas, they were contacted by attorneys at Hoffinger about the proper scope of the document production. *See id.* ¶ 64. At that time, Hoffinger and Stephen Stern of that firm were representing Moses Stern in the litigation. *See* Notice of Appearance by Stephen Stern, filed Apr. 11, 2008 (Docket # 50). On April 1, 2008, Stephen Stern wrote a letter to Buchanan attorney John Leathers, stating, "[w]e have been instructed to advise [you that] our clients do NOT waive any privilege including, *inter* alia, the attorney client privilege with respect to any files, documents, communications, etc. in your custody, possession or control and as an outgrowth of your representation of any of our clients." Stephen Stern Letter to Hoffinger, dated Apr. 1, 2008 (annexed as Ex. 1 to Declaration of Jeffrey H. Zaiger in Support of Buchanan Ingersoll & Rooney PC's Opposition to Moving Parties' Joint Motion to Amend Their Pleadings, filed May 30, 2014 (Docket # 762) ("Zaiger Decl.")). There followed various communications among Stephen Stern, Leathers, and Friedman regarding Stephen Stern's review of the production and privilege log. *See* April 22 Email Chain, dated Apr. 22, 2008 (annexed as Ex. 2 to Zaiger Decl.). Over the next couple weeks, Stephen Stern searched through the responsive documents and discussed with several attorneys at Buchanan which subpoenaed documents should be withheld. *See* April 23 & 24 Email Chain, dated Apr. 24, 2008 (annexed as Exs. 3–4 to Zaiger Decl.); May 6 & 7 Email Chain, dated May 7, 2008 (annexed as Ex. 5 to Zaiger Decl.). These emails reflect that there was some disagreement between Stephen Stern and the Buchanan attorneys about the proper scope of the document request and about which documents should be withheld. *See generally id.*

 **\*4** On May 8, 2008, Buchanan and Friedman produced documents and a privilege log in response to plaintiffs' and Safrin's subpoenas. Prop. Compl. ¶ 63. The Moving Parties allege, however, that Buchanan and Friedman "intentionally withheld certain key documents from the May 2008 Production that should have been produced in response to the subpoenas" and that they did so by listing "some, but not all, of those documents on the May 2008 Privilege Log knowing that no good faith basis existed to assert a privilege over the documents in a further effort to conceal the documents from Plaintiffs." *Id.* The Moving Parties further contend that "[Hoffinger] and Attorney [Stephen] Stern communicated with [Buchanan] concerning the production and the privilege log," and Hoffinger and Stephen Stern "had asserted that, as counsel for [Moses] Stern[,] ... they had the 'right to review the documents and privilege log' prior to the production." *Id.*

¶ 64. Thus, it is alleged, "[Buchanan] permitted [Hoffinger] and Attorney [Stephen] Stern to participate in the document review process and on April 23, 2008, Attorney [Stephen] Stern went to [Buchanan's] offices to review the documents prepared for production and [Buchanan's] proposed privilege log." *Id.*

Based on this conduct, the Moving Parties allege in their proposed complaint that Buchanan, Hoffinger, Friedman, and Stephen Stern "engaged in an intentional pattern of deceit and collusion with the intent to deceive Plaintiffs and the United States District Court for the Southern District of New York." *Id.* ¶ 149. Specifically, Moving Parties assert that these individuals and entities "participated in the May 2008 Production and in the preparation of the May 2008 Privilege Log, which wrongfully omitted certain key documents from the production and improperly listed documents on the privilege log ... [and] did so with the intent to deceive Plaintiffs and the Court by attempting to conceal the true nature of [Moses] Stern's scheme and the involvement of Friedman in that scheme." *Id.* ¶ 150.

The Moving Parties assert that the documents that were improperly withheld include:

 a. A June 29, 2007 3:18 p.m. email where Friedman forwarded to Stern an email that he had previously sent to Egert with the subject line: "Let's talk." Friedman then stated." in the body of the email: "Here are all the documents." Attached to the email were signature pages that Citigroup needed Safrin to sign for the Colonial deal to close including: (1) the Directorship Agreement; (2) the JSAE Colonial LLC Operating Agreement; (3) the FRGR Holdings LLC Operating Agreement; (4) the Guaranty; (5) the Environmental Indemnity; and (6) the Officer's Certificate.

 b. A June 29, 2007 3:21 p.m. email that Friedman sent to Stern with the subject line: "Signature Examples." Friedman then stated in the body of the email: "Signature Examples." Attached to that email were five emails from Joseph Kelemer, an employee of The Safrin Group, attaching various examples of what purported to be Joshua Safrin's signature.

 **\*5** c. A July 11, 2007 3:09 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy attaching an email from wizzy bizzy to Herrick Feinstein, LLP ("Herrick") attorney Dena Cohen

("Cohen") attaching Safrin's purported signature on Colonial deal-related documents.

d. A July 11, 2007 3:16 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy to Stern attaching an email that wizzy bizzy had sent to Herrick attorney Cohen attaching Safrin's purported signature on Colonial deal-related documents.

e. A July 11, 2007 3:16 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy to Stern attaching an email that wizzy bizzy had sent to Herrick attorney Stephen Fleissig attaching Safrin's purported signature on Colonial deal-related documents.

*Id.* ¶ 65. [2]

### C. *The Moving Parties Become Aware of the Discovery Misconduct*

On August 28, 2009, David Miller, counsel for Safrin and fourth party defendants Avery Egert and the Safrin Group, wrote a letter to Buchanan's counsel about certain documents that had been listed on the privilege log that Miller suspected were "not protected by the attorneyclient privilege." Miller Letter to Bayne, dated Aug. 28, 2009 (annexed as Ex. 7 to Zaiger Decl.), at 1. Miller noted that the privilege log contained "at least three documents concerning 'Safrin' " but that it was not at all clear about the nature and scope of such documents. *Id.* at 2. Accordingly, Miller requested that Buchanan "identify with specificity any documents pertaining to Joshua Safrin, Avery Egert and/or The Safrin Group that have been withheld on grounds of privilege and provide sufficient information so that [they] may determine whether good cause exists for seeking an order compelling the production of those documents." *Id.* Buchanan's counsel forwarded the letter to Stephen Stern in an email, writing, "[b]ecause the privilege belongs to your clients we wanted to bring you into this conversation promptly." August 28 Email to Stephen Stern, dated Aug. 28, 2009 (annexed as Ex. 8 to Zaiger Decl.).

On September 8, 2009, Buchanan's counsel responded to Miller's August 28 letter. *See* September 8 Letter to Miller, dated Sept. 8, 2009 (annexed as Ex. 9 to Zaiger Decl.) ("Bayne Letter"). Buchanan noted in the letter that it had "forwarded [the] correspondence to [Hoffinger] for consideration because the privilege ... belongs to their clients ... [and Buchanan] is simply a stake holder in this dispute." *Id.* at 1. Buchanan then asserted that the privilege

had properly been claimed for the withheld documents, arguing that "[Buchanan's] role in the Colonial Transaction was as legal counsel for [Moses] Stern and his affiliated entities. If you have reason to believe that [Buchanan] acted in some other capacity, then please provide us with the basis for your belief. Similarly, if you have evidence that [Buchanan] rendered purely commercial advice on any specific topic rather than legal advice, please provide us with your evidence." *Id.* at 2. Buchanan stated that it was refusing to "provide additional information about each of the thousands of documents on the privilege log," contending that this request "appears to be aimed more at diverting our time and spending our client's money than it does with any good faith discovery dispute." *Id.* at 2–3. Nevertheless, Buchanan conceded, "[i]f there are specific documents on the log about which you are interested in gaining more information to assess the claim of privilege, then please identify such documents ... and we will determine with [Hoffinger] whether there is more information that we can provide." *Id.* at 3. Additionally, Buchanan agreed to "review the specific entries identified in [the] letter mentioning 'Safrin' and will consult with [Hoffinger] concerning whether to continue to maintain the assertion of the privilege over them and will advise [Miller] of their decision." *Id.*

**\*6** On October 6, 2009, Buchanan's counsel wrote another letter to Miller, stating, "we have been authorized by [Hoffinger] to produce the documents bates stamped ... BIRFR0005909–20, which are attachments to a privileged email over which [Hoffinger] continues to assert the privilege.... We will produce these documents to all parties shortly." October 6 Letter to Miller, dated Oct. 6, 2009 (annexed as Ex. 10 to Zaiger Decl.) ("October 6 Letter"). On October 19, 2009, Buchanan followed through on this promise by producing these and other documents on a disc, and providing "a supplemental privilege log of documents from this production that [Moses] Stern's counsel has designated as being covered by the attorney client privilege." October 19 Letter from Bayne, dated Oct. 19, 2009 (annexed as Ex. 12 to Declaration of Thomas M. Wood in Support of Moving Parties' Reply in Support of Their Joint Motion to Amend Their Pleadings, filed June 16, 2014 (Docket # 767) ("Wood Supp. Decl.")). Among the documents produced in October 2009 were some of the documents the Moving Parties now assert had been improperly and deliberately withheld in the May 2008 production. Specifically, "[t]he attachments to the June 29, 2007 3:21 p.m. email from Stephen Friedman to [Moses] Stern ... were produced in October 2009 bates-numbered BIRFR0005909–0005920"

but "[t]he cover email, which had been identified [in the privilege log]," was not produced until July 2013. Bayne Decl. ¶ 4(b). Counsel for Safrin, Thomas Wood, asserts that when Buchanan made this production in October 2009, it entire Signature Examples email with all of its attachments (BIRFR005908–5920) and redact[ed] the purportedly privileged communication on the email." Wood Supp. Decl. ¶ 15. Wood also asserts that because Buchanan "release[d] only the attachments ... without any metadata," this "ma[de] it impossible for the Moving Parties to determine that the released documents were attachments to the Signature Examples email and not just five separate emails with attachments." Wood Supp. Decl. ¶ 15. The Court notes that, notwithstanding this assertion, Buchanan's October 6 Letter to Miller specifically stated that Buchanan would be producing "documents bates stamped ... BIRFR0005909–20, which are attachments to a privileged email." October 6 Letter.

On May 31, 2012, after all of the parties except Buchanan had been deposed, Buchanan produced a revised privilege log and also produced "approximately 895 documents previously withheld as privileged or non-responsive." Wood Supp. Decl. ¶ 16. It was at this point that Buchanan produced most of the documents now at issue including "[t]he July 11, 2007 3:09 p.m. email from Mark Stern to Stephen Friedman," "[t]he July 11, 2007, 3:16 p.m. email from Mark Stern to Stephen Friedman attaching email to Dena Cohen," and "[t]he July 11, 2007 3:16 p.m. email from Mark Stern to Stephen Friedman attaching email to Stephen Fleissig." Bayne Decl. ¶¶ 4(c)-(e). Although the produced documents "were originally electronic documents consisting of emails with attachments," Buchanan "unilaterally and without explanation produced them in a format that stripped them of all metadata making it more burdensome and difficult, if not impossible, for the Moving Parties to use the information efficiently." Wood Supp. Decl. ¶ 16. From June 2012 until November 2012, Buchanan's counsel and Safrin's counsel engaged in various communications during which Safrin's counsel attempted to obtain "native files or tiffs with metadata and extracted text" of the aforementioned documents. See Metadata Emails (annexed as Ex. 13 to Wood Supp. Decl.), at 1.

**\*7** In a letter dated October 9, 2012, Safrin's counsel, Thomas Wood, wrote the following:

> [Buchanan's] May 2012 production included approximately 895

documents that [Buchanan] withheld for over four years based on claims that the documents were either irrelevant or privileged.... [Buchanan] then produced documents that are not even arguably privileged and are critical to [Safrin's] claims and defenses.... [Buchanan's] decision to withhold documents identified by Bates Nos. BIRFR0004777–80, BIRFR0004794–4796, BIRFR0004830–4832, which are the emails from Mark Stern to Stephen Friedman forwarding emails sent from wizzy bizzy to Mark Stern containing signature pages with Safrin's forged signature, for over four years is incomprehensible. It is even more troubling in light of the fact that between August and October 2009, David Miller ... objected to [Buchanan's] assertion of privilege over documents identified in [Buchanan's] privilege log as involving 'Safrin' and asked [Buchanan] to review all the documents identified on its privilege log.... [Buchanan] claimed that Egert, The Safrin Group and Safrin were on a 'fishing expedition' and refused to review the documents or revise the privilege log.... By refusing to revise the log, [Buchanan's counsel] essentially concealed the nature of many of the documents identified on the privilege log and prevented Safrin from being able to properly assess [Buchanan's] assertion of privilege. The result is that Safrin had to wait two more years to receive critical emails that are in no way privileged.... The law is quite clear that as a party to this case, [Buchanan] is responsible for its discovery responses.

*Id.* at 8–9. In another letter dated November 16, 2012, Wood further contended:

[Buchanan] has an affirmative obligation under Federal Rules of Civil Procedure 26(e) to correct any erroneous assertions of privilege.... Contemporaneous communications in 2008 demonstrate it was [Buchanan] *not* Mark Stern or [Hoffinger] that reviewed the responsive documents, determined which documents to withhold as privileged, and prepared the privilege log with no apparent input from Stern or [Hoffinger].... It was [Buchanan's] in-house counsel that made the initial determination of which documents were subject to a valid claim of privilege and then certified that they had a reasonable basis for withholding the documents based on claims of privilege. Having done so, [Buchanan] remains responsible to supplement or correct those assertions.

*Id.* at 17–18. In the same letter, Wood asserted that Buchanan "was obligated to provide sufficient information about the documents being withheld to allow the other parties to assess [Buchanan's] assertion of privilege" and that Buchanan's "description of BIRFR0004777 through BIRFR0004793 is more than incomplete; it is misleading." *Id.* at 20. Wood continued, "[b]y providing inaccurate information, [Buchanan] concealed the true nature of the documents making it impossible for others to challenge the assertion of privilege. If [Buchanan] had identified [these] Email Messages ... on its May 2008 privilege log, Mr. Safrin would have challenged the assertion of privilege and discovered these critical communications." *Id.* In May 2013, Buchanan still had not produced the metadata or native copies of the documents, so the parties brought this issue to the attention of the Court. *See generally* Letters to the Honorable Gabriel W. Gorenstein, dated May 2013 (annexed as Exs. 15–16 to Wood Supp. Decl .).

**\*8** Meanwhile, Amusement, together with several other parties, filed a motion to compel Buchanan and other parties to produce certain documents pursuant to the crime-fraud exception to the attorney-client privilege. *See* Notice of Motion and Motion to Compel, filed June 6, 2012 (Docket # 649). On February 11, 2013, this Court granted the motion to compel and identified certain categories of documents that were to be produced. *See* Amusement Indus., Inc. v. Stern, 293 F.R.D. 420, 440–41 (S.D.N.Y.2013). In compliance with the order, in July 2013 Buchanan produced, among other documents, the "June 29, 2007 3:21 p.m. email from Stephen Friedman to Mark Stern," which was bates-numbered BIRFR0005908. Bayne Decl. ¶ 4(b). [3]

At the same time, Buchanan produced "[t]he June 29, 2008 3:18 p.m. email from Stephen Friedman to Mark Stern bates-numbered BIRFR0047204–0047227." *Id.* ¶ 4(a). When producing it, Buchanan's counsel explained that it had not previously been produced because it was "saved in a folder for a different client which is why it was not part of [Buchanan's] document production in this case." July 11 Baynes Email, dated July 11, 2013 (annexed as Ex. 18 to Wood Supp. Decl.), at 4. However, the Moving Parties allege, "when [Buchanan] produced the files for that deal, the email was missing form those files as well." *See* Mov. Reply at 8; see also Declaration of Craig H. Missakian in Support of Moving Parties' Memorandum in Further Support of Their Joint Motion to Amend Their Pleadings, filed June 16, 2014 (Docket # 766) ("Missakian Decl."), ¶¶ 3–5.

### D. *The Filing of the Instant Motion*

Soon after the July 2013 production, the Court approved an amended discovery schedule, which set the following deadlines: February 18, 2014, as the close of all fact discovery; July 11, 2014, as the close of all expert discovery; and August 15, 2014, as the date by which all premotion letters for dispositive motions must be filed. *See* Endorsed Letter, filed Aug. 20, 2013 (Docket # 708). On November 26, 2013, the Court granted the parties' request to stay discovery pending a mediation scheduled for February 4, 2014. See Endorsed Letter, Nov. 26, 2013 (Docket # 733). On December 11, 2013, Stephen Stern was permitted to withdraw as Moses Stern's counsel. *See* Stipulation and Order, filed Dec. 11, 2013 (Docket # 736). Meanwhile, the stay of discovery was extended to March 10, 2014. *See* Order, filed Jan. 28, 2014 (Docket # 737). After receiving notification that the parties failed to reach a settlement, the Court lifted the discovery stay on March 17, 2014. *See* Endorsed Letter, filed Mar. 17, 2014 (Docket # 739). On March 28, 2014, the Court approved a new discovery schedule setting the fact discovery deadline for June 30, 2014, expert discovery deadline for October 17, 2014, and the deadline for filing pre-motion letters for

dispositive motions for October 17, 2014. *See* Amended Schedules, filed Mar. 28, 2014 (Docket # 741) ("March 2014 Schedule").[4]

**\*9** On May 6, 2014, the Moving Parties sought permission to make the instant motion to amend the pleadings, which was granted. *See* Order, filed May 7, 2014 (Docket # 750). They filed their joint motion to amend their pleadings three days later. *See* Plaintiffs, Third–Party Plaintiff Joshua Safrin, Defendant Avery Egert and Fourth Party Defendant The Safrin Group, LLC's Notice of Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 755). In support of their motion, the Moving Parties have submitted legal memoranda, declarations, accompanying exhibits, and copies of the proposed amended pleadings.[5] Buchanan and Friedman have submitted legal memoranda as well as declarations and exhibits in opposition to the joint motion to amend.[6]

## II. *LAW GOVERNING MOTIONS TO AMEND*

Federal Rule of Civil Procedure 15(a)(2) instructs courts to "freely give leave [to amend] when justice so requires." Nonetheless, leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, ... undue prejudice to the opposing party ... [or] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182 (1962); *accord Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 101 (2d Cir.2002). The Second Circuit has characterized Rule 15 as encompassing a "liberal" amendment policy. See, e.g., *Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir.2008). A motion to amend under Rule 15(a)(2) may be made at any stage of the litigation, see, e.g., *Laurent v. PricewaterhouseCoopers LLP,* 2012 WL 3614043, at \*3 (S.D.N.Y. Aug. 15, 2012), and " '[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith,' " *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.,* 626 F.3d 699, 725 (2d Cir.2010) (quoting *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993)). Under Rule 15(a)(2), the "nonmovant bears the burden of showing prejudice, bad faith and futility of the amendment." *Grant v. Citibank (S.D.), N.A.,* 2010 WL 5187754, at \*6 (S.D.N.Y. Dec. 6, 2010) (citations omitted).[7]

## III. *DISCUSSION*

As noted, the Moving Parties seek to add claims against current parties, Buchanan and Friedman, and non-parties, Stephen Stern and Hoffinger, for violation of section 487 of the New York Judiciary Law based on their claim that these parties wrongfully omitted key documents from their document production and instead improperly and misleadingly listed them on the privilege log. *See* Prop. Compl. ¶ 150. Section 487 provides that "[a]n attorney or counselor who ... [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party" is liable to "the party injured [for] treble damages, to be recovered in a civil action." N.Y. Jud. Law § 487(1); *accord Polanco v. NCO Portfolio Mgmt., Inc.,* 2014 WL 2483180, at \*9 (S.D.N.Y. June 3, 2014) ("Section 487(1) ... allows for claims against attorneys who engage in acts of deceit or collusion that are directed at a court or that occur during the course of a pending judicial proceeding.") (internal quotation marks and citation omitted). The Attorneys have raised various grounds in opposition to the motion, including futility and prejudice. We focus our attention exclusively on the issue of delay and prejudice as it is sufficient to dispose of the motion.

**\*10** The Second Circuit has held that an amendment prejudices a non-moving party when, among other things, "the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial [or] (ii) significantly delay the resolution of the dispute." *Monahan v. N.Y.C. Dep't of Corr.,* 214 F.3d 275, 284 (2d Cir.2000). Case law further explains that " '[o]ne of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action.' " *MHANY Mgmt. Inc. v. Cnty. of Nassau,* 843 F.Supp.2d 287, 341 (E.D.N.Y.2012) (quoting *H.L. Hayden Co. v. Siemens Med. Sys.,* 112 F.R.D. 417, 419 (S.D.N.Y.1986) (collecting cases)).

With these principles in mind, we believe several circumstances weigh against granting leave to amend. First, while not dispositive, the Moving Parties waited for a significant period after becoming aware of the Attorneys' wrongful discovery conduct before filing the instant motion to amend. While it is well-established that "delay, standing alone, is an insufficient basis to deny leave to amend," *U.S. for and on Behalf of Mar. Admin. v. Cont'l Ill. Nat'l Bank &*

*Trust Co. of Chi.,* 889 F.2d 1248, 1254 (2d Cir.1989) (citations omitted), a court "plainly has discretion ... to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice" the nonmovant, *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990). In general, " '[t]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice.' " *Evans v. Syracuse City Sch. Dist.,* 704 F.2d 44, 47 (2d Cir.1983) (quoting *Advocat v. Nexus Indus., Inc.,* 497 F.Supp. 328, 331 (D.Del.1980)).

While the alleged wrongful discovery conduct occurred in 2008, *see* Prop. Compl. ¶¶ 63–64, we measure the delay from the time the Moving Parties became aware of the facts that serve as the basis for their proposed claims, *see, e.g., Bader v. Special Metals Corp.,* 985 F.Supp.2d 291, 304 (N.D.N.Y.2013) (denying motion to amend where "despite being aware, even before she commenced this action, of the protected activity she now seeks to add to her Complaint, Plaintiff failed to move to amend in a timely fashion"); *Suro v. United States,* 107 F.Supp.2d 206, 210 (E.D .N.Y.2010) (denying motion to amend where "Plaintiffs have long had notice of a potential claim against [the party that they wish to join]"). The Moving Parties explain that they "discovered [some of the wrongfully withheld] emails in May 2012, when [Buchanan] released documents from its privilege log" and that they then "took immediate steps to determine the extent of [Buchanan's] concealment." Mov. Reply at 33– 34. They contend that "any 'delay' in bringing their claims is attributable to [Buchanan] and Friedman," because Buchanan refused "to do anything more until after the Court ruled on the crime-fraud motion" in February 2013. *Id.* at 34–35. They also note that they did not receive one of the documents— the "Let's talk" email, dated June 29, 2007, at 3:18 p.m.— until June 6, 2013. *Id.* at 34. Additionally, the Moving Parties suggest that they did not file the motion sooner because "[i]n late July [2013], the parties began discussing settlement and worked to find an acceptable mediator." *Id.* at 34.

**\*11** Notwithstanding these explanations for their conduct, we believe that the Moving Parties' delay in bringing the instant motion was to some extent unjustified. The Moving Parties implicitly admit that they were put on notice of the Attorneys' discovery misconduct in May 2012 when they received a number of the emails at issue. *See* Mov. Reply at 33–34. Moreover, it is clear from the documents submitted in support of the instant motion that the Moving Parties

were aware of the essentials of the offending conduct by at least November 2012, about 18 months before the motion to amend was eventually filed. In a series of communications between counsel for Safrin and Buchanan in Fall 2012, Safrin's counsel accused Buchanan of engaging in the same discovery misconduct alleged in the proposed claims. *See* Metadata Emails at 8–9 ("Safrin had to wait two more years to receive critical emails that are in no way privileged .... The law is quite clear that as a party to this case, [Buchanan] is responsible for its discovery response.").

On November 16, 2012, Safrin's counsel asserted that Buchanan "was obligated to provide sufficient information about the documents being withheld to allow the other parties to assess [Buchanan's] assertion of privilege" and that Buchanan's "description of BIRFR0004777 through BIRFR0004793 is more than incomplete; it is misleading," and that "[b]y providing inaccurate information, [Buchanan] concealed the true nature of the documents making it impossible for others to challenge the assertion of privilege." *Id.* at 20. These accusations track the allegations in the Moving Parties' proposed claims that Buchanan "intentionally withheld certain key documents from the May 2008 Production that should have been produced in response to the subpoenas" and "listed some, but not all, of those documents on the May 2008 Privilege Log knowing that no good faith basis existed to assert a privilege over the documents in a further effort to conceal the documents from Plaintiffs." Prop. Compl. ¶ 63.

Additionally, the Fall 2012 correspondence indicates that the Moving Parties realized the significance of these "critical" emails in that they knew the emails "contain[ed] signature pages with Safrin's forged signature." Metadata Emails at 9– 10. Thus, the letters suggest that, at that time, the Moving Parties believed not only that the Attorneys had concealed the emails but also that the Attorneys had acted intentionally to hide evidence that was damaging to themselves and their clients. Furthermore, by November 2012, the Moving Parties were aware of Hoffinger and Stephen Stern's role in the withholding of these documents as Buchanan's counsel had noted their involvement in a letter to Safrin's counsel as early as September 8, 2009. *See* Bayne Letter; *see* also Prop. Compl. ¶ 64 ("[Buchanan] permitted [Hoffinger] and Attorney Stern to participate in the document review process....").

Given the fact that the Moving Parties were aware of the essential elements of their proposed section 487 claims by

November 2012, we believe there was unjustified delay in bringing the instant motion. We do not give great weight to the Moving Parties's assertions regarding Buchanan's alleged refusal to produce the metadata or native files as the Moving Parties have not shown why this prevented them from understanding the scope of the conduct at issue. Also, while we do not believe that settlement discussions would necessarily justify delay, we note that they did not begin until July 2013 and thus they do not explain the failure to act during the previous eight month period when the Moving Parties had all the information they needed to bring the claim. Also, it is of no moment that the Moving Parties did not receive two of the documents at issue until July 2013 as the conduct amounting to deceit was represented in the documents released in the previous productions. Finally, even under the Moving Parties' view of the facts, they had all the emails as of July 2013 and yet took no action until May 2014. The stay of discovery was not put into effect until November 2013, and thus, four months elapsed during the critical fact discovery phase without any effort made to pursue these claims.

**\*12** But we need not dwell on the question of whether the Moving Parties acted with alacrity in bringing this motion. Even if the Moving Parties had been able to justify their delay, other circumstances would lead us to conclude that allowing the amendment would be prejudicial and inappropriate. We begin by noting this litigation is in its final stages. The initial scheduling order in March 2008 set October 1, 2008, as the deadline for the "completion of all discovery." *See* Scheduling Order, filed Mar. 5, 2008 (Docket # 41). It took the ensuing six years for the parties to actually complete— or nearly complete—the fact discovery in this case, during which discovery deadlines were repeatedly extended as more parties and claims were added to the case. As noted by Buchanan, the parties have taken 59 days of testimony from 39 witnesses. *See* Buchanan Mem. at 6. The Moving Parties did not seek to file the instant motion to amend until less than 60 days before fact discovery was set to close. Granting the instant motion to amend risks unduly delaying the case by requiring the Court to reopen fact discovery to allow the parties to take depositions and obtain documentary evidence concerning the Attorneys' alleged wrongful conduct. Courts have commonly denied motions to amend in such circumstances. *See, e.g., iMedicor, Inc v. Access Pharm., Inc.,* 290 F.R.D. 50, 53 (S.D.N.Y.2013) ("[A]ssertion of plaintiff's new claims would both require defendant to expend significant additional resources to conduct discovery and prepare for trial, and significantly delay resolution of the dispute."); *Suro,* 107 F.Supp.2d at 209–10 (allowing the

amendment would require the court to "re-open discovery" which would "cause substantial and unnecessary delay in a case that already has been litigated for almost five years");

*accord Equal Rights Ctr. v. Niles Bolton Assocs.,* 602 F.3d 597, 603–04 (4th Cir.2010) (non-moving party would be prejudiced by reopening of discovery where motion to amend was filed at the "close of a three-year long discovery process and on the eve of the deadline for dispositive motions");

*Mercantile Trust Co. Nat'l Ass'n v. Inland Marine Prods. Corp.,* 542 F.2d 1010, 1013 (8th Cir.1976) (non-moving party had already "completed extensive discovery based upon the numerous defenses previously asserted" and where "[n]ew theories of defense and a new counterclaim advanced at this late date would necessarily reopen much of the discovery").

The Moving Parties respond that the amendment "will not require the parties to expend additional resources or significantly delay resolution of the dispute because discovery pertinent to the claim is already in process." Mov. Mem. at 6. They assert that "[t]he parties have all but confirmed the deposition schedule for the witnesses most likely to have information regarding the Section 487 Claim" and that "Safrin has already served a request for production of documents on Buchanan and subpoenas duces tecum on Kaye Scholer, [Hoffinger], the Law Offices of Stephen R. Stern, and Attorney Stern requesting documents relevant to the proposed Section 487 Claim." *Id.* But these statements fall far short of assuring the Court that the amendments would not further prolong this already six-year-old case. The reality is that the proposed claims have nothing to do with the existing claims in this case, and thus, the Moving Parties are seeking to fold an entirely new litigation into the current one. The new claims alleging deceit by the Attorneys relate to the Attorneys' failure to produce particular documents in discovery during the course of the litigation of this case. Those actions are not factually similar in the least to the existing claims in this case, which revolve exclusively around a real estate transaction and the subsequent dealings between Amusement and the other parties to effectuate that transaction, all of which occurred in 2007. Additionally, the damages that resulted from these two courses of conduct have nothing to do with each other. Accordingly, the discovery to determine what the Attorneys and the proposed non-parties did and what damages resulted from such conduct will be entirely different from the discovery that has been pursued to date. There is no common ground between these two sets of claims other than some overlap in parties.

**\*13** Furthermore, given the prior history of this case, there will inevitably be motions to dismiss (aspects of which would require serious consideration based on the parties' briefing of the "futility" issue) and myriad discovery disputes regarding these collateral claims, all of which will likely cause further delays. Additionally, as the Moving Parties themselves concede, they "may seek leave to amend again to add [other Buchanan] attorneys as additional defendants to their respective Section 487 claims" depending on "the outcome of discovery" regarding the proposed claims. Mov. Mem. at 2 n. 1. Finally, there would be nothing to stop the proposed defendants from asserting claims of their own once joined to the case.

Courts regularly deny motions to amend where the moving party seeks to add claims involving collateral matters, based on different factual allegations and distinct legal theories, from the claims already at issue in a case. These courts have recognized that the addition of such collateral claims in amended pleadings can easily delay resolution of the case due to the need to engage in substantial additional discovery regarding the new factual contentions. *See* Ansam Assocs., Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir.1985) (upholding denial of motion to amend where the plaintiff's "new claims concerned a different period of time and were derived from a different statute" given that "discovery had already been completed and [the defendant] had already filed a motion for summary judgment"); Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc., 148 F.Supp.2d 321, 327 (S.D.N.Y .2001) ("Prejudice is particularly likely where the amendment raises new theories of recovery or would require additional discovery.") (citation omitted); *accord* Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1428–29 (7th Cir.1993) ("[T]he district judge acted within the bounds of reason in refusing to allow the suit to be expanded to take in ... an entirely new and separate claim."); Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir.1990) (no abuse in discretion in district court's denial of motion to file amended complaint where "[t]he new claims set forth in the amended complaint would have greatly altered the nature of the litigation and would have required defendants to have undertaken, at a late hour, an entirely new course of defense"); Vonage Holdings Corp. v. SBC Internet Servs., Inc., 2007 WL 3169167, at \*3 (N.D.Tex. Oct. 30, 2007) (refusing motion to add new claims in patent dispute case because the new claims were "completely unrelated to the voice-compression technology that is at issue in this litigation ... [and would] undoubtedly further delay

the resolution of this case, require additional discovery, and further complicate an already complex case"); Lover v. District of Columbia, 248 F.R.D. 319, 322 (D.D.C.2008) ("Prejudice is likely if the amended complaint contains new complex and serious charges which would undoubtably require additional discovery for the defendants to rebut.") (internal quotation marks, brackets, and citation omitted); *see generally* 6 Wright, Miller & Kane Fed. Prac. & Proc. Civ. § 1487 (3d ed. 2014) ("[I]f the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation, the court may deem it prejudicial.").

**\*14** Prejudice is particularly likely to result where, as in this case, the moving party seeks to add collateral claims at a late stage in the litigation process. *See, e.g.,* In re Am. Int'l Grp., Inc. Sec. Litig., 2008 WL 2795141, at \*3 (S.D.N.Y. July 18, 2008) ("[A] proposed amendment causes undue prejudice if, at an advanced stage of litigation, the amendment concerns 'an entirely new set of operative facts of which it cannot be said that the original complaint provided fair notice.' ") (quoting Ansam, 760 F.2d at 446); Seymour/Jones v. Lefebvre, 1991 WL 165203, at \*1 (E.D.Pa. Aug. 22, 1991) (denying motion to amend on grounds of prejudice because proposed additional claims "concern only one of the three defendants, ... are entirely new and separate claims based on unrelated facts and events[,] ... [and] they would involve additional discovery at a point when the discovery period has almost expired"). We thus conclude that the potential for delay and resulting prejudice strongly favors denial of the motion to amend.

The cases the Moving Parties cite on the issue of prejudice do not change our view. *See* Mov. Mem. at 5–6; Mov. Reply at 36–37. These cases simply recognize that a motion to amend should not be denied on the ground that it would require the opposing party to "expend significant additional time and money" on additional discovery where circumstances otherwise suggest that granting the amendment would be fair, such as where the case is in an early stage of litigation. Hahn v. Domy Rooms, Inc., 2008 WL 3874313, at \*3 (S.D.N.Y. Aug. 18, 2008) (granting motion to amend when the parties had "only exchanged initial disclosures" and where there was no allegation that plaintiff did not timely file motion to amend); see also Block, 988 F.2d at 351 (upholding district court's grant of motion to amend because the non-moving parties' allegations that "they were prejudiced solely because

of the time, effort and money they expended in litigating this matter ... do not arise to ... 'substantial prejudice.' "); *Am. Med. Ass'n v. United Healthcare Corp.,* 2006 WL 3833440, at *6–7 (S.D.N.Y. Dec. 29, 2006) (no "undue prejudice" where "the parties have completed only preliminary discovery as to the 'proper parties in this action' and have not yet engaged in any significant discovery on the merits" and where the proposed claims "are based on 'substantially similar' allegations of misconduct" as the earlier claims);

*Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.,* 795 F.Supp. 639, 644 (S.D.N.Y.1992) (finding joinder of additional parties to be appropriate where "discovery relating to the counterclaims began only recently" because the case "would encompass essentially the same issues regardless of whether or not [the proposed parties] were added as counter-defendants"). Here, by contrast, the Court's concern is not simply that additional discovery will be required but that numerous depositions have already been taken, extensive document production has been made, the parties are at the final stage of the litigation, and the proposed claims have nothing to do with the claims currently being litigated. *Cf. Interpublic Grp. of Cos., Inc. v. Fratarcangelo,* 2002 WL 31720355, at *2 (S.D.N.Y. Dec. 4, 2002) ("Although the burden of undertaking additional discovery, standing alone, does not warrant a denial of a motion to amend a pleading on the grounds of prejudice, ... when that discovery addresses what is essentially a collateral matter-as it does in this action-denial is warranted.") (internal citation omitted); *see also Grace v. Rosenstock,* 228 F.3d 40, 53–54 (2d Cir.2000) ("The court also has discretion to deny leave to amend ... where the belated motion would unduly delay the course of proceedings by, for example, introducing new issues for discovery.") (internal citations omitted); *Ansam,* 760 F.2d at 446 (upholding denial of motion to amend where the proposed claims "concerned a different period of time and were derived from a different statute" and where "discovery had already been completed and [defendant] had already filed a motion for summary judgment").

**\*15** Finally, the addition of the collateral claims regarding the alleged discovery misconduct would further muddle this already complex case. When parties move to add claims involving completely different factual allegations and legal theories from the underlying suit, courts may exercise their discretion to deny amendment "in order to avoid unnecessary complexity and confusion." *Robinson v. Buffaloe & Assocs., PLC,* 2013 WL 4017045, at *2 (M.D.Tenn. Aug. 6, 2013); *see also Harris v. Armstrong,* 2005 WL 756523, at *1 (D .Conn.

Mar. 31, 2005) ("Underlying [Rule 15(a) ] is an assumption that the amended complaint will clarify or amplify the original cause of action. The proposed amendments would not serve these purposes but instead would add numerous unrelated parties and claims. Accordingly, the motion for leave to amend is denied."); *Trilithic, Inc. v. Wavetek U.S. Inc.,* 6 F.Supp.2d 803, 809 (S.D.Ind.1998) (denying motion to file supplemental pleading under Rule 15(d) because "the [proposed] breach of contract claim is so unrelated to the underlying patent infringement action that it constitutes extraneous matter that will protract and complicate the litigation"); *Triangle Indus., Inc. v. Kennecott Copper Corp.,* 402 F.Supp. 210, 212 (S.D.N.Y.1975) (rejecting addition of certain claims where they "raise[ ] the question [of] whether amendments (and supplementation) of the complaint would not add to the complications of an already over-complicated case to the extent that no jury could reasonably be expected to assimilate the facts or render and [sic] intelligent or just verdict"); *United States v. Eight Tracts of Land in Town of Brookhaven, Suffolk Cnty., State of N.Y.,* 270 F.Supp. 160, 164 (E.D.N.Y.1967) ("While amendments are as a general rule, freely granted as justice may require, they should be denied when their allowance prevents an equitable determination of the main suit and confuses the real issues involved."); see generally 6 Wright, Miller & Kane Fed. Prac. & Proc. Civ. § 1487 ("[I]f the court determines that ... the issues raised by the amendment are remote from the other issues in the case and might confuse or mislead the jury, leave to amend may be denied."). We do not think it appropriate to burden a jury with both unraveling the complexities of the original real estate transaction and judging the actions of attorneys in conducting document production during the course of the litigation.

In a case involving analogous circumstances, *Stiller v. Colangelo,* 221 F.R.D. 316 (D.Conn.2004), the court denied the plaintiff's motion to amend a complaint to add claims involving the defendant's "hand[ling] of this litigation since the filing of the Complaint" because it would prejudice the defendant by "add[ing] claims different in character and purpose from those articulated in the initial complaint" that would "require additional discovery ... and undue delay in the resolution of the case." 221 F.R.D. at 317. *Stiller* denied the motion also on grounds that the proposed claims were "sufficiently remote from the initial complaint ... [that] [t]he jury is likely to be confused when asked to consider both [the defendant's] behavior as [the plaintiff's] legal representative and his behavior as [the plaintiff's] legal adversary. Moreover, exposing the jury to allegations of wrongful conduct during the course of this litigation could easily prejudice the jury

against [the defendant]." *Id.* Here too the addition of the new claims would unnecessarily confuse a jury as it would be asked to simultaneously consider Buchanan and Friedman's alleged wrongful conduct both as negotiators representing Moses Stern in the underlying real estate transaction and as litigators responding to document subpoenas in the ensuing legal proceedings. Given the factual and legal dissimilarities between the underlying lawsuit and the proposed claims, any such claim is best brought as a separate suit and not as part of this case. [8]

## IV. *CONCLUSION*

**\*16** For the foregoing reasons, the Moving Parties' motion to amend their pleadings (Docket # 755) is denied.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 4460393

---

## Footnotes

1   *See also* Proposed Fourth Amended Complaint; Demand for Jury Trial (attached as Ex. A to Declaration of Mariana Aguilar in Support of Moving Parties' Notice of Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 759) ("Aguilar Decl.")) ("Prop.Compl."); Joshua Safrin's Fourth Amended Third–Party Complaint and Demand for Jury Trial (attached as Ex. A to Declaration of Thomas M. Wood IV in Support of Moving Parties' Notice of Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 758) ("Wood Decl.")) ("Safrin Prop. Pl.").

2   Buchanan's former counsel David Bayne explains in his declaration that all of these withheld documents were identified on the May 2008 privilege log except the email from June 29, 2007, at 3:18 p.m. *See* Declaration of David F. Bayne, filed May 30, 2014 (Docket # 763) ("Bayne Decl."), ¶ 5. According to Bayne, the email from June 29, 2007, at 3:18 p.m., was not included on the privilege log because it "was located in the wrong client folder." *Id.* ¶ 4(a).

3   This document was the cover email to the attachment documents that had been produced in October 2009.

4   Thus, fact discovery is now closed, with the exception of some residual matters. However, the expert discovery and pre-motion letter deadlines have been extended by several months.

5   *See* Moving Parties' Memorandum in Support of Their Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 756) ("Mov.Mem."); Declaration of Michael C. Rakower in Support of Joint Motion to Amend Pleadings, filed May 9, 2014 (Docket # 757) ("Rakower Decl."); Avery Egert's Proposed Answer to Plaintiffs' Proposed Fourth Amended Complaint (annexed as Ex. 1 to Rakower Decl.); Wood Decl.; Safrin Prop. Pl.; Aguilar Decl.; Prop. Compl.; Mov. Reply; Missakian Decl.; Wood Supp. Decl.

6   *See* Buchanan Ingersoll & Rooney PC's Memorandum of Law in Opposition to Moving Parties' Motion to Amend Their Pleadings, filed May 30, 2014 (Docket # 761) ("Buchanan Mem."); Zaiger Decl.; Bayne Decl.; Memorandum of Stephen Friedman in Opposition to Motion to Amend, filed May 30, 2014 (Docket # 764) ("Friedman Mem.").

7   In circumstances where a scheduling order sets a deadline for amending a complaint, however, the more onerous "good cause" standard under Rule 16(b) applies. *See* 📕 *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 339–40 (2d Cir.2000); *accord* 📕 *Grochowski v. Phoenix Constr.,* 318 F.3d 80, 86 (2d Cir.2003); *Lincoln v. Potter,* 418 F.Supp.2d 443, 453 (S.D.N.Y.2006) ("When a party moves to amend the pleadings after the deadline to do so in the court's scheduling order has passed, he must satisfy the good cause requirement of Fed.R.Civ.P. 16(b)...."). That is, a court can properly "deny[ ] leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." 📕 *Parker,* 204 F.3d at 340. The "primary consideration" in determining whether good cause has been shown "is whether the moving party can demonstrate diligence." 📕 *Kassner v. 2nd Avenue Delicatessen Inc,* 496

F.3d 229, 244 (2d Cir.2007). Here, the Moving Parties appear to concede that the Court's deadline to amend passed years before the filing of their motion and thus that the Rule 16's "good cause" standard applies. *See* Mov. Reply at 32. Nevertheless, we do not consider the applicability of the "good cause" standard because the motion fails under the more liberal Rule 15(a)(2) standard.

8    Nothing herein should be construed as addressing the question of whether the Moving Parties may move for sanctions in this litigation based on the conduct alleged in the proposed complaint—whether against parties or attorneys, including former attorneys. *See Hakim v. Leonhardt,* 126 F. App'x 25, 26 (2d Cir.2005) ("[A] court may hold an attorney responsible for discovery noncompliance even after he or she has been relieved as counsel.") (citations omitted).

---

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1397195
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dontie S. MITCHELL, Plaintiff,

v.

Andrew M. CUOMO, Governor, Anthony Annucci,
Commissioner of Department of Corrections,
John Miller, Correction Lieutenant, R. Wood,
Corrections Sergeant, Robert J. Mahuta,
Correction Officer, Napper, Correction Officer,
and Wells, Correction Officer, Defendants.

9:17-CV-0892 (TJM/DJS)
|
Signed 03/28/2019

Attorneys and Law Firms

Dontie S. Mitchell, Comstock, NY, pro se.

David A. Rosenberg, New York State Attorney General,
Albany, NY, for Defendants.

DECISION & ORDER

THOMAS J. McAVOY, Senior United States District Judge

I. INTRODUCTION

*1 This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred to the Hon. Daniel J. Stewart, United
States Magistrate Judge, for a report and recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In
his Report-Recommendation and Order (Dkt. No. 95) ("Rep.
Rec. & Ord."), Magistrate Judge Stewart recommends that
Defendants' Motion to Dismiss (Dkt. No. 57) be granted in
part and denied in part, and that Plaintiff's Fifth, Sixth, and
Seventh Motions for Preliminary Injunctions (Dkt. Nos. 61,
70, and 74) be denied. In addition, Magistrate Judge Stewart
ordered, *inter alia*, that Plaintiff's Motion to Amend (Dkt.
No. 61), and Plaintiff's Third Motion for Counsel (Dkt. No.
61), be denied. Plaintiff objects to Magistrate Judge Stewart's
orders denying amendment and the appointment of counsel,
and to various recommendations as addressed below.

II. STANDARDS OF REVIEW

a. Objection to Magistrate Judge Non-Dispositive
Order

A district court judge reviewing an objection to a magistrate
judge's non-dispositive pretrial order, as is in issue with
Magistrate Judge Stewart's orders denying amendment and
the appointment of counsel, [1] may not modify or set aside
any part of that order unless it is clearly erroneous or contrary
to law. *See* FED. R. CIV. P. 72(a); 28 U.S.C. § 636(b)
(1)(A); *Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir.
2007) ("[T]he district court to whom the case is assigned
shall consider ... objections and shall modify or set aside any
portion of the magistrate judge's order found to be clearly
erroneous or contrary to law.")(quoting Fed. R. Civ. P. 72(a)).
An order is clearly erroneous if, based on all the evidence, a
reviewing court "is left with the definite and firm conviction
that a mistake has been committed." *In re Gordon*, 780 F.3d
156, 158 (2d Cir. 2015) (internal quotation marks omitted)
(quoting *United States v. Murphy*, 703 F.3d 182, 188
(2d Cir. 2012)). "An order is contrary to law when it fails
to apply or misapplies relevant statutes, case law, or rules
of procedure." *Lifeguard Licensing Corp. v. Ann Arbor T-
Shirt Co., LLC*, No. 15-CV-8459, 2017 WL 3142072, at
*1 (S.D.N.Y. July 24, 2017)(citation and internal quotation
marks omitted).

b. Objection to Magistrate Judge Recommendation
*2 When objections to a magistrate judge's recommendation
on a dispositive matter are made, the district court makes
a "*de novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." 28 U.S.C. § 636(b)(1); *see United
States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997) (The
Court must make a *de novo* determination to the extent that
a party makes specific objections to a magistrate's findings.).
When no objection is made to a report and recommendation,
or to a portion thereof, the Court subjects the report and
recommendation, or the portion to which no objection is
made, to only a clear error review. Fed. R. Civ. P. 72(b),
Advisory Committee Notes: 1983 Addition. In performing
such a review, "the court need only satisfy itself that there is
no clear error on the face of the record in order to accept the
recommendation." *Id.*

After reviewing the report and recommendation, the Court
may "accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge. The judge

may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b).

## III. DISCUSSION

### a. Motion to Amend

Magistrate Judge Stewart's decision to deny Plaintiff's motion to file a Second Amended Complaint, *see* Rep-Rec. & Ord., at 19-23, is not clearly erroneous or contrary to law. Proposed claims related to Plaintiff's confinement at Elmira C.F., Wende C.F., and Collins C.F. were already pled in this matter, severed from the action, and transferred to the Western District of New York. *See* Dkt. No. 13. It would be futile to amend to add these claims again. "[I]t is well established that leave to amend a [pleading] need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).

It would also be futile to reassert claims identical to those in the Complaint and Amended Complaint that the Court previously found to have been insufficiently pled to withstand a motion under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. Nos. 13 & 24. "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Ramos v. Dep't of Correction*, No. 3:15-CV-1444 (VAB), 2017 WL 855897, at *3 (D. Conn. Mar. 3, 2017)(citing *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).

Regarding Plaintiff's proposed claims related to his confinement at Great Meadow C.F. asserting his First Amendment right to (1) wear "cornrows;" (2) promote the Ujamaa Fraternal Dynasty ("UFD"), a non-profit organization which he founded as an alternative to gangs; and (3) receive daily mail without excessive delay, the Court previously denied Plaintiff's motion to amend to add these claims because Plaintiff was "attempting to add new defendants and claims that are completely unrelated to the central issues in the Amended Complaint." 01/29/18 Dec. & Ord., Dkt. No. 48, at 9. As the Court stated in its January 29, 2018 Decision and Order,

> Plaintiff's claims related to alleged violations of his First Amendment rights at Great Meadow C.F. in 2017 are wholly unrelated to the allegations

set forth in his Amended Complaint that he was assaulted at Clinton C.F. in 2014, and that his First Amendment rights were violated at Clinton C.F. in 2014. *Compare* Dkt. No. 28-1 *with* Am. Compl. Thus, the new allegations against the new defendants do not pertain to the operative pleading. Indeed, the proposed new claims involve events which occurred, if at all, years after the alleged wrongdoing set forth in the Amended Complaint, and were allegedly perpetrated by individuals not named in the Amended Complaint.

*Id.* Magistrate Judge Stewart correctly concluded at "[t]he allegations in the Proposed Second Amended Complaint do not cure the deficiencies previously identified." Rep-Rec. & Ord. at 23.[2]

**\*3** Magistrate Judge Stewart's decision to rely on the Court's previous Decision, and on Fed. R. Civ. P. 15(d),[3] to deny Plaintiff's motion to amend to add First Amendment claims allegedly occurring at Great Meadow C.F. is not clearly erroneous or contrary to law. The proposed First Amendment claims are neither related to nor pertain to the allegations in the operative pleading, thus providing a basis to deny amendment under Rule 15(d). *See Girard v. Hickey*, No. 9:15-CV-0187, 2016 WL 915253, at *5 (N.D.N.Y. Mar. 4, 2016)(" 'Courts regularly deny motions to amend where the moving party seeks to add claims involving collateral matters, based on different factual allegations and distinct legal theories, from the claims already at issue in a case.' ")(quoting *Amusement Indus., Inc. v. Stern*, No. 07 Civ. 11586, 2014 WL 4460393, at *13 (S.D.N.Y. Sept. 11, 2014)(collecting cases)); *McKenzie v. Obertean*, No. 17-CV-441W, 2019 WL 441593, at *1 (W.D.N.Y. Feb. 5, 2019)(" 'A supplemental pleading is designed to cover matters that occur subsequent to the filing of the complaint, but pertain to the original pleadings. Thus, under Rule 15(d), a party may supplement the original pleading to include subsequent occurrences which are related to the claim presented in the original complaint, absent prejudice to the nonmoving party.' ")(quoting *Albrecht v. Long Island R.R.*, 134 F.R.D. 40, 41 (E.D.N.Y. 1991)(citations omitted)); *Stepney v. Rochester Hous. Auth.*, No. 16-CV-6173-FPG, 2018 WL 3110225, at *6 (W.D.N.Y. June 25, 2018)("[C]ourts may ... decline

to permit supplemental pleadings if the new claims are not adequately 'related to the originally stated claims.' ") (quoting *Webster v. Himmelbach*, 271 F. Supp. 3d 458, 472 (W.D.N.Y. 2017), and citing Wright *et al.*, 6 Fed. Prac. & Proc. Civ. §§ 1510 and 1506 (3d ed.)(explaining that courts have denied supplemental pleadings when "the claim or defense asserted in the supplemental pleading bore little or no relationship to the original pleading" and that "refusal to allow the supplemental pleading is entirely justified when" the new "matters alleged have no relation to the" original claim)); *Beckett v. Inc. Vill. of Freeport*, No. CV 11-2163 LDW AKT, 2014 WL 1330557, at *6 (E.D.N.Y. Mar. 31, 2014)("Supplemental pleadings are 'limited to subsequent events related to the claim or defense presented in the original pleading.' ")(quoting 3 Moore Federal Practice § 15.30 (3d ed. 2010)); *see also Webster*, 271 F. Supp. 3d at 472–73 (W.D.N.Y. 2017)(Denying amendment under Rule 15(d) because "Plaintiff does not seek to bolster, amplify, or clarify the two claims alleged in his amended complaint; rather, he seeks to raise an entirely new constitutional claim under the First Amendment.").

Furthermore, denial of the motion to amend to add the First Amendment claims was proper because the addition of the claims would not promote the economic and speedy disposition of the controversy between the parties as framed in the operative pleading. *See Grace v. Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000) (Leave to amend is properly denied "where the belated motion would unduly delay the course of proceedings by, for example, introducing new issues for discovery.")(internal citation omitted); *Girard*, 2016 WL 915253, at *6 ("In considering plaintiff's motion [to amend], the Court is mindful of the fact that discovery has not been completed. However, because this case presently includes multiple causes of action asserted against multiple defendants, the Court finds that the addition of numerous other defendants and unrelated claims arising at entirely distinct locations will necessarily prolong this action and impose additional expense on defendants. Moreover, the Court finds that adding these new claims would not aid in the efficient resolution of this action."); *Andino v. Fischer*, 698 F. Supp. 2d 362, 374 (S.D.N.Y. 2010) (denying motion to supplement because "such a supplementation does not aid in the efficient resolution of the instant action" and would prejudice the existing defendants); *Stepney*, 2018 WL 3110225, at *6 ("[C]ourts may deny supplemental pleadings that would not 'promote the economic and speedy disposition of the entire controversy between the parties.' ")(quoting

Wright et al., 6 Fed. Prac. & Proc. Civ. § 1504 and citing *Sai v. Transp. Sec. Admin.*, 155 F. Supp. 3d 1 (D.D.C. 2016)). Magistrate Judge Stewart did not abuse his discretion in denying Plaintiff's motion to amend to add proposed First Amendment claims (including Plaintiff's proposed First Amendment claim against Gov. Cuomo). *See Girard*, 2016 WL 915253, at *2 (N.D.N.Y. Mar. 4, 2016)("The decision to grant or deny a motion to amend or supplement is committed to the sound discretion of the trial court, and the court's decision is not subject to review on appeal except for abuse of discretion.")(citing *Fielding v. Tollaksen*, 510 F.3d 175, 179 (2d Cir. 2007)). Because the statute of limitations does not appear to have run on Plaintiff's proposed First Amendment claims, Plaintiff is free to assert these claims in a separate action. For the reasons set forth above, Plaintiff's objection to Magistrate Judge Stewart's decision to deny Plaintiff's motion to amend is overruled.

### b. Motion for Appointment of Counsel.

**\*4** For the reasons discussed by Magistrate Judge Stewart at pages 25-26 of the Report-Recommendation and Order, his decision to deny without prejudice Plaintiff's third motion for the appointment of counsel is not clearly erroneous or contrary to law. Plaintiff's objection on this issue is overruled.

### c. Plaintiff's Fifth, Sixth, and Seventh Motions for Preliminary Injunctions

Plaintiff's objection to Magistrate Judge Stewart's recommendation to deny Plaintiff's Fifth, Sixth, and Seventh motions for preliminary injunctions is that "[his] current motions for preliminary injunctive relief are inextricably intertwined with and predicated upon [the] motion for leave to amend [the] Amended Complaint.... [The] motion to amend should have been granted, thereby establishing a basis for [the] current motions for preliminary injunctive relief." Obj., at p. 4. However, because the Court finds that Magistrate Judge Stewart properly denied the motion to amend, Plaintiff presents no meritorious reason to reject Magistrate Judge Stewart's recommendation to deny Plaintiff's Fifth, Sixth, and Seventh motions for preliminary injunctions. Furthermore, upon conducting a *de novo* review of these motions, the Court adopts Magistrate Judge Stewart's conclusions for the reason stated in the Report-Recommendation and Order at pages 23-25. Plaintiff's objection on this issue is overruled.

### d. Recommendation on "Blanket Ban" to Social Media Printed Content

Magistrate Judge Stewart recommends dismissal of Plaintiff's claim that DOCCS promulgated a policy with a "blanket ban" on printed materials from social media, emails, and text messages. In this regard, Magistrate Judge Stewart wrote:

> While Plaintiff alleges that Directive 4422 imposes such a blanket ban, *see* Am. Compl. at ¶ 129, a review of the Directive fails to bear out his assertions. As Defendants' Motion makes clear, the Directive expressly allows inmates to receive printed material with correspondence. Defs.' Mem. of Law at p. 13 (citing Directive 4422). The Directive itself does not appear to contain the ban on social media materials alleged by Plaintiff and nothing in his opposition papers refutes Defendants' contention to the contrary or points to anything in the Directive specifically barring complete access to such materials. *See* Dkt. Nos. 61-1 & 61-2. Given the information now available, Plaintiff's conclusory allegation regarding this policy is insufficient to withstand the Motion to Dismiss. *Salgado v. NYS Dep't of Corr. & Cmty. Supervision*, 2016 WL 6311296, at \*10 (W.D.N.Y. Sept. 15, 2016), report and recommendation adopted, 2016 WL 6298517 (W.D.N.Y. Oct. 27, 2016); *Odom v. Poirier*, 2004 WL 2884409, at \*13 (S.D.N.Y. Dec. 10, 2004).

Rep.-Rec. & Ord., at 15-16.

In objecting to this recommendation, Plaintiff points to an allegation in the Amended Complaint that he did not receive social media materials sent to him "because they were third-party mail in violation of Directive #4422," Am. Compl. ¶ 140, and asserts in his objections that "in truth, the 'blanket ban' on social media materials, emails, and text messages is an unwritten policy and how directive #4422 is being applied state-wide." Obj. at 3. Plaintiff's allegation in the Amended Complaint that he did not receive social media materials sent to him by a third-party does not establish that Directive

4422 imposes a blanket ban on social media printed content. Furthermore, his allegation in his objections of a unwritten policy in applying Directive 4422 is insufficient to modify the allegations contained in the Amended Complaint. Plaintiff is free to move to amend the Amended Complaint to include this allegation of an unwritten policy, but the absence of this allegation in the Amended Complaint provides a sufficient basis to adopt Magistrate Judge Stewart's recommendation on this issue. Accordingly, Plaintiff's objection in this regard is overruled.

### e. Recommendation on constitutionality of Rule 105.14

**\*5** Magistrate Judge Stewart concluded that Plaintiff lacks standing to challenge the constitutionality of Rule 105.14 because Plaintiff fails to allege that he suffered any actual injury due to the application of this rule. *See* Rep. Rec. & Ord., at 18-19. While Magistrate Judge Stewart noted that Plaintiff was previously found not guilty of violating this rule, he concluded that Plaintiff lacked standing because " '[a] plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future.' " Rep. Rec. & Ord., at 18 (quoting *Peck v. Baldwinsville Cent. Sch. Dist.*, 351 Fed. Appx. 477, 479 (2d Cir. 2009) (summary order) (in turn quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d at 344)). Plaintiff argues in his objections that "[b]ecause DOCCS denied my request to form a prison chapter of UFD, I can be disciplined for violating Prison Rule 105.14 and placed in solitary confinement for nine months if I continue to promote and organize UFD. Hence, I have standing to challenge the constitutionality of Prison Rule 105.14 as applied here." Obj., at 3. Plaintiff's allegation of possible future injury is insufficient to confer standing. As the Supreme Court has held:

> To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, ——, 130 S.Ct. 2743, 2752, 177 L.Ed.2d 461 (2010); *see also* [ *Summers v. Earth Island Institute*, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L.Ed.2d 1 (2009)]; [ *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992)]. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too

speculative for Article III purposes—that the injury is *certainly* impending." *Id.,* at 565, n. 2, 112 S. Ct. 2130 (internal quotation marks omitted). Thus, we have repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient. *Whitmore,* 495 U.S., at 158, 110 S. Ct. 1717 (emphasis added; internal quotation marks omitted); *see also Defenders of Wildlife, supra,* at 565, n. 2, 567, n. 3, 112 S. Ct. 2130; *see [ DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 345, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)]; *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 190, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000); *Babbitt v. Farm Workers,* 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L.Ed.2d 895 (1979).

*Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409, 133 S. Ct. 1138, 1147, 185 L.Ed. 2d 264 (2013)(emphasis added in *Clapper*).

Plaintiff's possible future injury from the application of Rule 105.14 is not "*certainly* impending," and therefore insufficient to confer standing. Accordingly, Plaintiff's objection on this issue is overruled.

#### f. Recommendations without Objections.

The Court has reviewed Magistrate Judge Stewart's recommendation to which no objections have been filed, and finds no clear error on the face of the record in relation thereto.

## IV. CONCLUSION

For the reasons discussed above, Plaintiff's objections to Magistrate Judge Stewart's orders denying Plaintiff's motion

to amend [Dkt. No. 61], and for the appointment of counsel [Dkt. No. 61], are **OVERRULED**, and Magistrate Judge Stewart's orders in the regard are **AFFIRMED**.

Also for the reasons discussed above, the Court **ACCEPTS and ADOPTS** the recommendations in the Report-Recommendation and Order, Dkt. No. 95, for the reasons stated therein. Thus, it is hereby

**ORDERED** that Defendants' Motion to Dismiss (Dkt. No. 57) is **GRANTED** in part and **DENIED** in part.

The motion is **GRANTED** (1) Insofar as it seeks dismissal of the claim asserting the existence of a blanket policy barring access to social media material, and (2) Insofar as it seeks dismissal of Plaintiff's claim related to the constitutionality of Rule 105.14, and these claims are **DISMISSED without prejudice**.

**\*6** The motion is **DENIED** (1) Insofar as Defendants Miller and Mahuta move to dismiss Plaintiff's Amended Complaint against them based upon qualified immunity; and (2) Insofar as Defendant Annucci seeks dismissal of Plaintiff's claims alleging that his First Amendment rights were violated by the arbitrary imposition of a mail watch,

and it is further,

**ORDERED** that Plaintiff's Fifth, Sixth, and Seventh Motions for Preliminary Injunctions (Dkt. Nos. 61, 70, and 74) are **DENIED**.

## IT IS SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 1397195

## Footnotes

1    *See* 28 U.S.C. § 636(b)(1)(A)(enumerating dispositive matters subject to *de novo* review and not including motions to amend); *Franke v. ARUP Laboratories, Inc.,* 390 Fed. App'x 822, 828 (10th Cir. 2010) ("Mr. Franke's motion to amend was a nondispositive pretrial matter that the magistrate judge was authorized to decide pursuant to 28 U.S.C. § 636(b)(1)(A)."); *Hall v. Norfolk Southern Ry. Co.,* 469 F.3d 590, 595 (7th Cir. 2006) ("The district judge correctly held that the magistrate judge's denial of Hall's motion to amend

his complaint [to add a defendant] was nondispositive, subject only to review for clear error."); *Pagano v. Frank*, 983 F.2d 343, 346 (1st Cir. 1993) ("Under ordinary circumstances a motion to amend a complaint is 'a pretrial matter not dispositive of a claim or defense of a party' within the purview of Fed. R. Civ. P. 72(a)."); *Palacio v. City of New York*, 489 F. Supp. 2d 335, 344 (S.D.N.Y. 2007)(reviewing magistrate judge's denial of the appointment of *pro bono* counsel under the clearly erroneous standard used for non-dispositive pre-trial orders)

2      For the reasons discussed in the text, Plaintiff's attempt to cure a deficiency in his proposed Second Amended Complaint through his objections, *see* Obj. at 2 ("Although I do not specifically state in my Proposed Second Amended Complaint that Superintendent Miller was personally involved in the denial of my request to form a prison chapter of UFD, I declare under penalty of perjury that he was."), is insufficient to reverse the decision to deny the motion to amend.

3      Rule 15(d) provides: "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time." Fed. R. Civ. P. 15(d).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1330557
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Leonard BECKETT, Plaintiff,

v.

The INCORPORATED VILLAGE OF FREEPORT,
The Incorporated Village of Freeport Police
Department, Police Officer Timothy P. Seaman,
The Incorporated Village of Freeport, Police
Officer William Luikart, The Incorporated Village
of Freeport Police Detective Edward S. Martin,
III, The Incorporated Village of Freeport, Police
Officer John Doe, The Incorporated Village of
Freeport, Individually and in their capacities
as Village of Freeport Police Officers, Police
Officer Diane Peress, The Incorporated Village of
Freeport, Police Officer Donetta Cumberbatch, The
Incorporated Village of Freeport, Nassau County,
Nassau County Police Department, Donald Meese,
Nassau County Detective, Diane Peress, Nassau
County Police Officer, John Doe, Nassau County
Police Officer, Individually and in Their Capacities
as Nassau County Police Officers, Defendants.

No. CV 11–2163(LDW)(AKT).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Valerie A. Hawkins, Hempstead, NY, for Plaintiff.

John L. Marsigliano, Chesney & Nicholas, LLP, Baldwin, NY, Sal F. Deluca, Simmons Jannace, LLP, Syosset, NY, Liora M. Ben–Sorek, Mineola, NY, for Defendants.

**MEMORANDUM AND ORDER**

A. KATHLEEN TOMLINSON, United States Magistrate Judge.

**\*1** Plaintiff Leonard Beckett ("Plaintiff" or "Beckett") brought this civil rights action claiming that his constitutional rights were violated by the Defendants in connection with their arresting him on February 6, 2010. Specifically, Plaintiff asserts that he was walking along the street in Freeport, New York at approximately 7:50 p.m. on February 6, 2010 when an individual slowed down his vehicle in the street and then exited the vehicle and pursued the Plaintiff. Second Amended Complaint ("SAC") ¶¶ 28–29 [DE 34]. Plaintiff maintains that he was wrongfully pursued on foot by several individuals, was unreasonably seized and detained, and was assaulted and battered. SAC ¶¶ 33–34.

Before the Court is Plaintiff Beckett's motion to amend the Complaint for a third time to include facts which he states occurred after the filing of the SAC and which stem from his recent acquittal on burglary and petit larceny charges. This motion is brought pursuant to Federal Rules of Civil Procedure 15(a), 15(d) and 21. DE 54. In particular, Plaintiff's counsel points out that shortly after filing the SAC on February 8, 2013, Plaintiff went on trial for a 2007 burglary which took place at 11 Weberfield Avenue in the Village of Freeport. Plaintiff was acquitted of all charges arising from the burglary on June 17, 2013. On August 23, 2013, Plaintiff moved to amend to supplement his pleading to include these "transactions, occurrences, and events" which post-date the SAC. Plaintiff purportedly does not seek to add any new causes of action.

Nassau County, the Nassau County Police Department, and Detective Donald Meese (collectively, the "County Defendants") oppose Plaintiff's third motion to amend, contending that Plaintiff's acquittal on the burglary charges has no connection to the instant action. The Nassau County Defendants maintain that the motion should be denied by the Court as a futility.

The Village of Freeport and the Freeport Police Department (collectively, the "Village Defendants") and the individual Freeport Police Officer defendants are represented by separate counsel. The Village Defendants have also filed opposition to Plaintiff's motion, arguing that there is no basis to amend to add these new factual allegations. Finally, individual Freeport Police Officers Timothy P. Seaman, William Luikart, Thomas D. Seaman, Donetta Cumberbatch, and Detective Edward S. Martin (the "Freeport Police Officer Defendants") also oppose the motion for leave to amend, proffering that Plaintiff's effort to insert new facts constitutes a misguided attempt to restart the discovery process for his eventual assertion of a malicious prosecution claim concerning the 2007 burglary.

For the reasons that follow, Plaintiff's motion for leave to file a Third Amended Complaint is DENIED.

## I. *BACKGROUND*

### A. The Allegations

Plaintiff filed his original Complaint on May 4, 2011. DE 1. Before Defendants answered, Plaintiff filed an Amended Complaint on August 20, 2011. DE 2. In an Order dated January 25, 2013, this Court granted, in part, and denied, in part, Plaintiff's motion to file a SAC. DE 33. Pertinent to the matter presently before the Court, Plaintiff in that motion sought leave to add a malicious prosecution claim for the 2007 Weberfield Burglary. *Id.* at 46. However, the Court found that the claim was not ripe at that time, holding that:

> **\*2** It is axiomatic that ... a claim for malicious prosecution does not arise until the underlying charges are dismissed in the plaintiff's favor. According to the [Proposed SAC], Plaintiff remains incarcerated on the Weberfield Burglary charges. Consequently, a malicious prosecution claim in connection with the Weberfield Burglary charges cannot stand and Plaintiff is DENIED leave to amend to add a malicious prosecution claim at this time.

*Id.* (internal citations omitted). In accordance with the directives set forth in the Court's January 25, 2013 Order, Plaintiff filed the SAC on February 8, 2013. *See generally* SAC.

The SAC alleges that on February 6, 2010, Police Officer Timothy Seaman ("Officer Seaman") received a radio report of a robbery at a liquor store in the Village of Freeport (the "Liquor Store Robbery"). SAC ¶¶ 20–23. The alleged perpetrator was described as a black male wearing a black jacket. *Id.* ¶ 24. Police Officer Seaman, who was in plain clothes and driving an unmarked vehicle, observed Plaintiff Beckett wearing a red and white jacket over a black jacket. *Id.* ¶¶ 22, 27. Officer Seamen alleged that as he slowed down his vehicle, Beckett began to run southbound. *Id.* ¶ 28. After getting out of the car, Officer Seaman pursued Beckett on

foot. *Id.* ¶ 29. Beckett asserts that Seaman did not identify himself as a police officer. *Id.* After a chase, Beckett was apprehended by Officer Seaman with the assistance of other Freeport Police Officers and was arrested *Id* . ¶ 32.

At the Village police station, Plaintiff found himself, "bruised, battered, bleeding from the mouth, and drifting in and out of consciousness." SAC ¶ 64. Plaintiff "spat his blood into a cup" and the cup was then "recovered by defendant Nassau County Police Detective Donald Meese and held as evidence along with Beckett's clothing." *Id.* ¶ 39. Detective Meese then forwarded the evidence to the Nassau County Medical Examiner's Office for DNA analysis. *Id.*

Plaintiff has set forth numerous claims arising out of his arrest in connection with the Liquor Store Robbery. The civil rights claims under 📖 42 U.S.C. § 1983 are based on Defendants' alleged unlawful search and seizure, unreasonable detention, assault, battery, use of excessive force, brutality, and unlawful punishment, all in violation of Plaintiff's rights protected under the Fourth and Fourteenth Amendments to the Constitution. Plaintiff also sets forth state law causes of action, including violations of the New York State Constitution, false arrest, false imprisonment, assault, and battery.

Beckett was incarcerated after having been convicted upon a plea of guilty to the Liquor Store Robbery. SAC ¶ 46. He was sentenced to five years in prison and five years post-release supervision. *Id.* On October 8, 2011, however, the New York State Supreme Court, Appellate Division, Second Department ("Second Department") reversed Beckett's conviction on the grounds that the Freeport police had unlawfully pursued and seized Plaintiff, rendering all evidence against him "fruit of the poisonous tree." *Id.* ¶ 49. In reaching that decision, the Appellate Division held that "the pursuit of the defendant and his seizure were unlawful" and "[c]onsequently, the physical evidence, identification testimony, and the defendant's statement to law enforcement officials should have been suppressed as 'fruit of the poisonous tree.' " 📖 *People v. Beckett,* 88 A.D.3d 898, 899–900, 931 N.Y.S.2d 126 (2d Dep't 2011) (internal citations omitted).

**\*3** On November 18, 2011, the Liquor Store Robbery charges against Plaintiff were dismissed. SAC ¶ 51. However, while Plaintiff was in custody at the Village Police Department, "[d]efendants collected the blood that Beckett

expelled from his mouth and subjected it to DNA analysis by the New York State police." *Id.* ¶ 52, 931 N.Y.S.2d 126. The blood taken from Plaintiff was "allegedly found to match DNA that was recovered on February 14, 2007 from 11 Weberfield Avenue in the defendant Village, the scene of an alleged burglary. ¶ 53. In light of this evidence, Plaintiff alleges, Nassau County Police Detective Michelle A. Clifford filed a felony complaint against the Plaintiff. SAC ¶ 54.

On June 20, 2011, a grand jury sitting in Nassau County "handed down a sealed indictment that charged Beckett with one count of burglary in the second degree in violation of New York State Penal Law § 140.25(2) and one count of petit larceny in violation of New York State Penal Law § 155.25." SAC ¶ 55. Plaintiff's bail was originally set at $100,000 in cash by a Nassau County court. *Id.* ¶ 56, 931 N.Y.S.2d 126. However, since Plaintiff "lacked the means to post bail in the said amount," he remained incarcerated in the Nassau County Correctional Facility until bail was reduced to $5,000 cash in July of 2012. *Id.* After posting bail, Plaintiff was released from custody July 14, 2012 following nineteen months of incarceration. *Id.*

### B. Acquittal of Weberfield Burglary Charges
On June 17, 2013, a Nassau County jury acquitted the Plaintiff on the burglary and petit larceny charges from the 2007 Weberfield Burglary. DE 50 at 1. Two days later, on June 19, 2013, Plaintiff's counsel filed a letter notifying the Court of the acquittal and requesting leave to amend a third time, explaining that

> [t]he reason for this request is that all New York state court criminal proceedings against Mr. Beckett have finally terminated. On June 17, 2013, a jury acquitted Mr. Beckett of all of the charges pending against him pursuant to Nassau County Court Indictment No. 376–12.

> As a result of the acquittal, Mr. Beckett wants to amend his complaint in this action to allege that the unlawful and malicious acts and/or omissions of the defendants resulted in the said state court prosecution. In response to Mr. Beckett's prior motion to amend his complaint to include the claims arising from the aforementioned state court prosecution, Your Honor ruled that these claims were not ripe for adjudication.

> It is respectfully submitted that, with the termination of the state court proceeding in favor of Mr. Beckett, these claims

are now ripe for adjudication. Therefore, Mr. Beckett would like to include those claims in this action and litigate all of his claims against the defendants in this action.

*Id.* at 1–2, 931 N.Y.S.2d 126. Plaintiff's counsel also argues that she has put the Court and all defendants on notice that the state criminal proceedings would have a bearing on the instant civil action throughout the pendency of the instant federal civil rights action. *Id.* at 2. Counsel stated that she has, moreover, requested the Court to "delay the prosecution of this action to await the outcome of the criminal proceeding" at multiple points during the pendency of this litigation, most recently on May 10, 2013. *Id.*

**\*4** On July 18, 2013, the parties participated in a Telephone Status Conference before this Court. *See* DE 53. The Court addressed Plaintiff's request for leave to amend the SAC, which the Court noted, is uniformly opposed by the Defendants. *Id.* ¶ 1, 931 N.Y.S.2d 126. The Court ultimately granted Plaintiff leave to file the requested motion and set a briefing schedule with the parties. *Id.* ¶ 2, 931 N.Y.S.2d 126.

In her motion, Plaintiff's counsel argues that: (1) Plaintiff acted promptly in notifying the Court and Defendants of his desire to amend; (2) the amended pleading is not futile; (3) the amendments will not require Defendants to expend additional resources in discovery or trial preparation; and (4) granting leave to amend to add the new allegations would serve judicial economy. *See* Memorandum of Law in Support of Motion to Amend Complaint ("Pl.'s Mem.") at 2–6 [DE 54–2].

In opposition, the County Defendants argue that Plaintiff's proposed amendments are futile because no "nexus" exists between the DNA retrieved by the Village Police after the February 2010 Liquor Store Robbery and the DNA used in the June 2013 prosecution of Plaintiff for the 2007 Weberfield Burglary. *See* Memorandum of Law in Opposition to Plaintiff's Motion to Amend His Complaint a Third Time ("County Defs.' Opp.") at 6–7 [DE 59]. Moreover, the County Defendants assert that Plaintiff has set forth no facts that Detective Meese or any other individually named County Defendant was involved in the "allegedly prolonged incarceration" or the prosecution for the 2007 Weberfield Burglary. *Id.* at 7, 931 N.Y.S.2d 126.

Counsel for the Village Defendants also opposes the motion, arguing that the proposed Third Amended Complaint

("TAC") is futile for reasons similar to those raised by the County Defendants. *See* TAC annexed as Ex. "A" to the Declaration of Valerie A. Hawkins in Support of Motion to Amend Complaint ("Hawkins Decl.") [DE 54–3]. Further, the Village Defendants claim that the amendments are an attempt by Plaintiff to "lay the foundation" for a future malicious prosecution claim concerning the Weberfield Burglary. *See* Village Defendants' Memorandum of Law in Opposition ("Village Defs'. Opp.") at 6–9 [DE 56–9]. Finally, the Freeport Police Officer Defendants argue in their opposition that: (1) the proposed TAC is futile because no contemplated malicious prosecution claim stemming from the 2007 Weberfield Burglary can be asserted against the Village Police Officer Defendants; (2) Plaintiff cannot amend a Notice of Claim in federal court, and, thus, the Supplemental Notice of Claim is deficient; and, in any event, (3) the Supplemental Notice of Claim is a futility. *See* Freeport Police Officer Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Amend ("Freeport Police Officers' Opp.") at 9–13.

## II. *LEGAL STANDARD*

### A. Federal Rule of Civil Procedure 16(b)(4)—"Good Cause"

To the extent that Plaintiff seeks leave to amend the Complaint pursuant to Rule 15(a), he must demonstrate "good cause" since the current motion comes after the deadline to amend pleadings has expired. According to Rule 16(b), the court must enter a scheduling order setting deadlines for subsequent proceedings in the case, including "the time to join other parties [and] amend the pleadings ." FED. R. CIV. P. 16(b). "By limiting the time for amendments, the rule is designed to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." *See Parker v. Columbia Pictures Industries,* 204 F.3d at 339–40 (2d Cir.2000) (internal quotations omitted); *accord Ricciardi v. Kimco Facilities Servs. Corp.,* No. 10 Civ. 5371, 2012 WL 6761533, at *1 (E.D.N.Y. Jun. 12, 2012). In certain cases, however, the Court may determine that a deadline "cannot reasonably be met despite the diligence of the party seeking the extension." *Parker,* 204 F.3d at 339 (internal quotations omitted). "In such cases, where the moving party has demonstrated good cause, the court may grant leave to amend the scheduling order to extend the deadline." *Id.; see 246 Sears Road Realty Corp. v. Exxon Mobil Corp.,* No. 99 Civ. 889, 2012 WL 4174862, at *9 (E.D.N.Y. Sept.18, 2012). "[I]n allowing modifications of scheduling orders only for good cause, [Rule 16(b) ] provides the district courts

discretion to ensure that limits on time to amend pleadings do not result in prejudice or hardship to either side." *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 243–44 (2d Cir.2007); *Erdogan v. Nassau County,* No. 10 Civ. 5837, 2014 WL 1236679, at *5 (E.D.N.Y. Mar.25, 2014).

**\*5** "Good cause in this context depends on the diligence of the moving party, and, to satisfy the standard, the movant must demonstrate that it is has been diligent in its effort to meet the Court's deadlines." *Sokol Holdings, Inc. v. BMD Munai, Inc.,* No. 05 Civ. 3749, 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2009) (internal citations and quotations omitted); *see Enzymotec Ltd. V. NBTY, Inc.,* 754 F.Supp.2d 527, 536 (E.D.N.Y.2011). "In other words, the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Sokol,* 2009 WL 2524611 at *7 (citing *Rent–A–Center Inc. v. 47 Mamaroneck Ave. Corp.,* 215 F.R.D. 100, 104 (S.D.N.Y.2003)); *Erdogan,* 2014 WL 1236679, at *4. In determining whether the good cause standard is met, "the primary consideration is whether the moving party can demonstrate diligence[,]" but that is not the only consideration. *Kassner,* 496 F.3d at 244. "The district court, in the exercise of its discretion under Rule 16(b), also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Id.; see Ritchie Risk Limited Strategies Trading (Ireland), Ltd. v. Coventry First LLC,* 282 F.R.D. 76, 79 n. 2 (S.D.N.Y.2012).

### B. Federal Rule of Civil Procedure 15(a)—Motion to Amend

Once Plaintiff has established "good cause" to modify the scheduling order under Rule 16(b)(4), Plaintiff must then satisfy the requirements of Rule 15(a) to be granted leave to amend. Rule 15(a) of the Federal Rules of Civil Procedure provides that in cases where a party cannot amend as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave." *Accord Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991); *Barber v. Hornbeck Offshore Operators, LLC,* No. 11 Civ. 5520, 2014 WL 1010993, at *5 (E.D.N.Y. Mar. 17, 2014); *M.E.S., Inc. v. Liberty Mut. Sur. Group,* No. 10 Civ. 2798, 2014 WL 46622, at *8 (E.D.N.Y. Jan.6, 2014). A court

"should freely give leave when justice so requires" and such leave is in the court's discretion. *See* FED. R. CIV. P. 15(a); *see also* Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 130 S.Ct. 2485, 2489, 177 L.Ed.2d 48 (2010) (Rule 15(a) "gives a district court discretion to decide whether to grant a motion to amend a pleading before trial."); Grace v. Rosenstock, 228 F.3d 40, 56 (2d Cir.2000); MHANY Mgmt. v. County of Nassau, 843 F.Supp.2d 287, 340 (E.D.N.Y.2012) (noting that "it is ultimately within the sound discretion of the court whether to grant leave to amend").

Notwithstanding the foregoing principles, leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." Williams v. Citigroup Inc., 659 F.3d 208, 213–14 (2d Cir.2011) (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); SCS Commc'n, Inc. v. Herrick Co., 360 F.3d 329, 345 (2d Cir.2004) ("[U]nder Rule 15(a), leave to amend a pleading may *only* be given when factors such as undue delay or undue prejudice to the opposing party are absent.") (emphasis in original). " 'The party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial.' " *Pasternack v. Lab. Corp. of Am.,* 892 F.Supp.2d 540, 529 (S.D.N.Y.2012) (quoting *Fariello v. Campbell,* 860 F.Supp. 54, 70 (E.D.N.Y.1994)); *accord Allstate Ins. Co. v. Elzanaty,* 916 F.Supp.2d 273, 304 (E.D.N.Y.2013). The opposing party likewise bears the burden of establishing that an amendment would be futile. *See Cummings–Fowler v. Suffolk Community Coll.,* 282 F.R.D. 292, 296 (E.D.N.Y.2012) (citing Blaskiewicz v. County of Suffolk, 29 F.Supp.2d 134, 137–38 (E.D.N.Y.1998)).

### B. Federal Rule of Civil Procedure 15(d)-Motion to Supplement Pleadings

**\*6** Federal Rule of Civil Procedure 15(d) provides that on motion, "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The same standard for motions to amend under Rule 15(a) applies to motions to supplement under Rule 15(d). *See Salazar v. Bowne Realty Assocs., LLC,* 796 F.Supp.2d 378, 383 (E.D.N.Y.2011); *Petrello v. White,*

No. 01 Civ. 3082, 2011 WL 4793172, at \*4 (E.D.N.Y. Feb. 23, 2011). Supplemental pleadings are "limited to subsequent events related to the claim or defense presented in the original pleading." 3 MOORE FEDERAL PRACTICE § 15.30 (3d ed.2010); *see Fair Housing in Huntington Committee v. Town of Huntington, N.Y.,* No. 02 Civ. 2787, 2010 WL 4791787, at \*7 (E.D.N.Y. Nov. 18, 2010). Significantly, a party seeking to supplement pleadings under Rule 15(d) is not required to demonstrate "good cause" under Rule 16(b)(4) since this latter provision pertains solely to motions to *amend*—not motions to *supplement* pleadings. *See Watson v. Wright,* No. 08 Civ. 960, 2011 WL 1118608, at \*5 (W.D.N.Y. Jan. 11, 2011) *adopted by* 2011 WL 1099981 (W.D.N.Y. Mar 24, 2011) ("Unlike motions to amend ... Rule 16's plain language does not require courts to set a deadline for filing a motion to supplement and the parties in this case did not set such a deadline in their Scheduling Order.") (internal citation and quotations omitted).

### III. *DISCUSSION*

#### A. Good Cause

To the extent that Plaintiff seeks leave to amend under Rule 15(a), the Court finds that Plaintiff has demonstrated "good cause" to modify the scheduling order pursuant to Rule 16(b)(4). In the present matter, the final deadline to join parties or amend the pleadings expired on March 19, 2012. *See* Feb. 9, 2012 Electronic Order. In that Electronic Order, the Court stated that:

> The Court will grant an extension of the deadline for the joinder of parties and amendment of pleadings set forth in the Case Management and Scheduling Order. If counsel wishes to amend the Complaint, she must do so by stipulation or by formal motion pursuant to the Federal Rules of Civil Procedure. The stipulation or motion is due by March 19, 2012.

*Id.* Here, Plaintiff's counsel accurately represents that she notified the Court of her intention to amend and file the proposed TAC just two days following Plaintiff's acquittal on the charges stemming from the 2007 Weberfield Burglary. *See* DE 50. In her June 19, 2013 letter, Plaintiff's counsel reported

that Plaintiff was acquitted by a Nassau County jury on June 17, 2013. *Id.* at 1. Furthermore, Plaintiff's counsel specifically cited this Court's January 25, 2013 Order in which the Court denied Plaintiff leave to amend a malicious prosecution claim arising from the Weberfield Burglary since it had not yet been adjudicated. *Id.;* DE 33 at 46. The Court reasoned, in light of the pending state prosecution, that any malicious prosecution claim arising from the Weberfield Burglary was not ripe for adjudication. *See* DE 33 at 46. However, following the June 17, 2013 acquittal on these charges, Plaintiff's counsel maintained that "with the termination of the state court proceeding in favor of Mr. Beckett, these claims are now ripe for adjudication." DE 50 at 2.

 **\*7** Approximately one month after Plaintiff filed the June 19, 2013 letter, the Court presided over a Status Conference where a briefing schedule for the motion to amend was established and entered. *See* DE 53 ¶ 2. Plaintiff's counsel ultimately filed her initial moving papers on August 23, 2013. *See* DE 54. In light of the multiple times Plaintiff brought the circumstances of her client's criminal prosecution to the attention of the Court, and considering the diligence of Plaintiff's counsel in advising the Court of her anticipated motion to amend only two days following her client's acquittal, the Court finds that Plaintiff has demonstrated good cause warranting the modification of the March 19, 2012 deadline to amend pleadings. *See Sokol,* 2009 WL 2524611 at \*7 (citing *Rent–A–Center Inc.,* 215 F.R.D. at 104); *Erdogan,* 2014 WL 1236679, at \*7 (finding that "the applicable deadline could not have reasonably been met and Plaintiff acted with diligence under Rule 16(b)").

### B. Undue Delay and Prejudice

Preliminarily, the Court points out that Plaintiff's motion papers do not clearly articulate whether the instant motion is brought solely under Rule 15(a) or pursuant to both Rule 15(a) and 15(d). For example, Plaintiff's counsel refers to the "new causes of action" and, at the same time, asks for leave "to allege the facts that have transpired since" the filing of the SAC to "develop his claims." *See* Pl.'s Mem. at 3; *see also* Plaintiff's Reply Memorandum of Law in Support of Motion to Amend Complaint ("Pl.'s Reply Mem.") at 5. According to counsel, Plaintiff "has not advanced any malicious prosecution or retaliation claims against any of the defendants" but rather "seeks to set forth the transactions, occurrences, and events that happened after he filed his second amended complaint in this action." Pl.'s Reply Mem. at 2–3. However, in her June 19, 2013 letter, Plaintiff's

counsel states that she seeks to amend the action "to allege that the unlawful and malicious acts and/or omissions of the defendants resulted in the said state court prosecution" for the Weberfield Burglary. DE 50 at 1. Despite the seeming dissonance of these representations, it appears that Plaintiff is seeking leave under Rule 15(a) to assert a malicious prosecution claim arising out of the Weberfield Burglary *and* to supplement the pleading under Rule 15(d) with facts that arose after the February 8, 2013 SAC was filed. As such, the Court will construe the motion under both Rule 15(a) and Rule 15(d).

Since courts apply the same factors when assessing motions to amend under Rule 15(a) and motions to supplement under Rule 15(d), the Court will simultaneously analyze whether Plaintiff should be granted leave to amend under these provisions. *See Riverhead Park Corp. v. Cardinale,* 881 F.Supp.2d 376, 379 (E.D.N.Y.2012) ("Where, as here, the Plaintiffs seek to add related claims against the same defendants, the analysis under Rule 15(a) and Rule 15(d) is the same.") (internal citations omitted). "A court should deny leave to amend or to serve a supplemental pleading only upon undue delay, bad faith or dilatory motive on the part of the [moving party], ... undue prejudice to the [nonmoving party,] ... [or] futility." *Cummings–Fowler,* 282 F.R.D. at 296 (internal citations and quotations omitted); *Williams,* 659 F.3d at 213–14. "The party opposing the motion bears the burden of establishing that an amendment would be prejudicial or futile." *Cummings–Fowler,* 282 F.R.D. at 296 (internal citation omitted). "Ultimately, it is within the sound discretion of the court whether to grant leave to amend." *Id.* (internal citation and quotations omitted).

 **\*8** Here, the Court finds no undue delay in the filing of Plaintiff's motion for leave to amend the pleading a third time. The claims and events sought to be added in the proposed TAC had not yet occurred and were not yet cognizable at the time the SAC was filed on February 8, 2013. *See* TAC. The steadfastness of Plaintiff's counsel in pursuing civil rights claims originating from the Weberfield Burglary is borne out by her multiple attempts at amending the pleading. In its January 25, 2013 Order, this Court held that any malicious prosecution claim arising out of the 2007 Weberfield Burglary was not yet ripe for review because that criminal matter was still pending in state court. *See* DE 33 at 46. As soon as those charges were terminated on June 17, 2013, Plaintiff's counsel wasted no time notifying the Court of those developments and renewing her request to amend the SAC in her letter of June

19, 2013. DE 50. Given this timeline, the Court finds that Plaintiff did not unduly delay bringing the instant motion.

However, the Court disagrees with Plaintiff's representation that "[t]his action remains in its early stages" and, as such, will not unduly prejudice the Defendants. *See* Pl.'s Mem. at 5–6. Judge Wexler has twice placed the parties on notice of jury selection in this action. First, on July 31, 2013, the parties were advised that jury selection was set for June 2, 2014. *See* Jul. 31, 2013 Electronic Order. Again, on January 28, 2014, Judge Wexler reminded the parties that the new jury selection date of June 2, 2014 remained in effect and there would be no adjournments. *See* Jan. 28, 2014 Electronic Order. As acknowledged by Plaintiff's counsel,

> [t]his matter was scheduled for jury selection on June 10, 2013; however, jury selection did not commence as Beckett was actually engaged in jury selection and trial in the Nassau County Court on the aforementioned burglary and petite (*sic* ) larceny charges against him.

Hawkins Decl. ¶ 22; *see also* DE 53 ¶ 3.

The Court also points out that discovery was closed on September 28, 2012, when Judge Wexler originally marked this case ready for trial. *See* DE 32. Plaintiff's counsel alludes to a possible fourth amended pleading (potentially adding a claim of malicious prosecution arising from the burglary acquittal) which would undoubtedly delay the resolution of this action further in contravention of Judge Wexler's directives. As the County Defendants argue, Plaintiff's supplemental pleading "foreshadows a future request—a fourth amended complaint—to add new claims (malicious prosecution)" at this late stage of the litigation. County Defs.' Opp. at 5–6. The Freeport Police Officer Defendants submit that Plaintiff's instant motion is prejudicial to them on grounds similar to those asserted by the County Defendants. *See* Freeport Police Officers' Opp. at 9. The Freeport Police Officers argue that the TAC constitutes "nothing more than an attempt to re-start' the case to obtain long waived discovery." *Id.* According to Plaintiff's counsel, Defendants will not be required to "expend additional resources to conduct discovery and prepare for trial and would not significantly delay the resolution of this dispute." Pl.'s Mem. at 5–6. However, this conclusory statement is not reflective of the facts presently before the Court. As set forth by counsel, Plaintiff "should be permitted to amend and supplement his complaint to allege the facts that have transpired since he filed his second amended complaint" and he should further ***be permitted to complete discovery to develop his claims against the defendants.*** Pl.'s Reply Mem. at 5 (emphasis added). As gleaned from the declarations of Plaintiff's counsel, discovery does, in fact, remain to be completed in this action. *See* Hawkins Decl. ¶¶ 23–24. Plaintiff's counsel points out that:

**\*9** 23. The original parties in this action, Beckett and the Village defendants, have served and responded to interrogatories and document requests. The Village defendants deposed Beckett on April 9 and 10, 2013. Counsel for the County defendants was present at the deposition.

24. Beckett and the County defendants have served interrogatories and document requests; however, they have not been responded to the same.

*Id.* Given that discovery is concededly incomplete with respect to the current claims, permitting a further amendment to allow Plaintiff to explore allegations of malicious prosecution concerning the Weberfield Burglary will substantially extend the time this matter is litigated. Moreover, the 2007 Weberfield Burglary concerns a completely different incident from the one at issue in this litigation—the 2010 Liquor Store Robbery. As such, the Court finds that granting leave for a third time would, contrary to counsel's assertions, "significantly delay" resolution of this action.

Finally, the Court notes that finding the TAC prejudicial does not foreclose Plaintiff's ability to bring a separate lawsuit in connection with the Weberfield Burglary. Plaintiff, in conjunction with the instant pleading, filed a Second Supplemental Notice of Claim, dated September 13, 2013, which included, *inter alia,* a claim of malicious prosecution against all Defendants. *See* Second Supplemental Notice of Claim annexed to the Declaration of Deputy County Attorney Liora Ben–Sorek, Esq. ("Ben–Sorek Decl.") as Ex. "D" [DE 58–4]. In its January 25, 2013 Order, the Court found Plaintiff's filing of the Supplemental Notice of Claim appropriate. DE 33 at 17. Here, too, the Court finds that the filing of the Second Supplemental Notice of Claim was appropriate. As previously explained by this Court, "several courts, without directly addressing the issue, have permitted plaintiffs to serve additional notices of claim which include

facts that developed after the original notice was filed." DE 33 at 17 (citing *Rotundo v. Vill. of Yorkville,* No. 09 Civ. 1262, 2011 WL 838892, at \*3 (N.D.N .Y. March 4, 2011); *Rivera v. Comm. Sch. Dist. Nine,* No. 00 Civ. 8208, 2002 WL 1461407, at \*2 (S.D.N.Y. July 8, 2002); *Blue Water Envtl., Inc. v. Inc. Vill. of Bayville, New York,* 12 Misc.3d 1169(A), 820 N.Y.S.2d 841 (N.Y .Sup.Ct. Nassau Co.2006)). Since Plaintiff filed the Second Supplemental Notice of Claim within the ninety day statute of limitations set forth in General Municipal Law § 50–e(1), Plaintiff is not precluded from bringing an independent action for malicious prosecution arising out of the June 17, 2013 acquittal on the Weberfield Burglary charges.

## C. Whether Supplemental Facts in the TAC Connect to the SAC Under Rule 15(d)

Plaintiff contends that the proposed TAC would "buttress judicial economy." Pl.'s Mem. at 6 (citing *State Farm Mut. Auto. Ins. Co. v. Grafman,* No. 04 Civ. 2609, 2007 WL 7704666 (E.D.N.Y. May 22, 2007)). As a general matter, Rule 15(d) "reflects a liberal policy favoring a merit-based resolution of the entire controversy between the parties." *Witkowich v. Gonzales,* 541 F.Supp.2d 572, 590 (S.D.N.Y.2008) (internal quotation marks and citations omitted); *Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted). However, this "liberal policy" under Rule 15(d) is predicated on whether "the supplemental facts connect [the supplemental pleading] to the original." *Id.* (internal citations and quotations omitted). Here, the central dispute is whether the 2007 Weberfield Burglary is connected to the 2010 Liquor Store Robbery for which this case was originally brought. Under Rule 15(d), "[t]he threshold consideration for the district court is whether the supplemental facts connect [the supplemental pleading] to the original pleading." *Fair Housing in Huntington Committee,* 2010 WL 4791787, at \*9 (internal citation and quotations omitted); *LaBarbera v. Audax Const. Corp.,* No. 02 Civ. 582, —— F.Supp.2d ——, 2013 WL 5295493, at \*8 (E.D.N.Y.2013) ( "Rule 15(d) allows a party to supplement the complaint in order to present subsequent material that is related to the claims presented in the original complaint."). "If there is a relationship, then leave to supplement should be freely permitted absent undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility." *Fair Housing in Huntington Committee,* 2010 WL 4791787, at \*9 (internal citation and quotations omitted).

**\*10** The Court finds that Plaintiff has failed to meet the threshold requirement establishing a connection between the claims in the operative pleading (SAC) and the new facts asserted in the proposed supplemental pleading (TAC) concerning the Weberfield Burglary. The County Defendants argue that "Plaintiff's proposed amendment[ ] attempts to link the DNA recovered at [Freeport Police Department] on February 6, 2010 with his continued incarceration on burglary charges (until July 2012) and the prosecution on those burglary charges which were resolved in June 2013." County Defs.' Opp. at 6. The County Defendants maintain that "neither Beckett's 2011 indictment on charges of burglary (stemming from a 2007 crime), nor his June 2013 trial were based at all upon the DNA retrieved at [Freeport Police Department] in February 2010." *Id.* at 7. In support of this position, the County Defendants have annexed the Affidavit of Assistant District Attorney Anthony Perri ("ADA Perri") to the Declaration of Deputy County Attorney Liora Ben–Sorek, Esq. filed in support of their opposition to Plaintiff's motion. *See* Ben–Sorek Decl., Ex. "E" ("Perri Aff."). ADA Perri explains that:

2. In June 2013, I was assigned to prosecute the case captioned: *People of the State of New York v. Leonard Beckett;* Indictment # 376N–12, in which the defendant was charged with having committed burglary in the second degree in violation of New York State Penal Law § 140.25(2).

3. The burglary at issue occurred on February 14, 2007 in Freeport, County of Nassau, State of New York.

4. The DNA left at the burglary scene was compared with a buccal sample taken from defendant Beckett, which he was required to give as a result of a prior conviction for endangering the welfare of a minor from May 16, 2003. Beckett's indictment on the burglary charge was, in part, based upon a comparison of those samples. The forensic evidence left at the crime scene and DNA obtained from the aforementioned mandatory buccal swabbing were the only DNA evidence utilized in connection with Beckett's indictment.

5. On or about February 27, 2013, another buccal swab was taken from Beckett pursuant to a discovery order signed by Acting New York Supreme Court Justice Hon. Alan L. Honorof under New York State Criminal Procedure Law § 240.40. The February 27, 2013 buccal sample also

matched the same DNA previously analyzed from the burglary scene.

6. Trial on the burglary charge was conducted in June 2013. The only DNA evidence presented during the trial was from the buccal sample taken in February 2013 and that which was recovered from the scene of the 2007 burglary.

*Id.* ¶¶ 2–6. Given this record, the County Defendants submit that "there is no nexus between the Defendants in this case and the actions sought to be alleged in the new pleading." County Defs.' Opp. at 7.

Similarly, the Village Defendants refer to ADA Perri's affidavit and argue that "the indictment of the plaintiff for that [Weberfield] burglary that resulted in his acquittal was based in part upon comparison of DNA that was left at the scene of the 2007 burglary in Freeport, New York with DNA obtained from the plaintiff from a buccal swab sample that plaintiff was required to give the Nassau County District Attorney as a result of his prior conviction in 2003 for endangering the welfare of a minor." Village Defs.' Opp. at 7. As such, the Village Defendants contend, the "DNA left at the scene of the burglary in 2007 was not obtained from his blood obtained on February 6, 2010 after his arrest for the robbery committed at the Freeport Wine & Liquor Store." *Id.* at 8. The Freeport Police Officer Defendants likewise state "it is undisputed that plaintiff's DNA from the 2010 robbery was not used in connection with plaintiff's prosecution for the 2007 burglary." Freeport Police Officers' Opp. at 11.

**\*11** In reply, Plaintiff argues that the "illegally obtained evidence was the foundation for both the 2010 robbery charges and the 2011 burglary charges against which Beckett had to defend himself." *See* Reply Declaration of Valerie A. Hawkins, Esq. in Support of Motion to Amend Complaint ("Hawkins Reply Decl."). In tying these two charges together, Plaintiff attempts to develop linkage between the SAC and the TAC which is necessary to add new allegations in a supplemental pleading under Rule 15(d). Citing a March 9, 2010 internal Nassau County Police Department memorandum from Sergeant Michael Cole of the Forensic Evidence Bureau to Defendant Meese, Plaintiff contends that Defendant Meese was "informed of a match between Beckett's DNA and the DNA found at the scene of the alleged robbery." Hawkins Reply Decl., Ex. "A." In that March 9, 2010 memorandum, submitted for the first time in reply, Sergeant Cole wrote that:

The evidence submitted to the **Forensic Evidence Bureau** for ***DNA*** analysis (10CR0010747, L10000698,)defendants gloves, jacket, cup and victims buccal swab kit have been accepted by the ***Medical Examiner / Department of Forensic Genetics*** for *immediate* analysis. The evidence has been transferred to the ***ME/DoFG.*** Should you need clarification or have any questions please, contact the Evidence Assessment Section at Ext. 7800.

*Id.* (emphasis in original). In citing this inter-departmental memorandum, Plaintiff concludes that the County Defendants had custody of the evidence secured from the 2010 Liquor Store Robbery arrest and later matched it with the earlier 2007 Weberfield Burglary. Hawkins Reply Decl. ¶ 5. Plaintiff submits that the County Defendants were "informed of a match between Beckett's DNA found at the scene of the alleged 2007 burglary" on May 28, 2010 as reflected in Detective Buokowski's case notes for the Office of the Medical Examiner. Pl.'s Reply. at 3; *see* Nassau County Office of the Medical Examiner Dep't of Forensic Genetics Case Contact Form, annexed as Exhibit "B" ("Forensic Notes") to the Hawkins Reply Decl. [DE 61–3]. As such, the assertion that "the illegal arrest by Beckett by the defendants had nothing to do with the 2011 burglary prosecution is false." Pl.'s Reply at 3. The inter-departmental memorandum and Forensic Notes are particularly troubling, according to Plaintiff's counsel, because all evidence from the pursuit and seizure of Plaintiff's person following the 2010 Liquor Store Robbery were declared unlawful by the Appellate Division in *Beckett,* 88 A.D.3d at 931, 931 N.Y.S.2d 667, by the time Plaintiff's burglary trial commenced in 2013. Hawkins Reply Decl. ¶ 4. As such, the DNA sample, which Plaintiff claims was seized during the February 2010 arrest, also lays the foundation for his motion to supplement and, counsel argues, the Court should allow Plaintiff to "develop his claims against the defendants." Pl.'s Reply Mem. at 5.

Based on a review of the record, the Court is not persuaded by Plaintiff's conclusion that the Weberfield Burglary is connected to the claims in the SAC for purposes of amending

under Rule 15(d). Although Plaintiff's counsel refers to the evidentiary decision of Justice Honorof which was issued on June 22, 2012 in connection with the Weberfield Burglary prosecution, counsel neglects to cite a critical segment of that decision, specifically, that the court denied Plaintiff's motion to suppress DNA evidence. *See* Hawkins Reply Decl., Ex. "C." The issue before Justice Honorof was not unlike the one currently before the Court, namely, whether the DNA used by the prosecution against the Plaintiff on the Weberfield Burglary constituted the same sample that was suppressed by the Appellate Division. *Id.* at 1, 931 N.Y.S.2d 667. In the Weberfield Burglary prosecution, Plaintiff moved to suppress the DNA as "fruit of the poisonous tree" whereas the state argued that "the DNA to which the DNA in this case was matched was not the DNA obtained which was ultimately suppressed, but rather came from the defendant's 'convicted defendant specimen', lawfully taken and maintained by the New York State DNA Index System after plea in that matter." *Id.* (internal citation omitted). However, Justice Honorof held that

> **\*12** [t]he defendant's motion to suppress the instant DNA evidence is denied. Though the DNA in the initial robbery case was illegally obtained, the defendant's subsequent plea and the DNA sample was legally obtained pursuant to a voluntary plea. As the Second Department held in *People v. King,* 232 AD3d 111, 117 "once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to use of that sample", lv. denied 91 NY3d 875 (1997).

*Id.* The County Defendants asserted in their opposition papers that "[a]s part of pre-trial discovery in the burglary prosecution, Nassau County Acting Supreme Court Justice Hon. Alan Honorof ordered Beckett to provide a buccal sample." County Defs.' Opp. at 4. As referenced in the County defendants' opposition and in the affidavit of ADA Perri, "[t]hat sample was taken on or about February 27, 2013 and matched the DNA found at the burglary scene." *Id.* In contrast to the arguments set forth by the Defendants, Plaintiff has set forth only conclusory, circular arguments proffering that the DNA sample used by the state to prosecute the Weberfield Burglary was unlawfully obtained. Moreover, as seen above, Plaintiff's contentions are predicated on an incomplete recitation of the facts from the underlying burglary proceeding. Given this record, the Court finds that the facts to be added in Plaintiff's supplemental pleading are

not connected to the civil rights claims stemming from the 2010 Liquor Store Robbery.

This case is distinguishable from *Witkowich,* 541 F.Supp.2d at 590, where, for example, the court *sua sponte* granted plaintiffs leave to supplement a retaliation claim pursuant to Rule 15(d) because plaintiff's new allegations in opposing defendants' summary judgment motion were "closely related to those raised" in the pleading. The court reasoned that the supplemental allegations involved the "same subject matter," "many of the same people," and events which took place around the same time as the original discrimination claim. *Witkowich,* 541 F.Supp.2d at 590. By contrast here, the series of events Plaintiff seeks to bring within the supplemented pleading (1) arise from totally different charges, (2) took place three years prior to the 2010 Liquor Store Robbery at issue, (3) involve different parties, and, (4) unlike the interconnectedness of a discrimination and retaliation claim, are not closely related but rather, represent two entirely different transactions.

Similarly, the facts in the present matter are dissimilar to those presented to the court in *Alexandre v. Town of Hempstead,* 275 F.R.D. 94, 98 (E.D.N.Y.2011) in which plaintiff's motion to supplement was granted pursuant to Rule 15(d). There, the plaintiff did not seek to add any new causes of action, but rather to add further facts to his original cause of action. As a result, the court found that only limited additional discovery would be necessary. *Alexandre,* 275 F.R.D. at 98; *see also Andino v. Fischer,* 698 F.Supp.2d 362, 374 (S.D.N.Y.2010) (denying motion to supplement under Rule 15(d)). Here, by contrast, the Plaintiff is admittedly using the unrelated acquittal of charges from the Weberfield Burglary to explore a potential new claim, not yet realized, against the Defendants. Unlike *Alexandre* and *Andino,* Plaintiff does not show how the contemplated malicious prosecution claim stemming from the Weberfield Burglary would connect to the original claims such that there is no undue prejudice or delay in the resolution of this action.

### D. Futility

**\*13** Assuming Plaintiff also seeks to set forth a new claim of malicious prosecution, the Court must assess whether that new cause of action would be a futility under Rule 15(a). In addition to causing undue prejudice, the Court finds that the purported new claim, namely, malicious prosecution

for the Weberfield Burglary, fails to state a plausible claim upon which relief can be granted. "An amendment is futile if the claim would be unable to withstand a Rule 12(b)(6) motion to dismiss ... and the court applies the same analysis in determining futility as it does in deciding Rule 12(b)(6) motions." *Wade v. Rosenthal,* No. 11 Civ. 5672, 2012 WL 3764291, at *1 (E.D.N.Y. Aug. 29, 2012) (internal citations and quotations omitted). "As a result, mere labels, conclusions, and a 'formulaic recitation of the elements of a cause of action' do not suffice to state a plausible claim." *Id.* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,555 (2007)). All Defendants in this action contend that any putative malicious prosecution claim originating from the burglary charges would be unsustainable. The County Defendants argue the general principle that a plaintiff must allege personal involvement of a defendant in a Section 1983 lawsuit. County Defs.' Opp. at 7. Here, the County Defendants maintain, "Plaintiff makes no direct allegation that Detective Meese or any of the other individual defendants caused Plaintiff's allegedly prolonged incarceration or was in any way involved in the prosecution against him of the burglary charges." *Id.*

The Freeport Police Officer Defendants contend that, as an initial matter, Plaintiff's counsel concedes that no new claim is being asserted in the TAC. Freeport Police Officers' Opp. at 9. As such, they argue that Plaintiff's counsel has "chosen to waste the time of the defendants and this court with the instant motion." *Id.* Assuming that Plaintiff *is* setting forth such a claim, the Freeport Police Officer Defendants assert that any such malicious prosecution claim would be futile against them because they "undisputedly had no role in commencing or continuing the prosecution of plaintiff in connection with the 2007 burglary." *Id.* at 10. Further, the Freeport Police Officer Defendants submit that Plaintiff cannot establish the "requisite element of malice" necessary to set forth a *prima facie* malicious prosecution claim against any of the Defendants. *Id.*

The Village Defendants likewise oppose the motion, arguing that a malicious prosecution claim associated with the Weberfield Burglary is futile because (1) contrary to Plaintiff, the DNA evidence used in the burglary trial was not unlawfully obtained, and (2) Plaintiff's counsel acknowledged at trial that the blood obtained at the scene of the burglary was, concededly, from the Plaintiff. Village Defs.' Opp. at 7–8.

A claim for malicious prosecution under New York law requires the plaintiff to prove: (1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) the termination of the proceeding in the plaintiff's favor; (3) a lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's action. *Anilao,* 774 F.Supp.2d at 504. "The absence of probable cause is, therefore, 'an essential element of a claim for malicious prosecution.' " *Perez v. City of New York,* No. 01 Civ. 5384, 2007 WL 14486, at *11 (E.D.N.Y.2007) (quoting *McClellan v. Smith,* 439 F.3d 137, 145 (2d Cir.2006)); *Gem Financial Service, Inc. v. City of New York,* No. 13 Civ. 1686, 2014 WL 1010408, at *9 (E.D.N.Y. Mar. 17, 2014) (listing the elements of a *prima facie* malicious prosecution claim). Furthermore, "[a]n indictment by a grand jury creates a presumption of probable cause." *Perez,* 2007 WL 14486, at *11. "The presumption may be overcome only by evidence establishing that the [defendants] have not made a complete and full statement of facts either to the Grand Jury or to the [prosecutor], that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith...." *Colon v. City of New York,* 60 N.Y.2d 78, 82–83, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983); *accord Faison v. Maccarone,* No. 11 Civ. 137, 2012 WL 681812, at *7 n. 11 (E.D.N.Y. Mar. 1, 2012) (holding that a plaintiff may only overcome the presumption by establishing that the indictment was procured by fraud, perjury, suppression of evidence or other police conduct undertaken in bad faith); *Perez,* 2007 WL 14486, at *11. A plaintiff must allege specific facts that rebut the presumption of probable cause which arises from a grand jury indictment. *Rhodes v. Tevens,* No. 07 Civ. 471 S, 2012 WL 777421, at *9 (W.D.N.Y. Mar.7, 2012).

**\*14** Here, to the extent that Plaintiff is attempting to set forth a malicious prosecution claim arising out of the Weberfield Burglary, the claim is not plausible. Preliminarily, the Court notes that such a claim suffers from some of the same infirmities identified in Plaintiff's assertion of a malicious prosecution claim stemming from the 2010 Liquor Store Robbery. As explained in the Court's January 25, 2013 Order:

The [Proposed SAC] alleges that "[o]n May 5, 2010, a Nassau County grand jury handed down an indictment that charged Beckett" with various counts of robbery, assault, criminal possession of a weapon, and resisting arrest. Therefore, a presumption arises that Defendants acted with probable cause and Plaintiff must allege wrongdoing by

the Defendants with respect to the grand jury proceedings. Plaintiff has not done so. Thus, the claim is unsustainable.

Notably, the Liquor Store Robbery malicious prosecution claim would also be subject to dismissal on other grounds. First, Plaintiff does not allege which Defendants were responsible for initiating or continuing the criminal prosecution. Nor does Plaintiff plead malice, which requires allegations of wrong or improper motive.

DE 33 at 45–46 (internal citations omitted). The Court finds that any putative malicious prosecution claim originating from the Weberfield Burglary is similarly deficient. In her proposed TAC, Plaintiff has not clearly set forth which of the defendants she seeks to recover against under a theory of malicious prosecution for the Weberfield Burglary. Moreover, Plaintiff has again failed to plead any facts which show a lack of probable cause or actual malice. As described in the affidavit of ADA Perri, the Weberfield Burglary prosecution was initiated pursuant to Indictment # 376N–12 in the *People of the State of New York v. Leonard Beckett*, charging Plaintiff with burglary in the second degree in violation of New York State Penal Law § 140.25(2). *See* Ben–Sorek Decl., Ex. "E" ¶ 2. Plaintiff has not rebutted the "presumption of probable cause" created by this grand jury indictment and, as such, fails to state a claim for relief that is plausible on its face. *See Hendrix v. City of New York,* No. 12 Civ. 5011, 2013 WL 6835168, at *8 (E.D.N.Y. Dec.20, 2013) (quoting *Twombly,* 550 U.S. at 547); *Brown v. City of New York,* No. 08 Civ. 5095, 2013 WL 5329356, at *1 (E.D.N.Y. Sept. 20, 2013) ("A grand jury indictment creates a rebuttable presumption of probable cause, which is fatal to a claim of malicious prosecution.") (citing *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003)).

As noted above, Plaintiff cannot show that "his indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Hendrix,* 2013 WL 6835168, at *8. Plaintiff's attempt to link the unlawfully seized DNA evidence from the 2010 Liquor Store Robbery with the 2007 Weberfield Burglary prosecution is mere conjecture unsupported by a plausible basis in fact. The DNA sample left at the scene of the 2007 Weberfield Burglary was compared with a buccal sample taken from the Plaintiff as a result of prior conviction for endangering the welfare of a minor. *See* Ben Sorek Decl., Ex. "E" ¶ 4. As ADA Perri noted, Plaintiff's indictment on the Weberfield Burglary charges was "in part" predicated upon

a comparison of the foregoing two DNA samples. *Id.* These were the only two items used in connection with Plaintiff's indictment.

**\*15** Moreover, in addition to the lack of probable cause, Plaintiff fails to show any malice by any of the Defendants. Actual malice under New York law "means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Stanbury v. Wertman,* No. 09 Civ. 4638, 2012 WL 183849, at *8 (S.D.N.Y. Jan. 24, 2012) (quoting *Rounseville v. Zahl,* 13 F.3d 625, 630 (2d Cir.1994)). "However, it is also the case that 'New York courts recognize that actual malice can rarely be established through direct evidence and thus may be proven though circumstantial evidence.' " *Id.* (quoting *Rounseville,* 13 F.3d at 630). "Further, New York law considers the lack of probable cause and the presence of malice closely related," *Rounseville,* 13 F.3d at 631, and "[a] lack of probable cause generally creates an inference of malice." *Id.* at *9 (citing *Boyd v. City of New York,* 336 F.3d 72, 78 (2d Cir.2003); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996)). Here, the Court finds that Plaintiff has not set forth any facts in the TAC to suggest that any of the Defendants were motivated by actual malice. This conclusion is further supported by the lack of probable cause reflected in the TAC. The prosecution of the Weberfield Burglary was based on a lawful indictment. Moreover, a buccal swab of Plaintiff's DNA evidence was ordered to be produced in pre-trial discovery by a state court judge, the results of which confirmed a match with the specimen recovered at the Weberfield Burglary.

Finally, the Court notes that, although not pleaded in the TAC, Plaintiff has again set forth state law causes of action for intentional infliction of emotional distress, negligence, false arrest, false imprisonment, assault, battery, and *prima facie* tort in the Second Supplemental Notice of Claim. *See* Ben–Sorek Decl., Ex. "D" ¶ 18. To the extent Plaintiff attempts to re-plead these allegations, the Court reminds Plaintiff of its decision in the Order of January 25, 2013 finding these claims futile. DE 33 at 18–19. As such, any of the foregoing putative state law claims would also constitute a futility.

## IV. *CONCLUSION*

For all of the foregoing reasons, the Court DENIES Plaintiff's motion to amend the Complaint for a third time. The parties

are directed to appear for an in-person status conference before this Court on April 24, 2014 at 12 p.m.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1330557

---

**End of Document**                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Girard v. Hickey, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 270 of 301

2016 WL 915253
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Chauncey GIRARD, Plaintiff,
v.
A. HICKEY, et al., Defendants.

9:15-CV-0187
|
Signed 03/04/2016

**Attorneys and Law Firms**

CHAUNCEY GIRARD, 11-A-1352, Plaintiff, pro se, Great
Meadow Correctional Facility, Box 51, Comstock, NY
12821.

JOHN F. MOORE, ESQ., Ass't Attorney General, HON.
ERIC T. SCHNEIDERMAN, New York State Attorney
General, Attorney for Defendants, The Capitol, Albany, NY
12224.

**DECISION AND ORDER**

THOMAS J. MCAVOY, Senior United States District Judge

**I. INTRODUCTION**

*1     Plaintiff Chauncey Girard commenced this action
by submitting a pro se civil rights complaint pursuant to
42 U.S.C. § 1983 (" Section 1983") alleging that
his constitutional rights were violated by the defendants
during his confinement at Auburn Correctional Facility
("Auburn C.F."). Dkt. No. 1 ("Compl."). Plaintiff also filed
an application to proceed in forma pauperis. Dkt. No. 5 ("IFP
Application"). By Decision and Order filed March 23, 2015,
plaintiff's IFP Application was granted and the sufficiency
of the claims asserted in the complaint was considered in
accordance with 28 U.S.C. § 1915(e) and 28 U.S.C.
§ 1915A. Dkt. No. 9 (the "March 2015 Order"). On the
basis of that review, the Court: (1) dismissed with prejudice
the claim that defendant Cuttle verbally threatened him;
(2) dismissed without prejudice the Fourteenth Amendment
due process claim against defendant Cuttle; the Fourteenth
Amendment equal protection claims against defendants
Hickey, Venditti, Thomas, [1] Abate, Gilfus, and Cuttle and
all claims against defendant Graham; (3) dismissed Graham

and Cuttle as defendants without prejudice; and (4) found
that the Eighth Amendment excessive force claims against
defendants Hickey, Venditti, Thomas, Abate, and Gilfus and
the First Amendment retaliation claims against defendants
Hickey, Venditti, and Thomas survived sua sponte review and
required a response. March 2015 Order at 10-11. Defendants
Hickey, Venditti, Thomas, Abate, and Gilfus submitted an
answer, and a Mandatory Pretrial Discovery and Scheduling
Order issued. Dkt. Nos. 40, 42.

Plaintiff has filed five motions to amend his complaint.
Dkt. No. 38 ("First Motion to Amend"), Dkt. No. 39
("Second Motion to Amend"), Dkt. No. 47 ("Third Motion
to Amend"), Dkt. No. 59 ("Fourth Motion to Amend"), and
Dkt. No. 64 ("Fifth Motion to Amend"). Plaintiff has also
filed a motions for preliminary injunctive relief (Dkt. No.
43) and for appointment of counsel (Dkt. Nos. 51, 81).
Defendants oppose the motions to amend and for preliminary
injunctive relief. Dkt. Nos. 48, 57, 61, and 67. In light of the
multiple motions, the discovery and dispositive motion filing
deadlines were reset until April 20, 2016, and June 20, 2016,
respectively. [2] Dkt. No. 71.

**II. MOTIONS TO AMEND**

**A. The Legal Standard**
The Federal Rules of Civil Procedure ("Fed. R. Civ. P.")
provide that courts "should freely give leave" to amend a
complaint "when justice so requires." Fed. R. Civ. P. 15(a)
(2). The Second Circuit has stated that " [t]his permissive
standard is consistent with our strong preference for resolving
disputes on the merits." Williams v. Citigroup Inc., 659
F. 3d 208, 212-13 (2d Cir. 2011) (internal quotation marks
omitted). Leave to amend should be given "absent evidence
of undue delay, bad faith or dilatory motive on the part of the
movant, undue prejudice to the opposing party, or futility."
Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 283 (2d
Cir. 2000); see also Couloute v. Ryncarz, No. 11-CV-5986,
2012 W L 541089, at *3 (S.D.N.Y. Feb. 17, 2012) (quoting
Monahan, 214 F.3d at 283). However, motions to amend
"should generally be denied in instances of futility, undue
delay, bad faith or dilatory motive, repeated failure to cure
deficiencies by amendments previously allowed, or undue
prejudice to the non-moving party." Burch v. Pioneer
Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008);
Monahan, 214 F.3d at 283. An amendment is futile if

Girard v. Hickey, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 271 of 301

the proposed claim could not survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)); *see also Malesko v. Corr. Serv. Corp.*, 229 F.3d 374, 382-84 (2d Cir. 2000), *rev'd on other grounds*, 534 U.S. 61 (2001) (A proposed am ended complaint seeking to assert claims barred by the statute of limitations is futile and must be denied).

**\*2** While there are a number of factors to be considered, "[p]erhaps the most important reason for denying leave to amend occurs when the opposing party will be unduly prejudiced by an amendment to the pleading." *Messier v. Southbury Training School*, No. 94-CV-1706, 1999 WL 20907, at \*3 (D. Conn. Jan. 5, 1999); *see also Amusement Indus., Inc. v. Stern*, No. 07 Civ. 11586, 2014 W L 4460393, at \*10 (S.D.N.Y. Sept. 11, 2014). The decision to grant or deny a motion to amend or supplement is committed to the sound discretion of the trial court, and the court's decision is not subject to review on appeal except for abuse of discretion. *See Fielding v. Tollaksen*, 510 F.3d 175, 179 (2d Cir. 2007).

Rule 15(d) of the Federal Rules of Civil Procedure provides that "on motion ... the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). The decision to grant or deny a Rule 15(d) motion is committed to the sound discretion of the district court. *Phillips v. Lavalley*, No. 9:12-CV-0610 (DNH/RFT), 2013 WL 1681422, at \*5-6 (N.D.N.Y. Mar. 1, 2013) (citing *Quentin Group LLC. v. Interlink Prod. Int'l, Inc.*, No 97 Civ. 0108, 1997 W L 313156, at \*2 (S.D.N.Y. June 9, 1997)); *see also Quarantino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995)). Rule 15(d) allows a party to supplement a pleading with matters that occurred after the filing of the original complaint, but pertain to the original pleading. *Albrecht v. Long Island R.R.*, 134 F.R.D. 40, 41 (E.D.N.Y. 1991); *see also McLean v. Scully*, No. 90 Civ. 2590, 1991 W L 274327, at \*1 (S.D.N.Y. Dec. 9, 1991) (the supplemental pleading should be "adequately related to the originally stated claims"). The standard for a motion to supplement is the same as for a motion to amend the pleadings under Rule 15(a). *Klos v. Haskell*, 835 F. Supp. 710, 715 (W.D.N.Y. 1993).

In the case of proposed amendments where new defendants are to be added, the Court must also look to Rules 20 and 21. *Ward v. LeClaire*, No. 9:07-CV-0026 (LEK/RFT), 2008 WL 182206, at \*3 (N.D.N.Y. Sept. 26, 2007) (citing *United States v. Chilstead Bldg. Co.*, No. 96-CV-0641 (N.D.N.Y. Nov. 7, 1997) (McAvoy, C.J.)). Rule 21 states that a party may be added to an action "at any time [and] on just terms." Fed. R. Civ. P. 21. Rule 21 is "intended to permit the bringing in of a person, who through inadvertence, mistake or for some other reason, had not been made a party and whose presence as a party is later found necessary or desirable." *Goston v. Potter*, No. 9:08-CV-0478 (FJS/ATB), 2010 W L 4774238, at \*5 (N.D.N.Y. Sept. 21, 2010) (quoting *United States v. Commercial Bank of N. Am.*, 31 F.R.D. 133, 135 (S.D.N.Y. 1962) (internal quotations marks omitted)). [3] Rule 20(a)(2) is liberally construed "so as to promote judicial economy and allow related claims to be tried within a single proceeding." *Equal Emp't Opportunity Comm'n v. Nichols Gas & Oil, Inc.*, 518 F. Supp. 2d 505, 508-09 (W.D.N.Y. 2007) (citing, inter alia, *Barr Rubber Prods. Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1127 (2d Cir. 1970)).

## B. Analysis

**\*3** Because plaintiff has submitted a series of motions seeking permission to amend his complaint, the Court will first review the Fifth Motion to Amend, which plaintiff has labeled as his "Final Amended Complaint and Addition." Dkt. No. 64.

### 1. The Fifth Motion to Amend

Construing plaintiff's Fifth Motion to Amend liberally, in addition to requesting permission to amend his original claims against the original defendants, plaintiff seeks permission to supplement his complaint to assert allegations of wrongdoing against new defendants that occurred after he filed his complaint. *See generally* Fifth Motion to Amend. Specifically, the proposed amended pleading alleges wrongdoing by the original defendants to this action that occurred, if at all, at Auburn C.F. between December 23, 2014 and February, 2015. *Id.* Plaintiff also requests permission to add multiple new defendants to this action in order to assert allegations against them relating in small part to events that took place while he was still at Auburn C.F., but in

Girard v. Hickey, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 272 of 301

large part to subsequent events that occurred at Upstate Correctional Facility ("Upstate C.F.") between February, 2015 and March, 2015; at Clinton Correctional Facility ("Clinton C.F.") between March 2015 and June or July, 2015; and at Great Meadow Correctional Facility ("Great Meadow C.F.") beginning on or about July, 2015. *Id.*

### a. Alleged Wrongdoing at Auburn C.F.

In his proposed amended complaint, plaintiff restates (1) the Eighth Amendment excessive force claims against defendants Thomas, Hickey, Venditti, Abate, and Gilfus and (2) the First Amendment retaliation claims against defendants Hickey, Venditti, and Thomas that survived sua sponte review, as set forth in the March 2015 Order. Fifth Motion to Amend at 3-4. Plaintiff also seeks to restate claims against defendants Graham and Cuttle that were dismissed without prejudice by the March 2015 Order, and to assert claims arising out of his confinement at Auburn C.F. against newly named defendants Conners, Dugan, Walawender, Annucci, Bellamy, and Koenigsman. *Id.* at 3-6. In support of these new claims, plaintiff alleges the following. In retaliation for a lawsuit that plaintiff had filed against him, defendant Graham retaliated against plaintiff by placing him near defendant Thomas whom he knew presented a danger to plaintiff; plaintiff was then allegedly assaulted by defendant Thomas. *Id.* at 2-3. As a result of alleged assaults on December 23, 2014, plaintiff suffered the following injuries: bruises, lacerations in his mouth, a "muscular Bone Injury," difficulty breathing, a rip in his stomach, and loss of consciousness. *Id.* at 4. Defendants Conners and Dugan denied plaintiff appropriate medical care for his serious injuries following the assaults. *Id.* at 3-4. Defendant Cuttle presided as hearing officer over plaintiff's disciplinary hearing. *Id.* at 4-5. Prior to the hearing Cuttle threatened to find plaintiff guilty, and in the course of the proceedings, he denied plaintiff assistance the right to present evidence. *Id.* Cuttle found plaintiff guilty and sentenced him to serve 365 days in the Special Housing Unit, a 365-day loss of privileges, and a 6-month loss of good time. *Id.* Plaintiff wrote to defendants Annucci, Bellamy, and Koenigsman about his assault and medical needs, but they were deliberately indifferent to plaintiff's needs. *Id.* at 6. Defendant Bellamy did, however, respond to plaintiff. *Id.* Plaintiff requested assistance from defendant Walawender but she "fail[ed] to acknowledge that cry for help." *Id.* at 5. Construed liberally, the proposed amended complaint alleges the following claims that arose during plaintiff's incarceration at Auburn C.F. against the

following defendants: (1) Eighth Amendment excessive force claims against defendants Thomas, Hickey, Venditti, Abate, and Gilfus; (2) First Amendment retaliation claims against defendants Hickey, Venditti, Thomas, and Graham; (3) an Eighth Amendment failure-to-protect claim against defendant Graham; (4) a Fourteenth Amendment due process claim against defendant Cuttle; (5) Eighth Amendment medical indifference claims against defendants Conners, Dugan, and Walawender; and (5) supervisory claims against defendants Annucci, Bellamy, and Koenigsman.

**\*4** Upon review, and with due regard for plaintiff's status as a pro se litigant, the Court grants plaintiff's motion to amend insofar as he seeks to assert the claims against defendants Thomas, Hickey, Venditti, Abate, Gilfus, Graham, Cuttle, Conners, Dugan, Annucci, and Koenigsman, as those claims are outlined herein above. However, the Court finds that plaintiff fails to state a claim against defendants Walawender or Bellamy, and thus the Court denies this aspect of his Fifth Motion to Amend.

Although plaintiff's Fifth Motion to Amend has been granted with respect to the Fourteenth Amendment due process claim against defendant Cuttle, for the reasons that follow, the Court will not at the present time direct service of the amended complaint upon defendant Cuttle or require a response from defendant Cuttle to the amended complaint.

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a Section 1983 action seeking money damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless that "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal ... or called into question by a federal court's issuance of a writ of habeas corpus ...." *Heck*, 512 U.S at 487 (internal citation omitted). [4] Moreover, the *Heck* Court directed that "when a state prisoner seeks dam ages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* (emphasis added). [5] Conversely, where the Section 1983 action even if successful will *not* demonstrate that invalidity of any outstanding criminal judgment or prison disciplinary determination against the plaintiff, the court should allow the

Girard v. Hickey, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 273 of 301

action to proceed. *See id.* (footnote omitted). In a subsequent case, *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court made clear that Heck's favorable termination rule applies to challenges made under Section 1983 to procedures used in disciplinary proceedings that deprived a prisoner of good time credits. *Peralta v. Vasquez*, 467 F.3d 98, 103 (2d Cir. 2006).

In *Peralta*, the Second Circuit ruled that Heck's "favorable termination" rule was not an absolute bar to a prisoner subject to " mixed sanctions," i.e., "sanctions that affect both (a) the duration of his imprisonment and (b) the conditions of his confinement ...." *Id.* at 104. The Second Circuit held that "a prisoner subject to such mixed sanctions can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule, *but ... he can only do so if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement*." *Id.* (emphasis in original).

**\*5** Because plaintiff received both segregated confinement and a recommended loss of good time as a result of defendant Cuttle's actions, plaintiff was subjected to "mixed sanctions" affecting both the duration and the conditions of his confinement. Since plaintiff has not demonstrated that this determination has been invalidated, the Court finds that *Heck* bars the claim against defendant Cuttle unless plaintiff "abandon[s], not just now, but also in any future proceeding, any claims he may have with respect to the duration of his confinement that arise out of the proceeding he is attacking in [this] § 1983 suit." (i.e., the recommended loss of good time). *Id.*

Accordingly, plaintiff is directed to advise the Court in writing, within thirty (30) days of the filing date of this Decision and Order, whether he waives for all times all claims against defendant Cuttle in this action relating to disciplinary sanctions affecting the duration of his confinement (i.e., the recommended loss of good time) in order to proceed with his claims against defendant Cuttle challenging the sanctions affecting the conditions of his confinement. The Court specifically advises plaintiff that the Court will deem his failure to file this statement (the "*Peralta* Waiver") within the required time to constitute his refusal to waive these claims, and such failure will result in the dismissal of

defendant Cuttle, and the Fourteenth Amendment due process claim against him, from this action without prejudice.

**b. Claims Arising at Upstate C.F.,
Clinton C.F., and Great Meadow C.F.**

The remainder of plaintiff's proposed amended complaint relates to alleged misconduct that occurred, if at all, after plaintiff was transferred out of Auburn C.F. in or about February, 2015. Fifth Motion to Amend at 6-9. Defendants oppose the addition of these new defendants and claims arguing, among other things that these claims concern "separate incidents" which are "unrelated" to the original Auburn C.F. claims, "each of which involved completely different Defendants" and which did not occur at Auburn C.F., but rather at "separate correctional facilities." Dkt. No. 67-1 at 7-19. Defendants assert that the joinder of these multiple individuals and claims is improper because the claims do not present common questions of law and fact; the claims do not arise out of the same transaction or occurrence as the original claims; defendants would be prejudiced if the new claims were allowed to go forward; the claims involve different evidence and witnesses; and there is no evidence to suggest that judicial economy would be served by joining these new claims and defendants. *Id.* at 8-19 (citing, inter alia, Fed. R. Civ. P. 20, 21).

"Courts regularly deny motions to amend where the moving party seeks to add claims involving collateral matters, based on different factual allegations and distinct legal theories, from the claims already at issue in a case." *Amusement Indus., Inc.*, 2014 WL 4460393, at \*13 (collecting cases). In addition, leave to amend is properly denied "where the belated motion would unduly delay the course of proceedings by, for example, introducing new issues for discovery." *Grace v. Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000) (internal citation omitted).

The Court has reviewed plaintiff's proposed amended complaint thoroughly and with due regard for his status as a pro se litigant. Based upon that review, and considering the factors for granting amendment and supplementation of a complaint, the Court finds that the claims arising during plaintiff's confinement at Upstate C.F., Clinton C.F., and Great Meadow C.F. that plaintiff now seeks to pursue in this action are legally and factually distinct from the pending claims arising during his confinement at Auburn C.F. Apart from Annucci and Koenigsman, who are employed at

the Central Office for the New York State Department of Corrections and Community Supervision, none of the new defendants are alleged to have been involved in the matters which gave rise to the Auburn C.F. claims. The mere fact that some of plaintiff's claims relate to his alleged need for medical care for injuries allegedly sustained at Auburn C.F. does not alter this Court's conclusion that the claim s are distinct and unrelated, because any medical care claims arising after plaintiff's transfer out of Auburn C.F. are, with the exception of supervisory defendants Annucci and Koenigsman, against new defendants at new facilities, and would require different discovery, witnesses, and evidence.

**\*6** In considering plaintiff's motion, the Court is mindful of the fact that discovery has not been completed. However, because this case presently includes multiple causes of action asserted against multiple defendants, the Court finds that the addition of numerous other defendants and unrelated claims arising at entirely distinct locations will necessarily prolong this action and impose additional expense on defendants. Moreover, the Court finds that adding these new claims would not aid in the efficient resolution of this action. *See Andino v. Fischer*, 698 F. Supp. 2d 362, 374 (S.D.N.Y. 2010) (denying motion to supplement because "such a supplementation does not aid in the efficient resolution of the instant action" and would prejudice the existing defendants).

Based upon the foregoing, the Court denies the remaining portions of plaintiff's Fifth Motion to Amend alleging claims that arose at Upstate C.F., Clinton C.F., and Great Meadow C.F., after he was transferred out of Auburn C.F. [6]

### 2. The Remaining Motions to Amend

Plaintiff's Fifth Motion to Amend has been granted in part and denied in part, and the proposed amended pleading, as modified by this Decision and Order, is the operative pleading. In light of this, plaintiff's First, Second, Third, and Fourth Motions to Amend (Dkt. Nos. 38, 39, 47, and 59) are denied as moot.

### III. MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

"In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the

merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.'" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted)). However, when the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the burden is even higher. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (internal quotation marks omitted)). A mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts.*, 598 F.3d at 35 n.4) (internal quotation marks omitted)); *see also Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) (a plaintiff seeking a mandatory injunction must make a "clear" or "substantial" showing of a likelihood of success on the merits of his claim). The same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order. *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992); *Perri v. Bloomberg*, No. 06-CV-0403, 2008 WL 2944642, at \* 2 (E.D.N.Y. Jul. 31, 2008). The district court has wide discretion in determining whether to grant preliminary injunctive relief. *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

In his motion for preliminary injunctive relief, plaintiff claims that he has "life threatening" injuries and is "being deprived [of] medical attention." Dkt. No. 43-2 at 1. In a supplemental submission, plaintiff alleges that he is not safe at Great Meadow C.F. because he is being "harassed and sexually assaulted" by staff at that facility. Dkt. No. 55 at 1-2. Construed liberally, plaintiff requests a court order directing that he receive adequate medical care from "an Outside Hospital Doctor" and that DOCCS staff be enjoined from assaulting and harassing him. Dkt. No. 43 at 1; *see also* Dkt. No. 43-2 at 1. Plaintiff requests injunctive relief against the following defendants-Dugar, Hickey, Thomas, Gilfus, Venditti, Abate, Cuttle, Graham, Annucci, and Koenigsman; as well as against the following non-parties-Silver Bird, [7]

Girard v. Hickey, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00391-LEK-TWD    Document 70    Filed 04/23/20    Page 275 of 301

Yuiser, Rogue, Western, Novack, Melecio, Uhler, Miller, Sullivan, and John Doe. Dkt. No. 43 at 1.

**\*7** Defendants have responded in opposition to the motion. Dkt. No. 48. Defendants argue, among other things, that plaintiff does not allege irreparable harm, his request for relief (apart from his request for money) is "patently unclear," and plaintiff fails to show a likelihood of success on the merits. *Id.* at 3-4.

"'To prevail on a motion for preliminary injunctive relief, the moving party must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint."' *Candelaria v. Baker,* No. 00-CV-0912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar. 10, 2006) (citations omitted). *See, e.g., Scarborough v. Evans,* No. 9:09-CV-0850 (NAM/DEP), 2010 WL 1608950, at \*2 (N.D.N.Y. Apr. 20, 2010) (motion for preliminary injunction alleging use of excessive force and denial of medical care by non-parties denied where complaint alleged denial of mental health care and proper conditions of confinement); *Lewis v. Johnston,* No. 9:08-CV-0482 (TJM/ATB), 2010 WL 1268024, at \*3 (N.D.N.Y. Apr. 1, 2010) (denying motion for injunctive relief based upon actions taken by staff at Great Meadow Correctional Facility in 2010, where the complaint alleged wrongdoing that occurred at Franklin and Upstate Correctional Facilities in 2006 and 2007). Here, plaintiff alleges that since his transfer to Great Meadow C.F. in or about July, 2015, he has been harassed, assaulted and denied medical care. *See* Dkt. No. 43. These allegations are not sufficiently related to the claims in the newly accepted amended complaint that he was assaulted, denied medical care, retaliated against, and denied due process at Auburn C.F. in 2014 through February, 2015. *See generally* Fifth Motion to Amend.

Even if the allegations in plaintiff's motion were related to the claims in the underlying amended complaint, the motion would still be denied because plaintiff has failed to substantiate any allegations of irreparable harm with evidence in admissible form or to demonstrate, with evidence, a likelihood of success on the merits of his underlying claims, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F. Supp. 547, 561 (E.D.N.Y. 1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Res., Inc.,* 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals.").

To the extent that plaintiff seeks injunctive relief against Silver Bird, Yuiser, Rogue, Western, Novack, Melecio, Uhler, Miller, Sullivan, and John Doe who are not defendants in the present action, injunctive relief is available against non-parties only under very limited circumstances, none of which are present here. *See* Fed. R. Civ. P. 65(d)(2); *Doctor's Associates, Inc. v. Reinert & Duree, P.C.,* 191 F.3d 297, 302-03 (2d Cir. 1999); *United States v. Regan,* 858 F.2d 115, 120 (2d Cir. 1988); *see also In re Rationis Enterprises, Inc. of Panama,* 261 F.3d 264, 270 (2d Cir. 2001) ("A court may not grant a final, or even an interlocutory, injunction over a party over whom it does not have personal jurisdiction.").

Finally, in this Circuit, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir. 2006); *see also Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir. 1996). Thus, insofar as plaintiff seeks injunctive relief against defendants Dugar, Hickey, Thomas, Gilfus, Venditti, Abate, Cuttle, Graham, who are all employed at Auburn C.F., that aspect of his motion is denied.

**\*8** Accordingly, for the foregoing reasons, plaintiff's motion for preliminary injunctive relief (Dkt. No. 43) is denied in its entirety.

### IV. MOTIONS FOR APPOINTMENT OF COUNSEL

Turning to plaintiff's motions for appointment of counsel, Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392-93 (2d Cir. 1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [The Court] should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the

Girard v. Hickey, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00391-LEK-TWD    Document 70    Filed 04/23/20    Page 276 of 301

need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)) (internal quotation marks omitted). This is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Hodge*, 802 F.2d at 621).

Even if the Court were to conclude that plaintiff's position seems likely to be of substance, the Court finds that the relevant factors weigh decidedly against granting plaintiff's motion at this time. For example, the Court finds that: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination, if or when this case progresses to trial, as is the case in many actions brought under Section 1983 by pro se litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez*, 899 F. Supp. at 974; (4) if this case survives any dispositive motions filed by defendants, it is highly probable that this Court will appoint trial counsel at the final pretrial conference; and (5) it is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. Although plaintiff claims that "due to [his] mental ability" he is unable to effectively litigate his claims, plaintiff's exhibit in support of his request for appointment of counsel, *see* Dkt. No. 81 at 4,[8] and his multiple submissions filed to date in this action, belie this claim. Indeed, plaintiff has been able to file a motion for injunctive relief and five motions to amend, and has been successful in amending his original claims to re-instate claims and defendants that were originally dismissed.

**\*9** For these reasons, plaintiff's motions for the appointment of counsel (Dkt. Nos. 51, 81) are denied.

**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's Fifth Motion to Amend (Dkt. No. 64) is **GRANTED in part and DENIED in part** as set forth above; and it is further

**ORDERED** that the Clerk of the Court is directed to (i) file the proposed amended complaint (Dkt. No. 64 at 2-10) as the amended complaint in this action; and (ii) revise the docket to add Anthony Annucci, Commissioner; Carl Koenigsman, Medical Deputy; Harold Graham, Superintendent, Auburn Correctional Facility; Cuttle, Captain, Auburn Correctional Facility; Conners, Sergeant, Auburn Correctional Facility; and Jessica Dugan, R.N., Auburn Correctional Facility as defendants.[9] The amended complaint, **as modified herein**, will supersede and replace the previously filed complaint and will be the operative pleading;[10] and it is further

**ORDERED** that the Clerk shall issue summonses for defendants Annucci, Koenigsman, Graham, Conners, and Dugan, and forward them, along with copies of the amended complaint, to the United States Marshal for service upon defendants Annucci, Koenigsman, Graham, Conners, and Dugan; and it is further

**ORDERED** that a formal response to plaintiff's amended complaint be filed by defendants Annucci, Koenigsman, Graham, Conners, and Dugan, or their counsel, as provided for in Rule 12 of the Federal Rules of Civil Procedure; and it is further

**ORDERED** that defendants Hickey, Venditti, Abate, Thomas, and Gilfus shall file a response to the amended complaint **within (30) thirty days** of the filing date of this Decision and Order; and it is further

**ORDERED** that plaintiff shall advise the Court in writing, **within thirty (30) days** of the filing date of this Decision and Order, whether he waives **for all times** all claims against defendant Cuttle in this action relating to disciplinary sanctions affecting the duration of his confinement (recommended good time loss) in order to proceed with his claims challenging the sanctions affecting the conditions of his confinement (i.e., the *Peralta* Waiver); and it is further

**ORDERED** that in the event plaintiff fails to timely file the required *Peralta* Waiver, he will be deemed to

Girard v. Hickey, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 277 of 301

have refused to waive the claims against defendant Cuttle relating to disciplinary sanctions affecting the duration of his confinement (recommended good time loss), and the Fourteenth Amendment due process claims against defendant Cuttle alleged in the amended complaint shall be dismissed without prejudice, without further order of this Court. In that event, defendant Cuttle will also be dismissed from this action without prejudice; and it is further

**\*10  ORDERED** that upon plaintiff's filing of the *Peralta* Waiver, the Clerk shall return this file to the Court for further review; and it is further

**ORDERED** that plaintiff's First, Second, Third, and Fourth Motions to Amend (Dkt. Nos. 38, 39, 47, and 59) are **DENIED**; and it is further

**ORDERED** that plaintiff's motion for preliminary injunctive relief (Dkt. No. 43) is **DENIED**; and it is further

**ORDERED** that plaintiff's motions for appointment of counsel (Dkt. Nos. 51, 81) are **DENIED**; and it is further

**ORDERED** that the following pretrial deadlines are reset: discovery is due by May 20, 2016, and dispositive motions are to be filed by July 15, 2016; and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 915253

## Footnotes

1   Plaintiff's complaint identified this defendant as "C. Tomas," but upon this defendant's appearance, the docket was modified to reflect that his actual name is "Charles Thomas." *See* Dkt. No. 26. The Court will refer to this defendant as Thomas.

2   The remaining pretrial deadlines have expired.

3   "Rule 21 cannot be read alone but must be read in the light of Rules 18, 19 and 20[.]" *Commercial Bank of N. Am,* 31 F.R.D. at 135. In this respect, the federal rules state, in part, that "[p]ersons ... may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).

4   Absent such a showing, an inmate may only seek relief in the federal courts through a petition for habeas corpus. *See Jenkins v. Haubert,* 179 F.3d 19, 23 (2d Cir. 1999).

5   In a subsequent case, the Supreme Court noted that "Heck uses the word 'sentence' to refer not to prison procedures, but to substantive determinations as to the length of the confinement." *Wilkinson v. Dotson,* 544 U.S. 74, 83 (2005) (citation omitted). The Court further explained that "*Heck* uses the word 'sentence' interchangeably with such other terms as 'continuing confinement' and 'imprisonment.'" *Id.* (citing [ Heck,] 512 U.S., at 483, 486, 114 S. Ct. 2364) (other citation omitted).

6   Should plaintiff wish to pursue his supplemental claims, he may do so by filing a separate civil action(s).

7   In the Fifth Motion to Amend, plaintiff appears to refer to this defendant at Silverberg. Dkt. No. 64 at 1.

8   This exhibit indicates that when plaintiff was examined in March, 2014, his thought process was "organized, linear and logical" and his mood was "stable." *Id.*

9   The only defendants remaining in this action are Hickey, Venditti, Abate, Thomas, Gilfus, Graham, Cuttle, Conners, Dugan, Annucci, and Koenigsman.

10  The claims that remain in this action are the following claims arising during plaintiff's confinement at Auburn C.F.: (1) Eighth Amendment excessive force claims against defendants Thomas, Hickey, Venditti, Abate, and

Girard v. Hickey, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00391-LEK-TWD   Document 70   Filed 04/23/20   Page 278 of 301

Gilfus; (2) First Amendment retaliation claims against defendants Hickey, Venditti, Thomas, and Graham; (3) an Eighth Amendment failure-to-protect claim against defendant Graham; (4) a Fourteenth Amendment due process claim against defendant Cuttle; (5) Eighth Amendment medical indifference claims against defendants Conners and Dugan; and (5) supervisory claims against defendants Annucci and Koenigsman.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 Positive
As of: April 23, 2020 6:57 PM Z

## *Forrest v. Cnty. of Nassau*

United States District Court for the Eastern District of New York

February 2, 2016, Decided; February 2, 2016, Filed

CV 14-6979 (JFB) (AKT)

**Reporter**
2016 U.S. Dist. LEXIS 16531 *

HORATIO FORREST, Pro Se, Plaintiff, -against- THE COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL FACILITY, and SHERIFF MICHAEL SPOSATO, Defendants.

**Subsequent History:** Adopted by, Dismissed by, Dismissed without prejudice by, in part *Forrest v. Nassau Cnty. Corr. Ctr., 2016 U.S. Dist. LEXIS 25609 (E.D.N.Y., Feb. 25, 2016)*

## Core Terms

Grievance, allegations, spider, exhaustion, amended complaint, extermination, Sheriff, Defendants', medical care, inmate, cell, administrative remedy, bite, motion to dismiss, sick call, deprivation, conditions of confinement, deliberate indifference, plaintiff's claim, recommends, vermin, prong, quotation, municipality, pleadings, rights, pro se, confinement, roaches, custom

**Counsel:** [*1] Horatio Forrest, Plaintiff, Pro se, East Meadow, NY.

For Nassau County Correctional Center, The County Of Nassau, Sheriff Michael Sposato, Defendants: Thomas Lai, Nassau County Attorney Office, Mineola, NY.

**Judges:** A. KATHLEEN TOMLINSON, United States Magistrate Judge.

**Opinion by:** A. KATHLEEN TOMLINSON

## Opinion

### REPORT AND RECOMMENDATION

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

#### I. PRELIMINARY STATEMENT

*Pro se* Plaintiff Horatio Forrest ("Plaintiff"), currently incarcerated at Nassau County Correctional Center ("NCCC"), brings this civil rights action, pursuant to *42 U.S.C. § 1983*, against Defendants the County of Nassau ("Nassau County" or "the County"), NCCC, and Sheriff Michael Sposato ("Sheriff Sposato") (collectively, "Defendants"). *See generally* Amended Complaint ("Am. Compl.") [DE 20]. Plaintiff alleges that Defendants violated his constitutional rights by subjecting him to unconstitutional conditions of confinement and by acting with deliberate indifference to his serious medical needs. *See id.* Defendants now move under *Federal Rule of Civil Procedure 12(b)(6)* to dismiss the Amended Complaint for failure to state a claim. *See* Notice of Motion [DE 31]. Defendants argue that the Amended Complaint should be dismissed because Plaintiff has not exhausted his administrative [*2] remedies as required under the Prison Litigation Reform Act of 1995 ("PLRA") and, in any event, Plaintiff has failed to state a plausible claim under *Section 1983*. *See generally* Defendants' Memorandum of Law In Support of County Defendants' Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(6)* ("Defs.' Mem.") [DE 31-4]. Plaintiff generally opposes the motion. *See generally* Plaintiff's Narrative Statement/Opposition ("Pl.'s Opp'n") [DE 34].

2016 U.S. Dist. LEXIS 16531, *2

Judge Bianco has referred Defendants' motion to this Court for a Report and Recommendation. *See* DE 41. Having carefully reviewed the factual allegations in the Amended Complaint and other submissions by the Plaintiff, the arguments advanced by the parties in their written submissions, and the applicable case law, the Court respectfully recommends to Judge Bianco that the motion to dismiss be GRANTED, in part, and DENIED, in part, and that Plaintiff be granted leave to amend his pleadings in accordance with this Report and Recommendation.

## II. BACKGROUND FACTS

### A. Standards for Reviewing Plaintiff's Factual Allegations

Because Plaintiff is proceeding *pro se*, the Court is obligated to construe his pleadings liberally to raise the strongest arguments that they suggest. *See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474-75 (2d Cir. 2006)* (per curiam). In **[\*3]** doing so, the Court may consider the factual allegations raised in a *pro se* plaintiff's opposition papers "to supplement the allegations in the complaint." *Williams v. Wellness Med. Care, P.C., No. 11-CV-5566, 2013 U.S. Dist. LEXIS 139626, 2013 WL 5420985, at \*1 n.1 (S.D.N.Y. Sept. 27, 2013)* (internal quotation marks omitted); *see Smolen v. Fischer, No. 12-CV-1856, 2012 U.S. Dist. LEXIS 120158, 2012 WL 3609089, at \*1 (S.D.N.Y. Aug. 23, 2012)* ("Although certain factual allegations in Smolen's opposition affidavit are not contained in the complaint, this Court will deem the complaint amended to include those allegations since Smolen is a *pro se* plaintiff.") (citing, *e.g., Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007))* (reversing dismissal of prisoner's *Section 1983* deliberate indifference suit where complaint's factual allegations satisfied *Fed. R. Civ. P. 8* and "[p]etitioner, in addition, bolstered his claim by making more specific allegations in . . . later filings"); *Sommersett v. City of New York, 09-CV-5916, 2011 U.S. Dist. LEXIS 71357, 2011 WL 2565301, at \*3 (S.D.N.Y. 2011)* ("where a *pro se* plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations"); *Ibok v. Sector, No. 05-CV-6584, 2006 U.S. Dist. LEXIS 4986, 2006 WL 302336, at \* 1, n.1 (S.D.N.Y. Feb. 9, 2006)* ("The Court may consider the factual allegations in plaintiff's

Response to supplement those in his complaint because of the liberal standard afforded to the pleadings of *pro se* litigants.") (citations omitted). Accordingly, in deciding the motion to dismiss, the Court will consider factual allegations **[\*4]** both in the Amended Complaint and Plaintiff's opposition.

Plaintiff has also filed the following records with the Court: (1) prisoner grievance form dated October 6, 2014 ("the October 6, 2014 Grievance"), (2) a November 7, 2014 Inmate Grievance Receipt from the Grievance Unit of the Nassau County Sheriff's Department Division of Correction ("Sheriff's Department") dated November 7, 2014 ("the November 7, 2014 Grievance Receipt"), and (3) a "Sick Call Request" form from Armor Correctional Health Services, Inc. ("Armor") dated October 2, 2014 ("October 2, 2014 Sick Call Request").[1] *See* DE 13, DE 23. The grievance documents are attached to Plaintiff's March 9, 2015 motion to amend the Complaint, *see* DE 13, and the sick call request is attached to Plaintiff's April 20, 2015 motion to compel, *see* DE 23.

"'While courts generally do not consider matters outside the pleadings, they may consider documents attached to the pleadings, documents referenced **[\*5]** in the pleadings, or documents that are integral to the pleadings in order to determine if a complaint should survive a 12(b)(6) motion.'" *Rivera v. Lempke, 810 F. Supp. 2d 572, 575 (W.D.N.Y. 2011)* (quoting *Smart v. Goord, 441 F. Supp. 2d 631, 637 (S.D.N.Y. 2006))* (internal alteration omitted); *see ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014)*; *Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002)*. Here, Plaintiff specifically refers to the October 6, 2014 Grievance and the October 2, 2014 Sick Call Request in the Amended Complaint, *see* Am. Compl. ¶ II(C)(1), and the Court may therefore consider these records in conjunction with the motion to dismiss, *see, e.g., Lee v. O'Harer, No. 13-CV-1022, 2014 U.S. Dist. LEXIS 178868, 2014 WL 7343997, at \*8 n.11 (N.D.N.Y. Dec. 23, 2014)* (observing that the court could consider copies of grievances the plaintiff attached to his response to the motion to dismiss since the plaintiff referred to the grievances specifically in his complaint); *Rivera, 810 F. Supp. 2d at 575* (holding that the court could "consider the excerpt from the record of plaintiff's

---

[1] Plaintiff filed an additional Sick Call Request which is dated February 8, 2015. *See* DE 23. The Court will not consider this Sick Call Request in deciding the motion to dismiss since the document is dated after the filing of the Amended Complaint.

2016 U.S. Dist. LEXIS 16531, *5

grievance proceedings that he has submitted as Exhibit A to his affirmation in opposition to defendants' motion to dismiss").

As for the November 7, 2014 Grievance Receipt, although Plaintiff does not reference this document in the Amended Complaint, he alleges that he "didn't receive a reply [to the October 6, 2014] grievance so [he] filled out a next (sic) grievance and then [they] send [an] exterminator to exterminate [his] cell." Am. Compl. ¶ II(C)(2). **[*6]** Construing this allegation liberally, the Court finds that the statement incorporates the November 7, 2014 Grievance Receipt by reference. Alternatively, the Court may consider the November 7, 2014 Grievance Receipt because it is "integral to the allegations of the complaint." _Islam v. Fischer, No. 07-CV-3225, 2008 U.S. Dist. LEXIS 19796, 2008 WL 650380, at *2 (S.D.N.Y. Mar. 6, 2008);_ see, e.g., _Blanche v. Pirelli, No. 08-CV-4752, 2009 U.S. Dist. LEXIS 72903, 2009 WL 2499737, at *2 (S.D.N.Y. Aug. 7, 2009)_ (where the plaintiff "d[id] not refer to his grievance in his complaint" but included it "in his opposition papers," holding that the court could consider the document as "integral" to the complaint in light of the defendant's _Rule 12(b)(6)_ motion to dismiss based on failure to exhaust administrative remedies); cf. _Wade v. Fischer, No. 10 CV 5417, 2012 U.S. Dist. LEXIS 47084, 2012 WL 1118206, at *1 (E.D.N.Y. Mar. 30, 2012)_ (holding that the court "may consider the record of the grievance plaintiff filed at Arthur Kill [Correctional Facility], attached as Exhibit A to defendants' notice of motion" without converting the defendants' _Rule 12(b)(6)_ motion to a motion for summary judgment because those grievance documents are either incorporated by reference into the complaint or relied on so heavily that they are integral to the complaint).

Based on the foregoing information, the Court has derived the following factual allegations from (1) the Amended Complaint,[2] (2) Plaintiff's combined narrative statement/opposition to Defendants' motion **[*7]** to dismiss, (3) the October 6, 2014 Grievance, (4) the November 7, 2014 Grievance Receipt, and (5) the October 2, 2014 Sick Call Request. All facts alleged by Plaintiff are assumed to be true for purposes of deciding the motion to dismiss and are construed in a light most favorable to Plaintiff as the non-moving party. See, e.g., _LaFaro v. N.Y. Cardiothoracic Grp., 570 F.3d 471, 475_ _(2d Cir. 2009); Matthews v. City of N.Y., 889 F. Supp. 2d 418, 425 (E.D.N.Y. 2012)._

**B. Plaintiff's Injury and Medical Treatment**

On September 28, 2014, a spider bit Plaintiff on his back while he was housed in the E-1-G Dorm at NCCC. See Am. Compl. ¶ IV. By October 3, 2014, Plaintiff's spider bite had "swoll[en] up to the size of a golf ball." _Id._ at p. 6. Initially, a corrections officer named "Simpson" would not allow Plaintiff to go to "emergency sick call" and told Plaintiff that "the pain [he] was feeling was not an emergency." Pl.'s Opp'n at 1. Officer Simpson ordered Plaintiff back to his cell and wrote him a disciplinary ticket. See id. However, Plaintiff ultimately received medical treatment for his spider bite on that same day, October 3, 2014. See Am. Compl. at p. 6. Plaintiff alleges that a member of the prison **[*8]** medical staff "cut open" his wound "to drain the pus and blood out, and to get a sample of the blood and pus[] to send to the lab and test for MRSA." _Id._; see id. § IV.A.

On October 10, 2014, "the results came back from the lab" showing that Plaintiff had tested positive for MRSA. _Id._ at p. 6. Plaintiff was then transferred from the E-1-G Dorm to the medical clinic in "the D Building, D-2-D." _Id._ Plaintiff was moved back to the E-1-G Dorm once he was "medical[y] cleared for MRSA" on October 28, 2014. _Id._ The following day, Plaintiff was moved to the E-2-C Dorm. _Id._

Plaintiff alleges that he "continue[s] to feel pain and discomfort as a result of the poisonous spider bite." _Id._; see id. ¶ IV.A. Plaintiff suffers from "severe pain" and swelling in his back and spine area which "hinder [him] from doing a lot of the things [he] use[d] to do, and leaves [him] with a result of sleepless nights." _Id._ Armor medical staff have prescribed him "numerous pain killers and muscle relaxer[s]" to treat his injury. Pl.'s Opp'n at 2; see Am Compl. at p. 7-8. Plaintiff has submitted a witness list that includes nine Armor nurses and physician's assistants whom Plaintiff alleges dressed his wound and prescribed pain medication, muscle relaxers, and antibiotics. **[*9]** See Pl.'s Opp'n at 3-4.

**C. Conditions of Confinement at NCCC**

Plaintiff alleges that he "was bitten by a spider and . . . exposed to MRSA due to the failure of the Sheriff and the County to properly maintain the Nassau County Correctional Center with respect to sanitation and extermination of vermin." Am. Compl. § IV. According to

---

[2] The allegations in the Amended Complaint are cited by paragraph number or page number depending on where they appear in the form pleading.

Plaintiff, the NCCC "is a[n] unhygienic and unsanitary nightmare, and heavily vermin infested with mice[], roaches, spiders and other bugs as well." Pl.'s Opp'n at 2. Plaintiff also alleges that there are "no extermination procedures or vermin control whatsoever" at NCCC. *Id.* Plaintiff states that his allegations are based on "personal knowledge" gained from being confined at NCCC for nearly two years. *Id.*

#### D. Grievances

With respect to his use of the grievance procedures at NCCC, Plaintiff states in the Amended Complaint that he "fill[ed] out a few sick call requests[s]" concerning the spider bite and the pain he had been experiencing. Am. Compl. § II.C.1. In the October 2, 2014 Sick Call Request, Plaintiff wrote: "I have a big bump on my back[.] I'm in severe pain [and] I have been filling out sick call slips since 9/28/14." 10/2/14 Sick Call Request [DE 23].

Plaintiff also filed a **[*10]** grievance on October 6, 2014. *See* Am. Compl. § II.C.1. The October 6, 2014 Grievance states the following: "I was bit[] by a spider like 9 days ago and today I see a big red spider crawling around in the my cell[.] I kill[ed] him and gave it to the police[.] I always keep my cell spic and span." 10/6/14 Grievance [DE 13]. In the section entitled "Actions requested by the Grievant," Plaintiff wrote: "I w[ould] like for the cells to be exterminated [as] I don't want to be subject[ed] to be bit[] again by a next (*sic*) poisonous spider." *Id.*

Plaintiff asserts that, when he did not receive a response to the October 6, 2014 Grievance, he filled out second grievance with a copy of his first grievance attached. Am. Compl. § II.C.2. The November 7, 2014 Grievance Receipt issued by the Sheriff's Department refers to a November 6, 2014 grievance by Plaintiff "in reference to MAINTENANCE." 11/7/14 Grievance Receipt [DE 13]. The November 7, 2014 Grievance Receipt states that Plaintiff would be contacted by a Grievance Investigator. *See id.*

After Plaintiff filed his second grievance, an exterminator was sent to his cell. Am. Compl. § II.C.2. However, Plaintiff alleges that he still "see[s] spiders, roaches and mice[] here." *Id.*

#### [*11] E. Claims for Relief

Plaintiff alleges that Defendants violated his civil rights

due to their "negligence, gross negligence[,] malfeasance[, and] failure to properly maintain" the NCCC, and by acting with "deliberate . . . indifference." *Id.* § V. Plaintiff requests monetary damages in the amount of $5 million. *See id.*

Construed liberally, the Court finds that the Amended Complaint asserts claims under both *Section 1983* and state law. Specifically, Plaintiff appears to claim that Defendants (1) violated his constitutional rights under the *Eighth* and/or *Fourteenth Amendments*[3] by (a) ) subjecting him to certain unlawful conditions of confinement, and (b) exhibiting deliberate indifference to his serious medical needs; and (2) acted negligently in maintaining conditions at NCCC. *See generally* Am. Compl.

Defendants do not address Plaintiff's conditions of confinement claim in their memorandum of law and instead focus only on his inadequate medical care and negligence claims. *See generally* Defs.' Mem. However, Defendants have moved to dismiss Plaintiff's Amended Complaint in its entirety pursuant to *Rule 12(b)(6)*, *see* Notice Of Mot., and the Court will therefore consider all of Plaintiff's claims in recommending a disposition of Defendants' motion.

#### III. RELEVANT PROCEDURAL HISTORY

Plaintiff commenced this action by filing a Complaint against the NCCC on November 20, 2014, together with

_____

[3] The *Eighth Amendment* protects incarcerated prisoners from cruel and unusual punishment in the form of unsafe prison conditions and inadequate medical care, while "a person detained prior to conviction receives protection against [such] mistreatment . . . [under] the *Due Process Clause of the Fourteenth Amendment* if held in state custody." *Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009)*; *see City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983)* ("The *Due Process Clause* . . . require[s] the responsible government or governmental agency to provide medical care to [pretrial arrestees] . . . who have been injured while being **[*12]** apprehended by the police."). Here, Plaintiff has not specified a constitutional basis for his conditions of confinement and inadequate medical care claims, nor has he indicated whether he is a pre-trial detainee or a convicted prisoner. However, the lack of distinction is immaterial because, in this context, the standards for establishing a constitutional violation under the *Eighth Amendment* and the *Due Process Clause of the Fourteenth Amendment* are identical. *See Caiozzo, 581 F.3d at 72*; *accord Nielsen v. Rabin, 746 F.3d 58, 63 n.3 (2d Cir. 2014)*.

an application to proceed *in forma pauperis. See* DE 1, DE 2. By Order entered December 8, 2014, Judge Bianco granted Plaintiff's application to proceed *in forma pauperis.* DE 4.

On February 20, 2015, NCCC filed **[*13]** a letter to Judge Bianco requesting a pre-motion conference regarding NCCC's anticipated motion to dismiss the Complaint pursuant to *Rule 12(b)(6).* DE 11. NCCC stated in its letter that Plaintiff's Complaint should be dismissed because (1) the Complaint did not name a suable entity, (2) Plaintiff did not exhaust his administrative remedies, and (3) the Complaint did not state a claim for which relief could be granted. *See id.* Judge Bianco issued an Order on February 26, 2015 setting a briefing schedule on NCCC's motion to dismiss. *See* 2/26/15 Elec. Order.

On March 9, 2015, Plaintiff moved to amend his Complaint "to include the County of Nassau as a primary party." DE 13. Plaintiff included with his motion the October 6, 2014 Grievance and the November 7, 2014 Grievance Receipt. *See id.* On March 12, 2015, Judge Bianco granted Plaintiff's motion to amend, stating that, under the circumstances, Plaintiff was "permitted to file an amended complaint as of right" pursuant to *Rule 15(a)(1)(B).* DE 14. Judge Bianco directed Plaintiff to file an amended complaint no later than April 13, 2015. *See id.* On April 9, 2015, Plaintiff filed his Amended Complaint naming Nassau County, NCCC, and Sheriff Sposato as parties. DE 20. **[*14]**

On April 20, 2015, Plaintiff filed a motion to compel the release of his prison medical records from Armor. DE 23. Plaintiff included with his motion two sick call request forms. *See id.* This Court granted the motion to compel on June 1, 2015. *See* 6/1/15 Elec. Order.

Defendants filed the instant motion to dismiss the Amended Complaint on June 1, 2015. *See* DE 31. Plaintiff filed a combined narrative statement and opposition to Defendants' motion on June 11, 2015. *See* DE 34.[4] On July 28, 2015, Judge Bianco referred Defendants' motion to this Court for a Report and Recommendation. DE 41. The Court has stayed discovery in this matter until the motion to dismiss is finally resolved by Judge Bianco. *See* DE 43.

---

[4] At the July 31, 2015 Initial Conference before this Court, Plaintiff confirmed that he is "using his narrative statement to also serve as his opposition to the defendants' motion." DE 43 ¶ 1.

## IV. STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to *Rule 12(b)(6),* the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 176 (2d Cir. 2013)* (quotations and citation omitted); *Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013).* The plaintiff must satisfy **[*15]** "a flexible 'plausibility standard.'" *Iqbal v. Hasty, 490 F.3d 143, 157 (2d Cir. 2007), rev'd on other grounds sub nom. Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).* "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 546, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).* The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id. at 570; see Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 91 (2d Cir. 2010)* (holding that a complaint must set forth "a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'") (quoting *Twombly, 550 U.S. at 555*).

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* by setting forth a two-pronged approach to be utilized in analyzing a motion to dismiss. District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id. at 679; see id. at 678* ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly, 550 U.S. at 555*)). Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity **[*16]** and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully." *Id. at 678* (citing *Twombly, 550 U.S. at 556-57*) (internal citations omitted).

In addition, where, as here, a plaintiff is proceeding *pro se*, the complaint must be considered under a more lenient standard than that accorded "formal pleadings drafted by lawyers." *Bellamy v. Mt. Vernon Hosp., No. 07-CV-1801, 2009 U.S. Dist. LEXIS 54141, 2009 WL 1835939, at \*3 (S.D.N.Y. June 26, 2009)* (quoting *Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972))*. A court must construe a *pro se* plaintiff's pleading broadly and interpret it to raise the strongest arguments that it suggests. *See Hughes v. Rowe, 449 U.S. 5, 9, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980)*; *Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir. 2002)*; *see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008)* (holding that when a plaintiff proceeds *pro se*, the district court "is obliged to construe his pleadings liberally" and noting that "the dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). "However, mere conclusions of law or unwarranted deductions need not be accepted." *Alston v. Sebelius, No. 13-CV-4537, 2014 U.S. Dist. LEXIS 123613, 2014 WL 4374644, at \*5 (E.D.N.Y. Sept. 2, 2014)* (internal quotation marks omitted).

## V. DISCUSSION

### A. Exhaustion of [*17]  Administrative Remedies

Defendants assert that the Amended Complaint should be dismissed because Plaintiff has failed to exhaust his administrative remedies as required by the PLRA. *See* Defs.' Mem. at 5-6. Plaintiff argues in opposition that his "medical records and the Facility Administrative Record" demonstrate that he exhausted all prison remedies. Pl.'s Opp'n at 2. For the reasons set forth, the Court recommends that Defendants' motion to dismiss based on failure to exhaust grounds be DENIED as to Plaintiff's conditions of confinement claim, and GRANTED as to Plaintiff's inadequate medical care claim.

### 1. Legal Standard Under the PLRA

The PLRA provides in relevant part: "No action shall be brought with respect to prison conditions under *section 1983* of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are

exhausted." *42 U.S.C. § 1997e(a)*. "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" *Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009)* (quoting *Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002))*; *see, e.g., Jones v. Bock, 549 U.S. 199, 211, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)*; *Woodford, 548 U.S. at 85* ("exhaustion of available administrative **[*18]** remedies is required for any suit challenging prison conditions"). Moreover, this provision requires complete and proper exhaustion in accordance with the prison's administrative procedures, "regardless of whether the relief sought is offered through those procedures." *Porter, 534 U.S. at 532*; *see, e.g., Woodford, 548 U.S. at 85*; *Booth v. Churner, 532 U.S. 731, 741, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001)*.

The Supreme Court has made clear, however, that prisoners "are not required to specially plead or demonstrate exhaustion in their complaints." *Jones, 549 U.S. at 216*. Rather, "failure to exhaust is an affirmative defense under the PLRA" that must be raised and proven by defendants. *Id*. The PLRA does not require "total exhaustion." *Id. at 223*. Thus, "if some claims are exhausted and others are not, the unexhausted claims should be dismissed while the exhausted claims can go forward." *Mena v. City of New York, No. 12-CV-6838, 2013 U.S. Dist. LEXIS 49365, 2013 WL 1352081, at \*6 (S.D.N.Y. Apr. 4, 2013)* *report and recommendation adopted, 2013 U.S. Dist. LEXIS 96088, 2013 WL 3580057 (S.D.N.Y. July 10, 2013)* (citing *Jones, 549 U.S. at 223*); *see Tartt v. City of New York, No. 12-CV-5405, 2014 U.S. Dist. LEXIS 96808, 2014 WL 3702594, at \*2 (S.D.N.Y. July 16, 2014)* ("The Supreme Court in *Jones* rejected a 'total exhaustion' rule that would bar any lawsuit containing one unexhausted claim, instead requiring district courts to dismiss non-exhausted claims and permit the others to proceed.").

"[W]hile the PLRA's exhaustion requirement is mandatory, certain caveats apply." *Ruggiero v. Cnty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006)*. Even where a plaintiff did not formally exhaust his administrative remedies, exhaustion may be excused **[*19]** if (1) administrative remedies were not actually available to the prisoner; (2) defendants' own actions inhibited exhaustion, constituting a waiver of the defense; or (3) "special circumstances" justify non-exhaustion. *Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)*; *see, e.g, Messa v. Goord, 652 F.3d 305, 309 (2d Cir. 2011)*;

*Ruggiero, 467 F.3d at 175*.[5] Moreover, the Second Circuit has held "that an inmate who obtains a favorable resolution of his complaint through informal processes has exhausted available administrative remedies under the [New York Department of Correctional Services ("DOCS")] scheme." *Hemphill, 380 F.3d at 682 n.4* (citing *Marvin v. Goord, 255 F.3d 40, 43 n.3 (2d Cir. 2001)* (per curiam) (finding that the resolution of a grievance "through informal channels satisfies the exhaustion requirement."); *see Ortiz v. McBride, 323 F.3d 191, 194 (2d Cir. 2003)* (citing *Marvin* and stating that "[t]his court has noted that under the administrative scheme applicable to New York prisoners, resolution of an inmate's grievances through informal channels can satisfy the exhaustion requirement of *42 U.S.C. § 1997e(a)*").

## 2. Application to Plaintiff's Claims

Defendants argue that Plaintiff's own allegations demonstrate that he has failed to exhaust his administrative remedies prior to initiating this action. *See* Defs.' Mem. at 6. Defendants point out that NCCC "is bound to provide grievance procedures as outlined by the State." *Id.* (citing *9 N.Y.C.C.R.R. § 7032.1-.12* (2015) *statutory authority N.Y. Correct. Law § 45(4), (6), (15)* (McKinney 2015). Under those procedures,

> [i]nmate grievances are required to be filed in writing to the Grievance Coordinator within five

days of the aggrieved occurrence. *Id.* at *§ 7032.4(d)* (2015). If the Grievance Coordinator issues a negative finding, the inmate is entitled to appeal the finding to the Chief Administrative Officer within two business days of receipt. **[*21]** *Id.* at *§ 7032.4(j)*. Thereafter, if the Chief Administrative Officer finds against the inmate, the inmate is then entitled to appeal the Chief Administrative Officer's determination to the New York State Commission of Correction within three business days of receipt. *Id.* at *§ 7032.5(a)*.

Defs.' Mem. at 6. Defendants assert that Plaintiff failed to comply with these procedures "by not taking his grievance to the highest level of administrative review." *Id.* Defendants note that Plaintiff has admitted the Defendants sent an exterminator to his cell, and while he "alleges that he 'still sees spiders roaches and mices [*sic*] here[,]' Plaintiff does not allege that he appealed County Defendants' actions or filed another grievance." *Id.* For these reasons, Defendants argue the Amended Complaint must be dismissed for failure to exhaust all prison remedies. *See id.*

As discussed, the Court reads the Amended Complaint as alleging that Defendants violated Plaintiff's constitutional rights in two distinct ways: (1) by subjecting him to unconstitutional conditions of confinement, and (2) by providing inadequate medical care. *See generally* Am. Compl. The Court will examine Plaintiff's efforts to exhaust these claims individually. **[*22]**

### a. Conditions of Confinement Claim

Plaintiff's submissions indicate that he has filed at least one grievance regarding his conditions of confinement claim. *See* Am. Compl. ¶ II(C)(1); 10/6/14 Grievance. The October 6, 2014 Grievance states that, nine days earlier, Plaintiff was bitten by a spider and that later "[he] saw a big red spider crawling around in [his] cell." Am. Compl. ¶ II(C)(1). Plaintiff killed the spider and "gave it to the police." *Id.*[6] Under the section "Documentation or Information to support the grievance," Plaintiff wrote, *inter alia*, that his medical records from October 3, 2014 confirm that the injury he suffered was a spider bite and that the wound was "cut open." *Id.* Under the section "Actions requested by the Grievant," Plaintiff wrote that

---

[5] The Second Circuit has reserved the question of whether this test, set forth in *Hemphill,* applies in light of the Supreme Court's interpretation of the PLRA's exhaustion requirement in *Woodford v. Ngo, 548 U.S. 81, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006). See Amador v. Andrews, 655 F.3d 89, 102 (2d Cir. 2011); Macias v. Zenk, 495 F.3d 37, 43 n.1 (2d Cir. 2007).* However, "[c]ourts in this circuit have acknowledged the tension between *Woodford* and *Hemphill,* but have continued to use the *Hemphill* test in the absence **[*20]** of circuit authority to the contrary." *Kasiem v. Switz, 756 F. Supp. 2d 570, 576 n.5 (S.D.N.Y. 2010); see also Smith v. City of New York, No. 12-CV-3303, 2013 U.S. Dist. LEXIS 144122, 2013 WL 5434144, at *9 (S.D.N.Y. Sept. 26, 2013)* ("In the absence of a clear indication that *Hemphill* has been overruled, this Court has no choice but to treat it as good law."). Moreover, the Second Circuit has continued to hold post-*Woodford* that an inmate's failure to comply with the exhaustion requirement may be excused on the grounds enumerated in *Hemphill. See Messa, 652 F.3d at 309* (citing the *Hemphill* factors). Thus, this Court will similarly consider the exceptions provided in *Hemphill.*

---

[6] Indeed, a corrections officer appears to have written on the October 6, 2014 Grievance that "Inmate Forrest gave me the spider." *See* 10/6/14 Grievance.

2016 U.S. Dist. LEXIS 16531, *22

he "w[ould] like for the cells to be exterminated" because he did not want to be bitten again by another poisonous spider. *Id.* The Court notes that section entitled "Decision of the Grievance Coordinator" has not been completed. *Id.*

Plaintiff eventually received that the November 7, 2014 **[*23]** Grievance Receipt from the Sheriff's Department, which states the following:

> **To**: Inmate FORREST, HORATI[O] CC# 13006689
>
> **Location**: E2Cl3
>
> **From**: Grievance Unit
>
> **Date**: 11/7/2014
>
> **Subject: Your Grievance**
> This is to acknowledge receipt of your Grievance in reference to MAINTENANCE
> Dated 11/6/2014
> A Grievance Investigator will contact you concerning this matter.

11/7/14 Grievance Receipt. The Court points out that the November 7, 2014 Grievance Receipt states it is made in response to a grievance dated November 6, 2014. *See id.* Construing this document in light of Plaintiff's allegation that he filed a second grievance upon receiving no response to the October 6, 2014 Grievance, *see* Am. Compl. ¶ II(C)(2), it appears to the Court that the November 7, 2014 Grievance Receipt may have been issued in response to a second grievance filed by Plaintiff. Plaintiff alleges that Defendants sent an exterminator to exterminate his cell, but that he still sees spiders, roaches, and mice. *See id.*

"Dismissal under *Rule 12(b)(6)* for failure to exhaust is . . . appropriate only where nonexhaustion is apparent from the face of the complaint." *Roland v. Smith, 907 F. Supp. 2d 385, 388 (S.D.N.Y. 2012)* (citing *McCoy v. Goord, 255 F. Supp. 2d 233, 251 (S.D.N.Y. 2003)); accord Barrett v. Armor Corr. Health, Inc., No. 13-CV-1063, 2014 U.S. Dist. LEXIS 39142, 2014 WL 1220756, at *5 (E.D.N.Y. Mar. 20, 2014)* (quoting *Rivera v. Anna M. Kross Ctr., No. 10-CV-8696, 2012 U.S. Dist. LEXIS 15126, 2012 WL 383941, at *2 (S.D.N.Y. Feb. 7, 2012)).* Defendants argue that non-exhaustion is apparent here because "Plaintiff **[*24]** does not allege that he appealed County Defendants' actions or filed another grievance" after Defendants sent an exterminator to his cell. Defs.' Mem. at 6.

Defendants' argument misplaces the burden of proving PLRA exhaustion on the Plaintiff. *See Jones, 549 U.S. at 216* (holding that prisoners "are not required to specially plead or demonstrate exhaustion in their complaints" and that "failure to exhaust is an affirmative defense under the PLRA" that must be raised and proven by defendants). Because prisoners are not required to affirmatively plead exhaustion, courts in this Circuit have held that "the fact that [the p]laintiff has provided only the first step of his grievance process does not necessarily mean that he did not comply with the additional steps." *Jandres v. Armor Health Care Inc., No. 12-CV-3132, 2014 U.S. Dist. LEXIS 45608, 2014 WL 1330655, at *4 (E.D.N.Y. Mar. 31, 2014)*; *see Groenow v. Williams, No. 13-CV-3961, 2014 U.S. Dist. LEXIS 32149, 2014 WL 941276, at *3 (S.D.N.Y. Mar. 11, 2014)* (stating that "[w]here a prisoner indicates that he has taken some steps toward exhaustion, district courts will not normally infer from his silence as to any remaining steps that he has not fully exhausted," and collecting cases).

Moreover, viewing Plaintiff's allegations through the prism of *Rule 12(b)(6)*, the Court must construe his exhaustion claims liberally and read any ambiguities in his favor. *Randolph v. City of New York Dep't of Correction, No. 05-CV-8820, 2007 U.S. Dist. LEXIS 68104, 2007 WL 2660282, at *7 (S.D.N.Y. Sept. 7, 2007).* Plaintiff alleges that he filed a grievance on October 6, 2014 **[*25]** complaining of his spider bite and the unsanitary conditions at NCCC. *See* Am. Compl. ¶ II(C)(2); 10/6/14 Grievance. When he did not receive a response from the Sheriff's Department, Plaintiff filed another grievance. *See* Am. Compl. ¶ II(C)(2). Defendants thereafter sent an exterminator to Plaintiff's cell, but Plaintiff alleges that he still sees spiders, roaches, and mice. *Id.*

According to Defendants, Plaintiff's allegations could be read as saying that he filed grievances; that he eventually received a response from Defendants in the form of the extermination; and that, even though he still saw vermin in his cell after the extermination, he failed to file an appeal or take any other action with regard to his grievances once his cell was exterminated. If so, Defendants contend, then Plaintiff has failed to exhaust his administrative remedies.

There are several difficulties with Defendants' argument. First, Plaintiff has not affirmatively stated in any of his submissions "that he failed to follow all the required grievance procedures." *Randolph, 2007 U.S. Dist. LEXIS 68104, 2007 WL 2660282, at *7*; *see, e.g.,*

*Groenow, 2014 U.S. Dist. LEXIS 32149, 2014 WL 941276, at \*4*. Although the Amended Complaint lacks specifics as to whether Plaintiff further grieved his claim once Defendants exterminated his cell, **[\*26]** "that is not a valid basis for dismissal under *Jones*." *Groenow, 2014 U.S. Dist. LEXIS 32149, 2014 WL 941276, at \*4* (quoting *Johnson v. Westchester Cnty. Dep't of Corr. Med. Dep't, No. 10-CV-6309, 2011 U.S. Dist. LEXIS 78202, 2011 WL 2946168, at \*2 (S.D.N.Y. July 19, 2011))* (internal alteration omitted); *see Randolph, 2007 U.S. Dist. LEXIS 68104, 2007 WL 2660282, at \*8* ("Since under *Jones* there is no obligation that a plaintiff plead the details of his efforts to exhaust, [Plaintiff]'s failure to mention some of the required steps cannot be deemed to establish a failure to exhaust; rather, it simply leaves ambiguity as to the extent of his exhaustion efforts."). Second, while Defendants cite the three-step grievance procedure in place at NCCC, they do not explain what steps an inmate is supposed to take where, as here, the Grievance Coordinator never issued a "negative finding" for Plaintiff to appeal. *9 N.Y.C.R.R. § 7032.4*; *see also Randolph, 2007 U.S. Dist. LEXIS 68104, 2007 WL 2660282, at \*7* ("[A]lthough defendants refer to the inmate's obligation to complete all five steps of the grievance process, they fail to describe how an inmate whose grievance is simply ignored by the prison can appeal and thereby satisfy the exhaustion requirement."); *cf. Groenow, 2014 U.S. Dist. LEXIS 32149, 2014 WL 941276, at \*4* (noting that the defendant identified the procedural step to be taken "where an inmate does not receive a timely response to his grievance," but nevertheless declining to dismiss on exhaustion grounds where the plaintiff "has not conceded that he did not take that step"). Third, **[\*27]** assuming a procedure exists for such circumstances, Plaintiff has not indicated that he is aware of that procedure, and Defendants do not contend otherwise. *See generally Groenow, 2014 U.S. Dist. LEXIS 32149, 2014 WL 941276, at \*4*; *but see Wade v. Fischer, No. 10-CV-5417, 2012 U.S. Dist. LEXIS 47084, 2012 WL 1118206, at \*2 (E.D.N.Y. Mar. 30, 2012)* ("Plaintiff cannot deny, however, his awareness of *§ 701.8(g)* DOCS Directive # 4040, which he himself submits to the Court, setting forth in pertinent part: 'If the superintendent fails to respond within the required twenty-five day time limit the grievant may appeal his/her grievance to CORC. This is done by filing a Notice of Decision to Appeal (Form # 2133) with the inmate grievance clerk.'").

The Court further observes that Plaintiff's allegations may be sufficient to show that he informally exhausted his administrative remedies. The Second Circuit has stated that administrative remedies may be "informally" exhausted where "the regulations advise inmates 'to attempt to resolve a problem on [their] own' before resorting to formal procedures." *Hemphill, 380 F.3d at 682 n.4* (quoting *7 N.Y.C.R.R. § 701.3(a)*). The regulations governing grievance procedures at NCCC state that "[e]very effort shall be made to resolve inmate complaints in an informal manner." *9 N.Y.C.C.R.R. § 7032.1*. Plaintiff's submissions also indicate that, prior to filing his first grievance, he (1) submitted the October 2, 2014 **[\*28]** Sick Call Request regarding his spider bite, *see* 10/2/14 Sick Call Request; and (2) gave a spider he found in his cell to a corrections officer, *see* Am. Compl. ¶ II(C)(1). These measures could be construed as attempts by Plaintiff to resolve his complaints about the unsanitary conditions at NCCC through "informal channels." *Ortiz, 323 F.3d at 194*; *see Hemphill, 380 F.3d at 682 n.4*.

Ultimately, such informal efforts will only satisfy the exhaustion requirement "if the efforts resulted in the matter being concluded in the inmate's favor." *Thomas v. Cassleberry, 315 F. Supp. 2d 301, 304 (W.D.N.Y. 2004)* (quoting *Nelson v. Rodas, No. 01-CV-7887, 2002 U.S. Dist. LEXIS 17359, 2002 WL 31075804, at \*3 n. 9 (S.D.N.Y. Sept. 17, 2002)* (internal quotation marks omitted)); *accord Dabney v. Pegano, No. 10-CV-1109, 2013 U.S. Dist. LEXIS 141899, 2013 WL 5464776, at \*17 n.9 (N.D.N.Y. Sept. 30, 2013)* aff'd, *604 F. App'x 1 (2d Cir. 2015)*; *Goodson v. Silver, No. 09-CV-0494, 2012 U.S. Dist. LEXIS 137177, 2012 WL 4449937, at \*9 (N.D.N.Y. Sept. 25, 2012)*. Here, Plaintiff asked "for the cells to be exterminated," 10/6/14 Grievance, and, in response, Defendants sent an exterminator to exterminate Plaintiff's cell. Defendants essentially argue that because Plaintiff alleges he still sees spider, mice, and roaches *after* the extermination, his grievance was not resolved in his favor. *See* Def.'s Mem. at 6-7. However, the Court finds that, under the circumstances presented here, the fact that Defendants (1) sent Plaintiff the November 7, 2014 Grievance Receipt, and (2) complied with Plaintiff's request to exterminate his cell, could be considered a "favorable resolution" of Plaintiff's grievance **[\*29]** even though, according to Plaintiff's allegations, the unsanitary conditions at NCCC have not been completely resolved. *Dabney, 2013 U.S. Dist. LEXIS 141899, 2013 WL 5464776, at \*17 n.9* ("The exhaustion requirement is satisfied in such a case because the inmate would not have had any reason to appeal a favorable resolution and thus would be relieved of the duty to complete the grievance process.") (citing *Andrews v. Cruz, No. 04—CV—566, 2010 U.S. Dist. LEXIS 28124, 2010 WL 1141182, at \*6 (S.D.N.Y.*

Mar. 24, 2010)); see also Goodson, 2012 U.S. Dist. LEXIS 137177, 2012 WL 4449937, at *9 ("[W]hen a matter has been concluded in the inmate's favor, it has been resolved (for purposes of his available exhaustion remedies), because nothing exists from which the inmate can appeal.") (footnote omitted).

In sum, construing the allegations in the Amended Complaint and Plaintiff's other submissions in a light most favorable to him, and considering them with regard to the applicable law, the Court concludes that dismissal of Plaintiff's conditions of confinement claim based on non-exhaustion is inappropriate at this juncture. Accordingly, the Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be DENIED to the extent that it seeks to dismiss Plaintiff's conditions of confinement claim due to Plaintiff's purported failure to exhaust his administrative remedies.

**b. Inadequate [*30]  Medical Care Claim**

However, the Court finds that dismissal for non-exhaustion is warranted with respect to Plaintiff's inadequate medical care claim. Critically, Plaintiff has not alleged that he filed a formal grievance regarding the medical care he received at NCCC. See Quezada v. Ercole, No. 09-CV-2832, 2011 U.S. Dist. LEXIS 83432, 2011 WL 3251811, at *5 (S.D.N.Y. July 29, 2011) (finding that the plaintiff failed to exhaust his disability claims where the plaintiff "does not allege that he filed grievances with the [Inmate Grievance Resolution Committee] regarding these claims, and DOCS has no record of such a grievance having been filed"); Rodriguez v. Mount Vernon Hosp., No. 09-CV-5691, 2010 U.S. Dist. LEXIS 103494, 2010 WL 3825736, at *14 (S.D.N.Y. Sept. 7, 2010) report and recommendation adopted, No. 09-CV-5691, 2010 U.S. Dist. LEXIS 103539, 2010 WL 3825715 (S.D.N.Y. Sept. 30, 2010) aff'd, No. 09-CV-5691, 2010 U.S. Dist. LEXIS 112325, 2010 WL 3959602 (S.D.N.Y. Oct. 5, 2010) (finding that the plaintiff did not exhaust his administrative remedies where the plaintiff "does not allege, nor does he present any evidence, that he filed a formal grievance"); see also Rentas v. Nason, No. 09-CV-5528, 2010 U.S. Dist. LEXIS 99549, 2010 WL 3734086, at *1 (S.D.N.Y. Sept. 22, 2010) ("The plaintiff does not allege that he filed a grievance relating to the alleged removal of crutches. The plaintiff cannot pursue his claim in federal court without first having exhausted his administrative remedies.") (footnote omitted). Although Plaintiff generally alleges the he filled out a grievance on October 6, 2014, see Am Compl. ¶ II.C.1,

the Court has reviewed the October 6, 2014 Grievance and finds that it does [*31] not address the medical care Plaintiff received at NCCC. See 10/6/14 Grievance. Moreover, the fact that Plaintiff "fill[ed] out a few sick call requests[s]" concerning his spider bite did not excuse him from filing a formal grievance. Am. Compl. § II.C.1; 10/2/14 Sick Call Request; see Crook v. Sanchez, No. CV 13-328, 2014 U.S. Dist. LEXIS 178981, 2014 WL 7399313, at *14 (E.D.N.Y. Feb. 12, 2014) (plaintiff's assertion that he 'continued to write to medical'" instead of filing a grievance not sufficient to show proper exhaustion); Cruz v. DeMarco, No. 12-CV-4277, 2013 U.S. Dist. LEXIS 125549, 2013 WL 4719086, at *7 (E.D.N.Y. Sept. 3, 2013) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules," and thus, submitting sick call requests does not properly exhaust an agency's available administrative remedies.") (internal alterations, citations, and quotation marks omitted); see also Williams v. Metro. Det. Ctr., 418 F. Supp. 2d 96, 101 (E.D.N.Y. 2005) ("While the complaint shows that [plaintiff] did make efforts to gain medical attention through letters and conversations with [the warden] and the medical staff, these efforts do not include the required steps of the PLRA's administrative remedy process.").

Plaintiff also has not alleged any facts which would excuse his failure to exhaust his administrative remedies with respect to his claims of inadequate medical care. Specifically, Plaintiff has not asserted that [*32] (1) the administrative remedies were not actually available to him at NCCC; (2) Defendants own actions prevented Plaintiff from grieving his unexhausted claim; or (3) special circumstances exist which warrant Plaintiff's being excused for fulfilling the requirement of proper exhaustion. See Hemphill, 380 F.3d at 686. In short, the Court finds no basis to conclude from Plaintiff's submissions that any of the Hemphill factors apply to excuse non-exhaustion here. See, e.g., Gomez v. Chill, No. 11-CV-6844, 2015 U.S. Dist. LEXIS 50800, 2015 WL 1853110, at *6 (S.D.N.Y. Apr. 17, 2015) report and recommendation adopted, No. 11-CV-6844, 2015 U.S. Dist. LEXIS 74320, 2015 WL 3862709 (S.D.N.Y. June 9, 2015); Shamel v. Agro, No. 11-CV-9473, 2013 U.S. Dist. LEXIS 27336, 2013 WL 704162, at *2 (S.D.N.Y. Feb. 26, 2013).

Accordingly, because a liberal reading of Plaintiff's Amended Complaint and other submissions indicates that he did not exhaust his administrative remedies with respect to the claim of inadequate medical care, and Plaintiff has not alleged that an explanation exists for his failure to do so, Defendants have met their burden of

proving that this claim should be dismissed. However, the Court recommends that Plaintiff's claim for inadequate medical care be dismissed, without prejudice, and that Plaintiff be given the opportunity to amend this claim after attempting to comply with the applicable exhaustion requirements, if that is still possible. *See Neal v. Goord, 267 F.3d 116, 123 (2d Cir. 2001)* ("We have recognized that failure to exhaust administrative **[*33]** remedies is usually a curable, procedural flaw that can be fixed by exhausting those remedies and then reinstituting the suit." (citation and internal quotation marks omitted)), *overruled in part on other grounds by Porter, 534 U.S. at 516; Bennett v. Wesley, 11-CV-8715, 2013 U.S. Dist. LEXIS 61133, 2013 WL 1798001, at *7 (S.D.N.Y. Apr. 29, 2013)* ("Where, as here, a prisoner has failed to exhaust his available administrative remedies, the law is clear that the appropriate disposition of the unexhausted claims is dismissal without prejudice.") (alteration, citation, and internal quotation marks omitted); *Davis v. Reilly, 324 F. Supp. 2d 361, 366 (E.D.N.Y. 2004)* ("If a prisoner's failure to exhaust administrative remedies is merely a 'temporary, curable, procedural flaw' that the plaintiff can cure by exhausting the remedies, dismissal without prejudice is appropriate.") (quoting *Snider v. Melindez, 199 F.3d 108, 111-12 (2d Cir. 1999)*).

For the foregoing reasons, the Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be GRANTED, to the extent that it seeks to dismiss Plaintiff's claim of inadequate medical care based on failure to exhaust administrative remedies, and that Plaintiff's inadequate medical care claim be DISMISSED, without prejudice.

## B. *Section 1983* Claims

*Section 1983* provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of **[*34]** any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . .

*42 U.S.C. § 1983*. "*Section 1983* provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia, U.S. , 132 S. Ct. 1657, 1661, 182 L. Ed. 2d 662 (2012)*; *see Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999)*. Thus, to state a claim under *Section 1983*, a plaintiff must "'allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States.'" *Rae v. Cnty. of Suffolk, 693 F. Supp. 2d 217, 223 (E.D.N.Y. 2010)* (quoting *Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999)*); *see Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010)* (quoting *Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994)*); *see also Rehberg v. Paulk, U.S. , 132 S.Ct. 1497, 1501-02, 182 L. Ed. 2d 593 (2012)*. *Section 1983* does not create any independent substantive rights but rather is a vehicle to "redress . . . the deprivation of [federal] rights established elsewhere." *Thomas, 165 F.3d at 142*.

Defendants argue that Plaintiff has failed to state a plausible *Section 1983* claim against them. *See* Def.'s Mem. at 3-5. According to Defendants, the allegations in the Amended Complaint "fail to identify the violation of any existing federal or constitutional right," and that even if he had identified such a right, Plaintiff's allegations "do not rise **[*35]** to the level of a federal or constitutional deprivation." *Id.* at 3-4. In particular, Defendants assert that Plaintiff has neither alleged facts sufficient to state a claim for deliberate indifference to his medical needs, nor demonstrated that Sheriff Sposato was personally involved in such constitutional violation. *Id.* at 4. Defendants further contend that NCCC is a "non-suable entity" and Plaintiff's claims against it must therefore be dismissed. *Id.* at 6-7.

Although Plaintiff opposes dismissal of his Amended Complaint, he has not presented any arguments to refute Defendants' assertions. His opposition instead largely restates the allegations from his Amended Complaint. *See generally* Pl's Opp'n. Plaintiff does maintain that "[t]he office of the Nassau County Attorney agrees that the County of Nassau is the suable entity," and he therefore "added the County of Nassau and . . . Sheriff Michael Sposato" as party defendants to this action. *Id.* at 2.

For the reasons explained below, the Court finds that Plaintiff has failed to state a *Section 1983* claim against the Defendants.

### 1. Acting Under the Color of State Law

2016 U.S. Dist. LEXIS 16531, *35

### a. Sheriff Sposato

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations **[*36]** is a prerequisite to an award of damages under *§ 1983*." *Spavone v. New York State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013)* (quoting *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)* (internal quotation marks omitted)); *see, e.g., Grullon v. City of New Haven, 720 F.3d 133, 138-39 (2d Cir. 2013); Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010)* (quoting *Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006)* (citation omitted)). "An individual cannot be held liable for damages under *§ 1983* 'merely because he held a high position of authority.'" *Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 127 (2d Cir. 2004)* (quoting *Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996)).* A complaint based upon a violation of *Section 1983* which does not allege facts establishing the personal involvement of an individual defendant "fails as a matter of law." *Gaines v. Armor Health Care, Inc., No. 12-CV-5663, 2013 U.S. Dist. LEXIS 174241, 2013 WL 6410311, at *3 (E.D.N.Y. Dec. 9, 2013)* (citing *Costello v. City of Burlington, 632 F.3d 41, 48-49 (2d Cir. 2011)).*

As an initial matter, it is unclear from the Amended Complaint whether Plaintiff intends to assert claims against Sheriff Sposato in his individual capacity or his official capacity, or both. *See generally* Am. Compl. Defendants do not address the issue or Plaintiff's allegations against Sheriff Sposato except to state that he "had no personal involvement" in Plaintiff's inadequate medical care claim. *See* Def.'s Men. at 4.

To the extent Plaintiff intends to sue Sheriff Sposato in his official capacity, it well settled that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity [of which the officer is an agent]." *Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)*; *accord Castanza v. Town of Brookhaven, 700 F. Supp. 2d 277, 283-84 (E.D.N.Y. 2010)* ("Official-capacity suits generally represent only another way of pleading **[*37]** an action against an entity of which an officer is an agent." (brackets omitted) (internal quotation marks and citation omitted)). Thus, "[w]ithin the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Phillips v. Cnty. of Orange, 894 F. Supp. 2d 345, 385 (S.D.N.Y. 2012)* (collecting cases). Here, because the County is named in the Amended

Complaint, the claims against Sheriff Sposato in his official capacity should be dismissed as duplicative and redundant. *See, e.g., Stancati v. Cty. of Nassau, No. 14-CV-2694, 2015 U.S. Dist. LEXIS 43802, 2015 WL 1529859, at *2 (E.D.N.Y. Mar. 31, 2015)* (dismissing *Section 1983* official capacity claims against Sheriff Sposato and a deputy sheriff as "duplicative and redundant" to the plaintiff's claims against Nassau County); *Reid v. Nassau Cnty. Sheriff's Dep't, No. 13—CV—1192, 2014 U.S. Dist. LEXIS 117471, 2014 WL 4185195, at *11 (E.D.N.Y. Aug. 20, 2014)* (dismissing *Section 1983* claims against Sheriff Sposato in his individual capacity "as redundant to [the plaintiff's] claims against the County").

As for Plaintiff's individual capacity claims against Sheriff Sposato, to survive a motion to dismiss, Plaintiff must state sufficient facts demonstrating that Sheriff Sposato was personally involved in the alleged constitutional violations. *See, e.g., Stancati, 2015 U.S. Dist. LEXIS 43802, 2015 WL 1529859, at *2*. Plaintiff's sole allegation against Sheriff **[*38]** Sposato is that he "fail[ed] . . . to properly maintain the Nassau County Correctional Center with respect to sanitation and extermination of vermin" — an alleged failure which led to Plaintiff being "bitten by a spider and exposed to MRSA." Am Compl. ¶ IV; *see id.* at p. 6 (same); Pl.'s Opp'n at 1 (same). The Court views this allegation as an attempt to impose liability against Sheriff Sposato based on his supervisory position.

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

*Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014)* (quoting *Colon, 58 F.3d at 873*); *see Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir. 2003)*; *Solomon v. Nassau Cty., 759 F. Supp. 2d 251, 256 (E.D.N.Y. 2011)* (citing *Spencer v. Doe, 139 F.3d 107,*

112 (2d Cir. 1998)).[7] Regardless of the basis for liability, "a Section 1983-based complaint must . [*39] . . allege particular facts indicating that an individual defendant was *personally involved* in the deprivation of the plaintiff's constitutional rights; mere 'bald assertions and conclusions of law' do not suffice." *Davis v. Cnty. of Nassau, 355 F. Supp. 2d 668, 677 (E.D.N.Y. 2005)* (emphasis in original) (quoting *Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996)).*

_____

[7] In *Iqbal*, the Supreme Court stated that "[b]ecause vicarious liability is inapplicable to . . . [S]ection 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *556 U.S. at 676*. The Second Circuit has not decided how *Iqbal* affected the standards for establishing supervisory liability articulated in *Colon. See Raspardo, 770 F.3d at 117* ("We have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after *Iqbal*.") (citation omitted); *Reynolds v. Barrett, 685 F.3d 193, 205 n. 14 (2d Cir. 2012))* ("*Iqbal* has, of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon* . . . . But the fate of *Colon* is not properly before us . . . ") (internal citations omitted). However, "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" [*40] *A'Gard v. Perez, 919 F. Supp. 2d 394, 407 (S.D.N.Y. 2013)* (quoting *Aguilar v. Immigration & Customs Enforcement Div., 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)).*

Here, Plaintiff's allegations do not satisfy any of the five possible bases for personal liability described in *Colon.* Thus, regardless of the "viability" of the *Colon* factors, "Plaintiff has failed to plead the requisite personal involvement to sustain the claims against [Sheriff Sposato]." *Lindsey v. Butler, 43 F. Supp. 3d 317, 330 (S.D.N.Y. 2014) on reconsideration in part, No. 11-CV-9102, 2014 U.S. Dist. LEXIS 156591, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014) reconsideration denied, 2015 U.S. Dist. LEXIS 43059, 2015 WL 1501625 (S.D.N.Y. Apr. 1, 2015); see Grullon, 720 F.3d at 139* ("Although the Supreme Court's decision in *Iqbal* . . . may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations, we need not reach *Iqbal*'s impact on Colon in this case, for [the plaintiff's] initial complaint did not adequately plead the Warden's personal involvement even under *Colon*.") (internal citation omitted); *Doe v. Whidden, 557 F. App'x 71, 73 (2d Cir. 2014)* (summary order) ("We need not decide how the Supreme Court's decision in *Iqbal* . . . affected the standards for establishing supervisory liability as articulated in *Colon* . . . , as Doe has not adduced sufficient evidence to show personal involvement under either standard.") (internal citations omitted).

Even with a liberal construction, the Amended Complaint lacks any factual allegations demonstrating that Sheriff Sposato was personally [*41] involved in Plaintiff's conditions of confinement or the adequacy of medical treatment he received at NCCC. Specifically, Plaintiff does not allege that Sheriff Sposato directly participated in the alleged constitutional violations, nor has Plaintiff alleged any facts, other than those underlying his isolated constitutional violations, which create an inference that Sheriff Sposato: (1) was aware of the constitutional violations and failed to remedy them, (2) created a policy or custom under which unconstitutional violations occurred, (3) was grossly negligent in supervising subordinates who committed the violations, or (4) was deliberately indifferent to Plaintiff's rights by failing to act on information indicating that unconstitutional acts were occurring. *See Harris v. Sposato, No. 15-CV-00396, 2015 U.S. Dist. LEXIS 48985, 2015 WL 1651083, at *3 (E.D.N.Y. Apr. 14, 2015)* (dismissing the plaintiff's claim against Sheriff Sposato where "[the] plaintiff does not allege any conduct or inaction attributable to him"); *Hernandez v. Sposato, No. 12-CV-2530, 2014 U.S. Dist. LEXIS 94611, 2014 WL 3489818, at *4 (E.D.N.Y. July 9, 2014)* (same where the plaintiff did not allege "any conduct attributable to Sheriff Sposato" and "seeks to impose liability on [hi]m only because of the positions [he] hold[s]); *Solomon, 759 F. Supp. 2d at 256* (holding that "[b]ecause the Plaintiff has not provided any evidence that Sposato and [Sheriff Edward] Reilly were 'personally involved' [*42] in any alleged failure to maintain a safe prison environment, the Court dismisses the claims against Sposato and Reilly in their entirety"). Ultimately, Plaintiff's allegations "only attempt to hold Sheriff Sposato liable on a theory of *respondeat superior*, which, under *Section 1983*, is not a viable theory of liability." *Stancati, 2015 U.S. Dist. LEXIS 43802, 2015 WL 1529859, at *3* (citing *Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003)* ("Supervisor liability in a *§ 1983* action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*." (brackets omitted)); *see Harris, 2015 U.S. Dist. LEXIS 48985, 2015 WL 1651083, at *3* ("A supervisor cannot be liable for damage under *Section 1983* solely by virtue of being a supervisor because there is no *respondeat superior* liability under *Section 1983*.") (citing *Richardson, 347 F.3d at 435*). Plaintiff therefore has not set forth a plausible *Section 1983* claim against Sheriff Sposato.

Accordingly, the Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be GRANTED to the extent it seeks dismissal of Plaintiff's

*Section 1983* claims against the Sheriff Sposato, and that Plaintiff's claims against the Sheriff Sposato be DISMISSED.

**b. NCCC**

"[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued." *Mendoza v. Cnty. of Nassau, 11—CV—02487, 2012 U.S. Dist. LEXIS 140961, 2012 WL 4490539 at *4 (E.D.N.Y. Sept. 27, 2012)* **[*43]** (citation omitted); *see Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002)*; *see also Robischung—Walsh v. Nassau County Police Department, 699 F. Supp. 2d 563, 565 (E.D.N.Y. 2010)*, *aff'd, 421 F. App'x 38 (2d Cir. 2011)*. The NCCC is an administrative arm of Nassau County, without a separate legal identity, and Plaintiff's claims against the NCCC are therefore redundant to his claims against the County. *See Melendez v. Nassau County, No. 10-CV-2516, 2010 U.S. Dist. LEXIS 97881, 2010 WL 3748743, at *5 (E.D.N.Y. Sept. 17, 2010)* (dismissing the plaintiff's claims against the Nassau County Sheriff's Department Division of Correction and the Nassau County Correctional Center because those entities are "administrative arms of Nassau County, and therefore are not suable entities"); *Benn v. Nassau Cty., No. 10-CV-1963, 2010 U.S. Dist. LEXIS 74568, 2010 WL 2976540, at *3 (E.D.N.Y. July 22, 2010)* (dismissing claims against the NCCC and other entities named in the complaint because they "are all administrative arms of their respective municipalities"); *see also Torres v. Nassau Cty. Jail, No. 11-CV-0264, 2011 U.S. Dist. LEXIS 53993, 2011 WL 1900125, at *3 (E.D.N.Y. May 19, 2011)* ("The Nassau County Jail is an administrative arm of Nassau County without an independent legal identity."). In light of these principles, Plaintiff cannot maintain his suit against the NCCC.

Accordingly, the Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be GRANTED to the extent it seeks dismissal of Plaintiff's *Section 1983* claims against the NCCC, and that Plaintiff's claims against the NCCC be DISMISSED.

**c. Nassau County**

"[A] municipality can be held liable under *Section 1983* if the deprivation **[*44]** of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven, 691 F.3d 72, 80 (2d Cir.2012)*, *cert. denied, ___ U.S. ___, 134 S. Ct. 125, 187 L. Ed. 2d 255 (2013)*; *accord Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 62 (2d Cir. 2014)*. "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Id.*; *see also Connick v. Thompson, 563 U.S. 51, 131 S.Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011)* (holding that under *§ 1983*, governmental bodies are not vicariously liable for their employees' actions); *Los Angeles Cnty., Calif. v. Humphries, 562 U.S. 29, 131 S. Ct. 447, 452, 178 L. Ed. 2d 460 (2010)* ("[A] municipality cannot be held liable solely for the acts of others, *e.g.*, solely because it employs a tortfeasor." (emphasis in original) (quotations and citation omitted)); *Monell, 436 U.S. at 691*.

To prevail on a *Section 1983* claim against a municipal entity, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008)*; *see also Connick, 563 U.S. 51, 131 S.Ct. at 1359* ("Plaintiffs who seek to impose liability on local governments under *Section 1983* must prove that 'action pursuant to official municipal policy' caused their injury." (quoting *Monell, 436 U.S. at 691*)); *Humphries, 562 U.S. 29, 131 S.Ct. at 452* ("[A] municipality may be held liable when execution of a government's policy or custom . . . inflicts the injury" (quotations and citation omitted)). "A municipal **[*45]** policy may be pronounced or tacit and reflected in either action or inaction." *Cash v. County of Erie, 654 F.3d 324, 333 (2d Cir. 2011)* *cert. denied, ___ U.S. ___, 132 S. Ct. 1741, 182 L. Ed. 2d 528 (2012)*. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick, 563 U.S. 51, 131 S.Ct. at 1359*.

To state a claim for municipal liability under *Section 1983*, a plaintiff must allege more than that a municipal policy or custom exists. *See Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995)* ("[T]he mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference[.]" (quotations, brackets, ellipsis and citation omitted)). "Rather, a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a

municipal policy or custom exists." *Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012)* (citing *Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993))* (internal citations omitted); *accord Triano v. Town of Harrison, NY, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012)*.

Here, Plaintiff alleges that he "was bitten by a spider and exposed to MRSA due to the failure of the Sheriff and the County to properly maintain the Nassau County Correctional Center with respect to sanitation and extermination of vermin." Am Compl. ¶ IV; *see id.* at p. 6 (same). Plaintiff further asserts that the NCCC "is a[n] unhygienic and **[*46]** unsanitary nightmare," *id.* at p. 7, which has no procedures in place for regular extermination, *see* Pl.'s Opp'n at 2. These bare allegations are insufficient to state a claim for municipal liability. *See Zahra, 48 F.3d at 685*. Plaintiff also has not alleged any facts which support the inference that the purported failure to exterminate vermin and maintain sanitary conditions at the NCCC was "the result of a municipal policy or custom of deliberate indifference." *Hernandez, 2014 U.S. Dist. LEXIS 94611, 2014 WL 3489818, at *5*. In particular, Plaintiff has not alleged facts from which the Court may reasonably infer:

> (1) the existence of a formal policy which is officially endorsed by the County . . . ; (2) actions taken or decisions made by County . . . policymaking officials which caused the alleged violation of his civil rights; (3) a County . . . practice so persistent and widespread as to practically have the force of law; or (4) a failure by County . . . policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with their employees.

*Whitenack v. Armor Med., No. 13-CV-2071, 2014 U.S. Dist. LEXIS 154028, 2014 WL 5502300, at *8 (E.D.N.Y. Oct. 30, 2014)*; *see also Gaines, 2013 U.S. Dist. LEXIS 174241, 2013 WL 6410311, at *4*; *Sulehria v. City of N.Y., 670 F. Supp. 2d 288, 320 (S.D.N.Y. 2009)*; *Davis, 224 F. Supp. 2d at 478*. Finally, Plaintiff has not alleged the existence of a custom or policy of Nassau County regarding inadequate medical care, let alone that such **[*47]** a policy caused a deprivation of his civil rights.

Based on the foregoing analysis, the Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be GRANTED to the extent it seeks dismissal of Plaintiff's *Section 1983* claims against Nassau County, and that Plaintiff's claims against Nassau

County be DISMISSED.

## C. Deprivation of a Constitutional Right

Because the Court recommends to Judge Bianco that the Amended Complaint be dismissed based on Plaintiff's failure to state a valid *Section 1983* claim against the Defendants, the Court need not address whether Plaintiff has adequately alleged that Defendants violated his constitutional rights by subjecting him to unconstitutional conditions of confinement and failing to provide him with adequate medical care. However, in light of the fact that the Court also recommends that Plaintiff be granted leave to amend his pleadings, the Court will undertake an analysis of Plaintiff's constitutional claims. For the reasons set forth below, the Court concludes that Plaintiff has failed to state a claim based on unconstitutional conditions of confinement or inadequate medical care.

### 1. Constitutional Standards

While a convicted prisoner's claims regarding **[*48]** prison conditions or inadequate medical care are analyzed under the *Eighth Amendment* proscription of cruel and unusual punishment, that prohibition does not apply to pre-trial detainees, who may not be "punished" prior to an adjudication of guilt. *Caiozzo, 581 F.3d at 69*; *see Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996)*. Instead, a pre-trial detainee held in state custody receives protection against such mistreatment under the *Due Process Clause of the Fourteenth Amendment*. *Caiozzo, 581 F.3d at 69*. As noted, Plaintiff has not specified whether he is an incarcerated prisoner or a pre-trial detainee, and thus it is not clear whether the *Eighth Amendment* or the *Fourteenth Amendment* applies to his constitutional claims. The Supreme Court has not "precisely limned" the duties of a custodial official under the *Due Process Clause* to provide safe prison conditions and adequate medical treatment to a pre-trial detainee, but "it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant, 101 F.3d at 856* (citing *City of Revere, 463 U.S. at 244* ("[T]he due process rights of a . . . [pretrial detainee] are at least as great as the *Eighth Amendment* protections available to a convicted prisoner[.]")); *see Caiozzo, 581 F.3d at 72*. Accordingly, Plaintiffs' claims "should be analyzed under the same standard irrespective of whether they are brought under the *Eighth* or *Fourteenth Amendment*." *Caiozzo, 581*

F.3d at 72; see Nielsen, 746 F.3d at 63 n.3; Rahman v. Schriro, 22 F. Supp. 3d 305, 312 (S.D.N.Y. 2014).


## 2. Conditions of Confinement

While "[t]he Constitution does not mandate comfortable **[*49]** prisons, . . . neither does it permit inhumane ones[.]" Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). To establish a claim under the Eighth or Fourteenth Amendment based on constitutionally unacceptable conditions of confinement, a plaintiff must show that the defendants acted with deliberate indifference. Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013). This standard has both an objective prong and a subjective prong. See id; Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996). Objectively, the inmate must show that the deprivation he suffered was "'sufficiently serious that he was denied the minimal civilized measure of life's necessities.'" Walker, 717 F.3d at 125 (quoting Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001)); see Farmer, 511 U.S. at 834. The plaintiff must also demonstrate that, subjectively, the defendant acted with "a sufficiently culpable state of mind.'" Walker, 717 F.3d at 125 (quoting Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001)); see Farmer, 511 U.S. at 834. That state of mind is one of deliberate indifference, in which a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes, 84 F.3d at 620.


## a. Objective Prong

To satisfy the objective prong, a plaintiff must plausibly allege facts indicating that the conditions of his confinement resulted "'in unquestioned and serious deprivations of basic human needs.'" Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir. 1985) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)). The Second Circuit has held "that prisoners may not be deprived of their basic human needs— **[*50]** e.g., food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to their future health." Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012) (internal citations omitted). "[T]here is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." Id. (quotations,

alterations and citation omitted); see also Walker, 717 F.3d at 125 (accord). However, "extreme deprivations are required to make out a conditions-of-confinement claim[ ] [b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society." Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992) (quotations and citation omitted); see also Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000) (accord). Moreover, "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." Hutto v. Finney, 437 U.S. 678, 686-87, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978) ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); see Reid v. Nassau Cty. Sheriff's Dep't, No. 13-CV-1192, 2014 U.S. Dist. LEXIS 117471, 2014 WL 4185195, at *14 (E.D.N.Y. Aug. 20, 2014) ("[C]onditions that are temporary or occasional . . . have been found not to constitute a sufficiently serious deprivation to sustain a Section 1983 deliberate indifference claim.") (internal quotation marks omitted).

The Second Circuit has acknowledged **[*51]** that allegations of "rodent infestation" may rise to the level of a constitutional violation. See Gaston, 249 F.3d at 165-66 (denying defendants' motion for summary judgment as to plaintiff inmate's claims of frigid temperatures, rodent infestation in his cell and collections of human waste and sewage water directly in front of his cell); see Reid, 2014 U.S. Dist. LEXIS 117471, 2014 WL 4185195, at *14. However, "'[t]he mere presence of vermin in a prisoner's housing area does not constitute punishment under the Eighth [or Fourteenth] Amendment.'" Cano v. City of New York, No. 13-CV-3341, 119 F. Supp. 3d 65, 2015 U.S. Dist. LEXIS 109126, 2015 WL 4865993, at *9 (E.D.N.Y. Aug. 13, 2015) (quoting McCoy v. Goord, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003)) (internal alteration omitted); accord Mena v. City of New York, No. 12-CV-0028, 2014 U.S. Dist. LEXIS 91105, 2014 WL 2968513, at *8-9 (S.D.N.Y. June 27, 2014). The plaintiff must plausibly allege facts suggesting that he was "regularly exposed to infestation or that infestation posed an unreasonable risk of damage to . . . [his] health." Cano, 2015 U.S. Dist. LEXIS 109126, 2015 WL 4865993, at *9 (granting summary judgment on condition of confinement claim where, inter alia, the plaintiffs "merely state that they saw roaches, insects, flies, and mice," and nothing more); Mena, 2014 U.S. Dist. LEXIS 91105, 2014 WL 2968513, at *10 (dismissing condition of confinement cause of action where there was "no evidence of vermin in significant numbers" and the plaintiff only claimed there was "vermin present" in the prison facility).

2016 U.S. Dist. LEXIS 16531, *51

Here, Plaintiff alleges that the NCCC "is a[n] unhygienic and unsanitary nightmare," that NCCC "has no extermination procedures or vermin [*52] control whatsoever," and that the facility is "heavily vermin infested with mice[], roaches, spiders and other bugs." Pl.'s Opp'n at 2. As a consequence of Defendants' purported failure to properly maintain the NCCC "with respect to sanitation and extermination of vermin," Plaintiff alleges that he "was bitten by a spider and . . . exposed to MRSA." Am. Compl. § IV. Plaintiff's spider bite and MRSA diagnosis required medical treatment, and Plaintiff alleges that he "continue[s] to feel pain and discomfort as a result of the poisonous spider bite." *Id.* at p. 6; *see id.* ¶ IV.A. Specifically, Plaintiff suffers from "severe pain" and swelling in his back and spine area which "hinder [him] from doing a lot of the things [he] use[d] to do, and leaves [him] with a result of sleepless nights." *Id.* at p. 6. Even though Defendants sent an exterminator to his cell, Plaintiff alleges that he still sees mice, roaches, and spiders at NCCC, *id.* § II.C.2, and that his allegations are based on "personal knowledge" he has gained throughout two years of detention at that facility. Pl.'s Opp'n at 2.

Reading Plaintiff's allegations liberally and in his favor, the Court finds that Plaintiff has alleged enough facts to show that he was exposed [*53] to objectively serious prison conditions. *See Walker, 717 F.3d at 125*. Plaintiff has alleged more than the mere presence of vermin at NCCC. *See Mena, 2014 U.S. Dist. LEXIS 91105, 2014 WL 2968513, at *10*. Plaintiff claims that NCCC is "heavily infested" with roaches, mice, spiders, and other bugs and that, due to Defendants' failure to implement regular procedures for extermination, he was bitten by a spider and exposed to MRSA. *See* Am. Compl. § IV., IV.A; Pl.'s Opp'n at 2. Plaintiff's spider bite may have been an isolated incident, but there is nothing in Plaintiff's submissions to suggest that the conditions he complains of were "temporary or occasional." *Reid, 2014 U.S. Dist. LEXIS 117471, 2014 WL 4185195, at *14*. Rather, Plaintiff appears to allege that the vermin infestation has been a problem throughout the two years he has been confined at NCCC. *See* Pl.'s Opp'n at 2. Moreover, Plaintiff's allegations could be reasonably construed as stating that he is "regularly exposed to infestation" at NCCC, *Cano, 2015 U.S. Dist. LEXIS 109126, 2015 WL 4865993, at *9*, and that vermin exist there in "significant numbers," *Mena, 2014 U.S. Dist. LEXIS 91105, 2014 WL 2968513, at *10*. Finally, Plaintiff asserts that his spider bite and MRSA diagnosis required medical treatment, and that he still experiences pain emanating from the site of the "poisonous" spider bite. *See* Am. Compl. at p. 6. These allegations are sufficient to suggest that the vermin [*54] "infestation posed an unreasonable risk of damage to . . . [his] health." *Cano, 2015 U.S. Dist. LEXIS 109126, 2015 WL 4865993, at *9; see Solomon v. Nassau Cty., 759 F. Supp. 2d 251, 259 (E.D.N.Y. 2011)*, and that Plaintiff suffered a "cognizable injury as a result of the poor conditions of his confinement." *Martin v. Cty. of Nassau, 692 F. Supp. 2d 282, 295 (E.D.N.Y. 2010)*. For these reasons, the Court concludes that Plaintiff has satisfied the objective prong of his conditions of confinement claim.

**b. Subjective Prong**

Even though Plaintiff has shown that the conditions of his confinement are sufficiently serious, he has failed to satisfy the second, subjective prong of the deliberate indifference standard, which requires a showing that the Defendants acted with a sufficiently culpable state of mind. *See Jolly, 76 F.3d at 480*. To satisfy the subjective prong, a plaintiff must allege that the defendant knew of and disregarded "an excessive risk to inmate health or safety." *Jabbar, 683 F.3d at 57; see Farmer, 511 U.S. at 835*. "Merely negligent conduct does not give rise to claims under the [*Eighth* or] *Fourteenth Amendment*." *Jabbar, 683 F.3d at 57; see also Walker, 717 F.3d at 125* ("To meet the subjective element, the plaintiff must show that the defendant acted with 'more than mere negligence.'") (quoting *Farmer, 511 U.S. at 835*). "Evidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." *Walker, 717 F.3d at 125* (quoting [*55] *Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003))*. However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer, 511 U.S. at 844-45*. In sum, "a prison official may be held liable . . . for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id. at 847*.

Here, Plaintiff's Amended Complaint states that, after he filed grievances regarding his spider bite and the presence of vermin in his cell, Defendants sent an exterminator to treat his cell. *See* Am Compl. § II.C.2. Thus, by Plaintiff's own admission, prison officials have taken measures to address the vermin infestation problem of which Plaintiff complained. *See Farmer, 511*

2016 U.S. Dist. LEXIS 16531, *55

*U.S. at 847*. Although Plaintiff states that he still sees roaches, spiders, and mice after the extermination, this allegation is not sufficient to show that Defendants were deliberately indifferent to his health or safety. *See Nolley v. Lord, No. 96-CV-1621, 1997 U.S. Dist. LEXIS 17651, 1997 WL 698172, at *7 (S.D.N.Y. Nov. 10, 1997)* ("[A]llegations of the mere presence of roaches, ticks and cats, with no evidence to rebut defendants' affidavits that prison officials have taken measures to address **[\*56]** these problems, do not rise to deliberate indifference on the part of prison officials."); *see also Summerville v. Faciuna, No. 05-CV-6459, 2009 U.S. Dist. LEXIS 69294, 2009 WL 2426021, at *9 (W.D.N.Y. Aug. 6, 2009)* (granting summary judgment dismissing the plaintiff's condition of confinement claim where evidence showed that the prison superintendent had the plaintiff's cell sprayed by an exterminator and replaced the window screen of the cell, and where the plaintiff "failed to point to any evidence suggesting that [the defendant] acted with reckless indifference to [p]laintiff's health and safety by allowing him to be exposed to bugs"); *Shire v. Greiner, No. 02-CV-6061, 2007 U.S. Dist. LEXIS 98958, 2007 WL 840472, at *13 (S.D.N.Y. Mar. 15, 2007)* (evidence that the prison official defendant arranged to have exterminators treat the plaintiff's cells "belie[d his] unsupported claim that [the defendant] was deliberately indifferent to his needs"); *see generally Townsend v. Clemons, No. 12-CV-03434, 2013 U.S. Dist. LEXIS 30212, 2013 WL 818662, at *8 (S.D.N.Y. Jan. 30, 2013) report and recommendation adopted, 2013 U.S. Dist. LEXIS 30225, 2013 WL 868605 (S.D.N.Y. Mar. 4, 2013)* (dismissing the plaintiff's sanitation-related claims where the plaintiff "has not linked any of these alleged deprivations to defendants' 'deliberate indifference'"). For these reasons, the Court concludes that Plaintiff has not established the subjective element of his conditions of confinement claim, and his claim should therefore be dismissed.

## 2. Inadequate Medical Care

Similar to a claim decrying conditions of confinement, **[\*57]** a cause of action for inadequate medical care under the *Eighth* or *Fourteenth Amendment* requires the plaintiff to show that the defendants were deliberately indifferent to his or her serious medical needs. *Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)* (citing *Estelle v. Gamble, 429 U.S. 97, 105, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976))*. This standard has both an objective and a subjective prong. *Id.*; *Salahuddin v. Goord, 467 F.3d 263, 279-81 (2d Cir.*

*2006)*. The plaintiff must allege facts which plausibly show first, that he or she had an objectively "serious medical condition," and, second, that this condition was met with subjective "deliberate indifference" on the part of the defendants. *Caiozzo, 581 F.3d at 72* (quoting *Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000))*; *see Salahuddin, 467 F.3d at 279-81*; *Hathaway, 37 F.3d at 66* ("First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' Second, the charged official must act with a sufficiently culpable state of mind." (internal citations omitted)). "[N]ot every lapse in medical care is a constitutional wrong." *Salahuddin, 467 F.3d at 279*. Thus, if the plaintiff fails to satisfy either the objective or subjective prong, his or her deliberate indifference claim must be dismissed. *See, e.g., Butler v. Suffolk Cnty. Corr. Facility Med. Ctr., No. 11-CV-1463, 2013 U.S. Dist. LEXIS 40493, 2013 WL 1193065, at *5 (E.D.N.Y. Mar. 22, 2013)*; *Stevens v. City of N.Y., No. 12-CV-3808, 2013 U.S. Dist. LEXIS 2851, 2013 WL 81327, at *3, *3 n.1 (S.D.N.Y. Jan. 8, 2013)*, *aff'd, 541 F. App'x 111 (2d Cir. 2013)* (citing *Goris v. Breslin, 402 F. App'x 582, 584 (2d Cir. 2010))*.

### a. Objective Prong

To satisfy the objective prong of the deliberate indifference standard, a plaintiff must show "his [or her] medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'" *Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005)* (quoting *Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998))*; *see Salahuddin, 467 F.3d at 279*.

Here, Plaintiff **[\*58]** alleges that he was bitten by a spider and contracted a MRSA infection. *See* Am. Compl. § IV; IV.A . There is "no[] dispute that MRSA constitutes a serious medical condition that may produce death, degeneration, or extreme pain." *Washington v. Westchester Cty. Dep't of Correction, No. 13-CV-5322, 2014 U.S. Dist. LEXIS 58015, 2014 WL 1778410, at *5 (S.D.N.Y. Apr. 25, 2014)*; *see Gaines, 2013 U.S. Dist. LEXIS 174241, 2013 WL 6410311, at *5* ("MRSA indeed could be a sufficiently serious condition.") (citing *Wargula v. Erie Cnty. Sheriff Dep't, No. 08—CV—0280, 2010 U.S. Dist. LEXIS 5685, 2010 WL 376402, at *4 (W.D.N.Y. Jan. 25, 2010)* (assuming that the plaintiff's MRSA infection constituted a sufficiently serious medical condition); *Ramirez v. Strange, No. 08—CV—0906, 2010 U.S. Dist. LEXIS 99252, 2010 WL 3828002, at *8 (D. Conn. Sept. 21, 2010)* (defendants conceded that a MRSA infection is a serious medical need)); *accord Mathews v. Pallito, No.*

2016 U.S. Dist. LEXIS 16531, *58

12-CV-58, 2014 U.S. Dist. LEXIS 137353, 2014 WL 4805333, at *11 (D. Vt. Sept. 26, 2014). Moreover, in light of Plaintiff's allegations describing the severity of his spider bite, *i.e.*, that it swelled to the size of a golf ball, had to be drained of pus and blood by Armor medical staff, and continues to cause him "severe pain" requiring him to take "numerous pain killers and muscle relaxer[s]," Am Compl. at p. 6-7, the Court finds that Plaintiff has demonstrated, at this stage of the litigation, that this injury was also objectively serious. *See Tiggs v. City of New York, No. 07—CV—7254, 2009 U.S. Dist. LEXIS 23299, 2009 WL 602991, at *2 (S.D.N.Y. Feb. 24, 2009)* ("Although failure to treat an insect bite unto itself likely does not rise to the level of a constitutional violation, failure **[*59]** to timely treat a bite that appears seriously infected—as Plaintiff's bite may have been when he requested and was denied medical attention— could conceivably constitute such a violation . . . . [D]epending on the appearance of Plaintiff's alleged injury when he requested and was denied medical assistance, Plaintiff may be able to establish that his medical need was 'sufficiently serious' to satisfy the objective prong of the deliberate indifferen[ce] test.") (footnote omitted). Accordingly, Plaintiff has satisfied the first prong of his claim for inadequate medical care.

**b. Subjective Prong**

Plaintiff must also show, however, that Defendants acted with "a sufficiently culpable state of mind" in denying him adequate medical care. *Salahuddin, 467 F.3d at 280-81; see Hathaway, 99 F.3d at 553.* "To satisfy the second prong, the plaintiff must allege that the defendants 'knew of and disregarded an excessive risk to inmate health or safety' and that they were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw the inference.'" *Thomas v. Nassau Cnty. Corr. Ctr., 288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003)* (quoting *Chance, 143 F.3d at 703*) (internal alterations omitted); *see Caiozzo; 581 F.3d at 72* (quoting *Farmer, 511 U.S. at 837*); *see also Collazo v. Pagano, 656 F.3d 131, 135 (2d Cir. 2011)* ("Subjectively, the official must have acted with the requisite state of mind, the 'equivalent of criminal **[*60]** recklessness.'") (quoting *Hathaway, 99 F.3d at 553*).

Here, Plaintiff has not alleged any facts to show that Defendants acted deliberately indifferent to his medical needs. To the contrary, Plaintiff's assertions indicate that Defendants consistently administered medical care to treat his spider bite and the resulting MRSA infection.

According to the Amended Complaint, Plaintiff received medical treatment for his spider bite the same day he filed an emergency sick call request. *See* Am. Compl. at p. 6. When a sample taken from Plaintiff's wound came back from the lab a week later showing that Plaintiff tested positive for MRSA, Plaintiff was immediately transferred to the medical clinic, where he remained until he was "medical[y] cleared for MRSA." *Id.; see Gaines, 2013 U.S. Dist. LEXIS 174241, 2013 WL 6410311, at *5* (finding allegations of deliberate indifference insufficient where the "[p]laintiff alleges that he complained of a 'condition' through a sick call, that [d]efendants did not treat him until three days later, and that infection then "'set in'"). Although Plaintiff maintains that he still suffers "severe pain" in his back and spine from the spider bite, Plaintiff admits that Armor medical staff have prescribed him antibiotics, pain medications and muscle relaxers in response to his discomfort, **[*61]** and that he is currently taking "6 pills." Am. Compl. at pp. 6-7. In fact, Plaintiff has listed nine "witnesses" from Armor whom Plaintiff claims dressed his spider bite wound and prescribed him various medications. *See id. at 8-9.*

Accordingly, in light of Plaintiff's allegations that he has received ongoing medical treatment at NCCC, Plaintiff has not shown that Defendants acted with the requisite deliberate indifference to his serious medical needs. *See Thomas v. Westchester Cty., No. 12-CV-6718, 2013 U.S. Dist. LEXIS 93697, 2013 WL 3357171, at *4 (S.D.N.Y. July 3, 2013)* (noting that the plaintiff's amended complaint "details the ongoing medical treatment that he received" and holding that the plaintiff "has not set forth any facts plausibly showing that any Defendant's occasional failure to change his bandages was accompanied by the requisite state of mind"); *see also McKenna v. Wright, No. 01-CV-6571, 2002 U.S. Dist. LEXIS 3489, 2002 WL 338375, at *6 (S.D.N.Y. Mar. 4, 2002)* ("Instead of illustrating that Defendants acted with deliberate indifference to his serious medical condition, Plaintiff's moving papers and accompanying exhibits, as well as Defendants' opposition papers and affidavits, show that the defendant physicians provided adequate medical care in light of the difficult circumstances presented by Plaintiff's related Hepatitis C and decompensated cirrhosis conditions."). "Even affording Plaintiff the **[*62]** special solicitude due *pro se* litigants, there are simply no facts rendering it plausible that Defendants acted with a state of mind akin to criminal recklessness." *Thomas, 2013 U.S. Dist. LEXIS 93697, 2013 WL 3357171, at *5* (citing *Phelps v. Kapnolas, 308 F.3d 180, 186 (2d Cir. 2002)).* For these reasons, the Court concludes that Plaintiff has not

established the subjective element of his inadequate medical care claim, and his claim should therefore be dismissed.

Accordingly, the Court respectfully recommends to Judge Bianco that Defendants' motion be GRANTED to the extent it seeks dismissal of Plaintiff's *Section 1983* claims for failure to adequately allege a deprivation of his constitutional rights.

### D. State Law Negligence Claims

In addition to his *Section 1983* claims, Plaintiff raises negligence claims against Defendants based on their failure to properly maintain NCCC. *See* Am Compl. § V. Negligence is a state common law claim. Under *28 U.S.C. § 1367*, which governs a federal court's exercise of supplemental jurisdiction, "[t]he district court may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction." *28 U.S.C. § 1367(c)(3)*; *see Spiegel v. Schulmann, 604 F.3d 72, 78 (2d Cir. 2010)*. Indeed, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors [of judicial economy, **[*63]** convenience, fairness, and comity] will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie—Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)*; *see Tops Mkts., Inc. v. Quality Markets, Inc., 142 F.3d 90, 103 (2d Cir. 1998)* ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them *without* prejudice.") (emphasis in original).

Here, the Court has recommended that Plaintiff's *Section 1983* claims be dismissed. The Court further finds that there are no exceptional circumstances in this case which would require the Court to decide Plaintiff's negligence claims. Likewise, interests of judicial economy, convenience, comity and fairness are not violated by refusing to entertain matters of state law in this case. *See generally Carnegie—Mellon Univ., 484 U.S. at 350 n.7*. Accordingly, this Court respectfully recommends to Judge Bianco that the Court decline supplemental jurisdiction over Plaintiff's negligence claims, and that these claims be DISMISSED, without prejudice.

### VI. LEAVE TO RE-PLEAD

Plaintiff previously moved to amend his Complaint. *See* DE 13. Judge Bianco granted Plaintiff's motion on the grounds that Plaintiff was "permitted to file an amended **[*64]** complaint as of right" pursuant to *Rule 15(a)(1)(B)*. DE 14. Although Plaintiff has not made a second request for leave to amend his pleadings, the Court has considered whether Plaintiff should be given an opportunity to re-plead his claims against the Defendants.

"When addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Aquino v. Prudential Life & Cas. Ins. Co., 419 F. Supp. 2d 259, 278 (E.D.N.Y. 2005)*; *see also Thompson v. Carter, 284 F.3d 411, 419 (2d Cir. 2002)* ("The liberal pleading standards applicable to *pro se* civil rights complaints in this circuit require that the district court give [plaintiff] an opportunity to flesh out his somewhat skeletal complaints before dismissing them"). The Second Circuit has stated that "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. Cnty. of Nassau, 180 F.3d 42, 53 (2d Cir. 1999)*, *overruled on other grounds by Gonzaga v. Doe, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002)*; *see also Fed. R. Civ. P. 15(a)(2)* ("The court should freely give leave [to amend] when justice so requires."). Thus, a court should only deny a *pro se* plaintiff leave to amend when "it is 'beyond doubt that the plaintiff can provide no set of facts in support' of his amended claims." *Pangburn v. Culbertson, 200 F.3d 65, 71 (2d Cir. 1999)* (quoting *Ricciuti v. N.Y. City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991))*.

Even under this liberal standard, however, a court may decline **[*65]** to provide the plaintiff with an opportunity to re-plead if the court finds that the plaintiff "cannot correct the defects in his federal claims" and therefore "any attempt to amend the pleading . . . would be futile." *Shorter v. Rice, No. 12-CV-0111, 2012 U.S. Dist. LEXIS 54028, 2012 WL 1340088, at *5 (E.D.N.Y. Apr. 10, 2012)*; *see Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)* ("The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). To that end, denial of leave to amend on the basis of futility may be appropriate where a claim is dismissed on the grounds that a party lacks the capacity to be sued. *See, e.g., Parker v. Mangano, No. 15-CV-1258, 2015 U.S. Dist. LEXIS*

2016 U.S. Dist. LEXIS 16531, *65

51659, 2015 WL 1841358, at *4 (E.D.N.Y. Apr. 20, 2015) (denying leave to re-plead claims against Nassau County Jail because "any amendment to plaintiff's claims against the Jail would be futile because it lacks capacity to be sued"); Joseph v. Nassau Cnty. Corr. Ctr., No. 12-CV-4414, 2013 U.S. Dist. LEXIS 59118, 2013 WL 1702162, at *9, n.5 (E.D.N.Y. Apr. 19, 2013) (holding that, because the Nassau County Correctional Center and the Nassau County Sheriff's Department "are not suable entities[,] . . . it is abundantly clear that any attempt to re-plead claims against those particular entities would be futile.").

Based on the foregoing case law and the Court's analysis of Plaintiff's claims set forth *supra* in this Report and Recommendation, the Court recommends to Judge Bianco that Plaintiff's **[*66]** claims against NCCC be dismissed with prejudice, and without leave to re-plead, because NCCC is not a suable entity. As to Sheriff Sposato and Nassau County, although the current allegations are deficient, there is some "indication that a valid claim might be stated" against these defendants. Cuoco, 222 F.3d at 112 (internal quotation marks and citation omitted). As discussed in this Report and Recommendation, if Plaintiff intends to re-plead his inadequate medical care claim, he will need to demonstrate that he has complied with the applicable exhaustion requirements. Accordingly, the Court respectfully recommends to Judge Bianco that Plaintiff be granted leave to re-plead his Section 1983 claims and state law claims against Sheriff Sposato and Nassau County.

## VII. CONCLUSION

Based on the foregoing findings, the Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be GRANTED, in part, and DENIED, in part. In particular, the Court recommends that the motion be DENIED insofar as it seeks dismissal based on Plaintiff's failure to exhaust his administrative remedies with respect to his conditions of confinement claim, and that the motion otherwise be GRANTED. The Court further recommends that **[*67]** Plaintiff's Amended Complaint be DISMISSED, without prejudice, and with leave to amend, with the exception of Plaintiff's claims against NCCC.

## VIII. OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* FED. R. CIV. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court via ECF. Any objections being filed by a *pro se* litigant are to be sent by first-class mail to the Clerk of the Court. A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Joseph F. Bianco, and to the Chambers of the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Bianco prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Beverly v. Walker, 118 F.3d 900, 901 (2d Cir. 1997), cert. denied, 522 U.S. 883, 118 S. Ct. 211, 139 L. Ed. 2d 147 (1997); Savoie v. Merchants Bank, 84 F.3d 52, 60 (2d Cir. 1996).

**Defendants' counsel is directed to serve a copy of this Report and Recommendation upon the *Pro Se* Plaintiff forthwith by overnight mail and first-class mail and to file proof of such service on ECF.**

SO ORDERED.

Dated: Central Islip, New York

February 2, 2016

/s/ A. Kathleen Tomlinson **[*68]**

A. KATHLEEN TOMLINSON

U.S. Magistrate Judge

---

End of Document

A Neutral
As of: April 23, 2020 7:07 PM Z

## Forrest v. Nassau Cnty. Corr. Ctr.

United States District Court for the Eastern District of New York

February 25, 2016, Decided; February 25, 2016, Filed

14-CV-6979 (JFB) (AKT)

**Reporter**
2016 U.S. Dist. LEXIS 25609 *

HORATIO FORREST, Plaintiff, -against- NASSAU COUNTY CORRECTIONAL CENTER, THE COUNTY OF NASSAU, AND SHERIFF MICHAEL SPOSATO, Defendants.

**Prior History:** _Forrest v. Cnty. of Nassau, 2016 U.S. Dist. LEXIS 16531 (E.D.N.Y., Feb. 2, 2016)_

## Core Terms

amended complaint, motion to dismiss, de novo review, report and recommendation, district judge, recommended, asserted claim, confinement, entirety, replead, notice

**Counsel:** **[*1]** Horatio Forrest, Plaintiff, Pro se, East Meadow, NY.

For Nassau County Correctional Center, The County Of Nassau, Sheriff Michael Sposato, Defendants: Thomas Lai, Nassau County Attorney Office, Mineola, NY.

**Judges:** JOSEPH F. BIANCO, United States District Judge.

**Opinion by:** JOSEPH F. BIANCO

## Opinion

ORDER

JOSEPH F. BIANCO, District Judge:

On November 20,2014, plaintiff filed a complaint in this action, proceeding _pro se_ and asserting claims against defendants, the County of Nassau, Nassau County Correctional Center ("NCCC"), and Sheriff Michael Sposato, (collectively, "defendants"). Plaintiff filed an amended complaint on April 9, 2015, asserting claims against the same defendants. Plaintiff alleges that defendants violated his constitutional rights by subjecting him to unconstitutional conditions of confinement and by acting with deliberate indifference to his serious medical needs. On June 1, 2015, defendants filed a motion to dismiss, and on July 28, 2015, the Court referred the motion to dismiss to Magistrate Judge Tomlinson for a Report and Recommendation ("R&R"). On February 2, 2016, Magistrate Judge Tomlinson issued a memorandum recommending that the motion to dismiss be granted in part and denied in part. Specifically, **[*2]** Magistrate Judge Tomlinson recommended that defendants' motion be denied "insofar as it seeks dismissal based on Plaintiff's failure to exhaust administrative remedies with respect to his conditions of confinement claim," but otherwise, be granted. (_See_ R&R, ECF No. 45, at 48.) Magistrate Judge Tomlinson recommended that plaintiff's Amended Complaint be dismissed "without prejudice and with leave to amend, with the exception of Plaintiff's claims against NCCC." (_Id._) The R&R instructed that any objections to the R&R be submitted within fourteen (14) days of receipt of the R&R (_See id._) The date for filing any objections has since expired, and plaintiff has not filed any objection to the R&R.

Where there are no objections, the Court may adopt the report and recommendation without _de novo_ review.

2016 U.S. Dist. LEXIS 25609, *2

*See* *Thomas v. Arn, 474 U.S. 140, 150, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)* ("It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."); *see also* *Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002)* ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial **[*3]** review of the magistrate's decision."); *cf.* *28 U.S.C. § 636(b)(1)(C)* and *Fed. R. Civ. P. 72(b)(3)* (requiring *de novo* review after objections). However, because the failure to file timely objections is not jurisdictional, a district judge may still excuse the failure to object in a timely manner and exercise its discretion to decide the case on the merits to, for example, prevent plain error. *See* *Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003)* ("[B]ecause the waiver rule is non jurisdictional, we 'may excuse the default in the interests of justice.'" (quoting *Thomas, 474 U.S. at 155*)).

Although plaintiff has waived any objection to the R&R and thus *de novo* review is not required, the Court has conducted a *de novo* review of the R&R in an abundance of caution and HEREBY ADOPTS the well-reasoned and thorough R&R in its entirety.

IT IS ORDERED that the motion to dismiss is granted and that plaintiff's complaint is dismissed in its entirety with leave to replead to correct the pleading deficiencies identified in Magistrate Judge' Tomlinson's R&R. However, because the NCCC is not a suitable defendant, the claims against the NCCC are dismissed with prejudice and without leave to replead. If plaintiff intends to pursue his claims, he may file an amended complaint stating claims against all defendants other than the NCCC **[*4]** within thirty (30) days of this Order. Plaintiff is warned that if he fails to file an amended complaint within thirty days, the Court may dismiss this case with prejudice, without further notice, for failure to prosecute, pursuant to Ru1e 4l(b) of the Federal Ru1es of Civil Procedure.

Dated: February 25, 2016

Central Islip, New York

SO ORDERED

/s/ Joseph F. Bianco

JOSEPH F. BIANCO

United States District Judge

---

**End of Document**